UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------- x

GLOBAL GOLD MINING, LLC,

                            Petitioner,

          - against -

PETER M. ROBINSON, AS PRESIDENT OF
INTERNATIONAL CHAMBER OF COMMERCE,
AN UNINCORPORATED ASSOCIATION, AND
INTERNATIONAL COURT OF ARBITRATION
OF THE INTERNATIONAL CHAMBER OF
COMMERCE, AN UNINCORPORATED
ASSOCIATION,

                        Respondents.

------------------------------------------- x

07 Civ. 10492 (GEL)

ECF CASE

<u>ELECTRONICALLY FILED</u>

## <u>NOTICE OF MOTION</u>

      PLEASE TAKE NOTICE that upon the attached (1) Declaration of Peter

M. Robinson, dated November 27, 2007 and (2) Notice of Petition Under N.Y. C.P.L.R. Article

75 and Petition Under N.Y. C.P.L.R. Article 75, and the accompanying Memorandum of Law in

Opposition to Petitioner's Petition and in Support of Respondents' Motion to Dismiss dated

December 4, 2007, Respondents International Chamber of Commerce and International Court of

Arbitration of the International Chamber of Commerce will move this Court, before the

Honorable Gerard E. Lynch, in Courtroom 6B, at the United States District Courthouse, 500

Pearl Street, New York, New York, on a date and time to be determined by the Court, pursuant

to Rules 12(b)(2), 12(b)(5) and 12(b)(6) of the Federal Rules of Civil Procedure, for an order

dismissing the Petition Under N.Y. C.P.L.R. Article 75 of Global Gold Mining, LLC and for

such other relief as the Court deems just and proper.

PLEASE TAKE FURTHER NOTICE that pursuant to the Stipulation and Order Extending Time, dated November 26, 2007, Petitioner's opposition papers are due by December 21, 2007.

Date:   New York, New York
        December 4, 2007

ALLEN & OVERY LLP

By:   /s/ Louis B. Kimmelman
        Louis B. Kimmelman
        Dana C. MacGrath
        Chintan V. Panchal

        *benno.kimmelman@allenovery.com*
        *dana.macgrath@allenovery.com*
        *chintan.panchal@allenovery.com*

1221 Avenue of the Americas
New York, New York  10020

*Attorneys for Respondents*
International Chamber of Commerce and
International Court of Arbitration of the
International Chamber of Commerce

TO:    Edward G. Kehoe
        Louisa B. Childs
        KING & SPALDING LLP
        1185 Avenue of the Americas
        New York, New York 10036

        *Attorneys for Petitioner*
        Global Gold Mining, LLC

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

GLOBAL GOLD MINING, LLC,

                                        Petitioner,

                -against-

PETER M. ROBINSON, AS PRESIDENT OF
INTERNATIONAL CHAMBER OF COMMERCE,
AN UNINCORPORATED ASSOCIATION, AND
INTERNATIONAL COURT OF ARBITRATION OF
THE INTERNATIONAL CHAMBER OF
COMMERCE, AN UNINCORPORATED
ASSOCIATION,

                                        Respondents.

---

NOTICE OF PETITION
UNDER N.Y. C.P.L.R.
ARTICLE 75

Index No.:07-_603576_

_Filed 10/29/07_

NEW YORK
COUNTY CLERK'S OFFICE

OCT 29 2007

NOT COMPARED
WITH COPY FILE

## NOTICE OF PETITION UNDER C.P.L.R. ARTICLE 75

PLEASE TAKE NOTICE that upon the annexed Petition Under N.Y. C.P.L.R.

Article 75, the Affirmation of Louisa B. Childs, dated October 26, 2007, and all exhibits thereto,

and the Memorandum of Law in Support of Petitioner Global Gold Mining, LLC's Petition

Under N.Y. C.P.L.R. Article 75, an application will be made to Submission Part, Room 130 at the

New York County Courthouse, 60 Centre Street, New York, New York on the 29th day of

November, 2007, at 9:30 A.M. of that day, or as soon thereafter as counsel can be heard, for an

Order directing the International Chamber of Commerce and the International Court of

Arbitration of the International Chamber of Commerce to submit to the tribunal of arbitrators in

ICA case number 14 770/EBS the question of its jurisdiction over Vardan Ayvazian, and for

such other and further relief as may be just, proper, and equitable, together with the costs and disbursements of this proceeding.

Venue in New York County is based upon the arbitration agreement among the parties and under Article 6(2) of the ICC Rules of Arbitration.

