UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GLOBAL GOLD MINING, LLC,

Petitioner,

- against -

PETER M. ROBINSON, AS PRESIDENT OF INTERNATIONAL CHAMBER OF COMMERCE, AN UNINCORPORATED ASSOCIATION, AND INTERNATIONAL COURT OF ARBITRATION OF THE INTERNATIONAL CHAMBER OF COMMERCE, AN UNINCORPORATED ASSOCIATION,

Respondents.

07 Civ. 10492 (GEL)

ECF CASE

**ELECTRONICALLY FILED**

**MEMORANDUM OF LAW IN OPPOSITION TO PETITIONER'S PETITION AND IN SUPPORT OF RESPONDENTS' MOTION TO DISMISS**

**ALLEN & OVERY LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 610-6300
Facsimile: (212) 610-6399

*Attorneys for Respondents*
International Chamber of Commerce and
International Court of Arbitration of the
International Chamber of Commerce

December 4, 2007

**TABLE OF CONTENTS**

Table of Authorities……………………………………………………………………………ii-iv

Preliminary Statement…………………………………………………………..……………..…1

Factual Background…………………………………………………………..……….……....2

Argument……………………………………………….…………………..……….….......4

I. THE PETITION SHOULD BE DISMISSED FOR INSUFFICIENT SERVICE OF PROCESS AND LACK OF PERSONAL JURISDICTION....................4

A. Global Gold Failed to Properly Serve Respondents ……..……….……………..4

B. Global Gold Has Failed to Establish Personal Jurisdiction over the ICC and ICC Court…………………………………………..…........5

II. THE PETITION SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6)……………………….……….8

A. Global Gold Has Failed to Allege or Establish A Violation of the ICC Rules….....................................................................................8

1. Global Gold Agreed to ICC Arbitration Administered by the ICC Court ……………………………………………………..8

2. The ICC Court Applied Article 6(2) to Global Gold's Request for Arbitration……………………………………..…….11

B. Global Gold Has Failed to Allege A Violation of Federal Law……………..…14

1. Respondents Are Entitled to Arbitral Immunity………………………14

2. Global Gold Has Misinterpreted Federal Law with Regard to Who Determines Whether There is An Obligation to Arbitrate………..16

C. Global Gold Has Failed to Satisfy the Standard for Obtaining Mandatory Injunctive Relief ……………….....................................19

III. PETITIONER IS RESPONSIBLE FOR RESPONDENTS' COSTS AND ATTORNEYS' FEES…………………………………………………….……....21

Conclusion……..……………………………………………………………….………..22

## TABLE OF AUTHORITIES

### CASES

*Abdul Wali v. Coughlin*,
754 F.2d 1015 (2d Cir. 1985)....................19

*Apollo Computer, Inc. v. Berg*,
886 F.2d 469 (1st Cir. 1989)....................17, 18

*Austern v. Chicago Bd. of Options Exch., Inc.*,
898 F.2d 882 (2d Cir.), *cert. denied*, 498 U.S. 850 (1990)....................14, 15

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
902 F.2d 194 (2d Cir. 1990)....................5, 6

*Corey v. New York Stock Exch.*,
691 F.2d 1205 (6th Cir. 1982) ....................14, 15

*Daiei, Inc. v. U.S. Shoe Corp.*,
755 F. Supp. 299 (D. Haw. 1991) ....................17, 18

*Diemaco v. Colt's Mfg. Co., Inc.*,
11 F. Supp. 2d 228 (D. Conn. 1998)....................8, 12, 21

*eBay, Inc. v. MercExchange, L.L.C.*,
__ U.S. __, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2007)....................20

*First Options of Chicago v. Kaplan*,
514 U.S. 938 (1995)....................16, 17

*Gillardi v. Country Vill. Heights Condo.*,
461 N.Y.S.2d 972 (N.Y. Sup. Ct. 1983) ....................5

*Gray v. Permanent Mission of People's Republic of Congo*,
443 F. Supp. 816 (S.D.N.Y. 1978)....................4

*Jazini v. Nissan Motor Co.*,
148 F.3d 181 (2d Cir. 1998)....................5

*Leadsinger, Inc. v. Cole*,
No. 05 Civ. 5606, 2006 WL 2266312 (S.D.N.Y. Aug. 4, 2006) ....................4

*Masefield AG v. Colonial Oil Indus., Inc.*,
No. 05 Civ. 2231, 2005 WL 911770 (S.D.N.Y. Apr. 18, 2005)....................17

*New England Cleaning Servs., Inc. v. Am. Arbitration Assn.*,
199 F.3d 542 (1st Cir. 1999)....................................................................14, 15

*New York v. Shinnecock Indian Nation*,
No. 03-3243, 03- 3466, 2007 WL 3307089 (E.D.N.Y. Oct. 30, 2007).......................20

*Piecznik v. Cambridge Antibody Tech. Group*,
No. 03-336, 2004 WL 527045 (S.D.N.Y. Mar. 16, 2004)...........................................6

*Richardson v. Am. Arbitration Assn.*,
888 F. Supp. 604 (S.D.N.Y. 1995)..........................................................15, 16

*Shaw Group v. Triplefine Intn'l Corp.*,
322 F.3d 115 (2d Cir. 2003)..........................................................17, 18, 19

*Simonson v. Int'l Bank*,
200 N.E.2d 427 (N.Y. Ct. App. 1964) ..............................................................6

*Tom Doherty Assocs. v. Saban Entm't, Inc.*,
60 F.3d 27 (2d Cir. 1995) ..............................................................................20

*York Hannover A.G. v. Am. Arbitration Assn.*,
No. 92 Civ. 1634, 1993 WL 159961 (S.D.N.Y. May 11, 1993).............................8, 12

*York Research Corp. v. Landgarten*,
927 F.2d 119 (2d Cir. 1991)...........................................................................12

**STATUTES AND RULES**

Fed. R. Civ. P. 12(b)(2)........................................................................1, 4

Fed. R. Civ. P. 12(b)(5)......................................................................1, 4, 5

Fed. R. Civ. P. 12(b)(6)......................................................................1, 4, 5

9 U.S.C. § 4.......................................................................................17

9 U.S.C. § 201.....................................................................................2

9 U.S.C. § 202 ...................................................................................14

9 U.S.C. § 203 ...................................................................................14

9 U.S.C. § 206 ......................................................................17, 19, 20

9 U.S.C. § 207 ........17

New York C.L.S. Gen. Assn. § 13 (2007) ........5

New York C.P.L.R. § 301 ........6, 7

New York C.P.L.R. § 302 ........6, 7

New York C.P.L.R. § 7502(a) ........4

New York C.P.L.R. § 7503(a) ........4

**OTHER AUTHORITIES**

W. LAURENCE CRAIG, WILLIAM W. PARK AND JAN PAULSSON, INTERNATIONAL CHAMBER OF COMMERCE ARBITRATION (Oceana Publications, Inc., 3d ed. 2000) ........10, 12, 13, 14

YVES DERAINS & ERIC A. SCHWARTZ, A GUIDE TO THE ICC RULES OF ARBITRATION (Kluwer Law International, 2d ed. 2005) ........10, 13

Jennifer Kirby, *The ICC Court: A Behind-the-Scenes Look, in* INTERNATIONAL COURT OF ARBITRATION BULLETIN (Vol. 16, No. 2 Fall 2005) ........7, 9

ERIK SCHÄFER, HERMAN VERBIST AND CHRISTOPHE IMHOOS., ICC ARBITRATION IN PRACTICE (Kluwer Law International 2005) ........6, 8

Respondents International Chamber of Commerce ("ICC") and International Court of Arbitration of the International Chamber of Commerce ("ICC Court") (collectively, "Respondents")[1] submit this memorandum of law in opposition to the Petition Under N.Y. C.P.L.R. Article 75 ("Petition") filed by Petitioner Global Gold Mining, LLC ("Petitioner" or "Global Gold") and in support of Respondents' motion to dismiss the Petition pursuant to Rules 12(b)(2), 12(b)(5) and 12(b)(6) of the Federal Rules of Civil Procedure.[2]

**Preliminary Statement**

Rather than seek an order compelling arbitration against the non-signatory party with whom it claims to have an arbitration agreement, Global Gold instead has sued the international arbitral institution that it chose to administer its arbitration. Global Gold requests a mandatory injunction requiring the ICC and ICC Court to reverse an administrative determination made in accordance with the ICC's arbitration rules that the ICC Court was not *prima facie* satisfied that an arbitration agreement under the ICC Rules may exist between Global Gold and the non-signatory party with whom Global Gold seeks to arbitrate.

Although Global Gold agreed to arbitration under the ICC arbitration rules administered by the ICC Court, it now asks this Court to intervene in the ICC Court's administration of that arbitration. This is impermissible under federal law as well as the ICC arbitration rules. Furthermore, Global Gold failed to effect proper service or establish personal jurisdiction.

---

[1] Although the caption of this proceeding refers to "Peter M. Robinson, as President of International Chamber of Commerce," Mr. Robinson is not a Respondent. The Petition identifies the ICC and ICC Court as the only Respondents. Petition ¶¶ 7, 8.

[2] Together with its Petition, on October 29, 2007 Global Gold filed in state court a Notice of Petition, an Affirmation of Louisa B. Childs, dated October 26, 2007 ("Childs Decl.") and a Memorandum of Law in Support of Petitioner Global Gold Mining, LLC's Petition Under N.Y. C.P.L.R. Article 75 ("Petitioner's Mem."). A copy of Petitioner's October 29, 2007 filing is attached to Respondents' Notice of Removal.

As a result, the Petition should be dismissed and Respondents should be awarded their costs and attorneys' fees incurred in defending this proceeding.

**Factual Background**

Global Gold commenced this proceeding by filing a Petition for relief under Article 75 of the New York C.P.L.R. in the Supreme Court of the State of New York, New York County (the "Proceeding"). Respondents removed the Proceeding to this Court pursuant to Section 205 of the Federal Arbitration Act because it relates to an arbitral agreement governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), 21 U.S.T. 2517, as implemented by Chapter 2 of the Federal Arbitration Act, 9 U.S.C. § 201 *et seq*.

Global Gold alleges that it entered into a Share Purchase Agreement ("SPA") with three Armenian shareholders ("Three Shareholders") of an Armenian company in December 2003. Petition ¶ 12. Global Gold and the Three Shareholders signed the SPA. *Id*. The SPA contained an arbitration clause providing for arbitration in New York under the ICC Rules of Arbitration ("ICC Rules"):[3]

> … any party may refer the dispute for final settlement to and in accord with under [sic] the Rules of Conciliation and Arbitration of the International Chamber of Commerce …. The place of arbitration of any matter to be settled under the Rules shall be in New York City, or at such other place as the parties shall unanimously choose.

*Id.* ¶ 19; Childs Aff., Ex. C ¶ 11.5.

In December 2006, Global Gold commenced arbitration against the Three Shareholders as well as an alleged undisclosed fourth shareholder, Vardan Ayvazian ("Ayvazian"), who did not sign the SPA. *Id.* ¶¶ 22, 23. Global Gold initiated the arbitration by

[3] A copy of the ICC Rules is attached hereto as Appendix A.

filing a Request for Arbitration with the ICC Court[4] in Paris pursuant to the arbitration clause in the SPA. *Id.*

None of the respondents named in Global Gold's Request for Arbitration responded within the time period provided in Article 5 of the ICC Rules. Where a respondent does not file an answer, or where any party raises an objection concerning the arbitration agreement, the ICC Court makes an administrative determination as to whether the arbitration shall proceed under Article 6(2) of the ICC Rules. *See* ICC Rules, Art. 6(2). Pursuant to Article 6(2) of the ICC Rules, the ICC Court determines whether it is *prima facie* satisfied that an arbitration agreement under the ICC Rules may exist between the claimant and each respondent named as a party in the case.

The ICC Court made an Article 6(2) *prima facie* determination as to whether an arbitration agreement under the ICC Rules may exist between Global Gold and each of the respondents named in its Request for Arbitration. Petition ¶ 24. The ICC Court made a positive Article 6(2) determination that it was *prima facie* satisfied that an arbitration agreement may exist as to each of the Three Shareholders. *Id.* As to non-signatory Ayvazian, the ICC Court made a negative Article 6(2) determination. *Id.* The ICC Court therefore referred only the dispute between Global Gold and the Three Shareholders to an arbitral tribunal pursuant to Article 6(2) of the ICC Rules. *Id.* ¶ 31. Global Gold asked the ICC Court to reconsider its negative Article 6(2) determination as to non-signatory Ayvazian. *Id.* ¶¶ 28, 30; Childs Aff., Exs. L, M. By letters dated May 14, 2007 and August 6, 2007, the ICC Secretariat advised that its requests had been submitted to the ICC Court and that reconsideration had been denied.

[4] The ICC Court is the arbitral body of the ICC that administers arbitrations under the ICC Rules. *See infra* at 9-11. The ICC and ICC Court are located in Paris, France, where the ICC Court administers ICC arbitrations, including the arbitration filed by Global Gold. *See* Declaration of Peter M. Robinson, dated November 27, 2007 ¶¶ 10, 11.

*Id.* ¶ 29,30; Childs Aff., Exs. N, O.

Dissatisfied with the outcome of the ICC Court's application of Article 6(2) of the ICC Rules, Global Gold filed this Petition seeking a mandatory injunction ordering the ICC and ICC Court to reverse its Article 6(2) administrative determination and send the issue of whether there is an agreement to arbitrate with non-signatory Ayvazian to the arbitral tribunal that is considering the claims against the Three Shareholders.  In so doing, Global Gold has chosen to ignore the appropriate remedy under federal law—asking this Court to compel non-signatory Ayvazian to arbitrate.

## Argument

### I.  THE PETITION SHOULD BE DISMISSED FOR INSUFFICIENT SERVICE OF PROCESS AND LACK OF PERSONAL JURISDICTION

As an initial matter, Global Gold's Petition should be dismissed pursuant to Fed. R. Civ. P. 12(b)(5) for insufficient service of process and pursuant to Fed. R. Civ. P. 12(b)(2) for failure to establish personal jurisdiction.

#### A.  Global Gold Failed to Properly Serve Respondents

Following removal, this Court may examine the sufficiency of original service under state law.  *See Leadsinger, Inc. v. Cole*, No. 05 Civ. 5606, 2006 U.S. WL 2266312, at *10 (S.D.N.Y. Aug. 4, 2006) (when reviewing the sufficiency of service of process, a federal court applies the law of the state from which the case was removed); *Gray v. Permanent Mission of People's Republic of Congo*, 443 F. Supp. 816, 821 (S.D.N.Y. 1978) ("It is within this Court's power upon removal to examine the sufficiency of original service; if the Court finds that such service was not sufficient, it may dismiss the case.").

Petitioner alleges that the ICC is an unincorporated association. Under New York law, service on an unincorporated association is made by serving the President or Treasurer of the association. *See* N.Y. C.L.S. Gen. Assn. § 13; *Gillardi v. Country Vill. Heights Condo*., 461 N.Y.S.2d 972, 973 (N.Y. Sup. Ct. 1983).

Global Gold served its Notice of Petition, Petition and supporting papers in New York on Mr. Peter M. Robinson, who Petitioner alleges is the "United States President of the ICC." Petition ¶ 8. Global Gold is mistaken. Mr. Robinson is President and Chief Executive Officer of the United States Council for International Business, Inc. ("USCIB"), a separate and distinct entity from Respondents ICC and ICC Court. *See* Declaration of Peter M. Robinson, dated November 27, 2007 ("Robinson Decl.") ¶¶ 2, 14. The USCIB is a U.S. non-profit organization created under New York law that represents U.S. industry on a number of global business and trade policy issues before various global bodies, including the ICC. *Id.* ¶¶ 3, 8, 9 and 12. Mr. Robinson does not hold an office with either the ICC or ICC Court. *Id.* ¶ 17. Respondent ICC is an association that has been located in Paris since it was created. *Id.* ¶ 10. Respondent ICC Court, the ICC's arbitral body, is also located in Paris. *Id*. ¶ 11. As a result, Global Gold's service of the Petition on Mr. Robinson is insufficient under N.Y. C.L.S. Gen. Assn. § 13, and the Petition should be dismissed pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure.

### B. Global Gold Has Failed to Establish Personal Jurisdiction over the ICC and ICC Court

Petitioner has the burden to assert facts demonstrating that the Court has personal jurisdiction. *See Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 196 (2d Cir. 1990). To do so, Petitioner must plead legally sufficient factual allegations that establish jurisdiction. *See id*. Vague and conclusory allegations are insufficient. *See Jazini v. Nissan Motor Co.*, 148

F.3d 181, 185 (2d Cir. 1998) ("conclusory non-fact-specific jurisdictional allegations" do not make out a *prima facie* case for extending jurisdiction).

Global Gold alleges in a conclusory fashion that jurisdiction over Respondents is predicated upon Sections 301 and 302 of the New York C.P.L.R. ("CPLR"), as well as consent. *See* Petition ¶ 9. Section 301 of the CPLR authorizes the exercise of jurisdiction over a foreign entity when it is "engaged in such a continuous and systematic course of 'doing business' [in New York] as to warrant a finding of its 'presence' in the jurisdiction." *Ball*, 902 F.2d at 198 (quoting *Simonson v. Int'l Bank*, 200 N.E.2d 427 (N.Y. Ct. App. 1964)). However, Petitioner has failed to assert any facts that establish a continuous and systematic course of conduct by Respondents in New York. Global Gold admits that Respondents' principal place of business is in Paris, France. *See, e.g.,* Petition ¶¶ 7, 8; Childs Aff., Exs. C and L. Although Petitioner asserts that "upon information and belief" the ICC and ICC Court have "offices throughout the world, including New York," it does not allege any supporting facts. *See* Petition ¶¶ 7, 8. To the extent that Global Gold is asserting that the USCIB in New York is the ICC, that is incorrect. Robinson Decl. ¶¶ 14, 15.

Nor has Petitioner established jurisdiction under CPLR § 302. In fact, Petitioner fails to identify the specific provision of Section 302 that is the alleged basis for asserting long-arm jurisdiction as well as any facts establishing such jurisdiction. *See Pieczenik v. Cambridge Antibody Tech. Group*, No. 03-336, 2004 WL 527045 (S.D.N.Y. Mar. 16, 2004) (noting that plaintiff had failed to identify the statutory provisions on which its jurisdictional arguments were based and has failed to allege any facts supporting jurisdiction). The ICC Court performs its work at the ICC's headquarters in Paris. *See* ERIK SCHÄFER ET AL., ICC ARBITRATION IN PRACTICE (Kluwer Law International 2005), at 15; *see also* ICC Rules, Art. 1(5) (the seat of the

Secretariat of the ICC Court is at the headquarters of the ICC in Paris).  The day-to-day administration of ICC arbitrations is handled by the ICC Secretariat located at the ICC's headquarters in Paris.  *See id.* at 3; *see also* ICC Rules, Article 1(5).  The Secretariat is the parties' point of contact with the ICC Court.  *See* Jennifer Kirby, *The ICC Court: A Behind-the-Scenes Look, in* INTERNATIONAL COURT OF ARBITRATION BULLETIN (Vol. 16, No. 2 Fall 2005), at 12; *see also* ICC Rules, Art. 4(1), 4(2) and 5(2).  All correspondence from Global Gold to the ICC Court regarding Global Gold's arbitration was sent to the ICC's offices in Paris.  *See* Childs Aff., Exs. C, L and M.  Likewise, all correspondence regarding Global Gold's arbitration from the Secretariat of the ICC Court was sent from Paris.  *See* Childs Aff., Exs. J, N, O, Q and R.  Petitioner alleges no facts to support its conclusory allegation that the ICC and/or ICC Court are subject to jurisdiction under Section 302 of the CPLR.

Finally, Petitioner wrongly contends that Respondents consented to personal jurisdiction in New York by "agreeing to administer an arbitration in New York."  Petition at ¶ 9. Petitioner's papers establish that it was Global Gold and the Three Shareholders who each agreed to arbitrate disputes under the SPA in New York in accordance with the ICC Rules.  *Id.* ¶ 19; Childs Aff., Ex. B § 11.5.  All of Global Gold's correspondence to the ICC Court and all of the ICC Court's acts in administering Global Gold's arbitration have been directed to or from the ICC's headquarters in Paris.  *See* Childs Aff., Exs. C, J, L, M, N, O, Q and R.  There is no factual support for the assertion that the ICC and ICC Court consented to the personal jurisdiction of a New York court.

Accordingly, Global Gold has failed to allege or establish personal jurisdiction under CPLR §§ 301 and 302 or otherwise as to the ICC and ICC Court.

## II.  THE PETITION SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6)

Even if Petitioner could establish proper service and jurisdiction, its claim is legally defective.  In seeking a mandatory injunction directing the ICC and ICC Court to reverse the ICC Court's administrative determination as to Ayvazian under Article 6(2) of the ICC Rules, Global Gold contends that Respondents have violated New York law, the Federal Arbitration Act and the ICC Rules.  Petition ¶ 1.  These allegations are baseless.

### A.  Global Gold Has Failed to Allege or Establish A Violation of the ICC Rules

#### 1.  Global Gold Agreed to Arbitration Under the ICC Rules Administered by the ICC Court

In signing the SPA, Global Gold agreed to arbitrate disputes related to the SPA under the ICC Rules.  Where parties adopt the ICC Rules, "they shall be deemed to have submitted *ipso facto* to the [ICC] Rules in effect on the date of commencement of the arbitration proceedings…."  ICC Rules, Art. 6(1).

By agreeing to arbitration under the ICC Rules, Global Gold also agreed to arbitration administered by the ICC Court.  "When the parties agree upon an arbitration clause referring to the ICC Rules of Arbitration, they thereby entrust the ICC International Court of Arbitration with certain decision-making powers assigned to it under the Rules."  ERIK SCHÄFER ET AL., ICC ARBITRATION IN PRACTICE, at 15.  *See Diemaco v. Colt's Mfg. Co.,* 11 F. Supp. 2d 228, 232 (D. Conn. 1998) ("When parties agree to arbitrate before the AAA and incorporate the Commercial Arbitration Rules into their agreement, they are bound by those rules and by the AAA's interpretation.") (citing *York Hannover A.G. v. Am. Arbitration Ass'n*, No. 92 Civ. 1643, 1993 WL 159961, at *5 (S.D.N.Y. May 11, 1993)).

In its role of administering arbitrations under the ICC Rules, the ICC Court performs a number of administrative tasks.  For example, the ICC Court fixes the place of

arbitration if not agreed by the parties, confirms and appoints arbitrators, and scrutinizes draft awards to help ensure their quality and enforceability.  *See* Kirby, *The ICC Court: A Behind-the-Scenes Look*, International Court of Arbitration Bulletin, at 10.

The ICC Court also determines whether it is *prima facie* satisfied that an arbitration agreement under the ICC Rules may exist between the parties.  Under Article 6(2), the ICC Court makes such a determination if a named respondent fails to file an answer to the Request for Arbitration, or if any party raises a plea concerning the "existence, validity or scope" of the arbitration agreement.  *See* ICC Rules, Art. 6(2).  Article 6(2) states:

> If the Respondent does not file an Answer, as provided by Article 5, or if any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement, the Court may decide, without prejudice to the admissibility or merits of the plea or pleas, that the arbitration shall proceed if it is *prima facie* satisfied that an arbitration agreement under the Rules may exist.  In such a case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself.  If the Court is not so satisfied, the parties shall be notified that the arbitration cannot proceed.  In such a case, any party retains the right to ask any court having jurisdiction whether or not there is a binding arbitration agreement.

ICC Rules, Art. 6(2).

Where the ICC Court makes an Article 6(2) determination, the ICC Rules provide for two possible results:  (1) the ICC Court may be *prima facie* satisfied that an arbitration agreement under the ICC Rules may exist between the parties, and therefore render a positive Article 6(2) determination; or (2) the ICC Court may not be *prima facie* satisfied that an arbitration agreement under the ICC Rules may exist, and as a result render a negative Article 6(2) determination.  In either event, this *prima facie* determination is purely administrative in character and does not resolve the issue of whether there is in fact a binding agreement to arbitrate.

Where the ICC Court makes a positive Article 6(2) determination, the rule expressly provides that "any decision as to jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself."  ICC Rules, Art. 6(2).  Where the ICC Court makes a negative Article 6(2) determination, the rule expressly provides that "any party retains the right to ask any court having jurisdiction whether or not there is a binding arbitration agreement."  *Id.*  Thus, following a negative Article 6(2) determination, a party can file a judicial action against anyone with whom it claims there is an arbitration agreement to obtain an order compelling arbitration.

Article 6(2) of the ICC Rules is one of the distinctive features of ICC arbitration. *See* W. LAURENCE CRAIG, WILLIAM W. PARK AND JAN PAULSSON, INTERNATIONAL CHAMBER OF COMMERCE ARBITRATION (Oceana Publications, Inc., 3d ed. 2000), at 155 ("The power of the ICC Court of Arbitration to decide whether there are sufficient indications of an agreement to arbitrate so that the arbitration should be ordered to proceed is an important feature of ICC arbitration.").  Pursuant to Article 6(2), the ICC Court has an important gate keeper function. "The Court's role under Article 6(2) is an important administrative safeguard against the putting into motion of an arbitration procedure where there is no jurisdictional basis for it whatsoever." *Id.* at 156.  In exercising its gate keeper role, the ICC Court has "not infrequently determined that the arbitration may not proceed against some of the named parties."  *Id.* at 157; *see also* YVES DERAINS & ERIC A. SCHWARTZ, A GUIDE TO THE ICC RULES OF ARBITRATION (Kluwer Law International, 2d ed. 2005), at 79 (the ICC Court "may allow an arbitration to proceed, but only in respect of some, and not all, of the parties designated in the Request for Arbitration or sought to be joined subsequently by the Respondent.").

By agreeing to the ICC Rules, Global Gold agreed to Article 6(2) of the ICC Rules and to the ICC Court's administrative function under that rule.

2. The ICC Court Applied Article 6(2) to Global Gold's Request for Arbitration

In accordance with Article 6(2) of the ICC Rules, the ICC Court made a *prima facie* determination as to whether there may be an arbitration agreement under the ICC Rules between Global Gold and each of the named respondents. The ICC Court made a positive Article 6(2) determination as to whether there may be an arbitration agreement under the ICC Rules between Global Gold and the Three Shareholders who signed the SPA, and made a negative Article 6(2) determination as to whether there may be an arbitration agreement under the ICC Rules between Global Gold and non-signatory Ayvazian.

By letter dated March 12, 2007, the Secretariat of the ICC Court advised that in accordance with the ICC Court's decision under Article 6(2), the arbitration shall proceed only between Global Gold and the Three Shareholders:

> The Secretariat informs you that the Court, at its session of 9 March 2007, took the following decisions:
>
> 1. Decided in accordance with Article 6(2) of the Rules that this arbitration shall proceed only between the following:
>
>    GLOBAL GOLD MINING, LLC (U.S.A.) vs/ 1. Ms. Mayren Batoyan (Armenia) 2. Mr. Edward Janibekian (Armenia) 3. Mr. Yurik Lalazaryan (Armenia).

Childs Aff., Ex. J. Although Global Gold asked the ICC Court to reconsider its negative Article 6(2) determination with respect to Ayvazian (Petition ¶¶ 28, 30), the ICC Court decided not to change its Article 6(2) determination. *See* Childs Aff., Ex. N and O.

Global Gold now argues that because the ICC Court was *prima facie* satisfied under Article 6(2) that an arbitration agreement under the ICC Rules between Global Gold and the Three Shareholders may exist, the ICC Court was required under Article 6(2) to refer the issue of whether an agreement to arbitrate under the ICC Rules may exist with non-signatory

Ayvazian to the arbitral tribunal as well. *See* Petitioner's Mem. at 15. Nothing in the text of the ICC Rules supports such a reading. Moreover, the ICC Court's interpretation and application of its rules is entitled to considerable deference and is binding on Global Gold. *See York Research Corp. v. Landgarten*, 927 F.2d 119, 123 (2d Cir. 1991) ("Given the parties' designation of the AAA as the supervisory authority regarding the resolution of disputes under the agreement, the AAA's view of the meaning of its rules is of considerable significance."); *York Hannover*, 1993 WL 159961, at *5; *Diemaco*, 11 F. Supp. 2d at 232 (by agreeing to arbitrate under an institution's rules, a party is "bound by those rules and by the [institution's] interpretation."). The ICC Court interpreted and applied Article 6(2) of the ICC Rules to each of the parties named in Global Gold's Request for Arbitration. Although Global Gold may be dissatisfied with the result, it has failed to establish any violation by the ICC or ICC Court of the ICC Rules.

Global Gold wrongly argues that Article 6(2) of the ICC Rules "expressly provides that a party retains the right to seek court intervention concerning the [ICC Court's] *prima facie* decision under Article 6(2)." Petition ¶ 34. The ICC Rules do not provide for judicial intervention in the ICC Court's administration of an ICC arbitration. Rather, in the event of a negative Article 6(2) determination, a disappointed claimant can file a judicial action against the party that refuses to arbitrate in order to "ask a court whether or not there is a binding arbitration agreement." ICC Rules, Art. 6(2). As explained in one of the leading treatises on ICC arbitration, an administrative decision by the ICC Court "is not subject to judicial review." CRAIG, ET AL., INTERNATIONAL CHAMBER OF COMMERCE ARBITRATION, at 161. The ICC Court's role as an administrative gate keeper in determining whether ICC arbitrations will proceed under Article 6(2) "has broadly been confirmed by national courts wherever such decisions of the [ICC] Court have been called into question." *Id.* at 160.

For example, in *Cekobanka v. ICC*, the ICC Court rendered a negative Article 6(2) determination and the dissatisfied claimant brought a judicial action against the ICC in a Paris court seeking to compel the ICC to constitute an arbitral tribunal to hear the case.  The French court refused and its judgment has been summarized as follows:

> The court found that there was no proof that the Court of Arbitration had failed to respect its Rules and that the Court had not committed any wrong by refusing to organize the arbitration solicited by the claimant. Because of the administrative nature of the Court of Arbitration's mission, and the nature of the suit seeking to hold the ICC liable, the French court did not itself consider whether arbitral jurisdiction existed, but only whether the Court of Arbitration had fulfilled its role under the Rules.

CRAIG, ET AL., INTERNATIONAL CHAMBER OF COMMERCE ARBITRATION, at 160.  In rejecting the claim, the French court found that the ICC "had not committed any fault and that the ICC Rules had been respected."  DERAINS & SCHWARTZ, A GUIDE TO THE NEW ICC RULES OF ARBITRATION, at 85.

Similarly, in *R.E.D.E.C. et Pharaon v. Uzinexport Import et Chambre de Commerce Internationale*, claimants challenged the ICC Court's negative 6(2) decisions in judicial proceedings in a Paris court.  CRAIG, ET AL., INTERNATIONAL CHAMBER OF COMMERCE ARBITRATION, at 161.  The French court did not examine the merits of the challenge and found that the ICC Court's Article 6(2) decisions were taken "in accordance with the Court's proper exercise of its functions in accordance with the ICC Rules."  *Id*.  These cases confirm that a decision by the ICC Court retains its administrative nature and is not subject to judicial review.

**B. Petitioner Has Failed to Allege or Establish A Violation of Federal Law**

Global Gold also fails to allege or establish a violation of federal law.[5] In fact, federal law bars claims against arbitral institutions like the one here, where the Petitioner is simply dissatisfied with the result of the institution's interpretation and application of its own rules.

1. Respondents Are Entitled to Arbitral Immunity

Federal law establishes absolute immunity from suit for arbitrators and arbitral institutions with respect to arbitral decision-making and the performance of functions integrally related to the arbitral process. *See Austern v. Chicago Bd. of Options Exch., Inc.*, 898 F.2d 882, 886 (2d Cir.), *cert. denied*, 498 U.S. 850 (1990) (stating that the "extension of arbitral immunity to encompass boards [that] sponsor arbitration is a natural and necessary product of the policies underlying arbitral immunity.") (quoting *Corey v. New York Stock Exch.*, 691 F.2d 1205, 1211 (6th Cir. 1982)); *New England Cleaning Servs., Inc. v. Am. Arbitration Ass'n*, 199 F.3d 542, 545 (1st Cir. 1999) ("As with judicial and quasi-judicial immunity, arbitral immunity is essential to protect decision-makers from undue influence and protect the decision making process from reprisals by dissatisfied litigants.").

The doctrine of arbitral immunity is founded upon the "functional comparability of the arbitrators' decision-making process and judgments to those of judges and agency hearing examiners [which] generates the same need for independent judgment, free from the threat of lawsuits." *Austern*, 898 F.2d at 886. The Second Circuit has recognized that, like judicial and quasi-judicial immunity protecting judges, "arbitral immunity is essential to protect the decision-

[5] Although Global Gold refers to New York law, it does not establish any basis for applying New York law to Respondents. Since this case relates to an arbitration clause governed by the New York Convention, federal law, not state law, applies to the issues in this Proceeding. *See* 9 U.S.C. §§ 202, 203 ("An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States.").

maker from undue influence and protect the decision-making process." *Id*. (quoting *Corey*, 691 F.2d at 1211).

The doctrine of arbitral immunity extends to claims against administering institutions insofar as the claims pertain to "functions that are integrally related to the arbitral process." *Id*.; *New England Cleaning Servs.*, 199 F.3d at 545 ("A sponsoring organization's immunity extends to the administrative tasks it performs, insofar as these are integrally related to the arbitration."); *Richardson v. Am. Arbitration Ass'n*, 888 F. Supp. 604, 605 (S.D.N.Y. 1995) (holding that "organizations administering arbitrations…are immune from suit."). Arbitral immunity also bars injunctive relief that would interfere with the institution's administration of arbitration cases. *See New England Cleaning Servs.*, 199 F.3d at 544 (holding that arbitral immunity barred a request for injunction preventing the AAA from processing a demand for arbitration under its rules).

Article 6(2) of the ICC Rules is one of the distinctive features of ICC arbitration and is essential to the ICC Court's gate keeper function. The ICC Court's *prima facie* determination under Article 6(2) is integral to the ICC Court's administration of cases under the ICC Rules. Allowing a dissatisfied claimant to attack the ICC Court's administrative determination under the Article 6(2) in a national court would interfere with the ICC Court's independent exercise of its administrative decision-making responsibility under the ICC Rules. The doctrine of arbitral immunity serves to prevent such interference with an arbitral institution's role in administering cases. As a result, Global Gold's attempt to compel the Respondents to

reverse an administrative decision made under the ICC Rules is barred and should be dismissed.[6]

2. Global Gold Has Misinterpreted Federal Law with Regard to Who Determines Whether There is An Obligation to Arbitrate

Global Gold argues that the ICC and ICC Court violated federal law by making a negative Article 6(2) determination with respect to Ayvazian because "the question of whether the dispute between Global Gold and Ayvazian should be arbitrated falls squarely within the jurisdictional ambit of the Arbitral Tribunal, not the [ICC Court]." Petitioner's Mem. at 12. Global Gold is wrong.

The leading United States case on the issue of who determines whether there is an obligation to arbitrate—a court or an arbitrator—is the Supreme Court's decision in *First Options of Chicago v. Kaplan*, 514 U.S. 938 (1995). The Supreme Court held that arbitrability is normally reserved as a matter for the court unless the parties' agreement "clearly and unmistakably" evidences the parties' contrary intent. *First Options*, 514 U.S. at 943-44 ("courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so."). Thus, the question of who decides whether there is an obligation to arbitrate turns on the parties' intent. *First Options*, 514 U.S. at 943-44.

Here, Global Gold asserts that the issue of whether non-signatory Ayvazian is required to arbitrate is an issue for the arbitral tribunal. But Global Gold's papers demonstrate otherwise. The ICC Court rendered a negative Article 6(2) determination as to whether an arbitration agreement under the ICC Rules may exist between Global Gold and Avyazian. Where the ICC Court has made a negative determination under Article 6(2), the ICC Rules

---

[6] In adopting the ICC Rules, Global Gold expressly agreed that the ICC and ICC Court would not be liable for administering arbitrations. *See* ICC Rules, Art. 34. By commencing this proceeding to hold the ICC and ICC Court liable for an administrative decision under Article 6(2), Global Gold has violated Article 34 of the ICC Rules. *See Richardson*, 888 F. Supp. at 605 (party who had incorporated the AAA rules into its arbitration agreement was bound to comply with the exclusion of liability contained therein).

expressly provide that it is for a national court (not an arbitral tribunal) to decide whether there is a valid arbitration agreement.

Although Global Gold agreed in the SPA to arbitrate under the ICC Rules with the Three Shareholders, Ayvazian did not sign the SPA. There is no "clear and unmistakable" evidence in the SPA or elsewhere that Ayvazian agreed to arbitrate under the ICC Rules, let alone to arbitrate at all. *See Masefield AG v. Colonial Oil Indus., Inc.*, No. 05 Civ. 2231, 2005 WL 911770 (S.D.N.Y. Apr. 18, 2005) (holding that incorporation of the ICC Rules into an arbitration agreement did not evidence a non-signatory's intent to arbitrate arbitrability); *cf. First Options*, 514 U.S. at 946-47 (concluding that a non-signatory to the arbitration agreement did not "clearly agree to submit the question of arbitrability to arbitration"). In the absence of "clear and unmistakable" evidence of Ayvasian's intent, the presumption under *First Options* would apply and the issue of whether Ayvazian is required to arbitrate with Global Gold would have to be determined by a court and not an arbitrator as a matter of federal law.

In arguing that Global Gold's incorporation of the ICC Rules into the SPA constitutes "clear and unmistakable evidence" that the issue of arbitrability as to non-signatory Ayvazian is for the arbitral tribunal, Global Gold principally relies upon the decisions in *Shaw Group v. Triplefine Int'l Corp.*, 322 F.3d 115 (2d Cir. 2003), *Apollo Computer, Inc. v. Berg*, 886 F.2d 469 (1st Cir. 1989), and *Daiei, Inc. v. U.S. Shoe Corp*., 755 F. Supp. 299 (D. Haw. 1991). A proper reading of these cases does not support Global Gold's argument.

*Shaw Group*, *Apollo* and *Daiei* each involved the issue of whether there was "clear and unmistakable evidence" of an agreement to arbitrate arbitrability following the ICC Court's positive Article 6(2) determination. *See Shaw Group*, 322 F.3d 117-123 (involving a challenge to arbitral jurisdiction over claims for fees following positive Article 6(2)

determination by ICC Court); *Apollo*, 866 F.2d at 470-72 (involving a challenge to arbitral

jurisdiction following a decision by the ICC Court "that pursuant to its rules, the arbitrator

should resolve the issue of arbitrability"); *Daiei*, 755 F. Supp. at 300-02 (involving a challenge to

arbitral jurisdiction after the ICC Court "ruled that arbitration would proceed before a sole

arbitrator.").  In each case, the court concluded that the parties had agreed to resolve arbitrability

in accordance with the ICC Rules, and the ICC Court had already made a positive Article 6(2)

determination under those rules.  *See Shaw Group*, 322 F.3d at 122 ("the parties understood the

'rules' to include those of the ICC itself.  Article 6, section 2 of those rules [] specifically

provides for the [ICC Court], the arbitral body of the ICC, to address questions of arbitrability");

*Apollo*, 866 F.2d at 473 (The ICC Rules "clearly and unmistakably allow the arbitrator to

determine her own jurisdiction when, as here, there exists a *prima facie* agreement to arbitrate");

*Daiei*, 755 F. Supp. at 303.

        In contrast, the ICC Court here made a negative Article 6(2) determination under

the ICC Rules with respect to non-signatory Ayvazian and did not send the issue of whether

there was an agreement to arbitrate with Ayvazian to the arbitral tribunal.  Article 6(2) provides

that in the case of a negative Article 6(2) determination by the ICC Court, any party may seek a

determination from a court having jurisdiction as to whether "there is a binding arbitration

agreement."  ICC Rules, Art. 6(2).  Under such circumstances, the ICC Rules provide that it is

for a court, not an arbitral tribunal, to decide whether there is an agreement to arbitrate.  The

cases on which Global Gold relies simply do not address this situation.

        The distinction between a negative Article 6(2) and a positive Article 6(2)

determination under the ICC Rules is highlighted by the Second Circuit's decision in *Shaw

Group*.  The Second Circuit observed that the ICC Court had reached a negative Article 6(2)

determination with respect to certain parties that had been named in the Request for Arbitration. *Shaw Group*, 322 F.3d at 122, n.3 (stating that "the ICC Court invoked ICC Rule 6.2 in its … ruling that [the] initial arbitration claim could be pursued as against [one party], but not as against [three others].").  The court recognized that, in light of the ICC Court's negative Article 6(2) determination, the proper result would be for the party seeking arbitration to bring an action against those non-signatories in a national court.  *Id.*  That is precisely what Global Gold has refused to do.

Federal law provides that a party seeking to arbitrate with a party that refuses to arbitrate may seek a court order compelling arbitration.  Section 206 of the Federal Arbitration Act provides that a court "may direct that arbitration be held in accordance with the [arbitration] agreement at any place therein provided for."  9 U.S.C. § 206.  Article 6(2) of the ICC Rules provides that in the event of a negative determination, a party "retains the right to ask any court having jurisdiction whether or not there is a binding arbitration agreement."  ICC Rules, Art. 6(2).  Global Gold has, for whatever reason, chosen not to compel arbitration against non-signatory Ayvazian.  What Global Gold has done—sue the ICC and ICC Court—is simply not permitted by the Federal Arbitration Act or the ICC Rules.

### C.    Global Gold Has Failed to Satisfy the Standard for Obtaining Mandatory Injunctive Relief

In seeking an order from this Court directing the ICC Court to reverse its *prima facie* determination and submit to the arbitral tribunal the issue of whether there is an agreement to arbitrate between Global Gold and non-signatory Ayvazian, Global Gold seeks a mandatory, permanent injunction.  *See Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985) (where the grant of injunctive relief will either (1) alter the positions of the parties as it existed prior to the grant or (2) grant the movant substantially all the relief he seeks, "such a preliminary

injunction would be deemed mandatory, rather than prohibitory, and a greater showing is required of the moving party").

A party seeking permanent injunctive relief must demonstrate four factors: (1) irreparable injury; (2) an inadequate remedy at law; (3) a balance of hardships that favors equitable relief; and (4) the public interest would not be disserved by a permanent injunction. *See eBay Inc. v. MercExchange, L.L.C.*, __ U.S.__, 126 S. Ct. 1837, 1839, 164 L. Ed. 2d 641 (2007); *New York v. Shinnecock Indian Nation*, Nos. 03-3243, 03-3466, 2007 WL 3307089 at *101 (E.D.N.Y. Oct. 30, 2007) ("The standard for a permanent injunction is the same as that for a preliminary injunction except that the plaintiff must establish actual success, rather than merely a likelihood of success on the merits."). Moreover, mandatory injunctions are subject to a more stringent standard of proof by the movant, and should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of the relief sought. *See Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) (citing cases).

Global Gold satisfies none of these requirements. There is no irreparable injury or lack of an adequate remedy at law because Global Gold has the right under the ICC Rules and the Federal Arbitration Act to seek an order from a court of competent jurisdiction compelling Ayvazian to arbitrate. *See* ICC Rules, Art. 6(2); 9 U.S.C. § 206. Global Gold has not established that the hardships justify equitable relief, having failed to seek an order compelling arbitration against the party with whom it seeks to arbitrate. Public policy will not be served by this Court interfering with an arbitral institution's administrative processes and ordering it to administer a case that the institution is not satisfied should proceed under its rules. There is no basis for the extraordinary equitable relief that Global Gold seeks.

## III. PETITIONER IS RESPONSIBLE FOR RESPONDENTS' COSTS AND ATTORNEYS' FEES

Instead of seeking to compel non-signatory Ayvazian to arbitrate, Global Gold has improperly filed this Proceeding against the ICC and ICC Court. In doing so, Global Gold has exposed the ICC and ICC Court to the costs and attorneys' fees required to respond to this lawsuit. Global Gold adopted the ICC Rules and is bound by them, including the provision that the ICC and ICC Court shall not have any liability for performing administrative functions under the ICC Rules. *See* ICC Rules, Art. 34 ("Neither the arbitrators, not the Court and its members, nor the ICC …. shall be liable to any person for any act or omission in connection with the arbitration."); *Diemaco*, 11 F. Supp. 2d at 232. As a result, Respondents respectfully request that the Court require Global Gold to reimburse the ICC and ICC Court for the costs and attorneys' fees resulting from this improper Proceeding.

**CONCLUSION**

For the reasons stated above, Respondents respectfully request that the Court dismiss the Petition in its entirety and award Respondents the costs and attorneys' fees incurred in defending this Proceeding.

Dated: New York, New York
December 4, 2007

Respectfully submitted,

ALLEN & OVERY LLP

By: /s/ Louis B. Kimmelman

Louis B. Kimmelman
Dana C. MacGrath
Chintan V. Panchal

1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 610-6300
Facsimile: (212) 610-6399
Email: benno.kimmelman@allenovery.com
dana.macgrath@allenovery.com
chintan.panchal@allenovery.com

*Attorneys for Respondents*
International Chamber of Commerce and International Court of Arbitration of the International Chamber of Commerce

# Rules of Arbitration

in force as from 1 January 1998

**Cost scales effective as of 1 July 2003**

---

# Rules for a Pre-Arbitral Referee Procedure

in force as from 1 January 1990

TABLE OF CONTENTS

**Foreword** 7

**Standard ICC Arbitration Clause** 9

**Standard Clause for an ICC Pre-Arbitral Referee Procedure** 16

**Standard Clause for an ICC Pre-Arbitral Referee Procedure and ICC Arbitration** 17

**Rules of Arbitration** 18

*INTRODUCTORY PROVISIONS*

Article 1: International Court of Arbitration ............... 18

Article 2: Definitions ............... 19

Article 3: Written Notifications or Communications; Time Limits ............... 19

*COMMENCING THE ARBITRATION*

Article 4: Request for Arbitration ............... 20

Article 5: Answer to the Request; Counterclaims ............... 22

Article 6: Effect of the Arbitration Agreement ............... 23

*THE ARBITRAL TRIBUNAL*

Article 7: General Provisions ............... 24

Article 8: Number of Arbitrators ............... 25

Article 9: Appointment and Confirmation of the Arbitrators ............... 26

Article 10: Multiple Parties ............... 28

Article 11: Challenge of Arbitrators ............... 28

Article 12: Replacement of Arbitrators ............... 29

*THE ARBITRAL PROCEEDINGS*

Article 13: Transmission of the File to the Arbitral Tribunal ..... 30
Article 14: Place of the Arbitration ..... 30
Article 15: Rules Governing the Proceedings ..... 31
Article 16: Language of the Arbitration ..... 31
Article 17: Applicable Rules of Law ..... 31
Article 18: Terms of Reference; Procedural Timetable ..... 32
Article 19: New Claims ..... 33
Article 20: Establishing the Facts of the Case ..... 33
Article 21: Hearings ..... 34
Article 22: Closing of the Proceedings ..... 35
Article 23: Conservatory and Interim Measures ..... 35

*AWARDS*

Article 24: Time Limit for the Award ..... 36
Article 25: Making of the Award ..... 36
Article 26: Award by Consent ..... 37
Article 27: Scrutiny of the Award by the Court ..... 37
Article 28: Notification, Deposit and Enforceability of the Award ..... 37
Article 29: Correction and Interpretation of the Award ..... 38

*COSTS*

Article 30: Advance to Cover the Costs of the Arbitration ..... 39
Article 31: Decision as to the Costs of the Arbitration ..... 40

*MISCELLANEOUS*

Article 32: Modified Time Limits ..... 41
Article 33: Waiver ..... 41
Article 34: Exclusion of Liability ..... 42
Article 35: General Rule ..... 42

**Appendix I: Statutes of the International Court of Arbitration 43**

Article 1: Function ..... 43
Article 2: Composition of the Court ..... 43
Article 3: Appointment ..... 43
Article 4: Plenary Session of the Court ..... 44
Article 5: Committees ..... 44
Article 6: Confidentiality ..... 44
Article 7: Modification of the Rules of Arbitration ..... 45

**Appendix II: Internal Rules of the International Court of Arbitration 46**

Article 1: Confidential Character of the Work of the International Court of Arbitration ..... 46
Article 2: Participation of Members of the International Court of Arbitration in ICC Arbitration ..... 47
Article 3: Relations between the Members of the Court and the ICC National Committees ..... 48
Article 4: Committee of the Court ..... 48
Article 5: Court Secretariat ..... 49
Article 6: Scrutiny of Arbitral Awards ..... 50

**Appendix III: Arbitration Costs and Fees 51**

Article 1: Advance on Costs ..... 51
Article 2: Costs and Fees ..... 53
Article 3: ICC as Appointing Authority ..... 55
Article 4: Scales of Administrative Expenses and Arbitrator's Fees ..... 55

**Rules for a Pre-Arbitral Referee Procedure 58**

Introduction ..... 58
Article 1: Definitions ..... 58
Article 2: Powers of the Referee ..... 59
Article 3: Request for Referee and Answer ..... 60

Article 4: Appointment of the Referee and Transmission of the File ..... 62
Article 5: The Proceedings ..... 63
Article 6: The Order ..... 65
Article 7: Costs ..... 66

**Appendix: Costs and Payment for a Pre-Arbitral Referee Procedure ..... 68**

A. Costs ..... 68
B. Payment ..... 68

## FOREWORD

During recent decades, arbitration has gained worldwide acceptance as the normal means of resolving international commercial disputes. National laws on arbitration have been modernized; international treaties on arbitration have acquired new adherents; arbitration has become part of the curricula of law schools; and businesses are increasingly attracted by a method of dispute resolution that can offer neutrality, flexibility and predictability, and lead to a final result that will be widely recognized internationally. Both private companies and government bodies are regularly parties to arbitration proceedings.

Established in 1923 as the arbitration body of the International Chamber of Commerce, the ICC International Court of Arbitration has pioneered international commercial arbitration as it is known today. Since its creation, the ICC Court has administered over fourteen thousand international arbitration cases that have involved parties and arbitrators from some 180 countries and of widely diverse legal, economic, cultural and linguistic backgrounds.

Every ICC arbitration is conducted by an arbitral tribunal, which examines the merits of the case and renders a final award. The role of the ICC Court, which meets weekly throughout the year, is to ensure the application of the ICC Rules of Arbitration. The Court's responsibilities include appointing arbitrators, confirming arbitrators that may have been nominated by the parties, deciding on challenges of arbitrators, fixing arbitrators' fees, and scrutinizing awards. In exercising its functions, it draws on the collective experience of its members from over eighty-five countries. The Court remains constantly alert to changes in the law and practice of arbitration in all parts of the world, so as to adapt its working methods to the evolving needs of parties and arbitrators. For the day-to-day management of cases, the ICC Court is supported by a Secretariat located at ICC headquarters in Paris, whose members of many different nationalities speak a wide range of languages.

The present ICC Rules of Arbitration came into effect on 1 January 1998. Although they are especially designed for arbitrations in an international context, they may also be used for non-international cases. They are published in this booklet with the ICC Rules for a Pre-Arbitral Referee Procedure, which were launched in 1990 as a means of obtaining urgent measures when difficulties arise in contractual relationships, prior to referral to arbitration. Those measures are ordered by a "referee", who may be selected by the parties or, alternatively, is appointed by the Chairman of the ICC International Court of Arbitration. The measures ordered by the referee are binding until the referee or a court or arbitral tribunal decides otherwise.

The ICC Rules of Arbitration and the ICC Rules for a Pre-Arbitral Referee Procedure, although available for use by any persons, whether or not members of ICC, can be applied only if the parties have agreed so in writing. It is recommended that parties include in their contract a clause to this effect. Three standard clauses have been drawn up for this purpose: one providing for ICC arbitration, one for the ICC pre-arbitral referee procedure, and the third providing for the use of both procedures. All three clauses may be found on the following pages.

This reprint has provided an opportunity to harmonize the English and French versions of the Rules for a Pre-Arbitral Referee Procedure in Articles 2.4.1 and 4.1.

## STANDARD ICC ARBITRATION CLAUSE

It is recommended that all parties wishing to make reference to ICC arbitration in their contracts use the following standard clause.

Parties are reminded that it may be desirable for them to stipulate in the arbitration clause itself the law governing the contract, the number of arbitrators and the place and language of the arbitration. The parties' free choice of the law governing the contract and of the place and language of the arbitration is not limited by the ICC Rules of Arbitration.

Attention is called to the fact that the laws of certain countries require that parties to contracts expressly accept arbitration clauses, sometimes in a precise and particular manner.

The ICC Rules of Arbitration have been translated into several of the languages listed below. These translations are available on the web site of the ICC International Court of Arbitration:

**www.iccarbitration.org**

### English

"All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules."

### French

"Tous différends découlant du présent contrat ou en relation avec celui-ci seront tranchés définitivement suivant le Règlement d'arbitrage de la Chambre de commerce internationale par un ou plusieurs arbitres nommés conformément à ce Règlement."

### Arabic

جميع الخلافات التي تنشأ عن هذا العقد أو التي لها علاقة به يتم حسمها نهائيا وفقا لنظام التحكيم لغرفة التجارة الدولية بواسطة حكم او عدة حكام يتم تعيينهم طبقا لذلك النظام.

## Bulgarian

"Всички спорове, които произтичат от този договор или имат връзка с него ще бъдат разрешени окончателно, съобразно Правилника за арбитраж на Международната търговска камара от един или повече арбитри, според този Правилник."

## Chinese

所有产生于或与本合同有关的争议均应按照国际商会仲裁规则由依该规则指定的一名或数名仲裁员终审解决。

## Croatian

"Svi sporovi koji proizlaze iz ovog ugovora ili su s njim u vezi konačno će se riješiti prema Arbitražnim pravilima Međunarodne trgovačke komore od strane jednoga ili više arbitara imenovanih u skladu s navedenim pravilima."

## Czech

"Všechny spory vzniklé z této smlouvy a nebo v souvislosti s ní budou řešeny s konečnou platností podle Pravidel rozhodčího řízení Mezinárodní obchodní komory jedním nebo více rozhodci jmenovanými podle těchto Pravidel."

## Danish

"Enhver tvist, der udspringer af eller i forbindelse med nærværende aftale, skal i overensstemmelse med Voldgiftsreglementet for Det Internationale Handelskammer afgøres endeligt af en eller flere voldgiftsmænd, der udpeges i overensstemmelse med Reglementet."

## Dutch

"Alle geschillen, die uit of met betrekking tot deze overeenkomst mochten ontstaan, zullen definitief worden beslecht overeenkomstig het Arbitrage-reglement van de ICC door één of meerdere arbiters benoemd overeenkomstig dit Reglement."

## Finnish

"Kaikki tästä sopimuksesta syntyneet tai siihen liittyvät erimielisyydet ratkaistaan Kansainvälisen kauppakamarin (ICC) välimiesmenettelyä koskevien sääntöjen mukaisesti. Välimiehinä toimivat näiden sääntöjen mukaisesti nimetyt yksi tai useampi välimies."

## German

"Alle aus oder in Zusammenhang mit dem gegenwärtigen Vertrag sich ergebenden Streitigkeiten werden nach der Schiedsgerichtsordnung der Internationalen Handelskammer von einem oder mehreren gemäß dieser Ordnung ernannten Schiedsrichtern endgültig entschieden."

## Greek

"Όλες οι διαφορές που προκύπτουν από την παρούσα σύμβαση ή έχουν σχέση με αυτήν θα επιλύονται οριστικώς βάσει του Κανονισμού Διαιτησίας του Διεθνούς Εμπορικού Επιμελητηρίου από έναν ή περισσοτερους διαιτητές που θα ορίζονται συμφώνως προς αυτόν τον Κανονισμό."

## Hungarian

"A jelen szerződésből eredő vagy azzal összefüggésben keletkező minden vitát a Nemzetközi Kereskedelmi Kamara Választottbírósági Szabályzatának megfelelően kell véglegesen rendezni az említett szabályzat szerint kijelölt egy vagy több választottbíró útján."

## Icelandic

"Úr öllum deilum sem rísa kunna vegna samnings þessa eða í sambandi við hann skal endanlega skorið í samræmi við gerðardómsreglur Alþjóða verslunarráðsins af einum eða fleiri gerðarmönnum sem tilnefndir eru í samræmi við reglurnar."

## Indonesian

"Semua perselisihan yang timbul dari atau sehubungan dengan perjanjian atau kontrak ini akan diselesaikan secara final sesuai dengan Peraturan Arbitrase Kamar Dagang Internasional oleh satu atau lebih arbitrator yang ditunjuk berdasarkan Peraturan Arbitase tersebut."

### Italian

"Tutte le controversie derivanti dal presente contratto o in relazione con lo stesso saranno risolte in via definitiva secondo il Regolamento d'arbitrato della Camera di Commercio Internazionale, da uno o più arbitri nominati in conformità di detto Regolamento."

### Japanese

この契約から又はそれに関連して生じるすべての紛争は、国際商業会議所の仲裁規則のもとで、同規則に従って選定される一人又は複数の仲裁人により、終局的に解決されるものとする。

### Korean

"이 계약으로부터 또는 이 계약과 관련하여 발생하는 모든 분쟁은 국제상업회의소(International Chamber of Commerce)의 중재규칙에 따라 선정된 1인 또는 수인의 중재인에 의하여 위 중재규칙에 의거하여 최종적으로 해결된다."

### Lithuanian

"Visi ginčai, kylantys iš šios sutarties ar su ja susiję, turi būti sprendžiami arbitražu pagal Tarptautinių prekybos rūmų (International Chamber of Commerce) arbitražo taisykles vieno ar daugiau arbitrų, paskirtų pagal minėtas taisykles, kurių sprendimas bus galutinis."

### Mongolian

"Энэхүү гэрээнээс болон түүнтэй холбоотой үүссэн бүх маргааныг Олон Улсын Худалдааны Танхимын Арбитрын Дүрмийн дагуу, уг дүрэмд заасны дагуу томилогдсон нэг буюу түүнээс дээш арбитрчаар эцэслэн шийдвэрлүүлнэ."

### Nepali

यस संझौताबाट उत्पन्न भएका वा उठेका सम्पूर्ण विवादहरुको अन्तिम समाधान मध्यस्तथा सम्बन्धी अन्तर्राष्टिय वाणिज्य संघ (International Chamber of Commerce) को नियम बमोजिम नियुक्त भएका एक वा सो भन्दा बढी मध्यतस्थाताहरु बाट गरीने छ।

### Norwegian

"Enhver tvist som måtte oppstå på grunnlag av eller i forbindelse med denne avtale, skal endelig avgjøres i henhold til Voldgiftsreglene til Det Internasjonale Handelskammer, av en eller flere voldgiftsdommere oppnevnt i samsvar med disse Reglene."

### Persian (Farsi)

«کلیه اختلافات ناشی از یا در ارتباط با این قرارداد، براساس قواعد داوری اتاق بازرگانی بین المللي، توسط یک یا چند داور که طبق قواعد مذکور منصوب می شوند، به طور نهایی حل و فصل خواهد شد».

### Polish

"Wszelkie spory wynikające z niniejszego kontraktu lub w związku z nim będą rozstrzygane ostatecznie stosownie do regulaminu arbitrażowego Międzynarodowej Izby Handlowej przez jednego lub więcej arbitrów wyznaczonych zgodnie z tym regulaminem."

### Portuguese

"Todos os litígios emergentes do presente contrato ou com ele relacionados serão definitivamente resolvidos de acordo com o Regulamento de Arbitragem da Câmara de Comércio Internacional, por um ou mais árbitros nomeados nos termos desse Regulamento."

### Romanian

"Toate litigiile decurgând din prezentul contract sau în legătură cu el vor fi definitiv soluționate în conformitate cu Regulile de arbitraj ale Camerei Internaționale de Comerț, de către unul sau mai mulți arbitri numiți în conformitate cu amintitele Reguli."

### Russian

"Любые споры, возникающие из настоящего контракта или в связи с ним, подлежат окончательному урегулированию в соответствии с Арбитражным Регламентом Международной Торговой Палаты, одним или несколькими арбитрами, назначенными в соответствии с этим Регламентом".

Standard ICC Arbitration Clause

## Serbian

"Sve sporove koji proisteknu iz postojećeg ugovora ili u vezi sa ugovorom, rešavaće konačno na osnovu Pravila o Arbitraži Međunarodne trgovinske komore jedan ili više arbitara imenovanih u skladu sa navedenim Pravilima."

## Slovak

"Všetky spory, ktoré vznikajú v súvislosti s plnením tejto zmluvy, budú riešené podľa arbitrážnych pravidiel Medzinárodnej obchodnej komory jedným alebo viacerými arbitrami, vymenovanými v súlade s uvedenými pravidlami."

## Slovene

"Vse spore, ki izvirajo iz te pogobde ali so z njo v zvezi, bo dokončno rešil, z uporabo Pravil Arbitraže pri Mednarodni trgovinski zbornici, en ali več arbitrov, ki bodo imenovani v skladu z navedenimi Pravili."

## Spanish

"Todas las desavenencias que deriven de este contrato o que guarden relación con éste serán resueltas definitivamente de acuerdo con el Reglamento de Arbitraje de la Cámara de Comercio Internacional por uno o más árbitros nombrados conforme a este Reglamento."

## Swedish

"Samtliga tvister med anledning av eller i samband med detta avtal skall slutligt avgöras enligt Internationella Handelskammarens skiljedomsregler av en eller flera skiljemän utsedda i enlighet med dessa regler."

## Thai

"ให้ระงับข้อพิพาททั้งปวงที่เกิดขึ้นเนื่องจาก หรือเกี่ยวเนื่องกับสัญญาที่มีอยู่ในปัจจุบันภายใต้กฎอนุญาโตตุลาการของหอการค้านานาชาติ (ICC) โดยอนุญาโตตุลาการคนเดียว หรือหลายคนซึ่งได้รับการแต่งตั้งตามกฎดังกล่าว"

## Turkish

"İşbu sözleşmeden doğacak veya bu sözleşmeyle ilgili bütün anlaşmazlıklar Milletlerarası Ticaret Odası Tahkim Kuralları uygulanarak, bu kurallar dairesinde tayin edilen bir veya birden fazla hakem tarafından kesin olarak karara bağlanacaktır."

## Ukrainian

"Будь-які спори, що виникають з даного контракту або в зв'язку з ним, підлягають остаточному врегулюванню відповідно до Арбітражного Регламенту Міжнародної Торгової Палати, одним або кількома арбітрами, призначеними відповідно до цього Регламенту."

## Vietnamese

"Mọi tranh chấp phát sinh từ hợp đồng này hoặc có liên quan đến nó sẽ được giải quyết dứt điểm theo Quy tắc trọng tài của Phòng Thương mại Quốc tế bởi một hoặc nhiều trọng tài viên được chỉ định theo đúng Quy tắc này."

## STANDARD CLAUSE FOR AN ICC PRE-ARBITRAL REFEREE PROCEDURE

It is recommended that all parties wishing to make reference to the ICC pre-arbitral referee procedure in their contracts use the following standard clause:

"Any party to this contract shall have the right to have recourse to and shall be bound by the pre-arbitral referee procedure of the International Chamber of Commerce in accordance with its Rules for a Pre-Arbitral Referee Procedure."

The extent to which the ICC Rules for a Pre-Arbitral Referee Procedure are recognized and accepted may vary from one country to another depending on the applicable law(s). Parties wishing to have recourse to these Rules should ensure that they conform with the law(s) applicable to each case.

For translations of the above clause, please consult the web site of the ICC International Court of Arbitration:

**www.iccarbitration.org**

## STANDARD CLAUSE FOR AN ICC PRE-ARBITRAL REFEREE PROCEDURE AND ICC ARBITRATION

Parties wishing to have recourse to both the ICC pre-arbitral referee procedure and ICC arbitration should make specific reference to both procedures in their contracts. The following standard clause is recommended:

"Any party to this contract shall have the right to have recourse to and shall be bound by the pre-arbitral referee procedure of the International Chamber of Commerce in accordance with its Rules for a Pre-Arbitral Referee Procedure.

All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules of Arbitration."

For translations of the above clause, please consult the web site of the ICC International Court of Arbitration:

**www.iccarbitration.org**

# RULES OF ARBITRATION

## INTRODUCTORY PROVISIONS

### Article 1
### International Court of Arbitration

1

The International Court of Arbitration (the "Court") of the International Chamber of Commerce (the "ICC") is the arbitration body attached to the ICC. The statutes of the Court are set forth in Appendix I. Members of the Court are appointed by the World Council of the ICC. The function of the Court is to provide for the settlement by arbitration of business disputes of an international character in accordance with the Rules of Arbitration of the International Chamber of Commerce (the "Rules"). If so empowered by an arbitration agreement, the Court shall also provide for the settlement by arbitration in accordance with these Rules of business disputes not of an international character.

2

The Court does not itself settle disputes. It has the function of ensuring the application of these Rules. It draws up its own Internal Rules (Appendix II).

3

The Chairman of the Court or, in the Chairman's absence or otherwise at his request, one of its Vice-Chairmen shall have the power to take urgent decisions on behalf of the Court, provided that any such decision is reported to the Court at its next session.

4

As provided for in its Internal Rules, the Court may delegate to one or more committees composed of its members the power to take certain decisions, provided that any such decision is reported to the Court at its next session.

5

The Secretariat of the Court (the "Secretariat") under the direction of its Secretary General (the "Secretary General") shall have its seat at the headquarters of the ICC.

### Article 2
### Definitions

In these Rules:

(i) "Arbitral Tribunal" includes one or more arbitrators.

(ii) "Claimant" includes one or more claimants and "Respondent" includes one or more respondents.

(iii) "Award" includes, *inter alia*, an interim, partial or final Award.

### Article 3
### Written Notifications or Communications; Time Limits

1

All pleadings and other written communications submitted by any party, as well as all documents annexed thereto, shall be supplied in a number of copies sufficient to provide one copy for each party, plus one for each arbitrator, and one for the Secretariat. A copy of any communication from the Arbitral Tribunal to the parties shall be sent to the Secretariat.

2

All notifications or communications from the Secretariat and the Arbitral Tribunal shall be made to the last address of the party or its representative for whom the same are intended, as notified either by the party in question or by the other party. Such notification or communication may be made by delivery against receipt, registered post, courier, facsimile transmission, telex, telegram or any other means of telecommunication that provides a record of the sending thereof.

3

A notification or communication shall be deemed to have been made on the day it was received by the party itself

or by its representative, or would have been received if made in accordance with the preceding paragraph.

4

Periods of time specified in or fixed under the present Rules shall start to run on the day following the date a notification or communication is deemed to have been made in accordance with the preceding paragraph. When the day next following such date is an official holiday, or a non-business day in the country where the notification or communication is deemed to have been made, the period of time shall commence on the first following business day. Official holidays and non-business days are included in the calculation of the period of time. If the last day of the relevant period of time granted is an official holiday or a non-business day in the country where the notification or communication is deemed to have been made, the period of time shall expire at the end of the first following business day.

## COMMENCING THE ARBITRATION

### Article 4
### Request for Arbitration

1

A party wishing to have recourse to arbitration under these Rules shall submit its Request for Arbitration (the "Request") to the Secretariat, which shall notify the Claimant and Respondent of the receipt of the Request and the date of such receipt.

2

The date on which the Request is received by the Secretariat shall, for all purposes, be deemed to be the date of the commencement of the arbitral proceedings.

3

The Request shall, *inter alia*, contain the following information:

a) the name in full, description and address of each of the parties;

b) a description of the nature and circumstances of the dispute giving rise to the claim(s);

c) a statement of the relief sought, including, to the extent possible, an indication of any amount(s) claimed;

d) the relevant agreements and, in particular, the arbitration agreement;

e) all relevant particulars concerning the number of arbitrators and their choice in accordance with the provisions of Articles 8, 9 and 10, and any nomination of an arbitrator required thereby; and

f) any comments as to the place of arbitration, the applicable rules of law and the language of the arbitration.

4

Together with the Request, the Claimant shall submit the number of copies thereof required by Article 3(1) and shall make the advance payment on administrative expenses required by Appendix III ("Arbitration Costs and Fees") in force on the date the Request is submitted. In the event that the Claimant fails to comply with either of these requirements, the Secretariat may fix a time limit within which the Claimant must comply, failing which the file shall be closed without prejudice to the right of the Claimant to submit the same claims at a later date in another Request.

5

The Secretariat shall send a copy of the Request and the documents annexed thereto to the Respondent for its Answer to the Request once the Secretariat has sufficient copies of the Request and the required advance payment.

6

When a party submits a Request in connection with a legal relationship in respect of which arbitration proceedings between the same parties are already pending under these Rules, the Court may, at the request

of a party, decide to include the claims contained in the Request in the pending proceedings provided that the Terms of Reference have not been signed or approved by the Court. Once the Terms of Reference have been signed or approved by the Court, claims may only be included in the pending proceedings subject to the provisions of Article 19.

### Article 5
### Answer to the Request; Counterclaims

1

Within 30 days from the receipt of the Request from the Secretariat, the Respondent shall file an Answer (the "Answer") which shall, *inter alia*, contain the following information:

a) its name in full, description and address;

b) its comments as to the nature and circumstances of the dispute giving rise to the claim(s);

c) its response to the relief sought;

d) any comments concerning the number of arbitrators and their choice in light of the Claimant's proposals and in accordance with the provisions of Articles 8, 9 and 10, and any nomination of an arbitrator required thereby; and

e) any comments as to the place of arbitration, the applicable rules of law and the language of the arbitration.

2

The Secretariat may grant the Respondent an extension of the time for filing the Answer, provided the application for such an extension contains the Respondent's comments concerning the number of arbitrators and their choice and, where required by Articles 8, 9 and 10, the nomination of an arbitrator. If the Respondent fails to do so, the Court shall proceed in accordance with these Rules.

3

The Answer shall be supplied to the Secretariat in the number of copies specified by Article 3(1).

4

A copy of the Answer and the documents annexed thereto shall be communicated by the Secretariat to the Claimant.

5

Any counterclaim(s) made by the Respondent shall be filed with its Answer and shall provide:

a) a description of the nature and circumstances of the dispute giving rise to the counterclaim(s); and

b) a statement of the relief sought, including, to the extent possible, an indication of any amount(s) counterclaimed.

6

The Claimant shall file a reply to any counterclaim within 30 days from the date of receipt of the counterclaim(s) communicated by the Secretariat. The Secretariat may grant the Claimant an extension of time for filing the reply.

### Article 6
### Effect of the Arbitration Agreement

1

Where the parties have agreed to submit to arbitration under the Rules, they shall be deemed to have submitted *ipso facto* to the Rules in effect on the date of commencement of the arbitration proceedings, unless they have agreed to submit to the Rules in effect on the date of their arbitration agreement.

2

If the Respondent does not file an Answer, as provided by Article 5, or if any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement, the Court may decide, without prejudice to the admissibility or merits of the plea or pleas, that the arbitration shall proceed if it is *prima facie* satisfied that an arbitration agreement under the Rules may exist. In such a case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral

Tribunal itself. If the Court is not so satisfied, the parties shall be notified that the arbitration cannot proceed. In such a case, any party retains the right to ask any court having jurisdiction whether or not there is a binding arbitration agreement.

3

If any of the parties refuses or fails to take part in the arbitration or any stage thereof, the arbitration shall proceed notwithstanding such refusal or failure.

4

Unless otherwise agreed, the Arbitral Tribunal shall not cease to have jurisdiction by reason of any claim that the contract is null and void or allegation that it is non-existent, provided that the Arbitral Tribunal upholds the validity of the arbitration agreement. The Arbitral Tribunal shall continue to have jurisdiction to determine the respective rights of the parties and to adjudicate their claims and pleas even though the contract itself may be non-existent or null and void.

## THE ARBITRAL TRIBUNAL

### Article 7
### General Provisions

1

Every arbitrator must be and remain independent of the parties involved in the arbitration.

2

Before appointment or confirmation, a prospective arbitrator shall sign a statement of independence and disclose in writing to the Secretariat any facts or circumstances which might be of such a nature as to call into question the arbitrator's independence in the eyes of the parties. The Secretariat shall provide such information to the parties in writing and fix a time limit for any comments from them.

3

An arbitrator shall immediately disclose in writing to the Secretariat and to the parties any facts or circumstances of a similar nature which may arise during the arbitration.

4

The decisions of the Court as to the appointment, confirmation, challenge or replacement of an arbitrator shall be final and the reasons for such decisions shall not be communicated.

5

By accepting to serve, every arbitrator undertakes to carry out his responsibilities in accordance with these Rules.

6

Insofar as the parties have not provided otherwise, the Arbitral Tribunal shall be constituted in accordance with the provisions of Articles 8, 9 and 10.

### Article 8
### Number of Arbitrators

1

The disputes shall be decided by a sole arbitrator or by three arbitrators.

2

Where the parties have not agreed upon the number of arbitrators, the Court shall appoint a sole arbitrator, save where it appears to the Court that the dispute is such as to warrant the appointment of three arbitrators. In such case, the Claimant shall nominate an arbitrator within a period of 15 days from the receipt of the notification of the decision of the Court, and the Respondent shall nominate an arbitrator within a period of 15 days from the receipt of the notification of the nomination made by the Claimant.

3

Where the parties have agreed that the dispute shall be settled by a sole arbitrator, they may, by agreement,

nominate the sole arbitrator for confirmation. If the parties fail to nominate a sole arbitrator within 30 days from the date when the Claimant's Request for Arbitration has been received by the other party, or within such additional time as may be allowed by the Secretariat, the sole arbitrator shall be appointed by the Court.

4

Where the dispute is to be referred to three arbitrators, each party shall nominate in the Request and the Answer, respectively, one arbitrator for confirmation. If a party fails to nominate an arbitrator, the appointment shall be made by the Court. The third arbitrator, who will act as chairman of the Arbitral Tribunal, shall be appointed by the Court, unless the parties have agreed upon another procedure for such appointment, in which case the nomination will be subject to confirmation pursuant to Article 9. Should such procedure not result in a nomination within the time limit fixed by the parties or the Court, the third arbitrator shall be appointed by the Court.

## Article 9
## Appointment and Confirmation of the Arbitrators

1

In confirming or appointing arbitrators, the Court shall consider the prospective arbitrator's nationality, residence and other relationships with the countries of which the parties or the other arbitrators are nationals and the prospective arbitrator's availability and ability to conduct the arbitration in accordance with these Rules. The same shall apply where the Secretary General confirms arbitrators pursuant to Article 9(2).

2

The Secretary General may confirm as co-arbitrators, sole arbitrators and chairmen of Arbitral Tribunals persons nominated by the parties or pursuant to their particular agreements, provided they have filed a statement of independence without qualification or a qualified statement of independence has not given rise to

objections. Such confirmation shall be reported to the Court at its next session. If the Secretary General considers that a co-arbitrator, sole arbitrator or chairman of an Arbitral Tribunal should not be confirmed, the matter shall be submitted to the Court.

3

Where the Court is to appoint a sole arbitrator or the chairman of an Arbitral Tribunal, it shall make the appointment upon a proposal of a National Committee of the ICC that it considers to be appropriate. If the Court does not accept the proposal made, or if the National Committee fails to make the proposal requested within the time limit fixed by the Court, the Court may repeat its request or may request a proposal from another National Committee that it considers to be appropriate.

4

Where the Court considers that the circumstances so demand, it may choose the sole arbitrator or the chairman of the Arbitral Tribunal from a country where there is no National Committee, provided that neither of the parties objects within the time limit fixed by the Court.

5

The sole arbitrator or the chairman of the Arbitral Tribunal shall be of a nationality other than those of the parties. However, in suitable circumstances and provided that neither of the parties objects within the time limit fixed by the Court, the sole arbitrator or the chairman of the Arbitral Tribunal may be chosen from a country of which any of the parties is a national.

6

Where the Court is to appoint an arbitrator on behalf of a party which has failed to nominate one, it shall make the appointment upon a proposal of the National Committee of the country of which that party is a national. If the Court does not accept the proposal made, or if the National Committee fails to make the proposal requested within the time limit fixed by the Court, or if the country of which the said party is a national has no National

Committee, the Court shall be at liberty to choose any person whom it regards as suitable. The Secretariat shall inform the National Committee, if one exists, of the country of which such person is a national.

### Article 10
### Multiple Parties

1

Where there are multiple parties, whether as Claimant or as Respondent, and where the dispute is to be referred to three arbitrators, the multiple Claimants, jointly, and the multiple Respondents, jointly, shall nominate an arbitrator for confirmation pursuant to Article 9.

2

In the absence of such a joint nomination and where all parties are unable to agree to a method for the constitution of the Arbitral Tribunal, the Court may appoint each member of the Arbitral Tribunal and shall designate one of them to act as chairman. In such case, the Court shall be at liberty to choose any person it regards as suitable to act as arbitrator, applying Article 9 when it considers this appropriate.

### Article 11
### Challenge of Arbitrators

1

A challenge of an arbitrator, whether for an alleged lack of independence or otherwise, shall be made by the submission to the Secretariat of a written statement specifying the facts and circumstances on which the challenge is based.

2

For a challenge to be admissible, it must be sent by a party either within 30 days from receipt by that party of the notification of the appointment or confirmation of the arbitrator, or within 30 days from the date when the party making the challenge was informed of the facts and circumstances on which the challenge is based if such date is subsequent to the receipt of such notification.

3

The Court shall decide on the admissibility and, at the same time, if necessary, on the merits of a challenge after the Secretariat has afforded an opportunity for the arbitrator concerned, the other party or parties and any other members of the Arbitral Tribunal to comment in writing within a suitable period of time. Such comments shall be communicated to the parties and to the arbitrators.

### Article 12
### Replacement of Arbitrators

1

An arbitrator shall be replaced upon his death, upon the acceptance by the Court of the arbitrator's resignation, upon acceptance by the Court of a challenge, or upon the request of all the parties.

2

An arbitrator shall also be replaced on the Court's own initiative when it decides that he is prevented *de jure* or *de facto* from fulfilling his functions, or that he is not fulfilling his functions in accordance with the Rules or within the prescribed time limits.

3

When, on the basis of information that has come to its attention, the Court considers applying Article 12(2), it shall decide on the matter after the arbitrator concerned, the parties and any other members of the Arbitral Tribunal have had an opportunity to comment in writing within a suitable period of time. Such comments shall be communicated to the parties and to the arbitrators.

4

When an arbitrator is to be replaced, the Court has discretion to decide whether or not to follow the original nominating process. Once reconstituted, and after having invited the parties to comment, the Arbitral Tribunal shall determine if and to what extent prior proceedings shall be repeated before the reconstituted Arbitral Tribunal.

5

Subsequent to the closing of the proceedings, instead of replacing an arbitrator who has died or been removed by the Court pursuant to Articles 12(1) and 12(2), the Court may decide, when it considers it appropriate, that the remaining arbitrators shall continue the arbitration. In making such determination, the Court shall take into account the views of the remaining arbitrators and of the parties and such other matters that it considers appropriate in the circumstances.

## THE ARBITRAL PROCEEDINGS

### Article 13
### Transmission of the File to the Arbitral Tribunal

The Secretariat shall transmit the file to the Arbitral Tribunal as soon as it has been constituted, provided the advance on costs requested by the Secretariat at this stage has been paid.

### Article 14
### Place of the Arbitration

1

The place of the arbitration shall be fixed by the Court unless agreed upon by the parties.

2

The Arbitral Tribunal may, after consultation with the parties, conduct hearings and meetings at any location it considers appropriate unless otherwise agreed by the parties.

3

The Arbitral Tribunal may deliberate at any location it considers appropriate.

### Article 15
### Rules Governing the Proceedings

1

The proceedings before the Arbitral Tribunal shall be governed by these Rules and, where these Rules are silent, by any rules which the parties or, failing them, the Arbitral Tribunal may settle on, whether or not reference is thereby made to the rules of procedure of a national law to be applied to the arbitration.

2

In all cases, the Arbitral Tribunal shall act fairly and impartially and ensure that each party has a reasonable opportunity to present its case.

### Article 16
### Language of the Arbitration

In the absence of an agreement by the parties, the Arbitral Tribunal shall determine the language or languages of the arbitration, due regard being given to all relevant circumstances, including the language of the contract.

### Article 17
### Applicable Rules of Law

1

The parties shall be free to agree upon the rules of law to be applied by the Arbitral Tribunal to the merits of the dispute. In the absence of any such agreement, the Arbitral Tribunal shall apply the rules of law which it determines to be appropriate.

2

In all cases the Arbitral Tribunal shall take account of the provisions of the contract and the relevant trade usages.

3

The Arbitral Tribunal shall assume the powers of an *amiable compositeur* or decide *ex aequo et bono* only if the parties have agreed to give it such powers.

### Article 18
### Terms of Reference; Procedural Timetable

1

As soon as it has received the file from the Secretariat, the Arbitral Tribunal shall draw up, on the basis of documents or in the presence of the parties and in the light of their most recent submissions, a document defining its Terms of Reference. This document shall include the following particulars:

a) the full names and descriptions of the parties;
b) the addresses of the parties to which notifications and communications arising in the course of the arbitration may be made;
c) a summary of the parties' respective claims and of the relief sought by each party, with an indication to the extent possible of the amounts claimed or counterclaimed;
d) unless the Arbitral Tribunal considers it inappropriate, a list of issues to be determined;
e) the full names, descriptions and addresses of the arbitrators;
f) the place of the arbitration; and
g) particulars of the applicable procedural rules and, if such is the case, reference to the power conferred upon the Arbitral Tribunal to act as *amiable compositeur* or to decide *ex aequo et bono*.

2

The Terms of Reference shall be signed by the parties and the Arbitral Tribunal. Within two months of the date on which the file has been transmitted to it, the Arbitral Tribunal shall transmit to the Court the Terms of Reference signed by it and by the parties. The Court may extend this time limit pursuant to a reasoned request from the Arbitral Tribunal or on its own initiative if it decides it is necessary to do so.

3

If any of the parties refuses to take part in the drawing up of the Terms of Reference or to sign the same, they shall

be submitted to the Court for approval. When the Terms of Reference have been signed in accordance with Article 18(2) or approved by the Court, the arbitration shall proceed.

4

When drawing up the Terms of Reference, or as soon as possible thereafter, the Arbitral Tribunal, after having consulted the parties, shall establish in a separate document a provisional timetable that it intends to follow for the conduct of the arbitration and shall communicate it to the Court and the parties. Any subsequent modifications of the provisional timetable shall be communicated to the Court and the parties.

### Article 19
### New Claims

After the Terms of Reference have been signed or approved by the Court, no party shall make new claims or counterclaims which fall outside the limits of the Terms of Reference unless it has been authorized to do so by the Arbitral Tribunal, which shall consider the nature of such new claims or counterclaims, the stage of the arbitration and other relevant circumstances.

### Article 20
### Establishing the Facts of the Case

1

The Arbitral Tribunal shall proceed within as short a time as possible to establish the facts of the case by all appropriate means.

2

After studying the written submissions of the parties and all documents relied upon, the Arbitral Tribunal shall hear the parties together in person if any of them so requests or, failing such a request, it may of its own motion decide to hear them.

3

The Arbitral Tribunal may decide to hear witnesses, experts appointed by the parties or any other person, in

the presence of the parties, or in their absence provided they have been duly summoned.

4

The Arbitral Tribunal, after having consulted the parties, may appoint one or more experts, define their terms of reference and receive their reports. At the request of a party, the parties shall be given the opportunity to question at a hearing any such expert appointed by the Tribunal.

5

At any time during the proceedings, the Arbitral Tribunal may summon any party to provide additional evidence.

6

The Arbitral Tribunal may decide the case solely on the documents submitted by the parties unless any of the parties requests a hearing.

7

The Arbitral Tribunal may take measures for protecting trade secrets and confidential information.

### Article 21
### Hearings

1

When a hearing is to be held, the Arbitral Tribunal, giving reasonable notice, shall summon the parties to appear before it on the day and at the place fixed by it.

2

If any of the parties, although duly summoned, fails to appear without valid excuse, the Arbitral Tribunal shall have the power to proceed with the hearing.

3

The Arbitral Tribunal shall be in full charge of the hearings, at which all the parties shall be entitled to be present. Save with the approval of the Arbitral Tribunal and the parties, persons not involved in the proceedings shall not be admitted.

4

The parties may appear in person or through duly authorized representatives. In addition, they may be assisted by advisers.

### Article 22
### Closing of the Proceedings

1

When it is satisfied that the parties have had a reasonable opportunity to present their cases, the Arbitral Tribunal shall declare the proceedings closed. Thereafter, no further submission or argument may be made, or evidence produced, unless requested or authorized by the Arbitral Tribunal.

2

When the Arbitral Tribunal has declared the proceedings closed, it shall indicate to the Secretariat an approximate date by which the draft Award will be submitted to the Court for approval pursuant to Article 27. Any postponement of that date shall be communicated to the Secretariat by the Arbitral Tribunal.

### Article 23
### Conservatory and Interim Measures

1

Unless the parties have otherwise agreed, as soon as the file has been transmitted to it, the Arbitral Tribunal may, at the request of a party, order any interim or conservatory measure it deems appropriate. The Arbitral Tribunal may make the granting of any such measure subject to appropriate security being furnished by the requesting party. Any such measure shall take the form of an order, giving reasons, or of an Award, as the Arbitral Tribunal considers appropriate.

2

Before the file is transmitted to the Arbitral Tribunal, and in appropriate circumstances even thereafter, the parties may apply to any competent judicial authority for interim

or conservatory measures. The application of a party to a judicial authority for such measures or for the implementation of any such measures ordered by an Arbitral Tribunal shall not be deemed to be an infringement or a waiver of the arbitration agreement and shall not affect the relevant powers reserved to the Arbitral Tribunal. Any such application and any measures taken by the judicial authority must be notified without delay to the Secretariat. The Secretariat shall inform the Arbitral Tribunal thereof.

## AWARDS

### Article 24
### Time Limit for the Award

1

The time limit within which the Arbitral Tribunal must render its final Award is six months. Such time limit shall start to run from the date of the last signature by the Arbitral Tribunal or by the parties of the Terms of Reference or, in the case of application of Article 18(3), the date of the notification to the Arbitral Tribunal by the Secretariat of the approval of the Terms of Reference by the Court.

2

The Court may extend this time limit pursuant to a reasoned request from the Arbitral Tribunal or on its own initiative if it decides it is necessary to do so.

### Article 25
### Making of the Award

1

When the Arbitral Tribunal is composed of more than one arbitrator, an Award is given by a majority decision. If there be no majority, the Award shall be made by the chairman of the Arbitral Tribunal alone.



2

The Award shall state the reasons upon which it is based.

3

The Award shall be deemed to be made at the place of the arbitration and on the date stated therein.

### Article 26
### Award by Consent

If the parties reach a settlement after the file has been transmitted to the Arbitral Tribunal in accordance with Article 13, the settlement shall be recorded in the form of an Award made by consent of the parties if so requested by the parties and if the Arbitral Tribunal agrees to do so.

### Article 27
### Scrutiny of the Award by the Court

Before signing any Award, the Arbitral Tribunal shall submit it in draft form to the Court. The Court may lay down modifications as to the form of the Award and, without affecting the Arbitral Tribunal's liberty of decision, may also draw its attention to points of substance. No Award shall be rendered by the Arbitral Tribunal until it has been approved by the Court as to its form.

### Article 28
### Notification, Deposit and Enforceability of the Award

1

Once an Award has been made, the Secretariat shall notify to the parties the text signed by the Arbitral Tribunal, provided always that the costs of the arbitration have been fully paid to the ICC by the parties or by one of them.

2

Additional copies certified true by the Secretary General shall be made available on request and at any time to the parties, but to no one else.

3

By virtue of the notification made in accordance with Paragraph 1 of this Article, the parties waive any other form of notification or deposit on the part of the Arbitral Tribunal.

4

An original of each Award made in accordance with the present Rules shall be deposited with the Secretariat.

5

The Arbitral Tribunal and the Secretariat shall assist the parties in complying with whatever further formalities may be necessary.

6

Every Award shall be binding on the parties. By submitting the dispute to arbitration under these Rules, the parties undertake to carry out any Award without delay and shall be deemed to have waived their right to any form of recourse insofar as such waiver can validly be made.

### Article 29
### Correction and Interpretation of the Award

1

On its own initiative, the Arbitral Tribunal may correct a clerical, computational or typographical error, or any errors of similar nature contained in an Award, provided such correction is submitted for approval to the Court within 30 days of the date of such Award.

2

Any application of a party for the correction of an error of the kind referred to in Article 29(1), or for the interpretation of an Award, must be made to the Secretariat within 30 days of the receipt of the Award by such party, in a number of copies as stated in Article 3(1). After transmittal of the application to the Arbitral Tribunal, the latter shall grant the other party a short time limit, normally not exceeding 30 days, from the receipt of the application by that party, to submit any comments thereon. If the Arbitral Tribunal decides to correct or interpret the Award, it shall submit its decision in draft form to the Court not later than 30 days following the expiration of the time limit for the receipt of any comments from the other party or within such other period as the Court may decide.

3

The decision to correct or to interpret the Award shall take the form of an addendum and shall constitute part of the Award. The provisions of Articles 25, 27 and 28 shall apply *mutatis mutandis*.

## COSTS

### Article 30
### Advance to Cover the Costs of the Arbitration

1

After receipt of the Request, the Secretary General may request the Claimant to pay a provisional advance in an amount intended to cover the costs of arbitration until the Terms of Reference have been drawn up.

2

As soon as practicable, the Court shall fix the advance on costs in an amount likely to cover the fees and expenses of the arbitrators and the ICC administrative costs for the claims and counterclaims which have been referred to it by the parties. This amount may be subject to readjustment at any time during the arbitration. Where, apart from the claims, counterclaims are submitted, the Court may fix separate advances on costs for the claims and the counterclaims.

3

The advance on costs fixed by the Court shall be payable in equal shares by the Claimant and the Respondent. Any provisional advance paid on the basis of Article 30(1) will

be considered as a partial payment thereof. However, any party shall be free to pay the whole of the advance on costs in respect of the principal claim or the counterclaim should the other party fail to pay its share. When the Court has set separate advances on costs in accordance with Article 30(2), each of the parties shall pay the advance on costs corresponding to its claims.

4

When a request for an advance on costs has not been complied with, and after consultation with the Arbitral Tribunal, the Secretary General may direct the Arbitral Tribunal to suspend its work and set a time limit, which must be not less than 15 days, on the expiry of which the relevant claims, or counterclaims, shall be considered as withdrawn. Should the party in question wish to object to this measure, it must make a request within the aforementioned period for the matter to be decided by the Court. Such party shall not be prevented, on the ground of such withdrawal, from reintroducing the same claims or counterclaims at a later date in another proceeding.

5

If one of the parties claims a right to a set-off with regard to either claims or counterclaims, such set-off shall be taken into account in determining the advance to cover the costs of arbitration in the same way as a separate claim insofar as it may require the Arbitral Tribunal to consider additional matters.

## Article 31
## Decision as to the Costs of the Arbitration

1

The costs of the arbitration shall include the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court, in accordance with the scale in force at the time of the commencement of the arbitral proceedings, as well as the fees and expenses of any experts appointed by the Arbitral Tribunal and the reasonable legal and other costs incurred by the parties for the arbitration.

2

The Court may fix the fees of the arbitrators at a figure higher or lower than that which would result from the application of the relevant scale should this be deemed necessary due to the exceptional circumstances of the case. Decisions on costs other than those fixed by the Court may be taken by the Arbitral Tribunal at any time during the proceedings.

3

The final Award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties.

# MISCELLANEOUS

## Article 32
## Modified Time Limits

1

The parties may agree to shorten the various time limits set out in these Rules. Any such agreement entered into subsequent to the constitution of an Arbitral Tribunal shall become effective only upon the approval of the Arbitral Tribunal.

2

The Court, on its own initiative, may extend any time limit which has been modified pursuant to Article 32(1) if it decides that it is necessary to do so in order that the Arbitral Tribunal or the Court may fulfil their responsibilities in accordance with these Rules.

## Article 33
## Waiver

A party which proceeds with the arbitration without raising its objection to a failure to comply with any provision of these Rules, or of any other rules applicable to the proceedings, any direction given by the Arbitral Tribunal,

or any requirement under the arbitration agreement relating to the constitution of the Arbitral Tribunal, or to the conduct of the proceedings, shall be deemed to have waived its right to object.

### Article 34
### Exclusion of Liability

Neither the arbitrators, nor the Court and its members, nor the ICC and its employees, nor the ICC National Committees shall be liable to any person for any act or omission in connection with the arbitration.

### Article 35
### General Rule

In all matters not expressly provided for in these Rules, the Court and the Arbitral Tribunal shall act in the spirit of these Rules and shall make every effort to make sure that the Award is enforceable at law.

## APPENDIX I
## STATUTES OF THE INTERNATIONAL COURT OF ARBITRATION

### Article 1
### Function

1

The function of the International Court of Arbitration of the International Chamber of Commerce (the "Court") is to ensure the application of the Rules of Arbitration of the International Chamber of Commerce, and it has all the necessary powers for that purpose.

2

As an autonomous body, it carries out these functions in complete independence from the ICC and its organs.

3

Its members are independent from the ICC National Committees.

### Article 2
### Composition of the Court

The Court shall consist of a Chairman, Vice-Chairmen, and members and alternate members (collectively designated as members). In its work it is assisted by its Secretariat (Secretariat of the Court).

### Article 3
### Appointment

1

The Chairman is elected by the ICC World Council upon the recommendation of the Executive Board of the ICC.

2

The ICC World Council appoints the Vice-Chairmen of the Court from among the members of the Court or otherwise.

3

Its members are appointed by the ICC World Council on the proposal of National Committees, one member for each Committee.

4

On the proposal of the Chairman of the Court, the World Council may appoint alternate members.

5

The term of office of all members is three years. If a member is no longer in a position to exercise his functions, his successor is appointed by the World Council for the remainder of the term.

### Article 4
### Plenary Session of the Court

The Plenary Sessions of the Court are presided over by the Chairman or, in his absence, by one of the Vice-Chairmen designated by him. The deliberations shall be valid when at least six members are present. Decisions are taken by a majority vote, the Chairman having a casting vote in the event of a tie.

### Article 5
### Committees

The Court may set up one or more Committees and establish the functions and organization of such Committees.

### Article 6
### Confidentiality

The work of the Court is of a confidential nature which must be respected by everyone who participates in that work in whatever capacity. The Court lays down the rules regarding the persons who can attend the meetings of the Court and its Committees and who are entitled to have access to the materials submitted to the Court and its Secretariat.

### Article 7
### Modification of the Rules of Arbitration

Any proposal of the Court for a modification of the Rules is laid before the Commission on Arbitration before submission to the Executive Board and the World Council of the ICC for approval.

# APPENDIX II
# INTERNAL RULES OF THE INTERNATIONAL COURT OF ARBITRATION

## Article 1
## Confidential Character of the Work of the International Court of Arbitration

1

The sessions of the Court, whether plenary or those of a Committee of the Court, are open only to its members and to the Secretariat.

2

However, in exceptional circumstances, the Chairman of the Court may invite other persons to attend. Such persons must respect the confidential nature of the work of the Court.

3

The documents submitted to the Court, or drawn up by it in the course of its proceedings, are communicated only to the members of the Court and to the Secretariat and to persons authorized by the Chairman to attend Court sessions.

4

The Chairman or the Secretary General of the Court may authorize researchers undertaking work of a scientific nature on international trade law to acquaint themselves with Awards and other documents of general interest, with the exception of memoranda, notes, statements and documents remitted by the parties within the framework of arbitration proceedings.

5

Such authorization shall not be given unless the beneficiary has undertaken to respect the confidential character of the documents made available and to refrain from any publication in their respect without having previously submitted the text for approval to the Secretary General of the Court.

6

The Secretariat will in each case submitted to arbitration under the Rules retain in the archives of the Court all Awards, Terms of Reference and decisions of the Court, as well as copies of the pertinent correspondence of the Secretariat.

7

Any documents, communications or correspondence submitted by the parties or the arbitrators may be destroyed unless a party or an arbitrator requests in writing within a period fixed by the Secretariat the return of such documents. All related costs and expenses for the return of those documents shall be paid by such party or arbitrator.

## Article 2
## Participation of Members of the International Court of Arbitration in ICC Arbitration

1

The Chairman and the members of the Secretariat of the Court may not act as arbitrators or as counsel in cases submitted to ICC arbitration.

2

The Court shall not appoint Vice-Chairmen or members of the Court as arbitrators. They may, however, be proposed for such duties by one or more of the parties, or pursuant to any other procedure agreed upon by the parties, subject to confirmation.

3

When the Chairman, a Vice-Chairman or a member of the Court or of the Secretariat is involved in any capacity whatsoever in proceedings pending before the Court, such person must inform the Secretary General of the Court upon becoming aware of such involvement.

4

Such person must refrain from participating in the discussions or in the decisions of the Court concerning

the proceedings and must be absent from the courtroom whenever the matter is considered.

5

Such person will not receive any material documentation or information pertaining to such proceedings.

## Article 3
## Relations between the Members of the Court and the ICC National Committees

1

By virtue of their capacity, the members of the Court are independent of the ICC National Committees which proposed them for appointment by the ICC World Council.

2

Furthermore, they must regard as confidential, vis-à-vis the said National Committees, any information concerning individual cases with which they have become acquainted in their capacity as members of the Court, except when they have been requested by the Chairman of the Court or by its Secretary General to communicate specific information to their respective National Committees.

## Article 4
## Committee of the Court

1

In accordance with the provisions of Article 1(4) of the Rules and Article 5 of its Statutes (Appendix I), the Court hereby establishes a Committee of the Court.

2

The members of the Committee consist of a Chairman and at least two other members. The Chairman of the Court acts as the Chairman of the Committee. If absent, the Chairman may designate a Vice-Chairman of the Court or, in exceptional circumstances, another member of the Court as Chairman of the Committee.

3

The other two members of the Committee are appointed by the Court from among the Vice-Chairmen or the other members of the Court. At each Plenary Session the Court appoints the members who are to attend the meetings of the Committee to be held before the next Plenary Session.

4

The Committee meets when convened by its Chairman. Two members constitute a quorum.

5

(a) The Court shall determine the decisions that may be taken by the Committee.

(b) The decisions of the Committee are taken unanimously.

(c) When the Committee cannot reach a decision or deems it preferable to abstain, it transfers the case to the next Plenary Session, making any suggestions it deems appropriate.

(d) The Committee's decisions are brought to the notice of the Court at its next Plenary Session.

## Article 5
## Court Secretariat

1

In case of absence, the Secretary General may delegate to the General Counsel and Deputy Secretary General the authority to confirm arbitrators, to certify true copies of Awards and to request the payment of a provisional advance, respectively provided for in Articles 9(2), 28(2) and 30(1) of the Rules.

2

The Secretariat may, with the approval of the Court, issue notes and other documents for the information of the parties and the arbitrators, or as necessary for the proper conduct of the arbitral proceedings.

**Article 6**
**Scrutiny of Arbitral Awards**

When the Court scrutinizes draft Awards in accordance with Article 27 of the Rules, it considers, to the extent practicable, the requirements of mandatory law at the place of arbitration.

## APPENDIX III
## ARBITRATION COSTS AND FEES

**Article 1**
**Advance on Costs**

1

Each request to commence an arbitration pursuant to the Rules must be accompanied by an advance payment of US$ 2,500 on the administrative expenses. Such payment is non-refundable, and shall be credited to the Claimant's portion of the advance on costs.

2

The provisional advance fixed by the Secretary General according to Article 30(1) of the Rules shall normally not exceed the amount obtained by adding together the administrative expenses, the minimum of the fees (as set out in the scale hereinafter) based upon the amount of the claim and the expected reimbursable expenses of the Arbitral Tribunal incurred with respect to the drafting of the Terms of Reference. If such amount is not quantified, the provisional advance shall be fixed at the discretion of the Secretary General. Payment by the Claimant shall be credited to its share of the advance on costs fixed by the Court.

3

In general, after the Terms of Reference have been signed or approved by the Court and the provisional timetable has been established, the Arbitral Tribunal shall, in accordance with Article 30(4) of the Rules, proceed only with respect to those claims or counterclaims in regard to which the whole of the advance on costs has been paid.

4

The advance on costs fixed by the Court according to Article 30(2) of the Rules comprises the fees of the arbitrator or arbitrators (hereinafter referred to as "arbitrator"), any arbitration-related expenses of the arbitrator and the administrative expenses.

5

Each party shall pay in cash its share of the total advance on costs. However, if its share exceeds an amount fixed from time to time by the Court, a party may post a bank guarantee for this additional amount.

6

A party that has already paid in full its share of the advance on costs fixed by the Court may, in accordance with Article 30(3) of the Rules, pay the unpaid portion of the advance owed by the defaulting party by posting a bank guarantee.

7

When the Court has fixed separate advances on costs pursuant to Article 30(2) of the Rules, the Secretariat shall invite each party to pay the amount of the advance corresponding to its respective claim(s).

8

When, as a result of the fixing of separate advances on costs, the separate advance fixed for the claim of either party exceeds one half of such global advance as was previously fixed (in respect of the same claims and counterclaims that are the subject of separate advances), a bank guarantee may be posted to cover any such excess amount. In the event that the amount of the separate advance is subsequently increased, at least one half of the increase shall be paid in cash.

9

The Secretariat shall establish the terms governing all bank guarantees which the parties may post pursuant to the above provisions.

10

As provided in Article 30(2) of the Rules, the advance on costs may be subject to readjustment at any time during the arbitration, in particular to take into account fluctuations in the amount in dispute, changes in the amount of the estimated expenses of the arbitrator, or the evolving difficulty or complexity of arbitration proceedings.

11

Before any expertise ordered by the Arbitral Tribunal can be commenced, the parties, or one of them, shall pay an advance on costs fixed by the Arbitral Tribunal sufficient to cover the expected fees and expenses of the expert as determined by the Arbitral Tribunal. The Arbitral Tribunal shall be responsible for ensuring the payment by the parties of such fees and expenses.

## Article 2
## Costs and Fees

1

Subject to Article 31(2) of the Rules, the Court shall fix the fees of the arbitrator in accordance with the scale hereinafter set out or, where the sum in dispute is not stated, at its discretion.

2

In setting the arbitrator's fees, the Court shall take into consideration the diligence of the arbitrator, the time spent, the rapidity of the proceedings, and the complexity of the dispute, so as to arrive at a figure within the limits specified or, in exceptional circumstances (Article 31(2) of the Rules), at a figure higher or lower than those limits.

3

When a case is submitted to more than one arbitrator, the Court, at its discretion, shall have the right to increase the total fees up to a maximum which shall normally not exceed three times the fees of one arbitrator.

4

The arbitrator's fees and expenses shall be fixed exclusively by the Court as required by the Rules. Separate fee arrangements between the parties and the arbitrator are contrary to the Rules.

5

The Court shall fix the administrative expenses of each arbitration in accordance with the scale hereinafter set out or, where the sum in dispute is not stated, at its

discretion. In exceptional circumstances, the Court may fix the administrative expenses at a lower or higher figure than that which would result from the application of such scale, provided that such expenses shall normally not exceed the maximum amount of the scale. Further, the Court may require the payment of administrative expenses in addition to those provided in the scale of administrative expenses as a condition to holding an arbitration in abeyance at the request of the parties or of one of them with the acquiescence of the other.

6

If an arbitration terminates before the rendering of a final Award, the Court shall fix the costs of the arbitration at its discretion, taking into account the stage attained by the arbitral proceedings and any other relevant circumstances.

7

In the case of an application under Article 29(2) of the Rules, the Court may fix an advance to cover additional fees and expenses of the Arbitral Tribunal and may make the transmission of such application to the Arbitral Tribunal subject to the prior cash payment in full to the ICC of such advance. The Court shall fix at its discretion any possible fees of the arbitrator when approving the decision of the Arbitral Tribunal.

8

When an arbitration is preceded by an attempt at amicable resolution pursuant to the ICC ADR Rules, one half of the administrative expenses paid for such ADR proceedings shall be credited to the administrative expenses of the arbitration.

9

Amounts paid to the arbitrator do not include any possible value added taxes (VAT) or other taxes or charges and imposts applicable to the arbitrator's fees. Parties have a duty to pay any such taxes or charges; however, the recovery of any such charges or taxes is a matter solely between the arbitrator and the parties.

## Article 3
## ICC as Appointing Authority

Any request received for an authority of the ICC to act as appointing authority will be treated in accordance with the Rules of ICC as Appointing Authority in UNCITRAL or Other *Ad Hoc* Arbitration Proceedings and shall be accompanied by a non-refundable sum of US$ 2,500. No request shall be processed unless accompanied by the said sum. For additional services, ICC may at its discretion fix administrative expenses, which shall be commensurate with the services provided and shall not exceed the maximum sum of US$ 10,000.

## Article 4
## Scales of Administrative Expenses and Arbitrator's Fees

1

The Scales of Administrative Expenses and Arbitrator's Fees set forth below shall be effective as of 1 July 2003 in respect of all arbitrations commenced on or after such date, irrespective of the version of the Rules applying to such arbitrations.

2

To calculate the administrative expenses and the arbitrator's fees, the amounts calculated for each successive slice of the sum in dispute must be added together, except that where the sum in dispute is over US$ 80 million, a flat amount of US$ 88,800 shall constitute the entirety of the administrative expenses.

Appendix III to the ICC Rules of Arbitration

## A. ADMINISTRATIVE EXPENSES

| Sum in dispute (in US Dollars) | | | | Administrative expenses(*) |
|---|---|---|---|---|
| up to | 50 000 | | | $ 2 500 |
| from | 50 001 | to | 100 000 | 3.50% |
| from | 100 001 | to | 500 000 | 1.70% |
| from | 500 001 | to | 1 000 000 | 1.15% |
| from | 1 000 001 | to | 2 000 000 | 0.70% |
| from | 2 000 001 | to | 5 000 000 | 0.30% |
| from | 5 000 001 | to | 10 000 000 | 0.20% |
| from | 10 000 001 | to | 50 000 000 | 0.07% |
| from | 50 000 001 | to | 80 000 000 | 0.06% |
| over | 80 000 000 | | | $ 88 800 |

*(*) For illustrative purposes only, the table on the following page indicates the resulting administrative expenses in US$ when the proper calculations have been made.*

## B. ARBITRATOR'S FEES

| Sum in dispute (in US Dollars) | | | | Fees(**) minimum | Fees(**) maximum |
|---|---|---|---|---|---|
| up to | 50 000 | | | $ 2 500 | 17.00% |
| from | 50 001 | to | 100 000 | 2.00% | 11.00% |
| from | 100 001 | to | 500 000 | 1.00% | 5.50% |
| from | 500 001 | to | 1 000 000 | 0.75% | 3.50% |
| from | 1 000 001 | to | 2 000 000 | 0.50% | 2.75% |
| from | 2 000 001 | to | 5 000 000 | 0.25% | 1.12% |
| from | 5 000 001 | to | 10 000 000 | 0.10% | 0.616% |
| from | 10 000 001 | to | 50 000 000 | 0.05% | 0.193% |
| from | 50 000 001 | to | 80 000 000 | 0.03% | 0.136% |
| from | 80 000 001 | to | 100 000 000 | 0.02% | 0.112% |
| over | 100 000 000 | | | 0.01% | 0.056% |

*(**) For illustrative purposes only, the table on the following page indicates the resulting range of fees when the proper calculations have been made.*

| SUM IN DISPUTE (in US Dollars) | A. ADMINISTRATIVE EXPENSES(*) (in US Dollars) | B. ARBITRATOR'S FEES(**) (in US Dollars) Minimum | B. ARBITRATOR'S FEES(**) (in US Dollars) Maximum |
|---|---|---|---|
| up to 50 000 | 2 500 | 2 500 | 17.00% of amount in dispute |
| from 50 001 to 100 000 | 2 500 + 3.50% of amt. over 50 000 | 2 500 + 2.00% of amt. over 50 000 | 8 500 + 11.00% of amt. over 50 000 |
| from 100 001 to 500 000 | 4 250 + 1.70% of amt. over 100 000 | 3 500 + 1.00% of amt. over 100 000 | 14 000 + 5.50% of amt. over 100 000 |
| from 500 001 to 1 000 000 | 11 050 + 1.15% of amt. over 500 000 | 7 500 + 0.75% of amt. over 500 000 | 36 000 + 3.50% of amt. over 500 000 |
| from 1 000 001 to 2 000 000 | 16 800 + 0.70% of amt. over 1 000 000 | 11 250 + 0.50% of amt. over 1 000 000 | 53 500 + 2.75% of amt. over 1 000 000 |
| from 2 000 001 to 5 000 000 | 23 800 + 0.30% of amt. over 2 000 000 | 16 250 + 0.25% of amt. over 2 000 000 | 81 000 + 1.12% of amt. over 2 000 000 |
| from 5 000 001 to 10 000 000 | 32 800 + 0.20% of amt. over 5 000 000 | 23 750 + 0.10% of amt. over 5 000 000 | 114 600 + 0.616% of amt. over 5 000 000 |
| from 10 000 001 to 50 000 000 | 42 800 + 0.07% of amt. over 10 000 000 | 28 750 + 0.05% of amt. over 10 000 000 | 145 400 + 0.193% of amt. over 10 000 000 |
| from 50 000 001 to 80 000 000 | 70 800 + 0.06% of amt. over 50 000 000 | 48 750 + 0.03% of amt. over 50 000 000 | 222 600 + 0.136% of amt. over 50 000 000 |
| from 80 000 001 to 100 000 000 | 88 800 | 57 750 + 0.02% of amt. over 80 000 000 | 263 400 + 0.112% of amt. over 80 000 000 |
| over 100 000 000 | 88 800 | 61 750 + 0.01% of amt. over 100 000 000 | 285 800 + 0.056% of amt. over 100 000 000 |

*(*)(**) See preceding page*

# RULES FOR A PRE-ARBITRAL REFEREE PROCEDURE

## Introduction

During the course of many contracts, especially those made for long-term transactions, problems can arise which require an urgent response. It is frequently not possible to obtain in the time required a final decision from an arbitral tribunal or from a court.

Accordingly, the International Chamber of Commerce (ICC) has set out the following Rules for a Pre-Arbitral Referee Procedure in order to enable parties that have so agreed to have rapid recourse to a person (called a "Referee") empowered to make an order designed to meet the urgent problem in issue, including the power to order the preservation or recording of evidence. The order should therefore provide a temporary resolution of the dispute and may lay the foundations for its final settlement either by agreement or otherwise.

Use of the Pre-Arbitral Referee Procedure does not usurp the jurisdiction of any entity (whether arbitral tribunal or national court) that is ultimately responsible for deciding the merits of any underlying dispute.

## Article 1
## Definitions

1.1

These Rules concern a procedure called the "Pre-Arbitral Referee Procedure", which provides for the immediate appointment of a person (the "Referee") who has the power to make certain Orders prior to the arbitral tribunal or national court competent to deal with the case (the "Competent Authority") being seized of it.

1.2

The Secretariat of the ICC International Court of Arbitration (the "Secretariat") shall act as the Secretariat of the Pre-Arbitral Referee Procedure.

1.3

a) In these Rules any reference to a party includes a party's employees or agents.

b) Any reference to the "Chairman" means the Chairman of the ICC International Court of Arbitration and includes, in his absence, a Vice-Chairman.

## Article 2
## Powers of the Referee

2.1

The powers of the Referee are:

a) to order any conservatory measures or any measures of restoration that are urgently necessary to prevent either immediate damage or irreparable loss and so to safeguard any of the rights or property of one of the parties;

b) to order a party to make to any other party or to another person any payment which ought to be made;

c) to order a party to take any step which ought to be taken according to the contract between the parties, including the signing or delivery of any document or the procuring by a party of the signature or delivery of a document;

d) to order any measures necessary to preserve or establish evidence.

2.1.1

These powers may be altered by express written agreement between the parties.

2.2

The Referee shall not have power to make any Order other than that requested by any party in accordance with Article 3.

2.3

Unless the parties otherwise agree in writing, a Referee appointed in accordance with these Rules shall not act as arbitrator in any subsequent proceedings between those parties or in any other proceedings in which there is any

issue or question that is the same as or connected with any raised in the proceedings before the Referee.

2.4

If the Competent Authority becomes seized of the case after the appointment of the Referee, the Referee shall nevertheless retain the power to make an Order within the time provided by Article 6.2, unless the parties otherwise agree or the Competent Authority orders otherwise.

2.4.1

Except as provided in Article 2.4 above, once the Competent Authority becomes seized of the case it alone may order, under the rules applicable to it, any further provisional or conservatory measures that it considers necessary. For such purpose the Competent Authority, if its rules so permit, shall be deemed to have been authorized by the parties to exercise the powers conferred on the Referee by Article 2.1.

## Article 3
## Request for Referee and Answer

3.1

An agreement to use the Pre-Arbitral Referee Procedure must be in writing.

3.2

A party requiring the appointment of a Referee must send two copies of its Request and of any annexed documents to the Secretariat. Such party must at the same time notify the other party or parties of the Request by the quickest method of delivery available, including telefax.

3.2.1

Each such Request must be accompanied by the amount required to open the file, as set out in Article B.1 of the Appendix to these Rules.

3.2.2

The Request must be drawn up in whatever language may have been agreed upon in writing by the parties or, in the absence of any such agreement, in the same language as the agreement to use the Pre-Arbitral Referee Procedure. If this language is not English, French or German, a translation of the Request into one of these languages must accompany the Request. The annexed documents may be submitted in their original language without translation except where it is necessary in order to understand the Request. The Request shall be in writing and shall contain in particular:

a) the names and addresses of the parties to the agreement together with a brief description of the legal relationships between the parties;

b) a copy of the agreement on which the Request is based;

c) the Order or Orders requested and an explanation of the grounds relied on so as to show that the Request falls within Article 2.1;

d) as the case may be, the name of the Referee chosen by agreement of the parties;

e) any information concerning the choice of the Referee required to be appointed, including, as appropriate, technical or professional qualifications, nationality and language requirements;

f) confirmation that the request has been sent to every other party, stating the means by which this has been done and enclosing proof of transmission, such as postal registration form, receipt from a private courier, or telefax receipt.

3.3

The requesting party shall, if required by the Secretariat, establish when a copy of the Request was received by each party to whom it was sent or when it should be treated as having been received by said party.

3.4

The other party or parties must submit to the Secretariat in writing an Answer to the Request within eight days from receipt of the copy of the Request sent in accordance with Article 3.2 above, and must send at the same time a

copy to the requesting party and to any other party, using the quickest method of delivery available, including telefax. The Answer must state any Order requested by that party or parties.

### Article 4
### Appointment of the Referee and Transmission of the File

4.1

The Referee may be chosen by the parties by agreement before or after a Request is made pursuant to Article 3, in which case the name and address of the Referee shall be sent immediately to the Secretariat. Upon receipt of the Answer or, at the latest, upon the expiry of the time limit set out in Article 3.4, and having verified the *prima facie* existence of the agreement of the parties, the Chairman shall promptly appoint the Referee agreed upon.

4.2

If a Referee is to be appointed under Article 3.2.2(e), the Chairman shall, upon the expiry of the time limit set out in Article 3.4, appoint the Referee in the shortest time possible, taking account of his technical or professional qualifications, nationality, residence, other relationships with the countries in which the parties are established or with which they are otherwise connected, and any submissions of any party concerning the choice of a Referee.

4.3

Once the Referee has been appointed, the Secretariat shall so notify the parties and shall transmit the file to him. Thereafter, all documentation from the parties must be sent directly to the Referee with a copy to the Secretariat. All documentation from the Referee to the parties must be copied to the Secretariat.

4.4.

Any party may challenge a Referee appointed under Article 4.2. In such case the Chairman, after giving the

other party and the Referee an opportunity to comment, shall take within the shortest time possible a final decision as to the validity of the challenge. His decision shall be within his sole discretion and shall not itself be subject to challenge or appeal by any party.

4.5

Another person shall be appointed (a) where a Referee dies or is prevented or unable to carry out his functions, or (b) it is decided under Article 4.4. that a challenge is valid or (c) if the Chairman decides, after giving the Referee an opportunity to comment, that he is not fulfilling his functions in accordance with the Rules or within any applicable time limit. Such an appointment shall be made in accordance with Article 4.2 (but subject to Article 4.4). In such case the new Referee shall proceed afresh.

4.6

The reasons for any decision about an appointment, challenge or replacement of any Referee shall not be disclosed.

### Article 5
### The Proceedings

5.1

If any party has not presented an Answer by the time the file is transmitted to the Referee, the requesting party may be required by the Referee to establish to his satisfaction that a copy of the Request was received or should be treated as having been received by that party before he proceeds further. If the Referee is not so satisfied he shall notify the relevant party of its right to submit an Answer and shall set a time limit within which the Answer shall be submitted. Any such action by the Referee shall not affect the validity of his appointment.

5.2

Any decision as to the Referee's jurisdiction shall be taken by the Referee.

5.3

Within the limits of the powers conferred on him by Article 2.1 and subject to any agreement of the parties, the Referee shall conduct the proceedings in the manner which he considers appropriate for the purpose for which he was appointed including:

* considering the written documents submitted by the parties,

* informing the parties of any further investigation or inquiry that he may consider necessary,

* making such further investigation or inquiry, which may include his visiting any place where the contract is being carried out, or the premises of the parties, or any other relevant place; obtaining the report of an expert; and hearing any person he chooses in connection with the dispute, either in the presence of the parties or, if they have been duly convened, in their absence. The results of these investigations and inquiries shall be communicated to the parties for comment.

5.4

In agreeing to these Rules the parties undertake to provide the Referee with every facility to implement his terms of reference and, in particular, to make available to him all documents which he may consider necessary and also to grant free access to any place for the purpose of any investigation or inquiry. The information given to the Referee shall remain confidential between the parties and the Referee.

5.5

The Referee may convene the parties to appear before him within the shortest time limit possible on a date and at a place fixed by him.

5.6

If one of the parties fails to make a submission or to comment or appear as required by the Referee, and the Referee is satisfied that the party concerned has received or should have received the relevant communication, he may nonetheless continue with the proceedings and may make his Order.

## Article 6
## The Order

6.1

The decisions taken by the Referee shall be sent by him to the Secretariat in the form of an Order giving reasons.

6.2

The Referee shall make and send the Order within 30 days from the date on which the file was transmitted to him. This time limit may be extended by the Chairman upon a reasoned request from the Referee or on his own initiative if he thinks it is necessary to do so.

6.3

The Referee's Order does not pre-judge the substance of the case, nor shall it bind any Competent Authority, which may hear any question, issue or dispute in respect of which the Order has been made. The Order of the Referee shall however remain in force unless and until the Referee or the Competent Authority has decided otherwise.

6.4

The Referee may make the carrying out of his Order subject to such conditions as he thinks fit including (a) that a party shall commence proceedings before the Competent Authority on the substance of the case within a specified period, (b) that a party for whose benefit an Order is made shall provide adequate security.

6.5

The Secretariat shall notify the parties of the Order of the Referee provided it has received the full amount of the advance on costs fixed by the Secretariat. Only Orders so notified are binding upon the parties.

6.6

The parties agree to carry out the Referee's Order without delay and waive their right to all means of appeal or recourse or opposition to a request to a court or to any other authority to implement the Order, insofar as such waiver can validly be made.

6.7

Unless otherwise agreed between the parties and subject to any mandatory order, any submissions, communications or documents (other than the Order) established or made solely for the purposes of the Pre-Arbitral Referee Procedure shall be confidential and shall not be given to the Competent Authority.

6.8

The Referee shall not be obliged to explain or give further additional reasons for any Order after it has been notified by the Secretariat under Article 6.5. Neither the ICC nor any of its employees or persons acting as Chairman or Vice-Chairman, nor any person acting as Referee shall be liable to any person for any loss or damage arising out of any act or omission in connection with the Rules, except that the Referee may be liable for the consequences of conscious and deliberate wrongdoing.

6.8.1

The Competent Authority may determine whether any party that refuses or fails to carry out an Order of the Referee is liable to any other party for loss or damage caused by such refusal or failure.

6.8.2

The Competent Authority may determine whether a party that requested the Referee to issue an Order, the carrying out of which caused damage to another party, is liable to such other party.

## Article 7
## Costs

7.1

The costs of the Pre-Arbitral Referee Procedure comprise: (a) an administrative charge as set out in the Appendix to these Rules, (b) the fees and expenses of the Referee to be determined as set out in the Appendix and (c) the costs of any expert. The Referee's Order shall state who shall bear the costs of the Pre-Arbitral Referee Procedure and in what proportion. A party that made an advance or other payment in respect of costs for which it was not liable under the Referee's Order shall be entitled to recover the amount paid from the party that ought to have made the payment.

7.2

The costs of and payment for any procedure under these Rules are as set out in the Appendix hereto.

# APPENDIX
# COSTS AND PAYMENT FOR A PRE-ARBITRAL REFEREE PROCEDURE

## A. COSTS

1.

An administrative charge of US$ 2,500 is payable by the requesting party in respect of each Request made to the ICC to appoint a Referee or to administer a Pre-Arbitral Referee Procedure.

The charge covers all services rendered by the ICC that may be required by the Rules, but not any services required by alterations to or extensions of the Pre-Arbitral Referee Procedure. The administrative charge is not refundable and becomes the property of the ICC.

2.

The amount of the fees and expenses of the Referee shall be fixed by the Secretary General of the ICC International Court of Arbitration. The amount shall be reasonable, taking into consideration the time spent, the complexity of the matter and any other relevant circumstances.

3.

The costs of the procedure shall also include any fees and expenses of any expert.

## B. PAYMENT

1.

The amount required to open the file (Article 3.2.1 of the Rules) is US$ 5,000, of which US$ 2,500 constitutes the administrative charge as set out above and US$ 2,500 constitutes an advance on the fees and expenses of the Referee and any expert. No request for the appointment of a Referee or for the administration of an ICC Pre-Arbitral Referee Procedure will be entertained unless accompanied by this amount.

2.

As soon as possible after the file has been sent to the Referee and after such consultation as is possible with the Referee and the parties, the Secretariat shall fix an advance on costs to cover the estimated costs of the Pre-Arbitral Referee Procedure (Article 7.1 of the Rules). Such advance on costs is subject to readjustment by the Secretariat.

The requesting party shall pay the whole of this advance on costs, except insofar as the Secretariat may request the other party or parties to contribute to the advance on costs in the light of any request for an Order by the Referee which any other party may have made.

3.

No Order of the Referee shall be notified by the Secretariat or be valid unless the advance on costs has been received (Article 6.5 of the Rules). Where two or more parties have been asked to contribute to the advance on costs and have not paid their contribution, only the Order requested by the party or parties that have fully paid the advance or contribution shall be notified and be valid.

## THE INTERNATIONAL CHAMBER OF COMMERCE

ICC is the world business organization, a representative body that speaks with authority on behalf of enterprises from all sectors in every part of the world.

The fundamental mission of ICC is to promote trade and investment across frontiers and help business corporations meet the challenges and opportunities of globalization. Its conviction that trade is a powerful force for peace and prosperity dates from the organization's origins early in the last century. The small group of far-sighted business leaders who founded ICC called themselves "merchants of peace".

Because its member companies and associations are themselves engaged in international business, ICC has unrivalled authority in making rules that govern the conduct of business across borders. Although these rules are voluntary, they are observed in countless thousands of transactions every day and have become part of the fabric of international trade.

ICC also provides essential services, foremost among them the ICC International Court of Arbitration, the world's leading arbitral institution. Another service is the World Chambers Federation, ICC's worldwide network of chambers of commerce, fostering interaction and exchange of chamber best practice.

Within a year of the creation of the United Nations, ICC was granted consultative status at the highest level with the UN and its specialized agencies.

Business leaders and experts drawn from ICC's membership establish the business stance on broad issues of trade and investment policy as well as on vital technical and sectoral subjects. These include financial services, information technologies, telecommunications, marketing ethics, the environment, transportation, competition law and intellectual property, among others.

ICC was founded in 1919. Today it groups thousands of member companies and associations from over 130 countries. National committees work with their members to address the concerns of business in their countries and convey to their governments the business views formulated by ICC.

**www.iccwbo.org**

## ICC NATIONAL COMMITTEES AND GROUPS

| | *Founded* | | *Founded* |
|---|---|---|---|
| Algeria | 2000 | Kuwait | 1978 |
| Argentina | 1947 | Lebanon | 1973 |
| Australia | 1927 | Lithuania | 1994 |
| Austria | 1921 | Luxembourg | 1921 |
| Bahrain | 1999 | Madagascar | 2004 |
| Bangladesh | 1994 | Malaysia | 2003 |
| Belgium | 1920 | Mexico | 1945 |
| Brazil | 1967 | Monaco | 2001 |
| Burkino Faso | 1976 | Morocco | 1957 |
| Cameroon | 1981 | Nepal | 2001 |
| Canada | 1945 | Netherlands | 1921 |
| Caribbean | 1999 | New Zealand | 1998 |
| Chile | 1993 | Nigeria | 1979 |
| China | 1994 | Norway | 1922 |
| Chinese Taipei | 1966 | Pakistan | 1955 |
| Colombia | 1961 | Panama | 2003 |
| Costa Rica | 2002 | Philippines | 1998 |
| Croatia | 2003 | Poland | 1999 |
| Cuba | 2000 | Portugal | 1934 |
| Cyprus | 1980 | Qatar | 2001 |
| Czech Republic | 1999 | Romania | 2001 |
| Denmark | 1920 | Russia | 2000 |
| Dominican Republic | 2005 | Saudi Arabia | 1975 |
| Ecuador | 1987 | Senegal | 1975 |
| Egypt | 1974 | Serbia & Montenegro | 1927 |
| El Salvador | 2003 | Singapore | 1978 |
| Finland | 1927 | Slovakia | 2000 |
| France | 1920 | Slovenia | 2001 |
| Georgia | 2002 | South Africa | 1958 |
| Germany | 1925 | Spain | 1922 |
| Ghana | 1999 | Sri Lanka | 1955 |
| Greece | 1926 | Sweden | 1921 |
| Guatemala | 2005 | Switzerland | 1922 |
| Hong Kong, China | 1998 | Syria | 1988 |
| Hungary | 1996 | Tanzania | 2000 |
| Iceland | 1983 | Thailand | 1999 |
| India | 1929 | Togo | 1977 |
| Indonesia | 1955 | Tunisia | 1974 |
| Iran | 1963 | Turkey | 1934 |
| Ireland | 1979 | Ukraine | 1998 |
| Israel | 1959 | United Arab Emirates | 2003 |
| Italy | 1920 | United Kingdom | 1920 |
| Japan | 1923 | United States | 1920 |
| Jordan | 1975 | Uruguay | 1952 |
| Korea | 1959 | Venezuela | 1939 |



Not Reported in F.Supp.2d
Page 1
Not Reported in F.Supp.2d, 2006 WL 2266312 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**Leadsinger**, Inc. v. **Cole**
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
**LEADSINGER**, INC., Plaintiff,
v.
Edward J. **COLE**, Defendant.
**No. 05 Civ. 5606(HBP).**

Aug. 4, 2006.

Mr. Edward J. Cole, Tustin, CA, pro se.

*OPINION AND ORDER*
PITMAN, Magistrate J.

I. *Introduction*

***1** I write to resolve three motions for contempt that plaintiff has made in this action.

By notice of motion dated September 20, 2005 (*see* Docket Items 37, 43, hereinafter "Contempt Motion I"), plaintiff moves for (1) an Order holding defendant in civil contempt, (2) certification of the facts to the district court for criminal contempt proceedings, (3) $4,050,000 in compensatory damages and (4) attorney's fees, based on defendant's alleged violation of an *exparte* temporary restraining order issued by the Supreme Court of the State of New York, New York County (Smith, J.), on April 27, 2005 and subsequently amended on May 25, 2005.[FN1]

FN1. In Contempt Motion I, plaintiff also moves to amend the caption as to replace the current designation for plaintiff, "Leadsinger, Inc.," with plaintiff's correct corporate name, "ES Electrosales Leadsinger Co. Ltd." This aspect of Contempt Motion I is granted.

By notice of motion dated November 28, 2005 (*see* Docket Items 40, 41, 42, 44, [FN2] hereinafter "Contempt Motion II"), plaintiff also moves for (1) an Order holding defendant in civil contempt, (2) certification of the facts to the district court for criminal contempt proceedings, and (3) attorney's fees, based on defendant's alleged violation of my September 26, 2005 Order (*see* Docket Item 26).

FN2. Plaintiff's electronic document filings in this action have been less than a model of clarity. As a result, some motions have been filed under multiple docket item numbers.

Finally, by notice of motion dated December 26, 2005 (*see* Docket Items 45, 46, 47, 48, 49, hereinafter "Contempt Motion III"), plaintiff moves for "judgment against defendant pursuant to the Court's inherent authority and to the extent applicable, [Fed.R.Civ.P.] 16," based on defendant's additional violations of my September 26, 2005 Order.

The parties have consented to my exercising plenary jurisdiction over this action pursuant to 28 U.S.C. § 636(c) (Docket Item 7). The following constitutes my findings of fact and conclusions of law pursuant to Local Rule 83.9(c).

II. *Findings of Fact*

A. *Background and Procedural History*

Plaintiff, ES Electrosales Leadsinger Co. Ltd. ("Leadsinger"), is in the business of selling karaoke products on both a wholesale and retail basis. On or about April 20, 2004, plaintiff entered into a contract with defendant, Edward J. Cole, pursuant to which Cole became Leadsinger's national sales manager for a one-year period (*see* Second Amended Complaint ("2d Am. Compl.") at ¶¶ 4-5 (Docket Item 21)).

Although the contract contained an automatic extension provision, plaintiff alleges that Cole resigned from his position several days before the contract expired (*see* 2d Am. Compl. ¶¶ 6-7). Plaintiff also claims that, *interalia,* Cole, both personally and through his sister, Sharon Cole, who was Cole's putative agent, violated the confidentially provision in the contract by sending e-mails "to Leadsinger's employees and/or representatives disparaging Leadsinger and unjustifiably attempting to create doubt about the quality of Leadsinger's products to thereby interfere with sales" (2d Am.Compl.¶ 17). Plaintiff further alleges that beginning in or about April 15, 2005, Cole and his sister began sending e-mails in which they threatened to, among other things, interfere with Leadsinger's business

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 2
Not Reported in F.Supp.2d, 2006 WL 2266312 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

relationships, as well as threatening to contact the family of Leadsinger's president, Jerry Choe, to disclose Choe's alleged personal indiscretions (*see* 2d Am. Compl. ¶¶ 20-22).

***2** On April 22, 2005, plaintiff filed a verified complaint in the Supreme Court of the State of New York, New York County, seeking a preliminary injunction, temporary restraining order and money damages as against defendant based on the following claims: (1) injurious falsehood, (2) interference with contract, and (3) interference with prospective advantage. Although not set forth as a separate claim, the complaint also alleged that defendant "received advances exceeding any commissions he may have earned" (*see* Notice of Removal, dated June 15, 2005 (Docket Item 1)).

Also on April 22, 2005, plaintiff filed an order to show cause seeking an *exparte* temporary restraining order against defendant (*see* Docket Item 1). On April 26, 2005, the Honorable Karen Smith, Justice, Supreme Court of the State of New York, New York County, declined to sign the application because plaintiff was "seek[ing] monetary relief for the alleged wrong committed by defendant" and, therefore, "a TRO or preliminary and permanent injunctive relief [was] not appropriate" (*see* Docket Item 1).

Following Justice Smith's denial, plaintiff filed a supplemental affidavit in support of its application for a temporary restraining order which stated, in pertinent part: "Plaintiff meant to inform this Court that damages were only being sought for defendant's breach of contract in conjunction with one customer, HH Gregg Appliances and Electronics ..." (Docket Item 1). Plaintiff simultaneously filed an amended verified complaint seeking damages only in connection with HH Gregg Appliances and Electronics (*see* Docket Item 1).

Based on these papers, Justice Smith signed the order to show cause and entered a temporary restraining order against defendant on April 27, 2005 (*see* Docket Item 1; *seealso* Ex. 2 attached to Affidavit of Paul W. Siegert, Esq. in Support of Motion for Contempt of Court, sworn to on September 19, 2005 ("Siegert 9/19/05 Aff.") (Docket Item 37)).

Justice Smith's Order stated:

ORDERED that pending the hearing of this motion, the defendant, Edward J. Cole, his servants, agents and employees are temporarily enjoined and restrained from communicating or making any other contact by mail, telephone, e-mail, voice-mail or other means with Leadsinger, Leadsinger's existing customers, potential customers of Leadsinger of which defendant is aware, sales representatives, management, or with the family of Jerry Choe and from harrassing [*sic* ], menacing, intimidating or threatening Jerry Choe or his family, and it if further

ORDERED that service of a copy of this Order and all the papers upon which it was granted including the summons and complaint shall be made upon the defendant personally on or before the 3rd day of May, 2005 and that such service shall be deemed sufficient.

(Siegert 9/19/05 Aff. Ex. 2).

Plaintiff's counsel e-mailed the order to defendant on April 27, 2005 and attempted, albeit unsuccessfully, to serve defendant with the Order and the supporting papers, as directed, by May 3, 2005 (Siegert 9/19/05 Aff. ¶¶ 8, 18-19). Since plaintiff was unable to serve defendant by May 3, 2005, plaintiff sought and was granted an amended order to show cause and a temporary restraining order from Justice Smith on May 25, 2005. The amended order was identical to the April 27 order quoted above; however, the deadline for service upon defendant was extended to June 1, 2005 (Siegert 9/19/05 Aff. ¶ 19 and Ex. 17). Plaintiff was personally served with the amended order to show cause and the supporting papers on May 27, 2005 (Siegert 9/19/05 Aff. ¶ 19 and Ex. 18).

***3** The case was subsequently removed from the Supreme Court of the State of New York, New York County, to this Court by Notice of Removal filed June 15, 2005 (Docket Item 1). Federal jurisdiction is based on diversity of citizenship. *See*28 U.S.C. § 1332(a)(1).

Following removal, by notice of motion dated July 22, 2005 (Docket Item 9), plaintiff moved for an Order holding defendant in contempt of Justice Smith's temporary restraining order. Plaintiff argued that defendant had violated Justice Smith's order by directly communicating with Leadsinger's customers, Jerry Choe (Leadsinger's president) and other members of Leadsinger management. That motion was denied without prejudice for, *interalia,* plaintiff's failure to set forth with particularity the damages resulting from defendant's alleged violation of Justice Smith's order (*see* Docket Items 19, 20).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2266312 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

By notice of motion dated September 20, 2005, plaintiff moved for a preliminary injunction and temporary restraining order seeking to enjoin defendant from contacting Leadsinger's customers, potential customers, sales representatives, management and the family of Jerry Choe, as well as from posting a website referring to Leadsinger.[FN3] I held a hearing on September 23, 2005 and, for the reasons stated on the record in open court, entered an order on September 26, 2005 that (1) denied plaintiff's application for a preliminary injunction and (2) provided the following directive to defendant:

FN3. That same notice of motion also contained Contempt Motion I.

Pending further order of the court, defendant is directed to refrain from directly contacting plaintiff's principals and their family members; if defendant wishes to contact plaintiff, he is directed to do so through counsel.
(*see* Docket Item 26; *seealso* Transcript of the September 23, 2005 Hearing ("9/23/05 Tr.") at 169-86).

On December 19, 2005, I held a conference to resolve a motion to withdraw by defendant's counsel and to address the briefing schedule for two pending motions for contempt. Defendant personally participated in the conference by telephone. During the conference, I granted defendant's counsel's motion to withdraw and provided defendant with the following warning and direction:
THE COURT: The second issue that I want to address today is there are two pending applications to hold you in contempt, Mr. Cole.... On September 26th, I issued an order directing you not to contact plaintiff, plaintiff's principles, or family members directly. And it appears that you have done so.
MR. COLE: Yes, sir, I have.
THE COURT: Why? Why have you violated my order? Before you go further-
....
THE COURT: Well, tell you what, Mr. Cole. On reflection, don't say anything. I'm considering whether I should refer this matter to the United States Attorney's Office under Federal Rule of Criminal Procedure 42 for criminal prosecution. So don't say anything else.
MR. COLE: Okay.
....
THE COURT: Mr. Cole, ... let me warn you that every instance of criminal contempt carries with it [ ]-if you are found guilty ... a potential sentence of up to thirty days imprisonment. My September order directing you not to contact plaintiff or its principles or their family members still stands.
***4** I am repeating that direction to you. You are not to contact plaintiff, plaintiff's principles, or the family members of plaintiff's principles. If you feel you need to communicate with plaintiff's principles about something, you are directed to do so through their attorney, Mr. Siegert. Do you understand that?
....
MR. COLE: Okay, Your Honor. I understand.
....
THE COURT: Mr. Cole, you ought to retain new counsel as soon as practicable. You may be facing a very serious situation here.

(Transcript of the December 19, 2005 conference ("12/19/05 Tr.") at 6-7, 9-11).

By Order dated December 19, 2005, I also provided defendant with the following admonition:
Mr. Cole is reminded that my September 26, 2005 Order remains in effect. I remind Mr. Cole that he is directed to refrain from directly contacting plaintiff's principals and their family members; if defendant wishes to contact plaintiff, he is directed to do so through counsel.

(Docket Item 52).

B. *Findings of Fact With Respect to Contempt Motion I*

As noted above, defendant was served with Justice Smith's May 25th amended order to show cause, containing the temporary restraining order, on May 27, 2005 (Siegert 9/19/05 Aff. ¶ 19 and Ex. 18). Justice Smith's temporary restraining order provided, in pertinent part:
ORDERED that pending the hearing of this motion, the defendant, Edward J. Cole, his servants, agents and employees are temporarily enjoined and restrained from communicating or making any other contact by mail, telephone, e-mail, voice-mail or other means with Leadsinger, Leadsinger's existing customers, potential customers of Leadsinger of which defendant is aware, sales representatives, [and] management ...

(Siegert 9/19/05 Aff. Ex. 17).

However, even after being served with the temporary

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2266312 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

restraining order, defendant repeatedly contacted members of Leadsinger's management, namely Jerry Choe, Leadsinger's president, director and a shareholder, K.H. Lee, Leadsinger's vice-president, director and a shareholder, and Steve Kim, Leadsinger's executive vice-president, director and a shareholder (*see* Reply Declaration of Paul W. Siegert, Esq., dated January 21, 2006 ("Siegert 1/21/06 Decl."), at ¶¶ 6-7; Declaration of Paul W. Siegert, Esq., dated December 26, 2006 ("Siegert 12/26/05 Decl."), at ¶ 4; Affidavit of Paul W. Siegert, Esq. in Support of Motion for Contempt of Court, sworn to on November 28, 2005 ("Siegert 11/28/05 Aff."), at ¶ 4).

Specifically, defendant sent e-mails on a nearly daily basis and sometimes many times per day to either Jerry Choe, K.H. Lee and/or Steve Kim. Defendant sent e-mails to these individuals on: May 29, 30 and 31, 2005 and June 2, 3, 4, 6, 7, 8, 9, 10, 11, 12 and 13, 2005 (*see* Siegert 9/19/05 Aff. ¶ 20 and Ex. 20-23, collectively).

C. *Findings of Fact With Respect to Contempt Motion II and Contempt Motion III*

As set forth above, my September 26, 2005 Order directed defendant:

***5** Pending further order of the court, defendant is directed to refrain from directly contacting plaintiff's principals and their families members; if defendant wishes to contact plaintiff, he is directed to do so through counsel.

(Docket Item 26). Indeed, during the September 23, 2005 hearing, I specifically provided defendant with the following directive:Mr. Cole, the defendant, [is] not to have any direct contact with plaintiff, with Mr. Choe or Mr. Choe's immediate family.

That is, he should not write to them. He shouldn't e-mail them. He shouldn't call them....

(9/23/05 Tr. at 185).

Defendant not only concedes actual knowledge of my Order in both letters and e-mails (*see* Siegert 11/28/05 Aff. ¶ 5 and, collectively, Ex. 5), he also candidly admits that he violated my order and welcomes the possibility of incarceration for his violations (*see* Siegert 11/28/05 Aff. ¶ 6 and, collectively, Ex. 6). For example, in an e-mail dated November 22, 2005 sent to, *interalia,* Jerry Choe, K.H. Lee and Steve Kim, defendant states:

Attached is a letter I sent to Judge Pittman [*sic* ] this morning admitting my personal contact with the Plaintiff in an effort to settle this matter since Mr. Siegert (admittedly) continues to refuse to communicate settlement offers to his client....

If Judge Pittman [*sic* ] wishes to incarcerate me for making a good faith settlement offer to the Plaintiff, I will happily serve my time. I have lost everything, so what does 30, 60, 90 or 120 days in jail mean to me?

(Siegert 11/28/05 Aff. Ex. 6).

The record here shows that defendant sent e-mails to Jerry Choe on October 26, 2005, November 23, 24, 25, 26, 27 and 29, 2005 and December 6, 11, 12, 13, 14, 15, 16, 17, 18, and 19, 2005 (*see* Siegert 11/28/05 Aff. ¶ 4 and, collectively, Ex. 4; Siegert 12/26/05 Decl. at ¶ 4 and, collectively, Ex. 4). In addition, defendant also sent e-mails to K.H. Lee and Steve Kim, both of whom, as noted above, are principles of Leadsinger, on October 17, 18 and 20, 2005, November 1, 3, 5, 7, 9, 11, 14, 15, 16, 18, 21, 22, 23, 24, 25, 27, 28, 29, and 30, 2005 and December 6, 8, 9, 12, 13, 14, 16, 17 and 19, 2005 (*see* Siegert 11/28/05 Aff. ¶ 4 and, collectively, Ex. 3; Siegert 12/26/05 Decl. at ¶ 4 and, collectively, Exs. 3-4).

Moreover, even after I admonished defendant during the December 19, 2005 conference and reminded him in my Order of that date to refrain from contacting plaintiff's principals (*see* Docket Item 52; *seealso* 12/19/05 Tr. at 6-7, 9-11), defendant continued to send e-mails to K.H. Lee and Steve Kim from December 27, 2005 through January 18, 2006 (*see* Siegert 1/21/06 Decl. at ¶ 7).

III. *Conclusions of Law*

A. *Magistrate Judge's Authority Under 28 U.S.C. § 636(e) to Rule on Plaintiff's Motions for Contempt*

When the parties have consented to a magistrate judge's exercising plenary jurisdiction over an action pursuant to 28 U.S.C. § 636(c), as they have in the present action (*see* Docket Item 7), "the magistrate judge may exercise the civil contempt authority of the district court."28 U.S.C. § 636(e)(4); *seealso**United States v. Montgomery Global Advisors V LLC,* 04-00733(EDL), 2005 WL 2249092 at *1 (N.D.Cal. Aug. 1, 2005) (same); *British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.,* 90 Civ. 2370(JFK)(FM), 2001 WL 958975 at *1 (S.D.N.Y. Aug. 22, 2001)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2266312 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 5

(explaining that "28 U.S.C. § 636(e) has recently been modified to give United States magistrate judges expanded contempt powers"). Accordingly, to the extent that plaintiff moves to hold defendant in civil contempt for violating the orders discussed above, I have the authority to adjudicate plaintiff's motions.

***6** Additionally, pursuant to 28 U.S.C. § 636(e)(3), I have the following criminal contempt authority:

In any case in which a United States magistrate judge presides with the consent of the parties under subsection (c) of this section, ... the magistrate judge shall have the power to punish, by fine or imprisonment, or both, criminal contempt constituting disobedience or resistance to the magistrate judge's lawful writ, process, order, rule, decree, or command. Disposition of such contempt shall be conducted upon notice and hearing under the Federal Rules of Criminal Procedure.

*Seealso*Roell v. Withrow, 538 U.S. 580, 593 (2003) (noting that "[28 U.S.C. § 636(e)(3) ] grants magistrate judges the power to hold parties before them in contempt, but conditions the imposition of contempt sanctions 'upon notice and hearing under the Federal Rules of Criminal Procedure" '). Therefore, to the extent that plaintiff moves for an order holding defendant in criminal contempt for allegedly violating my September 26, 2005 Order, although I have the authority to adjudicate that aspect of the motion,[FN4] I may only do so after providing the defendant with the constitutional safeguards of notice and a hearing in accordance with Rule 42(a) of the Federal Rules of Criminal Procedure.[FN5]I shall address in Section III.E.2. below, whether a Fed.R.Crim.P 42(a) notice and referral of this matter to the United States Attorney's Office for the Southern District of New York is warranted based on the record.

> FN4.28 U.S.C. § 636(e)(5) sets forth the restrictions placed on the sentence a magistrate judge may impose for criminal contempt.

> FN5.Fed.R.Crim.P 42(a) states: "Disposition After Notice. Any person who commits criminal contempt may be punished for that contempt after prosecution on notice."

I do not, however, have the authority to act on plaintiff's application to hold defendant in criminal contempt for allegedly violating the state court's temporary restraining order. Since I did not issue the order in question, a putative violation of the state court's temporary restraining order does not fall within the scope of 28 U.S.C. § 636(e)(3). Rather, in accordance with 28 U.S.C. § 636(e)(6):

[T]he magistrate judge shall forthwith certify the facts to a district judge and may serve or cause to be served, upon any person whose behavior is brought into question under this paragraph, an order requiring such person to appear before a district judge upon a day certain to show cause why that person should not be adjudged in contempt by reason of the facts so certified. The district judge shall thereupon hear the evidence as to the act or conduct complained of and, if it is such as to warrant punishment, punish such person in the same manner and to the same extent as for a contempt committed before a district judge.

*Seealso**JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.,* 03 Civ. 5562(JGK)(AJP), 2006 WL 1148110 at *1 (S.D.N.Y. Apr. 28, 2006) (discussing the certification procedure under 28 U.S.C. § 636(e)(6)); *Jones v. J.C. Penney's Dep't Stores, Inc.,* 228 F.R.D. 190, 198 (W.D.N.Y.2005) (same). Accordingly, I shall also address in Section III.D.6. below, whether certification of the facts to the district court is necessary under these facts.

B. *Due Process Requirements for Civil Contempt Proceedings*

***7** "Due process requires that before being held in contempt, a party must have notice that it is a defendant in a contempt hearing."*Drywall Tapers & Pointers of New York v. Local 530,* 889 F.2d 389, 394 (2d Cir.1989), *citing**Dole Fresh Fruit Co. v. United Banana Co.,* 821 F.2d 106, 109-10 (2d Cir.1987); *Bank of Credit & Commerce Int'l (Overseas) Ltd. v. Tamraz,* 97 Civ. 4759(SHS), 2006 WL 1643202 at *3 (S.D.N.Y. June 13, 2006) (same).*Accord**Z-Int'l, Inc. v. Z Line Int'l, Inc.,* 02 Civ. 8646(HB), 2005 WL 1580609 at *4 (S.D.N.Y. July 6, 2005) ("Before imposing sanctions on a person charged with civil contempt, due process requires that the person receive notice and an opportunity to be heard."); *Sterling Nat'l Bank v. A-1 Hotels Int'l, Inc.,* 00 Civ. 7352(GEL), 2004 WL 1418201 at *2 (S.D.N.Y. June 23, 2004) (same), *citing**Shoenberg v. Shapolsky Publishers, Inc.,* 971 F.2d 926, 934-35 (2d Cir.1992), *overruledinpartonothergroundsby,**Bassett v. Mashantucket Pequot Tribe,* 204 F.3d 343 (2d Cir.2000).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2266312 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

Here, in accordance with Local Rule 83.9(a), both an order to show cause (Contempt Motion I, *see* Docket Item 37) and notices of motion (Contempt Motion II, *see* Docket Items 40, 41, 42; Contempt Motion III, *see* Docket Items 45, 46, 47, 48) were either served upon defendant's prior counsel, Carter Ledyard & Millburn LLP, and/or defendant personally. Furthermore, defendant participated in the December 19, 2005 conference by telephone and was expressly apprised during that conference of the pendency of the first two motions for contempt (*see* 12/19/05 Tr. at 6-7), as well as being afforded an opportunity to respond to the motions by no later than January 6, 2006 (*see* 12/19/05 Tr. at 7-8, 15).*See*_Drywall Tapers & Pointers of New York v. Local 530,supra,_ 889 F.2d at 396 (explaining that Due Process was satisfied when defendant had either actual notice of the contempt proceeding or formal notice through service of the contempt motions upon defendant's attorney).

Defendant's prior counsel responded to Contempt Motion I before being granted leave to withdraw as counsel (*see* Memorandum of Law in Opposition to Plaintiff's Motion for Contempt against Edward J. Cole, dated November 23, 2005, Docket Item 39, ("Def.'s Contempt Motion I Opp."); *seealso* 12/19/05 Tr. at 7-8). Defendant, now *prose,* responded to both Contempt Motion II and Contempt Motion III on January 17, 2006-albeit more than one week later than I had directed (*see* Letter from Edward J. Cole to my chambers, dated January 17, 2006 ("Cole's 1/17 Letter")). Moreover, defendant has not demanded an evidentiary hearing on these motions nor does it appear that there are any material issues of fact in dispute that would necessitate a hearing. *See*_ACLI Government Securities, Inc. v. Rhoades,_ 989 F.Supp. 462, 466 n. 5 (S.D.N.Y.1997), *aff'd,*159 F.3d 1345 (2d Cir.1998) ("Local Rule 83.9(b) only requires oral evidence to be taken when factual disputes exist as to the alleged contemnor's conduct.").

C. *The Standards Applicable to a Motion for Civil Contempt*

***8** As the late Honorable Constance Baker Motley, United States District Judge, explained in _D'Orange v. Feely,_ 959 F.Supp. 631, 634-35, 637 (S.D.N.Y.1997):
It is a firmly established principal that federal courts possess the inherent power to punish for contempt. *See,*_Chambers v. NASCO, Inc.,_ 501 U.S. 32, 43, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27, (1991) ("Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates.") (quotation omitted); _Young v. United States ex rel. Vuitton et Fils, S.A.,_ 481 U.S. 787, 795, 107 S.Ct. 2124, 2131, 95 L.Ed.2d 740 (1987); _Abrams v. Terry,_ 45 F.3d 17 (2d Cir.1995). These powers reach conduct before the court and beyond the court's confines, _Young,_ 481 U.S. at 798, 107 S.Ct. at 2132-33, and are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."_Chambers,_ 501 U.S. at 43, 111 S.Ct. at 2132 (quoting _Link v. Wabash R.R. Co.,_ 370 U.S. 626, 630-31, 82 S.Ct. 1386, 1388-89, 8 L .Ed.2d 734 (1962)).

*Accord*_Israel v. Carpenter,_ 95 Civ. 2703(JCF), 2003 WL 21518830 at *2 (S.D.N.Y. July 7, 2003); _Merriweather v. Sherwood,_ 250 F.Supp.2d 391, 393 (S.D.N.Y.2003); _United States v. D-M Sales Corp.,_ 903 F.Supp. 431, 433 (E.D.N.Y.1995); _Janmort Leasing, Inc. v. Econo-Car Int'l, Inc.,_ 475 F.Supp. 1282, 1297 n. 12 (E.D.N.Y.1979), *citing*_Shillitani v. United States,_ 384 U.S. 364, 370 (1966).

The standards applicable to a motion for civil contempt are well settled and require only brief review. As the Court of Appeals for the Second Circuit explained in _Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Tech., Inc.,_ 369 F.3d 645, 655 (2d Cir.2004):
A party may be held in civil contempt for failure to comply with a court order if "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner."_King v. Allied Vision, Ltd.,_ 65 F.3d 1051, 1058 (2d Cir.1995). It need not be established that the violation was willful. _Donovan v. Sovereign Sec. Ltd.,_ 726 F .2d 55, 59 (2d Cir.1984).

*Seealso*_Perez v. Danbury Hosp.,_ 347 F.3d 419, 423-24 (2d Cir.2003); _Equal Employment Opportunity Comm'n v. Local 638,_ 81 F.3d 1162, 1171 (2d Cir.1996); _Huber v. Marine Midland Bank,_ 51 F.3d 5, 10 (2d Cir.1995); _New York State Nat'l Org. for Women v. Terry,_ 886 F.2d 1339, 1351 (2d Cir.1989).

As to the first prong, "[a] 'clear and unambiguous' order is one that is 'specific and definite enough to apprise those within its scope of the conduct that is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 7
Not Reported in F.Supp.2d, 2006 WL 2266312 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

being proscribed." ' *Medallic Art Co., Ltd. v. Novus Mktg., Inc.,* 99 Civ. 502, 2003 WL 22053130 at *1 (S.D.N.Y. Sept. 2, 2003), *quoting* *New York State Nat'l Org. for Women v. Terry,supra,* 886 F.2d at 1352; *seealso* *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.,* 04 Civ. 7369(LTS), 2006 WL 2128785 at *3 (S.D.N.Y. July 28, 2006) ("Any ambiguities in an order should be read in favor of the person charged with contempt."). *Accord* *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.,* 03 Civ. 5562(JGK)(AJP), 2006 WL 1206372 at *2 (S.D.N.Y. May 1, 2006); *Mingoia v. Crescent Wall Sys.,* 03 Civ. 7143(THK), 2005 WL 991773 at *1 (S .D.N.Y. Apr. 26, 2005); *Independent Living Aids, Inc. v. Maxi-Aids, Inc.,supra,* 349 F.Supp.2d at 515; *Panix Promotions, Ltd. v.. Lewis,* 01 Civ. 2709(HB), 2004 WL 421937 at *2 (S.D.N.Y. Mar. 5, 2004); *A.V. By Versace, Inc. v. Gianni Versace, S.p.A.,* 87 F.Supp.2d 281, 290-91 (S.D.N.Y.2000); *Bear U.S.A., Inc. v. Kim,* 71 F.Supp.2d 237, 246 (S.D.N.Y.1999), *aff'd,* 216 F.3d 1071 (2d Cir.2000).

***9** As explained by the Court of Appeals for the Second Circuit in *King v. Allied Vision, Ltd.,* 65 F.3d 1051, 1058 (2d Cir.1995):

A clear and unambiguous order is one that leaves "no uncertainty in the minds of those to whom it is addressed," *Hess v. New Jersey Transit Rail Operations, Inc.,* 846 F.2d 114, 116 (2d Cir.1988), who "must be able to ascertain from the four corners of the order precisely what acts are forbidden," *see* *Drywall Tapers, Local 1974 v. Local 530, Operative Plasterers Int'l Ass'n,* 889 F.2d 389, 395 (2d Cir.1989)....

*Accord* *Equal Employment Opportunity Comm'n v. N.Y. Times Co.,* 196 F.3d 72, 81 (2d Cir.1999); *United States v. District Council of New York City,* 409 F.Supp.2d 439, 450 (S.D.N.Y.2006); *U2 Home Entm't, Inc. v. Hong Wei Int'l Trading, Inc.,* 02 Civ. 5828(JFK), 2005 WL 3766976 at *6 (S.D.N.Y. May 3, 2005); *Independent Living Aids, Inc. v. Maxi-Aids, Inc.,supra,* 349 F.Supp.2d at 515; *Medallic Art Co., Ltd. v. Novus Mktg., Inc.,supra,* 2003 WL 22053130 at *1; *A.V. by Versace, Inc. v. Gianni Versace S.p.A.,supra,* 87 F.Supp.2d at 290; *Playboy Enter., Inc. v. Chuckleberry Pub., Inc.,* 939 F.Supp. 1032, 1036 (S.D.N.Y.1996).

With respect to the second prong, "[i]n the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate a 'reasonable certainty' that a violation occurred." *Levin v. Tiber Holding Corp.,* 277 F.3d 243, 250 (2d Cir.2002); *seealso* *Ceslik v. Miller Ford, Inc.,* 04 CV 2045(AWT), 2006 WL 1582215 at *1 (D. Conn. June 5, 2006); *Independent Living Aids, Inc. v. Maxi-Aids, Inc.,supra,* 349 F.Supp.2d at 515; *Matrix Essentials v. Quality King Distribs., Inc.,* 346 F.Supp.2d 384, 391 (E.D.N.Y.2004); *Panix Promotions, Ltd. v. Lewis,supra,* 2004 WL 421937 at *2.

Turning to the third and final prong, there can be no finding of contempt if it has been shown that the alleged contemnor has been "reasonably diligent and energetic in attempting to accomplish what was ordered." *Equal Employment Opportunity Comm'n v. Local 638,* 753 F.2d 1172, 1178 (2d Cir.1985), *aff'd,* 478 U.S. 421 (1986); *seealso* *Powell v. Ward,* 643 F.2d 924, 931 (2d Cir.1981) (same); *Aspira of N.Y., Inc. v. Bd. of Educ.,* 423 F.Supp. 647, 654 (S.D.N.Y.1976) ("It is a sufficient defense ... if a defendant ... has in good faith employed the utmost diligence in discharging his responsibilities.").

D. *Contempt Motion I*

As noted above, in Contempt Motion I plaintiff moves for (1) an Order holding defendant in civil contempt, (2) certification of the facts to the district court for criminal contempt proceedings, (3) $4,050,000 in damages, and (4) attorney's fees, based on defendant's alleged violation of Justice Smith's temporary restraining order (*see* Docket Items 37, 43).[FN6]

FN6. Plaintiff filed the same memorandum of law with this motion (Docket Item 43) that it submitted with a prior contempt motion that was denied on August 24, 2005 (Docket Item 20). Plaintiff has also submitted, but not filed, a memorandum of law dated September 20, 2005. Since it appears that defendant has responded to all of plaintiff's arguments (*see* Letter from Kenneth S. Levin, Esq. to my chambers, dated December 12, 2005), I shall address all of those arguments, notwithstanding plaintiff's failure to file its September 20, 2005 memorandum of law.

Defendant argues that Contempt Motion I should be denied based on the following theories: [FN7] (1) plaintiff has failed to adequately support its claim that it suffered $4,050,000 damages from defendant's alleged violation of the state court temporary restraining order (Def.'s Contempt Motion I Opp. at 1,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2266312 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 8

2-3); (2) the state court temporary restraining order is too vague and over broad to be enforced (Def.'s Contempt Motion I Opp. at 1, 3-4); (3) defendant was not served with process or the state court temporary restraining order during the critical period in question (Def.'s Contempt Motion I Opp. at 1, 4-6); (4) plaintiff's attorney urged defendant to undertake the very acts plaintiff now claims constitutes contempt (Def.'s Contempt Motion I Opp. at 1, 6-10); and (5) "[p]laintiff secured the underlying *exparte* restraining order through an affirmative misrepresentation to the state court and for the purpose of concealing a fraud, making enforcement of the restraining order against the interests of justice and public policy" (Def.'s Contempt Motion I Opp. at 1, 11-14).

FN7. As noted above, defendant's prior counsel, Carter Ledyard & Millburn LLP, responded to Contempt Motion I only (*see* Def.'s Contempt Motion I Opp. at 1).

***10** I shall first address the effective date of the state court's temporary restraining order, and then address whether defendant violated that order and, if so, what sanctions are chargeable.

1. *Effective Dates of the State Court's Temporary Restraining Order*

It is well settled that when a case has "been removed to this Court from the state court, federal [procedural] law is applied as though the action was originally commenced here."*Rabbi Jacob Joseph School v. Province of Mendoza,* 342 F.Supp.2d 124, 127 (E.D .N.Y.2004), *citing* 14C Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3738 at 390-91 ("The case will proceed as if it had been brought in the federal court originally."). However, state law applies to issues pertaining to the service of process prior to removal. *See*Fed. Ins. Co. v. Tyco Int'l Ltd., 422 F.Supp.2d 357, 384 (S.D.N.Y.2006) (" 'The sufficiency of service of process prior to removal is determined under the law of the state from whence the case was removed." '), *quoting*White v. Bombardier Corp., 313 F. Supp .2d 1295, 1300 (N.D.Fla.2004); *seealso*Weiss v. Glemp, 792 F.Supp. 215, 224 (S.D.N.Y.1992) ("In determining the validity of service prior to removal, a federal court must apply the law of the state in which the service was made."), *citing*Bomze v. Nardis Sportswear, Inc., 165 F.2d 33, 35 (2d Cir.1948); 14C Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3738 at 398-400 (in the context of cases removed to federal court "state law governs the substantive personal jurisdiction question and the sufficiency of the state court process.").

Plaintiff concedes, as it must, *see*Granny Goose Foods, Inc. v. Brotherhood Of Teamsters, 415 U.S. 423, 439-40 (1974), that the state court's temporary restraining order expired ten calendar days after the action was removed to federal court on June 15, 2005 (*see* Siegert 9/19/05 Aff. ¶ 20; *seealso* Affidavit of Jerry J. Choe, sworn to on September 19, 2005 ("Choe Aff."), at ¶ 3). Therefore, the state court's temporary restraining order expired on June 25, 2005.

The parties, however, are sharply divided on the date that defendant was first bound by the state court's temporary restraining order. Plaintiff argues that defendant was bound by Justice Smith's April 27, 2005 order on the day that defendant first had knowledge of it, irrespective of whether the order had been served upon defendant by that date (Siegert 9/19/05 Aff. ¶ 18). Defendant argues that New York's courts did not have personal jurisdiction over him until he was served with process on May 27, 2005 and that he was not bound by the temporary restraining order until that date (*see* Def.'s Contempt Motion I Opp. at 4-6). The weight of authority supports defendant's argument.

Section 6313(b) of the New York Civil Practice Law and Rules provides for personal service of temporary restraining orders:

***11** Unless the court orders otherwise, a temporary restraining order together with the papers upon which it was based, and a notice of hearing for the preliminary injunction, shall be personally served in the same manner as a summons.

As explained by the Supreme Court of the State of New York, Appellate Division, First Department, in *Abrams v. Lurie,* 176 A.D.2d 474, 476, 574 N.Y.S.2d 553, 555 (1st Dep't 1991):

[A] temporary restraining order ... must be served in the same manner as a summons (CPLR § [ ][ ] 6313(b)). In the case of a temporary restraining order, the court is expressly empowered to order service otherwise, but it is generally recognized that this power is exercised only when a temporary restraining order is issued in the context of an already pending action.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Seealso* Joseph M. McLaughlin, Practice Commentaries to N.Y. C.P.L.R. § 6313, C6313:2, at 379 (McKinney 1993) ("Since a temporary restraining order may be granted *exparte* prior to the commencement of an action, it must be 'personally served in the same manner as a summons.'...The court is expressly empowered to order non-personal service, which power will generally be exercised only in cases where the temporary retraining order is signed in an already pending action."); David D. Siegel, *New York Practice* § 481 at 810 (4th ed. 2005) ("An order to show cause containing a temporary restraining order must be served as the order itself dictates.... [W]here there is a specific direction about service, it should be followed to the letter.").

Here, Justice Smith's first order to show cause, which contained the temporary restraining order, was issued on April 27, 2005 *exparte* and stated that: "[S]ervice of a copy of the Order and all the papers upon which it was granted including the summons and complaint shall be made upon defendant personally on or before the 3rd day of May, 2005 ..." (Siegert 9/19/05 Aff. ¶ 18 and Ex. 2).

Under New York law, "[t]he method of service provided for in an order to show cause is jurisdictional in nature and must be strictly complied with."*Stern v. Garfinkle,* 22 A.D.3d 694, 694, 805 N.Y .S.2d 395, 395 (2d Dep't 2005); *accord*Hennessey v. DiCarlo, 21 A.D.3d 505, 505, 800 N.Y.S.2d 576, 576 (2d Dep't), *lv.denied*5 N.Y.3d 706, 835 N.E.2d 659, 801 N.Y.S.2d 799 (2005); *Scharmann's Inc. v. 388 West Broadway, LLC,* 258 A.D.2d 262, 262, 685 N.Y.S.2d 33, 34 (1st Dep't 1999); *Zambelli v. Dillon,* 242 A.D.2d 353, 353, 661 N.Y.S.2d 268, 269 (2d Dep't 1997); *McGreevy v.. Simon,* 220 A.D.2d 713, 713, 633 N.Y.S.2d 177, 178 (2d Dep't 1995).

As a result, the failure to serve an order to show cause in the manner directed is fatal to the enforcement of that order. *See,e.g.,Sorli v. Coveney,* 51 N.Y.2d 713, 714, 410 N.E.2d 1228, 1228, 431 N.Y.S.2d 1001, 1001 (1980) ("Inasmuch as petitioner failed to follow the provisions for service specified in the order to show cause, the petition must be dismissed."); *People ex rel. Planter v. McCoy,* 1 A.D.3d 1012, 1012-13, 767 N.Y.S.2d 357 (4th Dep't 2003), *lv.denied*1 N.Y.3d 508, 808 N.E.2d 860, 776 N.Y.S.2d 540 (2004) ("Petitioner's failure to serve those documents as directed in the order to show cause, however, deprived the court of personal jurisdiction over the parties, and this fatal jurisdictional defect requires dismissal of the proceeding."); *Kapsis v. Green,* 285 A.D.2d 492, 492, 727 N.Y.S.2d 895, 895 (2d Dep't 2001) (denying enforcement of a temporary restraining order, contained in an order to show cause, because respondent was not personally served with the order to show cause or its supporting papers and, therefore, jurisdiction over the respondent had not been obtained); *Turkish v. Turkish,* 126 A.D.2d 436, 439, 510 N.Y.S.2d 582, 585 (1st Dep't 1987) ("Since plaintiff did not strictly comply with the provisions for service set forth in the initial Order to Show Cause, there was no jurisdiction over defendant, and [plaintiff's] [contempt] proceeding should have been dismissed."); *Caralyus v. Hayduk,* 72 A.D.2d 590, 591, 421 N.Y.S.2d 79, 80 (2d Dep't 1979) ("Since the mode of service provided for in the order to show cause was jurisdictional in nature and must be strictly complied with, jurisdiction over [respondent] was never acquired."); *State v. Manginelli,* 64 A.D.2d 661, 663, 407 N.Y.S .2d 969, 971 (2d Dep't 1978) (noting that in the context of a contempt proceeding a court should not "[take] into consideration the conduct of the appellant before the order to show cause was served"); *In re Lakeland Federation of Teachers,* 65 Misc.2d 397, 400-01, 317 N.Y.S.2d 902, 907 (Sup.Ct. Westchester County 1971) ("There was no violation by any of the defendants until after the order to show cause with a temporary restraining order dated September 8, 1970, was served on the defendant union and the individual defendants."); *Ramos-Lopez v. Heffernan,* 64 N.Y.S.2d 603, 605 (Sup.Ct. Bronx County 1946) ("[F]ailure to serve the order to show cause within the time permitted by law was fatal.").

***12** Although plaintiff's counsel apparently forwarded a copy of Justice Smith's first order to show cause to defendant by e-mail on April 27, 2005 and defendant acknowledged receipt of the order by return e-mail of even date (Siegert 9/19/05 Aff. ¶¶ 8-10 and Exs. 3, 6), plaintiff was, admittedly, unable to serve the defendant with the order by May 3, 2005 (Siegert 9/19/05 Aff. ¶¶ 18-19). As a result, plaintiff sought and was granted an amended order from Justice Smith on May 25, 2005, which extended the deadline to effect service upon defendant until June 1, 2005 (Siegert 9/19/05 Aff. ¶ 19 and Ex. 17). Plaintiff was personally served with the amended order to show cause, which contained the temporary restraining order, along with the summons and amended complaint, on May 27, 2005 (Siegert 9/19/05 Aff. ¶ 19 and Ex. 18).

Based on the foregoing authority, New York's courts

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2266312 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 10

did not have personal jurisdiction over the defendant until defendant was served on May 27, 2005 and plaintiff could not, therefore, have enforced the temporary restraining order against defendant until that date. Indeed, plaintiff concedes that when it first attempted to enforce the temporary restraining order before Justice Smith on May 5, 2005 "questions arose as to whether Cole had been timely served with the Court's Order of April 27" ((Siegert 9/19/05 Aff. ¶ 18 and Ex. 16). If New York's courts did not have personal jurisdiction over defendant until May 27, 2005 and, thus, could not have held Cole in contempt for putative violations of the temporary restraining order prior to that date, a federal district court, to which the action was subsequently removed, is subject to the same limitation.[FN8] As the Supreme Court explained in *Granny Goose Foods, Inc. v. Brotherhood Of Teamsters,supra,* 415 U.S. at 436:

> FN8. Plaintiff argues that "a person having knowledge of the Court's Temporary Restraining Order is bound by that Order irrespective of whether the Order in actually served upon him" (Siegert 9/19/05 Aff. ¶ 18). Plaintiff cites the following cases in support of its argument: *McCain v. Dinkins,* 84 N.Y.2d 216, 223, 639 N.E.2d 1132, 1138, 616 N.Y.S.2d 335, 341 (1994); *McCormick v. Axelrod,* 59 N.Y.2d 574, 583, 453 N.E.2d 508, 513, 466 N.Y.S.2d 279, 283 (1983); *Daly v. Amberg,* 126 N.Y. 490, 496, 27 N.E. 1038, 1039-40 (1891).
> However, these cases are distinguishable from the present action. In both *McCain* and *McCormick,* the orders at issue were entered in actions where personal jurisdiction had already been established. In *Daly,* the individuals who were held in contempt were the defendant's agents and all of them had been served with the order in question, although the defendant had not. Here, the temporary restraining order at issue was contained within the order to show cause and, as discussed above, personal jurisdiction over the defendant was dependant upon plaintiff's serving the order to show cause, as well as the summons and amended complaint. In an analogous case, involving the improper service of a June 16, 1987 order to show cause, containing a temporary restraining order and a summons and complaint, the Appellate Division, Second Department, explained:
>
> > The plaintiff's contention that the defendant was bound to honor the injunction notwithstanding the improper service because it was aware of its content is untenable. Equally unavailing is the plaintiff's argument that the subsequent service of the summons and complaint ... on June 24, 1987, conferred jurisdiction retroactive to June 16, 1987.
> > *Norlee Wholesale Corp., Inc. v. 4111 Hempstead Turnpike Corp.,* 138 A.D.2d 466, 468, 525 N.Y.S.2d 873, 876 (2d Dep't 1988) (internal citations omitted).

[W]hile Congress clearly intended to preserve the effectiveness of state court orders after removal, there is no basis for believing that [28 U.S.C.] § 1450 was designed to give injunctions or other orders greater effect after removal to federal court than they would have had if the case had remained in state court.

Accordingly, I find that defendant was first bound by the state court's temporary restraining order on May 27, 2005. As a result, the relevant period for reviewing defendant's conduct under Contempt Motion I is from May 27, 2005 until June 25, 2005.

2. *The Relevant Portions of the Temporary Restraining Order Were Clear and Unambiguous*

Defendant agues that Justice Smith's temporary restraining order "was so vague and overly broad" that it did not provide defendant with "meaningful notice of the acts he should have been prohibited from doing" (Def.'s Contempt Motion I Opp. at 3-4).

Specifically, defendant argues that the use of broad language, such as "potential customers of Leadsinger" and "sales representatives," would prohibit defendant from engaging in common acts like shopping at many large retail stores, as well as prohibiting defendant from contacting sales representatives about matters unrelated to Leadsinger. As such, defendant contends that the order cannot serve as a basis for a criminal contempt motion (*see* Def.'s Contempt Motion I Opp. at 4).[FN9]

> FN9. The only authority that defendant cites in support of its argument is *Rodgers v. Dunkirk Ice Cream Co.,* 86 Civ. 5612(JFK).1989 WL 82451 at *2 (S.D.N.Y. July 17, 1989), which involved the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2266312 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 11

interpretation of the term "revised jingle" that was used in a negotiated settlement agreement. However, unlike the restraining order at issue here, the Court in *Rodgers* found that there was no " 'meeting of minds' between the parties as to whether the second or third jingle was the 'revised' tape referred to in the settlement agreement" and, therefore, the Court rescinded the settlement agreement rather than hold defendant in contempt. *Id.* at *3.

***13** During the relevant period-from May 27, 2005 to June 25, 2005-plaintiff relies only on defendant's e-mails to members of Leadsinger's management to establish violations of Justice Smith's Order; plaintiff is not relying any alleged contacts with "potential customers" or "sales representatives" (*see* Siegert 9/19/05 Aff. ¶ 20 and Exs. 20-23). Therefore, even assuming that the terms "potential customers of Leadsinger" and "sales representatives" are vague, the portion of the order that defendant is accused of violating, *i.e.,* contacting members of Leadsinger's management by e-mail, is clear and unambiguous. Justice Smith's order proscribed the following conduct:

ORDERED that pending the hearing of this motion, the defendant, Edward J. Cole, his servants, agents and employees are temporarily enjoined and restrained from communicating or making any other contact by mail, telephone, e-mail, voice-mail or other means with Leadsinger, Leadsinger's existing customers, potential customers of Leadsinger of which defendant is aware, sales representatives, [and] management ...

Based on the order's express terms, plaintiff was clearly on notice that contacting Jerry Choe or other members of Leadsinger management by e-mail would constitute a violation of the temporary restraining order. No colorable argument can be made that the above-quoted portion of the order was not " 'specific and definite enough to apprise those within its scope of the conduct that [was] being proscribed," ' *see*Medallic Art Co., Ltd. v. Novus Mktg., Inc.,supra, 2003 WL 22053130 at *1, or that defendant could not "ascertain from the four corners of the order precisely what acts [were] forbidden," *see*Drywall Tapers, Local 1974 v. Local 530, Operative Plasterers Int'l Ass'n,supra, 889 F.2d at 395.

Accordingly, defendant's argument that the temporary restraining order is too vague to be enforced in unavailing.

3. *Defendant Was Not Induced By Plaintiff or Its Counsel to Engage in Prohibited Conduct During the Relevant Time Period*

Next, defendant argues that he cannot be held in contempt because plaintiff's counsel and Jerry Choe, through an intermediary, advised him that he should engage in the precise conduct plaintiff now claims to be a violation of the temporary restraining order (Def.'s Contempt Motion I Opp. at 6-10). Specifically, defendant points to a May 7, 2005 e-mail he received from Paul Seigert, plaintiff's counsel, in which Mr. Siegert stated, in pertinent part: "In my opinion, you should (1) unconditionally repent [and] (2) secure two or three accounts for Leadsinger without condition ..." (*see* Affidavit of Edward J. Cole, executed July 28, 2005 ("Cole Aff."), at ¶ 37 and Ex. 11 attached thereto). Defendant also claims that from late April through early May 2005, an individual by the name of Chuck Stewart functioned as an intermediary for Jerry Choe. Defendant alleges that Stewart relayed messages from Choe to him during this period, advising defendant that Choe wanted him to secure new business for Leadsinger (*see* Cole Aff. ¶¶ 33-34). Defendant's argument is unpersuasive for several reasons.

***14** First, as discussed in the prior section, Contempt Motion I relies only on defendant's e-mails to members of Leadsinger's management to establish violations of Justice Smith's Order during the relevant period (*see* Siegert 9/19/05 Aff. ¶ 20 and Exs. 20-23). Thus, the communications from Messrs. Siegert and Chou could not have induced the conduct that underlies Contempt Motion I.

Second, the May 7, 2005 e-mail from Siegert and the discussions with Stewart in or about late April until early May 2005, all predated service on defendant of Justice Smith's amended order to show cause and the temporary restraining order on May 27, 2005. As a result, even assuming for purposes of argument that the above conduct by Siegert and Stewart offers some justification for Cole's conduct in or about late April and early May, the record shows that neither plaintiff nor its counsel offered conflicting advice to defendant after service of the temporary restraining order. Indeed, on the day that defendant was served with the restraining order he expressly advised his sister, Sharon Cole, and others:

Do not contact any persons related to LEADSINGER and do not reply to emails that you may receive from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

anybody even remotely related to LEADSINGER, and whatever you do, have no contact with [Siegert]. The clock officially started running on the restraining order today.

....

I have copied [Siegert] on this email. From this day forward, you will only hurt yourself if you violate the restraining order....

(E-mail from Edward Cole to Sharon Cole and others, dated May 27, 2005 and annexed as Ex. 19 to the Siegert 9/19/05 Aff.). Nevertheless, failing to heed his own advise, defendant engaged in conduct that was clearly and unequivocally prohibited by the temporary restraining order by e-mailing Jerry Choe and other members of Leadsinger's management, including K.H. Lee and Steve Kim, on a nearly daily basis and sometimes many times per day from May 29, 2005 through and including June 13, 2005 (*see* Siegert 9/19/05 Aff. ¶ 20 and Ex. 20-23, collectively).

To the extent that defendant argues that his actions should be excused because he was acting in good faith based on a combination of conflicting advice from Siegert and, indirectly, from Choe, the Court of Appeals for the Second Circuit has explained that "[t]he fact that the prohibited act was done inadvertently or in good faith, however, does not preclude a citation for civil contempt, for the sanction is remedial in nature."*Vuitton et Fils S.A. v. Carousel Handbags,supra,* 592 F.2d at 129;*seealsoIndependent Living Aids, Inc. v. Maxi-Aids, Inc.,supra,* 349 F.Supp.2d at 517 (same); *Gasser v. Infanti Int'l, Inc.,* 03 CV 6413(ILG), 2004 WL 906487 at *6 (E.D.N.Y. Mar. 24, 2004) (collecting cases holding that "acting in good faith [will] not preclude a finding of civil contempt").*Accord* *United States v. Weslin,* 204 F.Supp.2d 547, 554 (W.D.N.Y.2001), *aff'd,*34 Fed .Appx. 815 (2d Cir.2002) ("Good faith reliance on advice of counsel is not a defense to a charge of criminal contempt, though it may be considered as a mitigating factor in the punishment to be imposed in the event of conviction."), *citingUnited States v. Remini,* 967 F.2d 754, 757-58 (2d Cir.1992); *Howe Laboratories, Inc. v. Stevick,* 94 CV 5013(SJ), 1996 WL 652608 at *6 (E.D.N.Y. Nov. 6, 1996) ("[A] good faith reliance on legal advice does not excuse a party for contempt."); *S.E.C. v. Musella,* 818 F.Supp. 600, 606 (S.D.N.Y.1993) (collecting cases holding that "[t]he party seeking a finding of contempt need not show that violation of the order was willful, and good faith is not a defense. Nor may the alleged contemnor rely on his own inadvertence, misunderstanding or advice from counsel.").[FN10]

FN10. Defendant cites no authority which directly supports his argument that a suggestion by an adversary that a litigant engage in proscribed conduct constitutes a defense to a contempt motion.
The only authority that defendant cites is *Arons v. Lalime,* 6:94-CV-7618 (CJ)(SH), 1998 WL 912034 at *1 (W.D.N.Y. Oct. 8, 1998), which involved an attorney's violation of New York Disciplinary Rule 7-104(a)(2) by providing legal advice to an unrepresented party whose interests were in conflict with those of the attorney's client. *Id.* at *6. Although Siegert's conduct is troubling, unlike *Arons* there is no motion before me to sanction Siegert for his conduct or to disqualify his as plaintiff's counsel. Rather, it is defendant's conduct that is the focus of the motion at issue. Accordingly, there is no need to determine whether Siegert's conduct constituted a violation of New York Disciplinary Rule 7-104(a)(2).

***15** Thus, defendant's argument is without merit and does not constitute a defense to plaintiff's contempt motion.

4. *Even a Putatively Invalid Court Order Must be Obeyed*

Defendant also argues that he should not be held in contempt because "plaintiff sought the underlying restraining order for improper reasons: to cover up fraud" and plaintiff "misrepresented its legal position before the state court in order to secure the *exparte* restraining order" (Def.'s Contempt Motion I Opp. at 11-14).

Again, defendant cites not authority in support of its arguments. Even if I were to assume for purposes of argument the truth of defendant's allegations, "[i]t is axiomatic that a court order must be obeyed, even assuming its invalidity, until it is properly set aside."*Leighton v. Paramount Pictures Corp.,* 340 F.2d 859, 861 (2d Cir.1965), *citingUnited States v. United Mine Workers,supra,* 330 U.S. at 289-95. As the Supreme Court explained in *Celotex Corp. v. Edwards,* 514 U.S. 300, 306 (1995):

In *GTE Sylvania, Inc. v. Consumers Union of United States, Inc .,* 445 U.S. 375, 386, 100 S.Ct. 1194, 1201,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2266312 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 13

63 L.Ed.2d 467 (1980), we reaffirmed the well-established rule that "persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order."

*Seealso*In re Criminal Contempt Proceedings, 329 F.3d 131, 138 (2d Cir.2003) (same); *Milltex Indus. Corp. v. Jacquard Lace Co., Ltd.,* 55 F.3d 34, 41 n. 14 (2d Cir.1995) ("The fact that a court order might be unlawful does not, of course, give a lawyer or client license to violate it; to the contrary, the proper course is to adhere to the order until-and unless-it is vacated."); *Fed. Trade Comm'n v. Verity Int'l, Ltd.,* 140 F.Supp.2d 313, 315 (S.D.N.Y.2001), *vacatedas*moot, 443 F .3d 48 (2d Cir.2006) ("In most circumstances, the validity of an order is not an appropriate consideration on a contempt motion, as a court order ordinarily must be obeyed unless and until it is reversed or vacated."), *citing*Walker v. City of Birmingham, 388 U.S. 307, 317-21 (1967)*and*United States v. Cutler, 58 F.3d 825, 832 (2d Cir.1995).*Accord*United States v. Rylander, 460 U.S. 752, 756 (1983) ("[A] contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy.")

Thus, defendant's arguments concerning the alleged invalidity of the temporary restraining order also fail.

5. *Plaintiff's Alleged Inability To Prove Its Damages*

Finally, defendant argues that because plaintiff has failed to adequately support its claim that it suffered $4,050,000 in damages from defendant's alleged violation of the state court temporary restraining order, the contempt motion should be denied (Def.'s Contempt Motion I Opp. at 1, 2-3).

***16** "The imposition of civil contempt sanctions may serve dual purposes: to secure future compliance with court orders and to compensate the party that has been wronged."*Paramedics Electromedia Comercial, Ltda. v. GE Med. Sys. Info. Tech., Inc.,supra,* 369 F.3d at 657;*seealso*Int'l Union v. Bagwell, 512 U.S. 821, 829 (1994) ("A contempt fine accordingly is considered civil and remedial if it either 'coerce[s] the defendant into compliance with the court's order, [or] ... compensate[s] the complainant for losses sustained." '), *quoting*United States v. United Mine Workers, 330 U.S. 258, 303-04 (1947).*Accord*F.T.C. v. Verity Int'l, Ltd.,supra, 443 F.3d at 70;*Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.,* 885 F.2d 1, 5 (2d Cir.1989); *Perfect Fit Indus., Inc. v. Acme Quilting Co.,* 673 F.2d 53, 56-57 (2d Cir.1982).

As noted above, the state court's temporary restraining order ceased to have effect after June 25, 2005 and, therefore, coercing defendant's future compliance is no longer an available remedy. Accordingly, the only civil contempt remedy available to plaintiff is compensatory damages.

"Compensatory sanctions should reimburse the injured party for its actual damages."*New York State Nat'l Org. for Women v. Terry,supra,* 886 F.2d at 1353;*seealso*Equal Employment Opportunity Comm'n v. Local 638,supra, 81 F.3d at 1177;*Perfect Fit Indus., Inc. v. Acme Quilting Co.,supra,* 673 F.2d at 57;*Vuitton et Fils S.A. v. Carousel Handbags,* 592 F .2d 126, 130 (2d Cir.1979). A "claim of actual damages must be established by competent evidence and the amount must not be arrived at by mere speculation or conjecture."*In re Walmar Screen Printing Co.,* 184 F.Supp. 858, 861 (E.D.N.Y.1960), *quoting*Babee-Tenda Corp. v. Scharco Mfg. Co., 156 F.Supp. 582, 588 (S.D.N.Y.1957).*Accord*King v. Allied Vision, Ltd.,supra, 65 F.3d at 1062 (" '[S]ome proof of loss must be present to justify [a sanction's] compensatory aspects." '), *quoting*New York State Nat'l Org. for Women v. Terry,supra, 886 F.2d at 1353-54;*Theatre Confections, Inc. v. Sunstar Theatres Coral Springs, LLC,* 03-CV-6006 (CJS), 2003 WL 21730694 at *1 (W.D.N.Y. June 6, 2003) ("Compensatory sanctions should reimburse an injured party for its actual damages and may not be imposed absent some proof of actual loss.").

Here, plaintiff has failed to prove that it suffered any actual injury as a result of defendant's violating the state court's temporary restraining order. The only putative evidence that plaintiff submits in support of its claim for damages is an e-mail from defendant dated January 24, 2005, (*see* Choe Aff. ¶ 14 and Ex. 30), and the affidavit of Jerry Choe, Leadsinger's president, which states:

Leadsinger is entitled to compensation for the damages suffered as a result of Edward Cole's contempt of two court orders. By e-mail dated January 24, 2005 (Exh. 30), the defendant wrote me about the opening order, minimum pallets, and prepacks to various customers. In fact, based upon his 20 some-odd year experience as a salesman, he

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

exclaimed "[t]his is what I know we will do" [my emphasis]. After issuance of the court orders, Mr. Cole violated the order by contacting Best Buy, Walmart, Toys 'R Us, BJ's, Transworld Entertainment and Musicland, directly or indirectly through representatives and aborting deals. In fact, he even admitted speaking personally with representatives of Walmart and Best Buy. As a result, plaintiff lost $4 million in profits.

***17** Mr. Cole also violated the Order by contacting Leadsinger representatives after issuance of the court orders, with knowledge of them, and while they were in effect. Because of his statements, two representatives, i.e., Bell Marketing and Trend Marketing, ceased to perform their duties and Leadsinger was forced to replace them at a significant cost amounting to $50,000.

(Choe Aff. ¶¶ 14-15).

Neither defendant's January 24, 2005 e-mail nor Choe's affidavit provides evidence of actual injury to plaintiff as a result of defendant's alleged violation of the state court's temporary restraining order. On the contrary, plaintiff has misconstrued defendant's January 24, 2005 e-mail, which merely reflects defendant's hopes concerning possible orders by potential customers rather than a list of actual orders by current customers. As defendant points outs, the e-mail is riddled with phrases which indicate that Cole is referring to possible rather than actual orders, for example: "I think we can do ..."; "We'll get ..."; This is what I KNOW we will do ..."; "I REALLY believe we'll get ..." (see Choe Aff. Ex. 30). Plaintiff has not provided any contracts, invoices or similar documentation that would establish the existence of these putative orders. *See,e.g .,Time Warner Cable v. U.S. Cable T.V., Inc.,* 920 F.Supp. 321, 329 (E.D.N.Y.1996) ("In civil contempt proceedings, the plaintiff is not entitled to compensation for damages that it did not actually experience.").

Moreover, plaintiff has failed to offer any evidence establishing a causal connection between defendant's allegedly contemptuous conduct during the relevant time period and the cancellation of these alleged orders or the need to replace the two marketing firms. Plaintiff is not entitled to compensatory damages without some evidence that defendant's contemptuous conduct caused plaintiff to suffer actual damages. *See,e.g.,King v. Allied Vision, Ltd.,supra,* 65 F.3d at 1063 (explaining that there was " 'no proof of loss was offered on behalf [of plaintiff], no evidence of actual injury due to [defendant's] activities was shown and there was no evidence that awarding the contempt sanction to [plaintiff] would have additional coercive effect on defendant's behavior ...." '), *quotingNew York State Nat'l Org. for Women v. Terry,supra,* 886 F.2d at 1354;*U2 Home Entm't, Inc. v. Hong Wei Int'l Trading, Inc.,supra,* 2005 WL 3766976 at *7 ("[N]one of Plaintiff's submissions on this contempt motion shows any evidence of actual loss."); *Perfect Fit Ind., Inc. v. ACME Quilting Co., Inc.,* 77 Civ.2004(CBM), 1985 WL 376 at *3 (S.D.N.Y. Mar. 7, 1985) (explaining that compensatory damages were not appropriate because plaintiff "failed to prove actual monetary damages or loss as a result of [defendant's] contumacious conduct beyond costs and counsel fees"); *McKay v. Communispond, Inc.,* 581 F.Supp. 801, 810 (S.D.N.Y.1983) ( "[B]ecause plaintiff did not establish that he was injured by defendant's conduct, his request for damages is denied."), *citingVuitton et Fils, S.A. v. Carousel Handbags,supra,* 592 F.2d at 130;*Powell v. Ward,* 487 F.Supp. 917, 936 (S.D.N.Y.1980), *aff'dasmodified,*643 F.2d 924 (2d Cir.1981) (denying compensatory damages in a civil contempt action where plaintiffs failed to show that they suffered any actual injury).

***18** Nevertheless, "a court may assess attorney's fees as a sanction for the 'willful disobedience of a court order." ' *Chambers v. NASCO, Inc.,supra,* 501 U.S. at 45,*quotingFleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 718 (1967); *seealsoNew York State Nat'l Org. for Women v. Terry,* 159 F.3d 86, 96 (2d Cir.1998) ("A finding that a condemnor's misconduct was willful strongly supports granting attorney's fees and costs to the party prosecuting the contempt."), *citingWeitzman v. Stein,* 98 F.3d 717, 719 (2d Cir.1996); *Vuitton et Fils S.A. v. Carousel Handbags,supra,* 592 F.2d 126 at 130.

In order to establish willful contempt, it must be shown that the "contemnor had actual notice of the court's order, was able to comply with it, did not seek to have it modified, and did not make a good faith effort to comply."*New York State Nat'l Org. for Women v. Terry,* 952 F.Supp. 1033, 1043 (S.D.N.Y.1997), *aff'd,*159 F.3d 86 (2d Cir.1998); *seealsoMingoia v. Crescent Wall Sys.,* 03 Civ. 7143(THK), 2005 WL 991773 at *5 n. 3 (S.D.N.Y. Apr. 26, 2005) (same), *citingBear U.S.A. Inc. v. William Kim,* 71 F.Supp.2d 237, 249-250 (S.D.N.Y.1999).

The record here contains clear and convincing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2266312 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 15

evidence that defendant had (1) actual notice of the temporary restraining order and repeatedly acknowledged its existence in his correspondence; (2) never contested his ability to comply with it; (3) never sought to have the order modified; and (4) did not make a good faith effort to comply with it. Rather, after being served with the temporary restraining order on May 27, 2005, defendant contacted Jerry Choe and other members of Leadsinger's management, including K.H. Lee and Steve Kim, by e-mail on a nearly daily basis and sometimes many times per day (*see* Siegert 9/19/05 Aff. ¶ 20 and Ex. 20-23, collectively).

Accordingly, based on defendant's willful violation of Justice Smith's temporary restraining order, plaintiff is entitled to recover the reasonable attorney's fees it incurred in filing Contempt Motion I. However, since plaintiff has failed to provide any documentation concerning its legal fees, plaintiff is directed to submit contemporaneous time records, as required by *New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1147-48 (2d Cir.1983), for all attorneys and staff who worked on Contempt Motion I, setting forth the date on which services were performed, the hours spent and the nature of the work performed, as well as the reasonable hourly rates requested.

6. *Summary*

I conclude that plaintiff has shown by clear and convincing evidence that defendant willfully violated Justice Smith's clear and unambiguous temporary restraining order by repeatedly sending e-mails to members of Leadsinger's management after being served with the order on May 27, 2005. As outlined above in section II.B, the record shows that defendant contacted Jerry Choe and other members of Leadsinger's management, including K.H. Lee and Steve Kim, by e-mail on a nearly daily basis and sometimes many times per day from May 29, 2005 through and including June 13, 2005 (*see* Siegert 9/19/05 Aff. ¶ 20 and Ex. 20-23, collectively). Defendant also does not argue that he was "reasonably diligent and energetic in attempting to accomplish what was ordered."*Equal Employment Opportunity Comm'n v. Local 638,supra,* 753 F.2d at 1178.

***19** Accordingly, I find that Cole is in civil contempt of Justice Smith's May 25th temporary restraining order.

However, since the temporary restraining order has now expired, and plaintiff has failed to establish that it suffered any actual injury as a result of defendant's willful violation of the order, the only sanction available is to award plaintiff its reasonable attorney's fees incurred in filing Contempt Motion I. Plaintiff is, therefore, directed to submit within ten (10) days of the date of this Order documentation pertaining to the legal fees plaintiff incurred in filing Contempt Motion I.

Furthermore, in light of the fact that Justice Smith's temporary restraining order has expired and since the record shows that plaintiff ceased sending e-mails once he retained counsel in mid-June 2005 (*see* Siegert Aff. ¶ 20), I do not find that certification of the facts to the district court for criminal contempt proceedings, pursuant 28 U.S.C. § 636(e)(6), is warranted in this instance.

E. *Contempt Motion II*

In Contempt Motion II, plaintiff also moves for (1) an Order holding defendant in civil contempt, (2) certification of the facts to the district court for criminal contempt proceedings, and (3) attorney's fees, based on defendant's alleged violation of my September 26, 2005 Order (*see* Docket Items 40, 41, 42, 44). My September 26, 2005 Order, as set forth above, directed defendant to refrain from directly contacting plaintiff's principals (*see* Docket Items 26, 52).

As outlined above in section II.C, plaintiff not only conceded actual knowledge of my Order in both letters and e-mails (*see* Siegert 11/28/05 Aff. ¶ 5 and, collectively, Ex. 5), he also candidly admitted that he violated my order and welcomed the possibility of incarceration for his violations (*see* Siegert 11/28/05 Aff. ¶ 6 and, collectively, Ex. 6).

The record here shows that plaintiff sent e-mails to Jerry Choe on October 26, 2005 and again from November 23 through and including December 19, 2005 on a nearly daily basis and sometime many times per day, with a few brief gaps around the holidays (*see* Siegert 11/28/05 Aff. ¶ 4 and, collectively, Ex. 4; Siegert 12/26/05 Decl. at ¶ 4 and, collectively, Ex. 4). In addition, defendant sent e-mails to K.H. Lee and Steve Kim, both of whom are principles of Leadsinger, on October 17, 18 and 20, 2005 and again from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2266312 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 16

November 1 through and including December 19, 2005 on a nearly daily basis and sometime many times per day (*see* Siegert 11/28/05 Aff. ¶ 4 and, collectively, Ex. 3; Siegert 12/26/05 Decl. at ¶ 4 and, collectively, Exs. 3-4).

In response to Contempt Motion II, defendant states: "I admit that I did make efforts to [contact plaintiff] via E-mail" (Letter from Edward J. Cole to my chambers, dated January 17, 2006 ("Cole 1/17/06 Letter"), at 2). However, defendant first argues that because there is some indication in the record that Jerry Choe may not have read his e-mails, his conduct should be excused (*see* Cole 1/17/06 Letter at 2-3). This argument is meritless. As plaintiff properly notes, my Order clearly and unequivocally prohibited plaintiff from contacting plaintiff's principals (*see* Docket Item 26). Indeed, during the September 23, 2005 hearing, I provided defendant with the following directive:

***20** Mr. Cole, the defendant, [is] not to have any direct contact with plaintiff, with Mr. Choe or Mr. Choe's immediate family.

That is, he should not write to them. *He shouldn't e-mail them* .He shouldn't call them....

(9/23/05 Tr. at 185 (emphasis added)). Whether or not Leadsinger's principles read the prohibited e-mails is immaterial to a finding of contempt.

Defendant next argues that because plaintiff has not provided him with evidence substantiating its claim that K.H. Lee and Steve Kim were principles of Leadsinger, his conduct should also be excused (*see* Cole 1/17/06 Letter at 4). Defendant, however, has misconstrued the record. Plaintiff has provided evidence, in the form of affidavits from its attorney, indicating that K.H. Lee is Leadsinger's vice-president, director and a shareholder and that Steve Kim is Leadsinger's executive vice-president, director and a shareholder (*see* Siegert 1/21/06 Decl. at ¶ 7; Siegert 12/26/05 Decl. at ¶ 4; Siegert 11/28/05 Aff. at ¶ 4).

Defendant also states that "[s]ince the hearing on December 19, 2005, I have NOT attempted to contact the Plaintiff and I sincerely apologize to you for my prior indiscretions" (Cole 1/17/06 Letter at 4 (emphasis in original)). It appears, however, that defendant's request for leniency is disingenuous. Even after I admonished defendant during my December 19, 2005 conference and reminded him in my Order of even date to refrain from contacting plaintiff's principals, defendant continued to engage in prohibited conduct:

Mr. Cole is in error when he claims not to have sent any emails to Leadsinger [following the conference]. As a matter of fact ... from December 27, 2005 through January 18, 2006, Mr. Cole sent 43 emails to Leadsinger-all addressed to K.H. Lee and Steve Kim, who are principles of the company. I have personal knowledge of these emails because Mr. Cole sends copies to me.

(Siegert 1/21/06 Decl. at ¶ 7).

1. *Civil Contempt*

Based on the record, I conclude that plaintiff has shown by clear and convincing evidence that defendant violated my September 26, 2005 Order, directing plaintiff to refrain from directly contacting plaintiff's principals, by repeatedly sending e-mails to Leadsinger's principals. Defendant does not argue that my September 26th Order was unclear or ambiguous, nor does he claim that the evidence of his noncompliance is less than clear and convincing. Defendant also does not argue that he was "reasonably diligent and energetic in attempting to accomplish what was ordered."*Equal Employment Opportunity Comm'n v. Local 638,supra,* 753 F.2d at 1178.

Accordingly, I find that Cole is in civil contempt of my September 26, 2005 Order.

With respect to sanctions, as discussed above, "[t]he imposition of civil contempt sanctions may serve dual purposes: to secure future compliance with court orders and to compensate the party that has been wronged."*Paramedics Electromedia Comercial, Ltda. v. GE Med. Sys. Info. Tech., Inc.,supra,* 369 F.3d at 657;*seealso**Int'l Union v. Bagwell,supra,* 512 U.S. at 829.

***21** Plaintiff has not alleged that it suffered any actual injury as a result of defendant's violating my September 26th Order (*see* Siegert 11/28/05 Aff. at ¶ 7), therefore, a compensatory sanction is not appropriate here. However, because I find that defendant willfully violated my September 26th Order, plaintiff is entitled to receive the reasonable attorney's fees it incurred in filing Contempt Motion II. *See**New York State Nat'l Org. for Women v. Terry,supra,* 159 F.3d at 96. Again, because plaintiff has failed to provide the documentation required by *New York State Ass'n for Retarded Children, Inc. v. Carey,supra,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

711 F.2d at 1147-48, concerning the legal fees incurred in filing Contempt Motion II, plaintiff is directed to submit such documentation within ten (10) days of the date of this Order.

As for coercive sanctions, the Honorable Sidney H. Stein, United States District Judge, recently outlined the factors a district court should consider in imposing a coercive sanction:

If a party is adjudged to be in civil contempt, the court must determine what sanctions are necessary to secure future compliance with its order and to compensate the complaining party for past noncompliance. *See*[*Paramedics Electromedicina[ Comercial, Ltda. v. GE Med. Sys. Info. Tech., Inc.,supra,*] 369 F.3d at 657. A district court has considerable discretion in determining whether a coercive sanction is necessary and, if so, the form it will take.*Id.* When imposing a coercive sanction, a court should consider (1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden. *Id.* at 657-58 (citing *Perfect Fit Indus. v. Acme Quilting Co.,* 673 F.2d 53, 57 (2d Cir.1982)). Arrest is an appropriate coercive sanction for civil contempt, so long as its purpose is not punitive but is instead to compel the contemnor to perform the required act. *Cf.Hicks v. Feiock,* 485 U.S. 624, 631-34, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988) (explaining distinction between civil and criminal contempt and noting that imprisonment is appropriate sanction for civil contempt if remedial in nature, i.e. if conditioned upon compliance).

*Bank of Credit & Commerce Int'l (Overseas) Ltd. v. Tamraz,supra,* 2006 WL 1643202 at *3;*seealsoDole Fresh Fruit Co. v. United Banana Co.,supra,* 821 F.2d at 110 (same).

Here, the character and magnitude of the harm threatened by defendant's continued violation of my September 26th Order, given the heated nature of the relationship between Cole and Choe, should not be trivialized. The constant e-mails from defendant to plaintiff's principles generate far more heat than they do light in the context of this litigation, especially those in which the defendant uses the threat of exposing Choe's alleged criminal activity to law enforcement and Choe's family members as a means of extorting a settlement in this matter. Based on defendant's continued violation of my September 26th Order, some monetary sanction is called for in order to coerce future compliance with my Order. The need for a monetary sanction is highlighted by the fact that even after I warned defendant during my December 19, 2005 conference that I was considering whether I should refer this matter to the United States Attorney for the Southern District of New York, defendant continued to engage in prohibited conduct by sending e-mails to K.H. Lee and Steve Kim (*see* Siegert 1/21/06 Decl. at ¶ 7). Defendant, however, has repeatedly claimed that he lacks financial resources and is considering filing for bankruptcy (*see,e.g.,* 12/19/05 Tr. at 3-5). The type of coercive sanction imposed here, however, will be prospective and conditional. Thus, defendant will not have to pay the sanction so long as he complies with my September 26th Order.

***22** Accordingly, commencing on the date of this Order, for each violation of my September 26th Order, defendant shall be required to pay a fine to the Clerk of the Court based on the following schedule: $500 for the first violation, $1000 for the second violation, $2000 for the third violation, and so on; the fine shall double for every subsequent act of noncompliance. *SeeTitra California, Inc. v. Titra Film,* 98 Civ. 234(KMW)(FM), 2001 WL 1382587 at *5 (S.D.N.Y. Nov. 6, 2001) ("In the absence of any loss to the complainant, any fine that may be imposed is necessarily coercive, rather than compensatory, and therefore should be made payable to the court."), *citingNew York State Nat'l Org. for Women v. Terry,supra,* 886 F.2d at 1354.

2. *Criminal Contempt*

With respect to plaintiff's application for an order holding defendant in criminal contempt, the Court of Appeals for the Second Circuit has explained that "[a] trial court ordinarily first applies the coercive remedy of civil contempt and only makes use of the criminal sanction when the disobedience continues."*United States v. Petito,* 671 F.2d 68, 72 (2d Cir.1982); *seealsoIn re de Kleinman,* 923 F.Supp. 24, 29 (S.D.N.Y.1996).*AccordYates v. United States,* 355 U.S. 66, 75 (1957) ("[T]he more salutary procedure would appear to be that a court should first apply coercive remedies in an effort to persuade a party to obey its orders, and only make use of the more drastic criminal sanctions when the disobedience continues."); *United States v. Rosado,* 728 F.2d 89, 94 n. 4 (2d Cir.1984) ("In imposing contempt sanctions federal courts should 'resort to criminal sanctions only [if] the

civil remedy is inappropriate." '), *quoting* *Shillitani v. United States,supra,* 384 U.S. at 371 n. 9.

Nevertheless, the "[r]efusal to obey a court order may subject a person to both civil and criminal contempt for the same acts." *In re Grand Jury Witness,* 835 F.2d 437, 441 (2d Cir.1987), *citing* *Yates v. United States,supra,* 355 U.S. at 74; *seealso* *Sec. Exch. Comm'n v. American Bd. of Trade, Inc.,* 830 F.2d 431, 439 (2d Cir.1987) ("When a district court's order has been violated, the court may impose either civil contempt remedies or criminal contempt sanctions, or both."); *Universal City Studios, Inc. v. N.Y. Broadway Int'l Corp.,* 705 F.2d 94, 96 (2d Cir.1983) ("Though the use of judicial power to secure future compliance with a court order involves civil contempt remedies, the use of such power in the aftermath of past violations can take the form of either civil contempt remedies or criminal contempt punishments, or both."(internal citations omitted)).

As noted above, in hope of coercing defendant's future compliance with my September 26th Order, I admonished defendant on December 19, 2005 to refrain from contacting plaintiff's principals and warned him that I was considering whether I should refer this matter to the United States Attorney for the Southern District of New York for criminal prosecution (*see* 12/19/05 Tr. at 6-7, 9-11). Nevertheless, it appears from the record that defendant failed to heed my clear warning and defiantly continued to engage in prohibited conduct by sending e-mails to K.H. Lee and Steve Kim (*see* Siegert 1/21/06 Decl. at ¶ 7). Thus, it is clear that defendant's disobedience continued even after he was warned of the possibility of criminal prosecution. Accordingly, I find that there is reason to believe that Cole is also in criminal contempt of my September 26, 2005 Order.

***23** The procedural requirements for criminal contempt proceedings were recently outlined by the Honorable John G. Koeltl, United States District Judge, in *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.,supra,* 2006 WL 1206372 at *6-*7:

[Plaintiff] also seeks to have [defendant] sanctioned for criminal contempt. 18 U.S.C. § 401 authorizes a United States Court to "punish by fine or imprisonment, or both, at its discretion, such contempt of its authority ... as ... [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." 18 U.S.C. § 401. To hold a defendant in criminal contempt, it must be proven beyond a reasonable doubt "that (1) the court entered a reasonably specific order; (2) defendant knew of that order; (3) defendant violated that order; and (4) his violation was willful." *United States v. Cutler,* 58 F.3d 825, 834 (2d Cir.1995). To establish the final element of willfulness, which, as explained above, need not be shown to hold a person in civil contempt, the criminal contempt must have been committed with "a specific intent to consciously disregard an order of the court." *United States v. Lynch,* 162 F.3d 732, 735 (2d Cir.1998) (internal quotation marks and citations omitted).

Pursuant to Rule 42(a) of the Federal Rules of Criminal Procedure, punishment for criminal contempt must take place after "prosecution on notice." Fed.R.Cr.P. 42(a)."The Court must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney." Fed.R.Cr.P. 42(a)(2). The Court must give the alleged contemnor "notice in open court" of the prosecution, and the notice must include "the essential facts constituting the charged criminal contempt." Fed.R.Cr.P. 42(a)(1)(C). The right to a trial by jury is also guaranteed for "serious" criminal contempt allegations potentially resulting in more than six months imprisonment. *Int'l Union, United Mine Workers v. Bagwell,* 512 U .S. 821, 826-27 (1994); *seealso* Fed. R. Cr. P. 42(a)(3).

Accordingly, I find based on the record here that there is reason to believe that Cole is in criminal contempt of my September 26, 2005 Order. As a result, and in accordance with Rule 42 of the Federal Rules of Criminal Procedure, defendant is hereby placed on notice that I shall refer this matter to the United States Attorney's Office for the Southern District of New York for investigation and, if the United States Attorney deems it appropriate, prosecution. *See* *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.,supra,* 2006 WL 1206372 at *6-*7.

F. *Contempt Motion III*

Finally, in Contempt Motion III plaintiff moves for "judgment against defendant pursuant to the Court's inherent authority and to the extent applicable, [Fed.R.Civ.P.] 16," based on defendant's repeated violation of my September 26, 2005 Order (*see* Docket Items 45, 46, 47, 48, 49).

***24** Plaintiff appears to be arguing that my September 26th Order should be considered part of the Rule 16

pretrial order entered in this action (*see* Docket Item 6) and, therefore, that a violation of that order forms the basis for the entry of a default judgment.[FN11]

> FN11. The only authority that plaintiff cites in support of its application for the entry of a default judgment against defendant is an isolated excerpt from James Wm. Moore *etal.,Moore's Federal Practice* § 16.92[4], dealing with Rule 16 sanctions imposed on a client when "noncompliance with a court order is the product not of inadvertence, but of a tactical decision made to try to secure some advantage," and an unpublished Second Circuit opinion, *Blum v. Schlegel,* 96-7705, 96-7723, 1997 WL 138741 at *1-*2 (2d Cir. Mar. 21, 1997), where the Circuit affirmed the district court's dismissal of a complaint with prejudice, pursuant to Fed.R.Civ.P. 37(b)(2), as a civil contempt sanction for plaintiff's violation of a protective order. However, neither of these authorities supports plaintiff's application for the entry of a default judgement against defendant based on his failure to comply with my September 26, 2005 no-contact order.

Although federal courts have a vast array of sanctions available to them under Rules 16(f) and 37(b) of the Federal Rules of Civil Procedure, a court may not strike an answer or issue a default judgment against a defendant as a means of punishing that defendant's contempt of court on a matter that is unrelated to the merits of the underlying action. As the Court of Appeals for the Ninth Circuit explained in *TeleVideo Systems, Inc. v. Heidenthal,* 826 F.2d 915, 916-17 (9th Cir.1987):

There are limits, however, on the power of courts to impose sanctions. The need for the orderly administration of justice does not permit violations of due process. *See**Phoceene Sous Marine, S.A. v. U.S. Phosmarine, Inc.,* 682 F.2d 802, 805-06 (9th Cir.1982) (recognizing that willful deceit and conduct utterly inconsistent with the orderly administration of justice would merit the imposition of severe sanctions, but finding that because defendant's deceit-falsely stating that he was too ill to attend trial-was unrelated to the merits of the controversy the sanction was inconsistent with due process); *Securities and Exchange Commission v. Seaboard Corp.,* 666 F.2d 414, 416-17 (9th Cir.1982) (finding that a default judgment against the defendant for failure to pay a fine when the defendant had complied with an order to give a deposition was punitive and a violation of due process as the court could not presume that the case lacked merit); *seealso**Hammond Packing Co. v. Arkansas,* 212 U.S. 322, 349-54, 29 S.Ct. 370, 379-81, 53 L.Ed. 530 (1909) (upholding a default judgment for the defendant's failure to comply with an order to produce documents because the court could presume, from the failure to produce evidence relating directly to the merits of the matter, that the case was lacking in merit); *Hovey v. Elliott,* 167 U.S. 409, 413-14, 17 S.Ct. 841, 843, 42 L.Ed. 215 (1897) (finding that courts may not strike an answer and enter a default merely to punish a contempt of court unrelated to merits of case).

*Seealso**Collazos v. United States,* 368 F.3d 190, 202-03 (2d Cir.2004) ( "The common principle to be derived from [*Hovey* and *McVeigh v. United States,* 78 U.S. (11 Wall.) 259 (1870) ], as the Supreme Court observed in *Degen[ v. United States,* 517 U.S. 820, 828 (1996) ], is that disentitlement may not constitutionally be employed simply 'as punishment." '); *Hudson Tire Mart, Inc. v. Aetna Cas. & Sur. Co.,* 518 F.2d 671, 674 (2d Cir.1975) (comparing *Hammond* and *Hovey* and discussing the distinction between striking an answer and entering a default judgment as punishment for contempt, as compared with the entry of a default judgment "for failure to produce documents on the ground that failure to do so created a presumption of no merit to the defense"); *Duell v. Duell,* 178 F.2d 683, 687 (D.C.Cir.1950) (comparing *Hammond* and *Hovey* and finding that "[t]he court's action in striking the answer and rendering a default judgment was erroneous for the further reason that civil contempt may not be punished in that fashion unless it grows out of a defendant's failure to produce, when ordered to do so, material evidence in his possession or under his control"); *The Fred M. Lawrence,* 94 F. 1017, 1018 (2d Cir.1899) (noting *Hovey'* s prohibition on striking an answer or entering a default judgment as punishment for defendant's contemptuous conduct); *Burke v. ITT Automotive, Inc.,* 139 F.R.D. 24, 31-32 (W.D.N.Y.1991) (comparing *Hammond* and *Hovey* and explaining that " '[t]hese decisions establish that there are constitutional limitations upon the power of courts, even in aid of their own valid processes, to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause" '), *quoting**Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 209 (1958); *Bollard v. Volkswagen of Am., Inc.,* 56 F.R.D. 569, 585 (W.D.Mo.1971) (comparing *Hammond* and *Hovey* and noting "[t]he existence of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 20
Not Reported in F.Supp.2d, 2006 WL 2266312 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

the distinction between mere punishment of a party's violation of an order as for contempt and striking a pleading and entering judgment by default under statutory authority allowing such procedure, where violation of an order indicates the lack of merit in a defense").

***25** Although I mentioned during the September 23, 2005 hearing that my Order was "more in the nature of a case management order" (9/23/05 Tr. at 185), it is clear that my Order was not related to the merits of this action or the production of evidence. Unlike the standard provisions contained in a Rule 16 pretrial order, *i.e .,* setting deadlines for amendments to the pleadings, discovery, dispositive motions or settlement conferences, my order dealt only with prohibiting defendant from contacting plaintiff's principles or their family members.

Based on the foregoing authorities, since my September 26, 2005 no-contact order was completely unrelated to the merits of this action or the production of putative evidence, the entry of a default judgment against defendant as a contempt sanction for violating my order is not appropriate. Accordingly, plaintiff's application for the entry of a default judgment as against defendant based on Cole's continued violation of my September 23, 2005 Order is denied.

IV. *Conclusion*

With respect to Contempt Motion I, plaintiff's motion is granted to the following extent: (1) the caption shall be amended to reflect plaintiff's correct corporate name, "ES Electrosales Leadsinger Co. Ltd;" (2) defendant is found to be in civil contempt of Justice Smith's May 25, 2005 temporary restraining order, and (3) plaintiff is entitled to the reasonable attorney's fees it incurred in filing Contempt Motion I and, therefore, is directed to submit within ten (10) days of the date of this Order documentation pertaining to its legal fees. However, Contempt Motion I is denied to the following extent: (1) the facts will not be certified to the district court for criminal contempt proceedings and (2) plaintiff is not entitled to $4,050,000 in compensatory damages.

With respect to Contempt Motion II, plaintiff's motion is granted to the following extent: (1) defendant is found to be in civil contempt of my September 26, 2005 Order; (2) plaintiff is entitled to the reasonable attorney's fees it incurred in filing Contempt Motion II and, therefore, is directed to submit within ten (10) days of the date of this Order documentation pertaining to its legal fees; (3) commencing with the date of this Order, for each violation of my September 26th Order, defendant shall be required to pay a fine to the Clerk of the Court based on the following schedule: $500 for the first violation, $1000 for the second violation, $2000 for the third violation, and so on; the fine shall double for every subsequent act of noncompliance, and (4) I conclude that there is reason to believe that Cole is in criminal contempt of my September 26, 2005 Order. Therefore, in accordance with Rule 42 of the Federal Rules of Criminal Procedure, defendant is hereby placed on notice that I shall refer this matter to the United States Attorney's Office for the Southern District of New York for investigation and, if the United States Attorney deems it appropriate, prosecution.

***26** Finally, with respect to Contempt Motion III, plaintiff's application for the entry of a default judgment as against defendant based on Cole's continued violation of my September 23, 2005 Order is denied.
SO ORDERED

S.D.N.Y.,2006.
Leadsinger, Inc. v. Cole
Not Reported in F.Supp.2d, 2006 WL 2266312 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 911770 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

Masefield AG v. Colonial Oil Industries, Inc.
S.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
MASEFIELD AG and Masefield Ltd., Plaintiffs,
v.
COLONIAL OIL INDUSTRIES, INC., Defendant.
**No. 05 Civ. 2231(PKL).**

April 18, 2005.

Stanley McDermott III, DLA Piper Rudnick Gray Cary U.S. LLP, New York, New York, for Plaintiffs.
Felix Weinacht, White & Case LLP, New York, New York, for Defendant.

*OPINION AND ORDER*

LEISURE, J.

***1** In this action, plaintiffs, Masefield AG and Masefield Ltd., seek injunctive relief enjoining defendant from pursuing arbitration against them before the International Chamber of Commerce ("ICC"). Plaintiffs also request judgment declaring that they have no agreement to arbitrate with defendant and are not bound to arbitrate with defendant. Plaintiffs now petition the Court for a preliminary injunction barring defendant from arguing before the three-member Arbitration Tribunal (the "Tribunal"), to be formed by the ICC, that the Tribunal has the power to determine whether plaintiffs must arbitrate defendant's demands. After filing their written submissions, the parties appeared before the Court for oral argument on April 12, 2005. For the reasons that follow, plaintiffs' request for a preliminary injunction is GRANTED.

*BACKGROUND*

According to the complaint, on September 23, 2003, defendant, a large independent oil distributor, entered into a purchase agreement (the "Contract") with Masefield America ("MA"), a company affiliated with plaintiffs. (*See* Complaint ("Compl.") ¶ 13.) The Contract provided that MA would sell approximately 50,000 tons of fuel oil to defendant each month of the one-year period beginning November 1, 2003 through October 31, 2004. (*Id.*) The Contract also contained an arbitration provision, which stated in pertinent part:

Unless otherwise agreed between the parties in writing any disputes between them shall be resolved by Arbitration in City of New York, United States of America, under the rules of Conciliation and Arbitration of the International Chamber of Commerce, each party appointing its own Arbitrator with a third being appointed by the two so chosen.

(*Id.* ¶ 14.)

On October 29, 2004, defendant filed a demand for arbitration (the "Arbitration Demand") with the ICC, alleging that MA, along with plaintiffs, defaulted on the Contract by failing to deliver fuel oil during the months of September and October 2004. (*Id.* ¶ 13.)Defendant claimed that this breach caused it to sustain damages of $3,644,520. (*Id.*)

Plaintiffs' action was triggered by defendant's decision to name plaintiffs, along with MA, as parties in the Arbitration Demand, even though plaintiffs are not signatories to the Contract. (*Id.* ¶ 2.) The complaint states that, though affiliated with plaintiffs, MA is a separate and independent company, and neither Masefield AG nor Masefield Ltd. is a parent or a subsidiary of MA.[FN1](*Id.* ¶ 3.) Thus, while MA filed a response to the Arbitration Demand, denying that it breached the Contract, (*id.* ¶ 13), plaintiffs, in several submissions to the ICC, argued that they were not parties to any arbitration agreement with defendant, should not be included as respondents in this arbitration, and are not subject to ICC jurisdiction, (*id.* ¶ 17).

FN1. A declaration filed with plaintiffs' papers explains the relationship between MA and plaintiffs more fully. James Daley owns 90% of Masefield AG, which is the parent company of Masefield Ltd. Daley is the sole owner of Masefield Trading AG, which is a non-party affiliate company and the parent company of MA. Therefore, plaintiffs are affiliated companies of MA, but not in the same ownership chain. (*See* Declaration of James Daley, dated March 1, 2005, ¶ 5-6.)

On January 31, 2005, the ICC informed plaintiffs that it was referring the threshold issue of arbitrability to the Tribunal. (*Id.* ¶ 18.)As a result, plaintiffs filed the instant action on February 17, 2005, seeking (1)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

injunctive relief barring defendant from pursuing any arbitration against them, and (2) a declaratory judgment that they have no agreement to arbitrate with defendant and are not bound to arbitrate with defendant. On March 8, 2005, the Court endorsed plaintiffs' application for an order to show cause why the preliminary injunction and the declaratory judgment should not be granted, and, as noted above, the parties appeared before the Court for oral argument on April 12, 2005.

*DISCUSSION*

I. Arbitrability To Be Determined by the Court

***2** As a preliminary matter, the parties dispute whether the Court or the Tribunal should decide whether plaintiffs have agreed to arbitrate with defendant. Both sides primarily rely upon *First Options of Chicago, Inc. v. Kaplan,* wherein the Supreme Court ruled that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so."514 U.S. 938, 944 (1995) (quoting *At & T Tech., Inc. v. Communications Workers,* 475 U.S. 643, 651 (1986)); *see also Abram Landau Real Estate v. Benova,* 123 F.3d 69, 72 (2d Cir.1997) ("When parties disagree about whether they ever entered into an arbitration agreement, a court decides that issue, absent a clear and unmistakable delegation of that authority to an arbitrator.") (citations omitted). Plaintiffs argue that the Court should decide this issue because they have not entered into any contract with defendant containing an arbitration provision, much less demonstrated any intention to give the Tribunal the power to determine whether they agreed to arbitrate with defendant. (*See* Plaintiffs' Memorandum Of Law In Support Of Their Application For An Order To Show Cause Why This Court Should Not Prohibit Colonial Oil Industries, Inc. From Asserting Its Right To Arbitrate Against Plaintiffs ("Pls.Mem.") at 5.) Defendant, on the other hand, contends that the Tribunal, not the Court, should determine the issue of arbitrability because the Contract's broad arbitration provision constitutes "clear and unmistakable evidence" of the parties' intentions to refer this decision to the arbitrators. (*See* Defendant's Response to Order to Show Cause ("Def.Mem.") at 3.)

In *First Options,* the Supreme Court directs lower courts to apply "ordinary state-law principles that govern the formation of contracts" when determining whether the parties agreed to arbitrate a particular issue, including arbitrability. *See First Options,* 514 U.S. at 944 (citations omitted). Under New York law, which applies here pursuant to paragraph 19 of the Contract, it is axiomatic that the formation of a contract requires 1) offer, 2) acceptance, and 3) consideration. *See Deutsche Asset Mgmt. v. Callaghan,* No. 01 Civ. 4426, 2004 U.S. Dist. LEXIS 5945, *47 (S.D.N.Y. Apr. 7, 2004) (Motley, J.) (citations omitted). Moreover, the intent of the parties assumes "central importance" when determining whether a contract was formed. *Id.* (citations omitted).

Here, defendant simply presumes that plaintiffs are parties to the Contract before arguing that the broad arbitration provision contained within it manifests plaintiffs' intent to submit the issue of arbitrability to the Tribunal. Defendant has not attempted to explain why the Contract agreed to by MA and defendant should be considered probative of plaintiffs' intent to agree with defendant. Furthermore, defendant does not challenge plaintiffs' assertion that they played no role in negotiating the terms of the Contract with defendant. (*See* Declaration of Kenhardt Scheepers ("Scheepers Decl."), dated March 1, 2005, ¶¶ 5-6.) Thus, on the present record, the Court is unwilling to interpret the Contract as anything more than a manifestation of the intentions of MA and defendant, and rejects defendant's contention that the arbitration provision clearly and unmistakably reveals plaintiffs' desire to arbitrate arbitrability with defendant. Because defendant relies solely on the breadth of the Contract's arbitration provision [FN2] and does not direct the Court to any clear and unmistakable evidence that plaintiffs agreed with defendant on any issue, much less the issue of arbitration, the Court will decide whether plaintiffs are bound to arbitrate with defendant. *See First Options,* 514 U.S. at 944.

FN2. Defendant also argues that the broad arbitration provision incorporates the ICC Rules, including Article 6(2), which expressly grants the Tribunal the responsibility of determining questions pertaining to its jurisdiction. (*See* Def. Mem. at 7-9.) However, this assertion is also founded upon the unproven assumption that the arbitration provision reflects plaintiffs' intent.

II. The Arbitration Provision May Not Be Enforced Against Plaintiffs

***3** As this Court has stated in the past, "[i]t is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 911770 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

fundamental that arbitration agreements are creatures of contract law."*Scher v. Bear Stearns & Co.,* 723 F.Supp. 211, 214 (S.D.N.Y.1989) (Leisure, J.) (citation omitted). Thus, " 'a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." ' *Thomson-CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir.1995) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582 (1960)). "Absent an express agreement to arbitrate, [the Second Circuit] has recognized only 'limited theories upon which [it] is willing to enforce an arbitration agreement against a non-signatory." ' *Merrill Lynch Inv. Managers v. Optibase, Ltd.,* 337 F.3d 125, 129 (2d Cir.2003) (quoting *Thomson,* 64 F.3d at 780). The five recognized theories are: "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Id.* at 129 (quoting *Thomson,* 64 F.3d at 776). Defendant maintains that three of the five theories apply to plaintiffs in this case. Specifically, defendant asserts that plaintiffs are bound to arbitrate, even though they are not signatories to the Contract, because (1) plaintiffs' participation in the performance of the Contract amounts to estoppel; (2) plaintiffs were MA's agents; and (3) MA is no more than plaintiffs' alter ego. (*See* Def. Mem. at 5.) The Court will address each argument *in seriatim.*

A. Estoppel

Guided by ordinary principles of contract and agency, the Second Circuit has reasoned that a non-signatory may be bound by an agreement containing an arbitration provision where the non-signatory knowingly exploited and accepted the benefits of an agreement.[FN3] *SeeMAG Portfolio,* 268 F.3d at 61 (quoting *Thomson,* 64 F.3d at 778, and citing *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.,* 9 F.3d 1060, 1064 (2d Cir.1993)). The Circuit has emphasized that "[t]he benefits must be direct-which is to say, flowing directly from the agreement."*Id.* (citing *Thomson,* 64 F.3d at 779). In *Am. Bureau of Shipping v. Tencara Shipyard, S.P.A.,* 170 F.3d 349, 353 (2d Cir.1999), for example, non-signatory owners of a vessel were found to directly benefit from an agreement containing an arbitration provision between a shipyard and a classification society, where the classification of the vessel enabled the owners to secure insurance at lower rates and sail the vessel under a certain country's flag. Similarly, a non-signatory to an agreement, which governed the use of a trade name and contained an arbitration clause, was estopped from arguing that it was not bound to arbitrate after it had received a copy of the agreement, did not object to it when given the opportunity to do so, and utilized the trade name pursuant to the terms of the agreement. *SeeDeloitte,* 9 F.3d at 1064.

FN3. The courts of this Circuit have also developed an "alternative estoppel theory," which provides that a signatory will be estopped from avoiding arbitration with a non-signatory when " 'the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed,' and the signatory and non-signatory parties share a close relationship."*MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC,* 268 F.3d 58, 62 (2d Cir.2001) (quoting *Thomson,* 64 F.3d at 779). This theory does not apply to cases like the present one where a signatory is attempting to bind a non-signatory.

Conversely, where "the agreement [is] not the direct source of the benefit," a non-signatory is not bound to arbitrate. *Thomson,* 64 F.3d at 778-79. In *Thomson,* two companies entered into an exclusive trade agreement. *Id.* at 775.Subsequently, a third party competitor acquired one of the companies in an apparent attempt to force the remaining company out of the market. *Id.* The unacquired signatory was now bound to trade only with a company that was a subsidiary of its competitor and the level of trading declined. *Id.* The Court ruled that the non-signatory was not subject to arbitration because the benefit derived by the non-signatory flowed from its acquisition of one of the signatories, not directly from the agreement itself. *Id.* at 779.

***4** Defendant contends that Masefield AG is estopped from avoiding arbitration because its receipt of all of the proceeds from the eight cargoes of fuel oil purchased by defendant constituted a direct benefit flowing from the Contract. (*See* Def. Mem. at 5.) Plaintiffs concede that Masefield AG assisted MA in directing defendant to make its payments under the Contract directly to Masefield AG for a debt owed by MA to Masefield AG. (*See* Scheepers Decl. ¶ 9). However, plaintiffs argue, *inter alia,* that the proceeds are an indirect benefit, and therefore insufficient for estoppel purposes, because Masefield AG only exploited the contractual relationship between MA and defendant, and not the Contract itself. (*See*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiffs' Memorandum Of Law In Response To Defendant's Response To Order To Show Cause And Defendant's Motion To Dismiss The Complaint ("Pls.Reply") at 6 (citing *MAG Portfolio,* 268 F.3d at 61).)

While at first blush the Contract may appear to be the direct source of defendant's payments to Masefield AG, Masefield AG's benefit here actually flows directly from MA's prior debts to Masefield AG. Indeed, the Contract only addresses defendant's purchase of fuel oil from MA and makes no mention of Masefield AG or its receipt of the proceeds. Though Masefield AG may be taking advantage of MA's agreement with defendant to secure repayment of MA's prior obligations, any benefit derived from it is indirect.

Moreover, unlike the non-signatories in *Am. Bureau* and *Deloitte* that were estopped from avoiding arbitration, there is no evidence on the present record that Masefield AG specifically contemplated exploiting the terms of the Contract prior to its formation. In *Am Bureau,* upon which defendant relied at oral argument, the agreement at issue was between a shipyard and a classification society, which inspected vessels and declared them seaworthy. *See*170 F.3d at 351. It is evident from the non-signatory vessel owners' earlier agreement with the shipyard, wherein the parties agreed that the vessel would be inspected by the classification society with whom the shipyard later contracted, that the vessel owners contemplated deriving some benefit from the particular terms of the later agreement. *Id.* In a similar fashion, when the non-signatory company in *Deloitte* received the agreement concerning the use of a trade name, chose not to object to it, and then proceeded to use the trade name pursuant to the terms of the agreement, it may be inferred that the non-signatory considered the terms of the agreement and determined that it would later seek to benefit from them. *See*9 F.3d at 1064.

By contrast, there has been no showing here that Masefield AG was even aware of MA's agreement with defendant, much less considered its specific terms, when it decided to loan MA the funds, which were repaid, at least in part, with the proceeds from the Contract. It appears to the Court that this case is more analogous to *Thomson,* than to *Am. Bureau* or *Deloitte.*Just as the benefit derived by the non-signatory in *Thomson* flowed from its position as the parent of one of the signatories, *see*Thomson, 64 F.3d at 779, Masefield AG's benefit here results from its position as MA's lender, and not from the Contract itself. Furthermore, the *Thomson* Court explained that the non-signatory would have been estopped from avoiding arbitration if it had attempted to exploit specific provisions of the agreement containing the arbitration provision. *See*Thomson, 64 F.3d at 779. Likewise, had Masefield sought to invoke or enforce particular aspects of the Contract, it too would be compelled to arbitrate. However, there is no evidence on the present record that it did so. Accordingly, the Court finds that Masefield AG is not estopped from avoiding arbitration with defendant.

B. Agency

***5** In its papers, defendant claims, without more, that plaintiffs should be compelled to arbitrate because they were MA's agents. (*See* Def. Mem. at 5.) When pressed further on the issue at oral argument, defense counsel argued that the agency theory should apply to Masefield Ltd. because paragraph 21 of the Contract provides that "[a]ll operational enquiries & other matters arising should be forwarded solely to: Masefield Ltd." In addition, Masefield AG allegedly acted as MA's agent in receiving all of defendant's payments under the Contract.

The Second Circuit has cautioned that "conclusory allegations of a general agency relationship between a signatory and non-signatory do not suffice to compel ... unwilling non-signatories to arbitrate under that theory."*Alco Int'l, E.C. v. Merrill Lynch & Co.,* 98 Fed. Appx. 44, 46-47 (2d Cir.2004) (citing *Merrill Lynch,* 337 F.3d at 130-31). A full showing of agency supported by an accepted theory of agency or contract law is required, and generalized allegations of affiliation are insufficient. *See*Merrill Lynch, 337 F.3d at 130-31 (citing *Thomson,* 64 F.3d at 780)." 'Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." ' *Merrill Lynch,* 337 F.3d at 130 (quoting Restatement (Second) of Agency, § 1 (1958)).

In its conclusory argument, defendant fails to establish that plaintiffs, as the alleged agents, acted subject to MA's control with respect to the Contract. While plaintiffs concede that Masefield Ltd. provided MA with some operational support until MA hired an operations manager and that Masefield AG assisted MA in directing defendant to pay Masefield AG

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 911770 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 5

directly (*see* Scheepers Decl. ¶¶ 8-9), these facts do not demonstrate that plaintiffs consented to act at the direction of MA. Accordingly, an agency relationship is not evident at this stage and plaintiffs cannot be compelled to arbitrate under this theory.

C. Alter Ego/Veil-Piercing

In certain circumstances, a court may pierce the corporate veil of one corporation and hold a second corporation legally accountable for the actions of the first if the second corporation (1) exercised complete domination over the first with respect to the transaction at issue, and (2) such domination was used to defraud or injure the party seeking to pierce the veil. *See*MAG Portfolio, 268 F.3d at 63;Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir.1997). Determining whether one corporation has completely dominated another is a "fact specific" inquiry, in which courts consider many factors, including:
(1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

***6***MAG Portfolio,* 268 F.3d at 63 (quoting *Freeman v. Complex Computing Co.,* 119 F.3d 1044, 1053 (2d Cir.1997)). Thus, a non-signatory may be bound to arbitrate where it exercised complete domination over a signatory and employed that domination to injure another signatory to the agreement. *See, e.g.,Thomson,* 64 F.3d at 777-78. However, the conduct at issue must reveal "a virtual abandonment of separateness." *Id.* (citations omitted).

Defendant's veil-piercing argument falls well short of the standard set forth above. Citing *Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 97 (2d Cir.1999), wherein the Court found it significant to the veil-piercing analysis that virtually of the correspondence of various affiliate companies was mailed to the same address and that the affiliates were referred to as a "group" of companies, defendant contends that MA is no more than plaintiffs' alter ego because the Contract directs all inquiries to be sent to Masefield Ltd. and plaintiffs have described themselves, along with MA, as the "Masefield Group" or "Masefield group of companies." (*See* Def. Mem. at 5-6.) Considering these two relatively minor facts in the context of the unchallenged declarations of Scheepers and Daley, which state that MA, Masefield AG, and Masefield Ltd. are each fully capitalized, independent companies with minimal personnel overlap that deal with one another in an arm's length manner, the Court is not persuaded that either plaintiff completely dominated defendant for the purpose of harming defendant. The present record does not reflect a "virtual abandonment of separateness" and therefore, it would be improper to pierce MA's corporate veil.

III. A Preliminary Injunction Should Issue

It is well established that in order to obtain a preliminary injunction, the movant must show: (a) irreparable harm; and, (b) either, (1) likelihood of success on the merits; or, (2) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *See,e.g.,Sweeney v. Bane,* 996 F.2d 1384, 1388 (2d Cir.1993); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). Whether injunctive relief should issue or not " 'rests in the sound discretion of the district court which, absent abuse of discretion, will not be disturbed on appeal." ' *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990) (quoting *Thornburgh v. Am. Coll. of Obstetricians and Gynecologists,* 476 U.S. 747, 755 (1986)).

Irreparable harm is " 'the single most important prerequisite for the issuance of a preliminary injunction." ' *Reuters Ltd.,* 903 F.2d at 907 (quoting *Bell & Howell: Mamiya Co. v. Masel Co. Corp.,* 719 F.2d 42, 45 (2d Cir.1983)). Irreparable harm is an "injury for which a monetary award cannot be adequate compensation." *Javaraj v. Scappini,* 66 F.3d 36, 39 (2d Cir.1995) (citing *Jackson Dairy,* 596 F.2d at 72). Further, "[i]rreparable harm must be shown by the moving party to be imminent, not remote or speculative." *Reuters,* 903 F.2d at 907 (citing *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 972 (2d Cir.1989)). The movant is required to establish not a mere possibility of irreparable harm, but that it is "*likely* to suffer irreparable harm if equitable relief is denied." *JSG Trading Corp. v. Tray-Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 911770 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

"Likelihood sets, of course, a higher standard than 'possibility." ' *Id.*

***7** Within the arbitration context, the Second Circuit has held that irreparable harm results from arbitrating a dispute involving a party who is not covered by the arbitration agreement. *See Maryland Casualty Co. v. Realty Advisory Bd. on Labor Relations,* 107 F.3d 979, 985 (2d Cir.1997) ("[T]he time and resources [plaintiff] would expend in arbitration is not compensable by any monetary award of attorneys' fees or damages pursuant to the provisions of the [arbitration agreement] or the Arbitration Act.")); *see also Merrill Lynch,* 337 F.3d at 129.

Here, plaintiffs advance the same argument to establish both irreparable harm and a likelihood of success on the merits. They maintain that, because they are not signatories to the Contract and none of the five theories for binding non-signatories properly apply to them, the Contract's arbitration provision may not be enforced against them. Thus, if forced to arbitrate against defendant, they will (1) suffer irreparable harm pursuant to *Maryland Casualty,* and (2) will likely prevail on the merits of their claim to preclude defendant from arbitrating against them. (*See* Pls. Mem. at 6.)

Plainly, the force of plaintiffs' argument for preliminary injunctive relief largely depends upon whether the Contract's arbitration provision may be enforced against them. As discussed in Part II *supra,* on the present record, defendant cannot demonstrate that plaintiffs, as non-signatories, are bound to arbitrate along with MA. As a result, at this stage, plaintiffs would suffer irreparable harm if compelled to arbitrate with defendant, *see Maryland Casualty,* 107 F.3d at 985, and, because plaintiffs' claim is limited to preventing defendant from arbitrating with them, there appears to be a likelihood of success on the merits. Moreover, the balance of hardships tips decidedly in plaintiffs' favor here, as defendant should not be permitted to compel two non-signatories to arbitrate under the Contract without a clear basis in the law. Meanwhile, defendant is not left without a remedy as it may continue to pursue its claim in arbitration against MA.

IV. Rule 65 Requirements

A court issuing a preliminary injunction must be specific and describe in reasonable detail the act or acts sought to be restrained. *See* Fed.R.Civ.P. 65(d). Thus, during the pendency of this action, the Court hereby enjoins defendant from asserting to the Tribunal in the arbitration proceeding against MA that the Tribunal has the power to determine whether plaintiffs must arbitrate defendant's demands.

In addition, Federal Rule of Civil Procedure 65(c) provides in pertinent part:

No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Fed.R.Civ.P. 65(c).

***8** "The purpose of requiring security prior to issuance of an injunction or a temporary restraining order is to guarantee payment of costs and damages incurred by a party who is wrongfully enjoined or restrained." *Interlink Int'l Fin. Servs., Inc. v. Block,* 145 F.Supp.2d 312, 314 (S.D.N.Y.2001) (quoting 13 Moore's Federal Practice at 65-94.1 (3d. ed.1997)). Generally, the amount of the bond posted is the limit that a wrongfully restrained party may recover. *See id.* District courts in the Second Circuit are vested with wide discretion in determining the amount of the bond that the moving party must post. *See Doctor's Assocs., Inc. v. Stuart,* 85 F.3d 975, 985 (2d Cir.1996); *Ferguson v. Tabah,* 288 F.2d 665, 675 (2d Cir.1961). Indeed, in cases where the non-movant has not shown a likelihood of harm, the district court may properly set no bond. *See Doctor's Assocs.,* 85 F.3d at 985; *Ferguson,* 228 F.2d at 675.

Though the parties did not address the bond issue in their filings, the Court requested their views at oral argument. Plaintiffs maintained that no bond is necessary because the merits of defendant's Arbitration Demand are not at issue in plaintiffs' request for a preliminary injunction; the sole issue is whether plaintiffs can be compelled to arbitrate. Conversely, defendant argued that, because MA is a shell company and any future judgment against it may not be collectible, the bond amount should equal the amount at stake in the arbitration, namely $3,644,520. Defendant's position assumes that, if it ultimately prevails against MA but cannot collect from MA, it necessarily should be able to arbitrate against plaintiffs. As discussed above, defendant, thus far, has not established that it can arbitrate against plaintiffs

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 911770 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 7

for the amount claimed in its Arbitration Demand. If defendant later demonstrates that plaintiffs should be subject to arbitration, then the preliminary injunction may be vacated and defendant would be free to pursue its claims against plaintiffs. Consequently, on the present record, defendant cannot show a likelihood of harm and the Court will not require plaintiffs to post a bond.

*CONCLUSION*

For the foregoing reasons, plaintiffs' request for a preliminary injunction is GRANTED.

SO ORDERED.

S.D.N.Y.,2005.
Masefield AG v. Colonial Oil Industries, Inc.
Not Reported in F.Supp.2d, 2005 WL 911770 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
Slip Copy, 2007 WL 3307089 (E.D.N.Y.)
**(Cite as: Slip Copy)**

Page 1

**NewYork** v. **Shinnecock** Indian Nation
E.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
State of **NEWYORK**, **NewYork** State Racing and Wagering Board, **NewYork** State Department of Environmental Conservation, and Town of Southampton, Plaintiffs,
v.
The **SHINNECOCK** INDIAN NATION, Frederick C. Bess, Lance A. Gumbs, Randall King, and Karen Hunter, Defendants.
Town of Southampton, Plaintiff,
v.
The **Shinnecock** Tribe a/k/a the **Shinnecock** Indian Nation, Frederick C. Bess, Lance A. Gumbs, and Randall King, Defendants.
**Nos. 03-CV-3243 (JFB)(ARL), 03-CV-3466 (JFB)(ARL).**

Oct. 30, 2007.

Robert A. Siegfried, New York State Office of the Attorney General, Albany, NY, for plaintiffs State of New York, New York State Racing and Wagering Board, and New York State Department of Energy Conservation.
Michael Stewart Cohen of Nixon Peabody, LLP, Jericho, NY, for plaintiff Town of Southampton.
Christopher H. Lunding of Cleary, Gottlieb, Steen & Hamilton, New York, NY, for defendants.

MEMORANDUM AND ORDER
JOSEPH F. BIANCO, District Judge.
***1** In the above-captioned consolidated actions, plaintiffs New York State ("New York"), the New York State Racing and Wagering Board (the "Board"), the New York State Department of Environmental Conservation (the "DEC") (collectively, the "State"), and the Town of Southampton (the "Town" or "Southampton") (collectively, the "plaintiffs") seek to permanently enjoin defendants, the Shinnecock Indian Nation (the "Shinnecock Nation" or the "Shinnecock Tribe" or the "Nation" or the "Tribe" or the "Shinnecocks" or the "Shinnecock" or the "Shinnecock Indians"), and its tribal officials sued in their official capacity (collectively, the "defendants"), from constructing a casino and conducting certain gaming on a parcel of non-reservation property known as "Westwoods," which is situated in the western half of the Town in Suffolk County, New York ("Westwoods" or the "Westwoods land" or the "Westwoods site" or the "Westwoods parcel"). Plaintiffs have demonstrated that the defendants' actions and threatened actions with respect to the construction and operation of a Westwoods casino are not in compliance with New York anti-gaming laws and environmental laws, as well as the Southampton Town Code (the "Town Code"). However, because the Shinnecock Indian Nation is asserting immunity with respect to such laws, there are three main legal issues in the case: (1) whether aboriginal title to Westwoods held by the Shinnecock Indian Nation at the time of first European contact in 1640 has been extinguished; (2) whether, even if aboriginal title has not been extinguished, the Shinnecock Indian Nation is barred from asserting sovereignty at Westwoods, under the Supreme Court decision in *City of Sherrill v. Oneida Indian Nation,* 544 U.S. 197 (2005), because of the disruptive consequences that the construction and operation of a casino would have on the Town and the Suffolk County, New York ("Suffolk County") community; and (3) whether there is any legal basis to allow gambling at Westwoods in non-compliance with New York's anti-gaming laws if the proposed casino development is not within the parameters of federal law as set forth in the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ("IGRA"). This Memorandum and Order sets forth the Court's Findings of Fact and Conclusions of Law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

The Court conducted a lengthy and thorough bench trial, which lasted 30 days, and included over 20 witnesses, over 600 exhibits, and over 4,000 pages of transcripts. After carefully considering the evidence and the law, this Court concludes that the plaintiffs have demonstrated that they are entitled to a permanent injunction that prevents the development of a casino at Westwoods that is not in full compliance with New York and Town laws and regulations. [FN1]

FN1. In a Memorandum and Order, dated November 7, 2005, the Court determined that the Shinnecock Indian Nation satisfied the federal common law standard for determining tribal existence and, therefore, that issue was not part of the trial.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Court finds that there are three independent grounds for the Court's ruling in favor of plaintiffs. First, the evidence overwhelmingly demonstrated in a plain and unambiguous manner that aboriginal title held by the Shinnecock Indian Nation to the Westwoods land was extinguished in the 17th century. More specifically, a series of colonial era documents demonstrate in clear and unequivocal language that (1) the Shinnecock Indian Nation sold land, which included Westwoods, to non-Indians in the 17th century; (2) the land was subsequently acquired by Southampton; and (3) the sovereign authority of the Province of New York confirmed and ratified the ownership of the land by the Town, including a determination by New York Provincial Governor Richard Nicolls in 1666 in which he confirmed that “all the right and interest” in the land that included Westwoods “is belonging, doth and shall belong unto the town of Southampton” and promised to defend the Town in its peaceable enjoyment of such land “[a]gainst all other claims whatsoever.”Although the defendants attempt to point to certain aspects of the historical record in an effort to cast doubt on the meaning or validity of these transactions, the Court finds their arguments unavailing and concludes that this colonial-era extinguishment of aboriginal title to Westwoods is clear, unmistakable, and valid. Therefore, although there is no dispute that the Shinnecock Indian Nation currently owns and occupies Westwoods, the absence of current aboriginal title for the Westwoods land renders the Shinnecock Indian Nation subject to the application of New York and Town laws in the development of a casino on such land.

***2** Second, even assuming *arguendo* that the Shinnecock Indian Nation has unextinguished aboriginal title to Westwoods, their proposed casino development is barred under the Supreme Court's decision in *Sherrill* because of the highly disruptive consequences the development and operation of a casino would have on the neighboring landowners, as well as the Town and the greater Suffolk County community. More specifically, based upon the evidence offered at trial, the Court concludes that the construction and operation of a casino at Westwoods would have severe disruptive consequences to the administration of governmental affairs, as well as the health, safety, and long-settled expectations of the residents of Southampton. For example, the substantial disruption to the transportation infrastructure in the Town and Suffolk County is undeniable. The evidence at trial demonstrated that the area in and around Southampton is already plagued with extremely high levels of traffic congestion in the summer months. The only rational conclusion to be drawn from the evidence is that, absent substantial infrastructure improvements (whose cost and feasibility are unknown), the addition of a casino to this already overburdened traffic system would be disastrous and undoubtedly would be highly disruptive to state and local governance and the settled expectations of landowners. In addition, the evidence demonstrated that the operation of a casino would have a multitude of other health and environmental impacts on neighboring landowners and the Town. Therefore, even if unextinguished aboriginal title currently existed, the Shinnecock Indian Nation's delayed assertion of sovereignty over this non-reservation land at Westwoods-after centuries of non-use of the land except for cutting timber and recreational functions-is barred by laches and other equitable principles under *Sherrill.*

A third independent ground exists for the permanent injunction in plaintiffs' favor. It is undisputed that the Shinnecock Indian Nation's planned gaming facility fails to comply with applicable New York law and that the proposed development does not fall within the confines of IGRA, which supplanted any federal common law right of tribes to conduct the type of unregulated gaming that the Shinnecock Indian Nation seeks to operate at Westwoods. The Shinnecock Indian Nation is not recognized by the federal government and Westwoods is not “Indian lands” as defined by the statute and, thus, the Shinnecock Indian Nation cannot utilize the safe-haven that IGRA provides from the otherwise applicable state anti-gaming laws. Therefore, the Shinnecock Indian Nation can only engage in gaming at Westwoods if it is in compliance with current New York gambling laws. Since the operation of a casino at Westwoods would violate New York anti-gaming laws, there is no legal basis for the Shinnecock Indian Nation to operate the casino.

In terms of the requested relief, defendants argue that a permanent injunction is unwarranted because any harm from the proposed casino is speculative and not imminent. However, there is nothing speculative or remote about the project-the Shinnecock Indian Nation has a development agreement in place to build a 61,000 square foot (“sf.”) casino at Westwoods on 15 acres (which defendants expect to have a capacity to hold 900 to 1,000 gaming machines and 60 table

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

games), it has stated its intention to build the casino without being legally bound by government regulation of any type, and it began clearing trees at Westwoods in 2003 to start the project. Plaintiffs have satisfied the requirements for permanent injunctive relief, including a showing of irreparable harm, if the defendants are not prevented from building a casino in violation of New York anti-gaming and environmental laws, and Town zoning laws and other regulations.

***3** Although the Shinnecock Indian Nation has emphasized to this Court during the trial (and the Court recognizes) the financial importance that the proposed casino has to the Shinnecock Indian Nation as it continues to face substantial economic hardship, this Court's proper role is not to address or remedy those economic hardships, but rather to examine the evidence under applicable law to determine whether the proposed casino development is legally permissible. For the reasons outlined briefly above and in detail in the Findings of Fact and Conclusions of Law that follow, the Court concludes that plaintiffs have demonstrated in an overwhelming fashion that they are entitled to a permanent injunction preventing the development of a casino at Westwoods that is not in compliance with New York and Town laws and regulations.

I. BACKGROUND

A. THE CONSOLIDATED ACTIONS

The lawsuit commenced by the Town against the Nation and its three Trustees (03-cv-3466) (the "Town action"), has been consolidated with the lawsuit commenced by New York, the Board, and the DEC against the Nation and its Trustees, as well as the Chairman of the Shinnecock Nation Gaming Authority (03-cv-3243) (the "State action"). Plaintiffs seek declaratory relief that the construction and operation of a casino at Westwoods is illegal under both New York and local law and, as a result of such violations and threatened violations, seek to permanently enjoin such activities. The Court will briefly summarize below the pleadings filed by each of the parties.

(1) THE STATE COMPLAINT

The State complaint asserts five causes of action. The First Cause of Action alleges that any attempt by the defendants to build and operate a casino at Westwoods would violate New York anti-gaming laws and that such gaming would not be permitted under federal law (as set forth in IGRA) because, among other things, the Nation has not been recognized as a tribe by the Bureau of Indian Affairs (the "BIA"). (State Complaint, at ¶¶ 71-78.) The Second Cause of Action contends that defendants lack a Storm Water Pollution Prevention Plan ("SWPPP") and a Notice of Intent ("NOI") pursuant to a General State Pollutant Discharge Elimination System ("SPDES") permit for construction and operation of a casino and, therefore, cannot legally commence construction of the casino. (*Id.,* at ¶¶ 79-81.)The Third Cause of Action charges that, given the failure to apply for and obtain an SPDES permit under New York environmental law, defendants cannot lawfully commence construction of a casino with a wastewater treatment facility that would discharge effluent into New York waters. (*Id.,* at ¶¶ 82-84.)The Fourth Cause of Action alleges that, because defendants failed to apply for and obtain a permit for a new well under New York environmental laws, defendants may not commence construction of a casino with an attendant new well having a pumping capacity exceeding forty-five gallons per minute. (*Id.,* at ¶¶ 85-87.)The Fifth Cause of Action asserts that, because the necessary environmental impact studies have not been conducted as required under the State Environment Quality Review Act ("SEQRA"), the DEC cannot issue the necessary permit to allow construction and operation of a casino facility.(*Id.,* at ¶¶ 88-90.)The State seeks a permanent injunction and a declaratory judgment in connection with these claims.

(2) THE TOWN'S COMPLAINT

***4** The Town also seeks declaratory relief and a permanent injunction. Specifically, the Town alleges that, in July 2003, defendants engaged in site preparation activities at Westwoods in connection with their previously-announced decision to develop a casino at that site. (Town's Complaint, at ¶¶ 12-15.) The Town contends that these construction activities were not preceded by any application for, or the issuance of, the requisite Town permits and approvals and, thus, such activities and threatened activities violate the Town Code. (*Id.,* at ¶ 16.)The First Cause of Action alleges that defendants violated Town Code § 330-184(I), which requires site plan approval or written permission from the Southampton Planning Board before any "regrading, clearing, tree removal or any other work in preparation of future use of a site" may take place. (*Id* ., at ¶ 21.)According to the

Slip Copy
Slip Copy, 2007 WL 3307089 (E.D.N.Y.)
**(Cite as: Slip Copy)**

Page 4

complaint, defendants did not apply or receive site plan approval before engaging in site preparation activities at Westwoods. (*Id.,* at ¶ 23.)The Second Cause of Action asserts that defendants' activities and/or threatened activities violate Town Code § 325-6(A), which is part of the Town's wetlands protection legislation and prohibits certain construction activities in a wetland area or within 200 feet of wetland boundaries in the absence of a Town-issued wetlands permit. (*Id.,* at ¶¶ 27-36.)In particular, it is alleged that defendants' site preparation activities at Westwoods qualify under this provision and defendants violated it by not obtaining the requisite permit. (*Id.,* at ¶¶ 31-34.)In short, the complaint alleges that "[d]efendants have refused to acknowledge, much less comply with Chapters 325 ["Wetlands"] and 330 ["Zoning"] of the Town Code, and otherwise have refused to recognize and acknowledge the Town's authority to regulate the uses of the lands within its borders."(*Id.,* at ¶ 36.)

(3) DEFENDANTS' DEFENSES

Defendants make a number of admissions in their answers to the complaints.[FN2] Defendants admitted that the Tribe is not listed on the master list of federally-recognized Indian Tribes maintained by the federal government in the Federal Register. (Defs. Ans. to State's Complaint, at ¶ 43.) With respect to the alleged illegal gaming under New York law, defendants admitted that the Nation owns Westwoods and that the Nation intends "to engage in gaming activities in a building to be constructed on a portion of the Westwoods Parcel...."(*Id.,* at ¶¶ 46, 49.)Specifically, defendants admitted to a plan to construct a gaming facility in the summer of 2003 that would have the capacity to accommodate at least "900 to 1,000 gaming machines and 60 table games."(*Id.,* at ¶ 50.)Defendants also conceded that the Nation had not received an identification number issued by the Board or a license issued by the Town authorizing gaming at Westwoods, as required by New York gaming laws.(*Id.,* at ¶¶ 53-54.)With respect to the alleged violations of New York environmental laws, defendants admitted that they have not submitted any of the documents to the DEC for an environmental impact study in order to commence construction of a gaming facility at Westwoods under New York environmental laws, and that they also lacked the environmental and building permits and agreements required under Town zoning laws, Town fire code regulations, and New York environmental laws. (*Id.,* at ¶¶ 58-59.)

FN2. The admissions and defenses contained in the Answer to the State Complaint mirror those contained in the Answer to the Town Complaint.

***5** Although a number of defenses are raised in defendants' answers to the complaints, their core defense is that New York and its political subdivisions, including Southampton, lack the power under the United States Constitution and federal common law to require the defendants to obtain any license, permit, or other form of approval to construct or operate a gaming facility at Westwoods. (Defs. Answer to State's Complaint, at 13, "Third Affirmative Defense"; *see also* Defs. Answer to Town's Complaint, at ¶¶ 8-9, "Third Affirmative Defense.")

II. PROCEDURAL HISTORY

On June 29, 2003, the State commenced the State action in New York State Supreme Court, Suffolk County ("Suffolk County Supreme Court") to stop construction activities at the Westwood site. On that same date, the State obtained a temporary restraining order (a "TRO") signed by New York State Supreme Court Justice Edward D. Burke. On July 1, 2003, defendants removed the case to this Court and the matter was assigned to the Honorable Thomas C. Platt.

On July 14, 2003, Southampton filed the Town action in Suffolk County Supreme Court, also seeking to enjoin construction activities, based on defendants' alleged violation of the Town's zoning and land use laws. On that same date, New York State Supreme Court Justice James M. Catterson granted the Town's application for a TRO. Thereafter, on July 15, 2003, defendants removed the action to this Court and the matter was assigned to the Honorable Thomas C. Platt.

Shortly after removal of the State action, the State moved for remand. The State's motion for remand was denied by order dated July 29, 2003. *See New York v. Shinnecock Indian Nation,* 274 F.Supp.2d 268, 271 (E.D.N.Y.2003). The Town also moved to remand, but later agreed to withdraw its motion when the two actions were consolidated. (*See* Stipulation and Order, dated December 22, 2003.)

The State also moved this Court for a TRO and a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

preliminary injunction to halt construction of the casino. The Town joined in the State's motion. By Memorandum and Order dated August 29, 2003, the Court granted the preliminary injunction. *See* *New York v. Shinnecock Indian Nation,* 280 F.Supp.2d 1, 10 (E.D.N.Y.2003). The Court also stayed the action for a period of eighteen months to allow the BIA to decide the Nation's petition to the BIA for federal recognition. (*Id.*) Defendants appealed the August 29, 2003 Memorandum and Order, and the Second Circuit remanded the case on November 18, 2003, stating that the district court should determine whether a preliminary injunction and stay was still warranted since the BIA could not address the Nations' petition for recognition within the eighteen months contemplated by the Court. *See New York v. Shinnecock Indian Nation,* No. 03-7996, at 1-2 (2d Cir. Nov. 26, 2003). Following the remand, on November 18, 2003, the Court conducted a conference in the State action in which the Town participated. At that conference, the Court lifted the stay, but continued the preliminary injunction pending a decision at trial. The Town action was also consolidated with the State action and the parties were ordered to proceed with discovery. (*See* Stipulation and Order, dated December 22, 2003.)

***6** The parties filed motions for summary judgment and partial summary judgment on July 21, 2005. Defendants sought to dismiss the Town and State complaints on the grounds that the Nation is an Indian Tribe and is therefore entitled to tribal sovereign immunity. Plaintiffs sought partial summary judgment permanently enjoining defendants from operating a gaming facility, alleging that defendants lack the right to engage in tribal gaming under IGRA or under federal common law, and that any gaming was subject to New York gaming and environmental laws. The Town sought partial summary judgment on the grounds that Westwoods is not "Indian country," as defined at 18 U.S.C. § 1151, and thus is subject to state and local law, and that, in any event, the Nation no longer holds aboriginal title to Westwoods because such title was extinguished by sovereign act during the colonial era.

By Memorandum and Order, dated November 7, 2005, Judge Platt denied all motions for summary judgment and partial summary judgment, except that he granted the defendants' motion for summary judgment on the issue of whether the Nation is an Indian Tribe pursuant to the federal common law standard established in *Montoya v. United States,* 180 U.S. 261, 266 (1901) and *Golden Hill Paugussett Tribe of Indians v. Weicker,* 39 F.3d 51, 59 (2d Cir.1994). *See* *New York v. Shinnecock Indian Nation,* 400 F.Supp.2d 486, 491-92 (E.D.N.Y.2005). Judge Platt held that "[t]he cases described above, beginning with *Montoya* and continuing to the present, establish a federal common law standard for determining tribal existence that the Shinnecock Indian plainly satisfies." *Id.* at 492. However, Judge Platt emphasized that "recognizing the Shinnecocks as a Tribe does not end the matter. The question remains as to what use Defendants may put the Westwoods property...." *Id.* at 493. Judge Platt also found that the recent Supreme Court decision in *Sherrill* was relevant to considering "the extent of the impact of the 'disruptive' claims [of the defendants], the nature of the Indians' present titles and possibly the length of the delay and the question of laches, and appropriate remedies. These are factual and legal determinations which may only be resolved at a trial." *Id.* at 496. Judge Platt noted that "a remedy may also be disruptive in cases similar to the one at bar, where dispossession is not at issue and only neighboring landowners will be affected by the Indians' claims." *Id.* at 496 n. 6 (citing *Sherrill,* 544 U.S. at 219-20).

III. THE TRIAL

A bench trial commenced in this action before Judge Platt on October 4, 2006. On November 15, 2006, after six days of trial, the case was re-assigned to the undersigned.[FN3] The bench trial resumed on December 4, 2006. On December 6, 2006, the State filed a motion for reconsideration of the denial of their motion for partial summary judgment. The Court denied the State's request that the trial be discontinued until the reconsideration motion was fully briefed and decided. Instead, the Court decided to continue with the trial and address the legal issues raised by the motion for reconsideration at the conclusion of the trial along with the other legal issues in the case. The final witness testified on April 17, 2007. The parties submitted their proposed findings of fact and conclusions of law on May 1 and May 2, 2007, for utilization by the Court in connection with this Memorandum and Order. Summations were heard on May 9 and May 10, 2007.

FN3. Pursuant to Rule 63 of the Federal Rules of Civil Procedure, when the case was re-assigned due to Judge Platt being unable to proceed with the trial, the undersigned certified familiarity with the record and

Slip Copy
Slip Copy, 2007 WL 3307089 (E.D.N.Y.)
**(Cite as: Slip Copy)**

Page 6

determined that the proceedings in the case could be completed without prejudice to the parties. (Trial Transcript (hereinafter, "Tr.") 855-57.) The Court also gave each party the option of recalling any witness who had already testified before Judge Platt. The parties agreed to recall two witnesses and consented to the Court relying on the transcript for the testimony of the other witnesses who had already testified.

IV. FINDINGS OF FACT[FN4]

FN4. To the extent that any Finding of Fact reflects a legal conclusion, it shall be to that extent deemed a Conclusion of Law, and vice-versa.

A. THE PARTIES

***7** Plaintiff New York is a sovereign state with offices at the Capitol, in the City and County of Albany, New York. (Joint Pretrial Order Stipulation of Fact (hereinafter, "Stip.") No. 1.) [FN5] Plaintiff Board is an agency established within the Executive Branch of the government of New York, pursuant to Section 101 of the Racing, Pari-Mutuel Wagering and Breeding Law of the State of New York, and consists of three members appointed by the Governor of New York. (Stip. No. 2.) Plaintiff the DEC is an agency established within the Executive Branch of the government of New York, pursuant to New York Environmental Conservation Law article 3. (Stip. No. 3.)

FN5. Although this Memorandum and Order makes specific reference to certain, but not all, of the individual factual stipulations set forth in the Joint Pre-Trial Order, each and all of those factual stipulations have been fully considered by the Court in connection with the Court's decision.

Plaintiff Southampton is a municipal corporation organized and existing under the laws of New York, situated within Suffolk County and having an address at 116 Hampton Road, Southampton, New York. (Stip. No. 4.)

Defendant Shinnecock Indian Nation was held to be a tribe of Indians in this Court's Memorandum and Opinion dated November 7, 2005, and has offices on the Shinnecock Reservation in Southampton (the "Shinnecock Reservation"). (Stip. No. 5.) The Nation has not been acknowledged to be an Indian tribe by the BIA. (Stip. No. 9.) The Nation does not appear in the list of "tribal entities recognized and eligible for funding and services from the [BIA] by virtue of their status as Indian Tribes," as set forth at 70 Fed.Reg. 71, 194 (Nov. 25, 2005). (Stip. No. 10.) There exists no treaty between the Nation and the United States. (Stip No. 11.) The relationship between the Nation and the government of New York (and its predecessors) predates the existence of the federal government. (Stip. No. 12.) The Nation currently occupies and is in possession of the Shinnecock Reservation, on which some members of the Nation reside. (Stip. No. 13.) The Shinnecock Reservation is generally described in the first sentence of Section 1 of Chapter 46 of the New York Laws of 1859, and does not include the property described below as Westwoods. (Stip. No. 14.)

Defendant James W. Eleazer, Jr. was, at the time the complaints in these consolidated actions were filed, an elected Trustee and official of the Nation, and was sued by the State in his official capacity only. (Stip. No. 6.) By Order of this Court dated April 17, 2007, Mr. Eleazer was dismissed from this action as a defendant, and Randall King was substituted as a party defendant in the place of Mr. Eleazer. Defendant Lance A. Gumbs was, at the time the complaints in these consolidated actions filed, and is now an elected Trustee and official of the Nation, and is being sued by the State in his official capacity only. (Stip. No. 7.) Defendant Frederick C. Bess was, at the time the complaints in these consolidated actions were filed, chairman of the Shinnecock Nation Casino at Westwoods Authority, and is now an elected Trustee of the Nation, and is being sued by the State in his official capacity only. (Stip. No. 8.) By Stipulation and Order of this Court dated March 21, 2007, Karen Hunter, who is currently Chairman of the Shinnecock Nation Gaming Authority (the "Gaming Authority"), formerly known as the Shinnecock Nation Casino at Westwoods Authority, was substituted as a party defendant in this action in the place of Phillip D. Brown, V, who was the successor to defendant Mr. Bess as Chairman of the Gaming Authority.

B. THE WESTWOODS PARCEL

***8** The Shinnecock Tribe owns a parcel of land, commonly known as "Westwoods," which is approximately 80 acres in total area, located in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Hampton Bays area within the boundaries of the Town. (Stip. No. 15.) Westwoods is located approximately 85 miles east of New York City. (Stip. No. 37.)

Westwoods consists of three tax lots: (a) Suffolk County Tax Map, District No. 0900, Section 186, Block No. 2, Lot No. 38 ("Parcel A"); (b) Suffolk County Tax Map, District No. 0900, Section 187, Block No. 2, Lot No. 78 ("Parcel B"); and (c) Suffolk County Tax Map, District No. 0900, Section 207, Block No. 1, Lot No. 1 ("Parcel C"). (Stip. No. 16; D259,[FN6] at 4; D156 a, b, c, d.) Parcel A is property to the north of Newtown Road and south of Great Peconic Bay; this parcel is about 41.5 acres. Parcel B is property north of Sunrise Highway and south of Newtown Road; this parcel is about 36.7 acres. Parcel C is property south of Sunrise Highway and is about 2.0 acres. (D259 at 8; D264; D156d; Stip. No. 16; Tr. 3292-94.)

FN6. Exhibit numbers preceded by the letter D (*e.g.,* D259) represent exhibits introduced by defendants; exhibit numbers preceded by the letter "T" represent exhibits introduced by the Town; exhibit numbers preceded by the letter "S" represent exhibits introduced by the State.

The Nation currently has fee simple title to Westwoods. (Stip. No. 17.) The Nation currently occupies and possesses Westwoods. (Stip. No. 18.) Westwoods is not part of any reservation established by New York.[FN7](Stip. No. 20.) Westwoods does not appear in the records of the BIA as Indian fee land, the title to which is restricted against alienation in accordance with 25 U.S.C. § 177. (Stip. No. 24.) Westwoods is not currently under federal superintendence, as that term is used in connection with land that is a "dependent Indian community" for purposes of 18 U.S.C. § 1151(b). (Stip. No. 25.) Westwoods is not a "dependent Indian community" within the meaning of 18 U.S.C. § 1151. (Stip. No. 26.) Westwoods was not set aside by the federal government for the use of Indians as Indian land, as that term is used in determining whether land is a "dependent Indian community" for purposes of 18 U.S.C. § 1151(b). (Stip. No. 27.) There exists no express agreement between the Nation and the United States regarding Westwoods. (Stip. No. 28.). There exists in the Office of the Clerk of Suffolk County no recorded deed by the Nation, as grantor, conveying title to all or any part of Westwoods to anyone, nor is there a recorded deed conveying title to all or any part of Westwoods to the Nation, as grantee. (Stip. Nos. 29 and 30.)

FN7. However, the above-referenced Suffolk County Tax Maps identify both Westwoods and the Shinnecock Reservation at Shinnecock Neck as "Shinnecock Indian Reservation." (D156a, b, c, d.)

There are other areas adjacent to, or in the vicinity of, Westwoods and the Town that are relevant to the instant litigation: (a) Canoe Place or Niamuck ("Canoe Place") is a name given to a place where Indians formerly carried their canoes between Shinnecock Bay and the Great Peconic Bay in what is now Southampton (Stip. No. 35); (b) Canoe Place is located at the approximate current site of the Shinnecock Canal in Southampton (Stip. No. 36); (c) Cold Spring Pond is a body of water within the Town east of Canoe Place and is located approximately two miles east of the closest boundary of Westwoods (Stip. No. 38); (d) Quogue is a hamlet within Southampton to the west of Canoe Place and is located approximately 6-1/2 miles southwest of the closest boundary of Westwoods (Stip. No. 39); and (e) Seatuck is a place located at the southern end of the current western border of the Town (Stip No. 46), and is located at the current border between the Town of Brookhaven and Southampton. (Tr. 2580-81; T226.)

C. WESTWOODS AT THE TIME OF THE FIRST EUROPEAN CONTACT

***9** The Nation was in possession of the lands in and around Southampton when the first European settlers arrived in 1640. *See Shinnecock Indian Nation,* 400 F.Supp.2d at 489. In fact, plaintiffs' expert agreed that the whole Town was owned by the Shinnecocks at the time of first European contact in 1640. (Tr. 1115-16.) Moreover, the history of the Town contained in its own records states that when the first settlers arrived "it appears that the whole extent of what is now the town of Southampton was owned by the Shinnecock tribe of Indians, who were divided into many small bands, and were living in villages that were without exception situated near the different creeks or branches of the bays...." (D3, at II-III.) Thus, at the time of first European contact, Westwoods was possessed and owned by the Shinnecocks.

D. THE SETTLEMENT AND FORMATION OF SOUTHAMPTON

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

By a Patent granted on April 20, 1635 by the Plymouth Company (the "Sterling Patent"), Lord William Alexander, the Earl of Sterling, obtained undisputed title, in the name of the King of England, to the lands of Long Island. (James P. Lynch, *The Shinnecock and "Westwoods" in Southampton, New York: An Ethnohistorical Analysis,* Feb. 16, 2005(T12),[FN8] at 18-20; Alexander von Gernet, *On the Authority of New York Colonial Governors to Decide on Matters Relating to Shinnecock Lands and the Town of Southampton,* June 29, 2006(S62), at 6; T29, at 29.)

FN8. Pursuant to stipulation by the parties, the contents of the expert reports were deemed to have been read into the record in lieu of direct testimony. (Joint Pretrial Order, at 30.) Each party was permitted to conduct a direct examination of its expert witness in order to familiarize the Court with the opinions of the expert and the witness was then subjected to cross-examination.

James Farrett was the duly appointed agent of the Earl of Sterling, who was granted the right and authority to convey lands within the Sterling Patent. (T12, at 21-22; S62, at 6; T32, at 50-51; Tr. 2441.) By deed dated April 17, 1640, Farrett granted free leave and liberty to four named English colonists and their associates to possess and improve a parcel of "eight miles square" of land on Long Island. (T12, at 22-23; S62, at 6; T33, at 45-47.) The deed, dated April 17, 1640, also granted to the four named English colonists and their associates the right to "make purchase (in theire owne names at theire owne leisure from any Indians that Inhabit or have lawfull right to any of the aforesaid land) all or any pt thereof, and thereby assure it to themselves and their heyres as theire Inhabitance for ever."[FN9](T12, at 22-23; S62, at 6-7; T33, at 46.).

FN9. In this Memorandum and Order, unless otherwise noted in brackets, the Court has maintained the original spelling and grammar contained in these colonial era documents.

By a confirmation document dated July 7, 1640, Farrett specified the bounds of the aforesaid "eight miles square" of land that constituted the plantation that came to be known as Southampton (the "Southampton plantation"). (T33, at 49-50; T12, at 23-24; S62, at 7.) In particular, the confirmation of July 7, 1640 specified that the westerly bounds of the "eight miles square" of the Southampton plantation was "the place where the Indians drawe over their canoes out of the north bay over to the south side of the island,"*i.e.,* Canoe Place. (T33, at 49; T12, at 23-24.) The lands constituting the Southampton plantation as of 1640 were thus situated exclusively to the east of Canoe Place. (T33, at 49-50; T12, at 24; Katherine A. Hermes, *Rebuttal Report to Alexander von Gernet's Report Entitled "On the Authority of New York Colonial Governors to Decide on Matters Relating to Shinnecock Lands and the Town of Southampton,"* Aug. 21, 2006(D91), at 5; Tr. 2441, 2175.)

***10** On December 13, 1640, certain Shinnecock Indians, including tribal leadership, executed a deed that conveyed to English colonists all of the Shinnecock Tribe's right, title, and interest in lands bounded on the west by "the place where the Indians hayle over their cannoes out of the North bay to the south side of the Island,"*i.e.,* Canoe Place, (the "1640 Deed") (S66, at 266-67; T12, at 31; T181, at 266-67; S62, at 7-8.) Only lands located to the east of Canoe Place are described in the 1640 Deed. (Stip. No. 21.)

In or about 1644, the "Towne of Southampton" was accepted into the jurisdiction of the Colony of Connecticut, under terras and provisions set forth in a document entitled "Ye Combynation of Southampton Wth Har[t]ford."(T12, at 26-27; D95; Katherine A. Hermes, *Report on the History of Land Transactions Between the Colony of Connecticut and the Long Island Indian Tribes in the Seventeenth Century,* June 30, 2006(D25), at 20; Tr. 2443.)

The terms of the "Ye Combynation of Southampton Wth Har[t]ford," provided, *inter alia,* that "if [u]pon vewe of such orders as are alreddy established by ye General Court for ye Jurisdiction of Connectecoate, there be found any difference therin from such as are also for ye present settled in ye Towne of Southampton, the said Towne shal ha[v]e libertie to regulate themsel[v]es acording as may be most sutable to their owne comforts and con[v]eniences in their own judgment, provided those orders made by them concerne themsel[v]es only and intrence not [u]pon ye interestes of others or ye Generall Combination of ye [u]nited Collonies, and are not cross to ye rule of riteousness. The like powre is also reser[v]ed [u]nto themsel[v]es for the future, for making of such orders as may concerne their Towne ocations."(D95, at 567; T12, at 27.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

By reason of these terms and provisions, Southampton, as an already-existing town, had the most liberal association with the Colony of Connecticut of all the towns and plantations under that colony's jurisdiction. (T12, at 27.) Defendants' expert witness, Katherine A. Hermes, testified that “ordinarily, when Connecticut founded towns, they were founded from scratch,” but Southampton existed as a town prior to its combination with Connecticut and was permitted to keep the laws it had enacted prior to the combination so long as those laws were not in conflict with the interests of others or the laws of the United Colonies.[FN10](Tr. 2456; D91, at 5.)

FN10. Although Professor Hermes testified about the concept of “personal jurisdiction” in the Colony of Connecticut, there is no order or law that provides that the Colony of Connecticut retained jurisdiction over its inhabitants regardless of where those inhabitants might travel. (Tr. 2593-94.)

In 1650, the Connecticut General Court enacted an order that makes reference to an earlier order that prohibited individuals from buying any land from Indians, either directly or indirectly, under any pretense whatsoever (the “1650 Order”). (D46.) The 1650 Order remained the law of the Colony of Connecticut until 1663, when the Connecticut General Court enacted an order that replaced it. That successor order prohibited purchases of Indian land by individuals, except with allowance of the General Court. (D100; D25, at 20-21; Tr. 2453.) New England colonies other than Connecticut had similar laws and these laws were very widely published and understood. (D25, at 3.)

E. THE OGDEN AND TOPPING TRANSACTIONS INVOLVING WESTWOODS

***11** As set forth below, in the 17th century, there were two transactions in which the Nation sold lands west of Canoe Place, including Westwoods, to non-Indians and the Town subsequently acquired those lands.

(1) THE OGDEN PURCHASE

As of May 12,1659, the western boundary of Southampton was Canoe Place. (T12, at 24; T33, at 49-50; T181, at 266-67; D91, at 5.) On May 12, 1659, Sachem (Chief) Wyandanch and his son, on behalf of the Shinnecocks, conveyed the lands west of Canoe Place [west to Peaconock], to John Ogden, by an instrument that is referenced herein as the “Ogden Deed.” This acquisition by Ogden became known as the “Quogue Purchase” or the “Ogden Purchase.” (T50, at 162; T12, at 37; Tr. 872-76, 1067.)

At the time of the Quogue Purchase, Ogden was a Southampton proprietor who was also a magistrate to the Connecticut General Court. (T12, at 37; T59, at 70-71; Tr. 2557; D25, at 24; D136, at 314; D137, at 334.) Moreover, at that time, Sachem Wyandanch possessed political authority over the Shinnecocks, including authority to convey the lands west of Canoe Place to Ogden. (T12, at 33-36; Tr. 889-93, 895-896; T45, at 198; T46; T47, at 295; T49; S62, at 8 & n. 9.) For example, on May 15, 1657, approximately two years before the Quogue Purchase, the Connecticut Colony General Court acknowledged that the Shinnecocks recognized the “Montacutt Sachem” (*i.e.,* Sachem Wyandanch) as their Sachem.[FN11] (T47, at 295; Tr. 2541.)

FN11. On September 19, 1666, Thomas Halsey, a Southampton proprietor, (T181, at 266), reported that during a “time of the trouble in this towne of Southampton by reason of murder committed by the Indians,” he witnessed Shinnecock Sachem Mandush cut up a turf of ground in Southampton and deliver it to Sachem Wyandanch, that he also saw Sachem Mandush and other Shinnecocks stroking Sachem Wyandanch on the back, and that since that time, Sachem Wyandanch “hath acted upon ye aforesaid Interest given to him as by letting and disposing of land at Quaquanantuck and else where....” (T46, at 158.) On September 19, 1666, Thomas Saire (Sayre), a Southampton proprietor, (T181, at 266), reported that he had witnessed all that was reported by Halsey, except for the delivery of turf by Sachem Mandush to Sachem Wyandanch, and also attested that “when Mandush gave up his right to Wyandanch and stroaked him on the back, Mandush alsoe told Wyandanch that now hee would bee all one dogge.”(T46, at 158.)

The lands west of Canoe Place, conveyed by Sachem Wyandanch and his son to Ogden on May 12, 1659, were not part of the Colony of Connecticut at the time of that conveyance, as they were outside the territorial limits of Southampton. (T50, at 162; T12, at 24, 26, 32;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

T33, at 49-50; T34; D91, at 5; D95.) The lands conveyed by Sachem Wyandanch and his son to Ogden included Westwoods. (T12, at 37; D25, at 2, 24; T50, at 162; Tr. 876, 2474.) There is nothing in the historical record reflecting or suggesting that at any time prior to this litigation, the Shinnecock Tribe in any way disputed or contested Sachem Wyandanch's authority to act on their behalf [FN12] (Tr. 896.)

FN12. In its 1978 Memo (discussed *infra* ), the Shinnecock Indian Nation referenced that the Ogden Deed was from "Shinnecock sachem Wiandance" without questioning Sachem Wyandanch's authority over the Shinnecocks. (T229, at page "I" of "Index to Appendices.") Prior to this litigation, the Shinnecock Tribe has never challenged or contested the validity of the conveyance by Sachem Wyandanch and his son, *i.e.,* the Quogue Purchase, to Ogden. (Tr. 896, 2544.)

Sachem Wyandanch died in 1659. (S69, at 57; S62, at 9 n. 13.) By an order dated June 7, 1665, the Court of Sessions in Southold directed that the annual sum of twenty-five shillings per year, which was to be paid to "ye late Sachem Wyandance," pursuant to the terms of the Ogden Deed, (T50), should be made to the "sunk squaw daughter & heire to the said sachem."(T56, at 171; T57; T12, at 38.) Thus, one can infer from the order of June 7, 1665 that the Court of Sessions considered the Ogden Deed a valid, lawful, and effective instrument. [FN13]

FN13. It appears from the historical record that the conveyance to Ogden of lands west of Canoe Place was made in part payment of a fine imposed on the Shinnecocks by Connecticut Colony prior to September 8, 1657, by reason of the participation by certain Shinnecocks in an incident of arson. (T12, at 37-38; T52, at 231; T53; T54, at 180; T56; T57; T58, at 166-67; D183, at 62; Tr. 877-81, 883-85, 888.) This conclusion is supported by a number of evidentiary sources, including the following: (1) by an order issued by the Connecticut General Court on May 20, 1658, Ogden was one of four magistrates authorized and appointed to collect and distribute the proceeds of the arson fine imposed previously on the Shinnecocks (D57; Katherine A. Hermes, *Rebuttal Report Responding to 'The Shinnecock and 'Westwoods' in Southampton New York: An Ethnohistorical Analysis,' by James P. Lynch and 'Supplement to 'The Shinnecock and 'Westwoods' in Southampton, New York: An Ethnohistorical Analysis,* Aug. 21, 2006 (Revised for typographical corrections Sept. 28, 2006) (D32), at 22); (2) according to *The History and Archaeology of the Montauk Indians,* published in 1979 by the Suffolk County Archaeological Association, "[t]he land [of the Quogue Purchase] was sold in part payment of the fire money owed by Shinnecock Indians. Wyandanch had assumed the debt of 400 pounds and was paying in land-Shinnecock land for a Shinnecock debt." (T51, at 65; T12, at 37); and (3) in his treatise entitled *The Algonquian Peoples of Long Island From Earliest Times to 1700,* historian John Strong notes that "[John] Ogden had apparently purchased the debt from the Southampton officials who were unsuccessful in forcing payment from the Shinnecocks" prior to the Quogue Purchase. (T52, at 231.)

Sometime between May 12, 1659 and February 2, 1663, Ogden sold the lands of the Quogue Purchase to John Scott. (T12, at 38; T53; S62, at 9 & n.ll; Tr. 2472.) On February 2, 1663, Scott sold the lands of the Quogue Purchase to the proprietors of Southampton.[FN14](T53, at 175-76; T66 at p. 54; S67, at 175-77; T12, at 38-39; S62, at 9; Tr. 2472.) Upon the sale of the lands of the Quogue Purchase by Scott to the proprietors of Southampton, Ogden confirmed in writing that "Wyandanch delivered unto him quiet seizen and possession of [those] lands ... all the lands above recited in part of pay of the four hundred pounds the Shinecock Indians stood indebted, and the said Wyandanck bound for the said Indians."[FN15](T53, at 176; T12, at 38.)

FN14. References to "Quaganantick" in the May 1663 records of the Connecticut General Court suggest that Connecticut knew of Southampton's interest in lands west of Canoe Place. (D100, at 402; Tr. 2568-70.)

FN15. During the trial of the 1667 Action in which Southampton sued Southold to, *inter alia,* confirm its title to certain lands west of Canoe Place and west of Westwoods (discussed *infra* ), Ogden testified under oath, and once again confirmed how "hee came seized of the Land in question, that it was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3307089 (E.D.N.Y.)
**(Cite as: Slip Copy)**

Page 11

about the firemoney the Shinnacock Indyans being to pay a Certaine sume of money for the Mischiefe done by them. The Montauks Sachem being bound for them tooke the Land in question into hi[s] possession, and upon some Consideracion made it over to Mr. Ogdon, and Mr. Ogdon saith all his Right is conveyed to Southton,"*i.e.,* Southampton. (D183, at 62.)

(2) THE TOPPING PURCHASE

***12** As of April 10, 1662, the western boundary of the Town was Canoe Place. (T12, at 24, 39-40; T58, at 167-68; D91, at 5.) On April 10, 1662, Sachem Wyandanch's political successor, Weany Sunk Squaw, and others, on behalf of the Shinnecocks, sold and conveyed lands west of Canoe Place to Thomas Topping. This transaction has become known as the "Topping Purchase." [FN16](T191; T12, at 39-41; Tr. 896-98; T58, at l67-68; S62, at 9.) At the time of the Topping Purchase, Topping was a Southampton proprietor who was also a magistrate to the Connecticut General Court. (T12, at 39; T59, at 70-71; Tr. 2558; D25, at 24.)

FN16. In its 1978 Memo (discussed *infra* ), the Shinnecock Indian Nation described the Topping Deed as being from "Weany Sunk squaw, female Shinnecock sachem."(T229, at page "i" of "Index to Appendices.")

The lands of the Topping Purchase were situated west of Canoe Place, and included the lands of the Quogue Purchase, including Westwoods. (T12, at 39-40; Tr. 899; T58, at 167-68; T191; D25, at 24-25; Tr. 2474.) The lands that were the subject of the Topping Purchase were not part of the Colony of Connecticut at the time of the Topping Purchase because they were situated outside the then-territorial limits of Southampton. (T12, at 24, 26, 32, 41; T33, at 49-50; T34, at 31; T58, at 167-68; T61; James P. Lynch, *Supplement to The Shinnecock and "Westwoods" in Southampton, New York: An Ethnohistorical Analysis,* June 29, 2005(T13), at 12; D91, at 5; D95.) The western boundary of the lands identified in the Topping Purchase was "Seatuck," which is the modern-day border between Southampton and Brookhaven. (T12, at 39; Tr. 897-98; T58, at 168; T61; T191; Stip. No. 46.) The Topping Deed recited that the consideration for the Topping Purchase was "four score fathoms of wampum, or other pay, equivelent."(T58, at 168; Tr. 899, 2183-84.)

By this purchase, Topping acquired the same rights to land west of Canoe Place that were included in the Ogden Purchase. (T12, at 41; S62, at 10; D91, at 7.) Whatever the reason for these overlapping deeds (which both included Westwoods), there is no question that these lands were sold by the Shinnecock Tribe and subsequent determinations by governors, discussed *infra,* confirmed such sale when issues arose related to these lands.[FN17]

FN17. Plaintiffs made a number of challenges to the validity of the Ogden and Topping transactions during the trial. Although some of those challenges involve disputes over historical facts (such as whether Sachem Wyandanch had authority to act on behalf of the Shinnecock Tribe), the Court has addressed these issues in the Conclusions of Law, rather than the Findings of Fact, for purposes of organizational convenience.

F. COLONIAL ERA DOCUMENTS AND EVENTS FOLLOWING THE OGDEN/TOPPING TRANSACTIONS

Following the Ogden and Topping transactions, there were several occasions in the 17th century during which issues relating to those lands were brought to the attention of the Governor of the Province of New York and, in one instance, a court. As set forth below, on each of these subsequent occasions, the prior sale of such land to Southampton was confirmed.

(1) THE NICOLLS DETERMINATION

In a document dated September 17, 1666, several Shinnecocks recorded their "protest" over the 1662 sale of lands west of Canoe Place by Weany (Sunk Squaw) and other Shinnecocks to Captain Topping, claiming that they were "the true proprietors of the said lands."(T61; Tr. 2180-83.) In the 1666 protest document, the Shinnecock signatories sought to have Governor Richard Nicolls (whom they expressly acknowledge to be the "hon (bbl) & discreet Governor of this Island") determine that they were the "true proprietors" of the lands of the Topping Purchase, and that they should receive payment from the Southampton proprietors, for their conveyance, if so directed by Governor Nicolls.[FN18] (T61; Tr. 2180-83.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN18. This dispute also was recounted in the Town's records. Specifically, in the Introduction to the First Book of Records of the Town of Southampton, William S. Pelletreau, Southampton Town Clerk, wrote that the land within the bounds of the Town "was honorably purchased of its aboriginal owners" by the white settlers. (D3, at III.) Subsequently, in the Introduction to the Third Book of Records of the Town of Southampton, Pelletreau refers to the "settling of the western part of the town," and states, "[a]s has been stated in a former volume, that portion west of Canoe Place was purchased from its Aboriginal owners in 1666, and the controversy between the Town and Capt. Thomas Topping was decided by a reference to Richard Nicol, Governor of the Province."(D153, at II.)

***13** Notwithstanding its use of the word "protest," the September 17, 1666 document declares the intention of its Shinnecock signatories to "impart and assigne all our said Interest in ye said lands [of the Topping Purchase] ... unto our ancient and loving ffriends the Townes men of Southampton to them and their successors for ever."(T61; Tr. 2182.) Thus, by the protest document, the Shinnecock signatories were not seeking to unwind, invalidate, or reverse the conveyance of land to Topping, or to obtain the lands of the Topping Purchase for themselves, but instead were merely seeking to be paid, *i.e.,* to receive the "four score fathom of wampum" recited as consideration in the Topping Deed. (T61; Tr. 2182-84.)

Subsequent to the September 17, 1666 protest document, and on October 3, 1666, Governor Nicolls issued a determination (the "Nicolls Determination"), in which he concluded and determined a "difference" between the "town of Southampton" and "Capt Thomas Topping." (T66, at 54-56; Tr. 2177-79.) In his determination, Governor Nicolls noted that he had reviewed several deeds, including the deed from "some of Shinecock Indians to Capt Topping,"*i.e.,* the Topping Deed, and the deed from "John Scott to Southampton men," *i.e.,* the 1663 deed conveying the lands of the Quogue Purchase to Southampton. (T66, at 54; Tr. 2185-86; S62, at 10.) In the Nicolls Determination, Governor Nicolls determined, *inter alia,* that "all the right and interest that ye said Capt Thomas Topping" had by virtue of the Topping Deed "is belonging, doth and shall belong unto the town of Southampton ... and their successors forever," (T66, at 54.)

By virtue of this language, Governor Nicolls determined that Southampton was the rightful owner of the lands of the Topping Purchase. (T66, at 54; T12, at 47-49; T13, at 13-15; S62, at 10-11.) In fact, in the Nicolls Determination, Governor Nicolls promised to defend the Town in its "peaceable enjoyment" of the lands of the Topping Purchase "[a]gainst all other claims whatsoever."(T66, at 55; T12, at 47-49; T13, at 13-15; Tr. 2564.)

Westwoods is located within the boundaries of the lands that were the subject of the Nicolls Determination. (Stip. No. 62.) At the time he issued the Nicolls Determination, Governor Nicolls was the prevailing sovereign authority within the Province of New York, which included Long Island. (T12, at 45-49; T13, at 13; T62; Tr. 1203-04, 2561, 2189-90; S62, at 19-25.) Governor Nicolls had been appointed the first English governor of the Province of New York on April 2, 1664, by virtue of a commission from the Duke of York. (S72; S62, at 19; Tr. 2189-90.) In the Nicolls Determination, Governor Nicolls ordered, *inter alia,* Southampton to pay to the "Indians (concerned to receive it)" the sum of "four score fathoms of wampum," which was precisely the same amount specified in the Topping Deed as consideration to be paid to the Shinnecocks for the lands of the Topping Purchase. (T66, at 55; T58, at 168; S62, at 10-11; Tr. 901, 2183-84.)

***14** The Nicolls Determination does not explicitly or implicitly contest, challenge, or question in any way, the validity, legality, or effectiveness of either the Topping Deed or the deed from Scott to the Town, for the lands of the Quogue Purchase.[FN19](T66; T13, at 14; Tr. 2192-93, 2560.) Governor Nicolls possessed law-making authority to promulgate the Duke's Laws and he could settle disputes. (T12, at 45-46; S62, at 19-25; Tr. 2189-91; D91, at 11-12.) Governor Nicolls, under the Duke of York's proprietorship, also had the authority to address the question of Indian land purchases. (S62, at 20-24.) There is nothing in the historical record to suggest that the Shinnecock Tribe has ever challenged, in any way, the validity, legality, or effectiveness of the Nicolls Determination. (Tr. 908.)

FN19. The Nicolls Determination was made by Governor Nicolls more than 18 months after the date of a letter to Governor Nicolls

from Connecticut Colony Secretary John Allyn (the "Allyn Letter"), advising that "by the established order of this [Connecticut] Colony ... no land was to be purchased to the perticuler use of any person, without the consent of or Generall Courte, and all such purchases to be null in lawe."(D71; T66; Tr. 1200-04, 2194-95.) Thus, at the time of the Nicolls Determination, Governor Nicolls, by virtue of the Allyn Letter, was aware of the existence of a Connecticut General Court order pertaining to the purchase of lands from Indians. (Tr. 2193-95; D25, at 26; D91, at 11-12.) The Allyn Letter does not specify the date or any other identifying feature of the "established order of this Colony" to which it makes reference, but Professor Hermes testified that the Allyn letter could only have been referring to either the 1650 or 1663 orders of Connecticut Colony. (D71; Tr. 2553.) Professor Hermes also acknowledged that the Allyn Letter was written at a time when Long Island was no longer under the jurisdiction of Connecticut Colony. (D25, at 25-26; Tr. 2552.)

Subsequent to, and as explicitly directed by the Nicolls Determination, by a written instrument dated November 6, 1667, Topping assigned and delivered to Southampton the Topping Deed, and all his right, title, and interest in the lands of the Topping Purchase, *i.e.,* the lands from Canoe Place to Seatuck, including Westwoods. (T197; T13, at 15; Tr. 901-02; 2564-65.) Subsequent to the Nicolls Determination, and on February 22, 1667 (N.S.[FN20]), several Shinnecock Indians, including Weany Sunk Squaw, Accobacco, and others, confirmed and acknowledged (i) their April 10, 1662 sale of lands to Topping; (ii) that Topping had sold those lands to Southampton; (iii) that Governor Nicolls had ordered the Town to pay "fourscore fathom of wampum"; and (iv) that they had received such payment from the Town. (S70; S70A; S62, at 12; D91, at 10; Tr. 902-05, 2198-99.) The Shinnecock signatories of the February 22, 1667 (N.S.) document confirmed also that they were "fully contented with the bargaine origeinally made with Capt. Topping." (S70; S70A; S62, at 12; T13, at 16; Tr. 902-03, 905, 2198-99; 2565-56.) The document ended by stating that "wee will defend the s'd Southton men in the possession and enjoyment of the premisses from the clayms of any other."(S70; S70a.)

FN20. Until 1752, when the Gregorian calendar still used today was adopted, England and its colonies followed the Julian calendar, under which March 25 was the beginning of the new year. (D32, at 28 .) In this Memorandum and Order, "N.S." indicates that the date is expressed using the modern, Gregorian calendar (rather than the date expressed in the original document).

(2) THE 1667 ACTION COMMENCED BY SOUTHAMPTON AGAINST SOUTHOLD

In 1667, a trial was conducted in the Court of Assizes for the Colony of New York (the "Court of Assizes") in an action commenced by the inhabitants of Southampton against the inhabitants of Southold (the "1667 Action"). (D183, at 59; Stip. No. 64.) The 1667 Action concerned Southampton's contention that it was the owner of lands known as Aquebauke Meadows, and Southampton's claim that Southold had trespassed on such lands. (D183, at 59; Tr. 906, 2574-75.) The Aquebauke Meadows were situated to the west of Westwoods, within the lands of the Topping Purchase. (Stip. Nos. 62, 65; Tr. 2576.) During the trial of the 1667 Action, and in order to prove its claim of ownership of the Aquebauke Meadows, Southampton produced the Topping Deed, and stated that the Topping Deed had been assigned to the Town. (D183, at 60; Tr. 906-07; 2576.) Southampton also introduced the Nicolls Determination, and contended that Governor Nicolls "had put a decision to this matter already, when it was before him upon Complaint of the Towne against Captain Tapping."(D183, at 61; T12, at 49; Tr. 907-08, 2576-77.)

***15** The jury in the 1667 Action rendered a unanimous verdict in favor of plaintiff Southampton, and Southampton's title to the Aquebauke Meadows was thereby confirmed. (D183, at 62; Tr. 908.) The jury's verdict in the 1667 Action confirmed the validity, legality, and effectiveness of the Topping Deed, and its subsequent assignment to Southampton, as well as the Town's ownership of all lands included within the Topping Purchase, including the Aquebauke Meadows and Westwoods.

(3) THE 1676 ANDROS PATENT

On July 1, 1674, Major Edmund Andros was appointed governor of the Province of New York by a commission from the Duke of York. (S62, at 25.) On

November 1, 1676, New York Colonial Governor Edmund Andros issued a Patent (the “Andros Patent”) to the proprietors of Southampton. (T188, at 279-80; T12, at 49-50; S62, at 14; Tr. 2202-03.) Among other things, the Andros Patent confirmed the existence of “a certaine Towne ... commonly called and knowne by the name of South Hampton.”(D188, at 279.) The Andros Patent confirmed that the “certaine Tract of Land, thereunto belonging” to Southampton extended from Seatuck on the west to Wainscott (the border between Southampton and East Hampton) on the east, which are basically the east and west boundaries of the Southampton as they are known today. (T188, at 279; T12, at 49-50; S62, at 14; Tr. 908-11.) The western boundary of the tract of land belonging to the Town, as specified by the Andros Patent, is identical to the western boundary of the lands specified in the Topping Deed, *i.e.,* “Seatuck.” (T188, at 279; T58, at 167-68; T12, at 50 n. 12; Tr. 2204, 2208-10, 2580-81.) Westwoods is located within the boundaries of the “certaine Tract of Land” described in the Andros Patent. (Stip. No. 77; Tr. 2506-07.)

In his Patent, Governor Andros declared that he does “Ratifie Confirme and grant, unto [list of individuals] ... as Patentees for and on the behalfe of themselves and their Associates the ffreeholders and Inhabitants of the said Towne, their Heires, Successors and Assignes, All the aforementioned Tract of Land ... and of every part and parcel thereof, to the said Patentees and their Associates, their Heires Successors and Assignes ... for ever....” (T188, at 279-80.) The Andros Patent also provided that “if it shall so happen that any part or parcell of the Lande within the bounds and Limits afore described be not already Purchased of the Indyans It may bee purchased (as occasion) according to Law....” (T188, at 280.) During the colonial era, New York governors frequently exercised their authority to decide on the validity of purchases from Indians and to impose settlements. (S62, at 27.) There is no historical evidence that the Shinnecock Tribe or any of its members ever challenged or contested, in any way, the validity, legality, or effectiveness of the 1676 Andros Patent. (Tr. 911.) The Colony of Connecticut had no jurisdiction over the Province of New York at the time the Andros Patent was issued. (Tr. 1205.)

***16** Accordingly, the 1676 Andros Patent, especially when considered in the context of the prior transactions and documents involving Westwoods, confirmed Southampton's ownership of all lands west of Canoe Place, including Westwoods.

(4) THE 1686 DONGAN PATENT

In January of 1683, Colonel Thomas Dongan received from the Duke of York instructions and a commission constituting him the Governor of the Province of New York. (S62, at 28.) In 1686, Governor Dongan received a new commission and instructions directly from the King of England, which granted him certain powers and authority. (S72, at xvii, 177-78; S62, at 28-29; S74.) Governor Dongan was granted full power and authority “to make, constitute and ordain Laws, Statutes and Ordinances for the publick peace, welfare & good Government of our said Province and of the people and inhabitants thereof.”(S72, at xvii; S62, at 28-29; S74.)

On December 6, 1686, Governor Dongan issued a Patent (the “Dongan Patent”) to the proprietors of Southampton. (T69; S62, at 15-18; T12, at 50-51.) The term “ffreeholders,” as used in the Dongan Patent, described individuals who were the proprietors of Southampton. (Tr.2294.) There is nothing in the Dongan Patent (relating to Southampton's title) that is inconsistent with the scope of Governor Dongan's authority, as set forth in his 1686 commission and instructions from the king. (S62, at 29.) The Dongan Patent, *inter alia,* confirmed and reiterated the provisions of the Andros Patent, including its description of the “certaine tract of Land” belonging to Southampton, running from Wainscott on the east to Seatuck on the west. (T69, at 385; T188; Tr. 911-12, 2213-14, 2588-89; T12, at 50-51.)

The Dongan Patent recited that it was issued in response to an application submitted by Major John Howell, a freeholder of Southampton, and one of the patentees under the Andros Patent, to “confirm unto ye ffreeholders of said Towne in a more full & ample manner all the aboverecited tracts and parcells of land within the limitts and bounds aforesaid and finally determine the difference between the [I]ndyans and the ffreeholders of the said towne of Southampton.”(T69, at 387; Stip. No. 72.) The Dongan Patent recited that Governor Dongan had “examined the matter in variance between the ffreeholders of the said Towne of Southampton and the [I]ndyans and do finde that the ffreeholders of the Towne of Southampton aforesaid have lawfully purchased the lands within the Limitts and bounds aforesaid of the [I]ndyans and have payd them therefore according to agreement so that all the [I]ndyan right by virtue of said purchase is invested

into the ffreeholders of the Towne of Southampton aforesaid ....“ (T69, at 387-88; T12, at 50; S62, at 15-16; Tr. 911-13, 2218-19.) The “lands within the Limitts and bounds aforesaid” referenced in the Dongan Patent are stated explicitly to be the lands of Southampton, from Wainscott on the east to Seatuck on the west.[FN21](T69, at 385, 387; S62, at 17; Tr. 2217.)

FN21. Although Professor Hermes stated that because the Dongan Patent was issued 12 days after the confirmation of the 1640 Indian deed it can reasonably be inferred that the dispute involved lands east of Canoe Place, (Tr. 2590), the Court rejects that speculative conclusion and, instead, relies upon the above-referenced description of the land contained in the Dongan Patent that contradicts Professor Hermes's conclusion.

***17** As was the common practice at the time, the Dongan Patent was recorded in the Secretary's Office for the Province of New York and perused by the Attorney General, who found “Nothing Contained therein prejudiciall to his Majys Interest.”(S62, at 29; S65 at 394.) The Dongan Patent created and established a body “Corporate and Politique,” known as the “Trustees of the ffreeholders and commonalty of the Towne of Southampton” (the “Southampton Trustees”), which was made up of the freeholders and inhabitants of Southampton. (T69, at 388.) There is no historical evidence that the Shinnecock Tribe or any of its members ever challenged or contested, in any way, the validity, legality, or effectiveness of the Dongan Patent. (Tr. 913.)

Accordingly, the 1686 Dongan Patent confirmed Southampton's ownership in all lands west of Canoe Place, including Westwoods.

(5) THE 1676 ORDER OF THE COURT OF ASSIZES

On October 5, 1676, the Court of Assizes noted that the Town of Southold (“Southold”) and Southampton had not yet complied with the Law of 1664 and prior orders concerning the taking out of “Grants, Patents or Confirmations for their Towns or Lande.”(D77, at 723-24.) By Judgment of the Court of Assizes, dated October 5, 1676, the Court held that Southold and Southampton “have forfeited all their titles, Rights & priviledges to the lands in the sd Townshipps & if they doe not by Monday fortnight next (being the 23rd day of this instant month) send up the acknowledgmt of their past Default & Resolves & Desire to obey & fulfill the Law & the severall orders of the Cort of Assizes, for the taking out their Grants, Patents or Confirmations, as directed by Law, Then Execution to issue out by Authority of this Crt for the above forfeiture to the use of his Maty without further delay” (the “1676 Judgment”) (D77, at 724.) The Town complied with the 1676 Judgment, as well as the Law of 1664 and prior orders of the Court of Assizes referenced therein, by October 23, 1676, the deadline set by the 1676 Judgment. (D77, at 724.)

There is absolutely no evidence that the execution of the above-referenced Judgment of forfeiture, and the actual forfeiture of Southampton's titles, ever occurred. According to James Truslow Adams's *History of the Town of Southampton,* in 1670, the Southampton titles, including those acquired from the Indians, “were declared invalid by the Court of Assize[ ] unless renewed under the new government.”(D42, at 89.) The foregoing passage confirms that the invalidation of Southampton's titles was conditional only. In other words, it would occur only if the 1676 Judgment were executed, if the Town did not comply with the Judgment by October 23, 1676. (D42, at 89.) The condition expressed in the 1676 Judgment did not occur and, therefore, the forfeiture of Southampton's land titles never occurred.

G. USE AND OCCUPANCY OF LAND WEST OF CANOE PLACE, INCLUDING WESTWOODS

The Court has carefully examined the evidence to determine what, if any, use and occupancy of land west of Canoe Place, including Westwoods, has occurred by the Nation since these colonial era transactions and events. As set forth in detail below, based upon that review of the evidence, the Court concludes that, with respect to the period from the late 17th century through the 18th century, there is overwhelming evidence that the Nation occupied land to the east of Canoe Place during this period and scant, if any, evidence that they occupied and used land west of Canoe Place, which is where Westwoods is located. Moreover, even if members of the Shinnecock Tribe inhabited areas west of Canoe Place at some time between the 17th and at least the end of the first three quarters of the 19th century-as asserted by defendants' habitation witness Dr. Jack Campisi-there is no evidence that their use or occupancy was exclusive or continuous, and there is no evidence of how many

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Shinnecock resided there, or where, or for how long. For example, as conceded by Dr. Campisi, there are no records for the period 1743 through 1889 that indicate that the Shinnecock Indians lived west of Canoe Place, but there are records during that period that indicate that the Shinnecock Indians lived east of Canoe Place. (Tr. 2754-57 .) Moreover, Dr. Campisi's conclusions are of limited value because he completely disregarded and failed to explain the numerous above-referenced colonial era documents-such as the Ogden Deed, the Topping Deed, and the Nicolls Determination-that support the conclusion that the Shinnecocks sold all their lands west of Canoe Place and resided east of Canoe Place. In short, the Court finds that there is no evidence of regular or continuous Shinnecock Indian Nation habitation on Westwoods from 1640 to the early 20th century. Instead, the use and occupancy evidence is consistent with the conclusion that the Shinnecock Tribe sold its rights, title, and interest in the lands west of Canoe Place in the 17th century and resided east of Canoe Place. The Court has analyzed the evidence offered by both parties on this issue and provides below the reasons for the Court's conclusions.[FN22]

FN22. Although the Court has fully considered all the evidence offered during the trial and has even addressed certain evidence that it viewed as immaterial, not every single piece of evidence on this issue (or on the other issues) is referenced in this Memorandum and Order. To the extent certain evidence is not referenced, the Court did not deem such evidence to be probative and did not believe it warranted particular discussion.

(1) THE 1703 LEASE LANDS

***18** By an "Indenture" dated August 16, 1703 (sometimes referred to as the "1000 year lease"), the Shinnecock Indians acquired from the Town certain usufruct rights, for a period of 1,000 years, in lands east of Canoe Place. (T73; Tr. 2755; T12, at 55-57.) The lands that are the subject of the Indenture (collectively, the "1703 Lease Lands") include the Shinnecock Hills, the areas known as Sebonack and Cold Spring, and Shinnecock (Great) Neck. (T199; T12, at 55-56, 63, 65, 76, 87; T73; Tr. 2755.) In conjunction with the execution of the 1703 Indenture, the Shinnecocks executed a confirmatory deed to the Trustees of Southampton, dated August 16, 1703, in which the Tribe confirmed that it did "give grant Remise Release and for ever Quit Claim unto ye said Trustees ... all such Right, Estate, title, Interest and Demand whatsoever, as they ... and their people had or out [ought] to have of in or to all that tracte of Land of ye township of Southampton...." (T72, at 176; T12, at 52-55; T229, at 9, 17.)

As of the latter part of the 18th century (circa 1790), the Shinnecock Tribe was situated only east of Canoe Place, near Cold Spring, and not west of Canoe Place. (T12, at 10, 76, 87; T73; T121, at 541; T199; T203; Tr. 913-21,1220-21.) In the late 18th century, the Shinnecocks constructed, or caused to be constructed, a meeting house that was situated to the east of Canoe Place. The meeting house was completed sometime after September 27, 1791. (T123, at 514; T199; T13, at 18-19; Tr. 919-21.)

(2) CANOE PLACE CHAPEL

The so-called Canoe Place Chapel or Warnertown Chapel was located to the south of Westwoods, and south of Montauk Highway. (Tr. 1222-23.) The Canoe Place or Warnertown Chapel was not exclusively a Shinnecock house of worship. (Tr. 1223-24.) The chapel, which was at one time located next to the burial plot of the Reverend Paul Cuffee, is located to the south of Westwoods. (Stip. No. 41; Tr. 1226-29.) There is no historical evidence that there was a Shinnecock tribal settlement in the location of the Paul Cuffee burial plot, which is located to the south of Westwoods. (Tr. 1236-38.) If members of the Shinnecock Tribe ever lived in the area of Westwoods in the 17th century, that habitation ended no later than 1675. (Tr. 2658-60, 2727.) There is no evidence of Shinnecock tribal habitation on Westwoods itself.

(3) MISSIONARY RECORDS

Missionary records do not show that members of the Shinnecock Indian Tribe or Nation inhabited Westwoods during the 18th century. (Tr. 2730-31.) There are no references in missionary Azariah Horton's journals, from the 18th century, to Canoe Place or to the property now known as Westwoods. (Tr. 2731-32; DUO.) The list of places Horton visited, according to his journals, do not show a pattern of Shinnecock residence at Canoe Place or Westwoods. (Tr. 2733-34; D110.) The principal quarters of Long Island Indian tribes were at cornfields, and for the Shinnecocks, the cornfields were at Sebonack or Shinnecock Neck, east of Canoe Place. (Tr. 2734-35.)

There were no cornfields at Canoe Place or Westwoods. (Tr. 2735.) Accounts of the Indian missionary Samson Occum provide no evidence of Shinnecock habitation west of Canoe Place. (Tr. 2736-38.) Accounts of the Indian missionary Peter John do not identify the Shinnecock Indians with the church at Canoe Place and provide no evidence of Shinnecock habitation west of Canoe Place or at Westwoods. (Tr. 2738-39.) The church that the Indian missionary Paul Cuffee was instrumental in building was located east of Canoe Place. (Tr. 2740.) The 1809 Annual Report of the Board of Directors of the New York Missionary Society (the "1809 Annual Report") refers to a June 9, 1808 communication from Paul Cuffee, reflecting that he ministered to "four different societies," identified as the "Montauk," "Cold-Spring," "Puspatock," and "Islip." (T205, at 8-9.) The 1809 Annual Report also reflects a communication of Paul Cuffee, dated April 17, 1809, which reported that "[t]he tribe of Chinecock, or Cold-Spring consists, including children, of 109 persons or there-about" (T205, at 17.) Paul Cuffee's communications referring to the society at "Cold-Spring," and to "[t]he tribe of Chinecock or Cold-Spring" suggest that, as of 1808 and 1809, the Shinnecock Tribe was situated to the east of Canoe Place, at Cold Spring.

***19** In the summer of 1902, anthropologist/archaeologist M.R. Harrington undertook extensive archaeological excavations of numerous Shinnecock Indian sites in Southampton. (T13, at 19; T200, at 231.) In his 1924 paper entitled *An Ancient Village Site of the Shinnecock Indians,* prepared for the American Museum of Natural History, Harrington wrote about his 1902 excavations at an ancient village site situated east of Canoe Place, on the west bank of Sebonac Creek. (T200, at 233.) In his paper, Harrington identified this ancient village site as a Shinnecock village, dating back at least "three hundred years ago" (circa 1602), and noted that "we have good reason for assuming that the village was Shinnecock from first to last."(T200, at 233, 246; T13, at 19-20.) This ancient village was situated in the Sebonack/Cold Spring area, east of Canoe Place. (T13, at 19-20; T200, at 233.) The Shinnecock habitation at Sebonack, in the mid-17th century, is confirmed by a 1649 agreement between the Town and the Shinnecocks, who are referenced therein as the "Soaponack Indyans." (T203; Tl3, at 20-21.)

Defendants' expert Dr. Campisi testified that Indians who attended a church west of Canoe Place may have walked as much as twelve miles to attend church, whether they lived east or west of Canoe Place. (Tr. 2742.) With respect to accounts of Indian missionary William Benjamin, Dr. Campisi admitted that his opinion that 70 members of the Shinnecock Tribe were members of the church in Canoe Place in 1845 may not be correct and, therefore, may not support his conclusion of Shinnecock habitation west of Canoe Place in the 19th century. (Tr. 2743-44, 2746-49.) With respect to Indian missionary James Downs, Dr. Campisi does not know whether his congregation at the church in Canoe Place consisted of Shinnecock Indians or whether it included other Indians and non-Indians. (Tr. 2751.) Downs's history of Canoe Place indicates that around 1830, there were non-Indians living in the vicinity of the churches west of Canoe Place. (Tr. 2751-53; D376.) Downs's *History of the Shinnecocks* indicates that, in 1827, William Benjamin's church at Canoe Place included both Poosepatuck and Shinnecock Indians. (D108, at 13.) Downs, in describing the missionary and preaching activities of Azariah Horton on eastern Long Island between approximately 1742 and 1752 stated, "[h]e [Horton] appears to have ben [sic] untiring in his efforts for the salvation of perishing souls while the principal settlements of the Indians were at Montauk and Shinnecock and therefore most of his time was spent there...." (D108, at 8.) The reference to "Shinnecock" in this passage, given the entire historical record, is a reference to lands east of Canoe Place, within the 1703 Lease Lands. (T73; T199; T226.) Thus, Downs concluded that the principal settlements of the Indians between 1742 and 1752 were located at Montauk and Shinnecock, not any location west of Canoe Place.

***20** Edward Ernest Eells's article entitled *Indian Missions on Long Island,* at Part IV, "Azariah Horton," cites Horton's journal for the following proposition: "Although, as Horton states, Montauk was the home of the largest group of Indians on Long Island, yet there was a large group in Southampton at Sebonac.... These were the Shinnecock Indians...." (D112, at 171 (footnotes omitted).) By 1845 (the date of publication of Prime's *History of Long Island,* (T248)), Shinnecock Neck was "the residence of the remnants of the Shinnecock tribe of Indians. Their church formerly stood beyond the hills, about 3 miles west, within sight of the isthmus called Canoe Place. It was afterwards removed a little to the west, at the spot where the grave of the Rev. Paul Cuffee is still to be seen.... The Indians having taken up their residence some years ago on this Neck, removed their church

thither, where the Rev. *William Benjamin* supplies them half the time."(T248, at 216-17) (italics in original.) The Presbyterian church at Canoe Place was "extinct" by 1845, but a small Congregational church, consisting of only 12 members, still existed in that vicinity. (T248, at 217.)

(4) LEASE OF TIMBER LANDS WEST OF CANOE PLACE BY THE NATION

By the early part of the 19th century, timber resources within the Town were being rapidly depleted. (T12, at 62-68; T13, at 32-35; Tr. 932-37; T94; T95; T176; T239, at 223.) As the Shinnecocks' timber resources to the east of Canoe Place became depleted, the Shinnecocks sought to obtain from Southampton the right to cut timber situated to the west of Canoe Place. (T12, at 97-98; T13, at 32-35; Tr. 932-37.) At an Indian Trustee Meeting held on April 7, 1808 (the "1808 Trustee Meeting"), it was voted, in the presence of Shinnecock Trustees and the Southampton Trustees, that the Shinnecocks lease 120 acres of land west of Canoe Place. (T134; T12, at 95-97; Tr. 934-37.) The land referred to in the minutes of the 1808 Trustee Meeting was bounded on the west by "Conklin's Corner." (T134; T12, at 96.) Conklin's Corner was a corner formed by lands of Israel Conklin (who owned lands west of Canoe Place, but no lands east of Canoe Place), and it was located in the vicinity of Westwoods, to the west of Westwoods. (T102; T114; T115; T116; T12, at 79-82, 95-96; Tr. 937-39.) The 120 acres referred to in the minutes of the 1808 Trustee Meeting included Westwoods. (T12, at 95-97; Tr. 934-38, 945.) The 120 acres described in the minutes of the 1808 Trustee meeting were to extend from Conklin's Corner "East to the Old Field." (T134; Tr. 938.) According to James P. Lynch, plaintiffs' ethnohistorical expert, the "Old Field" was also known as "Roger's Meadow," was bounded on the east by Canoe Place Pond, and extended westward into the Canoe Place Division.[FN23](Tr. 938.)

FN23. There are also references to the leasing of land west of Canoe Place in the vicinity of Westwoods in documents relating to the widening of Newtown Road in the 1920s. In particular, on or about November 1920, civil engineer J.A.S. Gregg, in response to the "orders" of the Southampton Town Superintendent, surveyed and laid out part of Newtown Road, in the vicinity of Westwoods. (T207; T208; T232, at 350; T13, at 29; Tr. 976-79.) On or about October 12, 1921, Gregg prepared a statement of land available and land required for the widening and improvement of Newtown Road in the vicinity of Westwoods. (T208; Tr. 977-81.) Gregg's statement references, under the heading "Land already available for road," 2021.7 lineal feet of the "Old road from Mr. Jaques' entrance to land leased to Indians" and 2362.3 lineal feet of the "Old road through land leased to Indians."(T208.) Gregg's statement also references, under the heading "Land Required," 78,849 sf. of "land leased to Indians." (T208.) Gregg's references to "land leased to Indians" support the conclusion that the current Shinnecock presence at Westwoods was the result of the Shinnecocks having obtained a lease from the Southampton Trustees circa 1808. (T13, at 30-31; Tr. 979-81.) In fact, defendants' title examination and abstracting witness, Mason Haas, testified that he is not aware of any lands, other than Westwoods, referred to in any respect as "Indian land" as of 1921, the year in which Town Exhibit 208 was created. (Tr. 3064-65.) The Town's widening and improvement of the portion of Newtown Road that runs across Westwoods, in the early 1920s, occurred without any objection or protest by the Shinnecock Tribe. (T13, at 29-31; Tr. 976-81.)

(5) THE 1822 PETITION TO THE NEW YORK STATE LEGISLATURE

In an 1822 petition of the Shinnecocks to the New York State Legislature, the Shinnecocks claim to be the "lawfull owners of a certain tract of land lying in the said Town of Southampton ... bounded on the west by a place called canoe place...." (T136; T12, at 99; Tr. 923-25.) Thus, this petition referenced land claims by the Shinnecocks only to the east of Canoe Place, and no claims of ownership were made by the Shinnecocks in this petition for any land west of Canoe Place. (T136; T12, at 99; Tr. 923-925.)

(6) INDIAN HUTS PHOTOGRAPH

***21** Defendants offered a photograph of purported Indian huts in 1879. (D377.) However, based upon the description accompanying the photograph, the huts were not located at or near Westwoods, and the photograph does not show the presence of a Shinnecock settlement at Canoe Place. It is also not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

known whether these huts were occupied by Indians or non-Indians at the time. (T247, at 280, 282; Tr. 2775-78.)

(7) THE 1890 *CASSADY* LITIGATION

The tract of land referred to in the action entitled *Trustees of the Tribe of Shinnecock Indians v. James Cassady,* Supreme Court of the State of New York, Suffolk County, filed July 21, 1890 (the *"Cassady* Litigation"), includes Westwoods, in whole or in part. (Stip. No. 100; Tr. 961.) The record of the *Cassady* Litigation includes no reference to any Shinnecock claim of subsisting aboriginal rights; instead, the Findings of the Court reference defendant's contention that the Shinnecocks had purchased Westwoods. (D2; Tr. 962.) One of the Findings of the Court in the *Cassady* Litigation was that the Shinnecock Tribe had been in "quiet and peaceable possession of the premises where the alleged trespass occurred, for upward of sixty years."(D2, at "First" Finding.) The Findings of the Court in the *Cassady* Litigation did not include any finding or determination that (i) the Shinnecocks had aboriginal rights in the subject premises; (ii) the Shinnecocks had been in possession of the premises since time immemorial; or (iii) the Shinnecocks had been in exclusive possession of the premises since any time prior to circa 1830. (T12, at 116-17; D2.) The record of the *Cassady* Litigation contains no evidence that the Town was aware, at any time, of the purported sale of the subject premises by Shinnecock Trustees to Miles Carpenter. (D2, at "Second" Finding; Tr. 1245-46.) Defendants' witness, Dr. Campisi, testified that the land that was the subject of the *Cassady* Litigation was not where the Shinnecock Indians lived. (Tr. 2781.)

(8) THE 1922 *HUBBARD* LITIGATION

The tract of land referred to in Paragraph "V" of the Findings in the action entitled *Shinnecock Tribe of Indians v. Hubbard,* Supreme Court of the State of New York, Suffolk County, judgment entered December 27, 1922) (the *"Hubbard* Litigation"), includes Westwoods, in whole or in part. (Stip. No. 101; Tr. 963.) The Findings in the *Hubbard* Litigation include a finding that "for more than 70 years last past" plaintiff Shinnecock Tribe and its members "have obtained its firewood and fencing" from Westwoods, but the record in the *Hubbard* Litigation does not include a finding or determination that (i) the Shinnecocks claimed or had aboriginal rights in the subject premises; (ii) the Shinnecocks had been in possession of the premises since time immemorial, or (iii) the Shinnecocks had been in possession of the premises since any time prior to circa 1850. (D1, at Findings ¶ "V"; Tr. 963; T12, at 121-25.) The Opinion of Referee William Pelletreau in the *Hubbard* Litigation states that the plaintiff tribe "has only such rights to litigate as are conferred by statute ."(D1, at Opinion.)

***22** Despite the statement that "within the memory of living witnesses three, four or five families of said tribe resided on said tract," which appears in the "Findings" of the referee appointed in the *Hubbard* litigation, there is no basis on which to conclude that (i) those families resided on the approximately 80-acre Westwoods parcel, inasmuch as the tract at issue in the *Hubbard* Litigation was stated to be "about 100 acres" in size; (ii) any of those families were living in Shinnecock tribal relations; or (iii) any other families or individuals ever resided at Westwoods. (D1, at ¶¶ "V" and "VI" of "Findings;" Tr. 2781-82.) The Findings in the *Hubbard* Litigation also state that "plaintiff [Tribe] has for many years resided on Shinnecock Neck in the town of Southampton."[FN24](D1, at ¶ "IV" of "Findings.")

FN24. The testimony of defendant Mr. Gumbs, discussed *infra,* that no portion of Westwoods has ever been allotted to any tribe member, undermines the contention of the defendants, as well as the referee's finding in the Hubbard Litigation, that "within the memory of living witnesses three, four or five families of said tribe resided on said tract."(D1, at ¶ "VI" of "Findings.)

(9) MAPS

As set forth below, maps of the Town from 1797 to the early 20th century do not support a conclusion of Shinnecock habitation west of Canoe Place or at Westwoods.

A 1797 survey map created by the New York State Department of Transportation (the "1797 DOT Map") depicts the Indian meeting house, discussed *supra,* to the east of Canoe Place, and identifies Indian habitation only to the east of Canoe Place; the 1797 DOT Map indicates no Shinnecock habitation to the west of Canoe Place. (T199; Tr. 920-21, 2760-61; T13, at 18-19.) As depicted on the 1797 DOT Map, the Indian meeting house was situated within the 1703

Lease Lands, which are depicted on the 1797 DOT Map as "Shinnecock tribe & Indian Reserve." (T199; T13, at 18; Tr. 920-21.) According to Mr. Lynch, the Indian meeting house depicted on the 1797 DOT Map was "a marker denoting the main location of Shinnecock settlement from circa 1602 through 1809 and beyond."(T13, at 18-19.)

A 1780 map prepared by Major John Andre does not show any habitation at all in the vicinity of Westwoods, and no Indian habitation at all west of Canoe Place. (D208a; Tr. 1049-50.)

An 1829 map of Suffolk County created by David Burr (the "1829 Burr Map") does not indicate the presence of Shinnecock Indians to the west of Canoe Place, but does indicate the name Shinnecock (spelled "Shunnecock") east of Canoe Place. (T360; Tr. 1232-34, 2762-63, 2765-66.) The 1829 Burr Map depicts the presence of an Indian meeting house to the east of Canoe Place-the same Indian meeting house that is depicted on the 1797 DOT Map. (T360; T199; Tr. 1233.)

The 1833 Sumner Map shows a triangle symbol, which indicates the location of Indians, east of Canoe Place. (T250; Tr. 2766-68, 2685.)

The 1836 J. Calvin Smith Map (the "1836 Smith Map") erroneously locates a Shinnecock reservation south of Canoe Place, on the west side of Shinnecock Bay, according to a report co-authored by Dr. Campisi. (D119; T251, at 37; Tr. 2769-71.) An 1839 republication of the 1829 Burr map repeats the error of the 1836 Smith Map. (D118; Tr. 2771-72.)

***23** The 1838 U.S. Coast Guard and Geodetic Survey Map shows no Indian dwellings or Indian habitation west of Canoe Place but does show Indian dwellings east of Canoe Place at Shinnecock Neck. (T247, at 265, 269-71; Tr. 2772-75.)

The 1859 Chace Map places the Shinnecock Indians east of Shinnecock Bay, and east of Canoe Place, on Shinnecock Point or Shinnecock Neck, and contains no indication of Shinnecock presence west of Canoe Place. (T247, at 272; Tr. 2775; D29, at 12.)

The Gazetter of the State of New York (Tenth Edition), published in 1861, reported that in Southampton, an Indian settlement, which was "the residence of the remnant of the Shinnecock Indians, consisting of about 200 persons," was situated on the east side of Shinnecock Bay. (T144, at 638 n. 12.)

The 1873 Beers Map places the Shinnecock Indians east of Shinnecock Bay, and east of Canoe Place, on Shinnecock Point or Shinnecock Neck, and contains no indication of Shinnecock presence or habitation west of Canoe Place. (T247, at 274; Tr. 2775; D29, at 12.)

The Map Showing the Subdivision of the Town of Southampton Among the Proprietors (the "Proprietor's Map"), created by or under the direction of William S. Pelletreau, not later than 1885, references two locations east of Canoe Place as lands in which the Shinnecocks held an interest, namely Shinnecock Hills and Shinnecock Neck, but does not indicate any other lands in which the Shinnecocks held an interest, including but not limited to, any lands west of Canoe Place, including Westwoods. (T226.)

The 1902 Art Village Map shows the Shinnecock settlement at Shinnecock Neck, east of Canoe Place, and shows no Shinnecock presence west of Canoe Place. (T247, at 272, 275; Tr. 2779-80.)

The 1916 Belcher Hyde Map shows the Shinnecock tribal village or residences on the Shinnecock Reservation and contains no indication of Shinnecock habitation or settlement west of Canoe Place. (T247, at 272, 276-77; Tr. 2780.)

The 1929 Dolph Stewart Map includes the words "Shinnecock Indians" in the general vicinity of Westwoods but shows the Shinnecock Reservation east of Canoe Place. (T247, at 275, 278-79; Tr. 2780-81.)

In sum, the maps of the Town during this period do not support a conclusion of Shinnecock habitation west of Canoe Place or at Westwoods.[FN25](Tr. 2757-81.)

FN25. A February 2003 Stage I Archaeological Survey for the "Shinnecock Reservation-West Hills" concluded, on the basis of archival research and 249 test excavations within a 15-acre area claimed by the Shinnecock, that "the project area witnessed minimal documented human activity in the past."(T135, at ii; T12, at 98-99; Tr. 964-66.) The 15-acre parcel studied in the February 2003 Survey was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

within Westwoods. (T135 at 16, 17, 21; Tr. 965.)

(10) OTHER RECORDS AND WRITINGS

The Court also has examined other records and writings, referenced by defendants, to determine if they support Shinnecock habitation west of Canoe Place at Westwoods on a continuous basis since the 17th century. None of this other evidence supports such a conclusion. For example, the writings of Timothy Dwight provide no information that indicates a Shinnecock presence or habitation west of Canoe Place in the early 19th century. (Tr. 2782.)

Similarly, Russell Carman's article *In the Beginning: The Shinnecock Indians and the First White Settlers in Quogue,* (D107), is also not reliable or persuasive. Carman reports that "[t]he Indians told my grandfather, and he told me, that a large portion of the [Shinnecock] tribe lived, except during the severe cold months, on the bluffs overlooking Peconic Bay, on the westerly side of the 'haulover', where the Shinnecock locks are today."(D107, at 1.) However, the article does not identify the historic period during which this information was reported. Moreover, Carman cites no historic sources or historic documents for the information contained in his article concerning Shinnecocks living west of the "haulover" and no historic sources corroborate Carman's account.[FN26](Tr. 2724-25.)

FN26. Dr. Campisi testified that it was his opinion that one of the two possible periods to which the events described in the paragraph of Carman's article recounting Indians living west of the "haulover" could be referring was sometime between 1620 and 1637. (D107, at 1; Tr. 2658-59.) Dr. Campisi also testified that it was his interpretation that the Indians told Russell Carman's grandfather the information about where Shinnecocks lived in approximately 1876. (D107, at 1; Tr. 2656-58.) Thus, according to his interpretation of the time-frames at issue in the Carman article, Carman's grandfather was told by the Indians the information concerning the purported habitation of Indians west of the haulover 200 years after the latest time at which those habitations had occurred. (D107, at 1; Tr. 2726-27.) Dr. Campisi also admitted that he does not know whether the "bluffs," referred to in the Carman article as having been a location where Indians purportedly lived, included Westwoods. (Tr. 2725.) Dr. Campisi conceded that the Carman article is not a learned treatise, is not a primary historical document, and is not a primary source article on which he would rely solely. (Tr. 2654-55, 2726.) Thus, Dr. Campisi acknowledged that Carman's hearsay article "is not the strongest piece of evidence in the world" concerning purported Shinnecock habitation. (Tr, 2658-60.) Dr. Campisi also admitted that: (1) historic sources indicate that the locations regularly occupied by the Shinnecocks in the 17th and 18th centuries were at Shinnecock Neck, Quogue, and Sebonack, sometimes called Cold Spring (Tr. 2725-26); and (2) historic sources do not include the property now known as Westwoods as the location regularly occupied by the Shinnecocks in the 17th and 18th centuries (Tr. 2726).

***24** To support their position, defendants also rely on a report written by Barbara M. Moeller, who was engaged by the Town to produce a historical profile of Hampton Bays, as well as Ms. Moeller's deposition. The 2005 report made several conclusions, including the following: (1) the Canoe Place Inn (which is about 700 yards south of the closest Westwoods boundary) "has been an Indian habitation location for centuries" (D192, at 13); (2) there was an Indian burying ground at the site of the grave of Paul Cuffee (which is about one-half mile southwest of the closest Westwoods boundary) and that Indian remains other than those of Cuffee are or were buried at the site (D192, at 16); and (3) early settlers in Hampton Bays mingled with Indians already living in the area (D192, at 54). Ms. Moeller also opined that when the railroad went through the grave of Paul Cuffee in 1869, Indian remains there were dug up and moved to the Shinnecock Reservation. (D359, at 78-80.) The Court finds Ms. Moeller's report and opinions to have little probative value. As an initial matter, it is clear from the circumstances surrounding the commissioning of the work, as well as from a review of the report itself, that it was not intended to be a scholarly work, but rather was meant to provide general historical information as a planning tool related to future development and decisions regarding preservation of structures or sites. (D359, at 28, 69.) Moreover, Ms. Moeller's qualifications in historic research are very limited; in fact, Ms. Moeller conceded that to say that she specializes in historic research is "an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3307089 (E.D.N.Y.)
**(Cite as: Slip Copy)**

Page 22

overstatement of my talents ." (D359, at 37-38.) More importantly, Ms. Moeller does not provide an explanation as to how she arrived at her opinions, and defendants have not offered any evidence to otherwise support these conclusions. Thus, in light of the entire trial record, the Court declines to credit these unsubstantiated conclusions.[FN27] Moreover, even if Ms. Moeller's conclusions are true, the presence of Indians in the vicinity of Westwoods falls far short of establishing continuous use and occupation of Westwoods by the Shinnecock Nation.[FN28]

FN27. For similar reasons, to the extent that defendants also seek to support their position or to undermine or discredit Mr. Lynch's analysis by pointing to the draft article by Town Historian Henry Moeller entitled *Three Indian Meetinghouses,* as well as discussions by Mr. Lynch about that draft article, the Court does not find that Mr. Lynch's concern with the article undermines his credibility or conclusions. In fact, Henry Moeller acknowledged that the draft article was not published because he is not convinced that he knows what happened as it relates to these historical events. (D363, at 337.) In short, the article has virtually no probative value and does not impact the conclusions drawn by the Court based on the entire trial record.

FN28. Defendants also suggest that "[n]umerous documents relating to Indian records and archeology, possibly containing information relevant to the Shinnecock Indian Nation's possession of Westwoods, known to have been in the custody of the Town have disappeared."(Defs. Proposed Findings of Fact, at ¶ 1.) The primary basis for this contention is a statement by Mr. Moeller that "sensitive" archeological information given to the Town of Southampton Planning Department in the 1970s could not be found when he looked for such information more recently. (D199, at 1; D363, at 220-22.) However, there is no evidence as to the content or subject matter of this information, and there is no reason to believe that it had any relevance to the issues that are the subject of this litigation. Moreover, Mr. Moeller also agreed that the archeological information that he was unable to find may have been kept in "a different form" by the Town within the Town records. (D363, at 224-25.) Thus, the Court does not find any basis to conclude that documents relevant to this litigation are missing or that, even if they were missing, they would be favorable to the Nation's position. As discussed in detail *supra,* there is an overwhelming historical record from which the Court makes its conclusions in this case on the issue of extinguishment of aboriginal title.

## H. STATEMENTS BY NATION REPRESENTATIVES REGARDING WESTWOODS

### (1) 1888 NEW YORK STATE LEGISLATIVE HEARING

In 1888, the New York State Legislative Assembly appointed a "Special Committee to Investigate the Indian Problem of the State of New York" (the "Special Committee"). (T133.) Milton Winfield Lee, a Shinnecock Tribe member who was later elected multiple times as a Shinnecock Tribal Trustee, provided sworn testimony before the Special Committee. (T145, at 850-51; T229, at Appendix 14; T12, at 95, 98, 107, 112-13.) Lee testified to the following: (1) "The tribe bought fifty acres of wood land"; (2) "I think they [the tribe] have a deed of this tract"; and (3) "We bought it of Wakeman Foster ... a white man...." (T145, at 851; T12, at 95, 98, 107, 112-13; Tr. 958-60.) The "wood land" referred to by Lee included a portion of Westwoods. (T12, at 94-95; Tr. 959.) According to Mr. Lynch, Foster held no rights in lands in the vicinity of Westwoods, and thus Foster could not have been the source of any rights claimed by the Shinnecocks in Westwoods. (T12, at 107, 113-14; Tr. 960.) According to Mr. Lynch, the loss of the Shinnecock's native language, which occurred as a result of "profound socio-cultural change," caused Shinnecock memories, based on oral tradition, to become distorted.[FN29](T12, at 107, 109; T144.)

FN29. On August 10, 1888, James H. Foster, a Southampton native familiar with the Shinnecocks, also provided sworn testimony before the Special Committee, at Southampton. (T133 at 827-838.) Mr. Foster was a Justice of the Peace of Southampton. (T133 at 831; T169at 296.) Mr. Foster testified to a Shinnecock claim that the Tribe

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

had purchased "about fifty acres" of woodland, "seventy or eighty years ago," *i.e.,* 1808-1818. (T133 at 830; T12 at 111-12; Tr. 945-946, 954-958.) The "woodland" referred by Mr. Foster in his testimony before the Special Committee was Westwoods. (T12 at 94-95; Tr. 958; T133 at 830.) During Mr. Foster's testimony before the Special Committee, there was no mention that the Shinnecock had subsisting aboriginal rights to Westwoods. (T133; T12 at 115.)

(2) THE 1943 JOINT LEGISLATIVE COMMITTEE

***25** On October 14, 1943, Fred Smith, who identified himself as a member of the Shinnecock Tribe, gave sworn testimony at a public hearing of the "Joint Legislative Committee on Indian Affairs," which had been established by the New York State Legislature. (T233, at 39; Stip. No. 94.) Smith was 74 years of age when he testified on October 14, 1943, and he had always lived in Southampton. (T233, at 39.) Mr. Smith was referring to the Westwoods Parcel or to a parcel of land including Westwoods when he referred to the "west wood land" in his testimony. (Stip. No. 95.) Mr. Smith testified that the Tribe had purchased Westwoods "by some money the Shinnicocks [sic] had."(T233, at 42.)

(3) THE 1978 SHINNECOCK NATION LITIGATION REQUEST

In February 1978, the Shinnecock Indian Tribe submitted to the United States Department of the Interior a "Litigation Request and Statement in Compliance with 25 CFR § 54.6 by The Shinnecock Tribe" (the "1978 Litigation Request"). (Stip. No. 89; T229.) The land that was the subject of the 1978 Litigation Request did not include Westwoods or any other land located to the west of Canoe Place. (Stip. No. 90.) In support of the 1978 Litigation Request, the Shinnecocks submitted to the Department of the Interior a "Memorandum in Support of Litigation Request" (the "1978 Memo") and various "Appendices" and documentary exhibits. (Stip. No. 91; T229.) One of the three signatories of the 1978 Memo was Marguerite Smith, an attorney admitted in New York and also a member of the Shinnecock Indian Nation. (Stip. No. 92.) The 1978 Memo was prepared by, or on behalf of, the Shinnecock Tribe, and its submission was authorized by the Nation. (Stip. No. 93.) The 1978 Memo does not suggest that either the Ogden Deed or the Topping Deed was void, invalid, or illegal. (T229.) To the contrary, in the 1978 Memo, the Shinnecock Nation acknowledged the validity and legality of the Ogden Deed and the Topping Deed by stating that "the Tribe's domain to the west of Canoe Place was conveyed to non-Indian individuals in 1659, 1662," and also that "[t]he tribal territory to the west of Canoe Place was subsequently conveyed to non-Indian individuals by deeds of 1659 and 1662."(T229, at 8, 16 .)

I. THE ORAL TRADITION OF THE NATION REGARDING WESTWOODS

The Court has also examined the oral tradition of the Nation regarding Westwoods. During the course of a Shinnecock tribal meeting held on February 4, 2003, Kevin Eleazer, a former Shinnecock Tribal Trustee, stated that "we're not even sure if we own the land at West Woods.... It was given to us by a millionaire, and yet there was never a deed for that."(T261, at 42; Tr. 2947-48.)

Defendant Mr. Gumbs, Chairman of the Shinnecock Tribal Trustees, admitted that he personally heard Kevin Eleazer's statement at the tribal meeting of February 4, 2003 that Westwoods "was given to us by a millionaire," and that he (Mr. Gumbs) had heard another unidentified tribal member make a statement like that previously and that Kevin Eleazer was reiterating it. (S251, at 249.) Mr. Gumbs admitted that the reason he believes Kevin Eleazer's February 4, 2003 statements about Westwoods were inaccurate is that they were based on statements that Kevin Eleazer had acquired from someone else, who had acquired them from someone else before that, and that as stories go "down the loop" over time, they change. (Tr. 2949; S251, at 249-50.) The passing down of stories or memories, orally, from one person to another, from generation to generation, is precisely how Mr. Gumbs came to his understanding of the oral history concerning Westwoods, through what he was told by Augustus (Gus) Thompson and others. (Tr. 2938, 2846, 2849-54.) Mr. Gumbs's understanding of the reputation in the Shinnecock community concerning Westwoods is that it is "land that we have," that "[i]t's been used in the past for firewood purposes" and "[g]enerally in the community it has been used as a means of survival and as recreation for the community."(Tr. 2846.) The principal source of Mr. Gumbs's understanding and knowledge of Westwoods, particularly its history and the origin of the Shinnecock's rights and interest therein, was Mr. Thompson, who died when Mr. Gumbs was 10 years

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

old, and with whom Mr. Gumbs became familiar through nightly dinners and helping Mr. Thompson on his garbage collection route. (Tr. 2846-49.) Mr. Thompson told Mr. Gumbs that the Tribe "always owned" Westwoods. (Tr. 2854.) The only specific information about Westwoods history that Mr. Thompson told Mr. Gumbs was that Mr. Thompson pointed out to Mr. Gumbs "indentations" in the land at Westwoods on the north side of Newtown Road that Mr. Thompson believed were for "wiki-ups," which could have been used for shelter or a cellar to store things. (Tr. 2850-52.) Notwithstanding Mr. Gumbs's testimony that Mr. Thompson told him that the Tribe "always owned" Westwoods, Mr. Gumbs acknowledged that he could not say one way or the other whether Lee's 1888 testimony that the Shinnecocks had purchased 50 acres of woodland (*i.e.,* Westwoods) was incorrect. (Tr. 2949-52.) In so acknowledging, Mr. Gumbs conceded the possible validity and veracity of testimony about the origin of Shinnecock ownership of Westwoods that was in direct conflict with his testimony of his understanding of the reputation within the Shinnecock community, based on the Tribe's oral history, of the origin of the Shinnecock's ownership of Westwoods, *i.e.,* that the Shinnecocks "always owned" Westwoods. Mr. Gumbs acknowledges that "once or twice" he has heard members of the Shinnecock Tribe say that they did not believe the Tribe owned Westwoods, but he dismissed those statements simply because one of the persons, when confronted about such a statement made at a tribal meeting, had no explanation of how he arrived at it. (Tr. 2854-55.) No evidence was presented by defendants that Mr. Thompson ever was elected a Tribal Trustee, that he held any other elected or appointed position within the Tribe, that he enjoyed any particular formal or informal status of respect or authority within the Tribe, or that he was ever deemed by the Tribe at any point as knowledgeable on any matter of Shinnecock history, including its oral history generally, or specifically as that oral history relates to the Shinnecock's alleged ownership, use, and/or occupancy of Westwoods. No evidence was presented that Mr. Thompson's recounting to Mr. Gumbs of his understanding of the Shinnecock's ownership of Westwoods, including the origin thereof, what may have been located at Westwoods over time, and how the Tribe may have used Westwoods over time, represents anything more than the isolated statement, or opinion of one single tribal member, which is entitled to no greater weight, authority, or reliance than the statements about Westwoods from any other tribal member. Mr. Gumbs indicated that his understanding of the source of what Mr. Thompson told him about Westwoods was Mr. Thompson's own experiences going to Westwoods and what "his father had told him." (Tr. 2851.) No evidence was presented by defendants that Mr. Thompson's father was ever elected a Tribal Trustee, that he held any other elected or appointed position within the Tribe, that he enjoyed any particular informal status of respect or authority within the Tribe, or that he was ever deemed by the Tribe at any point as knowledgeable on any matter of Shinnecock history, including its oral history generally, or specifically as that oral history relates to the Shinnecock's alleged ownership, use and/or occupancy of Westwoods.

***26** The Shinnecock Tribe does not have anyone who is designated as the tribal historian. (S249, at 30.) Defendants did not present any evidence that there is any one person who is deemed authoritative within the Tribe with respect to the Tribe's oral history and oral tradition, or is a keeper or custodian of accurate and/or reliable oral history, including as that oral history and tradition relates to the Shinnecock's alleged historical use and occupancy of Westwoods, and the origin of their title to and interest in Westwoods.

In sum, there is no basis to conclude that Mr. Gumbs's testimony about the Shinnecock Nation's oral history concerning the Tribe's purported historical use and occupancy of Westwoods, including the origin of the Tribe's rights in Westwoods, is in any respect more reliable or is entitled to any greater weight than the oral statements about how the Shinnecocks acquired Westwoods through gift or purchase made by persons identified as members of the Shinnecock Tribe, to wit, Kevin Eleazer, Milton Winfield Lee, and Fred Smith.

J. THE TOWN'S TREATMENT OF WESTWOODS FROM THE STANDPOINT OF GOVERNMENTAL AUTHORITY

(1) LACK OF PROPERTY TAXES ON WESTWOODS

No property taxes have been assessed or imposed on Westwoods from 1927 to the present, and Westwoods is not listed in any tax records of the Town for the years 1800 through 1926. (Stip. No. 32.) There exists no known evidence that Westwoods ever has been listed as taxable property in any assessment records of Southampton. (Stip. No. 33.) Neither the State nor the Town is aware of any evidence that Westwoods ever

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

has been listed in any assessment records of Southampton as anything other than tax-exempt Indian land. (Stip. No. 34.) The relevant Suffolk County Tax Maps describe both the Shinnecock Reservation and Westwoods as "Shinnecock Indian Reservation." (D232; D156d.)

(2) THE CANOE PLACE DIVISION

As set forth below, the Southampton proprietors laid out in or about 1738 a 3000-4000 acre subdivision of property consisting of 39 numbered lots, which includes at least a portion of Westwoods within its boundaries (the "1738 Canoe Place Division" or the "Division"), and there is no documented record of any objection or challenge to the laying out or allotment of the Division.

(a) THE LAYING OUT, ALLOTMENT, AND BOUNDARIES OF THE CANOE PLACE DIVISION OF 1738

In or about 1738, Southampton proprietors laid out a 3000-4000 acre subdivision of property known as the "Canoe Place Division" of the Quaga purchase, consisting of 39 numbered lots, running from "Jeremiah Culver's land" on the east, to "Red crick" on the west. (T97; Martin A. Read, L.S., *The Location of the "Westwoods" Parcel Relative to 1738 Canoe Place Division,* Barrett, Bonacci & Van Weele, P.C., June 28, 2006 (T210), at 1-2; T12, at 68-70; Tr. 971-72, 1268-69.) The surveying and laying out of the 1738 Canoe Place Division is reflected in a portion of Town records dated March 27, 1738, entitled "A Return of the Canoe place Division," which also provides a description of the lands constituting the Division. (T210, at 1-2; T97.) The 1738 Canoe Place Division is described in "A Return of the Canoe place Division," (T97), as being bounded southerly by the highway running "from Canew place Gate to tianah," northerly by "the beach from Conew place pond on the north side to Red crick gut," westerly "on a direct line northwardly to a fresh pond near Red crick the southward part thereof to [be] a tree marked with No. 38, by the pond, and still running northward to Red crick and so along the branch and by the side of the crick to the north sid[e]," and easterly by "Jeremiah Culvers land which he bought in said Purchas at the South end butting up on Quaga Road, and the north end butting on the beach."(T97, at 123-24; T210, at 1-2; Tr. 1268-69.)

***27** Defendants' title abstraction and examination witness, Mason Haas, admitted that according to Town Exhibit 215, the boundaries of the 1738 Canoe Place Division were north by Peconic Bay, south by Montauk Highway, east by Canoe Place Pond, and west by Red Creek. (T97; Tr. 3041.) Using modern-day landmarks, the Division is generally bounded on the south by Montauk Highway, on the north by Great Peconic Bay, on the west along a line running from Tiana Creek northerly to Red Creek, and on the east by a north-south line in the vicinity of the present day Shinnecock Canal. (T210, at 1-2; Tr. 1269.) The dotted line on Town Exhibit 217, created by plaintiffs' expert land surveyor, Martin A. Read, depicts accurately the northerly, southerly, and westerly boundaries of the 1738 Canoe Place Division, as described in "A Return of the Canoe place Division," (T97), superimposed on an enlarged portion of the 1894 Beers Atlas Map that depicts the westerly portion of Southampton. (T217; T210, at 1-2; Tr. 1271-72.) Although Mr. Read could not locate the easterly boundary line of Lot No. 1 of the Division with a degree of specificity that would have allowed him to plot it on Town Exhibit 217, he was able to determine that the approximate eastern boundary of the Division, using modern landmarks, was in the vicinity of the Shinnecock Canal. (T217; Tr. 1272-73; T210, at 2.)

The 1894 Beers Atlas Map refers on its face to the "Canoe Place Division" and its having been " '[l]aid out in' 1738." (T216; Tr. 1270, 3047-48.) The location of the words "Canoe Place Division" on the 1894 Beers Atlas Map substantiates generally the east-west reach or boundaries of the 1738 Canoe Place Division, as those boundaries are described in "A Return of the Canoe place Division."(T97; T216; Tr. 1270; T210, at 2.) The Proprietor's Map, (T226), refers to "Canoe Place Division Divided-1738," and the location of those words is consistent with the approximate location of the lands of the Division, as established by the testimony of both Mr. Read and Mr. Haas. (T226; T210, at 1-2; Tr. 1268-73, 3041-42; T97; T215; Tr. 3048.)

The lots described in the 1738 Canoe Place Division are aligned in a northerly/southerly direction. The first 37 lots are numbered consecutively, running from east to west, with Lot No. 1 of the Division being the easterly most lot. (T97; T210, at 1-2; Tr. 1269.) The document "A Return of the Canoe place Division" sets forth a specific acreage for each of the 39 lots of the Division, as well as a description of the physical

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

location of each lot in relation to the other lots within the Division. (T97, at 124-25; Tr. 3045.)

The land located immediately to the east of the eastern boundary of Lot 1 of the 1738 Canoe Place Division is described as being "Jeremiah Culvers [sic] Land." (T97, at 124; Tr. 3045.) That land of Jeremiah Culver was purchased by Culver from the Town prior to the creation of the 1738 Canoe Place Division. (T97, at 124; Tr. 3044-45.)

***28** On April 2, 1739, the Southampton Town Proprietors met to allocate interests in the 39 numbered lots within 1738 Canoe Place Division; that is, to determine which proprietors would obtain rights in which of the 39 lots of the Division (the "Canoe Place Division Lot Drawing"). (D172; T107; T12, at 70). The 39 numbered lots within the Division were allotted to specifically-named Town proprietors during the Canoe Place Division Lot Drawing. (D172; T97; T107.) For each of the 39 lots in the 1738 Canoe Place Division, the Canoe Place Division Lot Drawing identifies one or more named individual Proprietors of the Town who received interests or allotments (expressed in terms of "fifties" or portions thereof) in said lots. (D172; T107; Tr. 3045-46.)

None of the individuals (each, an "Allottee") whose names appear in the Canoe Place Division Lot Drawing found within the *Third Book of Records of the Town of Southampton, Long Island, N.Y. with Other Ancient Documents of Historic Value,* at 129-32, were members of the Shinnecock Tribe. (Stip. No. 79.) There is no documented record of any objection or challenge by or on behalf of the Shinnecock Tribe of Indians to the laying out or allotment of the 1738 Canoe Place Division. (Stip. No. 80.)

(B) WESTWOODS GENERALLY IS SITUATED WITHIN THE 1738 CANOE PLACE DIVISION

The lands that were part of or the subject of the 1738 Canoe Place Division were located exclusively to the west of Canoe Place; that is, using modern landmarks, the lands of the Division were situated entirely to the west of the modern day Shinnecock Canal. (T97; T215; T216; T217; T226; T210, at 1-2; Tr. 1268-73, 3041-42, 3047-48.) Westwoods is located entirely to the west of Canoe Place, that is, to the west of the modern day Shinnecock Canal. (T214; Stip.Nos. 16, 35, 36.)Westwoods is generally located within the boundaries of the 1738 Canoe Place Division as they were described by plaintiffs' expert Mr. Read, with recourse to modern landmarks.[FN30](T214; T97; T210, at 1-2; T217.) The Court found Mr. Read's testimony to be credible, as supported by his extensive analysis of various documents including deed histories and maps, that at least aportion of Westwoods, namely some portion of Westwoods that is north of the Milton Reiner Property as it runs from west to east, lies within Lot No. 2 of the 1738 Canoe Place Division and that no portion of Westwoods lies west of the westerly boundary of Lot No. 4 of the Division.[FN31](T210, at 1, 5-6; Tr. 1267-68.)

FN30. Mr. Haas admitted that he had testified under oath at his deposition in this action that Westwoods is located within the lands that were the subject of the 1738 Canoe Place Division. (Tr. 3041-42.)

FN31. It should also be noted that Town Exhibit 111 is an excerpt of the Southampton Town Records from 1795, depicting a plan for the laying out of a road across the 1738 Canoe Place Division. (T111; Tr. 3065-66.) Town Exhibit 111 refers to a highway running "from the Canoe place ditch at the Western Boundary of the Indian Land to the Said Red Creek Island Road."(T111; Tr. 3065-66.) According to Mr. Haas, Exhibit 111 relates to the laying out of a portion of Newtown Road, and at no point in history is he aware of a time when Newtown Road began at Westwoods. (Tr. 3065-67.) Mr. Haas admitted that if one assumes that the "Canoe Place Ditch" referenced in Town Exhibit 111 is located where the modern-day Shinnecock Canal is located, the reference in Town Exhibit 111 to "Indian land" could not be a reference to Westwoods. (Tr. 3067.) The Canoe Place Ditch is the place where Indians formerly carried their canoes between Shinnecock Bay and the Great Peconic Bay, and was located where the modern day Shinnecock Canal is situated. (Stip. No. 35; T12, at 76-78.) Thus, the reference in this 1795 document to "Indian Land" does not appear to be a reference to Westwoods, but instead appears to be a reference to the 1703 Lease Lands, *i.e.,* the lands situated exclusively to the east of Canoe Place, which were the subject of the 1000 year lease. (T73; T12, at 52-57; Tr. 2755.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Although Mr. Haas contends that the Canoe Place Division was simply a proposal that was never implemented (Tr. 3042-43, 3055), the Court rejects that opinion as contrary to the historical record-including land records, maps, and deeds-which support the conclusion that the Canoe Place Division was executed. (T97, T107, T215, T216, T226; T210, at 5; D158D, D159C, D161C, D166C; Tr. 3042-55.) The inability to locate a subdivision map, or to locate deeds from the Trustees of the Town to any of the Allottees of the 39 lots within the Division, are not sufficient to ignore the compelling evidence that the Division existed and was executed.

***29** In addition, deeds within the chains of title for property adjoining Westwoods which refer to Westwoods as "Indian land," "Indian reservation," or "Land of the Shinnecock Tribe of Indians," make up the majority of the evidence that Mr. Haas cites to support his opinion that the Shinnecocks have owned Westwoods for the entirety of the existence of recorded land title records within the Suffolk County Clerk's Office. (D157, at 1-20; D154, at ¶¶ 8-10; Tr. 3024-27.) However, deeds for properties adjoining Westwoods also contain some references that are more ambiguous as to the purported Shinnecock ownership of Westwoods, including "Indian land, so-called," "so called Indian Land," "land now or formerly of the Shinnecock Tribe,""land now or formerly of the Shinnecock Indian Tribe,""land now or formerly of The Shinnecock Indian Reservation,""lands reputed to be Indian Lands,""land now or formerly of Trustees of the Shinnecock Tribe," and "what is known as Indian land."(D157, at 2-8, 12-13, 15-19; Tr. 3027-29.)

In any event, Mr. Haas's opinions regarding ownership of Westwoods are limited to the period from 1845 going forward. (Tr. 3030.) In other words, Mr. Haas admitted that there is no reliable documentary evidence of Shinnecock ownership of Westwoods prior to 1845 and that he found nothing in his title work in this case to indicate any interest that the Shinnecocks had in Westwoods prior to 1845. (Tr. 3030.) Thus, he acknowledged that there is nothing in his opinions that is inconsistent with the position that the Shinnecock Tribe acquired an interest in Westwoods in or around 1808. (Tr. 3031.)

(3) SOUTHAMPTON'S HISTORIC REGULATION OF TIMBER RESOURCES

At various times during the 18th century, the Southampton Trustees regulated timber resources throughout the Town, as well as the rights of the Shinnecocks to cut timber. (T12, at 62-68; Tr. 925-32.) For example, by orders of the Southampton Trustees, dated May 5, 1741, April 2, 1745, and April 1, 1746, no timber was permitted to be cut or carted in Shinnecock Great Neck, and Sebonack Great Neck, both of which locations are situated within the 1703 Lease Lands, east of Canoe Place. (T12, at 63; T88, at 6; T89, at 34; T90, at 44; T199; Tr. 925-29.) By order of the Southampton Trustees, dated March 5, 1747, no "green timber" was to be cut or carted "[i]n or upon any part of the Indian Land,"*i.e.,* the 1703 Lease Lands. (T91, at 55; T12, at 63; Tr. 927.) By order of the Southampton Trustees, dated July 3, 1744, the Shinnecocks were granted "a mile of timber" "on lands "from the Conueplace Eastward," through a 50-year lease to the Indians. (T92, at 26; T12, at 64.) By order of the Southampton Trustees, dated June 2, 1747, the Shinnecocks were granted "all the timber in Shenecock Great neck ... and also all the timber in Sebonack neck."This order also provided that the timber granted to the Shinnecocks should "Ly ... from the Conneu-place ditch Eastward as far as the Coldspring...." (T93, at 57; T12, at 64-65.) The area of timber granted to the Shinnecocks by the aforesaid order of June 2, 1747 was in close proximity to the Shinnecocks' main village at Cold Spring (Sebonack). (T93; T12, at 64-65; T13, at 25-27, 32-35.) By reason of a growing shortage of timber resources, and the sale of timber by individual Shinnecocks to local townsmen, 32 Shinnecocks entered into a mutual agreement dated June 12, 1764, which provided, *inter alia,* that "[n]either Shall any Indian or Squaw Sell any timber on penalty of Eight Shillings for any trees so Sold...." (T94; T12, at 65; Tr. 930-31.) By order of the Southampton Trustees, dated April 30, 1782, it was recognized that the Shinnecocks had complained to the Trustees that agreements not to sell timber, such as the foregoing agreement dated June 12, 1764, had been "broken thrugh," and the Shinnecocks had made an application to the Southampton Trustees for aid and assistance in fostering "a Strict Observance of sd. Agreement."(T95, at 384.) The April 30, 1782 order prohibited the cutting or carting of wood "off any part of the Indian land," except for the consumption of persons having an interest in such lands. (T95, at 384-85; T12, at 66-67; Tr. 931-32.) By order of the Southampton Trustees, dated April 2, 1754, no timber was to be cut or carted off "any part of the undivided land westward of Canuplace on penalty of six shillings...." (T176, at 108; T12, at 65; Tr. 933-34.) By a second order of the Southampton Trustees, dated

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

April 2, 1754, there was to be no flaxseed "soed on any part of the Indian land."(T176, at 108.) By distinguishing between the "Indian land" and the "land westward of Canuplace" in the two orders of the same date, it appears that the Southampton Trustees viewed the "Indian land" to be situated exclusively east of Canoe Place, while the lands west of Canoe Place were not considered "Indian land." (T176, at 108.)

K. THE NATION'S TREATMENT OF WESTWOODS FROM THE STANDPOINT OF GOVERNMENTAL AUTHORITY

(1) USE OF WESTWOODS FOR FIREWOOD AND RECREATION

***30** Defendants are aware of no written document reflecting that the Shinnecock Tribe and/or its Trustees ever made any allotments of land within the borders of Westwoods to any member of the Nation. (Stip. No. 31.) Tribal Chairman Mr. Gumbs, who claimed to be knowledgeable about the reputation within the Shinnecock community concerning the history of Westwoods, testified at trial that as far as he knew, no portion of Westwoods had ever been allotted to a tribal member in the history of the Tribe. (Tr. 2835, 2845, 2937, 2939-40.) Mr. Gumbs admitted that the Shinnecock Tribe has no written tribal laws at all, including any concerning the use of Westwoods, or any environmental standards that are referenced in the agreement originally entered into between the Shinnecock Gaming Authority and Ivy Ong, discussed *infra.*(D237, at section 6.7; Tr. 2886-87, 2947, 2938-40.)

Mr. Gumbs also admitted that, according to Tribal history, Westwoods is to be used for firewood and recreational purposes. (Tr. 2938.) The historical use of Westwoods only for firewood and recreational purposes is consistent with the testimony of other Shinnecock Trustees. (S249, at 39; S248, at 198.) No permanent structure currently exists on any part of Westwoods. (Stip. No. 19.) Except for the erection of gates across roadways, the Shinnecock Tribe has never fenced in the Westwoods property. (D251, at 262-64; S248, at 161.) Defendants Messrs. Eleazer and Bess testified that the Shinnecock Tribe has never adopted or enacted any written rules or regulations regarding the use of Westwoods by Tribe members. (S249, at 100; S248, at 160-61.) To the extent that the Shinnecocks used the area now known as Westwoods in the 19th and 20th centuries, they used it primarily as a timber lot for cutting wood and timber. (Tr. 2782.)

As stated by Tribal Trustees, the purpose of the development of a casino at Westwoods would be for the Tribe's economic development, that is, to meet the financial needs of the members of the Tribe, and to enjoy the economic success achieved by other Indian communities that engage in gaming. (Tr. 2880-82; S249, at 108-09.)

(2) ENCROACHMENTS ON WESTWOODS

Mr. Gumbs admitted that the Shinnecocks have been aware of the fact that the driveway of a neighboring/adjoining property owner currently encroaches on Westwoods. (Tr. 2941-42; S251, at 224-26.) Specifically, Mr. Gumbs acknowledged that a former owner of that encroaching driveway, Mr. Raynor, was obligated to pay rent to the Shinnecocks for the use of the portion of Westwoods on which the driveway encroached, but stopped remitting payments. (Tr. 2941-42; S251, at 224-25.) Mr. Gumbs conceded that the driveway has continued to encroach on Westwoods since Mr. Raynor sold his property. (Tr. 2942; S251, at 226.) Mr. Gumbs admitted that the Shinnecock have never commenced a lawsuit against Mr. Raynor or the current owner of the encroaching driveway, seeking payment of rent or the removal of the encroachment, and that Mr. Gumbs does not have any knowledge that even so much as a letter from the Shinnecock was sent to either Mr. Raynor or the current owner of the property demanding the removal of the encroaching driveway.[FN32](Tr. 2942-43; S251, at 226-27.)

FN32. On the issue of governmental authority, there is an unpaved parking area at Westwoods used by the Shinnecocks, and Mr. Gumbs testified that no Town or New York official ever objected to the clearing of land for a parking lot. However, Mr. Gumbs admitted that the parking lot was created "before his time," that he does not know when the parking tot was created, and that he does not know whether the Town was aware that the parking lot was being created. (Tr. 2940-41.) No evidence was presented at trial that Southampton or New York was ever aware that land was cleared for the creation of the parking lot on Westwoods, or an awareness that the parking lot on Westwoods, in fact, existed. Mr. Gumbs also admitted that the parking area at Westwoods is not related

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to any commercial activity by the Tribe. (Tr. 2941.)

L. SOUTHAMPTON ZONING LAW

***31** In 1957, when Southampton initially adopted its zoning code, Westwoods was zoned "C residential," which was a single-family residential district, with a minimum lot area per dwelling of 15,000 sf. (T5; T265; Tr. 94-97.) In 1972, pursuant to the Town's 1970 Comprehensive Plan, the Town re-zoned Westwoods "R-60," which is a residential classification for a single-family residence with a minimum lot size of 60,000 sf. (T6; T266; Tr. 98-100.) In 1984, Southampton re-zoned Westwoods "R-80," which is a residential classification for a single-family residence with a minimum lot size of 80,000 sf. (T264, T312; Tr. 100-03.)

Former Southampton Town Planner David Emilita testified that the R-80 zoning classification of Westwoods, as adopted in 1984, was omitted from the Town's subsequent zoning map, and as part of the Town's "Master Plan Update Number Three of 1985" it was proposed that Westwoods be reclassified from an R-80 zone to an R-60 zone. (Tr. 103-04.) Town Exhibit 9 includes the 1985 recommendation for the rezoning of Westwoods to an R-60 zone, in order to "Replace Omitted Zoning Map Designation." (T9, at third to last page; Tr. 104-06.) The third to last page of Town Exhibit 9, including the words "Replace Omitted Zoning Map Designation," was prepared by Mr. Emilita. (Tr. 105-06.) Mr. Emilita testified that the words "Shinnecock Indian Reservation," which appear on the third to last page of Town Exhibit 9, were placed there by him, "[f]or identification," and that such words were intended to show that Westwoods was owned by the Shinnecocks, and that the words had no zoning significance. (Tr. 107-08; 121.)

A public hearing was held in Southampton Town Hall in 1985, concerning proposed updates to the Town's Master Plan, including the designation of Westwoods as property bearing an R-60 zoning classification. (T8; Tr. 108-09.) A letter authored on behalf of the Shinnecock Tribe, which requested that the Town remove markings from the zoning map that showed the Town's zoning authority over the Shinnecock's lands, was read into the public record at this 1985 public hearing. (T8, at 11-13; Tr. 109-12.) Southampton did not grant the Shinnecock's request that it remove markings from the zoning map that showed the Town's zoning authority over the Shinnecock lands. (Tr. 112.) In 1986, the Town approved the proposed changes that appeared in Town Exhibit 9, and re-zoned Westwoods R-60, through the enactment and adoption of Local Law No. 7 of 1986. (T11; Tr. 113-14, 241-42.)

Since the enactment of Local Law No. 7 of 1986, there have been no Southampton Local Laws that have affected or changed the R-60 zoning designation of Westwoods. (Tr. 242-43.) Westwoods currently remains zoned R-60 by the Town. (Tr. 240-42; T11.) As an R-60 designated parcel, the use of Westwoods is limited to single-family residential use. (T267; Tr. 114, 245.) A gaming casino is not a permitted use in an R-60 zone. (T267; Tr. 245.) A gaming casino is not a permitted use anywhere in the Town. (T267; Tr. 245.) A gaming casino is not authorized by Southampton zoning law. (T267; Tr. 246.)

***32** Mr. Emilita testified that there is no impact, from a zoning standpoint, resulting from the fact that a Town zoning map shows no zoning classification for Westwoods. (Tr. 104.) At all times from 2003 to the present, § 330-184(I) of the Southampton Town Zoning Law provided that "[n]o regrading, clearing, tree removal or any other work in preparation of future use of a site may take place until site plan approval or written permission has been received from the Planning Board."(T267, at 330.) At all relevant times, the operation of a gaming casino and related commercial structures and activities, such as hotels, restaurants, and retail stores have not been identified as "permitted" or "special exception" uses within any "Country Residence" or "Residence" zoning districts in the Table of Use Regulations appearing at § 330-10 of the Town of Southampton Zoning Law, including R-60. (T267; Tr. 246-47.)

To date, neither the Shinnecock Tribe, nor any representative, Trustee, or any other person or entity acting on its behalf has applied for or received a bingo or games of chance identification number from the Board. (Stipulation, dated January 17, 2007, Stip. No. 5.) To date, the Town has not issued any state-authorized license to any defendant to permit gaming within Westwoods. (Stipulation, dated January 17, 2007, Stip. No. 6.)

Town of Southampton Planning and Development Administrator, Jefferson Murphree, testified that no commercial structure can be constructed within the Town in compliance with the Town Code in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

absence of a Town-issued building permit. (Tr. 247-48.)

Neither "Shinnecock Indian Reservation," nor "Indian Reservation," nor "IND-RES" is a zoning district or classification within the Town. (Tr. 116-17,235-36, 244, 269; T267.) Mr. Murphree testified that the labeling of Westwoods as "Indian Reservation" or "IND-RES" suggests nothing as far as the zoning of Westwoods is concerned. (Tr. 244.) It is the Town's practice to zone all lands within the Town.[FN33](Tr. 236, 261, 266.) Shinnecock Trustees Messrs. Gumbs and Eleazer admitted that they were aware that Westwoods was assigned a zoning classification by the Town.[FN34](Tr. 2943; S249, at 12, 98-99.)

FN33. The May 20, 1987 letter from then-Southampton Town Attorney Fred Thiele to the New York Department of State ("NYSDOS") refers only to the Town's then-existing policy concerning its zoning laws with respect to the Shinnecock Reservation; it makes no explicit or implied reference to Westwoods. (D229.) Mr. Thiele's letter also states unequivocally that "the Town of Southampton zones all the lands in the Town excluding incorporated villages," (D229, at 1), and this is consistent with the trial testimony of Mr. Murphree. (Tr. 236, 261, 266.) There are no properties within Southampton that do not carry a zoning classification assigned by the Town. (Tr. 236.) Because the 1987 letter addresses the Shinnecock Reservation, the Court views it as having little, if any, probative value on the issues related to Westwoods.

FN34. Shinnecock Trustee Mr. Bess testified that Westwoods was assigned a zoning classification, but he believed it had been removed. (S248, at 210-12.)

## M. CURRENT TOPOGRAPHY AT WESTWOODS

The Westwoods project site is bordered to the north by the Great Peconic Bay, to the south by the Sunrise Highway, and to the west and east by residential areas. (S125, at 40; Tr. 1842; T1; T2; T3.) The sections of the Westwoods parcel north and south of Newtown Road generally include hilly terrain with centrally-located high points. The north parcel includes the bluff topography sloping towards the Great Peconic Bay (to the north) and generally towards Newtown Road (to the south). The south parcel includes topography generally sloping towards Newtown Road (to the north) and towards "Canoe Place" (to the southeast). (S125, at 40.)

The topography reflects that Newtown Road is a relative low point between higher elevation lands on the north and south parcels, and surface runoff is directed towards Newtown Road from both parcel sections. (S125, at 40.) The project site is located within Seismic Zone C, which is identified as a region of intermediate seismic hazard. (S125, at 9; S150.)

***33** The portion of Westwoods located on the north side of Newtown Road, along the shore of the Great Peconic Bay, contains a coastal bluff approximately 50 to 70 feet above mean sea level (as defined in the National Geodetic Vertical Datum ("NGVD") 1929). (S125, at 9; Stipulation dated January 16, 2007, Stip. No. 6.) The coastal bluff, one of the unique and sensitive environs that contribute to the overall community character of the Town, acts as a natural protective barrier that absorbs wave energy and mitigates impacts from erosion and high water, and also provides a source of material for other natural protective features, such as beaches and dunes. (S125, at 10; Tr. 1842.)

Proposed development along the waterfront area within the Town is reviewed by the Town for consistency with these local community waterfront objectives. (S125, at 10.) Soils underlying Westwoods are part of the Plymouth-Carver soil association. Characteristic of the Pine Barrens, the Plymouth-Carver soils are distinguished by their coarse texture, which allows for rapid permeability. (S125, at 11.) The soils at Westwoods and their underlying geology allow for a renewable source of fresh ground water, which recharges the aquifer through percolation of rainwater or snowmelt, which is an important characteristic for an area served by a ground-water-based sole source for the municipal water supply system. (S125, at 11.)

The high soil permeability at Westwoods also increases vulnerability to contamination by septic systems, spills, and other development-related discharges. (S125, at 11, 52.) Westwoods is characterized by undulating topography with spot elevations ranging from a high of 92 feet NGVD, on the southern Westwoods parcel, elevation of 37 feet along Newtown Road, and elevation of 50 feet on the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

northern Westwoods parcel. (S125, at l2; S166.)

N. CURRENT ENVIRONMENTAL RESOURCES AND CONDITIONS IN SOUTHAMPTON GENERALLY AND AT WESTWOODS

(1) WATER RESOURCES

Southampton, as well as the rest of Long Island, obtains its water supply solely from ground water sources, which consist of three primary aquifers: the Upper Glacial, Magothy, and Lloyd aquifers. (S125, at 12; Stipulation, dated January 16, 2007, Stip. Nos. 7, 9-10.)Infiltration from precipitation, runoff, and snowmelt are the only sources of recharge to these aquifers, and where no development has occurred, approximately 50% of the precipitation that falls on the land could be expected to recharge the underlying aquifers, with the remainder of the precipitation lost through evaporation and plant transpiration. (S125, at l3; S162, at 9-11.)

Where development has resulted in impervious surfaces (*e.g.,* rooftops, parking lots, streets, and sidewalks), a greater percentage of precipitation becomes overland flow-runoff-before infiltrating to the aquifers. (S125, at 13.) Most of the surface waters on Long Island are fed from the ground water. (S125, at 13.) Eight specific hydrogeologic zones based upon different flow patterns have been identified on Long Island, and Southampton is located within Zones III, IV, V, and VI. (S125, at 14, and Figure 6 .)

***34** Westwoods is located in hydrogeologic Zone IV, and adjacent to Zone III. (S125, at 14 and Figure 6; D298.) Zone III is an area that has good ground water quality in both the Upper Glacial and Magothy aquifers. (S125, at 14.) Zone IV encompasses the northern and eastern portion of the South Fork, and is characterized by shallow flow systems that discharge directly into streams and marine waters. (S125, at 14 and Figure 6; S162, at 9; D298.)

There are no named streams, ponds, or lakes on Westwoods, but nearby or adjacent water bodies include: (a) Great Peconic Bay (approximately 19,100 acres), which borders the site to the north; (b) Shinnecock Bay (approximately 4,550 acres), which is located approximately one-half mile to the southeast; (c) Shinnecock Canal, which connects Great Peconic Bay and Shinnecock Bay, is located approximately one-quarter mile to the east at its closest point; (d) Squire Pond (approximately 19 acres), which is located approximately one-quarter mile to the northwest; and (e) Flanders Bay and Reeves Bay (approximately 2,600 acres), which are located approximately 7 miles to the west, at the westernmost area of the Peconic Estuary. (S125, at 15.)

Westwoods is located within the watershed of the Peconic Estuary. (S125, at 15; Stipulation, dated January 16, 2007, Stip. No. 15). Storm water and snow-melt water runoff in the watershed that does not percolate to ground water is conveyed by overland flow to Great Peconic Bay, and runoff from Westwoods and other lands within the watershed have a cumulative qualitative and quantitative impact on the Great Peconic Bay. (S125, at 15.) The Great Peconic Bay is a part of the Peconic Estuary, which separates the North and South Forks of the eastern end of Long Island; the Peconic Estuary consists of over 100 bays, harbors, and tributaries, and includes over 128,000 acres of land and 120,000 acres of surface waters. (S125, at 15.) The Peconic Estuary is part of the Natural Estuary Program (“NEP”), which has designated it as an “Estuary of National Significance.” (S125, at 15.) The portion of the Westwoods property along the shoreline of the Great Peconic Bay is within a flood zone area. (S125, at 17 and Figure 9; S137.) The Great Peconic Bay and the Shinnecock Canal have been mapped by the DEC as tidal wetlands (littoral zone). (S125, at 19; Stipulation, dated January 16, 2007, Stip No. 13.) Westwoods includes tidal wetlands along its Great Peconic Bay shoreline. (S125, at 19; Stipulation, dated January 16, 2007, Stip. No. 13.) A federal National Wetland Inventory map published for the Mattituck quadrangle contains the Westwoods property and identifies wetland habitats on the Westwoods property along the Great Peconic Bay shore that coincide with the United States Geologic Survey mapping of hydric soils, also an indicator of potential wetlands. (S125, at 19-20.)

The Coastal Area mapped by the NYSDOS includes a portion of the Westwoods property north of Newtown Road within the coastal zone for purposes of the federal Coastal Zone Management Act and related New York statutes. (S156; S125, at 19-20.)

(2) AIR RESOURCES

***35** Long Island, including Suffolk County, is in the Ozone Transport Region and is within a moderate non-attainment zone for nitrogen dioxide and ozone, two substances for which National Ambient Air

Quality Standards ("NAAQS") have been set. (S125, at 20-21.) Long Island, including Suffolk County, is in the non-attainment zone for particulate matter (dust) below 2.5 microns in size, a substance for which a NAAQS has also been set. (S125, at 21.)

(3) BIOLOGICAL RESOURCES

Terrestrial habitats contribute to the area's community character, as well as the well-being of the area's native species. (S125, at 21.) Westwoods is covered primarily by a "Pitch Pine-Oak Forest." (S125, at 21; Tr. 1842.) Extending shoreward (from north to south), Westwoods has three primary zones-coastal, transitional, and terrestrial woodlands-that contain the following ecological habitat types: maritime beach, maritime shrubland, maritime oak forest, pitch pine slope, pitch pine oak forest, successional maritime forest, successional old field, and maritime pitch pine dune woodland. (S125, at 21; Tr. 1842-43.)

The "maritime oak forest" habitat located on Westwoods has a high ecological value; the habitat "maritime pitch pine dune woodland" that is on Westwoods has been assigned the highest value available within New York for a habitat site because this habitat is especially vulnerable to extinction. (S125, at 21-22; S152, at 83, 123.) There is potential habitat on the bluff area located on the northern Westwoods parcel for a plant species known as the Nantucket juneberry, also known as the Nantucket shadbush (*Amelanchier nantuckentensis* ), an endangered species. (S125, at 27, Appendix B.)

Protection and sustainable management of the Peconic Estuary and its resources-including fish and shellfish-are critical to the community character and economic well-being of eastern Long Island. (S125, at 27-31.) The Peconic Estuary, to which Westwoods is hydrologically connected, is threatened by algal blooms; nutrient pollution arising from fertilizer runoff; infiltration from septic systems; storm water runoff and wastewater discharges; degradation and destruction of natural habitats on land adjoining the estuary; pathogen contamination of shellfish beds; and toxic chemical pollution from human activities. (S125, at 28-30.)

Although defendants' expert, James Mansky, states that Westwoods "is classified as Coastal Oak-Heath Forest in accordance with the document *Ecological Communities of New York State"* the Court credits the testimony of plaintiffs' expert, Robert Graver, that the correct habitat classification of the Westwoods property is pitch pine-oak forest. (S226, at 2; D259, at ¶ 11; Tr.1954.) Westwoods is part of a continuous pine barrens habitat that includes the Central Pine Barrens and possesses the same habitat characteristics as the pitch pine-oak forest that comprises much of the Central Pine Barrens.[FN35] (S226, at 2-3; Tr.1955.)

FN35. In any event, this dispute regarding classification is not critical in the Court's analysis regarding the impact on the forest on Westwoods from the development of the property.

***36** The forest on Westwoods can be characterized as one in excellent condition that exhibits the appropriate stratification and structure of a pitch pine-oak forest, has old-growth trees 90 to 110 years of age, does not have significant incursions of invasive species, is relatively large and unfragmented by Long Island standards, and supports many wildlife species indigenous to this habitat type. (S226, at 4; S125, at 25-26; Tr.1954.) Large numbers of small trees, mostly oaks, that were less than four inches, as measured in diameter at breast height ("DBH"), are present at Westwoods. (S226, at 4.) The presence of small trees at Westwoods is evidence that forest regeneration is actively taking place as older trees are lost to senescence, disease, and blowdown, and thus is an indication of good forest structure and vitality. (S226, at 4; Tr.1955.) Hundreds of small pitch pines and dozens of small oak have become established in the previously cleared five to ten acre area at Westwoods, demonstrating that the cleared area is rapidly undergoing reforestation. (S226, at 4.)

Approximately 30 species of birds were identified on Westwoods during two short visits by Mr. Grover to Westwoods on April 12, and August 9, 2006. (S226, at 5; Tr.1959.) The New York State Breeding Bird Atlas divides the state into survey blocks of nine square miles, and Block 7052A, which includes the Westwoods property, covers much of the area known as Hampton Bays. (S226, at 5.)

Interim data for 2000-2005 shows 73 breeding species for the survey block, of which at least 40 of these species nest in the type of habitat provided by the Westwoods property; since there is ample woodland habitat on the property, it is reasonable to assume that all or most of these species use the property for breeding purposes. (S226, at 5-6, Exhibit l;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Tr.1958-59.)

The Westwoods property also supports habitat for New York Special Concern Species, including the Eastern Box Turtle. (S226, at 5-6; Tr.1955-56.) Other special concern species, including the Sharp-shinned Hawk and Cooper's Hawk, would be expected on this property, based on habitat, during the winter. (S226, at 6.)

O. CURRENT COMMUNITY SERVICES IN SOUTHAMPTON GENERALLY AND AT WESTWOODS

Hospitals/medical centers that serve the eastern Long Island area, including the area of Westwoods, are Southampton Hospital (about 7.5 miles east, in Southampton); Peconic Bay Medical Center, formerly Central Suffolk Hospital (about 8 miles northwest, in Riverhead, New York); Eastern Long Island Hospital (about 30 miles northeast, in Greenport, New York); and University Hospital (about 33 miles northwest, at SUNY Stony Brook, New York). (S125, at 37.) Ambulance service for the area is provided by the Hampton Bays Volunteer Ambulance Corp, Inc., Flanders-Northampton Volunteer Ambulance Co., Inc., Riverhead Volunteer Ambulance Corps, Inc., Southampton Town Volunteer Ambulance Corps., and East Quogue Fire Department (a volunteer fire department). (S125, at 38.) Fire and rescue service for the area is provided by the following: Hampton Bays Fire Department (about 2 miles southwest); Flanders Fire Department (about 4 miles west); Southampton Fire Department (about 7.5 miles east); and Riverhead Fire Department (about 8 miles west). (S125, at 38.) The Town of Southampton Police Department would likely be the first responding agency in the event of a police emergency at Westwoods. (S125, at 38.)

***37** Westwoods is located within the Hampton Bays Water District ("HBWD"). (Stipulation, dated January 16, 2007, Stip. No. 8.) The HBWD supplies potable water for commercial and domestic use, and also provides fire protection water to businesses, schools, municipal agencies, apartment complexes, and private homes in the community of Hampton Bays. (S125, at 39.) As an undeveloped property, there is no current water demand on Westwoods. (S125, at 39; Stipulation, dated January 16, 2007, Stip. No. 11; Tr. 1843.)

Westwoods is not served by a community sewer system or municipal wastewater treatment plant, and in the absence of a community sewer system, residential, commercial, and industrial businesses must provide for their own wastewater treatment. (S125, at 40; Tr. 1843.) Two options for wastewater disposal at Westwoods are either a subsurface (on-lot septic tank with a leach field) or on-site wastewater treatment facility. (S125, at 40.)

As an undeveloped site, there is currently no demand for electrical power at Westwoods. (S125, at 41; Tr. 1843.) An electrical substation with a capacity of approximately 10 megawatts ("MW") is located south of Sunrise Highway about one-quarter mile from Westwoods. (S125, at 41; D248.)

A high pressure natural gas line is located approximately one-half mile southeast of Westwoods, and runs north along Newtown Road and terminates near Holtzman Drive southeast of Westwoods. (S125, at 41; Stipulation, dated January 16, 2007, Stip. No. 19.) As an undeveloped site, there is currently no demand for natural gas at Westwoods. (S125, at 41; Stipulation, dated January 16, 2007, Stip. No. 17; Tr. 1843.)

Because the Town does not provide curbside collection or disposal of solid waste, private collection service companies collect approximately one-half of the residential waste stream and all of the solid wastes generated by commercial, industrial, and non-hazardous institutional entities, as well as farms; large-volume generators must arrange for private haulers to collect and transport trash, recyclables, and construction/ demolition debris to receiving centers located outside the Town. (S125, at 41.)

P. SOUTHAMPTON DEMOGRAPHICS AND COMMUNITY CHARACTER

(1) DEMOGRAPHICS

Suffolk County's population on January 1, 2005 was estimated to be 1,483,396 persons, and is expected to increase between 2004 and 2030 by 19%. (S125, at 42.) In 1962, the County's saturation population was projected to be 3.4 million people, but a much lower saturation population is now expected due to lower average household sizes, zoning changes, land preservation efforts, and other measures taken by Southampton that also are designed to retain community character. (S125, at 42.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Southampton is the largest and most populated of the five "East End" towns of Suffolk County with a population (as of January 2005) of 58,564 permanent residents, including 504 residents of the Shinnecock Reservation (0.8% of the total Town populace). (S125, at 43.) The Southampton population swells dramatically during the summer tourist season from the July 4th to Labor Day holidays, reaching its peak in July and August at nearly triple the year-round population, with the second-home population comprising the largest component of Southampton's summer population. (S125, at 43; Tr. 1472-73.) Tourism and the vacation home industry drive the Town's economy. (S125, at 43.)

(2) AESTHETICS

***38** Unimpeded views of the beach along the Great Peconic Bay exist on Westwoods and adjacent properties, and recreational boaters and other users of the Great Peconic Bay can view the coastal bluffs, including the coastal transitional and terrestrial woodland zones. (S125, at 44.) These visual resources are unique and important visual corridors and vistas. (S125, at 44.) The coastal bluff is an important local aesthetic resource that contributes to the overall community aesthetics in the Town. (S125, at 44.) The Sunrise Highway is a Scenic Road Corridor. (S125, at 45.) Ambient sound levels on the Westwoods property are associated with residential activity on the western, eastern, and southern boundaries. (S125, at 45.)

(3) COMMUNITY CHARACTER

Westwoods is zoned residential 60,000 ("R-60"), and is surrounded by lands zoned as residential 80,000 ("R-80"), "R-60," and residential 15,000 ("R-15"), where 80,000 sf., 60,000 sf., and 15,000 sf., respectively, are the minimum lot sizes in the zoning classification. (S125, at 31-32, 47 and Figure 14; S167; T4.) Southampton's unique scenic quality and sense of place is derived from the interrelationship between rural farmland, areas of undeveloped open space, and the hamlet centers. (S125, at 47.) This rural character, with significant natural and historic resources, is the quality that maintains Southampton's economic vitality as a visitor attraction, as well as an attractive place to live and work. (S125, at 47; S167.) Southampton's zoning is intended to maintain its natural, historic, and scenic resources, green space and recreational areas, and promote affordable housing. (S125, at 34-37; S167.) Southampton's zoning is also intended to maintain a diverse economy that capitalizes upon but does not erode the Town's natural, historic, and scenic resources, and enhance its rural and historic scenery, beach, and recreational amenities, and cultural and specialty retail amenities, while protecting the established character and the social and economic well-being of both private and public property. (S125, at 35-36; S167.)

Q. THE NATION'S DEVELOPMENT PLAN FOR GAMING FACILITY AT WESTWOODS

The Gaming Authority is an instrumentality of the Shinnecock Indian Nation. (Stip. No. 49.) The Gaming Authority was formed by the Nation in or about 2003 in order to enter into a contract regarding gaming at Westwoods on behalf of the Nation. (D237; D238; Tr. 2842.) The Gaming Authority entered into a Development/Management Agreement ("Development/Management Agreement") with Ivy Ong and Ong Enterprise, LLC (collectively, "Ong"), dated May 1, 2003, for the development, construction, and operation of a gaming facility at Westwoods. (D237.) The intent of the parties to the Development/Management Agreement was that only the parties to the agreement would have the right to enforce any provisions of the Development/Management Agreement, and in particular, that the State and the Town would not have any right to enforce any provisions of the Development/Management Agreement. (D237, at ¶ 6.7; Tr. 2914-15.) A Closing Letter was executed on or about March 19, 2004, between Ong and Gateway Casino Resorts, LLC ("Gateway"), with the consent of the Gaming Authority, assigning the rights of the developer/manager set forth in the Development/ Management Agreement to Gateway. (D239; Tr. 2924.) An Addendum to the Development/Management Agreement was executed in or about March 2004, by the Nation, between the Gaming Authority and Gateway. (D238.)

***39** Mr. Gumbs negotiated the Development/ Management Agreement on behalf of the Nation and its Gaming Authority. (Tr. 2886.) The Development/ Management Agreement provides for an Initial Facility of approximately 61,000 sf. on a 15-acre tract of land on Westwoods (on the south side of Newtown Road) capable of holding between 900-1000 gaming machines and 60 table games. (D237; D238.) The Development/ Management Agreement also provides the developer/manager a right of first refusal with

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

respect to the expansion of gaming facilities on other portions of Westwoods. (D237, at ¶ 4.4; Tr. 2913-14.) The Gaming Authority, with approval of the Nation, could enter into a contract with another developer for development on those portions of Westwoods not the subject of the Development/ Management Agreement and provide for development on those portions of Westwoods, and it is the position of the Nation that should its at-large council agree, the Nation could develop all portions of Westwoods without regard to any New York or local law. (Tr. 2916.)

The Development/Management Agreement provides that the construction, maintenance, and operation of any gaming facilities at Westwoods would be conducted "in a manner which adequately protects the environment and the public health and safety and for that purpose shall comply with the requirements of all other applicable health, safety and environmental standards enacted by the Tribe" and would comply with "[t]hose standards generally imposed by the laws and regulations of the State relating to public facilities with regard to building, sanitary and health standards and fire safety ... [and] water discharges ...," except that if there are "federal water standards specifically applicable to the Reservation [they] would preempt such State standards."(S237, at ¶ 6.7.) However, the Nation could excuse compliance with such standards in the future. (Tr. 2915.) Moreover, although the Development/Management Agreement as amended by the Addendum provides for the construction of gaming facilities and related ancillary facilities on 15 acres at Westwoods, the Nation could allow construction of additional facilities at Westwoods on other portions of Westwoods in the future, including portions of Westwoods north of Newtown Road. (S237, at ¶ 4.4; S238, at (4), (10); Tr. 2929.)

## R. CONFIGURATIONS OF OTHER POTENTIAL CASINO COMPLEXES AT WESTWOODS

The Nation and its Gaming Authority have received several gaming facility configurations ranging from a temporary gaming facility to a multi-component entertainment complex. (S113-16; S118-19.) In the past, the Economic Development Committee of the Nation has considered economic development proposals that include development constructed on portions of Westwoods north of Newtown Road, including the construction and operation of a marina along the north shore of Westwoods in Great Peconic Bay. (S113-16; S118-19; Tr. 2906-08.)

The following components of a casino complex have been identified by developers and others for a casino complex at Westwoods: (a) temporary casino (21,600 sf., including a 1,200-1,300 seat bingo hall); (b) casino (130,000 sf.); (c) theater (3,000 seat, 50,000-60,000 sf.); (4) retail (75,000 sf.); (d) hotels (1,604 rooms), including a 400 room, 6 floor hotel on northern parcel, a 600 room, 4 floor hotel on northern parcel, a 300 room hotel on southern parcel, a 160 room hotel on southern parcel, and a 144 room hotel on southern parcel; (e) spa (25,000 sf.); (f) convention center (50,000 sf.); and (g) restaurants. (S113-16; Tr. 1840, 1867-69.) The proposed 130,000 sf. casino would contain 3,500 gaming devices and 140 table games, not including "back of the house" space. (S113.)

***40** The Tribe may ultimately construct (or expand) a gaming facility at Westwoods to the maximum extent possible, restricted only by the physical dimensions of the site. (S125, at 1-2; Tr. 1840-41.) Speaking on behalf of the Nation, Mr. Gumbs has said that "[o]nce [the Tribe] get[s] a shovel in the ground we can do whatever we want" when discussing the building of a casino at Westwoods. (Tr. 1479-80.) Westwoods is physically large enough to accommodate a casino and commercial and hotel components as described above, with enough space to allow expansion of the casino to 340,000 sf., a casino complex similar in size to that at Foxwoods in Connecticut that occupies approximately 54 acres. (S125, at 2-3 and Figure 2.)

Win per unit per day ("W/U/D")-how much a gaming device wins per day on average within a gaming facility-is a major factor in determining the potential size of a gaming facility in terms of its overall revenue profitability. (Tr. 1394, 1397.) At a minimum, a casino with a W/U/D within the range of $180 to $240 is financially viable. (Tr. 3216.) It is a conservative conclusion that a stand-alone casino at Westwoods comprising 162,500 sf., including a 130,000 sf. casino and approximately 32,500 sf. of "back of the house" space, with 3,500 gaming devices and 140 table games, would likely have a W/U/D of approximately $300, and would be financially viable. (S1, at 3, 6-8; Tr. 1392-93, 1395-96.)

As concluded by defendants' expert, Steven Rittvo, a casino at Westwoods with 6,500 positions and a 1,000 person hotel would be financially viable and have a W/U/D in excess of $220. (S268; Tr. 3113-15; 3212-13, 3216.) Mr. Rittvo also concluded that a casino in Mastic, New York, just 20 to 25 miles closer to New York City than Westwoods, with 6,500

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

gaming positions, would likely generate a W/U/D of more than $300 and have an attendance in excess of 7.6 million visitors per year. (Tr. 3228-30; S14, at 2-4; S271.)

The difference in travel time from New York City and other locations west of Mastic to Mastic, as compared with travel time from New York City and other locations west of Mastic to Westwoods-approximately 25 minutes-would not account for a significant reduction in the number of visitors to or the financial performance of a casino at Westwoods as compared to a casino at Mastic. (S14, at 2-4.)

S. PHYSICAL COMMENCEMENT OF CASINO PROJECT AT WESTWOODS

On or about July 12, 2003, trees and brush were cleared by use of a bulldozer and other construction equipment from a portion of Westwoods located to the south of Newtown Road. (Stip. No. 47.) The clearing of trees and brush within Westwoods, on or about July 12, 2003, was done by the Shinnecock Indian Nation in furtherance of its intention to construct a building on a site within Westwoods located to the south of Newtown Road, in which it intended to conduct gaming. (Stip. No. 48.) Shinnecock Trustee Bess was unable to identify any activity at Westwoods that occurred prior to the clearing of land in 2003 for a casino as to which he believed the Town could have enforced its laws, but did not. (S248, at 212.) No evidence was presented at trial by defendants that the Shinnecocks had engaged in any activity or use of Westwoods prior to their 2003 clearing of land for a casino with respect to which the Town could have enforced any of its zoning or land use laws, but did not.[FN36]

FN36. Michael Benincasa is now the Chief Building Inspector for the town. He testified that, before he did his 2003 physical inspection of Westwoods following the clearing of the land for the casino, he had never had any occasion to inspect anything at Westwoods or enforce zoning or building regulations at Westwoods because it was vacant property. (D364, at 51-52, 67.) He understood at the time of the inspection that Westwoods was zoned residential and advised the people present on the property that clearing the land was a violation of the Town Code, but he received no response. (D364, at 54-56.)

***41** Neither the Nation, nor any representative, Trustee, or any other person or entity acting on the Nation's behalf, has done the following: (1) applied for or received site plan approval for any activity at Westwoods from the Town for any purpose at any time (Stip. No. 51); (2) submitted environmental or building permit applications to the Town showing compliance with Town zoning laws, fire code regulations, and New York environmental laws with respect to any building to be constructed at Westwoods (Stip. No. 53); (3) applied for or received permission from the Southampton Town Planning Board to engage in any activities at Westwoods in preparation for its development (Stip. No. 55); or (4) applied for or received any permit or approval from the Town for any activity conducted or to be conducted on any portion of Westwoods (Stip. No. 56). Prior to the summer of 2003, there had been publicized efforts by the Shinnecocks to develop Westwoods. (Defs. Ans. to Town Compl., at ¶ 12.)

As discussed *supra,* the zoning classifications of the properties in the general vicinity of Westwoods are predominately residential. (Tr. 253.) Southampton has a Comprehensive Plan, which sets forth the Town's vision, goals, policies, and objectives regarding growth within the Town, and which sets forth where inhabitable land usage (residential, commercial, or industrial) should go, and which seeks to avoid incompatible land usage. (Tr. 233, 235-36.) Southampton's adoption of zoning laws and zoning designations is a mechanism by which the Town implements its Comprehensive Plan, and the zoning laws and designations must be consistent with the Comprehensive Plan. (Tr. 233-34.) Construction of a gaming casino at Westwoods would be inconsistent with the Comprehensive Plan. (Tr. 253-54.) There are no planning goals of the Town that would be satisfied by the construction of a casino at Westwoods. (Tr. 254.) The construction of a casino at Westwoods would be entirely out of character and inconsistent with the Comprehensive Plan. (Tr. 254.)

Chapter 325 of the Town Code contains the Town's wetland protection law. (T268.) In Southampton, the purpose of a wetlands permit is to ensure that any land disturbance or development that occurs in wetlands or within 200 feet of wetlands does not result in significant adverse impacts to wetlands. (Tr. 276-77.) Land disturbances or development within 200 feet of wetlands includes the clearing of natural vegetation, grading, excavation, placement of fill, building,

structural changes, the installation of any man-made structure, planting, or landscape activities. (T268; Tr. 277-78.) The northern parcel of Westwoods contains or lies adjacent to wetlands, as the Great Peconic Bay system is regulated as wetlands under Chapter 325 of the Town Code. (Tr. 279-80.)

The Peconic Estuary, which includes the Great Peconic Bay, has been designated as an estuary of national significance by the United States Environmental Protection Agency. (Tr. 280.) Development on the northern parcel of Westwoods could implicate Chapter 325 of the Town Code. (Tr. 281.) Notwithstanding the Nation's stated intention to meet or exceed federal, state, and local environmental standards in connection with the development of a casino at Westwoods, the Nation admitted that no assessment or analysis had been done to determine whether it would be feasible to meet or exceed those standards in connection with a gaming facility at Westwoods. (Tr. 2886-88, 2947; D237, at 6.7; S248, at 193-94.)

T. IMPACT OF CONSTRUCTION AND OPERATION OF A CASINO COMPLEX AT WESTWOODS

***42** As set forth in detail below, based on the evidence at trial, the Court concludes that the construction and operation of a casino complex at Westwoods would disrupt the Town's governmental administration and the settled expectations of Southampton residents, and have disruptive environmental and traffic impacts in Southampton, as well as in Suffolk County generally.

(1) FAILURE TO COMPLY WITH STATE ENVIRONMENTAL PERMITTING REQUIREMENTS

None of the defendants, nor any person or agency acting on behalf of any of the defendants, has submitted any application for any type of permit or authorization from New York alleged by the plaintiffs to be required for development of the Westwoods Parcel. (Stipulation, dated January 16, 2007, Stip. No. 1.) The construction of a casino at Westwoods likely would require the following permits or authorizations that under New York law are issued by the DEC: (a) a permit for the construction and operation of a waste water treatment facility that will discharge to ground or surface waters pursuant to ECL Article 17; and (b) the SPDES General Permit for Stormwater Discharges from Construction Activity, Permit No. GP-02-01, pursuant to ECL Article 17, titles 7 and 8, and ECL Article 70. (Stipulation, dated January 16, 2007, Stip. No. 27.) The DEC would generally use certain procedures in conducting the assessments or studies relating to the issuance of any permits or authorizations in connection with the proposed construction of a casino at Westwoods, including likely requiring the preparation of an environmental impact statement ("EIS") with public notice and review.[FN37](Stipulation, dated January 16, 2007, Stip. No. 25.)

FN37. The procedures are set forth in more detail in the January 16, 2007 Stipulation, Stip. No. 25.

Neither the Nation, nor any representative, Trustee, or any other person or entity acting on its behalf, has submitted a completed environmental assessment or any other form to the DEC with respect to construction of any building to be constructed at Westwoods. (Stip. No. 52.) No project for development of Westwoods by the defendants, or by any person or agency acting on behalf of any of the defendants, has been the subject of a consistency review pursuant to the Waterfront Revitalization and Coastal Resources Act, State Executive Law, Article 42 and 19 N.Y.C.R.R. Part 6. (Stipulation, dated January 16, 2007, Stip. No. 2.) The Nation has enacted no environmental statutes, laws, or regulations. (Tr. 2887.)

(2) NON-TRAFFIC RELATED ENVIRONMENTAL IMPACTS

The type of construction activities that reasonably could be expected for a casino complex at Westwoods include the following: site clearing, grubbing, and grading; excavation and fill activities; hauling of construction materials, and of construction debris; transport of construction workers to and from the site; material staging; sand mining; material backfilling; excavation dewatering; storm water management; construction of foundations and facilities, roadways, parking, signage, and lighting installation, or the extension of infrastructure (water, sewer, electrical power, natural gas, telecommunications, and cable); and site restoration and landscaping. (S125, at 3.)

***43** The types of equipment that would be required to construct a casino complex include the following: earth-moving equipment (front loaders, bulldozers,

dragline, backfillers, scraper/graders, and trucks); materials-handling equipment (concrete mixers, concrete pumps, a motor crane, and delivery trucks); and stationary equipment (pumps, generators, compressors, lighting, fuel storage, dumpsters, roll-offs, and other waste handling and storage equipment). (S125, at 3-4.) Construction activities would likely extend over a 24-month time period based on an 8 hours per day, five to six days per week schedule. (S125, at 4.) A casino at Westwoods most likely would operate 24 hours per day, 7 days per week, consistent with other existing casinos in the northeast such as Foxwoods Resort Casino, Mohegan Sun, and Turning Stone Resort Casino. (S125, at 4.) Impacts on adjacent properties, including those associated with operational noise and traffic, would be expected to occur during the 24-hour period. (S125, at 5.)

As set forth below, even without consideration of the adverse impacts arising from increased traffic to and from an operating casino at Westwoods, construction and operation of a casino at Westwoods would have disruptive practical consequences, disrupt settled expectations of the local communities and residents surrounding Westwoods, and seriously burden the administration of state and local governments.

(A) IMPACTS TO GEOMORPHOLOGY

On the approximately five to ten acres that have been cleared at the Westwoods site, no measures are present to prevent erosion of cleared soils and vegetation, and new erosion patterns are visible from the action of storm water runoff on the site. (S125, at 49.) Because of the large sand content (70 to 100%) of the soil, it could be mined for use as a sand source, and development projects in the region are known to remove (mine) sand for sale elsewhere, while lower quality fill is hauled to the development site as replacement material. (S125, at 11.)

Potential short-term (construction-related) adverse impacts on geological resources from the construction of a casino complex at Westwoods include the following: (a) increased erosion due to the clearing of existing soil-stabilizing vegetation; (b) increased erosion and sediment transport due to additional site clearing, grading, and the stockpiling of soils at the site; (c) the absence of erosion control measures will result in soil erosion and sedimentation of adjacent, downgradient surface waters in the Peconic Bay watershed, including the nearshore area of the Great Peconic Bay; (d) erosion, storm water runoff, and flooding, or ice formation in the winter, have the potential to impact NYS Route 27 due to the proximity of the southern boundary of the property immediately adjacent to the highway's right-of-way corridor; (e) degradation of surface and ground water quality from the discharge of chemicals, solvents, and petroleum products from heavy machinery and other construction uses; and (f) impacts on air quality due to dust generation during construction. (S125, at 49-50; Tr. 1845.)

***44** Potential significant long-term adverse impacts to geological resources from the operation of a casino complex at Westwoods include the following: (a) incompatibility of facility design with on-site geologic conditions (*i.e.,* seismic zones, soils, and subsurface conditions), and consequent safety risks if facility designs are not prepared consistent with established practices for seismic protection and geotechnical considerations and are not subject to appropriate review and oversight; (b) permanent modifications to existing topography due to site grading activities resulting in the loss of the scenic quality afforded by the undulating (morainic) characteristics of the site; (c) degradation and instability of the existing coastal bluff through reduction in vegetation cover, increased slopes, and consequent erosion, affecting the surrounding land and the shape and form of the beach below, and increasing sedimentation in the nearshore water; (d) accelerated erosion of the bluff due to a significant increase in human activities on the steeply-sloped bluff, the increased numbers of people who will have uncontrolled access to the bluff, and the increased quantity of storm water runoff; (e) if wastewater discharges are directed to the bluff directly or indirectly, accelerated erosion of the bluff; (f) as a result of the instability to and deterioration of the bluff, reduced capacity for the bluff to act as a natural protective barrier against wave energy and high water; (g) significantly increased erosion potential due to regrading, vegetative clearing, and an increase in storm water runoff resulting from the creation of impervious surfaces (*e.g.,* rooftops, parking lots, sidewalks, and roads); (h) in full development of property, adverse impacts on the surrounding residential neighborhoods from eroding soils, sediment transport, increased storm water runoff, and localized flooding; and (i) impairment of the natural viewshed due to changes in local topography, the deterioration of the coastal bluff, and the imposition of structures on the viewshed that includes the bluff and the beachfront at the Great Peconic Bay. (S125, at

50-51.)

(B) IMPACTS TO WATER RESOURCES

Potential short-term (construction-related) adverse impacts to water resources from the construction of a casino complex at Westwoods during construction include the following: (a) off-site sediment transport resulting in sedimentation of surrounding surface waters including the nearshore area of the Great Peconic Bay, degrading water quality of affected surface waters and adversely affecting aquatic habitats, recreational uses, and aquaculture; (b) deposition of eroded sediments on adjacent properties resulting in drainage and aesthetic/landscaping problems that can be costly for homeowners to address; (c) discharge of petroleum products stored in tanks (*e.g.,* diesel fuel for construction vehicles and gasoline for other machinery) and 55-gallon drums (*e.g.,* lubricating oils), solvents in containers up to 55-gallons in size for parts cleaning and related machinery maintenance, as well as cleaning agents, paints, thinners, and other materials containing solvents, all of which are subject to leaks, spills, and general releases thereby impacting surface and ground water quality and aquatic habitats on- and off-site; and (d) impacts on tidal wetlands and buffer along the Great Peconic Bay shoreline, including removal of wetland vegetation and habitat, and erosion and sedimentation. (S125, at 52-53.)

***45** Potential long-term impacts to water resources from the operation of a casino complex at Westwoods include the following: (a) because of the significant amount of impervious surfaces (*e.g.,* parking lots, buildings, sidewalks, and paved areas), reduced opportunities for rainfall and snowmelt to percolate to ground water to recharge the aquifer; (b) an increase in runoff with the potential to negatively impact surface water quality; (c) increased nutrient loading of nearby surface waters, including the Peconic Bay Estuary, due to increases in storm water runoff at the site from the increase in impervious surfaces; (d) modifications to the existing floodplain elevation along the Great Peconic Bay shoreline and construction of facilities within the designated flood zone altering the conveyance of floodwaters that can result in flooding of adjacent lands and destabilization of the coastal bluffs; (e) direct (*i.e.,* filling) or indirect (*i.e.,* disruption of drainage patterns and hydraulic inputs) impacts on nearshore wetland habitats and associated values and functions; (f) increased instability of the bluff resulting in sedimentation of surrounding surface waters including the nearshore area of the Great Peconic Bay, degrading water quality of affected surface waters, and adversely affecting aquatic habitats, recreational uses and aquaculture; (g) removal of wetland vegetation and wetland habitat erosion and sedimentation, and permanent damage to wetland functions and values; and (h) increase in the contribution of toxic compounds to surface waters, including the Peconic Estuary, due to the use of toxic substances at Westwoods. (S125, at 53-54; Tr. 1846-47.)

(C) IMPACTS TO AIR RESOURCES (NON-TRAFFIC RELATED)

Potential adverse long-term impacts on air resources include emissions from the following: (a) natural gas or fuel oil fired boilers; (b) emergency/standby generators; (c) motors associated with fire pumps; (d) heating, ventilation, and air conditioning ("HVAC") systems; and (e) off-site power generating facilities required to provide electricity to the site. (S125, at 56.)

(D) IMPACTS TO BIOLOGICAL RESOURCES

Potential short-term (construction-related) adverse impacts on biological resources (other than fish, shellfish, and bay biota) from the construction of a casino complex at Westwoods include the following: (a) short-term displacement of species during construction phase activities; and (b) loss of wildlife food and cover, as well as disruption of normal nutrient cycling during construction activities. (S125, at 60.)

Potential long-term significant adverse impacts on biological resources (other than fish, shellfish, and bay biota) from the operation of a casino complex at Westwoods include the following: (a) the permanent loss of maritime pitch pine dune woodland habitat at Westwoods, which has been identified as being rare, (SI), and especially vulnerable to extinction in New York; (b) habitat modifications and/or degradation due to vegetative clearing and removal of trees (including trees 90 to 110 years old); (c) loss of habitat (maritime oak forest) identified as having limited acreage, (S3), or vulnerable to extinction, (S2), in New York; (d) removal, significant reduction, or segmentation of the coastal, transitional, and/or woodland zones characterizing Westwoods; (e) loss of diverse habitats on Westwoods, several of which are fragile, not well-represented in New York, and subject to extinction; (f) introducing of "edge" habitat along

the perimeter of the clearing that will facilitate the incursion of undesirable species into the interior portions of the woodland areas, resulting in the displacement of native birds; (g) degradation of important coastal habitats and consequent impacts due to construction and operation of gaming-related facilities and influx of a significant concentration of people (casino patrons) along the Great Peconic Bay shoreline; (h) increased development pressures of Town lands from businesses that provide support to the casino development (such as suppliers, vendors, maintenance and repair, and business support) or businesses that will leverage the casino operations for their own gain (such as other entertainment, restaurant, hotel, retail, or service ventures). (S125, at 61; S226, at 3; Tr. 1848, 1957-58.)

***46** The lights, noise, and activity associated with the use of a casino complex at Westwoods will further disturb the wildlife in any remaining woodlands, further degrading the woodlands' value as a habitat. (S226, at 4.)

(E) IMPACTS TO LAND USE

Potential long-term adverse impacts related to land use from the operation of a casino complex at Westwoods include the following: (a) reductions in the residential quality of life in areas surrounding Westwoods resulting from lighting, noise, traffic, litter, the presence of multi-story buildings, the absence of buffers, and other operational characteristics of a casino; (b) impairment of the area's rural character resulting from, among other things, the daily assembly of a large number of people on the surrounding streets and increased commercialization; (c) increased potential for accidents, and increased dust and vehicle air emissions that can adversely affect the health, safety, and welfare of the existing, surrounding residents; (d) loss of the ability for the Town to manage its finite infrastructure resources consistent with the Comprehensive Plan; (e) loss of a vegetative buffer between Westwoods and adjacent residential land uses; and (f) increase in ambient noise in the adjacent residential neighborhoods from truck and other vehicular traffic. (S125, at 63-64; Tr. 1848-50.)

(F) IMPACTS TO COMMUNITY SERVICES

I. FISCAL IMPACTS

The daily number of employees at a 130,000 sf. casino (with an additional 32,500 sf. as "back of house" space) at Westwoods, with related hotels and related facilities, are to be estimated between 3,227 and 4,927, with approximately one-third of the employees on site at one time.[FN38] (S16, at ix and 4 (Table 3).) The daily number of visitors at a 130,000 sf. casino at Westwoods with related hotels and related facilities is estimated to be between 17,994 and 35,000. (S16, at ix, and 4 (Table 3).) The total daily population at a casino that would be built at Westwoods is estimated to be between approximately 21,000 and 40,000, with between approximately 10,500 and 19,500 persons present at any one time. (S16, at ix and 4 (Table 3).)

FN38. As noted above, it was estimated that the130,000 sf. casino would also include 32,500 sf. for "back of house" space. As discussed *supra,* based upon the expert evidence offered at trial, the Court concludes that a casino of this size certainly would be economically feasible at Westwoods.

If the Nation exercises exclusive sovereignty over Westwoods, no revenue to the Town will be generated by local taxes during the operation of a casino at Westwoods, although Town costs for the provisions of local services will increase. (S16, at viii, 3, 34.) The total cost of municipal services for the Town are likely to increase by $21.1 million if a 130,000 sf. casino with related hotels and facilities operates at Westwoods over a build-out period of 4 and one-half years and the first 1 and one-half years of operation. (S16, at xiii, 2, 34-38.) For example, the total cost of municipal services for the HBWD and Ambulance District are likely to increase by over $5.3 million if a 130,000 sf casino with related hotels and facilities operates at Westwoods over a build-out period of 4 and one-half years and the first 1 and one-half years of operation. (S16, at xiii, 36-37.) Moreover, the total cost of State Police services is estimated to increase by over $2.1 million if a 130,000 sf. casino with related hotels and related facilities operates at Westwoods over a build-out period of 4 and one-half years and the first 1 and one-half years of operation. (S16, at xiv, 38.)

II. OTHER IMPACTS RELATING TO COMMUNITY SERVICES

***47** The operation of a casino complex at Westwoods, the influx of a significant amount of people to one site, the increased traffic congestion on local roads

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(discussed *infra* ), and the incompatible nature of the proposed use with the surrounding existing residential uses will cumulatively result in the increased need for emergency services including the following: (a) police and security services to respond to emergency situations including theft/burglary, drunk driving, underage drinking, noise complaints, and trespass on adjacent residential properties; (b) police and security services to manage potential conflicts between users of the gaming facilities and adjacent landowners; (c) police and emergency services associated with increases in traffic accidents; (d) police services associated with managing traffic flow; (e) emergency services associated with responding to health-related emergencies at Westwoods; and (f) emergency services associated with fighting fires (including potential multi-floor fires) at Westwoods. (S125, at 66, 77; Tr. 1851.)

(G) IMPACTS TO POTABLE WATER SUPPLIES AND DISTRIBUTION

The existing water transmission network is unable to support necessary fire flow demands. (S125, at 67.) Development of a casino at Westwoods would significantly increase potable water demand. (S125, at 68.) The current system pumping capacity of 6.7 million gallons per day ("MGD") cannot accommodate a Westwoods casino development. (S125, at 67-68.) The existing water transmission system, consisting of combinations of 4-inch, 6-inch, 8-inch, 10-inch, and 12-inch diameter mains, depending on which water supply pump stations may be providing water at any given time, will not support a seasonal population water demand with the addition of a casino at Westwoods. (S125, at 68.)

Modifications to the HBWD's existing water supply, storage, and conveyance system would be necessary to support a casino at Westwoods. (S125, at 68; Tr.1902-03, 3300-01.) Potential long-term adverse impacts from modifications of the HBWD's existing water supply, storage, and conveyance system include the following: (a) localized drawdown of ground water elevations and increased salt water intrusions from pumping of an on-site well supply or increased pumping of existing municipal supplies to meet Westwoods's water demands; (b) increased cost of potable water supply resulting from the cost of new well sites, acquisition of buffer areas around well sites, pipes, and related equipment necessary to pump and convey additional supplies of potable water; and (c) reduced groundwater supplies for use as potable water for uses other than the casino at Westwoods. (S125, at 14, 68; Tr.1923-24.)

Potential adverse impacts from the construction and use of an on-site water supply source (*i.e.,* well(s) and a storage facility (for fire flows)) to provide potable water for a casino include the following: (a) increased intrusion of salt-water into the Upper Glacial aquifer, thus limiting its usefulness as a source of water supply for the HBWD; (b) localized drawdown of ground water due to pumping of an on-site well supply; (c) impairment of the area's viewshed resulting from the installation of a water storage tank; (d) additional site clearing associated with constructing water supply facilities; (e) additional security measures associated with protecting water supply; and (f) additional treatment chemicals on site and increased potential for spills associated with water treatment. (S125, at 68.)

(H) WASTEWATER TREATMENT IMPACTS

***48** Operation of a 130,000 sf. casino at Westwoods will require the construction and operation of a wastewater treatment facility capable of handling a design wastewater peak flow rate of 1.44 MGD with effluent discharges to either groundwater or surface waters. (S125, at 69.)

Because estimated sewage flows exceed the maximum population density equivalent flow rate of approximately 46,200 gallons per day that could be treated using an on-lot subsurface septic system, a wastewater treatment facility will be necessary in order to prevent contamination of groundwater or surface waters if a 130,000 sf. or a 300,000 sf. casino were to operate at Westwoods. (S125, at 69.)

If a casino of 130,000 sf. or larger were opened at Westwoods, the potential long-term environmental impacts of a discharge to groundwater or surface waters, even with a wastewater treatment plant, include the following: (a) reduction in groundwater and surface water quality resulting from the discharge of nutrients and oxygen-demanding substances and disinfectants, which are residual in the treated wastewater; and (b) increased likelihood of algal blooms due to nutrient discharges to nearshore waters. (S125, at 69.)

(I) SOLID WASTE IMPACTS

Potential adverse environmental impacts associated

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

with the collection, on-site storage of solid wastes, and subsequent hauling to offsite transfer/disposal facilities from a casino complex at Westwoods include the following: (a) generation of odors from stored solid wastes causing nuisance conditions to neighboring residential properties; (b) visual impairment due to litter generated by visitors and wastes dropped along local roads; (c) increased noise resulting from the operation of solid waste compactor units and trucks hauling solid wastes to off-site transfer/disposal facilities; and (d) potential for increased numbers of vermin (*i.e .,* rodents and insects) and resultant health and safety issues. (S125, at 73.)

(J) AESTHETIC IMPACTS

Short-term and long-term aesthetic impacts from construction and operation of a casino complex at Westwoods include the following: (a) encroachment on setbacks and height restriction exceedances typically applied to residential areas (if there is maximum build-out); (b) visual impacts on the coastal bluffs and scenic highway (Sunrise Highway); (b) significant changes in the viewshed from the Great Peconic Bay; (c) significant loss (if not elimination) of the tree buffer between the Westwoods site and adjacent residential land uses; (d) increased noise due to significant traffic increases on Newtown Road and Sunrise Highway; (e) increased noise due to day-to-day operations such as deliveries and workers' entering and exiting the establishment; (f) increased noise due to building HVAC units and restaurant exhaust fans; (g) irreversible changes to the neighborhood and Town community character; (h) light pollution from facility and parking lot lighting; and (i) noise from facility patrons. (S125, at 75-76.)

(K) IMPACTS FROM ENERGY INFRASTRUCTURE CONSTRUCTION AND OPERATION

***49** Potential adverse short-term and long-term impacts from the construction of electrical transmission lines to the site to provide the necessary energy needs of facilities at Westwoods include the following: (a) disruption of traffic along residential roads during construction causing potential congestion, as well as safety issues (*e.g.,* traffic accidents and injuries); (b) particulate air emissions during construction potentially resulting in visual impairment and health-related respiratory effects (*e.g.,*asthma and reduced lung capacity); (c) increased noise impacts on neighboring residential properties during construction; (d) additional growth inducing aspects and associated impacts from increasing electrical capacity to the area; (e) impairment of the area's viewshed due to overhead power lines and poles; and (f) traffic disruption during routine maintenance of the power lines and poles. (S125, at 56, 71-72.)

Potential adverse long-term impacts from the extension of a natural gas supply line to Westwoods to provide for on-site natural gas and the operation of a cogeneration facility in lieu of extension of high power lines include the following: (a) an increase in the localized area of criteria air pollutants including carbon monoxide ("CO"), hazardous air pollutants ("HAPs"), greenhouse gases such as nitrogen oxides ("NOx"), particulate matter equal to or less than 10 microns ("PM10"), sulfur dioxide ("SO2"), and volatile organic compounds ("VOCs"); (b) ground level ozone formation as a result of NOx, VOC, and CO emissions; (c) visibility impairment impacts as a result of NOx and S02 emissions; (d) acid rain impacts as a result of NOx and SO2 emissions; (e) traffic disruption for routine maintenance of the natural gas lines; and (f) additional growth-inducing aspects and associated impacts from increasing natural gas capacity to the area. (S125, at 57-58.)

Potential adverse long-term impacts from the operation of on-site storage of distillate oil and an on-site distillate oil-powered cogeneration facility, such as a No. 2 fuel oil powered cogeneration facility, include the following: (a) an increase in the localized area of criteria air pollutants including CO, HAPs, NOx, PM10, S02, and VOCs; (b) ground level ozone formation as a result of NOx, VOC, and CO emissions; (c) visibility impairment impacts as a result of NOx and S02 emissions; (d) acid rain impacts as a result of NOx and S02 emissions; (e) potential for spill or leaks of fuel oil during storage tank re-filling operations; (f) potential for spill or leaks from the storage tanks during normal facility operations or catastrophic failure; (g) potential contamination of surface and ground water resources due to spills or leaks; and (h) roadway congestion and safety concerns due to daily trucking of fuel oil deliveries on residential roads in order to access the site. (S125, at 58.)

(L) TRAFFIC-RELATED IMPACT

As set forth below, the Court concludes that the operation of a casino at Westwoods would have substantial disruptive impacts on the community due to increased traffic.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3307089 (E.D.N.Y.)
**(Cite as: Slip Copy)**

Page 43

1. TRAFFIC ANALYSIS

***50** The engineering firm of Greenman-Pedersen, Inc. ("GPI") was retained by the State to conduct an analysis of the traffic impacts that would be created by the construction and operation of a casino complex at Westwoods. (S108, at 2; Tr. 1519.) The traffic impact analysis was conducted by the Transportation Service Division of GPI, headed by Michael J. Salatti, a Professional Engineer and a Professional Transportation Operations Engineer. (S108, at 2; Tr. 1510-11, 1514, 1519.) The Court found this analysis to be credible and reliable in determining potential traffic impact and the results of that study are summarized below. In analyzing the traffic impact of a proposed land use, traffic engineers assume a "reasonable-worst-case" scenario in order to ensure that all the actual impacts are assessed and addressed.[FN39](Tr. 1528, 1530.) In order to analyze a "reasonable worst-case" scenario, GPI analyzed the traffic impacts of a casino complex at Westwoods during the peak traffic hours in the peak summer season. (S77, at 6-7.)

FN39. GPI's analysis is contained in an initial report and an addendum to that report. (S77; S108.) GPI also prepared a rebuttal report addressing the analysis of defendants' experts. (S95.)

2. 2006 (BASELINE) TRAFFIC

Traffic on the east end of Long Island has been growing progressively slower and more congested since the 1990s. (Tr. 1438-39.) People driving to the Hamptons from the New York City area take the Long Island Expressway to CR 111 to SR 27 as the preferred route. (Tr. 1445-46, 1449.) There currently is congestion on CR 111 during the peak periods of Friday afternoon and Saturday morning going eastward and Sunday afternoons and Monday mornings going westward during the months of April through October, and particularly heavy congestion in the months of July and August during such periods, and including Thursday nights going eastward. (Tr. 1449-50.) The Hamptons Bottleneck is where SR 27 becomes CR 39 going eastward near the intersection of SR 27/CR 39 and North Road. (Tr. 1452-53.)

The Town has legitimate concerns that changes to improve traffic on SR 27/CR 39 and to relieve the traffic at the Hamptons Bottleneck have created safety problems. (Tr. 1458-59.) In addition, congestion on SR 27 and CR 39 east of Southampton has not been relieved by measures addressing congestion at the Hamptons Bottleneck. (Tr. 1459-60, 1468.)

Traffic at the traffic circle on SR 24 is very heavy with severe congestion in various directions along the circle's entry points. (Tr. 1448.) There are backups and heavy traffic blocking SR 24 leading to the intersection of SR 24 and Old Montauk Highway. (S95, at 31-33; Tr. 1464-65.)

The roads around Westwoods are smaller, winding residential roads without shoulders and curbs and usually without sidewalks and street lights, and are inappropriate for travel by tour buses. (Tr. 1466-67.) GPI analyzed current traffic impacts in the vicinity of Westwoods in April and June of 2006. The primary study area included roadways close to the project site that would receive the maximum number of vehicle trips generated by the proposed casino complex at Westwoods. The secondary study area encompassed locations further from the site and included major intersections, ramps, weaving areas, and corridors on roads from the New York. City metropolitan area to Westwoods. (S77, at 7-9.)

3. BUILD CONDITION 2010 (TRAFFIC IN 2010 WITH CASINO COMPLEX AT WESTWOODS)

***51** The traffic volume estimated for the "2010 Build Condition" consists of traffic capacity without a casino complex (the "No-Build 2010 Condition") on the primary and secondary street network [FN40] plus the new traffic generated by operation of a casino complex at Westwoods for the Friday and Sunday PM peak traffic hours during the peak summer season. (S77, at 26.) GPI assumed the following elements of a casino complex at Westwoods when calculating vehicle traffic generated by its operation: (a) casino (130,000 sf. with 4,785 gaming positions); (b) theater (50,000-60,000 sf. with 3,000 seats); (c) retail (75,000 sf.); (d) casino hotel (600 rooms, 4 stories); (e) casino hotel (400 rooms, 6 stories); (f) spa (25,000 sf.); (g) convention center (50,000 sf.); (h) temporary casino (21,600 sf.); (h) free-standing hotels (604 rooms); and (i) free-standing restaurants (500 seats). (S77, at III and 27.)

FN40. To estimate traffic impacts in the 2010 No-Build Condition, GPI assumed that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

casino complex at Westwoods would begin operating in 2010 and a traffic growth rate of 2% per year was assumed based on a stipulation between the parties that traffic would grow at a yearly rate of between 2 and 2 1/2 percent. Based on this growth rate, GPI assumed that traffic volumes in 2010 would be 8 percent higher than in 2006. (S77, at 19; Tr. 1551-52.)

In 2010, the casino complex at Westwoods would generate about 39,681 new daily vehicle trips during a typical peak season Friday and about 47,292 new daily vehicle trips during a typical peak season Sunday. (S108, at 11.) During peak traffic hours, the increase in vehicular activity would include 3,009 new vehicle trips during a summer Friday peak hour and about 3,689 new vehicle trips during a summer Sunday peak hour. (S108, at 11.) FN41

FN41. With respect to defendants' traffic volume estimates, the Court finds a number of flaws in the methodology used by defendants' expert, Mr. Rittvo, including the use of a gravity model to generate trips to a particular land use (rather than vehicle counts at similar land uses), which resulted in a significant disparity in his trip rates when compared to ten published studies of casino traffic generation. (S95, at 3-5; D328, at 49-51; Tr. 3772-73.)

4. TRAFFIC CAPACITY ANALYSIS

GPI considered two alternates in determining the traffic impacts from a casino complex at Westwoods. (S77, at 36.) In "Build Alternate 1," GPI assumed that Westwoods cannot be directly accessed from Sunrise Highway and vehicles traveling to the casino complex on Sunrise Highway would have to use either Exit 65 or Exit 66 and then travel along the local roadways, including North Highway, Newtown Road (CR 62), Squiretown Road, and Montauk Highway (SR 27A), to reach Westwoods. (S77, at 36-37; Tr. 1522.)

In "Build Alternate 2," GPI assumed that ramps would be built from Sunrise Highway to Westwoods. One ramp would provide direct access for eastbound traffic on Sunrise Highway (SR 27) to Westwoods, one ramp would provide direct access for westbound traffic from Westwoods to the Sunrise Highway, and one ramp would provide direct access for westbound traffic on Sunrise Highway from east of the Shinnecock Canal to Westwoods. (S77, at 37; Tr. 1578-80 .) Visitors to the casino complex from east of the Shinnecock Canal would have to return on local streets. (S77, at 37.)

GPI conducted traffic capacity analyses for the two alternates using SYNCHRO and HCS software. The traffic impacts of the Westwoods casino complex were assessed by comparing traffic impacts in the No-Build 2010 Condition with Build Alternates 1 and 2. (Tr. 1547-52.) These analyses resulted in the following data: Eight of the nine signalized intersections analyzed would be operating under constrained traffic conditions during either the Friday and Sunday peak traffic hours under both Build Alternates 1 and 2, but the impacts would be more severe under Build Alternate 1. Of the eight intersections, four would be operating under constrained conditions during both Friday and Sunday peak hours, two would be operating under constrained conditions on Friday only, and the other two would be operating under constrained conditions on Sunday only. (S108, at capacity analysis summary tables; Tr. 1585-87.) Twelve of the fifteen unsignalized intersections would be operating under constrained traffic conditions in Build Alternate 1. Eleven intersections will be operating under constrained conditions during both the Friday and Sunday peak hours and one will be operating under constrained conditions only during the Sunday peak hour. Five unsignalized intersections will be operating under constrained traffic conditions under Build Alternate 2 during both Friday and Sunday peak hours. (S108, at capacity analysis summary tables.) The off-ramp at westbound Sunrise Highway (SR 27) and northbound CR 111 would be operating under constrained traffic conditions under both Build Alternates 1 and 2. In addition to this ramp, Build Alternate 2 would also result in traffic constraints at the off-ramp at westbound Sunrise Highway (SR 27) and northbound Route 24 operating at the lowest level of service. This ramp would not operate under constrained conditions under the No-Build 2010 Condition. (S108, at capacity analysis summary tables.) The freeway weaving segments at Sunrise Highway (SR 27) westbound between NYS Route 24 On/Off ramps would operate under constrained traffic conditions under both Build Alternates 1 and 2. (S108, at capacity analysis summary tables.) Based upon the data, GPI concluded:

***52** These capacity constraints and delaysassociated with the proposed project would have a negative

cumulative impact on the overall traffic operations of the surrounding roadway network. Thus, the individual delays and queues at intersections would collectively result in a gridlock situation under Alternate 1 and significantly high traffic impacts under Alternate 2, when compared to the No-Build 2010 Conditions. The local streets would be unable to accommodate the newly added traffic under these conditions.... In summary, the analyses conducted for this assessment have indicated, even under the reasonable scenario we have assumed, that the traffic impacts imposed upon the existing road network would be overwhelmingly significant, imposing lengthy delays, creating extraordinary queues and resulting in degradation of safety.
(S77, at V.)

5. DEFENDANTS' TRAFFIC EXPERT

As a threshold matter, because defendants' traffic analysis expert, Sam Schwartz, used project-generated traffic volumes for his traffic impact analysis from Mr. Rittvo (Tr. 3771, 3780), the reliability of Mr. Schwartz's analysis is undermined by the flaws in Mr. Rittvo's estimates. There are also flaws in the defendants' traffic impact analysis (S95, at 24-48), which the Court believes further contribute to an underestimation of the traffic impact by a casino at Westwoods.

In any event, Mr. Schwartz conceded that, in analyzing the casino currently proposed by the defendants (with 1,310 gaming stations and no hotel), certain traffic engineering changes would need to be made in order for traffic to operate at a "reasonable" level, such as upgrading or introduction of traffic signals, and some redesign of several intersections. (D320, at 5-6; D321, at 1; Tr. 3541.) Although he classifies these improvements as "routine," it is far from clear that these modifications will not implicate other traffic issues and considerations, or that they will necessarily alleviate the problems caused by the additional traffic. (S95, at 40-45.)

Moreover, Mr. Schwartz conceded that traffic generated by the casino in the constrained scenario (with 3,000 gaming stations and a 450-room hotel) and the unconstrained scenario (with 6,500 gaming stations and a 1,000-room hotel) would cause unreasonable disruption in the area of Westwoods in the absence of direct access ramps from Sunrise Highway to the casino. (Tr. 3935-37.)

Defendants presented no evidence concerning when, by whom, or at whose cost improvements described by Mr. Schwartz to any intersections intended to reduce traffic impacts would be accomplished. Moreover, there are other legal hurdles regarding the building of direct ramps to Westwoods from Sunrise Highway, which plaintiffs have failed to address. Specifically, the portion of SR 27 commonly known as Sunrise Highway, which bisects the southern portion of the Westwoods Parcel, is a New York highway. (Stipulation, dated January 16, 2007, Stip. No. 20.) There is currently no direct vehicular access to Westwoods from State Route 27. (Stipulation, dated January 16, 2007, Stip. No. 21.) Currently, the only vehicular access onto the Westwoods site from a public street is from Newtown Road. (Stipulation, dated January 16, 2007, Stip. No. 22.) None of the defendants, nor any person or agency acting on behalf of any of the defendants, has sought any authorization or permit from New York or the NYDOT alleged by the State to be necessary to build a highway or ramp connection from Sunrise Highway to Westwoods. (Stipulation, dated January 16, 2007, Stip. No. 24.) The Nation will not alienate any portion of Westwoods. (Tr. 2935, 2964.) The NYDOT will not grant a permit to any person seeking to build an access ramp from a limited access highway, such as Rt. 27, to private property unless the ramp connects to a publicly owned roadway before the private property. (S245; D361, at 75-76.) There are no public roads on the middle Westwoods parcel south of Newtown Road and north of Sunrise Highway. (D266; D274.)

6. ADVERSE AIR QUALITY IMPACTS RELATED TO TRAFFIC

***53** Mr. Grover of GPI prepared a Mobile Source Air Quality Report, in connection with development of a casino at Westwoods, which the Court found credible and reliable. (S200.) The purpose of the air quality assessment was to determine the impact of traffic generated by the development of a casino at Westwoods on air quality emissions in the area surrounding the property. (S200, at 4.) Highway traffic is a significant source of emissions of several air contaminants. (S200, at 4; Tr.1933.) The pollutants emitted by automobiles and trucks consist of CO, VOCs, NOx, and particulate matter ("PM"), all of which are detrimental to human health when they or chemicals created by them are inhaled. (S200, at 4; Tr.1934-36.)

CO, VOC, and NOx emissions are all higher in the build condition than in the no-build condition. (S200, at 8; Tr.1941-42.) Persons residing in and around the main travel routes to and from Westwoods would be exposed to greater amounts of CO, and to greater amounts of ozone arising from the reactions of VOCs and NOx in the atmosphere, should a casino be built at Westwoods. (S200, at 8; Tr.2006-07.) PM emissions are higher for a casino complex at Westwoods in 2010, both with and without ramp access from Route 27, for both PM2.5 and PM10 in an amount over 40% greater than the levels expected should no casino be built. (S200, at 8.)

7. DISRUPTIVE TRAFFIC NOISE

GPI performed a study of the expected noise levels from traffic that would arise from the operation of a casino complex at Westwoods, which the Court found credible and reliable. (S200; S230 .) The noise predictions made by GPI only consider typical vehicle noise, and do not account for the associated noise often encountered in a recreational/resort setting that a casino at Westwoods will likely create, such as loud stereos, beeping horns, etc. (S200, at 15; Tr.1947.) GPI assigned 10 receptor locations for noise monitoring purposes on the basis of the proximity to the project and adjacent roads, and representation of the residential land use primarily found in the project area. (S200, at 10, and Figure 3; S230, at Figure 1; Tr.1944.) GPI conducted monitoring using equipment certified by the manufacturer to meet or exceed American National Standards Institute standards for Type 1, 2 and 2A sound level meters, and which was calibrated at the beginning and end of each measurement session. (S200, at 13.)

According to Federal Highway Administration standards, traffic noise impacts from a highway improvement project occur when the predicted traffic noise levels approach or increase the noise abatement criteria, or when predicted future traffic noise levels substantially exceed the no-build levels. (S200, at 15; Tr.1944-45 .) The New York State Noise Analysis Policy has established that impacts occur when the predicted future traffic noise levels approach one decibel or exceed the noise abatement criteria or when the predicted future traffic noise levels substantially increase the no-build levels by six or more decibels. (S200, at 15; Tr.1944-45.)

***54** The predicted noise levels with an operating casino complex at Westwoods in 2010 exceed the noise levels expected in 2010 if no casino complex is built by more than 6 decibels at 6 of the 10 receptors under a Westwoods casino with no Route 27 access, affecting all of the residential development on Squiretown Road and Newtown Road north of Route 27, which includes approximately 75 single-family homes. (S200, at 14 (Table 18) and 16; Tr.1945-46.)

V. CONCLUSIONS OF LAW

There are several legal questions that the Court will address: (A) whether plaintiffs have demonstrated, as alleged in the causes of actions in the complaints, that the commencement of construction on Westwoods and the proposed gaming facility violates New York gaming laws and environmental laws, and the Town Code; (B) whether the Shinnecock Indian Nation's aboriginal title to Westwoods has been extinguished; (C) whether, even if the Nation holds unextinguished aboriginal title to Westwoods, plaintiffs have demonstrated that they are entitled to prevent the construction of a gaming facility under the Supreme Court decision in *Sherrill* because of the disruptive impact that will result from the Nation's assertion of sovereignty over Westwoods; (D) whether defendants can operate a gaming facility at Westwoods in violation of New York gaming laws when such activity is not within the confines of the federal legal framework embodied in IGRA; (E) whether defendants can assert sovereign immunity as a defense; and (F) whether the requirements for permanent injunctive relief have been satisfied. The Court will address each of these issues in turn.

A. THE CAUSES OF ACTION

As set forth below, the Court concludes that plaintiffs have demonstrated that the defendants' actions and threatened actions with respect to the construction and operation of a casino at Westwoods are not in compliance with applicable New York anti-gaming laws and environmental laws, as well as the Town Code.

(1) NEW YORK ANTI-GAMING LAWS

With respect to the State's First Cause of Action, the State established that the Nation's planned gaming facility is not in compliance with New York anti-gaming laws. Although the New York State Constitution generally forbids gaming, it does allow certain forms of gaming, including a state lottery for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

education, pari-mutuel betting on horse racing, and limited charitable gaming in the form of bingo and "games of chance" conducted by religious, charitable, and certain non-profit groups. *See*N.Y. Const. art. I, § 9. Moreover, only authorized organizations that are licensed by the Board may conduct bingo and "games of chance." *See*N.Y. Gen. Mun. Law § 187. The General Municipal Law defines an "authorized organization" to "mean and include bona fide educational, fraternal or service organization or bona fide organization of veterans or volunteer firemen...."N.Y. Gen. Mun. Law § 186(4). Furthermore, the conduct of these games is strictly regulated by New York law and regulations. *See*N.Y. Gen. Mun. Law §§ 188-a, 475; Exec. Law § 431. Unless the gaming activity is conducted pursuant to these exceptions in the New York Constitution and New York laws, gaming for profit in New York violates New York's criminal laws and is against public policy.[FN42] *See*Gen. Mun. Law §§ 189(14), 495-a; Penal Law § 225.30. Defendants have not obtained any authorization under New York law to conduct gaming at Westwoods.

FN42. In 2001, the New York Legislature repealed in part the *per se* exception for slot machines. The use of slot machines, however, remains prohibited unless it is approved by the Board as an authorized "game of chance" or it is included in a State-Tribal Compact executed in accordance with federal law. *See*N.Y. Gen. Mun. Law § 186(3); N.Y. Penal Law § 225.30; 9 N.Y.C.R.R. § 5620.1.

(2) NEW YORK ENVIRONMENTAL LAWS

***55** With respect to the State's other causes of action, the Court concludes that the evidence at trial demonstrated that the Nation's actions and threatened actions with respect to the proposed gaming facility at Westwoods are not in compliance with New York environmental laws that are the subject of those causes of action. First, the Nation cannot operate the proposed casino without construction and operation of a sewage treatment facility that will, at least from time to time, discharge wastewater to surface or ground waters of the State from a pipe or other outfall. Accordingly, under New York law, the Nation is required to obtain a SPDES permit for the discharge of sanitary wastewater to either surface or ground waters of New York. *See*6 N.Y.C.R.R. § 750-1.5(a)(4) (stating SPDES permit needed for discharges in excess of 1,000 gallons/day); 6 N.Y.C.R.R. § 750-1.14(c) (stating SPDES permit must be obtained before construction of wastewater treatment plant begins).

Similarly, under New York law, the Nation is also required to file for coverage under the SPDES General Permit for Stormwater Discharges for Construction Activities pursuant to N.Y. Envtl. Conserv. Law ("ECL") § 17-0807(4) and 6 N.Y.C.R.R. § 750-1.21(b)(2), by submitting a NOI certifying completion of a SWPPP that meets all of the DEC's technical requirements for erosion and sediment control. Thus, the Nation would be required to implement the SWPPP pursuant to the general permit and the NOI is required to be filed before the start of any construction activities. The Nation has not submitted an NOI to the DEC.

Furthermore, the issuance of the SPDES permit is also subject to an environmental review under SEQRA, which requires that an environmental review of an agency's proposed action occur before the action is undertaken. *See, e.g., Tri-City Taxpayers Ass'n v. Town Bd. of Queensbury,* 55 N.Y.2d 41, 45-46 (1982). In this case, the action would be the construction of a water treatment facility. Thus, the issuance of necessary governmental permits for the proposed casino are agency actions subject to SEQRA, and no permits can issue before the required environmental review has been completed. ECL § 8-0109(2). As stipulated by the parties, "the development of a gaming facility at the Westwoods Parcel would likely to be a Type I action, a type of activity identified in 6 N.Y .C.R.R. Part 617.4 as being likely to require the preparation of an EIS; if the lead agency determines that the proposed action may result in at least one potential significant adverse impact, it would issue a positive declaration to that effect in accordance with 6 N.Y.C.R.R. Part 617.7."(Stipulation, dated January 16, 2007, at ¶ 25.) Given the potential environmental impacts, the preparation of an EIS to identify, and then propose mitigation of, environmental impacts would be necessary before construction could commence on a casino in accordance with state law. *See Chinese Staff & Workers Ass'n. v. City of N.Y.,* 68 N.Y.2d 359, 366 n. 7 (1986) (holding that unlike NEPA, SEQRA requires EIS whenever there may be significant effect on environment). Violations of New York's environmental laws are subject to suit for injunctive relief pursuant to ECL § 71-1931. *See also*ECL § 71-1929 (holding that violators of ECL article 15, titles 1 through 11, "may be enjoined from continuing such violation").[FN43]

FN43. The State's Complaint also includes a cause of action asserting that defendants could not build a casino with a new well whose pumping capacity exceeded forty-five gallons per minute and thus was proposing to build a casino which would draw ground water in violation of ECL § 15-1527. ECL § 15-1527 imposes permit requirements whenever any person proposes to build such a well. *See*ECL § 15-1527(2). The State's environmental expert concluded that on-site wells could not supply a sufficient amount of potable water. (S125, at 68.) In any event, if the Nation should propose substituting such wells for water supplied by the HBWD, the Nation then would be in violation of that provision of state law.

***56** In the instant case, the Nation has stipulated that it has not even applied for any environmental permits from New York and has not commenced any aspect of the required SEQRA review. (Stip. No. 52; Stipulation, dated January 16, 2007, at ¶ 1.) Accordingly, the Nation's actions concerning the construction of the casino, and their threatened actions, are in violation of New York's environmental laws.

(3) TOWN CODE

With respect to the Town's causes of action, the Court concludes that the Town has established that the Nation's actions and threatened actions, in connection with the development activities and planned use of Westwoods for a casino facility, violate the provisions of the Town Code set forth in the causes of action.

Section 330-184 (subdivision I) of the Southampton Town Zoning Law provides that "no regrading, clearing, tree removal or any other work in preparation of future use of a site may take place until site plan approval or written permission has been received from the Planning Board."(T267.) None of the site preparation activities in which the Nation engaged on or about July 12, 2003 was preceded by any application or request for, or issuance of, site plan approval or written permission of the Southampton Planning Board, as required by Section 330-184(1) of the Town Code. Thus, these July 12 activities were not in compliance with Section 330-184 of the Town Code.

Similarly, under section 325-6, subdivision A of the Town Code, a permit must be obtained to develop land within 200 feet of wetlands. Such development includes the clearing of natural vegetation, grading, excavation, placement of fill, building, structural changes, the installation of any man-made structure, planting, and landscape activities. (Tr. 277-28.) The northern parcel of Westwoods contains or lies adjacent to wetlands, as the Great Peconic Bay system is regulated as wetlands under Chapter 325 of the Southampton Town Code. Thus, any development of Westwoods within 200 feet of the wetlands on its northern boundary also would implicate Chapter 325 of the Town Code.

In addition to the violations of the specific Town Code sections referenced in the Complaint, the Town also established at trial defendants' violations of Town Code §§ 330-6 and 330-10, regarding zoning, as well as Town Code § 123-9A. First, the operation of a gaming casino is not a permitted use at Westwoods, which is zoned R60, according to Section 330-6 of the Town Zoning Law, and the related "Residence Districts Table of Use Regulations," set forth in Town Zoning Law Section 330-10. (T267.) As a R-60 designated parcel, Westwoods is limited to single-family residential use. (Tr. 114, 245; T267.) A gaming casino is not a permitted use in an R-60 zone, or in any other residential zone. In addition, the operation of a casino has not been identified as a "permitted" or "special exception" use within any "County Residence" or "Residence" zoning districts in the Table of Use Regulations appearing at § 330-10 of the Town of Southampton Zoning Law. (T267.) In fact, a gaming casino is not a permitted use anywhere in Southampton, and is not otherwise authorized in any respect by the Town. (Tr. 245-46; T267.) Thus, the Town has demonstrated that the Nation's proposed casino development violates the Town's zoning law as set forth in Section 330-6 and the related "Residence Districts Table of Use Regulations" as set forth in Section 330-10. (Stip. No. 48.)

***57** To the extent that defendants suggest that Westwoods was "unzoned" because the current Town Zoning Map references Westwoods as "Ind-Res," the Court rejects that argument. Despite the lack of a designated zoning classification for Westwoods on the current version of the Town zoning map, the Town has classified the Westwoods parcel as residential property in 1957, 1972, 1984, and 1986, and has never taken any of the steps required to effectuate a change in that classification since 1986. Thus, there is no

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

question, from a legal standpoint, that the Town has zoned Westwoods as residential and any references on the zoning map have no legal implication. *See, e.g.,* Paradis v. Town of Schroeppel, 735 N.Y.S.2d 278, 278 (N.Y.App.Div.2001) (invalidating town board resolution purporting to amend town zoning code provision); *accord* Noghrey v. Town of Brookhaven, 625 N.Y.S.2d 268, 268 (N.Y.App.Div.1995); Naftal Assocs. v. Town of Brookhaven, 633 N.Y.S.2d 798, 798 (N.Y.App.Div.1995); Rockland Props. Corp. v. Town of Brookhaven, 612 N.Y.S.2d 673, 673 (N.Y.App.Div.1994).

The Court also rejects any argument by the defendants that the Town should be estopped from enforcing any zoning regulation because of its failure to place the designation on the current zoning map or because of a failure to enforce it. As a threshold matter, the Second Circuit has held that "principles of laches or estoppel do not bar a municipality from enforcing ordinances that have been allowed to lie fallow."*LaTrieste Rest. & Cabaret, Inc. v. Village of Port Chester,* 40 F.3d 587, 590 (2d Cir.1994); *see also* Parkview Assocs. v. City of New York, 71 N.Y.2d 274, 282 (1988) (holding that " '[e]stoppel is not available against a local government unit for the purpose of ratifying an administrative error,' " and such an administrative error does not confer rights contrary to the zoning laws) (quoting Morley v. Arricale, 66 N.Y .2d 665, 667 (1985)). In any event, even if applicable, defendants' estoppel argument also fails on the merits. First, Shinnecock Trustees Gumbs and Eleazer acknowledged they were aware that Westwoods was assigned a zoning classification by the Town. (Tr. 2943; S249, at 12, 98-99.) In fact, the Nation made an unsuccessful request to remove such classification in 1985. Thus, the Nation has been aware of the residential classification. Second, any argument that the Town should be estopped because it failed to enforce the zoning law is also factually flawed because, prior to the Nation's July 2003 activities, Westwoods had essentially remained in its natural state as a woodlot and, therefore, there was no reason for the Town to seek to enforce any provision of the Town Code or zoning laws prior to that time.

In addition to the zoning issues, the Town Code requires a Town-issued building permit to be issued in order to construct a commercial structure within Southampton. *See* Town Code 123-9. There is no question that the proposed construction of the casino facility at Westwoods would require the issuance of a building permit by the Town prior to the commencement of any construction or site preparation activities. Here, before commencing its site preparation activities, the Nation did not obtain a building permit. Thus, the activity at Westwoods violates Section 123-9 of the Town Code.

***58** Defendants essentially concede that they have not complied with these New York and Town laws and have not obtained the various approvals and permits that would be required to construct and operate a gaming facility in New York and Southampton. The Nation's position is that it is immune from these laws and legal requirements because Westwoods is tribal land over which the Nation holds unextinguished aboriginal title and it is to this legal issue that the Court now turns.

B. ISSUE OF EXTINGUISHMENT OF ABORIGINAL TITLE

Defendants argue that the construction and operation of a casino at Westwoods is immune from New York and local laws and regulations because the Nation holds unextinguished aboriginal title to Westwoods. In particular, at paragraph 16 of their Answer to the Town's Complaint, defendants

Admit that none of Defendants has applied for or received any permit or approval from the Town of Southampton and aver that the Town of Southampton has no jurisdiction over the Westwoods Parcel and has no power or right to enforce any part of the Code of the Town of Southampton or any other local law or regulation of the Town of Southampton within Shinnecock tribal lands or, specifically, within the Westwoods Parcel.

(Defs. Ans. to Town Complaint, at ¶ 16; *see also* Defs. Ans. to State Complaint, at ¶¶ 54, 59.) Similarly, defendants concede that the Gaming Authority "has not submitted any document to the DEC and aver that this agency of the State of New York has no right or power to require any of the Defendants to obtain any license or permit for activities on Shinnecock tribal lands or to regulate or interfere with any activities on Shinnecock tribal lands ."(Defs. Ans. to State Complaint, at 158.)

Defendants' position on this issue is contained in the Third Affirmative Defense to the Town's claims:

Under the Constitution and laws of the United States and federal common law, neither the Town of Southampton or any other municipal corporation in

the State of New York, including any county in the State of New York, has any right or power (a) to require the Shinnecock Indian Nation or any of its instrumentalities or affiliates to obtain a license, permit or any other form of permission prior to conducting any of the activities sought to be enjoined by the Complaint; or (b) to interfere with the right of the Shinnecock Indian Nation or any of its instrumentalities or affiliates from engaging in any of those activities or, in particular, from engaging in gaming or gambling activities on Shinnecock tribal lands.

(Defs. Ans. to Town Complaint, at 8, 9.) The virtually identical Third Affirmative Defense is contained in the Defendants' Answer to the State Complaint. (*See* Defs. Ans. to State Complaint, at 13.)

As analyzed in detail below, the Court concludes that the evidence at trial established in a clear and convincing manner that the Nation's aboriginal title to the Westwoods land was extinguished in the 17th century and, thus, defendants' defense to the current and threatened violations of New York and local laws in construction and operation of a casino at Westwoods fails on the merits.

(1) LEGAL FRAMEWORK FOR ANALYZING ABORIGINAL TITLE ISSUE

***59** "Aboriginal title refers to the Indians' exclusive right to use and occupy lands they have inhabited 'from time immemorial,' but that have subsequently become 'discovered' by European settlers."*Seneca Nation of Indians v. New York,* 382 F.3d 245, 249 n. 4 (2d Cir.2004) (*quoting County of Oneida v. Oneida Indian Nation of N.Y.,* 470 U.S. 226, 233-34 (1985) (*"Oneida I"* )), *cert. denied,*126 S.Ct. 2351 (2006). In *Oneida I,* the Supreme Court explained how aboriginal Indian title derived from the doctrine of discovery, which provided that "discovering nations held fee title to these lands, subject to the Indians' right of occupancy and use."*Oneida I,* 470 U.S. at 234;*see also Tee-Hit-Ton Indians v. United States,* 348 U.S. 272, 279 (1955) ("After conquest [Indians] were permitted to occupy portions of territory over which they had previously exercised sovereignty.") (internal quotation marks omitted).

This "[a]boriginal title, however, was not inviolable."*Seneca,* 382 F.3d at 249 n. 4. Specifically, "Indians were secure in their possession of aboriginal land until their aboriginal title was 'extinguished' by the sovereign discoverer."*Id.; see also Oneida I,* 470 U.S. at 234 ("[N]o one could purchase Indian land or otherwise terminate aboriginal title without the consent of the sovereign."). As the Supreme Court has long recognized, the sovereign "possessed exclusive power to extinguish the right of occupancy at will."*United States v. Alcea Band of Tillamooks,* 329 U.S. 40, 46 (1946); *see also Johnson v. M'Intosh,* 8 Wheat. 543, 21 U.S. 543, 588 (1823) ("All our institutions recognise the absolute title of the crown, subject only to the Indian right of occupancy, and recognise the absolute title of the crown to extinguish that right.")."Extinguishment could occur through a taking by war or physical dispossession, or by contract or treaty ... and did not give rise to an obligation to pay just compensation under the Fifth Amendment."*Seneca,* 382 F.3d at 249 n. 4 (citations omitted); *see also United States v. Santa Fe Pac R.R. Co.,* 314 U.S. 339, 347 (1941) (holding that aboriginal title can be extinguished "by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise") (citation omitted).

The Second Circuit also has confirmed that, during the colonial era, Great Britain held the right of extinguishment. *See Oneida Indian Nation v. New York,* 860 F.2d 1145, 1150 (2d Cir.1988) (*"Oneida II"* ) ("The right to extinguish Indian title, sometimes called a right of extinguishment, was held by the sovereign-Great Britain in the period prior to the American Revolution."); *see also Seneca Nation of Indians v. New York,* 206 F.Supp.2d 448, 505-06 (W.D.N.Y.2002) ("In the period prior to the American Revolution, Great Britain, recognized as the discovering nation and sovereign after defeating the French, held both the right of extinguishment and the right of preemption of Indian lands located in the colonies. Thus, Britain had the exclusive authority to extinguish Indian title, and its underlying fee title or right of preemption was good against all other discovering nations."), *aff'd,*382 F.3d 245 (2d Cir.2004), *cert. denied,*126 S.Ct. 2351 (2006).

***60** Although the sovereign clearly possesses a right of extinguishment, aboriginal title is not easily extinguished. In particular, "[i]t is well-settled that an intention to authorize the extinguishment of Indian title must be 'plain and unambiguous,' either 'expressed on the face of the [instrument] or ... clear from surrounding circumstances.' " *Seneca,* 382 F.3d at 260 (quoting *Mountain States Tel. & Tel. Co. v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Pueblo of Santa Ana,* 472 U.S. 237, 276 (1985) (other citations omitted)); *see also* *Oneida I,* 470 U.S. at 248 ("[C]ongressional intent to extinguish Indian Title must be 'plain and unambiguous,' ... and will not be 'lightly implied.' ") (*quoting* *Santa Fe,* 314 U.S. at 346, 354)); *Delaware Nation v. Pennsylvania,* 446 F.3d 410, 417 (3d Cir.2006) ("For extinguishment to occur, the sovereign must intend to revoke the Indians' occupancy rights.... The intent to extinguish aboriginal title must be 'plain and unambiguous' based on either the face of the instrument or surrounding circumstances.... Extinguishment cannot be lightly implied."). The foundational underpinning of this standard is the "policy of the federal government from the beginning to respect the Indian right of occupancy." *Cramer v. United States,* 261 U.S. 219, 227 (1923). Thus, given this strong policy, any ambiguity on the issue of whether aboriginal title has been extinguished must be resolved in favor of the Indian tribe. *See* *Santa Fe,* 314 U.S. at 354.

Moreover, in order to ensure that the extinguishment was plain and unambiguous, the Court may also consider events subsequent to any sovereign determinations that may be relevant on that issue. For example, in *Absentee Shawnee Tribe of Indians of Oklahoma v. Kansas,* the Tenth Circuit examined events subsequent to the treaty at issue to determine the intent and understanding of the Shawnee tribe:

[T]he historical record indicates that the Shawnees understood that the Treaty entitled the Rev. Johnson to the property under the Treaty, and that they intended him to have it.

This letter [from Chiefs and Council of the Shawnee Tribe of Indians] supports the conclusion that the Shawnees were fully cognizant of the effect of the 1854 Treaty in divesting their rights in the mission property. Even after the mission had discontinued providing educational services, the Shawnees clearly did not contemplate that they had any continued claim in the property. This is a case in which we cannot "ignore plain language that, viewed in historical context and given a 'fair appraisal,' clearly runs counter to a tribe's later claims."

*Id.* at 1421-22 (quoting *Klamath Indian Tribe,* 473 U.S. 753, 754 (1985) and *Wash. State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 675 (1979); *see also* *Cree v. Waterbury,* 78 F.3d 1400, 1405 (9th Cir.1996) (remanding to district court to examine, among other things, the circumstances surrounding 1855 Treaty between the United States and the Yakima Tribe, and the post-Treaty conduct of parties in order to interpret the scope of rights granted by the Treaty); *Shawnee Tribe v. United States,* 423 F.3d 1204, 1220 (10th Cir.2005) (holding that courts may not ignore plain language that " 'runs counter to a tribe's later claims' "); *Cook v. United States,* 32 Fed. Cl. 170, 174 (Fed.Cl.1994) (same); *United States v. Minnesota,* 466 F.Supp. 1382, 1385 (D.Minn.1979) ("To determine the intent of Congress and understanding of the Indians, the court must analyze the wording of the treaties, agreements, and enactments, the prior history, the surrounding circumstances, and the subsequent construction given those documents by the parties.").

***61** Finally, once extinguishment of aboriginal title occurs, it cannot be revived. *See, e.g.,* *Delaware Nation v. Commonwealth of Pennsylvania,* No. 04-CV-166, 2004 WL 2755545, at *10 (E.D.Pa. Nov. 30, 2004) ("[W]e find that the original right to possession, 'once having been extinguished, could not be revived, even if title were thereafter acquired by those who originally possessed that right.'") (quoting *Tuscarora Nation of Indians v. Power Auth. of N.Y.,* 164 F.Supp. 107, 113 (W.D.N.Y.1958)), *aff'd,* 446 F.3d 410, 417 (3d Cir.2006); *see also* *Cass County v. Leech Lake Band of Chippewa Indians,* 524 U.S. 103, 191 (1998) ("When Congress makes Indian reservation land freely alienable, it manifests an unmistakably clear intent to render such land subject to state and local taxation. The repurchase of such land by an Indian tribe does not cause the land to re-assume tax-exempt status.").

(2) COLLATERAL ESTOPPEL ISSUE

051 Extra cent-Y found within cent-Y markup.

As a threshold matter, the Town made a motion *in limine* to bar defendants from introducing any evidence, including any expert testimony, or making any argument at trial that the Shinnecock Tribe currently holds unextinguished aboriginal title to Westwoods. In particular, the Town argues that the Shinnecock are collaterally estopped from claiming that they have unextinguished aboriginal title to Westwoods because the Shinnecock Tribe participated as a defendant in *King v. Shinnecock Tribe of Indians,* 221 N.Y.S.2d 980 (N.Y.Sup.Ct.1961),[FN44] in which the New York State Supreme Court held that the Shinnecocks' aboriginal rights to certain lands, including Westwoods, was extinguished in the 17th century (the *"King* Litigation"). Defendants argue that this motion is essentially a motion for reconsideration of Judge Piatt's denial of summary judgment under the guise of

an evidentiary motion *in limine.*[FN45] Specifically, defendants contend that, although Judge Platt did not explicitly address this issue in his November 7 Memorandum and Opinion, the Town specifically moved for summary judgment in part on the ground of collateral estoppel and, by denying the motion, Judge Platt implicitly must have rejected this argument. As set forth below, whether viewed as a motion for reconsideration or a motion considered *de novo* by the Court, the Court finds the collateral estoppel doctrine to be inapplicable under the peculiar circumstances of the instant case. More specifically, since the issue was addressed in the prior lawsuit in the form of a stipulation by a New York State attorney acting on behalf of the Shinnecock Nation, the Town cannot rely on the collateral estoppel doctrine to preclude litigation of that issue in this lawsuit.

> FN44. This lawsuit was authorized by an act of the New York State Legislature, Chapter 379, New York Laws of 1960, which expressly subjected the Shinnecock Tribe to the lawsuit commenced by King. *Id.* at 982.

> Motions for reconsideration may be filed pursuant to Federal Rule of Civil Procedure 59(e). The decision to grant or deny a motion for reconsideration falls squarely within the discretion of the district court. *See Devlin v. Transp. Commc'ns Int'l Union,* 175 F.3d 121, 132 (2d Cir.1999). "The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked ... that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995) (internal citations omitted). Similarly, Local Civil Rule 6.3 provides that a party moving for reconsideration must "set[ ] forth concisely the matters or controlling decisions which [the party] believes the court has overlooked." In any event, "reconsideration of a previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *In re Health Mgmt. Sys. Inc. Sec. Litig.,* 113 F.Supp.2d 613, 614 (S .D.N.Y.2000) (citation and quotation marks omitted); *see also Medoy v. Warnaco Employees' Long Term Disability Ins. Plan,* No. 97 Civ. 6612(SJ), 2006 U.S. Dist. LEXIS 7635, at *4 (E.D.N.Y. Feb. 15, 2006) ("The standard ... is strict in order to dissuade repetitive arguments on issues that have already been considered fully by the Court.").

"Under New York law, collateral estoppel bars relitigation of an issue when (1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action."[FN46] *In re Hyman,* No. 05-7026-BK, 2007 WL 2492789, at *3 (2d Cir. Sept. 6, 2007) (citations omitted); *accord Hoblock v. Albany County Bd. of Elections,* 422 F.3d 77, 94 (2d Cir.2005). "The party seeking the benefit of collateral estoppel bears the burden of proving the identity of the issues, while the party challenging its application bears the burden of showing that he or she did not have a full and fair opportunity to adjudicate the claims involving those issues." *Khandhar v. Elfenbein,* 943 F.2d 244, 247 (2d Cir.1991) (citing *Kaufman v. Eli Lilly & Co.,* 65 N.Y.2d 449, 455-56 (1985)).

> FN46. The Second Circuit has stated that, where as here a party is seeking to enforce a New York judgment, New York law is applied. *See Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286 (2d Cir.2002) ("We apply federal law in determining the preclusive effect of a federal judgment and New York law in determining the preclusive effect of a New York State court judgment.") (internal citations omitted). In any event, although federal and state law differ in certain respects on some collateral estoppel issues, see *Indus. Risk Insurers v. Port Auth. of N.Y. and N.J.,* 493 F.3d 283, 288 (2d Cir.2007) (noting, as to collateral estoppel under New York and federal law, that "these two bodies of law do appear to diverge in some particulars"), the result here would be the same under either standard.

***62** Thus, the Court must look to the circumstances surrounding the *King* litigation to determine if these requirements were met. In *King,* a claim was brought by Douglas King against the Shinnecock Tribe to have the court resolve conflicting claims to land located within Southampton to the west of Canoe Place. *King,* 221 N.Y.S.2d at 981 (noting that the property at issue was located "about one quarter mile south of Montauk

Highway at Hampton Bays in the Town of Southampton" and is "bounded ... on the east by Shinnecock Bay"). King contended that he and his family members had actually possessed the land for at least 100 years and, thus, he had title to land based upon adverse possession.*Id.* at 982.In the lawsuit, the Attorney General of New York, by an Assistant Attorney General, appeared for both the State and the Nation. As part of the litigation, the Assistant Attorney General conceded or stipulated, that "as of the year 1738, record title to the premises was in the white proprietors of the Town of Southampton and not in the Shinnecock Indians, who had divested themselves of any recorded interest by treaty in the years 1662 and 1666."*Id.* at 982.[FN47]Therefore, it was conceded that there was no aboriginal title to the lands; instead, the court noted that "[i]t is the contention of the defense that at some time prior to 1810 the premises became part of the reservation and property of the Shinnecock Indians."*Id.* at 983.The court, however, rejected that argument due to a lack of evidence.[FN48]*Id.* at 986-87.In particular, the court explained:

FN47. The concession was actually made in a prior similar action in 1953, *see* *King v. Warner,* 137 N.Y.S.2d 568, 569 (N.Y.Sup.Ct.1953), but it was agreed that the 1961 *King* action would be tried based upon the record of the trial of the 1953 action. *King,* 221 N.Y.S.2d at 981. Thus, this stipulation in the 1953 action was applied to the 1961 *King* action.

FN48. In reaching this decision, the court did review "the genesis of title to lands in the Town of Southampton" and specifically referenced the analysis in *Trustees of the Freeholders and Commonalty of Southampton v. Mecox Bay Oyster Co.,* 116 N.Y. 1, 8 (1889).*See* *King,* 221 N.Y.S.2d at 985-86 (citing *Mecox Bay* ). In *Mecox Bay,* the Court of Appeals referred to the Andros and Dongan patents and found that, prior to the Andros patent, "all the Indian deeds had been delivered, and the rights of the Indians extinguished."Specifically, the Court of Appeals reviewed the land grants to the Town of Southampton, including the Andros and Dongan patents:

The first patent of the town was in 1676 by Governor Andros.... There can be no doubt that under this patent the title to all the lands vested in the corporate body thereby created. The grant was from the sovereign, who gave the grantees capacity to take and hold in a corporate character ....

Under this grant, therefore, title vested in the town. The Dongan charter was granted 10 years later. It can hardly be presumed that it could have been intended by that deed to have changed the title to the land. Prior to the date of the Andros charter, all the Indian deeds had been delivered, and the rights of the Indians extinguished. Under that charter, the title had vested absolutely in the town.

116. N.Y. at 8. As discussed *infra,* it is undisputed that the Andros and Dongan Patents covered all lands within the Town of Southampton, including Westwoods. (Stip. No. 77.)

There being no persuasive proof that the Shinnecock Indians have ever acquired any tribal interest in the premises in question since their right of occupancy was extinguished by the sovereign, I conclude that the plaintiff has clearly established his title thereto by adverse possession.

221 N.Y.S.2d at 987.[FN49]

FN49. The Shinnecock Nation took an appeal from the decision by the New York Supreme Court, but later abandoned that appeal. *See* *King v. Shinnecock Tribe of Indians,* 17 A.D.2d 820 (N.Y.App.Div.1962) (dismissing appeal).

Although the Town argues that the defendants are collaterally estopped from denying the extinguishment of their aboriginal rights in Westwoods because the court in *King* determined that the Andros and Dongan Patents extinguished such aboriginal title, this Court concludes that the doctrine of collateral estoppel should not be applied to this lawsuit on that issue because of the circumstances under which this issue was litigated in the New York court. In particular, the Court notes that the Town is seeking estoppel based upon a stipulation made on behalf of the Nation by the State of New York-the Town's current co-plaintiff and the Nation's current adversary in this lawsuit-while, in *King,* New York was representing the Nation in a trust capacity. The Second Circuit has recognized that "[m]ost courts have held that a fact established in prior litigation by stipulation, rather than by judicial resolution, has not been 'actually litigated.' " *Uzdavines v. Weeks Marine,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3307089 (E.D.N.Y.)
**(Cite as: Slip Copy)**

Page 54

Inc., 418 F.3d 138, 146 (2d Cir.2005) (citing cases); *see also* North Shore-Long Island Jewish Health Sys., Inc. v. Aetna U.S. Healthcare, 27 A.D.3d 439, 440-41 (N.Y.App.Div.2006) ("An issue is not actually litigated if there has been 'a failure to place a matter in issue by proper pleading, or even because of a stipulation' ") (quoting *Kaufman,* 65 N.Y.2d at 457 (emphasis omitted)); *1829 Caton Realty v. Caton BMT Assocs.,* 225 A.D.2d 599, 599 (N.Y.App.Div.1996) ("[T]he doctrine of collateral estoppel is not applicable since the issues resolved by the stipulation of settlement were never actually litigated.") (citation omitted). The Second Circuit also has "specified that where the parties intend a stipulation to be binding in future litigation, issues to which the parties have stipulated will be considered 'actually litigated' for collateral estoppel purposes." *Uzdavines,* 418 F.3d at 146;*see also* *Red Lake Band v. United States,* 221 Ct. Cl. 325, 607 F.2d 930, 934 (1979) ("As a general rule ... an issue is not 'actually litigated' for purposes of collateral estoppel unless the parties to the stipulation manifest an intent to be bound in a subsequent action."); *see generally* *United States v. Int'l Bldg. Co.,* 345 U.S. 502, 504 (1953) (finding no *res judicata* effect concerning tax deficiencies in previous years where deficiencies were entered into in prior tax litigation by stipulation). Here, where the stipulation regarding extinguishment of aboriginal title was entered into on behalf of the Shinnecock Nation by the attorney for New York, there is simply no indication from the record that this was done with the intent to be bound in subsequent actions. *See* *Red Lake Band,* 607 F.2d at 934 (holding that "an intention to be ... bound [in future litigations] should not be readily inferred"). Thus, although the Nation was a party to that action, the Court does not consider this issue to have been "actually litigated" or litigated in a manner which provided a "full and fair opportunity" for litigation on the issue when it was based on a stipulation by the State of New York's attorney acting on behalf of the Shinnecock Nation in a lawsuit in which New York was also a party.[FN50] *See* *In re Hyman,* 2007 WL 2492789, at *7 (declining to "mechanically apply collateral estoppel").

> FN50. To the extent plaintiffs also suggest that defendants should be judicially estopped from challenging the colonial era transactions, that argument is rejected for the same reasons discussed above. *See* *Uzdavines,* 418 F.3d at 147 (denying judicial estoppel and noting "we limit[ ] the doctrine of judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity are certain") (citations and quotation marks omitted).

***63** In sum, the Court concludes, as Judge Platt implicitly did in denying summary judgment, that the stipulation in the *King* litigation should not bar the Nation from litigating the aboriginal title issue in this lawsuit; rather, the Court has examined this issue on the merits after a full trial in which the Nation has been given a full and fair opportunity to be heard and, as set forth below, finds that aboriginal title to Westwoods has been extinguished.

(3) BURDEN AND STANDARD OF PROOF

The parties do not agree on the burden of proof or the standard of proof on the issue of the extinguishment of aboriginal title. Plaintiffs argue that, because defendants have asserted "unextinguished aboriginal title" to Westwoods as an affirmative defense to plaintiffs' intention to have this Court enjoin the development of a gaming facility on that land, defendants have the burden of proving this affirmative defense by a preponderance of the evidence. Defendants, however, argue that plaintiffs have the burden of proving by clear and convincing evidence that the Nation's aboriginal title to Westwoods has been extinguished.

The Court concludes that plaintiffs have the burden of proof to establish by a preponderance of the evidence the plain and unambiguous extinguishment of aboriginal title. The Court recognizes that the Nation has asserted aboriginal title as an affirmative defense and that it is well settled that defendants have the burden of proof with respect to affirmative defenses, as well as matters that are interposed in avoidance of plaintiffs' claim. *See, e.g.,* *Fitzgerald v. Henderson,* 251 F.3d 345, 357 (2d Cir.2001) (holding that defendant bears the burden of proof on an affirmative defense); *United States v. Sun Myung Moon,* 718 F.2d 1210, 1224 (2d Cir.1983) ("If defendant asserts an affirmative defense he bears the burden of proof on it."). However, in the instant case, it is undisputed that the Nation had aboriginal title at the time of initial discovery in 1640. *See* *Shinnecock Indian Nation,* 400 F.Supp.2d at 489 ("Defendants submitted a Fact Statement containing facts which are, for the most part, undisputed and which show that the Shinnecock Indian Nation ... [w]as in possession of the lands in and around the Town of Southampton when the first European settlers arrived in 1640...."). Instead, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

issue is whether that aboriginal title was extinguished. The Court notes that a federal law enacted in 1834, 25 U.S.C. § 194, places the burden of proof on a "white person" in any case concerning Indians with respect to "the right of property." Plaintiffs argue that the Supreme Court, however, has held that this burden-shifting law does not apply to states because a state is not a "person" within the meaning of the statute, *see Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 667 (1979), and that one court has held that Section 194 does not apply to land within the bounds of an original state, such as New York, *see Cayuga Indian Nation v. Pataki,* Nos. 80-CV-930, 80-CV-960, 1999 U.S. Dist. LEXIS 5228, at *13 (N.D.N.Y.1999). However, in *Cayuga Indian Nation of New York v. Village of Union Springs,* 317 F.Supp.2d 128 (N.D.N.Y. Apr. 15, 2004), the court rejected that argument:

***64** In *City of Sherrill,* the Supreme Court's language in *Wilson* was relied upon to find that the burden of proof rested with the municipality, and the Court of Appeals for the Second Circuit affirmed, further substantiating that finding. *See [Sherrill], aff'd in part and rev'd in part,* 337 F.3d 139 (2d Cir.2003). Therefore, here, as in *City of Sherrill,* the burdens of proof and production rest with defendants, the non-Indian parties questioning Indian title.

317 F.Supp.2d at 135. This Court agrees with the reasoning in *Cayuga* and concludes, where as here the plaintiffs are questioning Indian title and arguing aboriginal title has been extinguished, the burden lies with plaintiffs.

Although the Nation further argues that the standard of proof is elevated to "clear and convincing" evidence rather than the "preponderance" standard, the Court disagrees. The Court recognizes, as noted *supra,* that extinguishment is not implied and plaintiffs must prove plain and unambiguous extinguishment of aboriginal title. That rule, however, does not transform the underlying standard of proof to a "clear and convincing" standard. The only case cited by defendants that supports this contention is a Court of Claims decision in which reference was made to a "clear and convincing evidence" standard, *Alabama-Coushatta Tribe of Texas v. United States,* No. 3-83, 2000 WL 1013532, at *34 (Fed. Cl. June 19, 2000). However, the citations referenced in the decision do not support such a standard. In fact, the majority opinion in that case actually took exception to the dissenting judge's view that a rule of statutory construction in favor of Native Americans should be utilized in evaluating the findings of an administrative hearing officer and noted that "[i]t is a rule of statutory construction, to aid in determining the meaning of legislation, not a rule for the weighing of evidence and shifting of the normal burden of proof."[FN51] *Id.* at *7. Thus, this Court concludes that the burden of proof is on plaintiffs here to prove by a preponderance of the evidence that aboriginal title was plainly and unambiguously extinguished.

FN51. To the extent that defendants suggest that, in any situation when something must be proven unambiguously, it necessarily must be by clear and convincing evidence, the Court disagrees. *See, e.g., MacDraw, Inc. v. CIT Group Equip. Fin., Inc.,* 157 F.3d 956, 961 (2d Cir.1997) ("To prevail on its claim of promissory estoppel, [plaintiff] had to prove by a preponderance of the evidence ... a clear and unambiguous promise made by defendant....").

In any event, this dispute between the parties regarding the burden of proof and standard of proof is not critical to the outcome of this lawsuit because the Court finds that, even if the Court adopted defendants' position by placing the burden of proof on plaintiffs and applied a "clear and convincing evidence" standard, plaintiffs still prevail in this lawsuit. In other words, for the reasons discussed *infra,* the Court finds that plaintiffs have demonstrated by clear and convincing evidence that the Nation's aboriginal title to Westwoods has been extinguished in a plain and unambiguous manner.

(4) USE OF EXPERT TESTIMONY

There were a series of motions and objections by the parties opposing their adversary's use of expert testimony regarding historical facts and circumstances pertaining to the issue of the extinguishment of aboriginal title. The Court addressed these issues during the trial utilizing the standards and procedures set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and its progeny. Specifically, when a party wished to challenge an expert under *Daubert,* the Court allowed the opportunity to question the witness on the *Daubert* issues prior to the Court ruling on the motion to preclude the expert's testimony .[FN52]For reasons that were set forth on the record, the Court allowed all the proposed expert witnesses to testify because it found the *Daubert* criteria to be satisfied. Specifically, the

Court concluded that the purported defects in qualifications and methodology went to the weight of the testimony, and not the admissibility, and that the testimony did not improperly infringe on the Court's role to determine questions of law. Although the legal and factual bases for the Court's decision regarding these challenges to the experts are contained in the record, the Court will highlight key aspects of its rulings below.

FN52. Some courts have concluded that, in the context of a bench trial where there is not the same concern of juror confusion or potential prejudice, the court has considerable discretion in admitting the proffered testimony at the trial and then deciding after the evidence is presented whether it deserves to be credited by meeting the requirements of *Daubert* and its progeny. *See, e .g., New York v. Solvent Chem. Co., Inc.,* No. 83-CV-1401C, 2006 WL 2640647, at *2 (W.D.N.Y. Sept. 14, 2006) (collecting cases). Although the Court could have utilized that approach in this bench trial, the Court decided to follow the standard *Daubert* procedure and allowed the parties to conduct a preliminary examination of the witness to address any *Daubert* challenges first and then have the Court rule on those challenges before the witness was permitted to give his or her entire testimony.

(A) THE *DAUBERT* STANDARD

***65** The admissibility of expert testimony is analyzed under Rule 702 of the Federal Rules of Evidence, which provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. Under *Daubert,* the district court must perform a gatekeeping function to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."509 U.S. at 589;*see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999) (holding that whether the witness' area of expertise was technical, scientific, or more generally "experience-based," the district court, in its "gatekeeping" function, must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Nimely v. City of New York,* 414 F.3d 381, 396 (2d Cir.2005) ("The shift under the Federal Rules to a more permissive approach to expert testimony ... did not represent an abdication of the screening function traditionally played by trial judges.").

Thus, under Rule 702, the district court must make several determinations before allowing expert testimony: (1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact. *See Nimely,* 414 F.3d at 396-97. Moreover, if the requirements of Rule 702 are met, the district court must also analyze the testimony under Rule 403 and may exclude the testimony "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ."Fed.R.Evid. 403; *accord Nimely,* 414 F.3d at 397.

Under the *Daubert* standards, the Court must first determine whether the expert has sufficient qualifications to testify. *See Zaremba v. Gen. Motors Corp.,* 360 F.3d 355, 360 (2d Cir.2004) (stating that, where the witness lacked qualifications, an analysis of the remaining *Daubert* factors "seems almost superfluous"). Specifically, under Rule 702, the Court must determine whether the expert is qualified "by knowledge, skill, experience, training, or education."Fed.R.Evid. 702. A court should look at the totality of the witness' qualifications in making this assessment. *See, e.g., Rosco, Inc. v. Mirror Lite Co.,* No. CV-96-5658, 2007 WL 2274858, at *5 (E.D.N.Y. Aug. 6, 2007) ("A court must consider the 'totality of a witness'[ ] background when evaluating the witness'[ ] qualifications to testify as an expert." ') (quoting 29 Wright & Gold, Federal Practice and Procedure § 6265, at 246 (1997)); *accord Keenan v. Mine Safety Appliances Co.,* No. CV-03-0710, 2006 WL 2546551, at *2 (E.D.N.Y. Aug. 31, 2006). In addition, the Court must ensure that the expert will be proffering opinions on issues or subject matter that are within his or her area of expertise. *See Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 80 (2d Cir.1997).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

***66** With respect to reliability, as the Second Circuit has explained, the *Daubert* Court "has identified a number of factors bearing on reliability that district courts may consider, such as (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community."*Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 266 (2d Cir.2002) (citations and internal quotations omitted); *accord Nimely,* 414 F.3d at 396. These criteria are designed to be instructive, but do not constitute a definitive test in every case. *Kumho,* 526 U.S. at 151;*Nimely,* 414 F.3d at 396. Moreover, in addition to these criteria for determining whether the methodology is reliable, Rule 702 also requires that there be a sufficiently reliable connection between the methodology and the expert's conclusions for such conclusions to be admissible. *See Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *see also Amorgianos,* 303 F.3d at 266 ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.").

With respect to whether the expert's testimony will assist the trier of fact, the Second Circuit has repeatedly emphasized that "expert testimony that usurp [s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it, ... by definition does not aid the jury in making a decision; rather, it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's."*Nimely,* 414 F.3d at 397 (citations and quotation marks omitted).

The proponent of the expert testimony bears the burden of establishing the admissibility of such testimony under the *Daubert* framework by a preponderance of the evidence standard. *See Daubert,* 509 U.S. at 592 n. 10 ("These matters should be established by a preponderance of proof.") (citing *Bourjaily v. United States,* 483 U.S. 171, 175-76 (1987)); *see also*Fed.R.Evid. 702 advisory committee's note ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."); *Lust v. Merrell Dow Pharms., Inc.,* 89 F.3d 594, 598 (9th Cir.1996) ("It is the proponent of the expert who has the burden of proving admissibility."); *accord Baker v. Urban Outfitters, Inc.,* 254 F.Supp.2d 346, 353 (S.D.N.Y.2003) (same).

(B) SUMMARY OF COURT'S RULINGS ON THE EXPERTS

***67** As noted above, in the instant case, the Court utilized the procedure established for challenges to expert testimony under *Daubert,* analyzed the particular expert testimony that each party sought to admit under the applicable standard and, for the reasons set forth in detail on the record, determined that the testimony satisfied the requirements of Rule 702 and was not excludable under Rule 403. However, for purposes of convenience and completeness, the Court will summarize below the basis for the Court's ruling on these *Daubert* issues.

First, each of the experts had sufficient qualifications as historians or ethnohistorians by knowledge, skill, experience, training, or education to testify about the colonial era documents pertaining to transactions or events relating to the Westwoods parcel and to provide the historical context for those documents. For example, although the Shinnecock Nation challenged the credentials of Mr. Lynch, Judge Platt correctly found him sufficiently qualified to be permitted to proffer his opinions. Mr. Lynch's qualifications included, among other things, the following: (1) a Bachelor of Arts degree from Southern Connecticut State University where he majored in Sociology/Anthropology; (2) a Masters of Arts Degree from Wesleyan University, where his concentration of study was Anthropology/History and he authored a thesis on the process of adoption among the Iroquois Confederacy during the 18th century; (3) although he did not obtain a Ph.D., he completed all the necessary requirements for a doctoral degree in Anthropology/History at the University of Connecticut and passed his oral doctoral exam; (4) he has taken courses in title searching and conducted research, published works, and given presentations on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

many issues relating to Indian tribes of New York and New England; (4) he has approximately 13 years' experience as a private ethnohistorical consultant on Indian-related matters concerning Indian land claims, historical title searching, and petitions for federal acknowledgment as an Indian tribe; and (5) he was qualified as an expert in a Connecticut Superior Court lawsuit and has testified before the Connecticut Legislative Planning and Development Committee regarding legislation involving land grants. (T12; Tr. 394-96.) Thus, the Court found him qualified to testify concerning the matters covered by his report and supplemental report, including an analysis of interactions between the Shinnecocks and early settlers of the Town, the nature and scope of the Shinnecocks' historical use of Westwoods, and the nature and scope of authority exercised over that property by the Shinnecocks and the Town.

The Court also found Alexander von Gernet (an adjunct professor of Anthropology at the University of Toronto) to be qualified based upon his educational background, training, experience, publications, teaching, and prior expert certifications. (Tr. 996-97.) In fact, Professor von Gernet had been qualified as a expert witness in numerous jurisdictions in both Canada and the United States (including testifying and/or writing affidavits in twenty court proceedings), had previously testified as an expert with respect to the authority of the colonial governors, had testified in the *Cayuga* land claim litigation, and had written reports in three New York land claim cases (Cayuga, Seneca, and Oneida) addressing claims that certain Indian lands in New York remained unextinguished due, among other things, to unauthorized acts by New York governors. (S62.) Although defendants raised issues regarding Mr. Lynch's impartiality and certain errors in his reports and testimony, and similar arguments asserted in connection with errors in Professor von Gernet's report, the Court concluded that those issues went to the weight of their testimony, but were not sufficient to render them unqualified under the Rule 702 standard. *See McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1043 (2d Cir.1995) (holding that alleged weaknesses in expert's academic training and "other alleged shortcomings ... were properly explored on cross-examination and went to his testimony's weight and credibility-not its admissibility").

***68** With respect to various arguments by the Shinnecock Nation that either Mr. Lynch or Professor von Gernet were testifying about issues or subject matters that were purportedly beyond their area of expertise, the Court also found those arguments unavailing. For example, although the Shinnecock Nation argued that Professor von Gernet was not qualified to give testimony regarding the historical powers of New York colonial governors and the Shinnecock Tribe because he had never researched that particular issue prior to this litigation, the Court concluded that his expertise and qualifications could not be viewed so narrowly. Specifically, the Court ruled that the training and skills he had clearly developed in his other research and writing about the relationship between aboriginal people and colonial governors qualified him to provided testimony about the historical context of the authority of colonial governors as it related to the Shinnecock Nation. (Tr. 997-98.) Similarly, despite objections from the Shinnecock Nation, Mr. Lynch was qualified, based upon the experience outlined above, to testify about the historical context of various colonial era documents, including deeds and patents, as well as the Canoe Place Division. *See, e.g., Bunt v. Altec Indus. Inc.,* 962 F.Supp. 313, 317 (N.D.N.Y.1997) ("Liberality and flexibility in evaluating qualifications should be the rule ... [T]he expert should not be required to satisfy an overly narrow test of his own qualifications.") (citation and quotation marks omitted).

Second, the Court found that the methodology used by the various experts was sufficiently reliable to be admissible after considering the *Daubert* factors relating to this requirement. Specifically, the experts analyzed and considered the pertinent historical documents (including deeds, patents, confirmations, and other colonial era documents) in the context of the contemporary historical understanding. For example, Mr. Lynch's research included a review of "historical documents and records, deed, wills, leases, municipal and public records, treatises, and reports."(T12, at 6-7.) As a result, he spent substantial time researching and compiling the historical record that he has outlined in great detail in his report. The other experts, including Professor von Gernet and Professor Hermes, utilized a similar methodology. Based upon a review of these methodologies, the Court found that the experts' testimony was sufficiently reliable to be admissible under *Daubert* and, as with the objections to qualifications, the purported weaknesses complained of by the parties regarding methodology were the proper subject of cross-examination and went to the weight of these witnesses' testimony, not the admissibility. *See McCullock,* 61 F.3d at 1044 (finding expert testimony properly admitted where "[d]isputes

as to the strength of his credentials, faults in his use of different etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony"); *see also* *Daubert,* 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

***69** Finally, while seeking to offer their own expert testimony on these issues and topics, the parties sought to exclude or limit the opposing expert's testimony by arguing that the proffered expert testimony would not assist the court (as the trier of fact) in resolving the disputed issue regarding the extinguishment of aboriginal title and by arguing the testimony involved purely questions of law. After carefully considering this issue, the Court rejected those arguments and allowed both sides to present their expert testimony. The Court recognizes that the issue of whether aboriginal title was extinguished is a legal question for the Court to resolve and not experts. However, in deciding that issue, the Court is required to analyze centuries-old documents and historical events. It is the Court's conclusion that the consideration of expert testimony in the form of historians and ethnohistorians clearly assists the Court as the trier of fact, at a minimum, in identifying the ancient documents and historical events that may be relevant on this issue and providing testimony about the historical context for these documents and events to ensure that the meaning of the documents and/or events are not being misunderstood due to the substantial passage of time.

In fact, the Second Circuit has emphasized, in the context of litigation involving disputes about title to Indian land and extinguishment of Indian title to that land, that it is critical that the Court consider expert historical testimony to assist in the Court's determination of the meaning and interpretation to give to historical events. For example, in *Oneida Indian Nation v. New York,* 691 F.2d 1070 (2d Cir.1982), the issue was whether, under Article IX of the Articles of Confederation, New York had authority to extinguish Indian title to lands within its bounds. The district court, in granting a motion to dismiss, took judicial notice of historical facts that had been presented by both sides without the use of expert testimony. On appeal, the Second Circuit reversed and remanded the case for an evidentiary hearing to assist the district court in determining the issue raised by the motion to dismiss. The Second Circuit explained:

The district court, after reviewing the language and meager legislative history of the pertinent Articles [of Confederation] (no record of debates or committee reports was made), took judicial notice of pertinent individual records, notes, correspondence, histories, articles and other data, which may collectively be described as "historical evidence," as aids in interpreting the Articles, the Proclamation of 1783, and the 1784 Fort Stanwix Treaty. When there is no dispute as to the authenticity of such materials and judicial notice is limited to law, legislative facts, or factual matters that are incontrovertible, such notice is admissible.... However, when facts or opinions found in historical materials or secondary sources are disputed, it is error to accept the data (however authentic) as evidence, at least without affording the opposing party the opportunity to present information which might challenge the fact or the propriety of noticing it. Judicial notice of a disputed fact should not ordinarily be taken as the basis for dismissal of a complaint on its face. The better course is to conduct an evidentiary hearing at which the plaintiff may have its "day in court," and, through time-honored methods, test the accuracy of defendants' submissions and introduce evidence of its own.

***70** In the present case evidence of contemporary construction of the key Articles and surrounding circumstances relevant to their meaning, of which the district court took notice, contains statements with respect to factual issues, such as the understanding of representatives of federal and state governments and the Oneidas regarding the meaning of the disputed clauses, the pre-Revolutionary practices of the British Crown with respect to matters involved, and the post-Revolutionary practices of the new federal government and the states under the clauses. The district court drew heavily upon this extrinsic historical evidence as the basis for its interpretation of the Articles even though the evidence had not been the subject of cross-examination or analysis through expert testimony and may not have been put in perspective by introduction of other relevant evidence. In short, both sides and the court appear to have referred to, relied upon, and quoted from numerous untested primary and secondary historical sources, including history books, treatises, and other papers. We agree with appellants that the district court should not have granted defendants' Rule 12(b) (6) motion on the basis of this type of evidence without affording the plaintiffs an evidentiary hearing in order to clarify the meaning and context of statements relied on and the weight to be given to them.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3307089 (E.D.N.Y.)
**(Cite as: Slip Copy)**

Page 60

*Oneida,* 691 F.2d at 1086 (citations omitted). In another opinion issued before the evidentiary hearing in *Oneida* took place, the Second Circuit further articulated what type of hearing needed to be held:[T]he hearing to be held by the district court will be unlike the traditional trial of an issue of fact. Instead, the trial court will consider issues of law and statutory construction, against the historical background of the events surrounding the treaties, and the adoption of the applicable portions of the Articles of Confederation relied on by plaintiffs. This factual background in turn will probably be derived from the expert testimony of historians and others, and consideration by the court of contemporaneous documents and oral traditions.

*Oneida Indian Nation v. New York,* 732 F.2d 261, 265 (2d Cir.1984). On remand, the district court conducted an evidentiary hearing during which it considered the reports and testimony of the parties' respective experts and then granted the defendants' motion to dismiss. *Oneida Indian Nation v. New York,* 649 F.Supp. 420, 422 (N.D.N.Y.1986), *aff'd,*860 F.2d 1145 (2d Cir.1988).

In other cases involving tribal land and gaming claims, courts have similarly allowed consideration of historical experts to assist the trier of fact.*See, e.g., Cayuga Indian Nation v. Pataki,* 165 F.Supp.2d 266, 304-357 (N.D.N.Y.2001) (considering the testimony of Professor von Gernet on the question of New York's good faith in dealing with the Cayugas from the 1700s through the 1900s); *see also United States v. Idaho,* 210 F.3d 1067, 1069 (9th Cir.2000) ("At issue in this case is the ownership of submerged lands lying within the present-day boundaries of the Coeur d'Alene Indian Reservation, which was originally set aside by executive order in 1873. After a nine-day trial involving multiple expert and lay witnesses, extensive written reports, scientific studies, and historical documents, the district court issued a lengthy and meticulous decision...."); *Wisconsin v. Stockbridge-Munsee Cmty.,* 67 F.Supp.2d 990, 993 (E.D.Wis.1999) (noting that court heard testimony of historian in lawsuit involving plaintiff seeking a preliminary injunction to enjoin defendant Indian tribe from conducting a gambling operation in an area which the state argued was statutorily off-limits to gambling); *Wisconsin v. Stockbridge-Munsee Cmty.,* 366 F.Supp.2d 698, 742-43, 779 (E.D.Wis.2004) (granting summary judgment to the state and listing numerous expert witnesses).

***71** Therefore, having considered the objections by the parties to their adversary's experts, the Court concluded that this expert testimony regarding these historical documents, and the circumstances surrounding the creation and implementation of these documents, was necessary and appropriate given the legal issues that the Court needed to resolve and did not constitute pure questions of law for which no expert testimony was necessary.[FN53]

FN53. In addition to objecting to Professor Hermes's testimony on the grounds that it involved purely legal conclusions, the State also objected to her testimony because the State believed that the political question doctrine precluded any testimony or exhibits offered to question the propriety of the sovereign's extinguishment of aboriginal title over the Westwoods land. The Court has considered that objection, but declines to reject or strike her testimony on that basis. The Court recognizes that, once extinguishment by the sovereign is established, the Court cannot question the wisdom or propriety of such extinguishment (as discussed *infra* ). However, Professor Hermes's testimony was offered, in part, to attempt to persuade the Court *as a matter of historical fact* that extinguishment never occurred in the first place because the purchase of lands reflected in the Ogden and Topping Deeds was purportedly never approved by the General Court of the Colony of Connecticut as required by the 1650 Order. In other words, her position as it related to the two deeds was not that the sovereign invalidly extinguished aboriginal title in these deeds, but rather that the land transactions by these individuals with the Indians were invalid or void because they were never approved by the sovereign. Although the Court ultimately disagreed with her analysis, it needed to be fully considered. As noted above, the Second Circuit has cautioned that "when facts or opinions found in historical materials or secondary sources are disputed, it is error to accept the data (however authentic) as evidence, at least without affording the opposing party the opportunity to present information which might challenge the fact or the propriety of noticing it."*Oneida Indian Nation,* 691 F.2d

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3307089 (E.D.N.Y.)
**(Cite as: Slip Copy)**

Page 61

at 1086. Therefore, despite the State's objection to Professor Hermes's testimony on grounds of the political question doctrine and the other grounds outlined in their motion to strike, the Court declines to preclude consideration of Professor Hermes's testimony regarding information that the Shinnecock Nation seeks to present to the Court that they view as challenging the fact or the propriety of the Court considering these historical documents. Instead, the Court has fully considered Professor Hermes's testimony, and the other evidence pointed to by the Shinnecock Nation seeking to undermine the plain language of these historical documents, and finds such arguments unpersuasive in light of the entire trial record, for the reasons discussed in detail *infra.*

In sum, as set forth in the trial record, the Court found that each party provided a sufficient basis for the admissibility of the expert testimony under *Daubert* and the Court considered that testimony, not as direct testimony on the ultimate legal issue of extinguishment, but rather for a different purpose-namely, as instructed in other cases by the Second Circuit, to assist the Court in identifying the relevant colonial era documents and understanding the historical context for those documents, so that the Court could make the legal determination on the issue of extinguishment of aboriginal title.[FN54] The Court will now turn to its analysis of that issue having carefully considered the exhibits, expert testimony, and other evidence presented during the trial.

FN54. As noted *supra,* the parties agreed that the contents of the expert reports would be deemed to have been read into the record for purposes of direct examination. In addition to moving to exclude certain experts in their entirety on the grounds that the expert's testimony related purely to questions of law, there were also objections to the reports because of purported legal opinions contained in certain portions of the reports. In other words, the argument was that, even assuming *arguendo* that the testimony should not be excluded in its entirety as pure legal opinions, there were certain statements within the report that should be stricken on that basis. However, the objecting parties made this generalized objection without identifying specific sentences or portions of the report that were objectionable. When the objections were made, the Court reiterated that, to the extent the reports contained sentences constituting pure questions of law, it was not going to consider such portions of the report, but invited the parties to submit objections to particular sentences within the report if they wanted to move to strike portions of a report. No such specific objections were submitted by the parties.

(5) ANALYSIS

The evidence at trial demonstrated in an overwhelming manner that, during the colonial era, the Shinnecock Nation conveyed, ceded, and relinquished all of its right, title, and interest in the Southampton lands west of Canoe Place, including Westwoods, and that aboriginal title to those lands was extinguished by the then-prevailing sovereign authority. As set forth in detail below, the intentional sale of these lands, including Westwoods, by the Shinnecock Nation to non-Indians and the extinguishment of aboriginal title to such lands are plainly and unequivocally contained in the language of a series of colonial era documents pertaining to these transactions, including the following: (1) the 1659 Ogden Deed and 1662 Topping Deed reflecting transactions in which the Shinnecock conveyed certain lands, including Westwoods, to non-Indians; (2) the 1666 Nicolls Determination, in which Governor Nicolls confirmed that the lands, including Westwoods, had been conveyed by the Shinnecock Nation, thereby extinguishing aboriginal title in those lands; (3) the 1676 Andros Patent, in which Governor Andros issued a patent to the Proprietors of Southampton, which included Westwoods; and (4) the 1686 Dongan Patent, in which Governor Dongan again confirmed the prior extinguishment of aboriginal title. The assertions by the defendants that these transactions were void, and that the decisions of the New York Provincial Governors acting with sovereign authority were somehow inconsequential, are plainly contradicted by the historical record. Neither the language nor the context of the colonial era documents is ambiguous in any way; rather, the documents reflect a clear and compelling historical record establishing the sale of the land by the Shinnecock Nation and the repeated approval and confirmation of this conveyance of title to Southampton by various New York Provincial Governors, acting under the authority of the British

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Crown. Moreover, in addition to the clear and unmistakable intent of the sovereign authority to extinguish the Shinnecock Nation's aboriginal title to Southampton lands west of Canoe Place contained in these colonial era documents, the subsequent actions, and inactions, of the Shinnecock Nation after the issuance of these documents further confirm the extinguishment of aboriginal title to those lands-namely, prior to the position taken in the instant lawsuit, the Shinnecock Nation failed to challenge these conveyances and sovereign acts of extinguishment for over 300 years.

(A) THE COLONIAL ERA DOCUMENTS

(I) THE OGDEN AND TOPPING DEEDS

***72** The Ogden and Topping Deeds reflect the plain and unambiguous conveyance of Southampton lands west of Canoe Place, including Westwoods, by the Shinnecock Tribe to non-Indians. *See* *South Dakota v. Bourland,* 508 U.S. 679, 689 (1993) ("When an Indian tribe conveys ownership of its tribal lands to non-Indians, it loses any former right of absolute and exclusive use and occupation of the conveyed lands."). Although the defendants presented expert testimony and other factual evidence in support of their argument that these conveyances were invalid or void, the Court found such evidence unpersuasive for the reasons set forth below.

As outlined in the Finding of Facts, the first critical colonial era document is the May 12, 1659 Ogden Deed by which the well-known Sachem Wyandanch and his son conveyed all of the Shinnecock Tribe's right, title, and interest in lands west of Canoe Place (which was then the western boundary of the Town) to John Ogden. (T50.) Ogden was a Southampton Proprietor and Connecticut General Court magistrate. The language of the Ogden Deed clearly states the Shinnecock's intent to relinquish and cede all of their rights to the lands covered by the Ogden Deed, which included Westwoods. In particular, the Ogden Deed provides that the Shinnecock have "given and granted" such lands "unto Mr. John Ogden for himself his heirs executors and assigns for ever...." (T50, at 162.) When examining the execution of this deed in the historical context of other colonial era documents, it is clear that the reason for the conveyance of these lands to Ogden was payment of an arson fine imposed on the Shinnecock by Connecticut Colony. This conveyance to Ogden has become known as the "Ogden Purchase" or "Quogue Purchase." The lands involved in the Ogden Purchase were subsequently conveyed by Ogden to John Scott and Scott then conveyed those lands to the Proprietors of Southampton on February 2, 1663.

The second critical document of the colonial era is the April 10, 1662 Topping Deed. In the Topping Deed, Sachem Wyandanch's political successor, Weany Sunk Squaw, and others, on behalf of the Shinnecock Tribe, sold and conveyed lands west of Canoe Place (including lands located to the west of the western boundary of the Ogden Purchase) to Thomas Topping. (T58.) Topping was a Southampton Proprietor and Connecticut General Court magistrate. The Topping Deed specifically provides that the Shinnecock have "given and granted and by these presents do give and grant bargain sell assign and set over unto Thomas Topping aforesaid his heirs and assigns for ever all our right title and interest that we have or ought to have in a certain tract of land...." (T58, at 167.) The use of language such as "all our right title and interest" is precisely the type of language used when there is an intent to transfer all title in land. *See, e.g., Or.* *Dep't of Fish and Wildlife v. Klamath Indian Tribe,* 473 U.S. 753, 766 (1985) ("The Treaty language that ceded that entire tract ... stated only that the Tribe ceded 'all their right, title, and claim' to the described area. Yet that general conveyance unquestionably carried with it whatever special hunting and fishing rights the Indians had previously possessed...."); *see also* *United States v. Minnesota,* 466 F.Supp. 1382, 1385 (D.Minn.1979) ("[T]he 'all right, title, and interest' language is 'precisely suited' for the purpose of eliminating Indian title ....") (citation omitted). The lands of the Topping Deed ran from Canoe Place, on the east, to "Seatuck" on the west, which is the modern-day border between Southampton and Brookhaven. More importantly, there is no question that those lands included Westwoods. The purchase price reflected in the Topping Deed was "four score fathoms of wampum." (T58, at 168.)

***73** Although the defendants concede that the language of these deeds involve the conveyance of land including Westwoods by Shinnecock members, they seek to have this Court disregard these transactions as void or legally invalid on several grounds, including the following: (1) Sachem Wyandanch lacked authority from the Shinnecock to convey the land; (2) the Shinnecock may not have understood the import of the transaction; and (3) the applicable law of the Colony of Connecticut, whose jurisdiction Southampton operated under at the time of

these transactions, prohibited any individual from directly acquiring Indian lands. These arguments were presented primarily through defendants' expert, Professor Hermes. However, the Court finds these arguments, and the evidence presented in support thereof, unpersuasive. As a threshold matter, prior to this litigation, the Shinnecock have never challenged the validity of these transactions. In fact, in the 1978 Litigation Request, the Shinnecock declared that “the Tribe's domain to the west of Canoe Place was conveyed to non-Indian individuals in 1659, 1662.”(T229, at 8; *see also id.* at 16 (“The tribal territory to the west of Canoe Place was subsequently conveyed to non-Indian individuals by deeds of 1659 and 1662.”).) Moreover, as set forth below, their current position regarding the invalidity of these deeds is clearly contradicted by historical documents, the opinions of other historians, and the Shinnecock's own admissions.

With respect to Sachem Wyandanch, although Professor Hermes disputed Sachem Wyandanch's authority to act on behalf of the Shinnecock Tribe as a matter of historical fact, that position is undermined by, among other things, the following: (1) the September 19, 1666 reports of Southampton Proprietors Thomas Saire and Thomas Halsey (T46, at 158); (2) the fact that, as acknowledged by Professor Hermes, Sachem Wyandanch's authority over the Shinnecocks was recognized by the Connecticut Colony General Court in 1657 (T47, at 295; Tr. 2541); (3) Professor Hermes's admission that John Strong, a historian who Professor Hermes admitted possessed some expertise regarding the Shinnecocks, also concluded that Sachem Wyandanch had such authority, which is the same conclusion reached by Mr. Lynch (Tr. 2542-43); and (4) Professor Hermes's concession that the Shinnecock Tribe has never disagreed with the proposition that Sachem Wyandanch was authorized to act on the Tribe's behalf (Tr 2544).[FN55] In short, the historical record clearly supports the conclusion that Sachem Wyandanch was acting with the authority of the Shinnecock at the time of the Ogden transaction; there is simply no evidence to suggest otherwise.

FN55. In fact, in its 1978 Memo, the Shinnecock Nation referenced that the Ogden Deed was from “Shinnecock sachem, Wiandance” and did not contest his authority to act on their behalf. (T229, at “I” of “Index to Appendices.”)

The defendants' second argument-that the Shinnecocks may not have understood the meaning or import of their transactions with Ogden and/or Topping-is similarly unavailing. As one court noted in rejecting such an argument, the purported failure to recognize the import of giving up its rights at the time does not relieve the Shinnecock Nation of its obligations to live up to its agreement:

***74** Plaintiff's second argument is equally unavailing. Although plaintiff may not have thought it was relinquishing usufructuary rights in the 1831 treaty, its lack of understanding does not relieve it of its agreement to give up those rights.

Plaintiff's third argument is that the tribe would not have understood the terms, “surveyed and offered for sale.”....It is one thing for the tribe to show that a particular term would have had another meaning to treaty negotiators in the mid-nineteenth century; it is an entirely different thing for the tribe to say that its leaders would not have known the meaning of a particular term .... [A] claim of the ... lack of understanding by one party, is essentially immaterial.

*Menominee Indian Tribe of Wis. v. Thompson,* 943 F.Supp. 999, 1009, 1010 (W.D.Wis.1996), *aff'd,* 161 F.3d 449 (7th Cir.1998). Moreover, in the instant case, any suggestion that the Shinnecock did not understand the parameters of these transactions, is based upon sheer speculation, rather than any evidence in the historical documents or record. To the contrary, the consideration received for these transactions and subsequent actions of the Shinnecock fully support a finding that they understood exactly what lands they were conveying by executing these transactions.

Finally, the defendants seek to evade the legal impact of the Ogden and Topping Deeds by arguing, through Professor Hermes, that those conveyances were “void ab initio” by reason of a pre-1650 order (law) of the Connecticut General Court, which required the General Court's approval of any transactions between settlers and Indians, and that no one has been able to locate any such approval. This position, however, has a number of significant weaknesses. First, Professor Hermes acknowledged that she has been unable to locate the pre-1650 Order of the Connecticut General Court upon which her opinion is based. (Tr. 2545-46.) Second, Professor Hermes conceded that she does not know whether that pre-1650 Order prescribed any consequences for its violation, such as rendering violative transactions “void.” (Tr. 2548.) In fact, the 1650 Order, which makes reference to the pre-1650 Order on which Professor Hermes relies, does not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3307089 (E.D.N.Y.)
**(Cite as: Slip Copy)**

Page 64

contain the word "void" or its synonym, or the phrase "null in law." Third, although Professor Hermes testified she was unable to find any record of Connecticut General Court approval of either the Ogden Purchase or the Topping Purchase, she also conceded that there is no way to know for certain whether every transaction between settlers and Indians would necessarily be reflected in the records of a Colony's General Court. (Tr. 2594-96.) Thus, her unsuccessful search for a record such as the authorization of a transaction between settlers and Indians does not necessarily mean that such a record never existed. In short, after considering the historical evidence, the Court does not believe that the pre-1650 Order provides a sufficient legal basis to declare these transactions void as a matter of historical fact or as a matter of law.[FN56]

FN56. In addition, the Court notes that any alleged deficiency in these conveyances because of purported violations of Connecticut law was remedied by the Connecticut State Legislature in 1993. In particular, in 1993, the General Assembly of the State of Connecticut enacted "An Act Validating Transfers of Certain Lands," which provides, in pertinent part, as follows:

All transfers of land more than sixty years prior to the effective date of this act of any person or group or association of persons, otherwise valid except for the possible fact that the general assembly or its predecessor legislative bodies or other governmental authorities did not confirm, validate, ratify or approve such transfers of land in accordance with state or colonial laws or resolutions, common law or any other provisions requiring legislative or governmental approval of transfers of land held or occupied by any such person or group or association of persons, are hereby confirmed, validated, ratified and approved.

Special Act 93-1. Thus, to the extent that the defendants argue that the Ogden and Topping Deeds are somehow invalid because they were never approved under Connecticut law, this statute further defeats such an argument because it approved, validated, and ratified such transactions. The Court is unaware of any legal constraint that would prevent Connecticut from approving these colonial era transactions in modern times.

***75** In any event, the resolution of this issue regarding the 1650 Order is not critical to the Court's analysis because of subsequent historical events that demonstrate the clear and unambiguous intention to extinguish aboriginal rights in the lands involved in the Ogden and Topping Deeds, including Westwoods. More specifically, as discussed below, even assuming *arguendo* that the Ogden and Topping Deeds were violative of a pre-1650 Order of the Connecticut General Court, these transactions were later confirmed and ratified by the prevailing sovereign authority-namely, various New York Provincial Governors-thereby clearly extinguishing aboriginal title to those lands.

(II) THE NICOLLS DETERMINATION

In a document dated September 17, 1666, several Shinnecock members recorded their "protest" over the 1662 Topping Purchase. In that document, these Shinnecock members argued that they were the "true proprietors of the said lands," and they expressed their desire to receive compensation for the sale to Topping. (T61.) Significantly, these protestors did not question the validity of the conveyance itself or seek to void that transaction. In particular, the protesting Shinnecock group expressly assigned and conveyed whatever interest they held in the lands of the Topping Purchase to "our ancient and loving friends the Townes men of Southampton to them and their successors for ever."(T61, at 169.) Instead, the focus of the protest was whether they should receive payment from Southampton for the land. Thus, the protesters asked that Governor Nicolls determine whether they should receive payment from the Southampton Proprietors for their interest.

Governor Nicolls had been appointed the first English governor of the Province of New York on April 2, 1664, by virtue of a commission from the Duke of York. As such, Governor Nicolls possessed the authority to make laws, settle disputes, and address the question of Indian land purchases. As a result of this protest, Governor Nicolls considered the dispute fully and, on October 3, 1666, he issued the Nicolls Determination. Specifically, Governor Nicolls concluded and determined a "difference" between the "town of Southampton" and Topping. (T66, at 54.) The Nicolls Determination was made at a time when Connecticut no longer had jurisdiction over Long Island and while Governor Nicolls was the prevailing sovereign authority in the Province of New York, which included Long Island.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The language of the 1666 Nicolls Determination reveals the plain and unambiguous intent of Governor Nicolls (the sovereign authority at that time) to recognize the validity of the Topping Deed and to extinguish the Shinnecock's aboriginal title to the lands of the Topping Purchase-namely, all Southampton lands west of Canoe Place, including Westwoods-and to recognize that those lands were now owned exclusively by the Town, subject to no other rights or interests. In the Determination, Governor Nicolls declared that "all the right and interest that ye said Capt Thomas Topping and John Cooper have by the said deeds or any other way or means obtained ... is belonging, doth and shall belong unto the town of Southampton."(T66, at 54.) In addition, Governor Nicolls directed Thomas Topping and John Cooper to "deliver the town of Southampton all their deeds, writings and evidences that they have of a certain tract of land [*i.e.,* the lands of the Topping Purchase]." (T66, at 54.) He further instructed the Town to pay to the "Indians (concerned to receive it)" the sum of four score fathom of wampum, which was precisely the amount specified as consideration in the Topping Deed. (T66, at 55.) Finally, Governor Nicolls assured the Town that he would defend the Town in its peaceable enjoyment of the lands of the Topping Purchase, "[a]gainst all other claims whatsoever."(T66, at 55.)

***76** Therefore, any conceivable doubt as to the validity of the Ogden and Topping Deeds, based upon those transactions having been purportedly done in violation of the laws of Connecticut, was completely eliminated by this Determination of Governor Nicolls, when he (and not the Connecticut Colony) was now the sovereign authority. At that time, Governor Nicolls would have already been aware of the contention of Connecticut Colony Secretary John Allyn, who had written to Governor Nicolls some 18 months earlier, that under Connecticut Colony law "no land was to be purchased to the perticuler use of any person, without the consent of or Generall Courte, and all such purchases to be null in lawe."[FN57](D71.) Despite the existence of Allyn's claim, however, Governor Nicolls recognized the validity of the Topping Deed and the Town's title, which ultimately rested on that Deed. In fact, the Nicolls Determination does not suggest in any way that the Topping Deed was invalid or legally defective. It may have been that Governor Nicholls disregarded Allyn's position either because he did not believe that the Topping Deed had violated any Connecticut law, or he determined that the law of Connecticut Colony was irrelevant to his Determination as the sovereign authority over New York. In any event, whatever the reason, it is clear from the historical record that, despite Allyn's objection, the sovereign authority of New York ratified and confirmed the transaction.

> FN57. Professor Hermes testified that "it is likely" that the Allyn Letter was referring to a 1663 law of the Connecticut Colony (not the 1650 Order), which was enacted after both the Ogden and Topping Deeds, but opined that it could have been referring to past practice. (Tr. 2554.)

Subsequent to the Nicolls Determination, the directives of Governor Nicolls were clearly implemented. Specifically, Topping delivered the deeds, writings, and evidences of his Topping Purchase to Southampton by an instrument dated November 6, 1667, in which he formally assigned his right, title, and interest in the Topping Purchase to the Town. (T197.) Moreover, the Town remitted the "four score fathom of wampum" to the Shinnecock. This is confirmed in a document dated February 22, 1667 (N.S.), in which several Shinnecocks affirmed not only their April 10, 1662 sale of lands to Topping and that they were "fully contented" with that transaction, but they also acknowledged their receipt of the four score fathom of wampum from the Town. (S70, 70A.) *See* United States v. Dann, 873 F.2d 1189, 1194 (9th Cir.1989) ("[P]ayment for the taking of a[n] aboriginal title establishes that title has been extinguished."); *see also* United States v. Gemmill, 535 F.2d 1145, 1149 (9th Cir.1976) ("[A]ny ambiguity about extinguishment ... has been decisively resolved by congressional payment of compensation").

Therefore, the events surrounding the Nicolls Determination conclusively establish that: (1) the Shinnecock signatories in February 1667 expressed their agreement with their prior conveyance of land to Topping; (2) payment from the Town was accepted and retained by the Shinnecock for that land; and (3) the Governor, as the sovereign, had determined that, regardless of any position by the Connecticut Colony, the rights and interests to the land from the Topping Deed (including Westwoods) belonged to the Town. Under such circumstances, it is hard to imagine a more clear and unambiguous extinguishment of aboriginal title to this land.

***77** Defendants attempt to argue that any alleged

extinguishment of title, by Governor Nichols or otherwise, was subsequently invalidated by the Dutch's re-conquering New York in 1673 as a result of the Third Anglo-Dutch War and by the Order of the New York General Court of Assizes, dated October 5, 1676, relating to Southampton's failure to comply with the Law of 1664 concerning the taking out of "Grants, Patents, or Confirmations for their Towns or Lande."The Court finds both of these arguments to be without merit.

First, as a threshold matter, once aboriginal title is extinguished, it cannot be revived. In any event, any potential invalidation of titles by the Dutch re-conquering New York in 1673, for a brief period, was clearly remedied by Governor Andros in 1674 after the English re-conquered New York. More specifically, after the English re-conquered New York in 1674, a new charter was granted to the Duke of York in June 1674 on substantially the same terms that had existed previously. (S62, at 25.) Moreover, in that same year, after Governor Andros was appointed Governor of New York, he issued a proclamation in which he explicitly stated that "all former grants priviledges or concessions heretofore granted and all the estates legally possessed by any under his Royall Highnesse before the late Dutch government, As also all legall, judiciall proceedings during that government to my arrivall in these parts are hereby confirmed; And the possessors by virtue thereof to remain in quiet possession of their rights."(S72, at 108.) In other words, at the time when Governor Andros was the sovereign in New York, he made clear that all the transactions that occurred before the Dutch re-conquered in 1673 were still valid. Therefore, any argument that the prior extinguishment of aboriginal title was invalidated by the Dutch re-conquering of New York cannot prevail.

Second, defendants' contention regarding the consequence of the 1676 Order of the Court of Assizes is similarly unavailing. The Judgment made clear that the execution of the forfeiture of their titles and rights to lands in the town would take place *if* they did not comply with the Law of 1664 (regarding the taking out of "Grants, Patents or Confirmations for their Towns or Lande") by October 23, 2006, stating that the Town of Southampton "have forfeited all their titles, Rights & priviledges to the lands in the sd Townshipps & if they doe not by Monday fortnight next (being the 23rd day of this instant month) send up the acknowledgmt of their past Default & Resolves & Desire to obey & fulfill the Law & the severall orders of the Cort of Assizes, for the taking out their Grants, Patents or Confirmations, as directed by Law, Then Execution to issue out by Authority of this Crt for the above forfeiture to the use of his Maty without further delay."(D77, at 724.) However, the Town did comply with the Judgment, as well as the Law of 1664 and the prior orders, by the October 23, 1676 deadline. (D77, at 724.) Therefore, the condition that would lead to the execution of the forfeiture Judgment never took place. Accordingly, any claim that the Town lost title to Westwoods because of failure to comply with the October 5, 1676 Order is simply contradicted by the historical record.

(III) THE ANDROS PATENT

***78** On November 1, 1676, at a time when New York was no longer under the jurisdiction of Connecticut Colony, Governor Andros issued the Andros Patent. Governor Andros's authority to issue such a Patent, and to extinguish Indian title, cannot be questioned.

The Andros Patent confirmed the tract of land belonging to Southampton, and described that land as running from Seatuck on the west (which is the same western border established by the Topping Deed) and Wainscott on the east. (T188.) Thus, the Andros Patent described the entirety of the lands of modern-day Southampton, which include Westwoods, and ratified, confirmed, and granted, unto the freeholders and inhabitants of the Town, all of those lands, and "every part and parcell thereof ... for ever...." (T188, at 280.) Thus, Governor Andros confirmed that the Town was the owner of all lands from Wainscott (East Hampton) to Seatuck (Brookhaven), which included Westwoods. [FN58]

FN58. The Andros Patent provides also that "if it shall so happen that any part or parcell of the Lande within the bounds and Limits afore described be not already Purchased of the Indyans It may bee purchased (as occasion) according to Law ...." (T188, at 280.) Although the defendants contend that this sentence suggests that lands such as Westwoods had not been purchased lawfully, such an inference cannot be drawn from this language. Specifically, the word "if" indicates that Governor Andros was not making any finding that there were lands not already purchased from Indian tribes, but rather was simply providing that any such lands, if they existed, could be purchased.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Thus, this language does not undermine the conclusion that all lands within the bounds of the Town had, in fact, already been lawfully purchased from the Shinnecocks.

(IV) THE DONGAN PATENT

Subsequent to the issuance of the Andros Patent, disputes apparently arose between the Town and the Shinnecocks regarding the respective rights of the parties in the lands of the Town. As a result, an application was made by Major John Howell, a freeholder of the Town, and one of the patentees under the Andros Patent, for confirmation that the freeholders of the Town lawfully held the land. *See* T69, at 387 (seeking to have the Governor "confirm unto ye ffreeholders of said Towne in a more full & ample manner all the aboverecited tracts and parcells of land within the limitts and bounds aforesaid and finally determine the difference between the Indyans and the freeholders of the said towne of Southampton").

In response to that application, and on December 6, 1686, Governor Dongan issued the "Dongan Patent" to the Proprietors of Southampton. Governor Dongan's authority to issue such a Patent is well-established and the Colony of Connecticut had no jurisdiction over the Province of New York at this time. The Dongan Patent restates the terms of the Andros Patent, including its description of the "tract of land" belonging to Southampton, running from Wainscott on the east to Seatuck on the west. Moreover, the Dongan Patent provides, in relevant part, that the Governor had:

examined the matter in variance between the ffreeholders of the said Towne of Southampton and the Indyans and do finde that the ffreeholders of the Towne of Southampton aforesaid have lawfully purchased the lands within the Limitts and bounds aforesaid of the Indyans and have payd them therefore according to agreement so that all the Indyan right by virtue of said purchase is invested into the ffreeholders of the Towne of Southampton aforesaid....

(T69, at 387-88.) The "lands within the Limitts and bounds aforesaid," which the Town purchased from the "Indyans," were the entire lands of the Town, from Wainscott on the east, to Seatuck on the west. As with the Nicolls Determination, the Dongan Patent again emphasizes in clear and unmistakable language the prior extinguishment of the Shinnecock's aboriginal rights to any and all lands within the bounds of Southampton, including Westwoods.[FN59]

FN59. To the extent that the defendants suggest that the Town was not created until the Dongan Patent was issued in 1686 and thus could not have acquired land as a Town prior to that time, the Court rejects that argument. Although the Trustees of the Freeholders and Commonality of the Town of Southampton was formerly created in 1686, the Town itself dates back to 1640. *See, e.g.,* *Beers v. Hotchkiss,* 256 N.Y. 41, 46 (1931) ( "Southampton in its beginnings was without a royal patent, though its inhabitants like true precursors of the thought of Hobbes and Locke, had organized themselves already into a political community. The defect in the documents was supplied by the Andros patent of 1676 and the Dongan patent a decade later."). In fact, as discussed *supra,* there are numerous colonial era documents created between 1640 and 1676 that confirm that the Town was formed, and in actual existence, well before the Andros and Dongan Patents were issued. Thus, the Andros and Dongan Patents did not create the Town; rather, "[t]he rights of the original settlers were recognized and confirmed by the Andros and Dongan [patents], and any divisions of the common lands made prior thereto do not appear thereafter to have been questioned."*Shinnecock Hills & Peconic Bay Realty Corp. v. Aldrich,* 132 A.D. 118, 122 (2d Dep't 1909).

***79** In short, these colonial era documents plainly and unambiguously demonstrate beyond any question the extinguishment of aboriginal title by the sovereign authority on all Southampton lands west of Canoe Place, including Westwoods.

(B) SUBSEQUENT STATEMENTS AND CONDUCT BY THE SHINNECOCK NATION

The extinguishment of aboriginal title to this land is not only apparent from these colonial era documents and transactions, but is also confirmed by the conduct and statements of the Shinnecock in the centuries that followed these events.

First, in 1808, due to the rapid depletion of timber resources to the east of Canoe Place within

Southampton, the Shinnecock sought to obtain from the Town the right to cut timber situated to the west of Canoe Place. Specifically, at the 1808 Trustee Meeting, it was voted, in the presence of Shinnecock Trustees and Southampton Trustees, that the Shinnecock lease 120 acres west of Canoe Place that, by reference to the land boundaries in the minutes of the meeting, included Westwoods. (T134.) The Shinnecock's desire to lease these timber lands west of Canoe Place, including Westwoods, from the Town reflects an understanding by the Shinnecock that they no longer possessed ownership or occupancy rights west of Canoe Place.

Second, there have been sworn statements by members of the Shinnecock before the New York State Legislature reflecting their understanding that Southampton lands west of Canoe Place had been sold by the Shinnecock. For example, in 1888, Milton Winfield Lee, a Shinnecock Tribe member who was later elected multiple times as a Shinnecock Tribal Trustee, testified before the Special Committee that “[t]he tribe bought fifty acres of wood land” and that “I think they [the tribe] have a deed of this tract.”(T145, at 850-51 .) This testimony, which appears to be a reference to land including Westwoods, reflects an understanding that the Shinnecock no longer had aboriginal rights to this land and had to purchase it. Similarly, in 1943, a 74-year old Shinnecock member named Fred Smith testified at a public hearing before the “Joint Legislative Committee on Indian Affairs,” which had been established by the New York State Legislature. Smith testified that he had lived in Southampton his whole life and that the Tribe had purchased the “west wood land,” an apparent reference to Westwoods, “by some money the Shinnecocks had.”(T233, at 41-42.)

Finally, perhaps the most compelling statement by the Shinnecock Nation indicating their understanding that aboriginal title in Westwoods had been extinguished was in connection with a document submitted by the Tribe to the federal government about thirty years ago. Specifically, in the 1978 Litigation Request, the Shinnecock did not contest, or refuse to recognize, the legality of the Ogden and Topping Deeds in connection with Westwoods; rather, the Tribe conceded the validity and legality of these deeds by stating that “the Tribe's domain to the west of Canoe Place was conveyed to non-Indian individuals in 1659, 1662” (T229, at 8) and that “[t]he tribal territory to the west of Canoe Place was subsequently conveyed to non-Indian individuals by deeds of 1659 and 1662.”(T229, at 16.)

***80** Thus, the actions and statements by the Shinnecock Nation, or its members, in dealings with both the federal and state government bodies, as well as the 1808 lease with the Town, provide further evidence in support of the plain and unambiguous extinguishment of aboriginal title that is demonstrated in the series of colonial era documents relating to Southampton lands west of Canoe Place, including Westwoods.[FN60]

FN60. In addition to the affirmative actions and statements by the Shinnecock Nation, there also are a number of points in history, after the issuance of these colonial era documents, where the Shinnecock failed to claim it had aboriginal title to the land west of Canoe Place in circumstances where, if the Shinnecock understood such aboriginal title still existed, such a position logically would have been taken. For example, in 1738, the Town laid out and created the 1738 Canoe Place Division. This Division subdivided a 3,000 to 4,000 acre area west of Canoe Place and north of Montauk Highway, which included Westwoods, into 39 numbered lots. The Shinnecocks were not allotted any interests in those lots and there is absolutely no evidence in the historical record to any objection or challenge to the Canoe Place Division by the Shinnecock Tribe. Furthermore, in the Tribe's petition in 1822 to the New York State Legislature, the Shinnecock contended to be the “lawfull owners of a certain tract of land ... in the ... Town of Southampton ... bounded on the west by a place called canoe place....” (T136.) However, in that petition, the Shinnecock did not make any claim of ownership of any lands west of Canoe Place. In addition, in the early 1920s, the Town widened and improved Newtown Road (T208; T232, at 350), including the section of the road that runs across Westwoods, and there was no objection to that activity by the Shinnecock Nation.

(C) EVIDENCE REGARDING USE AND OCCUPANCY OF WESTWOODS

In support of its argument that plaintiffs have failed to demonstrate extinguishment of aboriginal title to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westwoods, defendants presented evidence regarding the Shinnecock Nation's use and occupancy of land west of Canoe Place, including Westwoods, and argued that "the evidence overwhelmingly supports the conclusion that the Nation has continuously owned and occupied Westwoods since first European contact."(Plts. Conclusions of Law, at 23.) Defendants pointed to several pieces of evidence including, but not limited to, the following: (1) the *Cassady* Litigation, in which the Trustees of the Shinnecock Tribe of Indians brought suit in 1890 against James Cassady in Suffolk County Court, in their capacity as Trustees; (2) the *Hubbard* Litigation, in 1922, in Suffolk County Court, involving the taking of loam from Westwoods by a road foreman of the Town; (3) the oral history of the Shinnecock Nation, as reflected in the testimony of a current Shinnecock Trustee who reported the general belief in the community that the Nation has always owned Westwoods; (4) historical evidence regarding meeting houses, chapels, and interactions with missionaries in the vicinity of Westwoods; (5) a 1879 photograph of purported Indian huts; and (6) a book in which the author recounts information told to him by his grandfather concerning the Shinnecock Nation.

The Court has carefully examined all of the evidence regarding the use and occupancy of the Westwoods land as it relates to the issue of aboriginal title and disagrees with both the factual assertion by defendants based upon this evidence, as well as the legal conclusions to be drawn from the evidence of use and occupancy.

With respect to the defendants' factual assertion, although there is evidence demonstrating the Shinnecock's use of the land west of Canoe Place in the 19th and 20th century, there is insufficient credible, reliable evidence demonstrating use or occupancy of that land by the Shinnecock Nation from the time of these colonial era transactions through the 18th century. As outlined in more detail in the Findings of Fact, there are several reasons for the Court's conclusion on this factual issue.

First, much of defendants' evidence only pertains to use of such land in the 1800s going forward. For example, in the 1890 *Cassady* Litigation, the court entered judgment for the Trustees and made a finding that the Nation had, at that time, been in quiet possession of Westwoods for "upwards of sixty years," which would place such possession in the early 1800s. Similarly, in the 1922 *Hubbard* Litigation, the court found that "for more than 70 years last past" plaintiff Shinnecock Tribe and its members "have obtained its firewood and fencing" from Westwoods, which would place such activity in the mid-1850s.[FN61] Thus, these references do not establish possession or use of Westwoods from the late 1600s to the 1800s.

> FN61. Although the referee appointed in the *Hubbard* case also stated that "within the memory of living witnesses three, four or five families of said tribe resided on said tract," (D1, Findings, at 2), there is no specific information that those families resided on Westwoods because the tract at issue in that case was "about 100 acres," (*id.*), while Westwoods is approximately 80 acres, and there is no information that any other families or individuals ever resided at Westwoods.

***81** Second, much of the evidence offered by the defendants to try to establish use and occupancy of the land west of Canoe Place, including Westwoods, between the late 17th and end of the 18th centuries is unpersuasive either because (1) the evidence only demonstrated use and occupancy of land east of Canoe Place (which is not in dispute); or (2) the evidence showed that Shinnecock may have been in the vicinity of Canoe Place or Westwoods, without any specificity regarding location in terms of whether it was west or east of Canoe Place and/or the precise nature and scope of the relationship of the Shinnecock Tribe to the location. For example, although there was a meetinghouse constructed by the Shinnecock Tribe in the late 18th century, the clear evidence is that it was situated east of Canoe Place. In addition, although there was evidence regarding the existence of the Canoe Place Chapel and the Reverend Paul Cuffee burial plot, both located south of Westwoods, there is no evidence of a Shinnecock Tribal settlement at that location or evidence that the chapel was exclusively a Shinnecock house of worship. Similarly, nothing in the missionary records shows that members of the Shinnecock Tribe inhabited Westwoods during the 18th century. Moreover, although defendants introduced an 1879 photograph purporting to depict Indian huts, there is nothing in the photograph supporting the position that the huts were at or near Westwoods, nor does it show when the huts were erected or whether the huts were occupied by Indians or non-Indians at the time.

Third, the Court finds that some of the evidence, in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

addition to being vague, is simply not reliable. For example, defendants point to Russell Carman's article *In the Beginning: The Shinnecock Indians and the First White Settlers in Quogue,* in which Carman stated that "[t]he Indians told my grandfather, and he told me, that a large portion of the [Shinnecock] tribe lived, except during the severe cold months, on the bluffs overlooking the Peconic Bay, on the westerly side of the 'haulover', where the Shinnecock locks are today."(D107, at 1.) However, the Court views this secondary source (with multiple levels of hearsay) as having very little, if any, probative value for several reasons. First, Carman does not identify the period of time during which this was reported and defendants' Indian habitation witness (Dr. Campisi) estimated that Carman's grandfather was told this information concerning the purported habitation of the haulover 200 years after the latest time at which the habitation occurred. (Tr. 2726-27.) Second, Carman cited no historical sources or documents for his statement that the Shinnecocks were living west of the "haulover" and the information itself is also vague. Even defendants' expert acknowledged that this "is not the strongest piece of evidence in the world" and is not a primary source document. (Tr. 2654-55; 2658-60.) Finally, and perhaps most importantly, to the extent defendants try to argue that this supports their position in a meaningful way, there is simply insufficient corroboration in the historical record to support their position.

***82** Not only is there the absence of reliable proof of use and occupancy of the land west of Canoe Place by the Shinnecock Tribe from the late 17th century until the 19th century, there is affirmative evidence that, at least as of the late 18th century, the Shinnecock Tribe was situated only east of Canoe Place, near Cold Spring, and not west of Canoe Place. In the late 18th century, the Shinnecocks built a meeting house that was situated east of Canoe Place, Specifically, the maps from that time period show the presence of a meeting house for the Shinnecock Tribe, east of Canoe Place, and no indication of habitation west of Canoe Place, including the following: (1) the 1797 NYDOT Map, which depicts the Indian meeting house east of Canoe Place and does not indicate any Shinnecock habitation west of Canoe Place (T199); (2) the 1780 map prepared by Major John Andre, which does not show any Indian habitation at all west of Canoe Place (D208a); (3) the 1829 Burr Map, which indicates both the name Shinnecock (spelled "Shunnecock") and the meeting house east of Canoe Place, but does not indicate the presence of Shinnecock Indians west of Canoe Place (T360); (4) the 1833 Sumner Map depicts a triangle symbol, indicating the location of the Indians, east of Canoe Place (T250); (5) the 1838 U.S. Coast Guard and Geodetic Survey Map depicts Indian dwellings east of Canoe Place at Shinnecock Neck, but shows no Indian dwellings or Indian habitation west of Canoe Place (T247, at 265, 269-71); (6) the 1859 Chace Map places the Shinnecock Indians east of Canoe Place, and does not show any Shinnecock habitation west of Canoe Place (T247, at 272); (7) the 1873 Beers map displays the Shinnecock Indians east of Shinnecock Bay, and east of Canoe Place, on Shinnecock Point or Shinnecock Neck, and contains no indication of Shinnecock presence or habitation west of Canoe Place (T247, at 274); (8) the Proprietor's Map, created no later than 1885, referenced two Shinnecock locations east of Canoe Place, but contains no indication of any Shinnecock interest in lands west of Canoe Place (T226).[FN62]

FN62. Although the 1836 Smith Map indicates a Shinnecock reservation south of Canoe Place on the west side of Shinnecock Bay, a report co-authored by defendants' habitation witness concluded that the map was in error. Moreover, the 1839 republication of the 1829 Burr map repeats the error in the 1836 Smith map.

Similarly, the Court does not view evidence regarding Shinnecock's oral history as undermining the extinguishment of aboriginal title. Defendants rely on the testimony of Mr. Gumbs, Chairman of the Shinnecock Tribal Trustees, to support the Shinnecock's position that its oral history demonstrates that it has always owned Westwoods. As a threshold matter, the Court notes that Mr. Gumbs's testimony is not a particularly strong basis for the evidence regarding oral history because the principal source of his understanding and knowledge of Westwoods was from Augustus (Gus) Thompson, who died when Mr. Gumbs was 10 years old, and with whom Mr. Gumbs became close because of nightly dinners and helping Mr. Thompson on his garbage collection route. There is no basis for concluding that Mr. Thompson had any leadership position with the Tribe or had any special knowledge as it related to tribal history. Moreover, this testimony is inconsistent with evidence regarding views of other members of the Shinnecock Nation. For example, during the course of a Shinnecock tribal meeting held on February 4, 2003, Kevin Eleazer, a former Shinnecock Tribal Trustee, stated, "[W]e're not even sure if we

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

own the land in West Woods It was given to us by a millionaire, and yet there was never a deed for that."(T261, at 42; Tr. 2947-48.) Moreover, as discussed in detail *supra,* the testimony by Mr. Gumbs about the oral history is also contradicted by the statements of Shinnecock representatives in state legislative hearings and in litigation that suggests that the Shinnecock Nation's aboriginal title to the Westwoods land was extinguished. Therefore, the Court concludes that the evidence of the Shinnecock Nation's oral history does not undermine the overwhelming evidence of extinguishment of aboriginal title contained in the record as a whole.

***83** In sum, the Court's thorough examination of the use and occupancy demonstrates that (1) there is no reliable evidence of use and occupancy of land west of Canoe Place by the Shinnecock Tribe from about 1675 until the 1800s; and (2) at some point in the 1800s, the Shinnecock Tribe was using land west of Canoe Place (which may have included Westwoods) for timber and, since that time, the Tribe has used such land for timber and other recreational uses, such as picnics. In terms of the legal conclusion that can be drawn from this factual evidence, the Court concludes that there is nothing in the historical evidence regarding use and occupancy that is inconsistent with the extinguishment of aboriginal title to Westwoods in the mid-17th century as indicated in the colonial era documents, discussed *supra,* from that time period. In fact, the use and occupancy evidence is completely consistent with the 1808 Southampton record indicating that the Shinnecock Tribe (through lease or otherwise) sought to use the Westwoods land for timber. Thus, the fact that the Shinnecock Tribe has been using the land for timber and some limited recreational uses for many years since the 19th century does not undermine the Court's conclusion from the plain and unambiguous language in the colonial era documents of the 17th century, demonstrating the acquisition of this land by the Town and the extinguishment by the sovereign of aboriginal title to this land.

(D) NEED FOR ECONOMIC DEVELOPMENT DOES NOT ALTER THE COURT'S ANALYSIS

Finally, the Shinnecock presented evidence of the poverty that exists on the Shinnecock Reservation and argued that the development of a casino at Westwoods will provide the Nation with much-needed economic development to support its self-governing community. Although the Court recognizes the difficult economic circumstances facing many families living on the Shinnecock Reservation, these economic hardships do not give any authority to this Court to rewrite history and ignore the overwhelming evidence demonstrating that aboriginal title of the Westwoods parcel has been extinguished. The Supreme Court has repeatedly cautioned that the justness, wisdom, or equity of a sovereign's extinguishment of aboriginal title is not open to re-examination by the court. *See, e.g., Santa Fe,* 314 U.S. at 347 ("[W]hether [extinguishment] be done by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise, its justness is not open to inquiry in the courts."); *Beecher v. Wetherby,* 95 U.S. 517, 525 (1877) (noting that "the propriety or justice of [the sovereign] towards the Indians with respect to their lands is a question of governmental policy, and is not a matter open to discussion ...."); *see also Oneida,* 691 F.2d at 1096 ("[A]ssuming *arguendo* that New York was entitled without federal consent to purchase the Oneidas' land, judicial inquiry into the 'manner, method and time' of its extinguishment of Indian title would be barred.") (*quoting Santa Fe,* 314 U.S. at 347);*Delaware Nation,* 446 F.3d at 416 (" '[T]he manner, method, and time of the sovereign's extinguishment of aboriginal title raise political, not justiciable, issues.'") (quoting *Santa Fe,* 314 U.S. at 347);*Gemmill,* 535 F.2d at 1147 ("[W]hen the Government clearly intends to extinguish Indian title the courts will not inquire into the means or propriety of the action.").

***84** Thus, although the law requires the plain and unambiguous extinguishment of aboriginal title, *Santa Fe,* 314 U.S. at 354, once that standard is met, the Court cannot disregard the clear intent of the sovereign. As one court explained when faced with similar concerns raised by a Tribe in connection with a land issue,

The above principles require the court to take a sympathetic view toward the position of the Red Lake Band [of Indians], but those principles do not permit us to ignore the clear wording of a treaty, agreement, or enactment, or to disregard the intent of Congress. The Supreme Court has cautioned that the courts cannot remake history or expand treaties and legislation beyond their clear terms to remedy a perceived injustice suffered by the Indians.

*Minnesota,* 466 F.Supp. at 1385. In the instant case, the various New York Provincial Governors, while acting under the authority of the British Crown, repeatedly approved of, and confirmed, the fact that the Shinnecock had ceded, relinquished, and conveyed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

their interest in lands west of Canoe Place, including Westwoods, to Southampton, and the historical record since that time is completely consistent with that unequivocal act of the sovereign. Thus, aboriginal title has been unambiguously extinguished. Since the extinguishment standard has been met, any injustices that the Shinnecock Nation believes occurred prior to that time, or since that time, with respect to that land or the Shinnecock Nation are beyond the purview of the Court's determination of the legal issue that has been decided in this case.

C. ANALYSIS UNDER *SHERRILL* OF DEFENDANTS' CLAIM OF SOVEREIGNTY OVER WESTWOODS

Plaintiffs also argue that, regardless of whether the Nation has unextinguished aboriginal title to Westwoods, defendants are barred from asserting sovereignty at Westwoods by the equitable doctrines of laches, acquiescence, and impossibility under the Supreme Court standard articulated in *Sherrill.* Defendants argue that *Sherrill* is inapplicable to the factual situation here because, among other things, the Nation is not re-acquiring possession of land as was the circumstance in *Sherrill* As set forth below, having carefully considered the trial evidence in the context of the *Sherrill* decision and Second Circuit authority interpreting *Sherrill,* the Court finds that equitable doctrines do provide an independent basis for plaintiffs' success on the merits of this case even assuming *arguendo* that the Nation's aboriginal title to Westwoods was not extinguished.

(1) LEGAL FRAMEWORK FOR ANALYZING DISRUPTIVE LAND CLAIM ISSUE

The 2005 decision of the United States Supreme Court in *Sherrill* set forth the legal framework under which a court must examine equitable doctrines in the context of an attempt by an Indian tribe to re-assert sovereignty over a parcel of land. In particular, *Sherrill* involved a refusal by the Oneida Indian Nation (the "OIN") to pay taxes on ten small parcels of land that it had recently purchased, which had been part of its former Indian reservation. Specifically, the OIN argued that "because the Court in *Oneida II* recognized the Oneidas' aboriginal title to their ancient reservation land and because the Tribe has now acquired the specific parcels involved in this suit in the open market, it had unified fee and aboriginal title and may now assert sovereign dominion over the parcels." *City of Sherrill v. Oneida Indian Nation,* 544 U.S. 197, 213 (2005). The Supreme Court, however, rejected that argument and held that equitable principles barred the OIN from unilaterally reviving its ancient claim of sovereignty over the land:

***85** Our 1985 decision [in *Oneida II* ] recognized that the Oneidas could maintain a federal common-law claim for damages for ancient wrongdoing in which both national and state governments were complicit. Today, we decline to project redress for the Tribe into the present and future, thereby disrupting the governance of central New York's counties and towns. Generations have passed during which non-Indians have owned and developed the area that once composed the Tribe's historic reservation. And at least since the middle years of the 19th century, most of the Oneidas have resided elsewhere. Given the longstanding, distinctly non-Indian character of the area and its inhabitants, the regulatory authority constantly exercised by New York State and its counties and towns, and the Oneidas' long delay in seeking judicial relief against parties other than the United States, we hold that the Tribe cannot unilaterally revive its ancient sovereignty, in whole or in part, over the parcels at issue. The Oneidas long ago relinquished the reins of government and cannot regain them through open-market purchases from current titleholders.

*Id.* at 202-03.Specifically, the Court noted that the "unilateral reestablishment of present and future Indian sovereign control, even over land purchased at the market price, would have disruptive practical consequences" because "[a] checkerboard of alternating state and tribal jurisdiction in New York State-created unilaterally at OIN's behest-would seriously burde[n] the administration of state and local governments and would adversely affect landowners neighboring the tribal patches." *Id.* at 219-20 (citation and quotation marks omitted). The Court further explained that "the distance from 1805 to the present day, the Oneidas' long delay in seeking equitable relief against New York or its local units, and developments in the city of Sherrill spanning several generations, evoke the doctrines of laches, acquiescence, and impossibility, and render inequitable the piecemeal shift in governance this suit seeks unilaterally to initiate." *Id.* at 221.Thus, although OIN could seek damages for any wrongful ancient dispossession with respect to this sovereign land, the Court ruled that the Tribe was precluded by equitable principles from seeking to reestablish sovereignty over the land. *Id.*

In the instant case, assuming aboriginal title has not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

been extinguished, defendants argue that *Sherrill* is inapplicable because, unlike the OIN, which had not been in possession of the land at issue for over a century, the Nation has always been in possession of Westwoods and has not been subject to taxation or government regulation on that land at any point. However, in *Cayuga,* the Second Circuit recognized that *Sherrill*"has dramatically altered the legal landscape" and had to be considered in deciding the land claim at issue in that case. 413 F.3d at 273. In particular, citing the broad language in *Sherrill,* the Second Circuit emphasized that *Sherrill*'s holding could not be limited to the narrow factual circumstances in *Sherrill,* but rather should be applied to disruptive Indian land claims more generally:

***86** We understand *Sherrill* to hold that equitable doctrines, such as laches, acquiescence, and impossibility, can, in appropriate circumstances, be applied to Indian land claims, even when such a claim is legally viable and within the statute of limitations. The [*Sherrill* ] Court's characterization of the Oneidas' attempt to regain sovereignty over their land indicate that what concerned the Court was the disruptive nature of the claim itself, ... Although we recognize that the Supreme Court did not identify a formal standard for assessing when these equitable defenses apply, the broadness of the Supreme Court's statements indicates to us that *Sherrill*'s holding is not narrowly limited to claims identical to that brought by the Oneidas, seeking a revival of sovereignty, but rather, that these equitable defenses apply to disruptive Indian land claims more generally.

*Id.* at 273-74 (citations and quotations omitted).

Therefore, given the broad language in *Sherrill* and the Second Circuit's conclusion that *Sherrill* should be applied more generally to disruptive land claims, the Court finds that it is appropriate to utilize the *Sherrill* framework to analyze the Nation's proposed use of the Westwoods land, which has been dormant for hundreds of years from a development standpoint, to build a casino in violation of New York and local laws. Nor does it matter that the Nation is the defendant is this case, rather than the plaintiff. There is no question that this lawsuit is centered around the Nation's position that it is not subject to any New York or local laws or regulation of any kind in connection with its proposed development of a casino at Westwoods. Thus, although the suit was initiated by the State and Town, the Court must resolve the Nation's land claim in the context of this suit and, in doing so, must consider whether the development of Westwoods is so disruptive that equitable principles should prevent the defendants from initiating such development free of governmental laws and regulations. In fact, the Supreme Court also reached such a conclusion in *Sherrill* in rejecting a suggestion by the dissent that a claim of tribal immunity could be raised defensively in a tax proceeding consistent with the majority opinion. *See* *Sherrill,* 544 U.S. at 214 n. 7 (citations omitted) ("The dissent suggests that, compatibly with today's decision, the Tribe may assert tax immunity defensively in the eviction proceeding initiated by Sherrill.... We disagree. The equitable cast of the relief sought remains the same whether asserted affirmatively or defensively.").

Accordingly, the Court will apply the *Sherrill* framework to the particular facts of this case to determine whether such equitable relief is warranted. Moreover, as with the extinguishment issue, the Court has placed the burden of proof on plaintiffs under a preponderance of the evidence standard, since they are the parties invoking the equitable principles to prevent the assertion of sovereignty. *See, e.g.,* *Gidatex, S.r.L. v. Campaniello, Imports, Ltd.,* 82 F.Supp.2d 126, 130-136 (S.D.N.Y.1999) (holding that party invoking equitable principles of unclean hands, laches, and acquiescence has burden of proof); *see also* *United States v. 0.28 Acres of Land,* 347 F.Supp.2d 273, 279 (W.D.Va.2004) (holding that party claiming laches bears the burden of proof).

B. NATION'S MOTION TO PRECLUDE EVIDENCE REGARDING POTENTIAL USES OF WESTWOODS

***87** During the trial, defendants sought to preclude any consideration by the Court of evidence regarding potential uses of Westwoods or the purported impact of those potential uses because such evidence is irrelevant and speculative. Instead, defendants argued that the Court should base its analysis only on evidence relating to the impact caused by the current proposed use of the property by the Nation as reflected in its development agreement-namely, a 61,000 sf. facility to be constructed on about 15 acres at Westwoods, capable of holding between 900-1,000 gaming machines and 60 table games. (D237, at 13, 15-16.) For the reasons set forth below, the Court disagrees and will consider, in conjunction with the entire record, both the impact of the current intended use by the Nation of the property, as well as the potential disruption that could be caused generally by the Nation's unfettered ability to develop the property

without regard to the laws and regulations of New York and the Town.

As a threshold matter, the Court notes that this lawsuit is not limited to a desire to enjoin construction of a casino of a particular size or nature; rather, plaintiffs seek to enjoin all construction as it relates to gaming activity at Westwoods. Moreover, in this lawsuit, the Nation has consistently taken the position that they have the absolute right to expand the gaming at Westwoods beyond the terms of any current contract with developers in any manner at any time free of New York and local laws. Thus, the dispute here relates not just to a particular proposed facility, but rather involves a more general position by the Nation that they can use the land for any purpose whatsoever.

In any event, both the Supreme Court in *Sherrill* and the Second Circuit in *Cayuga* analyzed the issue of the disruptive impact of the underlying land claims based upon potential future disruptiveness that would result from a decision in favor of the tribe. As noted *supra,* the *Sherrill* Court noted that "the unilateral reestablishment of present *and future* Indian sovereign control, even over land purchased at the market price, would have disruptive practical consequences."544 U.S. at 219 (emphasis added). In fact, the *Sherrill* Court specifically referenced the potential harmful consequences that could result in the future if the Oneidas' claim of sovereignty over the land was recognized-namely, the potential of future litigation to free the land of local zoning and other regulatory controls. *See id.* at 220 ("If OIN may unilaterally reassert sovereign control and remove these parcels from the local tax rolls, little would prevent the Tribe from initiating a new generation of litigation to free the parcels from local zoning or other regulatory controls that protect all landowners in the area."). In addition, the *Sherrill* Court cited in a footnote, as an example of potential future disruptive consequences, the Cayugas' attempt to assert tribal sovereignty over newly acquired property in order to conduct gaming in violation of local regulatory controls. *See id.* at 220 n. 13.Moreover, the *Sherrill* Court also stated that attempts to regain sovereignty over newly acquired parcels should be addressed through the land-in-trust provisions established by Congress and the Department of Interior. *Id.* at 220.That process includes consideration by the Secretary of the Interior of potential future conflicts of land which may arise. *Id.* at 221 ("Before approving an acquisition, the Secretary must consider, among other things, ...'the impact of the State and its political subdivisions resulting from the removal of the land from the tax rolls'; and '[j]urisdictional problems and potential conflicts of land use which may arise.'25 C.F.R. § 151.10 (2004).").

***88** Similarly, in *Cayuga,* the Second Circuit also considered the potential future impact of the Cayuga's possessory land claim, which sounded in ejectment. Specifically, in rejecting the contention that the request for ejectment should not be precluded under the equitable defense of laches because ejectment is characterized as an action at law rather than an action in equity, the Second Circuit stated that "[w]hether characterized as an action at law or in equity, any remedy flowing from this possessory land claim, which would call into question title to over 60,000 acres of land in upstate New York, can only be understood as a remedy that would similarly 'project redress into the present and future.' " *Cayuga,* 413 F.3d at 275 (quoting *Sherrill,* 544 U.S. at 221 n. 14) (footnote omitted). The Court further explained that "the import of *Sherrill* is that 'disruptive,' forward-looking claims, a category exemplified by possessory land claims, are subject to equitable defenses, including laches." [FN63] *Id.* at 277.

FN63. In fact, Judge Hall also acknowledged in his dissent in *Cayuga* that *Sherrill* applied equitable considerations to land possession claims that involved forward-looking, disruptive remedies. *See id.* at 90 (stating that *Sherrill* "supports the proposition that the nature of forward-looking, disruptive remedies generally will serve as equitable considerations that can bar such equitable remedies as re-possession, even against the United States").

Thus, the Court believes that, in considering the disruptive impact under *Sherrill,* it should consider not only the current stated use of the land, but also other future disruptive consequences that could flow from a broad ruling by this Court (as urged by defendants) that the Nation is free to develop the Westwoods land in any way it sees fit free of any New York or local laws or regulations. However, the Court emphasizes that this conclusion is not critical to the Court's *Sherrill* analysis under the facts of the instant case because, as discussed *infra,* the Court concludes that even the Nation's current intended use of Westwoods is sufficiently disruptive that it should be barred under the equitable principles articulated in *Sherrill.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(3) ANALYSIS

In applying *Sherrill* to the facts of this case, this Court has considered a number of factors including the degree of control and governmental authority asserted by the Nation and the Town at Westwoods over the past several centuries, the amount of historical delay in the Nation's assertion of sovereignty over Westwoods, and the degree of disruptive impact over neighboring landowners and the community if the Nation were now able to assert sovereignty over this land and build a gaming facility free from governmental laws and regulations. As discussed below, the Court concludes that when these factors are considered in the context of this case-namely, the Nation's hundreds of years of delay in claiming sovereignty over this land, the Nation's lack of use of this land for centuries for anything other than cutting timber and periodic recreational events, and the substantial disruption that a casino facility would have on the administration of governmental affairs in the Town and on the health, safety, and long-settled expectations of the community-the assertion of sovereignty is barred under the equitable doctrines of laches, acquiescence, and impossibility, even assuming *arguendo* that the Nation holds unextinguished aboriginal title to the land.

(A) HISTORIC LACK OF GOVERNMENTAL AUTHORITY OR CONTINUOUS PRESENCE BY THE NATION AT WESTWOODS

***89** The Nation has not maintained a continuous presence at Westwoods or exercised any governmental authority over that land. The evidence at trial demonstrated that the Nation has used Westwoods for its timber resources, pursuant to a lease sought by the Nation and granted by the Town in the early 19th century. This arrangement followed the depletion of timber resources in the lands east of Canoe Place, known as the 1703 Lease Lands. In fact, the only usage of Westwoods attested to by the Nation at trial was for cutting wood, Sunday school, and Fourth of July picnics. This lack of use or exercise of governmental authority over Westwoods was further confirmed by other evidence at trial, including but not limited to, the following: (1) there are no Shinnecock records or other records suggesting or indicating exclusive or continuous Shinnecock habitation of Westwoods; (2) there is no documented or recollected allotment of any lands within Westwoods to any Shinnecock tribal member; (3) there are no written tribal laws, rules, or regulations for use of Westwoods by Tribe members; (4) no permanent structure exists on any part of Westwoods and the property has never been fenced in by the Nation; (5) other than the 1808 minutes reflecting the Shinnecock request to lease 120 acres of land including Westwoods, the Town's Indian records contain no historical references to Westwoods; (6) a 2003 archaeological study of the 15-acre site within Westwoods, that relates to the proposed casino, found “minimal human activity in the past” (T135, at ii; Tr. 964-66); (7) a December 2003 report of a 3-acre site in the vicinity of Westwoods found “[n]o historic features or artifacts” (T202, at 14); and (8) when a non-Shinnecock owner of land adjacent to Westwoods encroached upon Westwoods land, the Nation took no action to have the encroachment removed. In short, the Nation is seeking to assert sovereignty in connection with a parcel of land over which the Nation has never claimed sovereignty prior to this litigation and which has remained essentially dormant for hundreds of years, other than use for timber and periodic social gatherings.

(B) TOWN'S EXERCISE OF GOVERNMENTAL AUTHORITY OVER WESTWOODS

In contrast to this lack of usage or exercise of governmental authority over Westwoods for centuries, the Nation has allowed the Town to exercise significant governmental authority over the land without any objection from the Nation. As a threshold matter, the defendants have emphasized, and the Court recognizes, that the Town has never sought to impose property taxes on the land. There is no record documenting the reason for such inaction, but defendants argue that it is indicative of an implicit recognition of sovereignty by the Town. However, the Court rejects that conclusion in light of the entire trial record. Although imposition of taxes is a strong indicator of governmental authority, it is certainly not the exclusive indicator under the law, or the dispositive indicator under the facts of this case. More specifically, despite the Town's failure to impose property taxes on Westwoods, the Town has over the years engaged in activity in connection with the land that is clearly indicative of the exercise of governmental authority, including but not limited to the following: (1) the 1738 Canoe Place Division, which subdivided a 3000-4000 acre area west of Canoe Place and north of Montauk Highway, including Westwoods, into 39 numbered lots; (2) the Canoe Place Division Lot Drawing, during which, even though no interests were allotted to Shinnecock members, there was no objection or challenge to the

establishment of the Canoe Place Division or the allotment process; (3) Town records indicate that the Town regulated the harvesting of timber throughout the Town in the 18th century, including in areas west of Canoe Place; and (4) in the 1920s, the Town widened and improved Newtown Road, including the portion of the road that runs through Westwoods, without any objection from the Nation. Moreover, since the Town's first zoning ordinance was adopted in 1957, Westwoods has been classified as residentially-zoned property by the Town and remains zoned as residential (R-60) today. Moreover, when the Nation requested that this designation be removed in 1985, the Town refused and the Nation did not further challenge that decision. Thus, even in the absence of the imposition of property taxes, the Town has exercised substantial government authority over Westwoods for several centuries without objection from the Nation and this fact is significant in considering the equitable factors under *Sherrill.*

(C) DISRUPTIVE IMPACT OF NATION'S EXERCISE OF SOVEREIGNTY

***90** In connection with the summary judgment motions and the preliminary injunction motion, Judge Platt identified some of the anticipated disruptive effects that could be caused by the casino project. *See* *Shinnecock Indian Nation,* 400 F.Supp.2d at 496 n .6 ("[A] remedy may also be disruptive in cases similar to the one at bar, where dispossession is not at issue and only neighboring landowners will be affected by the Indians' claims.") (*citing* *Sherrill,* 544 U.S. at 219-20);*Shinnecock Indian Nation,* 280 F.Supp.2d at 9-10 ("[T]he construction of a casino like the one proposed by Defendants would cause incredible traffic congestion in the surrounding community.... [I]t is also likely to drastically heighten air pollution along Routes 25 and 27."); *see also id.*("If Defendants fail to abide by State and Town environmental regulations, the likely harm to the pristine community of Southampton could be devastating.").

The concerns raised by Judge Platt in the pre-trial context regarding potential disruptive effects of this assertion of sovereignty by the Nation at Westwoods were borne out at trial. As described below, the evidence at trial demonstrated that the construction and operating of a gaming complex at Westwoods would undoubtedly cause a substantial disruption of the administration of state and local governments, as well as severely harm the settled expectations of landowners neighboring the Westwoods property and Town residents more generally. Moreover, the health and environmental problems would be further magnified in the instant situation because the assertion of sovereignty of the property would allow the Nation to develop a casino project free of New York and local laws and regulations.

First, a casino at Westwoods would require a significant expenditure of additional state and local funds to provide essential services to the facility, including such items as police, fire, ambulance, and providers of other municipal services such as the water district. Although taxation is generally used to at least partially offset these additional costs, no such offset could occur if the Nation were able to assert its sovereignty over the Westwoods land in a manner that made it immune from such taxes and fees,

Second, there is no question that a casino at Westwoods would have substantial disruptive impact on the area's already saturated transportation infrastructure. The evidence at trial clearly demonstrated that the traffic in and around the area of Southampton during the summer months is extremely high, resulting in substantial delays to motorists. Based upon the expert testimony and other evidence the Court heard at trial, the Court finds that the impact of adding thousands and thousands of additional motorists, destined for a Westwoods casino, into this severely-burdened transportation network would be devastating. Plaintiffs' traffic expert concluded: "In our expert opinion, with respect to traffic, the Westwoods project would impose a significant burden on an already overtaxed system.... [A] project the size of the Westwoods project, even if it is located west of the canal, would create significantly detrimental traffic and safety impacts to local communities."(S77, at II.) The Court finds that conclusion fully supported by the trial record. The disruption is not limited to the substantially-increased traffic delays and congestion that would inevitably result in the area as a result of the additional usage, but also safety issues that would flow from such a scenario. For example, plaintiffs' expert testimony credibly established that the use of local roads to access Westwoods, especially when considering the unreasonable delays on the major highways and roads that would ensue, would create enormous safety issues for motorists and residents. That evidence included the following: (1) local roadways "would not be able to handle the additional traffic activity" (S77, at 66, V ("The local streets would be unable to accommodate the newly added traffic under these conditions.")); (2) buses going to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the casino would have to travel over small, winding residential roads-without shoulders, curbs, sidewalks, or street lights-that are "not appropriate for commercial buses to be on" (Tr. 1466-67); and (3) "extraordinary delays" resulting from the unsignalized intersections being unable to handle the increase in traffic would "encourage unsafe choices by motorists" thereby "increasing the potential for accidents." (S77, at 40.) Even the Nation's expert regarding traffic impact acknowledged that there would be substantial increases in traffic in and around Westwoods from the operation of a casino. However, he concluded that the "unreasonable" traffic impacts could be alleviated through a series of modifications to various roadways *and* if direct access ramps from Sunrise Highway to Westwoods were built. (Tr. 3935-41.) In other words, even the Nation's traffic expert concluded that a casino would cause unreasonable disruption in the area of Westwoods in the absence of direct access ramps from Sunrise Highway to the casino. Yet, it was far from clear from the evidence who would build these ramps, whether they were legally permissible under current regulations, and who would bear the costs of such construction.[FN64] Moreover, even if the ramps could be built, it is entirely unclear how the construction of ramps where Squiretown Road or Newtown Road pass under Sunrise Highway would alleviate these traffic problems; instead, the traffic would just be tunneled into these small roads and create additional traffic issues there. Therefore, the evidence at trial demonstrated that a Westwoods casino would substantially disrupt the use of roadways in and around the Southampton area as a result of the increased traffic on an already severely-burdened traffic network.

FN64. For example, plaintiffs introduced evidence suggesting that there is substantial doubt as to whether such ramps would be consistent with the current criteria for such ramps under New York Department of Transportation rules. Specifically, the NYS DOT will not grant a permit to any person seeking to build an access ramp from a limited access highway, such as Route 27, to private property, such as Westwoods, unless the ramp connects to publicly-owned roadway before the private property. (S245, D361, at 75-76.) Because the ramps envisioned here would go directly into Westwoods and not connect to any public road, it would be problematic.

***91** Finally, the Court concludes that there are a series of disruptive health and environment impacts that would flow from the construction and operation of a casino at Westwoods. The Court credits the testimony and evidence offered by the plaintiff that there would be numerous short-term and long-term effects to the natural environment in and around Westwoods, including: (1) the degradation of water quality (Tr. 1847); (2) the loss or fragmentation of "very sensitive, actually rare" ecological subcommunities in the area (Tr. 1848); (3) the potential erosion of the coastal bluff area (Tr. 1851); (4) the generation of "very detrimental" edge habitats, which are used to "provide avenues for the incursion of ... non-native species into the interior of the forest where they displace native wildlife" (Tr.1958); and (5) other potential damage to "a critical ecosystem to Long Island," (Tr.1955), which includes several dozen species of birds and rare plant species (Tr.1955-59). In addition, plaintiffs offered credible evidence that traffic-related pollutants would increase and "cause a whole series of health impacts."(Tr.1935-36; S200, at 4-5.) Moreover, the noise quality of the area also would be adversely impacted (in Build Alternative 2, the build without ramp access scenario) and affect "all of the residential development on Squiretown Road and Newtown Road north of Rte 27, which includes approximately 75 single-family homes."(S200, at 16.)

Defendants presented evidence and made a number of arguments to address the massive evidence of disruptive impact offered by the plaintiffs. In particular, the Nation had three principal arguments: (1) although it is the Nation's position that it is not subject to New York or local regulations of any kind in connection with development at Westwoods, its current Development Agreement specifically requires that the initial 61,000 sf. facility and any future expansion be constructed in accordance with state environmental laws (Defs. Proposed Conclusions of Law, at 65); (2) the plaintiffs' expert testimony, and the assumptions and methodologies underlying that testimony, are "so unrealistic and unreliable as to be useless for any purpose"(*id.* at 66); (3) plaintiffs' disruption evidence "suffers from a fatal defect" because "[i]nstead of addressing the development of Westwoods as actually contemplated by the Development Agreement, the State and the Town chose to present only evidence with respect to the potential impact of a grossly overstated development of Westwoods that is contemplated only in their own imaginings"(*id.* at 12). The Court has carefully considered all of defendants' expert testimony and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

their arguments regarding the insufficiencies of plaintiffs' experts and is unpersuaded by the Nation's contention that plaintiffs have not made a sufficient showing of disruptive impact under *Sherrill.* The Court will address the Nation's three main contentions below.

***92** With respect to the Nation's current intention as reflected in the Development Agreement to comply with state environmental standards and its stated intention at trial to use best practices to avoid environmental impacts, the Court does not view such circumstances as sufficient to eliminate the disruptive impacts under *Sherrill.* The Nation currently has no environmental laws, building codes, or any other ordinances that require any contractor building on Westwoods to adhere to any standards whatsoever, or to consider environmental impacts. In any event, if the exclusive sovereignty sought by the Nation over Westwoods were recognized by the Court, the Nation would be free to modify any such codes or ordinances at any time even if they were adopted, and also would be able to modify the Development Agreement or any other contract at any time to eliminate any current desire to comply with New York environmental standards. Thus, the Nation's current intention to comply voluntarily with state environmental standards does not alter the Court's analysis under *Sherrill* under the facts of this case.

Defendants' position regarding flaws in the methodologies and assumptions of plaintiffs' experts is similarly unavailing.[FN65] Both plaintiffs and defendants in this lawsuit pointed to certain errors made by the opposing party's experts or certain factual assumptions that could not be supported with certainty. Each side argued that these flaws by the opposing expert led to an estimated calculation in terms of disruptive impact that made the expert opinion exaggerated and unreliable. The Court spent considerable effort navigating through this battle of the experts. Although defendants believe that the purported errors by plaintiffs' experts make them useless, the Court simply disagrees. When assessing these types of impacts based upon a proposed development of a site (or economically-viable potential use of a site), experts by necessity must utilize certain assumptions and estimates about human behavior in terms of how many people will attend such a casino, how long they will spend at the casino, as well as their method and route of transportation. The fact that these require some level of prediction about future human behavior, and that reasonable minds can differ regarding a particular assumption by an expert, does not mean that the testimony is useless. Here, despite defendants' contention to the contrary, the Court concludes that the methodologies utilized by plaintiffs' experts are sufficiently sound to be relied upon by the Court.[FN66] Moreover, even if plaintiffs' experts' calculations were adjusted to reflect the purported errors or weaknesses identified by defendants, the remaining levels of impact would still be sufficient to satisfy the *Sherrill* standard.

FN65. For example, defendants made the following arguments, among others, with respect to plaintiffs' experts: (1) "The methodology underlying the plaintiffs' expert testimony relating to the costs that would be imposed on the State and Town is characterized by gross errors and unfounded assumptions, and ignores any possibility of economic benefits to the community."(Defs. Proposed Conclusions of Law, at 66); (2) "The plaintiffs' environmental analysis suffers from the same unfound assumptions, and displays a notable lack of expertise. In particular, the plaintiffs' analysis of air and noise issues is amateurish and so methodologically defective as to be useless for any purpose"(*id.*); and (3) plaintiffs' traffic expert's report contained numerous errors, including a defective model and arithmetic errors (*id.* at 66-67).

FN66. Although defendants moved to strike reports and testimony of certain of plaintiffs' impact experts, the Court found, for the reasons set forth on the record, that the experts' reports and testimony satisfied the *Daubert* criteria.

Finally, the Court rejects defendants' contention that the expert evidence offered by plaintiffs is fatally flawed because it erroneously measures impact not of the current intended 61,000 sf. facility, but rather is based upon much larger casino projects not currently intended by the Nation. As a threshold matter, as discussed *supra,* the Court rejects the Nation's legal argument that the Court cannot consider under *Sherrill* the potential development of a casino even larger than the one currently anticipated by the Nation. In other words, the equitable analysis under *Sherrill* cannot take place on a piecemeal basis for each building erected at Westwoods or have to be reassessed and regulated by the federal courts every time there is a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

future change in activity at Westwoods; rather, this equitable issue under *Sherrill* necessarily looks forward into potential disruptive impacts that can reasonably result from unfettered development of the property. Moreover, the Court finds that plaintiffs credibly demonstrated that a large casino at Westwoods far beyond the Nation's current intentions is economically feasible. As plaintiffs' expert credibly concluded, given its proximity to New York City and the high demand for a gaming facility closer than Atlantic City or Connecticut, a gaming facility at Westwoods would have the economic potential to be massive in scale far beyond the 61,000 sf. casino that the Nation states that it currently intends to build. (Tr. 1410 (describing a 300,00 sf. casino with 7,000 gaming devices and approximately 250 tables).) The expert reached a conservative conclusion that a stand-alone casino at Westwoods comprising 162,500 sf., including 3,500 gaming devices and 140 table games, would be financially viable. (S1, at3, 6-8; Tr. 1393-96.) In fact, one of the defendants' expert witnesses (Mr. Rittvo), performed an economic analysis of a gaming facility with 3,000 gaming positions (and 450 hotel rooms and a restaurant with seating for 1,000 to 2,000 people), which he concluded would be "optimally sized" and extremely profitable, with between S358.4 million and $403.2 million in revenues for the Nation. (D329, at 1-2.) The defendants' expert also analyzed an unconstrained scenario with a casino with 6,500 positions, which would have revenues within the range that he considered necessary to be profitable.[FN67] (D238, at 1; S268, at line 64, col B; Tr. 3216.) Therefore, to the extent that defendants argue that all plaintiffs' expert testimony should be rejected because it looks at casino proposals beyond the one currently anticipated, the Court finds that argument unpersuasive.

FN67. Specifically, with respect to the casino with 6,500 gaming positions, defendants' expert concluded it would generate more than $521 million in gaming revenues and have a win per position of $220, which is within the range of win per position that the expert "likes to see" for a successful casino. (D328, at 1; S268, at line 64, col. B.; Tr. 3216.)

***93** In any event, even if the Court adhered to the defendants' position on this issue and only looked at the disruptive impact under *Sherrill* of the current proposed casino development as reflected in the Development Agreement, the Court's conclusion would not be altered under the facts of this case. First, it is undisputed that even the Nation's proposed 61,000 sf. gaming facility would be inconsistent with the current residential zoning classification of the Westwoods property. Second, if the Nation were allowed to assert exclusive sovereignty over this land, such development would take place without the Nation being required to comply with New York and local environmental and health laws and regulations. Third, although the levels of impact in the various areas described above would be less than the projections for the larger potential facilities, it is beyond cavil for the Nation to argue that the current proposal would not significantly increase the level of services that state and local authorities would have to provide in the area, as well as significantly disrupt the neighboring landowners and residents of the Town in various aspects including traffic, noise, and other related effects of a casino construction and operation. Perhaps the best illustration of this point is the testimony of the Nation's traffic expert. Although the Nation's expert regarding traffic impact acknowledged that there would be substantial increases in traffic in and around Westwoods based upon the Nation's current proposal, he concluded that the "unreasonable" traffic impacts could be alleviated through a series of modifications to various roadways. Even if these modifications were made, it is not clear to this Court based upon the detailed traffic evidence submitted at trial that the "unreasonable" traffic impacts will be avoided.

Thus, even the 61,000 sf. facility currently being contemplated by the Nation has a sufficiently disruptive impact to satisfy *Sherrill.*In *Sherrill,* the Supreme Court relied upon the mere possibility that the Oneidas would seek to free the land at issue from zoning and other regulatory controls at some future time as sufficient to apply laches to their sovereignty claim.[FN68]*See*544 U.S. at 220 ("If [the Oneida Indian Nation] may unilaterally reassert sovereign control and remove these parcels from the local tax rolls, little would prevent the Tribe from initiating a new generation of litigation to free the parcels from local zoning or other regulatory controls that protect all landowners in the area."). Even Justice Stevens, as the lone dissenter in *Sherrill,* recognized that "[g]iven the State's strong interest in zoning its land without exception for a small number of Indian-held properties arranged in a checkerboard fashion, the balance of interests obviously supports the retention of state jurisdiction in this sphere."*Id.* at 226-27 n. 6.

FN68. In *Sherrill,* there was no trial on the disruptive impact from the reassertion of sovereignty and the Court did not remand the case to the district court to take evidence on that issue. In fact, the district court had granted summary judgment in OIN's favor, finding there was no evidence of irreparable harm and the City of Sherrill could address any burdens from removal of the parcels from the tax rolls. *Oneida Indian Nation v. City of Sherrill,* 145 F.Supp.2d 226, 252, 255 (N.D.N.Y.2001). Instead, the Supreme Court found the disruptive impact warranting equitable relief "on considerations not discretely identified in the parties' briefs."544 U.S. at 214 n. 8.

The court reached a similar conclusion in *Cayuga Indian Nation of New York v. Village of Union Springs,* 390 F.Supp.2d 203 (N.D.N.Y.2005). In *Union Springs,* the court vacated an injunction that prohibited the defendants from enforcing local zoning and land use laws in connection with the Cayuga's activities on property recently purchased by the tribe, within an area subject to the tribe's land claim. In doing so, the court found that immunity from zoning and land laws was even more inherently disruptive than the Oneida's claimed immunity from taxation:

***94** If avoidance of taxation is disruptive, avoidance of complying with local zoning and land use laws is no less disruptive. In fact, it is even more disruptive. The Supreme Court [in *Sherrill* ] clearly expressed its concern about the disruptive effects of immunity from state and local zoning laws, even to the point of citing this case as an example....

The Nation is seeking relief that is even more disruptive than non payment of taxes. The Supreme Court's strong language in *City of Sherrill* regarding that disruptive effect on the every day administration of state and local governments bars the Nation from asserting immunity from state and local zoning laws and regulations.

*Union Springs,* 390 F.Supp.2d at 206.

In the instant case, this Court recognizes that there is no allegation that the Nation recently re-possessed Westwoods and, thus, it is factually distinct from *Sherrill* (and *Union Springs* ). Although this fact should obviously be carefully weighed in the *Sherrill* equitable analysis, the Court must also recognize that the degree and clarity of the disruption in the instant case demonstrated during the course of a lengthy trial far surpasses the disruption in *Sherrill,* in terms of how the development of Westwoods in violation of local zoning and land usage regulations would disrupt the administration of state and local governments, and negatively impact the well-being and settled expectations of adjacent landowners and the local population. Moreover, the other equitable factors strongly favor plaintiffs, including (1) despite possessing the Westwoods land for centuries, the Nation never claimed sovereignty over that land prior to this lawsuit; (2) the Nation has not used the land for anything other than timber and periodic recreational gatherings; and (3) the Nation never sought to free itself from the decades-old zoning classification, or sought to engage in activity that violated the Town's zoning laws or New York's environmental laws. In sum, after considering all of the equitable factors, the Court finds that, even assuming *arguendo* that the Nation had aboriginal title over Westwoods, the equitable doctrines of laches, acquiescence, and impossibility as articulated in *Sherrill* preclude the Nation from exercising sovereignty over that land for purposes of developing such land without regard to local zoning and land use laws, or other New York and local laws and regulations.

A. IGRA AND COMMON LAW RIGHTS UNDER *CABAZON*

After the trial in this consolidated action was commenced and the trial was reassigned to the undersigned, the State sought reconsideration of the denial by Judge Platt of their potentially dispositive motion for partial summary judgment and for a permanent injunction as it related to IGRA. Specifically, in its original motion and reconsideration motion, the State argued that, through the enactment of IGRA, Congress had occupied the field of Indian gaming and that any gaming outside the scope of this federal law must comply with New York law. As applied to the Nation in this case, the State contended that, because the planned gaming facility does not comply with IGRA and violates New York gaming laws, the State was entitled to partial summary judgment on its first cause of action (alleging violation of New York gaming laws) and a permanent injunction. Although the Nation acknowledged that it is not a tribe under IGRA and thus cannot conduct gaming under the provisions of IGRA, the Nation argued, among other things, that IGRA did not supplant its common law right to conduct gaming activity on Westwoods.

***95** In granting the motion for a preliminary injunction, Judge Platt agreed with the State's position that the Nation did not meet the criteria under IGRA and that any gaming would violate New York law. *Shinnecock Indian Nation,* 280 F.Supp.2d at 6-7. In denying the State's motion for partial summary judgment, the Court held that a trial was required to determine whether the Nation had retained aboriginal title over Westwoods and, if so, whether the impact of the casino on Westwoods was sufficiently disruptive that it could be prevented under the *Sherrill* case. *Shinnecock Indian Nation,* 400 F.Supp.2d at 493-96. However, Judge Platt did not specifically address the IGRA issue in the opinion.

Defendants suggested, when the motion for reconsideration was made during the trial, that Judge Platt implicitly concluded that, if the Nation continues to have unextinguished aboriginal title to Westwoods (an issue that needed to be resolved with a trial), the Nation would retain a common law right under *California v. Cabazon Band of Mission Indians,* 480 U.S. 202 (1987), to conduct gaming activity outside of IGRA. However, plaintiffs argued that Judge Platt simply overlooked this controlling legal issue and, thus, plaintiffs asked that the Court stop the trial and grant their motion for reconsideration. When the belated motion to reconsider was raised during the trial, the Court declined to halt the trial to decide the motion, but instead allowed the parties to re-brief the issue while the trial continued and advised the parties that the Court would re-analyze the IGRA issue in light of the motion for reconsideration at the conclusion of the case with the benefit of the full trial record. As set forth below, the Court finds that the Nation does not have a common law right to engage in gaming, outside the scope of IGRA, in violation of New York gaming laws and, even assuming *arguendo* that aboriginal title provided a common law safe-haven for such activity, no such exemption exists because aboriginal title has been extinguished.

(1) THE IGRA FRAMEWORK

Through the Commerce Clause of the United States Constitution, which allows Congress to "regulate Commerce ... with the Indian Tribes,"U.S. Const. art. I, § 8, cl. 3, Congress has the authority to regulate Indian affairs. Pursuant to that authority, Congress enacted IGRA in 1988 in response to the Supreme Court's decision in *Cabazon.*In *Cabazon,* the Supreme Court analyzed California's bingo laws, which restricted the operation of games, but did not prohibit them entirely. 480 U.S. at 210. The Court held that because California permitted a "substantial amount of gambling activity ... California regulate[d] rather than prohibit[ed] gambling in general and bingo in particular" and, thus, was precluded from prohibiting an Indian tribe from conducting bingo on Indian lands, even though it was being conducted in violation of California penal laws. *Id.* at 211.IGRA was enacted to create a comprehensive federal statutory scheme for tribal gaming that differed from the common law principles recognized by the *Cabazon* Court. *See Am. Greyhound Racing Inc. v. Hull,* 305 F.3d 1015, 1018 (9th Cir.2002) ("Congress declared [in 25 U.S.C. § 2702(1) ] that IGRA's primary purpose was "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments.") (footnote omitted); *Pueblo of Santa Ana v. Kelly,* 104 F.3d 1546, 1548 (10th Cir.1997) (holding that IGRA "provides a comprehensive regulatory framework for gaming activities on Indian lands which seeks to balance the interests of tribal governments, the states, and the federal government") (internal quotation marks omitted). Specifically, Section 1166(a) of Title 18 provides, in pertinent part, as follows:

***96** Subject to subsection (c), for purposes of Federal law, all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions applicable thereto, shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State.

18 U.S.C. § 1166(a). The only exception to Section 1166(a) is gaming that occurs in compliance with IGRA. *See*18 U.S.C. § 1166(c).

Gaming under IGRA can only be conducted by an "Indian tribe" on lands that the federal government defines as "Indian lands." 25 U .S.C. § 2710(d)(1). "Indian tribe" under IGRA is defined narrowly to include only tribes that are recognized by the BIA. 25 U.S.C. § 2703(5)(A). It also defines "Indian lands" to include all lands within the limits of any Indian reservation and any lands title to which is held in trust by the United States for the benefit of any Indian Tribe. 25 U.S.C. § 2703(4); 25 C.F.R. 502.12.

IGRA also divides gaming into three classes. Class I gaming includes social games for prizes of minimal value and traditional forms of Indian gaming engaged in as part of, or in connection with, tribal ceremonies

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

or celebrations. 25 U.S.C. § 2703(6). Class II gaming includes bingo and certain card games, but not banking card games or electronic facsimiles of any games of chance or slot machines of any kind. 25 U.S.C. § 2703(7)(A), (B). Class III gaming is defined as all forms of gaming that are not within the definitions of Classes I and II, including casino games, banking card games, and lotteries. 25 U.S.C. § 2703(8); 25 C.F.R. § 502.4.

With respect to Class III gaming, in addition to the requirements that the gaming be engaged in only by an "Indian tribe" on "Indian lands," IGRA provides the Class III gaming is only lawful where it is: (1) authorized by an ordinance or resolution adopted by the government body of the Indian Tribe and approved by the Chairman of the National Indian Gaming Commission; (2) located in a state that permits such gaming for any purpose by any person, organization, or entity; and (3) conducted in conformance with a tribal-state compact entered into by the Indian Tribe and the state that is in effect. 25 U.S.C. § 2710(d)(1). Pursuant to this framework, the state must negotiate in good faith with an Indian tribe to enter into a tribal-state compact governing the conduct of gaming activities when such negotiation is requested of the state by an Indian tribe with jurisdiction over Indian lands. 25 U.S.C. § 2710(d)(3). The Secretary of the Interior ("the Secretary") must then approve the tribal-state compact before it takes effect. 25 U.S.C. §§ 2710(d)(3)(B), (d)(8)."Since New York allows some forms of class III gaming-for charitable purposes-such gaming may lawfully be conducted on Indian lands provided it is authorized by a tribal ordinance and is carried out pursuant to a tribal-state compact."*Dalton v. Pataki,* 5 N.Y.3d 243, 259 (N.Y.2005). In short, under IGRA, class III gaming may only be conducted by an "Indian tribe" on "Indian land" in New York pursuant to a tribal-state compact approved by the Secretary. Given this framework, IGRA preempts state law in the field of regulating Indian gaming, but only to the extent of its application. In other words, if IGRA does not apply, then state law prohibitions on gambling are not preempted. *See, e.g., Carruthers v. Flaum,* 365 F.Supp.2d 448, 466 (S.D.N.Y.2005) ("IGRA preempts state anti-gaming laws, but only to the extent of its application."); *Cayuga Indian Nation of N.Y. v. Vill of Union Springs,* 317 F.Supp.2d 128, 148 (N.D.N.Y.2004) (same); *see also First Am. Casino Corp. v. E. Pequot Nation,* 175 F.Supp.2d 205, 209-10 (D.Conn.2000) ( "Because IGRA's text unambiguously limits its scope to gaming by tribes that have attained federal recognition, the statute does not apply to defendant's gaming-related activities.... Accordingly, plaintiff's state law claims are not completely preempted by IGRA.") (citation omitted).

***97** There is no question that the Nation cannot satisfy the requirements necessary to conduct gaming at Westwoods under IGRA. First, and foremost, the Nation cannot satisfy the definition of an "Indian tribe" because it is undisputed that the Nation is not recognized as a tribe by the BIA. In fact, in its opposition to the State's motion for partial summary judgment, the Nation acknowledged that "[a]ll parties agree that IGRA by its terms does not apply to the Shinnecock Nation, in that the Nation has been acknowledged to be an Indian tribe under the administrative procedures of the Department of the Interior described at 25 C.F.R. Part 83."(Defs. Memorandum of Law in Opposition to State's Motion for Partial Summary Judgment, at 11 (footnote omitted).) Moreover, Westwoods does not fall within the definition of "Indian lands" under IGRA.[FN69] As noted above, in the decision granting the preliminary injunction, Judge Platt thus concluded that the Nation could not conduct gaming consistent with IGRA and that any gaming would violate New York law:

> FN69. To the extent that defendants also seek to separately argue that Westwoods is "Indian country" under 18 U.S.C. § 1151, the Court disagrees and concludes that Westwoods is not Indian country because it fails to satisfy any of the § 1151 criteria and has never been set aside and superintended by the federal government. However, even assuming *arguendo* that aboriginal title could be equated with Indian country under § 1151, defendants' argument would fail because the Court has found aboriginal title to Westwoods has been extinguished.

IGRA outlines which tribes may conduct gaming in the United States, where such gaming may occur, and the types of gaming that may occur. Pursuant to IGRA, high-stakes bingo and slot machines-the type of gaming contemplated by the Shinnecock Nation-may only be conducted by an Indian tribe on lands that the federal government defines as Indian lands, unless the state otherwise permits such activity. 25 U.S.C. § 2710(d)(1). For the purposes of IGRA, an Indian tribe is one that has been recognized as such by the federal government. 25 U.S.C. § 2703(5)(A).... As discussed above, Defendants are not permitted to conduct bingo

Slip Copy
Slip Copy, 2007 WL 3307089 (E.D.N.Y.)
**(Cite as: Slip Copy)**

Page 83

gaming or games of chance under New York law. There is no exception under Article I, Section 9 of New York State Constitution or State gambling laws that allows a state-recognized Indian tribe to conduct gaming in New York. Likewise, there is no dispute that the Shinnecock Nation may not conduct gaming pursuant to IGRA, given that Defendants are not an Indian within the meaning of the statute, and the Property does not constitute Indian land, as defined by federal statute.

280 F.Supp.2d at 6-7.

Despite this legal conclusion and the failure to fall within IGRA, defendants argue that gaming on Westwoods is still permissible because IGRA was not preemptive and they continue to have a common law right to engage in tribal gaming. To the extent that the Nation argues that they continue to possess a common law right under *Cabazon* to engage in gaming at Westwoods outside the confines of IGRA, the Court finds that argument unpersuasive. The Court concludes that IGRA and Section 1166 have eliminated any common law right to engage in unregulated gaming under *Cabazon.*In cases involving broad federal legislation supplanting previously-existing common law rights, the Supreme Court and Second Circuit have both cautioned that courts should not infringe on Congress' authority by continuing to adhere to common law rules. For example, the Supreme Court concluded in *City of Milwaukee v. Illinois,* 451 U.S. 304 (1981), in holding that the Federal Water Pollution Control Act Amendments of 1972 had displaced the common law nuisance claims brought by plaintiffs, that "when Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears."451 U.S. at 314. With respect to the statutory scheme enacted by Congress to supersede the common law nuisance claim, the Court explained that "Congress has not left the formulation of appropriate federal standards to the courts through application of often vague and indeterminate nuisance concepts and maxims of equity jurisprudence, but rather has occupied the field through the establishment of a comprehensive regulatory program supervised by an expert administrative agency."*Id.* at 317.The Court also emphasized that the question to be asked is "whether the legislative scheme 'spoke directly to a question' ... not whether Congress had affirmatively proscribed the use of federal common law."*Id.* at 315 (citation omitted); *see also United Steelworkers of Am., AFL-CIO v. United Eng'g Inc.,* 52 F.3d 1386, 1393 (6th Cir.1995) (holding under *Milwaukee* that "a manifest and clear purpose need not be shown to displace federal common law.... Rather, the question to be asked is whether Congress has occupied the field") (citations omitted).

***98** The Second Circuit, applying *City of Milwaukee,* reached a similar conclusion in *Senator Linie GMBH & Co. KG v. Sunway Line, Inc.,* 291 F.3d 145 (2d Cir.2002), and held that a comprehensive maritime statute-the Carriage of Goods by Sea Act ("COGSA")-which contained a strict liability standard for shipping inherently dangerous goods superseded the scienter requirement in the maritime common law. The Second Circuit explained that the common law must yield to Congress' legislative design:

We must therefore ask whether the legislative scheme of COGSA speaks directly to the question of strict liability for shippers of inherently dangerous goods. When [a maritime code] does speak directly to a question, the courts are not free to 'supplement' Congress' answer so thoroughly that the Act becomes meaningless. There is a basic difference ... between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted.

*Id.* at 168 (citations and quotations omitted). As the Second Circuit noted, quoting *City of Milwaukee,*" 'we start with the assumption that it is for Congress, not federal courts, to articulate the appropriate standard to be applied as a matter of federal law.' " *Id.* (quoting *City of Milwaukee,* 415 U.S. at 317).

In the instant case, it is clear from the comprehensive statutory scheme that Congress enacted as part of IGRA that Congress intended to occupy the field of tribal gaming in response to *Cabazon.*In other words, Congress enacted a comprehensive regulatory program, which would be supervised by an expert federal administrative agency, and thereby sought to balance the interests of the tribes and states in the wake of *Cabazon* and provide the framework in which Indian tribes could conduct gaming on Indian lands. *See generally Artichoke Joe's Cal. Grand Casino v. Norton,* 353 F.3d 712, 721 (9th Cir.2003) ("[T]he same time Congress passed IGRA, it gave California the regulatory authority that *Cabazon* took away, 18 U.S.C. § 1166."). Thus, given the language and nature of this statute, the Court concludes that Congress intended to supplant any federal common law right of Indian tribes to engage in tribal gaming outside the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IGRA framework.

To hold otherwise would lead to the untenable conclusion that, although an Indian tribe recognized by the BIA could not conduct gaming on Indian land without a tribal-state compact under IGRA, an Indian tribe such as the Shinnecock Nation, not recognized by the BIA, could still conduct gaming that would otherwise violate IGRA. Such an interpretation-which gives the Nation more authority to conduct gaming than a BIA-recognized tribe under IGRA-would render IGRA's provisions nonsensical.

The court in *Carruthers v. Flaum* reached a similar conclusion. The circumstances in *Carruthers* related to an effort by the Unkechaug Indian Nation to open gaming facilities in Sullivan County. The plaintiff developers claimed, among other things, tortious interference by the defendants in their gaming and employment agreements. The court held that, because the contemplated facilities could not be opened in New York, the agreements were necessarily void. In reaching this conclusion, they rejected the argument that, even though the Unkechaug Nation was not recognized by the United States government, they could operate a gaming facility on ancestral land without interference from the state or federal government. Specifically, the court found that the Unkechaug Indian Nation did not have a common law right to operate the gaming facility outside the confines of IGRA:

***99** Plaintiffs contend that, because they do not fall within the ambit of IGRA, the Supreme Court's decision in *Cabazon* permits the tribe to conduct whatever gaming it likes on its ancestral lands. But they are wrong....*Cabazon* itself applies only to gaming activities conducted by federally-recognized Indian tribes on land that the federal government recognizes as reservation land....*Cabazon* by its terms has no applicability to this case, which involves a tribe that is not federally recognized as a sovereign nation, and whose ancestral lands have not been recognized by the federal government. Gaming activities on land that is not federally recognized as tribal lands remains within the State's historic right to regulate this controversial type of economic activities.

365 F.Supp.2d at 467. This Court agrees with the *Carruthers* analysis.[FN70] In short, IGRA did not leave available the back-door that defendants now seek to use and the Nation does not retain a common law right to engage in unregulated gaming at Westwoods outside the confines of IGRA.[FN71]

FN70. Defendants also assert that plaintiffs have no standing to enforce IGRA, except where the State is seeking to enforce a tribal-state compact. *See* 25. U.S.C. § 2710(d)(7). Though the Court agrees with this general point, defendants in fact miss the mark. Plaintiffs here are not asserting a cause of action for a violation of IGRA; rather, plaintiffs allege that, in light of IGRA, defendants have no federal common law right to conduct gaming and, therefore, must comply with New York law. As this Court determined above, Congress supplanted any federal common law right with IGRA and, thus, the Nation has no right to engage in unregulated gaming and must comply with New York law. *See, e.g., Carruthers,* 365 F.Supp.2d at 467 ("The Unkechaug are not a federally recognized tribe. Therefore, IGRA provides no exception for the Unkechaugs from the general prohibition on gambling in New York State."). Thus, plaintiffs' cause of action lies in violations of New York anti-gambling law in light of the inapplicability of IGRA, not in any right of action under IGRA.

FN71. To the extent that defendants similarly contend that they have an "inherent sovereignty" to engage in unregulated gaming even though they have not met the criteria of IGRA, the Court also rejects that argument. The Supreme Court has strictly limited the application of this doctrine of inherent tribal sovereignty. *See, e.g., McClanahan v. Ariz. State Tax Comm'n.,* 411 U.S. 164, 172 (1973) ("[T]he trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal preemption.... The modern cases thus tend to avoid reliance on platonic notions of Indian sovereignty and to look instead to the applicable treaties and statutes which define the limits of state power.") *accord South Dakota v. Bourland,* 508 U .S. 679, 694-95 (1993); *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 331 (1983); *see also Narragansett Indian Tribe v. Rhode Island,* 449 F.3d 16, 23-24 (1st Cir.2006), *cert. denied,* 127 S.Ct. 673 (2006). Here, where Congress has enacted IGRA and the proposed gaming does not relate to the

protection of tribal self-government or internal relations, there is no basis for the assertion that the Nation-which has not met the requirements of IGRA-has inherent tribal sovereignty to engage in gaming without regard to state law.

Finally, even assuming *arguendo* that there was some residual common law right possessed by a non-BIA recognized tribe such as the Shinnecock Nation to conduct unregulated gaming on land if it held unextinguished aboriginal title to that land, no such right exists here because, as the Court found *supra,* aboriginal title to the Westwoods land has been extinguished.

E. DEFENSE OF SOVEREIGN IMMUNITY

Defendants also argue that sovereign immunity acts as a complete bar to this lawsuit by the State and the Town. In particular, defendants argue that "[t]he Nation is a sovereign tribe of Indians and consequently as a matter of law cannot be sued absent consent or waiver, which it did not give in either of these consolidated actions."(Defs. Proposed Conclusions of Law, at 15-16.) The defendants raised this defense in their summary judgment motion and, although Judge Platt found the Nation to be a tribe of Indians, he denied the defendants' motion for summary judgment on the basis of sovereign immunity. *See* Shinnecock Indian Nation, 400 F.Supp.2d at 493 ("Unfortunately, recognizing the Shinnecocks as a Tribe does not end the matter. The question remains as to what use Defendants may put the Westwoods property adjacent to the western border of their reservation."). As set forth below, there are a number of independent grounds for the Court's conclusion that sovereign immunity is not a defense to this action.[FN72]

FN72. With respect to the burden of proof on a claim of sovereignty immunity, the Court concludes that the party asserting this defense-namely, defendants-bears the burden of proof. In *Christy v. Pa. Turnpike Comm'n,* 54 F.3d 1140, 1144 (3d Cir.1995), the Third Circuit held, in the context of a state agency seeking to invoke a sovereign immunity defense, "that the party asserting Eleventh Amendment immunity (and standing to benefit from its acceptance) bears the burden of proving its applicability"); *accord ITSI TV Prods. v. Agric. Ass'n,* 3 F.3d 1289, 1291 (9th Cir.1993). The Second Circuit has cited *Christy* and *ITSI TV Productions* with approval in cases in which a State agency was required to demonstrate that it was entitled to invoke Eleventh Amendment immunity. *See, e.g., Richardson v. N.Y. State Dep't of Corr. Servs.,* 180 F.3d 426, 449 (2d Cir.1999); *see also Mancuso v. N.Y. State Thruway Auth.,* 86 F.3d 289, 292 (2d Cir.1996) ("[T]he Thruway Authority is entitled to immunity if it can demonstrate that it is more like 'an arm of the State,' such as a state agency, than like 'a municipal corporation or other political subdivision.") (citations omitted). Although the Second Circuit has not decided this issue in the context of Indian tribes, the Eleventh Amendment jurisprudence on the burden of proof applies with equal force to assertions of tribal immunity and, thus, the defendants have the burden of proof on this issue. *See, e.g., State Eng'g of Nev. v. S. Fork Band of the Te-moak Tribe of W. Shoshone Indians of Nev.,* 66 F.Supp.2d 1163, 1173 (D.Nev.1999) ("Indian tribal sovereign immunity is closely analogous to a state's immunity from suit under the Eleventh Amendment."). However, even assuming that plaintiffs had the burden of proving that such immunity does not apply here, the Court concludes that plaintiffs have met the burden for the reasons set forth *infra.*

As a threshold matter, defendants have voluntarily submitted to the jurisdiction by removing the State's and Town's state court actions to federal court. The Supreme Court, in *Lapides v. Board of Regents of the University Systems of Georgia,* 535 U.S. 613, 616 (2002), held that a state waives its Eleventh Amendment immunity from suit when it voluntarily removes a lawsuit to federal court. Although the *Lapides* decision was limited to state law claims, there is no reason why the reasoning of *Lapides* would not apply to removal of both state and federal claims when the removing party is subject to suit in state court. *See, e.g., Embury v. King,* 361 F.3d 562 (9th Cir.2004); *Estes v. Wyo. Dep't of Transp.,* 302 F.3d 1200, 1204 (10th Cir.2002); *Brownsscombe v. Dep't of Campus Parking,* 203 F.Supp.2d 479, 482 (D.Md.2002). Moreover, even though *Lapides* did not involve an Indian tribe, the Court concludes that the issue of Indian tribal sovereignty can be analyzed under the analogous legal framework utilized when considering issues of state immunity from suit under the Eleventh

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Amendment. For example, in the *State Engineer* case, the district court explained:

***100** In the instant case Respondent Tribe joined in the removal to federal court, answered the complaint, and opposed a motion to remand on immunity grounds. If the Tribe were a state, that would clearly be sufficient to waive the state's sovereign immunity. We see no reason to treat the Tribe differently. As such, we treat the Tribe's actions as amounting to a clear and unequivocal waiver of immunity in this Court.

66 F.Supp.2d at 1173. Thus, the defendants can be sued in the instant lawsuit because of their voluntary removal of the state actions to this Court.

Second, it is clear from the Supreme Court's decision in *Sherrill* that a tribe can be prevented from invoking a defense of sovereign immunity where equitable doctrines preclude the tribe from asserting sovereignty over a particular parcel of land. In other words, the *Sherrill* Court held that the OIN could not invoke sovereign immunity to defend against local real property tax enforcement proceedings, including eviction proceedings. 544 U.S. at 211. Specifically, as noted *supra,* Justice Stevens argued in his dissent that tribal immunity could be raised "as a defense against a state collection proceeding."*Id.* at 225.However, the majority opinion specifically rejected that reasoning. *See id* . at 214 n. 7 ("The dissent suggests that, compatibly with today's decision, the Tribe may assert tax immunity defensively in the eviction proceeding against Sherrill. We disagree."); *see also id.* at 221 (Souter, J., concurring) (rejecting claim of territorial sovereign status whether affirmative or defensive). Thus, *Sherrill* allows a tribe to be sued by a state or town, such as the instant case, to enforce its laws with respect to a parcel of land if equitable principles prevent the tribe from asserting sovereignty with respect to that land. To hold otherwise would completely undermine the holding of *Sherrill* because, if defendants are immune from suit, plaintiffs here would be left utterly powerless to utilize the courts to avoid the disruptive impact that the Supreme Court clearly stated they have the equitable right to prevent.[FN73]

FN73. To the extent that the United States District Court for the Northern District of New York has concluded otherwise, in finding that the Oneida Nation is immune from county real property tax enforcement proceedings regarding the lands at issue in *Sherrill,* the Court disagrees with that conclusion for the reasons stated above. *See Oneida Indian Nation v. Oneida County,* 432 F.Supp.2d 285, 289 (N.D.N.Y.2006); *Oneida Indian Nation v. Madison County,* 401 F.Supp.2d 219, 228-30 (N.D.N.Y.2005).

Finally, even if the Shinnecock Indian Nation had tribal immunity when sued by the State, its tribal officials could be sued in their official capacities for prospective equitable relief. Specifically, the Second Circuit and other courts have held that a suit for injunctive relief can be pursued against a tribal official in his official capacity so long as plaintiff can maintain a cause of action under the applicable statute. *See Garcia v. Akwesasne Hous. Auth.,* 268 F.3d 76, 87-88 (2d Cir.2001); *see also Frazier v. Turning Stone Casino,* 254 F.Supp.2d 295, 310 (N.D.N.Y.2003) ("*Ex parte Young* offers a limited exception to the general principle of state sovereign immunity and has been extended to tribal officials acting in their official capacities ... but only to enjoin conduct that violates federal law."); *Bassett v. Mashantucket Pequot Museum and Research Ctr. Inc.,* 221 F.Supp.2d 271, 278-79 (D.Conn.2002) ( "[U]nder the doctrine of *Ex parte Young,* prospective injunctive or declaratory relief is available against tribal officials when a plaintiff claims an ongoing violation of federal law or claims that a tribal law or ordinance was beyond the authority of the Tribe to enact.").[FN74] In the instant case, although the State commenced the action alleging violations of New York anti-gaming and environmental law, Judge Platt held in his denial of the State's remand motion that the lawsuit raised federal claims related to IGRA, possessory interests of an Indian tribe with respect to Indian land, and the tribal status of the Shinnecock. (Memorandum and Order, at 3-5.). Thus, given the federal questions found by Judge Platt, the State may sue tribal officials for prospective injunctive relief pursuant to *Ex parte Young* and such defendants do not have a defense of sovereign immunity.[FN75]

FN74. The Supreme Court's decision in *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.,* 523 U.S. 751 (1988) is distinguishable from these cases because it was addressing sovereign immunity of federally-recognized Indian tribes from damages actions, not for injunctive relief as is being sought here. *See TTEA v. Ysleta Del Sur Pueblo,* 181 F.3d 676, 680-81 (5th Cir.1999) (distinguishing *Kiowa* and holding that "while the district court correctly

dismissed the damages claim based on sovereign immunity, tribal immunity did not support its order dismissing actions seeking declaratory and injunctive relief"); *Comstock Oil & Gas v. Ala. and Coushatta Indian Tribes of Tex.,* 261 F.3d 567, 571-72 (5th Cir.2001) ( "[T]he district court erroneously concluded that the Tribe was entitled to sovereign immunity against oil companies' claims for equitable relief.").

FN75. Moreover, with respect to tribal officials, the Supreme Court has also held that a suit for equitable relief against tribal officials for violation of state law may be brought in state court. *See Puyallup Tribe, Inc. v. Dep't of Game of Wash.,* 433 U.S. 165, 171-72 ("[W]hether or not the Tribe itself may be sued in a state court without its consent or that of Congress, a suit to enjoin violations of state law by individual tribal members is permissible."). In addition, in *Garcia,* the Second Circuit cited *Puyallup Tribe* in concluding that lawsuits for injunctive relief may be brought against tribal officials. 268 F.3d at 87. Therefore, pursuant to *Puyallup Tribe,* the lawsuits in the instant case could have proceeded in state court against tribal officials and a defense of sovereign immunity would have been unavailable. There is no basis for concluding that the removal of these claims against individual tribal members to federal court should alter this analysis.

***101** In sum, for the reasons set forth above,[FN76] the Nation cannot assert sovereign immunity as a defense to the instant lawsuit.[FN77]

FN76. Plaintiffs also set forth a number of other grounds to defeat any claim of sovereign immunity, including (1) defendants do not have sovereign immunity from suit for alleged violations of the SPDES program requirements because Congress abrogated such immunity in the Clean Water Act (Plts. Proposed Conclusions of Law, at 133-36); (2) defendants have no immunity from suit brought by the State because the Nation is not federally recognized and is subject to state jurisdiction under New York law (*Id.* at 138-40); and (3) defendant Trustees can be sued in their official capacities for prospective equitable relief based upon the *Ex Parte Young* doctrine. Because the Court has found the defense of sovereign immunity to be unavailable in this lawsuit for the reasons described above, the Court declines to address these other alternative arguments.

FN77. Defendants have a series of other affirmative defenses in their answers to the State and Town complaints, including, but not limited to, asserting that the claims are barred by collateral estoppel, waiver and equitable estoppel, laches, and unclean hands. The Court has considered all of these other affirmative defenses and, for the reasons outlined in this Memorandum and Order, find that none of these doctrines, or any other defenses asserted in the answers, bar plaintiffs' claims.

F. NECESSITY FOR PERMANENT INJUNCTIVE RELIEF

Plaintiffs seek a permanent injunction enjoining and restraining defendants from engaging in any further or additional site preparation, construction, development, or gaming-related activities at Westwoods, in furtherance of their announced intention to construct and operate a casino on Westwoods, and from otherwise violating state or local gaming, environmental, land use, and zoning laws with respect to Westwoods. As discussed below, the Court concludes that the requirements for permanent injunctive relief have been satisfied by the plaintiffs.

"A party seeking preliminary injunctive relief must establish (1) either (a) a likelihood of success on the merits of its case as (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor, *and* (2) a likelihood of irreparable harm if the requested relief is denied."*Time Warner Cable, Inc. v. DIRECTV, Inc.,* No. 07-0468-CV, 2007 U.S.App. LEXIS 18846, at *14-*15 (2d Cir. Aug. 9, 2007) (emphasis in original). The standard for a permanent injunction is the same as that for a preliminary injunction except that the plaintiff must establish actual success, rather than merely a likelihood of success on the merits. *See, e.g., Lusk v. Vill. of Cold Spring,* 475 F.3d 480, 485 (2d Cir.2007) (" 'The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception

that the plaintiff must show a likelihood of success on the merits rather than actual success.'") (quoting *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 546 n. 12 (1987)). Moreover, the Supreme Court recently reiterated the four-factor test that the court must satisfy in connection with an application for permanent injunctive relief:

According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.,* 126 S.Ct. 1837,1839(2007).

Applying this standard, all of the requirements for permanent injunctive relief have been met by the plaintiffs. First, plaintiffs have demonstrated actual success on the merits for all the reasons discussed *supra.* Second, plaintiffs have shown that, if the Nation is permitted to construct a gaming facility at Westwoods, they will suffer irreparable injury.[FN78] In particular, plaintiffs have shown that construction and operation of a casino in violation of the zoning laws would irreparably harm the community in terms of its essential character, as well as its health and safety. As Justices Stevens and O'Connor noted in *Brendale v. Confederated Tribes and Bands of Yakima Indian Nation,* 492 U.S. 408 (1989), development of land in contravention to zoning violations, as is proposed here, can have a highly destructive impact on the community:

FN78. As an initial matter, under New York law, a municipality such as the Town is not required to demonstrate irreparable injury to demonstrate its right to injunctive relief where the action involves enforcement of zoning ordinances. *See, e.g., Inc. Vill. of Williston Park v. Argano,* 602 N.Y.S.2d 878, 878 (N.Y.App.Div.1993) ("Because the plaintiff proved that the defendants were in violation of the local zoning ordinance, it was not required to show irreparable injury in order to demonstrate its right to injunctive relief."); *Town of Southampton v. Sendlewski,* 549 N.Y.S.2d 434, 435 (N.Y.App.Div.1989) ("[N.Y.] Town Law § 268 which authorizes a town to institute any action or proceeding to enforce its zoning ordinances requires no showing of injury to the public or the nonexistence of an adequate remedy at law as a condition to injunctive relief."); *Town of Smithtown v. Schleider,* 549 N.Y.S .2d 433, 434 (N.Y.App.Div.1989) (holding that in action to enjoin defendant's illegal use of property, "it was not necessary for the [Town] to demonstrate that the defendant's allegedly illegal use of his property was causing irreparable injury"). Here, the Town's suit for injunctive relief to restrain violations and threatened violations of its zoning laws is authorized by New York Town Law § 268(2). Therefore, because the Town's request for injunctive relief is statutorily-authorized, irreparable injury is presumed. *See, e .g., Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 479 (2d Cir.1995) (holding that a railroad seeking statutorily authorized injunctive relief is exempt from equitable criteria). Similarly, where as here the State is seeking an injunction to prevent violations of New York environmental laws, the requirements of irreparable injury and the balancing of the equities need not be shown independent of establishing a statutory violation. *See, e.g ., New York v.* *Sour Mountain Realty, Inc.,* 714 N.Y.S.2d 78, 83-84 (N.Y.App.Div.2000); *Adirondack Park Agency v. Hunt Bros. Contractors, Inc.,* 651 N.Y.S.2d 634, 635 (N.Y.App.Div.1996); *New York v.* *Brookhaven Aggregates, Ltd.,* 503 N.Y.S.2d 413, 414-15 (N.Y.App.Div.1986). However, even in the absence of this presumption of irreparable harm, the Court finds that plaintiffs have satisfied the permanent injunction requirements.

***102** Zoning is the process whereby a community defines its essential character. Whether driven by a concern for health and safety, esthetics, or other public values, zoning provides the mechanism by which the polity ensures that neighboring uses of land are not mutually-or more often unilaterally-destructive.

*Id.* at 433-34 (Stevens, J., O'Connor, J., concurring). Moreover, plaintiffs have shown that the anticipated construction and operation of the casino will have a detrimental environmental impact, some of which is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

essentially irreversible, such as the destruction of trees. Similarly, the proposed gaming at Westwoods would be conducted in violation of New York's anti-gaming provisions, which are designed to protect the public. Violations of these provisions clearly constitute irreparable harm to plaintiffs and the public. Third, none of these injuries-zoning violations, environmental injuries, and gambling in violation of state laws-can be adequately addressed by remedies at law, such as monetary damages. *See, e.g., Amoco Prod. Co.,* 480 U.S. at 545 ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."). Third, the Court has considered the balance of hardships, and finds that a remedy in equity is warranted. Specifically, as the Court discussed in detail in connection with the *Sherrill* analysis-where this land has been undeveloped for centuries, the Nation has never sought to assert sovereignty over the land prior to this litigation, and the proposed development without regarding to zoning or other regulations would substantially disrupt the settled expectations of the community and almost every aspect of the residents' lives-the balance of hardships is decidedly in plaintiffs' favor. Finally, the public interest clearly would not be disserved by a permanent injunction. To the contrary, the public interest is served by ensuring that development of this land does not take place in violation of current zoning laws, other land use regulations, and New York's anti-gaming provisions.

Defendants argue that any irreparable injury in this case is completely speculative and, thus, injunctive relief is unwarranted. The Court disagrees. The Court recognizes that "[i]njunctive relief should be narrowly tailored to fit specific legal violations" and "should not impose unnecessary burdens on lawful activity."*Waldman Publ'g Co. v. Landoll, Inc.,* 43 F.3d 775, 785 (2d Cir.1994) (citing *Soc'y for Good Will to Retarded Children, Inc. v. Cuomo,* 737 F.2d 1239, 1251 (2d Cir.1984)). Moreover, for an injunction to issue, "more than an abstract or nebulous plan to possibly commit a wrong sometime in the future, must be shown before the broad and potentially drastic injunctive power of the court will be exercised. Rather, 'injunctions issue to prevent existing or presently threatened injuries.' " *Gen. Fireproofing Co. v. Wyman,* 444 F.2d 391, 393 (2d Cir.1971) (quoting *Connecticut v. Massachusetts,* 282 U.S. 660, 674 (1931) (emphasis omitted)). In the instant case, there is nothing speculative or remote about the irreparable harm that would result in this case if the injunctive relief is not granted. The Nation formed a Gaming Authority and entered into a Development Agreement for the development, construction, and operation of a 61,000 sf. facility, and subsequently, prior to the issuance of the preliminary injunction, commenced construction activities at the Westwoods site by clearing trees with a bulldozer and other heavy equipment. Where the Nation's intent and imminent plans to build a gaming facility in violation of New York and Town laws have been made clear by words and action, plaintiffs are not required to wait until the facility is built to seek injunctive relief. Although the Nation continues to argue that harm from the potential expansion of a casino beyond its current plans cannot be the basis for injunctive relief, it is the Court's conclusion for the reasons discussed above that, even with respect to the currently planned casino, there is irreparable, imminent harm that would result if such construction and operation went forward in violation of state and local anti-gaming laws, zoning laws, and requisite environmental permits and approvals. Thus, plaintiffs have shown that they "will suffer 'real and imminent, not remote, irreparable harm' in the absence of a [permanent injunctive] remedy.' " *Henrietta D. v. Bloomberg,* 331 F.3d 261, 290 (2d Cir.2003) (quoting *Levin v. Harlesion,* 966 F.2d 85, 90 (2d Cir.1992) (internal quotation omitted)). Accordingly, permanent injunctive relief is warranted.

VI. CONCLUSION

***103** For the reasons set forth above, plaintiffs have met their burden for declaratory and permanent injunctive relief.[FN79] Plaintiffs shall submit a proposed judgment and permanent injunction by November 7, 2007. Defendants shall provide any objections to the specific language of the proposed judgment and permanent injunction by November 14, 2007.

FN79. Defendants moved for a judgment on partial findings at the close of plaintiffs' case pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, which the Court declined to rule on until the close of all evidence. For the reasons set forth in this Memorandum and Order, that motion is denied.

SO ORDERED.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3307089 (E.D.N.Y.)
**(Cite as: Slip Copy)**

Page 90

E.D.N.Y.,2007.
New York v. Shinnecock Indian Nation
Slip Copy, 2007 WL 3307089 (E.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Page 1
Not Reported in F.Supp.2d, 2004 WL 527045 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Pieczenik v. Cambridge Antibody Technology Group
S.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
George PIECZENIK, Plaintiff,
v.
**CAMBRIDGEANTIBODY** TECHNOLOGY GROUP, Domantis, Medical Research Council-Laboratory of Molecular Biology, the Commissioner of Patents and Trademarks of the United States Patent Office, an Agency of the Department of Commerce, and the Commissioner of Food and Drugs, Defendants.
**No. 03 Civ. 6336(SAS).**

March 16, 2004.

**Background:** Patent holder brought pro se action against, inter alia, Delaware and English licensing companies, asserting claims for patent infringement, patent invalidity, and alleged violations of Racketeer Influenced and Corrupt Organizations Act (RICO). Companies moved to dismiss for lack of personal jurisdiction, or, alternatively, for failure to state claim.

**Holdings:** The District Court, Scheindlin, J., held that:

(1) court could not assert personal jurisdiction over Delaware corporation under New York's "doing business" jurisdictional statute;

(2) personal jurisdiction could not be exercised over Delaware corporation under transaction of business provision of New York's long-arm statute with respect to patent infringement claim;

(3) personal jurisdiction could not be exercised over Delaware corporation under transaction of business provision of New York's long-arm statute with respect to RICO claim;

(4) jurisdiction did not exist over English company pursuant to New York's "doing business" jurisdictional statute; and

(5) jurisdiction did not exist over English company pursuant to transaction of business provision of New York's long-arm statute.

Motions granted.
West Headnotes
**[1] Federal Courts 170B 76.15**

170B Federal Courts
170BII Venue
170BII(A) In General
170Bk76 Actions Against Non-Residents; "Long-Arm" Jurisdiction in General
170Bk76.15 k. Transacting or Doing Business. Most Cited Cases
Allegation that defendant's website is accessible to New York residents, unaccompanied by averments that the website is either highly interactive or that plaintiff's claims arose out of defendant's website activity, cannot provide the basis for jurisdiction under New York's jurisdictional statutes. McKinney's CPLR 301, 302.

**[2] Federal Courts 170B 76.25**

170B Federal Courts
170BII Venue
170BII(A) In General
170Bk76 Actions Against Non-Residents; "Long-Arm" Jurisdiction in General
170Bk76.25 k. Tort Cases. Most Cited Cases
Absence of allegations that defendants in patent infringement action regularly solicited or did business in New York, engaged in any other persistent course of conduct, or derived substantial revenue from interstate or international commerce precluded exercise of personal jurisdiction over defendants under New York statute allowing for jurisdiction over defendant who met such requirements and who committed tortious act outside the state that caused injury within state. McKinney's CPLR 302(a)(3).

**[3] Federal Civil Procedure 170A 1825**

170A Federal Civil Procedure
170AXI Dismissal
170AXI(B) Involuntary Dismissal
170AXI(B)5 Proceedings
170Ak1825 k. Motion and Proceedings Thereon. Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 2
Not Reported in F.Supp.2d, 2004 WL 527045 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Even if local rules requiring represented party moving for summary judgment against pro se litigant to apprise that litigant of consequences of failing to respond to motion applied to defendants' motions to dismiss, pro se plaintiff who was notified of his rights was not entitled to dismissal of defendants' motions for failure to comply with such rules. U.S.Dist.Ct.Rules S.D.N.Y., Rules 12.1, 56.2.

**[4] Federal Courts 170B 76.35**

170B Federal Courts
170BII Venue
170BII(A) In General
170Bk76 Actions Against Non-Residents; "Long-Arm" Jurisdiction in General
170Bk76.35 k. Other Particular Types of Cases. Most Cited Cases
Federal district court sitting in New York could not assert personal jurisdiction over nonresident corporation under New York's "doing business" jurisdictional statute, given absence of allegations that corporation maintained New York office, had property or telephone listing in state, conducted public relations work in state, or had individuals located in state to promote its interests, and given that plaintiff's sole jurisdictional allegation, that corporation licensed rights under its patents in New York, the United States, and the world, did not suggest that corporation conducted business in New York on systematic and continuous basis. McKinney's CPLR 301.

**[5] Federal Courts 170B 76.35**

170B Federal Courts
170BII Venue
170BII(A) In General
170Bk76 Actions Against Non-Residents; "Long-Arm" Jurisdiction in General
170Bk76.35 k. Other Particular Types of Cases. Most Cited Cases
Allegation that Delaware licensing company licensed rights under its patents in New York and that, by doing so, infringed or contributed to infringement of plaintiff's patents did not support exercise of personal jurisdiction over company under transaction of business provision of New York's long-arm statute with respect to plaintiff's patent infringement claim, given that company offered sworn declaration that it did not engage in any licensing activities in New York, and that granting of licensing rights to New York corporation was not transaction of business under statute. McKinney's CPLR 302(a)(1).

**[6] Federal Courts 170B 76.35**

170B Federal Courts
170BII Venue
170BII(A) In General
170Bk76 Actions Against Non-Residents; "Long-Arm" Jurisdiction in General
170Bk76.35 k. Other Particular Types of Cases. Most Cited Cases
Federal district court in New York could not exercise personal jurisdiction over Delaware licensing company pursuant to transaction of business provision of New York's long-arm statute with respect to patent holder's claim for alleged violation of Racketeer Influenced and Corrupt Organizations Act (RICO), given patent holder's failure to allege any facts suggesting that connection existed between New York and Delaware company with regard to alleged collusion between Delaware company and other parties. 18 U.S.C.A. § 1961 et seq.; McKinney's CPLR 302(a)(1).

**[7] Federal Courts 170B 76.35**

170B Federal Courts
170BII Venue
170BII(A) In General
170Bk76 Actions Against Non-Residents; "Long-Arm" Jurisdiction in General
170Bk76.35 k. Other Particular Types of Cases. Most Cited Cases
Federal district court sitting in New York could not exercise personal jurisdiction over English licensing company pursuant to New York statute allowing for general jurisdiction over those "doing business" in New York, given that company specifically stated that it had no facilities, operations, employees, assets, or bank accounts in New York, and that company's alleged New York contacts did not suggest that it was doing business in New York on systematic and continuous basis, even upon aggregation of those contacts, which included being defendant in contract litigation in New York court, listing of non-company employee as contact person on contract underlying that litigation, purported contracts with unnamed New York businesses, allegations of minority ownership by New York corporation that were unaccompanied by averments that company was mere department or alter ego of corporation, and designation of New York bank as depository for its American depository receipts.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 3
Not Reported in F.Supp.2d, 2004 WL 527045 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

McKinney's CPLR 301.

**[8] Federal Courts 170B 76.35**

170B Federal Courts
170BII Venue
170BII(A) In General
170Bk76 Actions Against Non-Residents; "Long-Arm" Jurisdiction in General
170Bk76.35 k. Other Particular Types of Cases. Most Cited Cases

Transaction of business provision of New York's long-arm statute did not support exercise of personal jurisdiction by New York federal district court over English licensing company with respect to patent holder's patent infringement claims, given that patent holder premised jurisdictional argument on contracts between company and businesses either located in or doing business in New York, but did not adequately allege that company transacted business in New York and that such transaction of business had nexus with patent infringement claims; purported contracts were not alleged to have been negotiated or executed in New York, to require notices or payments to be sent there, or to require supervision by company there, and allegation that company had continuous research and licensing agreement with third party having New York address was insufficient to show jurisdiction. McKinney's CPLR 302(a)(1).

**Patents 291 328(2)**

291 Patents
291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
291k328 Patents Enumerated
291k328(2) k. Original Utility. Most Cited Cases
5,866,363, 6,605,448. Cited.

George Pieczenik, New York, New York, for Plaintiff pro se.
Michael B. Weiss, S. Penny Windle, Cahill Gordon & Reindel LLP, New York, New York, for Defendant Cambridge Antibody Technology Group.
Ivor R. Elrifi, Susan Gail Hecht, H. Joseph Hameline, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, New York, New York, for Defendant Domantis Inc.

*OPINION AND ORDER*

SCHEINDLIN, J.

***1** Dr. George Pieczenik, appearing pro se, brings this action against multiple defendants, alleging patent infringement, patent invalidity, and Racketeer Influenced and Corrupt Organizations ("RICO") claims.[FN1] Defendants Domantis Inc. and Cambridge Antibody Technology Group plc ("CAT") (collectively "defendants") now move to dismiss the action against them for lack of personal jurisdiction.[FN2] In the alternative, defendants move to dismiss the action for failure to state a claim.[FN3] Pieczenik counters with a series of papers styled "Cross Motions," seeking dismissal of defendants' motions citing their "failure to comply with Local Rules 12.1 and 56.2."[FN4] For the reasons that follow, defendants' motions to dismiss for lack of personal jurisdiction are granted and Pieczenik's cross motions are denied.

FN1. 18 U.S.C. § 1961 *et seq.*

FN2. Pieczenik has named only "Domantis" as a party to this action, making it unclear whether he is referring to Domantis Inc., a Massachusetts company, or its English parent, Domantis Limited. However, because he has only served Domantis Inc. and because Domantis Inc. is the party moving for dismissal, this Opinion addresses only the question of jurisdiction over Domantis Inc. and has no bearing on Pieczenik's suit against Domantis Limited. Although Pieczenik references Domantis Limited in his papers, as far as this Court is aware, Domantis Limited has never been served and is therefore not a party to this litigation.

FN3. CAT also seeks dismissal of Pieczenik's claims of patent invalidity for lack of subject matter jurisdiction. Because defendants' motions to dismiss for lack of personal jurisdiction are both granted, I do not consider their alternative grounds for dismissal.

FN4. *See* Cross Motion for Dismissal and in Opposition to Domantis' Motions for Failure to Comply with Local Rules 12.1 and 56 .2; 12/27/03 Letter to the Court from Pieczenik (seeking dismissal of CAT's motion to dismiss, citing failure to comply with Local Rules 12.1 and 56.1); Plaintiff's Reply Memorandum of Law and Evidence in Further Support of His Cross Motion to Dismiss CAT's Motion to Dismiss and a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 527045 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

Request for Reconsideration of Court's Ruling on MRC's and Aaron Klug's Relationship to CAT ("Pl. Reply CAT Mem.").

I. FACTS

A. The Moving Defendants

Domantis Inc. is a Delaware corporation that employs four people and has its only office in Cambridge, Massachusetts.[FN5] Domantis Inc. is a subsidiary of Domantis Limited, which is organized under the laws of the United Kingdom.[FN6] CAT is an English company, with its headquarters and principal place of business in Cambridge, England.[FN7]

FN5. *See* 12/4/03 Declaration of Robert J. Welna, Domantis Inc.'s Director of Finance, in Support of Domantis Inc.'s Motion to Dismiss ("Welna Decl.") ¶¶ 2-3; Third Amended Complaint ("Am.Compl.") ¶ 5. Pieczenik has amended his Complaint three times since the commencement of this action. When the instant motions were filed, the operative complaint was the Second Amended Complaint. But while the parties were in the process of briefing their respective motions, Pieczenik filed his Third Amended Complaint. Because the jurisdictional allegations regarding Domantis Inc. and CAT have not changed from the Second to the Third Complaint, defendants' respective motion papers are deemed to address the Third Amended Complaint.

FN6. *See* Welna Decl.; Am. Compl. ¶ 5.

FN7. *See* Am. Compl. ¶ 7; 12/19/03 Declaration of Diane Mellett, CAT's General Counsel and Company Secretary, in Support of CAT's Motion to Dismiss ("Mellett Decl.") ¶ 2.

B. Jurisdictional Allegations

1. Domantis Inc.

[1] Pieczenik alleges that Domantis Inc. licenses rights under its phage display patents in "New York, the United States, and the world," thereby infringing and contributing to infringement of his '363 and '448 patents.[FN8] Domantis Inc. counters that it does not "engage in any research or licensing activities in New York."[FN9]

FN8. Am. Compl. ¶ 27.

FN9. Welna Decl. ¶ 6. In one of his many letters to the Court, Pieczenik notes that "Domantis Limited advertises, on a Web site accessible in New York, a relationship with Imclone." 12/6/03 Letter to the Court from Pieczenik. Because this allegation is directed at Domantis Limited, rather than Domantis Inc., I do not consider it for purposes of the instant motion. However, I note that the allegation that a defendant's website is accessible to New York residents, unaccompanied by averments that the website is either highly interactive or that the plaintiff's claims arose out of the defendant's website activity, cannot provide the basis for jurisdiction under New York's jurisdictional statutes. *See In re Ski Train Fire in Kaprun, Austria on November 11, 2000 (Siemens Austria),* 230 F.Supp.2d 403, 408 (S.D.N.Y.2002). Insofar as Pieczenik argues that jurisdiction can be exercised over Domantis Inc. or CAT on the basis of their respective websites, his allegations are inadequate under either of New York's jurisdictional statutes.

2. CAT

a. License Agreements

Pieczenik alleges that CAT, like Domantis Inc., infringes and contributes to the infringement of his patents by licensing rights in "New York, the United States, and the world."[FN10] CAT identifies several license agreements that it has with New York entities: (1) a 1995 license and royalty agreement with Pfizer Inc., "a Delaware corporation that has an address in New York"; (2) a 1999 research and licensing agreement with G.D. Searle & Co., an Illinois company that was eventually acquired by Pfizer Inc.; and (3) a 1996 agreement with New York Medical College in Valhalla, New York.[FN11] None of these agreements were negotiated in New York or are governed by New York law, and only the third agreement required CAT to send materials and/or technology to New York.[FN12] CAT also states that it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 5
Not Reported in F.Supp.2d, 2004 WL 527045 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

transferred a therapeutic product candidate-Trabio™-to two locations in New York, for use in clinical trials.[FN13]

FN10. Am. Compl. ¶ 27.

FN11. Mellett Decl. ¶ 9; *see also id.* ¶¶ 10, 12.

FN12.*See id.* ¶¶ 9, 10, 12.

FN13.*See id.* ¶ 13.

b. Other Contacts

Pieczenik also offers many general jurisdictional allegations, scattered throughout his various submissions to the Court. *First,* he asserts that CAT is a defendant in a lawsuit brought by a former shareholder, Continental Venture Capital Limited (“CVC”), in New York state court.[FN14]*Second,* he points to the fact that CAT listed a New York investment banker as a “contact person for the Subscription Agreement for raising money in both its initial subscription offering to the present.”[FN15]*Third,* CAT has purportedly entered into contracts with companies and individuals, located or doing business in New York, such as Dyax and Bristol-Myers Squibb.” [FN16]*Fourth,* Genzyme Corp., a company with “a continuous presence in Yonkers, New York as Genzyme Genetics,” purportedly owns 11.28% of CAT.[FN17]*Fifth,* CAT maintains its American Depository Receipts (“ADRs”) in the Bank of New York, and is “required to continually monitor those assets either by phone, internet and/or mail.”[FN18]Aggregating the foregoing allegations, Pieczenik concludes that “[t]he bacteriophage that CAT uses comes from NY, the ideas come from New Yorker, the legal solutions come from New York. The only thing not from New York at CAT is the chutzpah and the accent.”[FN19]

FN14. Pl. Reply CAT Mem.

FN15. 12/6/03 Letter to the Court from Pieczenik.

FN16. Am. Compl. ¶ 7. Pieczenik also alleges, in the same sentence in his Amended Complaint that CAT “designated the Secretary of State of New York to receive process of service.”*Id.* CAT disputes this in a sworn declaration, which states that CAT has not designated the New York Secretary of State, or any agent, to receive process in New York. *See* Mellett Decl. ¶ 5. Pieczenik has not addressed this issue in his subsequent submissions.

FN17. Plaintiff's Cross Motion and Response Against CAT's Reply Brief (“Pl. CAT Mem.”).

FN18.*Id.*

FN19.*Id.*

II. APPLICABLE LAW

A. Local Rules 12.1 and 56.2

***2** Rule 12.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York provides that “[a] represented party moving to dismiss ... against a party proceeding pro se, who refers in support of the motion to matters outside the pleadings as described in Federal Rule of Civil Procedure 12(b)..., shall serve and file the notice required by Local Civil Rule 56.2 at the time the motion is served.”Federal Rule of Civil Procedure 12(b), in turn, references “matters outside the pleadings” only in the context of “a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted.”[FN20]Local Rule 56.2 provides that “[a]ny represented party moving for summary judgment against a party proceeding *pro se* shall serve and file as a separate document, together with the papers in support of a motion, a “Notice to Pro Se Litigant Opposing Motion For Summary Judgment” in the form indicated [in the rule].”

FN20.*See*Fed.R.Civ.P. 12(b) (“If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.”).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 527045 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

Local Rule 12.1, read in conjunction with Rule 12(b) and Local Rule 56.2, requires that a represented party moving for *summary judgment* against a pro se litigant apprise that litigant of the consequences of failing to respond to the motion. Local Rule 12.1 is intended to satisfy the prerequisites in this Circuit for granting a motion for summary judgment in a case involving a pro se litigant. Specifically, a court may not grant a summary judgment motion where one of the litigants is unrepresented unless: "(1) the court apprises the pro se litigant of the consequences of failing to respond to the motion, (2) an opposing party has already provided the litigant with the requisite notice, or (3) it is clear that the litigant understands 'the nature and consequences of a summary judgment motion." ' [FN21]

FN21. *See* *Arum v. Miller,* No. 00 Civ. 7476, 2003 WL 23205689, at *3 (E.D.N.Y. Feb.8, 2003) (citing *Ruotolo v. IRS,* 28 F.3d 6, 8 (2d Cir.1994); *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *M.B. v. Reish,* 119 F.3d 230, 232 (2d Cir.1997); and *Vital v. Interfaith Med. Center,* 168 F.3d 615, 620-21 (2d Cir.1999)).

B. Personal Jurisdiction

Inasmuch as "[t]his case relates to the infringement [and invalidity] of patents [it] is [ ] governed by the law of the Federal Circuit."[FN22] "When determining a personal jurisdiction case under Federal Circuit law, [a court] must first apply the state long-arm statute and then determine whether asserting jurisdiction would violate federal due process."[FN23] Because the Federal Circuit's approach to evaluating personal jurisdiction is consistent with that of the Second Circuit, I will weigh the jurisdictional issues relating to Pieczenik's patent claims under the precedents of state and federal courts in this Circuit.[FN24]

FN22. *Hypoxico, Inc. v. Colorado Altitude Training LLC,* No. 02 Civ. 6191, 2003 WL 21649437, at *1 (S.D.N.Y. July 14, 2003).

FN23. *Id.* at *2.

FN24. *See id.*

1. Legal Standard

Upon motion, a court is obligated to dismiss an action against a defendant over which it has no personal jurisdiction.[FN25] A plaintiff bears the ultimate burden of establishing, by a preponderance of the evidence, that the court has jurisdiction over the defendant.[FN26] However, "[p]rior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith ... legally sufficient allegations of jurisdiction, i.e., by making a *prima facie* showing of jurisdiction."[FN27] A plaintiff "can make this showing through his own affidavits and supporting materials[,] containing an averment of facts that, if credited ..., would suffice to establish jurisdiction over the defendant."[FN28] Thus, a court may consider materials outside the pleadings,[FN29] but must credit the plaintiff's averments of jurisdictional facts as true.[FN30] "[W]here the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party."[FN31]

FN25. *See* Fed.R.Civ.P. 12(b)(2); *see also* *In re Ski Train Fire in Kaprun, Austria,* 230 F.Supp.2d at 406.

FN26. *See* *Kernan v. Kurz-Hastings, Inc.,* 175 F.3d 236, 240 (2d Cir.1999); *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 507 (2d Cir.1994).

FN27. *Jazini v. Nissan Motor Co., Ltd.,* 148 F.3d 181, 184 (2d Cir.1998) (citations and quotation marks omitted); *see also* *Koehler v. Bank of Berm., Ltd.,* 101 F.3d 863, 865 (2d Cir.1996).

FN28. *Whitaker v. American Telecasting Inc.,* 261 F.3d 196, 208 (2d Cir.2001) (citations and quotation marks omitted).

FN29. *See* *Hsin Ten Enter. USA, Inc. v. Clark Enters.,* 138 F.Supp.2d 449, 452 (S.D.N.Y.2000).

FN30. *See* *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 567 (2d Cir.1996).

FN31. *A.I. Trade Fin., Inc. v. Petra Bank,* 989 F.2d 76, 79-80 (2d Cir.1993); *see also* *Whitaker,* 261 F.3d at 208.

***3** The determination of whether a federal court has

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 7
Not Reported in F.Supp.2d, 2004 WL 527045 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

personal jurisdiction over a defendant is a two-step process. *First,* the court must determine whether the plaintiff has shown that the defendant is subject to personal jurisdiction under the forum state's laws.[FN32] *Second,* the court must evaluate whether its assertion of jurisdiction pursuant to the forum state's laws comports with the requirements of due process.[FN33]

FN32. *See* *Bensusan Rest. Corp. v. King,* 126 F.3d 25, 27 (2d Cir.1997); *Met Life,* 84 F.3d at 567.

FN33. *See* *Bensusan Rest. Corp.,* 126 F.3d at 27; *Met Life,* 84 F.3d at 567. Because defendants are not subject to personal jurisdiction under New York's jurisdictional statutes, it is unnecessary to address the constitutional requirements for personal jurisdiction.

2. Personal Jurisdiction in New York [FN34]

FN34. Pieczenik fails to identify the statutory provisions on which his jurisdictional arguments are based. Accordingly, I will evaluate his allegations under both sections 301 and 302.
Because Pieczenik appears to allege *no* facts supporting jurisdiction under sections 302(a)(2) or 302(a)(3), these sections warrant only brief discussion. *First,* Pieczenik does not allege that either Domantis Inc. or CAT committed a tortious act while physically present in New York. As such, there is no basis for exercising jurisdiction over defendants on the basis of section 302(a)(2). *See* N.Y. C.P.L.R. § 302(a)(2) (McKinney 2003); *see also* *Westvaco Corp. v. Viva Magnetics Ltd.,* No. 00 Civ. 9399, 2002 WL 1933756, at *2 (S.D.N.Y. Aug.20, 2002) (noting that section 302(a)(2) requires that the tortious act be physically performed within New York state); *Millennium, L.P. v. Dakota Imaging, Inc.,* No. 03 Civ. 1838, 2003 WL 22940488, at *5 (S.D.N.Y. Dec.15, 2003). *Second,* Pieczenik does not aver facts suggesting that either Domantis Inc. or CAT regularly does or solicits business in New York, engages in any other persistent course of conduct, or derives substantial revenue from interstate or international commerce. Accordingly, section 302(a)(3) cannot serve as a basis for the exercise of personal jurisdiction over Domantis Inc. *See* N.Y. C.P.L.R. § 302(a)(3) (McKinney 2003).

a. Section 301

[2] Under New York law, a foreign corporation can be sued for all purposes if it is present or "doing business" in the state.[FN35] Under this test, "a foreign corporation is amenable to suit in New York if it is 'engaged in such a continuous and systematic course' of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction."[FN36] That is, a "corporation is 'doing business' and is therefore 'present' in New York and subject to personal jurisdiction with respect to any cause of action ... if it does business in New York 'not occasionally or casually, but with a fair measure of permanence and continuity.' " [FN37] "The doing business standard is a stringent one because a corporation which is amenable to the Court's general jurisdiction may be sued in New York on causes of action wholly unrelated to acts done in New York." [FN38]

FN35. *See* N.Y. C.P.L.R. § 301 (McKinney 2003); *Aerotel Ltd. v. Sprint Corp.,* 100 F.Supp.2d 189, 191 (S.D.N.Y.2000) (interpreting section 301).

FN36. *Aerotel Ltd.,* 100 F.Supp.2d at 191-92 (quoting *Frummer v. Hilton Hotels Int'l, Inc.,* 19 N.Y.2d 533, 536, 281 N.Y.S.2d 41, 227 N.E.2d 851 (1967)).

FN37. *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 95 (2d Cir.2000) (quoting *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 58 (2d Cir.1985)).

FN38. *Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG,* 160 F.Supp.2d 722, 731 (S.D.N.Y.2001) (quotation marks omitted).

To determine whether a foreign corporation is doing business in New York, courts have focused on a traditional set of indicia, assessing whether the company: (1) has an office in the state; (2) has any bank accounts or other property in the state; (3) has a phone listing in the state; (4) does public relations work there; and (5) has individuals permanently located in the state to promote its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

interests.[FN39] However, these factors are only intended to provide guidance-they do not amount to a "formula" for testing jurisdiction. As the Second Circuit has noted, "There is no talismanic significance to any one contact or set of contacts that a defendant may have with a forum state; courts should assess the defendant's contacts as a whole."[FN40]

FN39. *See Wiwa,* 226 F.3d at 98.

FN40. *Met Life,* 84 F.3d at 570; *see also Landoil Res. Corp. v. Alexander & Alexander, Servs., Inc.,* 918 F.2d 1039, 1043 (2d Cir.1990) ( "The Court must [ ] analyze a defendant's connections to the forum state 'not for the sake of contact-counting, but rather for whether such contacts show a continuous, permanent and substantial activity in New York." ') (quoting Weinstein, Korn & Miller, New York Civil Practice, ¶ 301.16, at 3-32)).

b. Section 302(a)(1)

Under section 302(a)(1) of New York's long-arm statute,[FN41] a court may exercise personal jurisdiction over a nondomiciliary if "the nondomiciliary [ ] transact[s] business within the state, [and] the claim against the nondomiciliary [ ] arise[s] out of that business activity."[FN42] A nondomiciliary "transacts business" in New York if it "purposefully avails [itself] of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws."[FN43] A court's determination of whether a defendant "transacts business" in New York is based on an assessment of the sum of the defendant's activities.[FN44]

FN41. Section 302(a)(1) reads, in relevant part: "[A] court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1) (McKinney 2003).

FN42. *CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986). Because jurisdiction under section 302(a)(1) requires consideration of whether a cause of action arose out of a party's transaction of business in New York, it is necessary to "determine the issue of personal jurisdiction separately for each cause of action asserted in the plaintiff's complaint." *Cosmetech Int'l LLC v. Der Kwei Enter. and Co.,* 943 F.Supp. 311, 317 (S.D.N.Y.1996); *see also Ainbinder v. Potter,* 282 F.Supp.2d 180, 184 (S.D.N.Y.2003).

FN43. *CutCo Indus., Inc.,* 806 F.2d at 365 (quoting *McKee Elec. Co. v. Rauland-Borg Corp.,* 20 N.Y.2d 377, 382, 283 N.Y.S.2d 34, 229 N.E.2d 604 (1967)); *see also Fort Knox Music Inc. v. Baptiste,* 203 F.3d 193, 196 (2d Cir.2000) ("[T]he statute allows jurisdiction only over a defendant who has 'purposefully availed himself of the privilege of conducting activities within New York and thereby invok[ed] the benefits and protections of its laws." ') (quotations marks omitted).

FN44. *See Sterling Nat'l Bank & Trust Co. of N.Y. v. Fidelity Mortgage Investors,* 510 F.2d 870, 873 (2d Cir.1975).

Where the cause of action is based on a contractual relationship, courts in the Second Circuit employ the following factors to evaluate whether a defendant is "transacting business" in New York:

***4** (1) whether the defendant has an on-going contractual relationship with a New York corporation; (2) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (3) what the choice-of-law clause is in any such contract; and (4) whether the contract requires notices and payments to be sent into the forum state or requires supervision by the corporation in the forum state.[FN45]

FN45. *Hutton v. Priddy's Auction Galleries, Inc.,* 275 F.Supp.2d 428, 439 (S.D.N.Y.2003) (citing *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.,* 98 F.3d 25, 29 (2d Cir.1996)).

This list of factors is not exhaustive, and a court's ultimate determination is based on a totality of the circumstances.[FN46] However, as evidenced by the preceding factors, "the mere existence of a contract with a New York corporation is not sufficient to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 527045 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 9

constitute the transaction of business under section [302(a)(1) ] of the CPLR."[FN47] In particular, "the grant of licensing rights to a New York corporation does not constitute the transaction of business within the meaning of the New York long-arm statute."[FN48]Thus, where a foreign defendant enters into a licensing agreement with a New York company, but lacks any other contacts with New York relating to that contract, the grant of licensing rights alone cannot serve as the basis for jurisdiction under section 302(a)(1).[FN49]

FN46.*See Agency Rent A Car Sys., Inc.,* 98 F.3d at 29.

FN47.*Pieczenik v. Dyax Corp.,* 265 F.3d 1329, 1335 (Fed.Cir.2001).

FN48.*Id.* (citing cases).

FN49.*See id.*

III. DISCUSSION

A. Pieczenik's Cross Motions

[3] I first address Pieczenik's contention that defendants' motions should be dismissed because of their failure to comply with Local Rules 12.1 and 56.2. Pieczenik initially made this argument in his letter to the Court dated December 27, and reiterated his concerns during the December 30, 2003 conference, adding that they could not remedy their alleged failure to comply because the "time [had] passed." [FN50]During that conference, I explained to Pieczenik that the purpose of the rule is to provide notice to pro se litigants and ensure that they are aware of the consequences of failing to respond to a motion. When Pieczenik responded that he "hop[ed] to save [himself] a lot of trouble," by prevailing on a technicality, he was clearly informed that his argument lacked merit .[FN51]Moreover, I formally notified Pieczenik of his rights in a December 31 Order,[FN52] even though (1) Local Rules 12.1 and 56.1 do not actually govern the motions at issue and (2) Pieczenik appeared to already know of the consequences, should he fail to respond.[FN53]

FN50.*See* Transcript of December 20, 2003 Conference at 14.

FN51.*Id.*

FN52.*See* 12/31/03 Order.

FN53. Pieczenik has considerable familiarity with the procedural aspects of federal litigation, having pursued a patent action against Dyax Corp. in the district courts of New York and Massachusetts and appealed the same action to the Federal Circuit. *See Pieczenik v. Dyax Corp.,* No. 00 Civ. 0243, 2000 WL 959753 (S.D.N.Y. July 11, 2000) (dismissing action against Dyax Corp. for lack of personal jurisdiction), *aff'd,*265 F.3d 1329;*Pieczenik v. Dyax Corp.,* 226 F.Supp.2d 314 (D.Mass.2002) (granting summary judgment to Dyax, finding no literal infringement by Dyax of the '363 patent or infringement under the doctrine of equivalents), *aff'd,*76 Fed.App. 293 (Fed.Cir.2003) (unpublished opinion). Following an adverse judgment in the Federal Circuit, Pieczenik filed a petition for a writ of certiorari from the Supreme Court. Pieczenik also alludes to a previous lawsuit in which he "sued the FDIC and Neil Bush on a RICO, in front of Judge Cederbaum [*sic* ]." Pl. Reply CAT Mem.

In light of the December conference and the consequent Order, Pieczenik's decision to reargue this issue in his subsequent submissions to the Court is baffling. However, because he cross moves on the basis of the Local Rules, it is necessary to briefly revisit the issue once more. In short, because Local Rule 12.1 does not apply to the motions at issue and because, even if it did, Pieczenik was notified of his rights, his cross-motions for dismissal on the basis of Local Rules 12.1 and 56.2 are denied.

B. Motion to Dismiss for Lack of Personal Jurisdiction

1. Domantis Inc.

a. Section 301

***5**[4] As an initial matter, I note that Pieczenik fails to allege, and Domantis Inc. appears to lack, all of the traditional indicia associated with "doing business" in New York. Specifically, Domantis Inc. is not alleged to maintain a New York office, have any property or a phone listing in the state, conduct public relations work in New York, or have individuals located in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 527045 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 10

state to promote its interests. Although failure to allege these facts, by itself, does not mean that jurisdiction under section 301 is lacking, Pieczenik fails to provide *any* basis upon which to infer that Domantis Inc. is "doing business" in New York. Even if true, Pieczenik's sole jurisdictional allegation regarding Domantis Inc.-that it "licenses rights under its patents in New York, the United States and the world"[FN54]-does not suggest that Domantis Inc. conducts business in New York with any regularity, and certainly not on a systematic and continuous basis. As such, Pieczenik offers no basis upon which this Court can exercise jurisdiction over Domantis Inc. under section 301.

FN54. Am. Compl. ¶ 27.

b. Section 302(a)(1)

i. Patent Infringement

[5] Pieczenik has also failed to allege facts sufficient to support a finding of jurisdiction under section 302(a)(1) with respect to Pieczenik's patent infringement claims.[FN55]Pieczenik's sole allegation linking Domantis Inc. to the forum state is that it licenses rights under its patents in New York and that by so doing, infringes or contributes to the infringement of his patents.[FN56]Notably, Domantis Inc. offers a sworn declaration stating that it does not engage in any licensing activities in New York.[FN57] Moreover, even crediting Pieczenik's allegation as true, the Federal Circuit has advised that "the grant of licensing rights to a New York corporation does not constitute the transaction of business within the meaning of the New York longarm statute."[FN58]Where the only allegation linking Domantis Inc. to New York is a vague statement that Domantis Inc. licenses rights throughout the world, including New York, it cannot provide the basis for jurisdiction under section 302(a)(1).

FN55.Section 302(a)(1) requires courts to separately consider whether jurisdiction exists for each cause of action asserted in a plaintiff's complaint. *See* *Cosmetech Int'l LLC,* 943 F.Supp. at 317. Pieczenik's arguments premised on section 302(a)(1) as to his patent invalidity warrant only brief discussion. Pieczenik does not sufficiently allege that Domantis, Inc. transacted business in New York related to his patent invalidity claims. Accordingly, there is no basis under section 302(a)(1) to assert personal jurisdiction over Domantis Inc. as to Pieczenik's claims of patent invalidity.

FN56.*See* Am. Compl. ¶ 27.

FN57. Welna Decl. ¶ 6.

FN58.*Pieczenik,* 265 F.3d at 1335.

ii. RICO

[6] Pieczenik submits that the Medical Research Council Laboratory of Molecular Biology, CAT, Dyax Corp., and Domantis Inc. colluded to "give the impression of Dyax being more than a 'virtual' patent licensing company."[FN59]Pieczenik further asserts that certain unidentified defendants committed mail fraud,[FN60] and that "[t]o the extent that communications were had with potential investors and pharmaceutical houses over ... [Domantis Inc.'s] telephone [number] the foregoing also constituted wire fraud within the meaning of 18 U .S.C. § 1343."[FN61]But he fails to allege any facts suggesting that a connection exists between New York and Domantis Inc. regarding this collusion. Absent any contacts between Domantis Inc. and the forum state, this Court lacks personal jurisdiction over Domantis Inc. as to the RICO claims.

FN59. Am. Compl. ¶ 58.

FN60.*See id.* ¶¶ 66-67.

FN61.*Id.* ¶ 67.

2. CAT

a. Section 301

***6**[7] The majority of Pieczenik's jurisdictional allegations are unrelated to his claims against CAT. Therefore, at best, these allegations can only support a finding of jurisdiction under section 301. Apparently opting for the "scatter-shot" approach to jurisdictional pleading, Pieczenik argues that this Court can exercise general jurisdiction over CAT based on the following: (1) pending state court litigation brought against CAT by CVC; (2) CAT's listing of a New York investment banker as a contact person for the Subscription

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Agreement purportedly at issue in the CVC litigation; (3) CAT's designation of the Secretary of State of New York to receive process of service; (4) CAT's entry into contracts with New York businesses; (5) 11.28% ownership of CAT by a New York company; and (6) CAT's maintenance of ADRs in the Bank of New York. Notably, Pieczenik does not allege that CAT has any of the traditional indicia of "doing business" in New York and CAT specifically states that it has no facilities, operations, employees, assets or bank accounts in New York.[FN62]

FN62. *See* Mellett Decl. ¶ 3.

Pieczenik's allegations fail to satisfy the stringent "doing business" standard of section 301 because, even when aggregated, they do not suggest that CAT is doing business in New York on a systematic and continuous basis. Each of these allegations merits only brief discussion. *First,* CVC's lawsuit against CAT is based upon an agreement executed between those parties. Although Pieczenik argues that this is significant because "CAT has always had the 'intent' to use the New York Courts to resolve it's [*sic* ] legal issues arising from its creation,"[FN63] a single agreement giving rise to litigation does not evidence continuous contact with New York. *Second,* CAT's listing of a non-CAT employee as a contact person on the CVC Subscription Agreement also fails to suggest that CAT is "present" in New York for purposes of section 301. *Third,* Pieczenik's argument that CAT enters into contracts with New York businesses, such as Dyax Corp. and Bristol-Myers Squibb, is flawed in several ways.[FN64] As Pieczenik's ongoing litigation against Dyax Corp. has demonstrated, Dyax Corp. is neither located nor does business in New York [FN65] and CAT has submitted a sworn declaration stating that it has not entered into any license agreements with Bristol-Myers Squibb.[FN66] Additionally, even if CAT enters into contracts with other, unnamed New York businesses, he avers no facts to suggest that these contracts are sufficiently significant in volume and frequency to constitute "doing business" in New York. As such these alleged "contracts" cannot support a finding of jurisdiction over CAT pursuant to section 301. *Fourth,* allegations of minority ownership unaccompanied by averments suggesting that CAT is a mere department or alter ego of Genzyme Corporation render Genzyme Corp.'s purported contacts with New York, if they exist, irrelevant for jurisdictional purposes.[FN67] *Fifth,* CAT's designation of the Bank of New York as a depository for its ADRs cannot support a finding of general jurisdiction under New York law.[FN68] Accordingly, there is no basis upon which to exercise jurisdiction over CAT under section 301.

FN63. Pl. CAT Mem.

FN64. Am. Compl. ¶ 7.

FN65. *See* *Pieczenik,* 2000 WL 959753, at *6.

FN66. *See* Mellett Decl. ¶ 11.

FN67. Although "the presence of [a] subsidiary alone does not establish the parent's presence in the state," *Jazini,* 148 F.3d at 184 (citing *Volkswagenwerk AG v. Beech Aircraft Corp.,* 751 F.2d 117, 120 (2d Cir.1984)), personal jurisdiction over a foreign parent exists where its New York subsidiary is either a "mere department," or an "agent," of the parent. *Id.* (citing *Koehler,* 101 F.3d at 865). "Conversely, jurisdiction exists over a subsidiary that is a mere department of a parent corporation which has a presence in New York." *In re Ski Train Fire in Kaprun, Austria,* 230 F.Supp.2d at 409. The inquiry as to whether a parent's contacts with the forum state should be ascribed to a subsidiary or affiliate is guided by four factors: (1) common ownership; (2) financial dependency of the subsidiary on the parent; (3) the degree to which the parent interferes in the selection and assignment of the subsidiary's personnel and fails to observe corporate formalities; and (4) the degree of control that the parent exercises over the subsidiary's marketing and operational policies. *See id.*(citing *Beech Aircraft,* 751 F.2d at 120-22). Pieczenik has made no allegations suggesting that any of these factors are present, nor has he provided any reason as to why CAT and Genzyme Corp. should be considered as a single entity for jurisdictional purposes.

FN68. *See* *Wiwa,* 226 F.3d at 97; *Whiteman v. Federal Republic of Aus.,* No. 00 Civ. 8006, 2002 WL 31368236, at *6 (S.D.N.Y. Oct.21, 2002).

b. Section 302(a)(1)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 527045 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 12

***7**[8] As a threshold matter, I note that Pieczenik appears to have withdrawn his RICO claims against CAT and thus, I do not consider whether jurisdiction is proper under section 302(a)(1) as to the RICO claims.[FN69] As for his patent infringement claims, Pieczenik appears to premise his jurisdictional argument on the contracts between CAT and companies either located in and/or conducting business in New York.[FN70]But he fails adequately to allege that: (1) CAT transacts business in New York and (2) this transaction of business bears a nexus to his claims of patent infringement.

FN69. Pl. CAT Mem. ("Plaintiff withdraws his RICO claims, without prejudice, against CAT").

FN70.*See id.*Jurisdiction over Pieczenik's patent invalidity claims is similarly unsupported by Pieczneik's allegations. Because Pieczenik fails adequately to allege that CAT transacted business in New York from which his patent invalidity claims arose, there no basis under section 302(a)(1) to exercise personal jurisdiction over CAT.

*First,* he does not aver facts supporting a finding that CAT transacts business in the forum state. For instance, he does not allege that any of these contracts were negotiated or executed in New York. To the contrary, CAT states that these contracts were negotiated and executed by CAT from England.[FN71] Nor does he submit that any of the contracts had a choice-of-law clause providing that the laws of New York would govern contract interpretation and/or disputes or that any of the contracts between CAT and New York entities require notices or payments be sent into the forum state or require supervision by CAT in New York. Indeed, the only averment that Pieczenik makes that even hints at CAT's transaction of business pursuant to one of these contracts is his submission that CAT has a "continuous research and licensing agreement with Pfizer."[FN72]However, this allegation, by itself, cannot establish a prima facie showing that there is jurisdiction over CAT in New York.

FN71.*See* Mellett Decl. ¶¶ 9, 10, 12.

FN72. Pl. CAT Mem.

*Second,* even if Pieczenik had adequately averred facts suggesting that this Court could exercise jurisdiction over CAT, he has not properly alleged that there is any nexus between these licensing agreements and his patent claims. Accordingly, he has failed to establish a prima facie showing that jurisdiction over CAT in New York may be properly exercised under section 302(a)(1).

## IV. CONCLUSION

For the reasons set forth above, defendants' motions to dismiss for lack of personal jurisdiction are granted and Pieczenik's cross motions are denied. The Clerk of the Court is directed to close these motions [numbers 63, 69, and 72 on the docket sheet].
SO ORDERED:

S.D.N.Y.,2004.
Pieczenik v. Cambridge Antibody Technology Group
Not Reported in F.Supp.2d, 2004 WL 527045 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

York Hannover Holding A.G. v. American Arbitration Ass'n.
S.D.N.Y.,1993.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Application of YORK HANNOVER HOLDING A.G., Plaintiff,
v.
AMERICAN ARBITRATION ASSOCIATION, Defendant,
andMcDermott International, Inc., McDermott Overseas Investment Company N.V., McDermott International Trading (Holland 1) B.V., McDermott International Trading (Holland 2) B.V., McDermott International Trading (Holland 3) B.V., McDermott International Trading (Holland 4) B.V. and McDermott International Trading (Holland 5) B.V., Intervenors-Defendants.
In re ARBITRATION BETWEEN YORK HANNOVER HOLDING, A.G. AND MCDERMOTT INTERNATIONAL, INC. et al.
**No. 92 Civ. 1643 (CSH).**

May 11, 1993.

MEMORANDUM OPINION AND ORDER
HAIGHT, District Judge:
***1** Following removal of this action from New York state court and denial of remand by order of this court dated June 22, 1992, this case is now before the court on Plaintiff's Petition to remove the arbitrators in an ongoing arbitral proceeding and Defendant-Intervenors' cross-motion for dismissal or summary judgment.

BACKGROUND

Petitioner York Hannover Holding (hereinafter "York") and Defendant-Intervenors McDermott International, Inc. et. al. (hereinafter "McDermott") were engaged in binding arbitration proceedings, pursuant to a contract between them. In accordance with the contract, the arbitration panel consisted of three arbitrators. Each party selected one arbitrator and the American Arbitration Association (hereinafter "AAA") selected a neutral chairman. Over one year into the arbitration, York's appointed arbitrator, Morton D. Weiner, resigned from the panel alleging that the chairman, Ralph Gant, was biased against York and had consistently ignored or blocked Weiner's input. After exhausting its remedies at the AAA, York now seeks judicial intervention in the ongoing arbitration, challenging the AAA's determination that Gant was not biased and requesting that the court order the AAA to remove the chairman or panel. York also contests the AAA's appointment of a replacement arbitrator for Weiner.

The underlying controversy involves a purchase agreement between York and McDermott whereby York was to purchase a McDermott German subsidiary. A dispute between the parties, involving approximately $60 million, over the monies owed under the agreement arose. Article 24 of the purchase agreement provides for binding and final arbitration in the event of a dispute arising under the agreement. The arbitration is to be governed by the Commercial Arbitration Rules of the American Arbitration Association,[FN1] which Rules are incorporated by reference into the contract. *See* Berman Aff., exh. 13 (Article 24 of the purchase agreement). The arbitration clause specifies that each party shall appoint one arbitrator and the two appointed arbitrators shall appoint a neutral third. In the event that the appointed arbitrators cannot agree, the AAA would appoint the neutral arbitrator.

The parties submitted their dispute to arbitration. Pursuant to the agreement, McDermott appointed Robert B. Davidson, Esq. and York appointed Morton D. Weiner as its arbitrator. The AAA appointed the neutral arbitrator, Ralph Gant, as Davidson and Weiner were unable to agree on a third. Procedural hearings commenced before the panel on June 18, 1990.

The immediate controversy concerns York's allegation of bias in the arbitral panel. York bases its allegation on the resignation of Weiner, on December 4, 1991, who resigned from the panel on the grounds that Gant was biased against York and that Weiner "could not get a fair hearing [with Gant] for [his] point of view." Weiner Aff., para. 12. Upon Weiner's resignation, York decided that it "could not in good conscience proceed with the arbitration presided over by Mr. Gant." Memo.Supp.Pet., p. 10. York requested that the AAA investigate the charges of bias. Both parties submitted material to the AAA regarding the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 159961 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**
Page 2

alleged bias and on January 16, 1992 an administrative conference on the issue was held. After the hearing, both sides were given additional time to submit "any new information" on the issue of disqualifying Gant, and both parties did submit additional material. *See* Lowenfeld Aff., exh. A (January 16, 1991 letter from AAA to the parties).

***2** On February 3, 1992, the AAA reaffirmed the appointment of Gant "after carefully considering the contentions and submissions of the Parties." *See id.* at exh. F (February 3, 1992 letter ruling of the AAA). York alleges that the AAA failed to investigate the claim of bias and that

[t]he due process accorded York Hannover by the AAA in merely treating this case as the usual resignation of an arbitrator simply to be replaced by a new arbitrator is superficial and completely misses the issue of whether this panel can treat [York] in a fair and even handed manner.

Lacher Aff., paras. 9-10; *see also* Lowenfeld Aff., para. 10 ("[t]he AAA has ignored the serious allegation raised by Mr. Weiner's resignation, and reduced the case to a mere successor arbitrator proceeding.")

Immediately after Weiner's resignation, the AAA directed York to appoint a successor to Weiner pursuant to Commercial Arbitration Rules 14 and 20. *See supra,* n. 1. The AAA extended the deadline by its January 16, 1992 letter to the parties, giving York one week from that date to appoint a replacement arbitrator. *See* Lowenfeld Aff., para. 4. York however failed to appoint an arbitrator by the deadline, arguing that it should be allowed to wait for a determination regarding Gant's disqualification before appointing a new arbitrator. *See* Lowenfeld Aff., paras. 5-7. The AAA apparently considered and rejected that argument at the January 16, 1992 administrative conference, and on January 27, 1992 it appointed a replacement arbitrator for Weiner. *See* Memo. Int.-Def. Opp. Appl. Replace, pp. 10-11.

York petitions this court to compel the AAA to remove the panel based on Gant's bias and the AAA's improper appointment of York's arbitrator. Defendant opposes York's application and moves to dismiss the action as premature or in the alternative for summary judgment.

DISCUSSION

*Applicable Law*

The McDermott companies are organized under the laws of the Republic of Panama, the Netherlands Antilles and the Netherlands. York is a corporation organized under the laws of Switzerland. Both parties suggest, and the court agrees, that the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, as enacted in the United States in 9 U.S.C. §§ 201-208, applies to this case.[FN2] Pursuant to 9 U.S.C. § 208 the Federal Arbitration Act, 9 U.S.C. §§ 1-15 (1988), applies to all cases within the Convention to the extent that its provisions do not contradict the Convention or 9 U.S.C. §§ 201-207.

*The Court's Power to Intervene in an Ongoing Arbitration Proceeding*

"Under the Federal Arbitration Act, the court's power to deal with bias is limited to setting aside the award *after* it has been rendered." *Dover Steamship Co. v. Rotterdamsche Kolen Centrale,* 143 F.Supp. 738, 742 (S.D.N.Y.1956) (emphasis in original); *see also* 9 U.S.C. § 10(b) (1988) (listing "evident partiality" of an arbitrator as a ground for vacating a *final* arbitration award); *Michaels v. Mariforum Shipping,* 624 F.2d 411, 414 n. 4 (2d Cir.1980) (stating in dictum that "it is well established that a district court cannot entertain an attack upon the qualifications or partiality or arbitrators until after the conclusion of the arbitration and the rendition of an award"); *Marc Rich & Co. v. Transmarine Seaways Corp.,* 443 F.Supp. 386, 387-88 n. 3 (S.D.N.Y.1978) ("[n]o section of the [Federal Arbitration] Act ... provides for judicial scrutiny of an arbitrator's qualifications in any proceeding other than an action to confirm or vacate an award"); *Catz American Co. v. Pearl Grange Fruit Exchange, Inc.,* 292 F.Supp. 549, 551 (S.D.N.Y.1968) (the petitioners "could not properly have brought the issue of partiality [of an arbitrator] before this court until after the arbitration and rendition of an award.") Similarly, where the applicable rules of arbitration require that an independent panel or board handle and determine complaints of arbitrator bias or impartiality, the decision of that panel "will generally be reviewable by a district court only after an award has been made." *Sanko S.S. Co. v. Cook Industries, Inc.,* 495 F.2d 1260, 1264 n. 4 (2d Cir.1973); *see also San Carlo Opera Co. v. Conley,* 72 F.Supp. 825, 833 (D.N.Y.1946), *aff'd* 163 F.2d 310 (2d Cir.1947) (where petitioner challenges an arbitrator's neutrality and the Arbitration Association decides against him, he

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 159961 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 3

should proceed in the arbitration but preserves his right to complain of bias in court after an award has been issued); American Arbitration Association, *Commercial Arbitration Rules,* Rule 19 (1988) ("[u]pon objection of a party to the continued service of a neutral arbitrator, the AAA shall determine whether the arbitrator should be disqualified ... which [determination] shall be conclusive.")

***3** While the court generally does not have jurisdiction to intervene in an ongoing arbitration proceeding, it may have such power "where intervention has been sought under the general equity powers of [the] court." 65 A.L.R.2d 755, 756 (1959). At least one federal court has dealt with the issue of whether it is ever appropriate for an arbitration proceeding to be subject to judicial scrutiny before a final award is rendered. In *Aerojet-General Corp. v. American Arbitration Ass'n,* 478 F.2d 248 (9th Cir.1973), the court recognized its power "in the most extreme cases" to intervene in an arbitration proceeding before a final award is rendered where the alleged defect in the proceeding will cause "severe irreparable injury." *See Aerojet-General* at 251-52. Under New York law, it is clear that a court has the equitable power to intervene before a final arbitration award is made. *See Astoria Medical Group v. Health Insurance Plan of Greater New York,* 11 N.Y.2d 128, 132 (1962) ( "courts have an inherent power to disqualify an arbitrator before an award has been rendered"); *Belanger v. State Farm Mutual Auto Ins. Co.,* 426 N.Y.S.2d 140, 141 (3d Dep't 1980) ("[w]here a party to an arbitration proceeding becomes aware of the ... probable partiality of an arbitrator, there would appear to be no reason why the court should not exercise its equitable jurisdiction ... at any time during the proceeding, rather than require the party to wait for the award, and then move to vacate.")

It is not necessarily inappropriate for this court to consider New York state decisions on the issue of exercising equitable jurisdiction. *See Michaels* at 413 n. 3 ("[t]he instant case arises under the Federal Arbitration Act and is therefore governed by federal law. Nevertheless, in view of the relative paucity of precedents on the (issue of what constitutes a 'final' award] and the similarity of language with regard to judicial review between the federal Act and the corresponding provisions in the New York statute ... we have looked to New York State decisions, as well.") However, for the reasons stated below, this court does not find sufficient bias and it is therefore unnecessary to decide whether in a proper case of bias the court's equitable powers can or should be exercised. *See Pompano-Windy City Partners v. Bear, Sterns & Co.,* 698 F.Supp. 504, 519 n. 12 (S.D.N.Y.1988) (declining to decide whether the court had jurisdiction to intervene where it found insufficient bias.)

*Alleged Bias of the Neutral Arbitrator*

9 U.S.C. § 207 provides that a court must confirm an arbitral award covered by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards "unless it finds one of the grounds ... specified in the said convention." Article V of the Convention states the grounds upon which recognition and enforcement of an arbitral award may be refused.[FN3] 9 U.S.C. § 10 states the grounds upon which an arbitral award may be vacated under the Federal Arbitration Act, which applies only to the extent that it does not contradict the Convention. *See* 9 U.S.C. § 208 (1988). 9 U.S.C. § 10(b) states that an arbitral award may be vacated for "evident partiality or corruption" of an arbitrator.[FN4] While there is no actual arbitration award here to be set aside, the standards applied by courts to determine if there is "evident partiality" are instructive in analyzing claims of arbitrator bias. *See Pompano-Windy City Partners* at 516.

***4** In the Second Circuit a party must show more than the partiality." The challenging party must show that a "reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Morelite Construction Corp. v. New York City Dist. Council Carpenters Benefit Funds,* 748 F.2d 79, 84 (2d Cir.1984). A finding of partiality or bias is generally confined to situations where an arbitrator has had a relationship or dealings with a party in the proceeding. *See P.T. Reasuransi Umum Indonesia v. Evanston Ins. Co.,*1992 U.S.Dist. LEXIS 19753, *5 (S.D.N.Y.1992); *Reichman v. Creative Real Estate Consultants, Inc.,* 476 F.Supp. 1276, 1284 (S.D.N.Y.1979). A party may show bias by " 'inferences from objective facts inconsistent with partiality.' " *Pompano-Windy City Partners* at 516 (quoting *Pitta v. Hotel Ass'n of New York City, Inc.,* 806 F.2d 419, 423 (2d Cir.1986)). The alleged bias must be " 'direct and definite; mere speculation is not enough.' " *Id.* (quoting *Sofia Shipping Co. v. Amoco Transport Co.,* 628 F.Supp. 116, 119 (S.D.N.Y.1986)). Bias is not established by showing that an arbitrator consistently agrees with the arguments of one side and repeatedly finds in their favor. *See Bell Aerospace Co. v. International Union, United Auto,* 500 F.2d 921, 923 (2d Cir.1974); *see also Fairchild & Co. v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 159961 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 4

Richmond, 516 F.Supp. 1305, 1313 (D.D.C.1981) ("[t]he mere fact that arbitrators are persuaded by one party's arguments and choose to agree with them is not of itself sufficient to raise a question as to the evident partiality of the arbitrators.")

York bases its allegation that the arbitral panel was biased primarily, if not exclusively, on its party-appointed arbitrator's allegation that Gant was biased. In fact, prior to Weiner's resignation York had not made any complaints or allegations of arbitrator bias. Because the allegation of bias against Gant was initiated by a fellow arbitrator, and not one of the parties to the arbitration, York claims this case is one of first impression. Specifically, York charges Gant with:

1. Repeated failure to afford claimant's attorneys equal time to make their presentations.
2. Failure to consult with his fellow arbitrators before reaching decisions on procedural motions.
3. Attention only to the lawyer-member of the panel (a party-appointed arbitrator), not to the businessman-member of the panel....
4. Failure to take account of any record differences among the arbitrators.
5. Issuance *without the knowledge or consent of Mr. Weiner* of a critical order ... as a Panel Order

Mem.Supp.Pet., p. 9 (emphasis in original). York alleges that these charges taken together demonstrate that Gant "substantially departed" from the standards of conduct expected of arbitrators as specified in the Arbitration Act, the AAA Rules and the Canons of Ethics for Arbitrators. *See* Mem.Supp.Pet., p. 10.

***5** Petitioner cites no authority, however, and this court has found none, to support the proposition that a violation of those rules and canons constitutes bias or any other ground to review an arbitral award. Even assuming that York's allegations are true, they do not make a showing of bias or partiality under the case law as detailed above.

As to its claim that the AAA improperly handled the complaint of bias, York fails to explain why the procedure followed by the AAA, which was in accordance with Rule 19 of the Commercial Arbitration Rules, was insufficient. York does claim that a "evidentiary hearing" should have been conducted but does not explain what additional evidence it would have, or could have, submitted.

The AAA Rules clearly outline the procedure to be followed when the AAA receives information regarding arbitrator bias from *any* source, which would include a co-panelist. If a party objects to the continued service of an arbitrator it shall submit its claim to the AAA and the AAA will determine whether the arbitrator should be disqualified, and that determination shall be "conclusive." *See* American Arbitration Association, *Commercial Arbitration Rules,* Rule 20 (1988). York has pursued arbitration before the AAA, and the AAA Rules were incorporated by reference into the purchase agreement between York and McDermott. York is therefore bound by those Rules. At this point in the process, the court must defer to the decision of the AAA.

*Replacement of Arbitrator Weiner*

Again, York is bound by the AAA Commercial Arbitration Rules. York offers no persuasive reason for its non-compliance with the AAA's direction, under Rules 14 and 20, to appoint a new arbitrator. York's argument against complying with the direction was considered by the AAA and rejected. The AAA is responsible for interpreting the AAA Rules and the parties are not free to simply ignore interpretations they do not agree with. *See* American Arbitration Association, *Commercial Arbitration Rules,* Rule 52 (1988) (AAA Rules that do not relate to an arbitrator's powers and duties "shall be interpreted and applied by the AAA.") In fact, York could have appointed a new arbitrator without affecting its complaint of bias or its ability to stay the arbitral proceedings pending a suit on the claim.

York is not free to disregard the Rules it agreed to operate under and expect this court to relieve it of the consequences of doing so. The replacement arbitrator appointed by the AAA should remain on the panel.

For all of the foregoing reasons, York's petition is denied. McDermott's cross-motion is denied as moot.

It is so ordered.

FN1. The pertinent Rules here are:
Rule 14. If the agreement of the parties ... specifies a method of appointing an arbitrator, that .. method shall be followed.... If no period of time [for appointment of an arbitrator] is specified in the agreement, the AAA shall notify the party to make the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 159961 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**
Page 5

appointment. If within ten days thereafter an arbitrator has not been appointed by a party, the AAA shall make the appointment.

Rule 19. [A] neutral arbitrator shall disclose to the AAA any circumstance likely to affect impartiality.... Upon receipt of such information from the arbitrator or another source, the AAA shall communicate the information to the parties.... Upon objection of a party to the continued service of a neutral arbitrator, the AAA shall determine whether the arbitrator should be disqualified and shall inform the parties of its decision, which shall be conclusive.

Rule 20. If for any reason an arbitrator should be unable to perform the duties of the office, the AAA may ... declare the office vacant. Vacancies shall be filled in accordance with the applicable provisions of these rules.

American Arbitration Association, *Commercial Arbitration Rules,* Rules 14, 19, 20 (1988).

FN2.9 U.S.C. § 202 (1988) provides that the Convention will apply to "[a]n arbitration agreement or arbitral award arising out of a legal relationship ... which is considered as commercial ... [If] [a]n agreement or award arising out of such a relationship ... is entirely between citizens of the United States [it] shall be decreed not to fall under the Convention." If the arbitration involves parties domiciled outside the "enforcing jurisdiction" it is within the Convention. *See* *Bergesen v. Joseph Muller Corp.,* 710 F.2d 928, 932 (2d Cir.1983).

FN3. Those grounds are: (1) incapacity of the parties; (2) lack of notice to appear or inability to present a case; (3) award beyond the scope of the arbitration agreement; (4) composition of panel or procedure was not in accord with arbitration agreement; (5) award not final or set aside in the rendering jurisdiction; (6) subject matter not arbitrable; (7) enforcement would be contrary to public policy in the enforcing state. *See* Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, Art. V(1)(a)-(e), (2)(a)-(b).

FN4. It is not clear whether the "evident partiality or corruption" ground applies to cases governed by the Convention. Article V of the Convention states that recognition may be refused "only if" a party proves a ground specified in Article V(1), which does not include any reference to impartiality or bias of an arbitrator. *See* *Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier,* 508 F.2d 969, 977 (2d Cir.1974) ("[b]oth the legislative history of Article V ... and the statute enacted to implement the United States' accession to the Convention [9 U.S.C. §§ 201-208] are strong authority for treating as exclusive the bases set forth in the Convention for vacating an award.") An award rendered by a panel that was tainted with bias or impartiality may conceivably be set aside under the Convention as violative of public policy and thus within Article V(2)(b). It is not necessary for this court to determine however whether allegations of bias fall within Article V of the Convention as the court declines to find that sufficient partiality has been shown. *See* *Andros Compania Maritima v. Marc Rich & Co.,* 579 F.2d 691, 699 n. 11 (2d Cir.1978) (where allegations of bias are insufficient under § 10 of the Federal Arbitration Act there is no reason to consider whether the alleged bias would come within the very narrowly construed public policy ground of the Convention); *Parsons* at 977 (refusing to decide whether the "manifest disregard" ground judicially implied in § 10 of the Federal Arbitration Act applies to arbitrations governed by the Convention because the ground had not been sufficiently proven); *Biotronik Mess-und Therapiegeraete GmbH & Co. v. Medford Medical Instr. Co.,* 415 F.Supp. 133, 140 (D.N.J.1976) (declining to decide whether the defense of fraud in 9 U.S.C. § 10(a), as either subsumed in the Convention through 9 U.S.C. § 208 or within Article V(2)(b)'s public policy defense, may be asserted in cases governed by the Convention because fraud had not been proven.)

S.D.N.Y.,1993.
Application of York Hannover Holding A.G. v. American Arbitration Ass'n.
Not Reported in F.Supp., 1993 WL 159961 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 159961 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 6

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| GLOBAL GOLD MINING, LLC, Petitioner, | : | 07 CV 10492 (GEL) |
| -against- | : | ECF Case |
| PETER M. ROBINSON, et al., Respondents. | : | |

## DECLARATION OF SERVICE

**KURT R. VELLEK,** hereby declares under penalty of perjury that on December 4, 2007 the Notice of Motion to Dismiss the Petition, the Declaration of Peter M. Robinson, and the Memorandum of Law in Support of the Motion were served upon Petitioner's counsel via the Court's CM/ECF system.

Dated: New York, New York
December 4, 2007

/s/ Kurt R. Vellek_______