PLEASE TAKE FURTHER NOTICE that, pursuant to Rule 403(b) of the C.P.L.R., any ANSWERING PAPERS shall be served at least seven days prior to the return date of this Petition.

Dated:   New York, New York
         October 26, 2007

                                    KING & SPALDING LLP


                                    _Edward G. Kehoe_
                                    Edward G. Kehoe
                                    Louisa B. Childs
                                    1185 Avenue of the Americas
                                    New York, New York 10036
                                    Telephone: (212) 556-2100
                                    Facsimile:  (212) 556-2246

                                    R. Doak Bishop
                                    Wade M. Coriell
                                    1100 Louisiana, Suite 4000
                                    Houston, TX 77002-5213
                                    Phone: (713) 751-3200
                                    Fax: (713) 751-3290

                                    Kenneth R. Fleuriet
                                    25 Cannon Street
                                    London EC4M 5SE
                                    United Kingdom
                                    Phone:  +44 (0)20-7551-7500
                                    Fax:  +44 (0)20-7551-7575

                                    *Attorneys for Petitioner Global Gold Mining, LLC*


TO:    Peter M. Robinson
       President
       International Chamber of Commerce;
       International Court of Arbitration
       c/o U.S. Council for International Business
       1212 Avenue of the Americas
       New York, New York  10036

       *Respondents.*

891868

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GLOBAL GOLD MINING, LLC,

                                Petitioner,

           -against-

PETER M. ROBINSON, AS PRESIDENT OF
INTERNATIONAL CHAMBER OF COMMERCE,
AN UNINCORPORATED ASSOCIATION, AND
INTERNATIONAL COURT OF ARBITRATION OF
THE INTERNATIONAL CHAMBER OF
COMMERCE, AN UNINCORPORATED
ASSOCIATION,

                           Respondents.

PETITION UNDER N.Y.
C.P.L.R. ARTICLE 75

Index No.:07-_____

Petitioner Global Gold Mining, LLC, ("Global Gold"), by and through its attorneys, King & Spalding LLP, for its petition pursuant to CPLR §§ 7502(a) and 7503(a) against respondents, International Chamber of Commerce (the "ICC") and International Court of Arbitration of the International Chamber of Commerce (the "ICA"), an administrative arm of the ICC, states as follows:

## INTRODUCTION

     1.     In this case, the International Chamber of Commerce ("ICC") and its affiliate the International Court of Arbitration ("ICA") have violated New York law, the Federal Arbitration Act ("FAA"), and the ICC's own Rules by seeking to expand the scope of their authority into matters that are within the jurisdictional domain of the arbitration tribunal. Specifically, the ICC and ICA improperly have made a determination that an arbitration will not proceed against one of four respondents named in an arbitration action properly commenced by Petitioner Global

Gold Mining, LLC. But issues concerning the jurisdiction of the arbitration tribunal are to be decided by the arbitration tribunal, not the administrative organizations selected by the parties to assist with organizational aspects of administering the arbitration.

2.     In December 2003, Petitioner Global Gold Mining, LLC, executed an agreement to purchase all of the shares of an Armenian company, SHA, LLC (the "Company") from what Global Gold believed to be the three sole shareholders who signed the agreement (either in person or by power of attorney). Unknown to Global Gold at the time, a fourth owner, Vardan Ayvazian, who did not sign the agreement, directed the actions of the others. After the closing, Global Gold discovered that most of the various representations and warranties in the agreement were false and were breached, causing substantial losses to Global Gold.

3.     The sale agreement contained an arbitration clause providing that disputes under the agreement would be settled by a tribunal of three arbitrators under the Rules of the ICC. Under Article 6(2) of these ICC Rules, the ICA makes an initial determination as to whether an arbitration agreement exists. Once an agreement to arbitrate is found to exist, the matter is submitted to arbitration, and the tribunal of three arbitrators selected pursuant to the agreement of the parties decides all matters relating to the arbitration tribunal's own jurisdiction.

4.     In December 2006, Global Gold properly commenced an arbitration against Ayvazian and the three other shareholders by filing a Request for Arbitration with the ICC/ICA. The ICC/ICA reviewed the language of the SPA and correctly concluded that disputes relating to the SPA shall be resolved by arbitration. However, the ICA improperly dismissed Global Gold's claim against the non-signatory, Ayvazian. Under settled New York law of agency and equitable estoppel, Ayvazian is bound by the arbitration clause just as the signatories are bound. But the ICC/ICA improperly refuses to submit that important, substantive question to the arbitrators.

Rather, the ICC/ICA has unilaterally dismissed the case against Ayvazian prior to transmitting the case file to the Arbitration Tribunal. The ICC/ICA has no right to make this determination under the governing agreement, applicable law, or even the ICC's own rules. The ICA's decision is particularly unusual because one of the other respondent shareholders submitted an answer in the arbitration to the ICA expressly confirming and admitting that Ayvazian is an "undisclosed to Global Gold shareholder." (See Childs Aff.[1], Ex. A, at 1.) The questions of arbitrability and jurisdiction are to be resolved by the arbitrational tribunal, not the ICC/ICA.

5.      Global Gold respectfully seeks an order from the Court directing the ICC/ICA to submit to the arbitration tribunal (which is already convened) the question of whether Ayvazian, the non-signatory principal, is bound by the written agreement to arbitrate.

### THE PARTIES

6.      Petitioner Global Gold is a limited liability corporation organized under the laws of Delaware with its principal place of business in Greenwich, Connecticut.

7.      Upon information and belief, respondent ICC is a non-profit unincorporated association with its principal place of business in Paris, France, and offices throughout the world, including New York. Upon information and belief, at the time of the commencement of the action, Peter M. Robinson was the United States President thereof.

8.      Upon information and belief, respondent ICA is the administrative body attached to the ICC with its principal place of business in Paris, France, and offices throughout the world, including New York. Upon information and belief, at the time of the commencement of the action, Peter M. Robinson was the United States President of the ICC, which oversees the ICA.

---

[1] "Childs Aff." refers to the Affirmation of Louisa B. Childs, dated October 26, 2007, filed simultaneously with this Petition.

## JURISDICTION AND VENUE

9.  Jurisdiction over respondents ICC/ICA is predicated upon CPLR §§ 301 and 302, as well as consent.  By agreeing to administer an arbitration in New York, the ICC/ICA have likewise agreed to submit to the jurisdiction of New York Courts for disputes arising from their conduct in administering that arbitration.

10.  Venue is proper in New York County pursuant to CPLR § 7502(a) because the arbitration clause in the SPA specifies New York County as the place of arbitration.

11.  Jurisdiction and venue are also proper under Article 6(2) of the ICC Rules of Arbitration, which states that where the ICA makes a *prima facie* determination that an arbitration may not proceed, "any party retains the right to ask any court having jurisdiction whether or not there is a binding arbitration agreement."

## FACTUAL BACKGROUND

### A.    The Share Purchase Agreement and Ayvazian's Involvement

12.  Global Gold is an American company that invests in Armenia's gold-mining industry.  In the spring of 2003, Global Gold entered into negotiations with the "Company" for the purpose of acquiring its Armenian mining properties.  On December 21, 2003, Global Gold concluded and executed a Share Purchase Agreement ("SPA") with Mayren Batoyan, Edward Janibekian, and Yurik Lalazaryan, all citizens and residents of Armenia, pursuant to which Global Gold purchased all of the issued and outstanding shares of the Company.  (See Childs Aff., Ex. B).  At that time, Global Gold believed that Lalazaryan, Janibekian, and Batoyan were the sole owners of the Company.  The SPA was signed by Lalazaryan on behalf of himself, and, by power of attorney, his two fellow shareholders.  (See Childs Aff., Ex. B, at 103-04).

a.    Ayvazian, the Undisclosed Principle,
Negotiates, Approves, And Profits From The SPA

13.    After the SPA was fully executed, and Global Gold had made payment, Global Gold learned from law enforcement personnel that Respondent Ayvazian, who at the time was Armenia's Minister of the Environment,[2] was a secret participant and beneficial owner in the Company when the SPA was signed. In a March 19, 2007 response to Global Gold's Request for Arbitration, Respondent Lalazaryan confirms this fact by stating, ". . . I am not responsible for such violations made by other shareholders, including the undisclosed to Global Gold shareholder Vardan Ayvazian." (See Childs Aff., Ex. A at 1 (Yurik Lalazaryan's Submission to the ICA)).

14.    Further research by Global Gold has revealed that Ayvazian completely controlled the transaction on the seller's side. Specifically, Batoyan, Janibekian, and Lalazaryan negotiated the terms of the SPA on the basis of explicit instructions from Ayvazian, and every term in both the preliminary agreement and the SPA was approved by Ayvazian before the agreement was signed. (See Childs Aff., Ex. C, at 7-8; Ex. A, at 1). Moreover, after Global Gold paid Batoyan, Janibekian, and Lalazaryan for their shares, Ayvazian collected the entire purchase price and distributed the funds to the other sellers while keeping a share for himself. (See Childs Aff., Ex. C, at 7; Ex. A, at 1) Notably, Ayvazian personally approved and agreed to the SPA's clause providing for ICC arbitration as well as the selection of New York law as the governing law of the SPA. (See Childs Aff., Ex. C, at 8; Ex. A, at 1).

15.    Armenia's preeminent association of investigative journalists, called hetq, has noted in an article entitled "Vardan Ayvazian has a Special Fondness for Goldmines," that Ayvazian has "has registered the majority of his mines in the names of his relatives, friends and

---

[2] Ayvazian has since resigned from his government post.

5

employees." (See Childs Aff., Ex. D, at 1). Respondent Batoyan has acted as a "representative" for Ayvazian in other gold mine matters. The article describes Batoyan as a "friend and fellow villager of Vardan Ayvazian's wife" who has "also acted as Ayvazian's representative in other organizations . . . [although] Mayren Batoyan has no relation to mining and works at the Yerevan hospital." (See id.) hetq's descriptions of Batoyan, her relationship with the Ayvazians, and her role as Ayvazian's agent in establishing another mining company for Ayvazian strongly support Global Gold's portrayal of the principal-agent relationship between Ayvazian and his fellow shareholders Batoyan, Janibekian, and Lalazaryan.

     b.    <u>Seller Representations and Warranties in the SPA</u>

    16.    When Global Gold purchased all shares in the Company, it negotiated certain contractual promises from the former shareholders that would serve to protect the Company's assets and value as an ongoing business. The Company's mining activities depended significantly on the cooperation of Armenian government officials in issuing and respecting licenses, providing certain authorizations for work to be performed, handling official paperwork in a timely fashion, and generally cooperating with the Company in its exploration and mining activities. As a foreign investor, Global Gold sought to protect itself in the event that the Company's Armenian shareholders misrepresented the true value of the Company as an ongoing business, or cooperated illicitly with government officials like Ayvazian to ensure that the Company's shares, once owned by Global Gold, would have little or no real value. While Global Gold was entirely unaware of Ayvazian's status as an undisclosed shareholder when the SPA was signed, it was careful to secure commitments from the selling shareholders that, to the best of their knowledge, the Company's licenses, governmental authorizations, and other approvals were in order and as represented.

17.    Specifically, the former shareholders were responsible for full disclosure about the value of the Company's assets and business, the status of any Governmental Authorizations and Legal Requirements applicable at the time of the SPA or potentially applicable in the future, and any actual and potential limitations or restrictions on the Company's assets or business. (See Childs Aff., Ex. B §§ 3, 10). Moreover, the former shareholders promised that the Company was in full compliance with all laws and regulations and that no family members or any other individuals indirectly controlled by the former shareholders were involved in the negotiation of the SPA or in any businesses that competed or might ultimately compete with the Company. (See Childs Aff., Ex. B §§ 3.17, 3.19, 3.25). In sum, the former shareholders made multiple warranties as to the status and ownership of the Company as well as the legal and business environment into which Global Gold was entering by purchasing shares in the Company.

18.    But shortly after the SPA was executed, Global Gold began to realize that the former shareholders were guilty of egregious misrepresentations and omissions. Virtually every representation in the SPA was false, and almost every warranty was breached. For example, although the Sellers had represented and warranted that the Company's exploration licenses extended through 2017, Ayvazian, acting in his capacity as Minister of the Environment, arbitrarily reduced the terms of those licenses at the first available opportunity. (See Childs Aff., Ex. C, at 14; Ex. A, at 1). Although the Sellers had represented and warranted that the Company was in compliance with all Legal Requirements, and that its Governmental Authorizations were valid and in order, Ayvazian decided otherwise in his capacity as Minister of the Environment. Ayvazian justified his attacks on the Company's licenses and license applications based on the Company's alleged non-compliance with the necessary laws and regulations. (See id.). In sum, having made a series of representations to Global Gold about the Company, its licenses, and its

legal status, Ayvazian contradicted and reneged on those representations and warranties shortly after the execution of the SPA.

**B.**    **The Agreement to Arbitrate and the Administrative Role of the ICC**

19.    The SPA contains an arbitration clause (the "Arbitration Clause"), providing that all disputes under the agreement will be referred for final settlement to a panel of three arbitrators under the ICC's Rules of Conciliation and Arbitration, in New York, under New York law.  The Arbitration Clause provides:

> **11.5    Arbitration; Jurisdiction; Service of Process**
> The parties acknowledge that they are entering into and shall perform under this Agreement in good faith, and any disputes will be resolved in good faith, with the letter and spirit of this Agreement as the standard.  The Parties will use their best efforts to resolve any disputes between themselves within thirty (30) days.  During this thirty (30) day period, any party within ten (10) days' notice may request and the other party must agree to meet in good faith to resolve the dispute.  After thirty day's [sic] effort, if a dispute is not resolved, any party may refer the dispute for final settlement to and in accord with under the Rules of Conciliation and Arbitration of the International Chamber of Commerce, London, England (the "Rules") by a panel of three (3) arbitrators.
>
> In the case of any matter to be settled under the Rules, each party hereto shall appoint one arbitrator and such two arbitrators shall appoint a third arbitrators; provided, that if all three arbitrators have not been appointed within thirty (30) days after the party submitting the matter in dispute has notified the other party of such submission, either party hereto may apply to the International Chamber of Commerce for appointment of the remaining arbitrators.  The place of arbitration of any matter to be settled under the Rules shall be in New York City, or at such other place as the parties shall unanimously choose.  On a case-by-case basis, the parties may also agree to alternative dispute resolution methods.  Such an Agreement must be in writing and signed by both parties.

(See Childs Aff., Ex. B § 11.5.  See also SPA § 11.6 (providing that the agreement is governed by New York law)).

20.    The ICC is an association that provides a forum for international business issues and offers various administrative services in connection with dispute resolution.[3]  (See Childs Aff., Ex. E (ICC's website describing "What is ICC?", http://www.iccwbo.org/id93/index.html)).    Under the ICC's Rules of Arbitration ("ICC Rules"), the ICC organizes the administrative aspects of the arbitration and assists in connection with certain procedural issues. The ICC's administrative responsibilities include facilitating the appointment of arbitrators, collecting fees and reimbursement of expenses for arbitrators, and advising the parties and arbitrators of relevant procedures and timetables established by the Panel of Arbitrators.  (See Childs Aff., Ex. F (ICC Rules, Arts. 4, 8, 9, 13, 30, 31)).

21.    A subgroup of the ICC, called the International Court of Arbitration (the "ICA"), handles these administrative tasks on behalf of the ICC.    (See id. (ICC Rules, Art. 1(1)). Although the ICA subgroup has the word "Court" in its name, the ICA does not itself adjudicate disputes.  Substantive and jurisdictional determinations are made by the independent arbitrators who apply relevant state or national law.  (See Childs Aff., Ex. G (ICC's website describing "What the [ICA] Court Does," http://www.iccwbo.org/court/arbitration/id4590/index.html ("The Court organizes and supervises your arbitration and helps in overcoming obstacles.  It does not itself resolve disputes, a task that is carried out by independent arbitrators.  The Court makes every effort to ensure that the award is enforceable in national courts if need be, although in practice the parties usually comply."))).

---

[3] Arbitration can be institutional or *ad hoc*.  Institutional arbitration is conducted under the auspices of an arbitral institution and occurs when the parties agree to apply the rules of that institution.  The ICC, the American Arbitration Association (AAA), and the London Court of International Arbitration (LCIA) are the three preeminent arbitration institutions.  These organizations do not resolve disputes.  They provide administrative support for the arbitration. An *ad hoc* arbitration is one conducted by arbitrators without administrative support from an institutional body.

**C.     Procedural History**

22.     On November 2, 2006, Global Gold sent a "Notice of Dispute" to Respondents Ayvazian, Batoyan, Janibekian, and Lalazaryan advising them of a dispute under the SPA (the "Dispute"), as required by the Arbitration Clause (See Childs Aff., Ex. I).  The Respondents did not attempt to resolve the Dispute in good faith within the thirty-day period provided by the Arbitration Clause.  Thus, on December 28, 2006, Global Gold exercised its right under the SPA to arbitrate the Dispute.

23.     In accordance with the ICC Rules, Global Gold submitted a "Request for Arbitration" to the Secretariat of the ICA and named Ayvazian, Batoyan, Janibekian, and Lalazaryan as respondents.  Global Gold also submitted to the ICA a check for $2,500.00 as an advance payment on administrative expenses, and named Jonathan D. Schiller of the law firm Boies, Schiller, and Flexner LLP, as its party appointed arbitrator.[4]  (See Childs Aff., Ex. C, at 6).  The Secretariat of the ICC/ICA then notified Global Gold and the four Respondents that the ICC/ICA was in receipt of the Request for Arbitration and the date of the receipt, and served them with the Request.  (See Childs Aff., Ex. F (ICC Rules, Arts. 4(1),(5)).

24.     On March 12, 2007, the ICC/ICA sent a letter to the parties stating that it had "[d]ecided in accordance with Article 6(2) of the Rules" that arbitration of the Dispute should proceed only against Batoyan, Janibekian, and Lalazaryan, and not against Ayvazian, the non-signatory owner and principal.  (See Childs Aff., Ex. J, at 1).

---

[4] Jonathan D. Schiller is a co-founder and the Managing Partner of Boies, Schiller, and Flexner LLP.  He concentrates on complex litigation and international arbitration, including ICC arbitrations.  Mr. Schiller also serves as an arbitrator in ICC and other arbitrations.  (See Childs Aff., Ex. H (Boies, Schiller, and Flexner LLP's website entitled, "Jonathan D. Schiller," http://www.bsfllp.com/lawyers/data/0002)).

25.   By its terms, Article 6(2) of the ICC Rules directs the ICC/ICA to make an administrative observation and determination as to whether or not an arbitration agreement exists. If an agreement exists, the arbitration goes forward, and the arbitration tribunal decides the merits of the case with the ICC supplying administrative support. Article 6(2) of the ICC's Rules does not permit the ICC/ICA to make preliminary rulings on arbitrability and jurisdiction. Instead, Article 6(2) expressly states that such rulings shall be within the province of the arbitral tribunal itself ("[t]he [ICA] may decide…that the arbitration shall proceed if it is *prima facie* satisfied that an arbitration agreement under the Rules may exist. In such case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself." (See Childs Aff., Ex. F (ICC Rules Art. 6(2)).

26.   The March 12, 2007 letter from the ICC/ICA also confirmed Global Gold's appointment of Jonathan Schiller as arbitrator, and the ICC/ICA directly appointed a second arbitrator, Dr. Ivan Zykin, on behalf of the remaining three respondents because respondents' time to do so had expired.[5] (See Childs Aff., Ex. J, at 1). The ICC/ICA noted that Arbitrators Zykin and Schiller should jointly nominate the Chairman of the Arbitral Tribunal within 30 days. (See id.)

27.   On March 19, 2007, respondent Lalazaryan submitted a response to the Request for Arbitration. Lalazaryan admitted that Ayvazian was an "undisclosed . . . shareholder." (See Childs Aff., Ex. A, at 1).

---

[5] Dr. Zykin currently is a partner of Andrey Gorodissky & Partners, one of Russia's preeminent law firms, where he chairs the international arbitration practice group. He also serves as the Vice President of the International Commercial Arbitration Court at the RF Chamber of Commerce and Industry (ICAC). Dr. Zykin has served as an arbitrator in more than one hundred and fifty cases, including arbitrations under the ICC Rules. (See Childs Aff., Ex. K (Andrew Gorodissky & Partners' website entitled, "Ivan S. Zykin," http://www.agp.org.ru/english/lawyers/zykin.html)).

28.    On March 27, 2007, eight days after Lalazaryan filed his response, Global Gold requested that the ICC/ICA reconsider its decision to dismiss Respondent Ayvazian from the case.[6] (See Childs Aff., Ex. L). But the ICC/ICA refused. (See Childs Aff., Ex. N, at 2).

29.    On May 14, 2007, the ICC/ICA instructed the parties to proceed to arbitration without Ayvazian and advised that it had taken the necessary steps under the ICC Rules to appoint a chairman of the Tribunal. (See Childs Aff., Ex. N, at 2). The ICC/ICA took these steps because Mr. Schiller, the arbitrator nominated by Global Gold, and Dr. Zykin, the arbitrator nominated by the ICC/ICA on behalf of the respondents, had not agreed on the appointment of a chairman within the allotted time period. (See Childs Aff., Ex. I (ICC Rules Article 8(4))). The ICC/ICA also informed the parties that, in accordance with ICC Rules Article 13, it would transfer the case file to the Arbitral Tribunal once the Tribunal was fully convened. (See Childs Aff., Ex. N, at 2).

30.    In July 2007, the ICC/ICA denied a further request by Global Gold to reconsider its decision to dismiss Ayvazian from the case. ((See Childs Aff., Ex. O). By letter dated August 6, 2007, the ICC/ICA informed the parties that it had appointed Professor Hans Smit as Chairman of the Arbitral Tribunal upon the proposal of the Dutch National Committee of the

---

[6] Global Gold supplemented its request for reconsideration to the ICC/ICA on April 20, 2007, with additional evidence that Ayvazian commonly uses Batoyan as an agent to conduct business related to Armenia's mines. (See Childs Aff., Ex. M). Global Gold included a series of articles by Armenia's leading association of investigative journalists, hetq, exposing Ayvazian's acquisition of mineral holdings throughout the country. (See id.). Hetq has used public records to identify the shareholders of a number of companies owned by Ayvazian, his family, and his close associates. (See id.). The articles describe Ayvazian's use of close associates as agents. In particular, the article entitled "Vardan Ayvazian Has a Special Fondness for Goldmines" notes Ayvazian's use of Batoyan -- a "friend and fellow villager of . . . Ayvazian's wife" who has "also acted as Ayvazian's representative in other organizations" -- to establish a company called Grade Redmet Ltd. (See id.).

ICC.[7] The ICC/ICA directed the parties to correspond directly with the Arbitral Tribunal. (See Childs Aff., Ex. O, at 2). In compliance with Article 30 of the ICC Rules, the ICC/ICA also fixed advance costs at $280,000 to be divided and paid equally between Global Gold and the Respondents. (See id.). These advance costs are meant to cover the fees and expenses of the arbitrators and the ICC administrative costs. (See Childs Aff., Ex. F (ICC Rules Art. 30(2).).

31.    On August 6, 2007, the ICC/ICA transmitted the case file to the fully convened Arbitral Tribunal. (See Childs Aff., Ex. Q at 1). It informed the Tribunal that the place of arbitration would be New York, New York, according to the agreement of the parties. (See id. at 3). Importantly, in its August 6, 2007 letter, the ICC/ICA addressed its administrative finding as to arbitrability. It noted that on March 9, 2007, "being prima facie satisfied that an arbitration agreement under the Rules may exist, [the ICA] decided that this arbitration would proceed [against Batoyan, Janibekian, and Lalazaryan.] This decision being administrative in nature, the Arbitral Tribunal must still decide on its own jurisdiction in accordance with Article 6(2) of the Rules." (See id. at 5). But the Arbitration Tribunal can *not* decide whether it has jurisdiction over non-signatory Ayvazian, *because the ICA improperly dismissed Ayvazian from the case prior to transmitting the case to the Arbitration Tribuna*l.

32.    On October 19, 2007, the ICC/ICA wrote to Global Gold and confirmed that it had received Global Gold's advance costs of $140,000. (See Childs Aff. Ex. R, at 1-2).

33.    Today, the Arbitral Tribunal is poised to adjudicate Global Gold's claims against Batoyan, Janibekian, and Lalazaryan.

---

[7] Hans Smit is the Stanley H. Fuld Professor of Law at Columbia Law School, where he teaches civil procedure, international arbitration, international law and transactions, and conflict of laws. Mr. Smit writes extensively in the area of international arbitration, and he has been knighted by the Queen of the Netherlands (Order of Netherlands Lion). (See Childs Aff., Ex. P (Columbia Law School's website entitled, "Hans Smit," http://www.law.columbia.edu/fac/Hans_Smit)).

34.     Global Gold files this petition pursuant to New York's CPLR, and Article 6(2) of the ICC Rules, which expressly provides that a party retains the right to seek court intervention concerning the ICC/ICA's *prima facie* decision under Article 6(2).

## FIRST CAUSE OF ACTION
### (Declaratory Judgment Requiring the ICC/ICA to Submit the Issue of Arbitrability to the Arbitrators)

35.     Global Gold repeats and realleges each and every allegation contained in paragraphs 1 through 34 of this Petition as though fully set forth herein.

36.     In this case, an agreement to arbitrate exists.

37.     Under Article 6(2) of the ICC Rules, when a *prima facie* arbitration agreement exists, the arbitration tribunal shall decide all issues concerning jurisdiction and enforceability of the arbitration agreement (*i.e.*, arbitrability).

38.     This is consistent with governing federal and New York state law.

39.     By making the determination as to the Arbitration Tribunal's jurisdiction over Ayvazian, and refusing to submit the jurisdictional issue to the Arbitration Tribunal, the ICC/ICA has violated New York law, the FAA and the ICC's Rules.

40.     And, by any measure, Global Gold's Request for Arbitration made a "*prima facie*" demonstration that Ayvazian is subject to the Arbitration Clause in the SPA. Since Ayvazian controlled and orchestrated the entire transaction culminating in the execution of the SPA and personally approved each provision in the SPA (including the Arbitration Clause), Ayvazian is subject to the SPA's arbitration provision under a legal theory of agency.

41.     Because Ayvazian received the direct benefit of the SPA -- his share of the purchase price -- Ayvazian is also subject to the SPA's Arbitration Clause under the theory of equitable estoppel.

42.    Global Gold is entitled, under Article 6(2) of the ICC Rules, to have the question of whether Ayvazian is subject to the SPA's Arbitration Clause decided by the Arbitration Tribunal appointed to hear the case.

43.    Global Gold and the ICC/ICA dispute whether the Arbitration Clause is valid and binding between the real parties, and whether the arbitrability of the dispute should be referred to arbitrators to decide.

44.    By reasons of the foregoing, an actual controversy exists between Global Gold and the ICC/ICA with respect to the Global Gold's rights pursuant to the Arbitration Clause of the SPA, New York law, and federal law.

## **RELIEF REQUESTED**

WHEREFORE, petitioner Global Gold demands:

(i)    on the First Cause of Action, an Order directing the ICC/ICA to submit to the tribunal of arbitrators in ICA case number 14 770/EBS the question of its jurisdiction over respondent Ayvazian;

(ii)    attorneys' fees, costs and other expenses associated with bringing this Petition; and

(iii)    such other and further relief as this Court deems just and proper.

Dated: New York, New York
        October 26, 2007

KING & SPALDING LLP

*Edward G. Kehoe*

Edward G. Kehoe
Louisa B. Childs
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile:  (212) 556-2246

R. Doak Bishop
Wade M. Coriell
1100 Louisiana, Suite 4000
Houston, TX 77002-5213
Phone: (713) 751-3200
Fax: (713) 751-3290

Kenneth R. Fleuriet
25 Cannon Street
London EC4M 5SE
United Kingdom
Phone:  +44 (0)20-7551-7500
Fax:  +44 (0)20-7551-7575

*Attorneys for Petitioner Global Gold Mining, LLC*

STATE OF                                    COUNTY OF                    ss.:
I, the undersigned, an attorney admitted to practice law,

☐  Certification      certify that the within
    By Attorney       has been compared by me with the original and found to be a true and complete copy.

☐  Attorney's         state that I am
    Affirmation
                                                                      the attorney(s) of record for
                                                        in the within action; I have read the foregoing
                                                        and know the contents thereof; the same is
                                        true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and
                                        as to those matters I believe it to be true.  The reason this verification is made by me and not by

Check Applicable Box

          The grounds of my belief as to all matters not stated upon my own knowledge are as follows:


I affirm that the foregoing statements are true, under the penalties of perjury.
Dated:
                                                                      _____
                                                                      The name signed must be printed beneath


STATE OF                                    COUNTY OF                    ss.:
I,
                                                                      being duly sworn, depose and say: I am
☐  Individual         the                                 in the within action: I have read
    Verification      the foregoing                        and know the contents thereof; the same is true to
                      my own knowledge, except as to the matter therein stated to be  alleged on information and  belief, and as to
                      those matters I believe it to be true.

☐  Corporate         the                      of
    Verification     a                                     corporation and a party in the within action; I have read the foregoing
                                                        and know the contents thereof: and the same is true to my own knowledge.
Check Applicable Box  except as to the matters therein stated to be alleged upon information and belief, and as to those matters I
                      believe it to be true. This verification is made by me because the above party is a corporation and I am an
                      officer thereof.

The grounds of my belief as to all matters not stated upon my own knowledge are as follows:



Sworn to before me on                                20                _____
                                                                      The name signed must be printed beneath



STATE OF                                    COUNTY OF                    ss.: (If both boxes are checked — indicate after names, type of service used.)
I,                                                                    being duly sworn, say:  I am not a party to the action, am over 18 years
of age and reside at
On                                20          I served the within
☐  Service            by depositing a true copy thereof enclosed in a post-paid wrapper, in an official depository under the exclusive
    By Mail           care and custody of the U.S. Postal Service within this State addressed to each of the following persons at the
                      last known address set forth after each name:

☐  Personal           by delivering a true copy thereof personally to each person named below at the address indicated.  I knew each
    Service on        person served to be the person mentioned and described in said papers as *a party therein:*
    Individual

Check Applicable Box




Sworn to before me on                                20                _____
                                                                      The name signed must be printed beneath

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GLOBAL GOLD MINING, LLC,

Petitioner,                         Index No.:07-_____

-against-

PETER M. ROBINSON, AS PRESIDENT OF
INTERNATIONAL CHAMBER OF COMMERCE, AN
UNINCORPORATED ASSOCIATION, AND
INTERNATIONAL COURT OF ARBITRATION OF THE
INTERNATIONAL CHAMBER OF COMMERCE, AN
UNINCORPORATED ASSOCIATION,

Respondents.

# Notice of Petition and Petition

## KING & SPALDING LLP

*Attorney(s) for*

1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
(212) 556-2100

To                              Service of a copy of the within is hereby admitted.

Dated: ...........................................,20 .......

Attorney(s) for                 ................................................................