UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GLOBAL GOLD MINING LLC,

                   Petitioner,

       -against-

PETER M. ROBINSON, AS PRESIDENT OF
INTERNATIONAL CHAMBER OF COMMERCE,
AN UNINCORPORATED ASSOCIATION, AND
INTERNATIONAL COURT OF ARBITRATION OF
THE INTERNATIONAL CHAMBER OF
COMMERCE, AN UNINCORPORATED
ASSOCIATION,

                   Respondents.

07 Civ. 10492 (GEL)

ECF Case

**ELECTRONICALLY FILED**

---

## MEMORANDUM OF LAW IN OPPOSITION
## TO RESPONDENTS' MOTION TO DISMISS

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile:  (212) 556-2246

*Attorneys for Petitioner*
*Global Gold Mining, LLC*

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ................................................................................. 1

II.  STATEMENT OF FACTS .................................................................................... 2

    A.   The Share Purchase Agreement and the Arbitration Clause.....................................2

    B.   The Arbitration...................................................................................................3

    C.   The Petition to the New York Supreme Court under CPLR Article 75..................6

III. ARGUMENT ........................................................................................................ 6

    A.   Global Gold Has Established a *Prima Facie* Case that  the Court Has
       Personal Jurisdiction over the ICC/ICA .................................................................6

    B.   The ICC/ICA Should be Estopped from from Contesting Sufficiency of
       Service of Process ...............................................................................................11

    C.   Global Gold Properly Seeks Judicial Review of the ICA's Administrative
       Finding ..............................................................................................................14

        1.   The ICA's Administrative Decision is Subject to  Judicial Review
           Under the ICC Rules and Federal Law ................................................... 14

        2.   In Seeking Judicial Review Under Article 6(2),  Global Gold
           Properly Named the ICC/ICA as Respondents......................................... 15

        3.   Arbitral Immunity Does Not Apply Here ................................................. 17

    D.   Global Gold has Alleged a Violation of Federal Law, New York law, and
       the ICC's own Rules Sufficient to Overcome a 12(b)(6) Motion for Failure
       to State a Claim .................................................................................................19

CONCLUSION...........................................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

Arista Records LLC v. Lime Group LLC,
  No. 06 Civ. 5936(GEL), 2007 WL 4267190 (S.D.N.Y. Dec. 3, 2007) ...................................9

Austern v. Chi. Bd. Options Exch.,
  898 F.2d 882 (2d Cir. 1990)....................................................................................18, 19

Corey v. N.Y. Stock Exch.,
  691 F.2d 1205 (6th Cir. 1982) ...............................................................................19

Diemaco v. Colt's Mfg Co.,
  11 F. Supp. 2d 228 (D. Conn. 1998) ......................................................16, 25, 26

Fed. Ins. Co. v. Al Qaida (In re Terrorist Attack on Sept. 11, 2001),
  No. 03 MDL 1570,03 Civ. 6978 (RCC), 2004 WL 1348996 (S.D.N.Y. June
  14, 2004) .......................................................................................................14

First Options of Chi., Inc. v. Kaplan,
  514 U.S. 938 (1995)...........................................................................................20, 22

Heimbach v. Village of Lyons,
  597 F.2d 344 (2d Cir. 1979)....................................................................................18, 19

Katz Agency, Inc. v. Evening News Ass'n,
  514 F. Supp. 423 (S.D.N.Y. 1981), aff'd, 705 F.2d 20 (2d Cir. 1983) ...................................8

Kemner v. Dist. Council of Painting and Allied Trades No. 36,
  768 F.2d 1115 (9th Cir. 1985) .............................................................................18, 19

Masefield v. Colonial Oil Indus., Inc.,
  No. 05 Civ. 2231 (PKL), 2005 WL 957344 (S.D.N.Y. Apr. 26, 2005)............................22, 23

Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro
  in Amministrazione Straordinaria,
  937 F.2d 44 (2d Cir. 1991)....................................................................................7, 8

Mason Tenders Dist. Council of Greater New York,
  884 F. Supp. 823 (S.D.N.Y. 1995) ..........................................................................26

Montclair Elec., Inc., v. Electra/Midland Corp.,
  326 F. Supp. 839 (S.D.N.Y. 1971) ...........................................................................14

New England Cleaning Servs. Inc. v. AAA,
  199 F.3d 542 (1st Cir. 1999)....................................................................................19

N.Y. City Jaycees, Inc. v. U.S. Jaycees, Inc.,
    377 F. Supp. 481 (S.D.N.Y. 1974), rev'd on other grounds, 512 F.2d 856 (2d
    Cir. 1975) ...................................................................................................................8, 11

PDK Labs, Inc. v. Friedlander,
    103 F.3d 1105 (2d Cir. 1997)...................................................................................................7

Revlon Inc. v. United Overseas Ltd.,
    No. 93 Civ. 0863 (SS), 1994 WL 9657 (S.D.N.Y. Jan. 12, 1994)..............................................9

Richardson v. AAA, et al.,
    888 F. Supp. 604 (S.D.N.Y. 1995) .......................................................................................19

Shapiro v. Cadman Towers, Inc.,
    51 F.3d 328 (2d Cir. 1995)...................................................................................................26

Shaw Group Inc. v. Triplefine Internat'l Corp.,
    322 F.3d 115 (2d Cir. 2003)................................................................................14, 20, 23

Trans World Airlines, Inc. v. Sinicropi,
    No. 93 Civ. 3094(CSH), 1994 WL 132233 (S.D.N.Y. Apr. 14, 1994) ..........................18, 19

Truong v. McGoldrick,
    No. 06 Civ. 1430(SAS), 2006 WL 1788960 (S.D.N.Y. June 27, 2006)..................................18

York Hannover Holding A.G. v. Am. Arbitration Ass'n,
    No. 92 Civ. 1643(CSH), 1993 WL 159961 (S.D.N.Y. May 11, 1993) ..........................25, 26

York Research Corp. v. Landgarten,
    927 F.2d 119 (2d Cir. 1991)...........................................................................................25, 26

**STATE CASES**

B.K. Bruce Lodge, Inc. v. The Grand United Order
    of Odd Fellows in Am.,
    208 A.D. 100 (1st Dep't 1924) .......................................................................................8, 11

Fishman v. Pocono Ski Rental Inc.,
    82 A.D.2d 906 (2d Dep't 1981).............................................................................................7

Jacobson v. Sassower,
    489 N.E.2d 1283 (N.Y. 1985) ............................................................................................16

Liberatore v. Calvino,
    293 A.D.2d 217 (1st Dep't 2002) ........................................................................................11

McGinn v. Morrin,
    286 N.Y.S. 410 (Sup. Ct. 1936) ................................................................................13

Society Milion Athena v. Nat'l Bank of Greece et al.,
    2 N.Y.S.2d 155 (Sup. Ct. 1937) .................................................................................12

Sullivan Realty Org., Inc. v. Syart Trading Corp.,
    68 A.D.2d 756 (2d Dep't 1979) .................................................................................12

## STATUES AND RULES

Fed. R. Civ. P. 4(h)(1) .........................................................................................................13

N.Y.C.P.L.R. § 301 (McKinney 2007) ...............................................................................7

N.Y.C.P.L.R. § 302 (McKinney 2007) .............................................................................11

## OTHER AUTHORITIES

42 Am. Jur. 2d Injunctions § 33 (2007) .............................................................................26

1 James Wm. Moore, et al., Moore's Federal Practice § 4.54
    (3d. 999 & Supp. 2007) ............................................................................................13

Yves Derains & Eric A. Schwartz, A Guide to the New ICC Rules of Arbitration
    (Kluwer Law International 1998) ......................................................................24, 25

Petitioner Global Gold Mining, LLC ("Global Gold"), respectfully submits this memorandum of law in opposition to the Motion to Dismiss filed by Respondents International Chamber of Commerce ("ICC") and the International Court of Arbitration of the International Chamber of Commerce ("ICA"), the ICC/ICA's accompanying memorandum of law ("Op. Br."), and the accompanying Declaration of Peter M. Robinson ("Robinson Decl."). As demonstrated below, the ICC/ICA's Motion to Dismiss should be denied in its entirety.

## I.    **PRELIMINARY STATEMENT**

Global Gold was compelled to bring a Petition against the ICC/ICA pursuant to N.Y. C.P.L.R. 7502(a) and 7503(a), because the ICC/ICA improperly dismissed a named Respondent from an arbitral proceeding prior to performing the administrative function of transmitting the case to the arbitral tribunal. As described in the Memorandum of Law of Petitioner Global Gold Mining, LLC in Support of its Petition Under N.Y. C.P.L.R. 75 (Childs Decl., [1] Ex. 1) ("GG Br."), the ICC/ICA's actions violate New York law, the Federal Arbitration Act ("FAA"), and the ICC's own Rules. The ICC/ICA seeks to expand the scope of their authority into matters that are within the jurisdictional domain of the arbitral tribunal.

Through its Motion to Dismiss, the ICC/ICA seeks to prevent Global Gold from obtaining judicial review of this erroneous determination, even though the ICC's own Rules provide expressly for judicial review under these circumstances. The ICC/ICA's arguments that the Petition should be dismissed for lack of personal jurisdiction, insufficiency of service of process, and failure to state a claim under which relief may be granted are wholly without merit. The ICC/ICA's Motion to Dismiss should be denied.

---

[1] "Childs Decl." refers to the Declaration of Louisa B. Childs, dated December 21, 2007, filed simultaneously with this memorandum.

## II.    STATEMENT OF FACTS

### A.    The Share Purchase Agreement and the Arbitration Clause

Global Gold is an American company that invests in Armenia's gold-mining industry.  In the spring of 2003, Global Gold entered into negotiations with an Armenian Company, SHA, LLC (the "Company"), for the purpose of acquiring its Armenian mining properties.  In December 2003, Global Gold executed a Share Purchase Agreement ("SPA") to purchase all of the shares of the Company.  Global Gold believed it was purchasing the shares from the three sole shareholders who signed the agreement (either in person or by power of attorney).  (See Childs Decl., Ex. 1, ¶ 12 (Petition)).  Unknown to Global Gold at the time, a fourth owner, Vardan Ayvazian, who did not sign the agreement, directed the actions of the three Company shareholders who signed the SPA.  Ayvazian was an undisclosed shareholder, principle, and leader of his group of three agents.  He directed negotiation of the SPA for the Company behind the scenes, and he profited substantially from the transaction that he secretly directed, as executed by his agents.  (See id. ¶¶ 2, 13-15).  After the closing, Global Gold discovered that most of the various representations and warranties in the agreement were false and were breached, causing substantial losses to Global Gold.  (See id. ¶ 16-18).

The SPA contains an arbitration clause (the "Arbitration Clause"), providing that all disputes under the agreement will be referred for final settlement to a panel of three arbitrators under the ICC's Rules of Conciliation and Arbitration ("ICC Rules"), in New York, under New York law. (See Op. Br., at 2; Childs Decl., Ex. 2, §§ 11.5, 11.6).[2]  A subgroup of the ICC, called

---

[2] Arbitration can be institutional or *ad hoc.*  Institutional arbitration is conducted under the auspices of an arbitral institution and occurs when the parties agree to apply the rules of that institution.  The ICC, the American Arbitration Association (AAA), and the London Court of International Arbitration (LCIA) are the three preeminent arbitral institutions.  These organizations do not resolve disputes.  They provide administrative support for the arbitration. n

the International Court of Arbitration (the "ICA"), organizes and administers arbitrations on behalf of the ICC. (See Childs Decl., Ex. 3 (ICC Rules, Art. 1(1)). Although the ICA subgroup has the word "Court" in its name, the ICA does not itself adjudicate disputes. (Childs Decl., Ex. 19). Rather, the ICA's responsibilities are merely administrative, and include facilitating the appointment of arbitrators, collecting fees and reimbursement of expenses for arbitrators, and advising the parties and arbitrators of relevant procedures and timetables established by the Panel of Arbitrators. (See Childs Decl., Ex. 3 (ICC Rules, Arts. 4, 8, 9, 13, 30, 31)).

**B.     The Arbitration**

In December 2006, Global Gold properly commenced an arbitration against Ayvazian and the three other shareholders pursuant to the SPA and the ICC Rules by filing a Request for Arbitration (the "Request") with the ICA. (See Childs Decl., Ex. 1, ¶¶ 22-23; Ex. 4). As the undisclosed principle and architect of the fraud perpetuated through the SPA agreement that he negotiated for the Company behind the scenes, Ayvazian is a proper party to the arbitration. In March 2007, however, the ICC/ICA sent a letter to the parties stating that it had "[d]ecided in accordance with Article 6(2) of the [ICC] Rules" that arbitration of the Dispute should proceed only against the three signatory shareholders Batoyan, Janibekian, and Lalazaryan, and not against Ayvazian, the non-signatory owner and principal. The ICC/ICA's decision was *sua sponte*, and the ICC/ICA did not provide any rationale for its decision. (See Childs Decl., Ex. 5, at 1). Global Gold twice asked the ICC/ICA to reconsider its decision, but the ICC/ICA steadfastly refused, standing on Article 6(2). (See Childs Decl., Ex. 1, ¶¶ 28, 30; Exs. 6-10).

By its terms, Article 6(2) of the ICC Rules directs the ICC/ICA to make an administrative

---

*ad hoc* arbitration is one conducted by arbitrators without administrative support from an institutional body.

observation and determination as to whether or not an arbitration agreement exists. If an agreement exists, the arbitration goes forward, and the arbitral tribunal decides the merits of the case (including issues of arbitrability and its jurisdiction over the parties) with the ICC supplying administrative support. Article 6(2) of the ICC Rules does not permit the ICC/ICA to make preliminary rulings on arbitrability and jurisdiction. Instead, Article 6(2) expressly states that such rulings shall be within the province of the arbitral tribunal itself: "The [ICA] may decide…that the arbitration shall proceed if it is *prima facie* satisfied that an arbitration agreement under the Rules may exist. In such case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself." (See Childs Decl., Ex. 3 (ICC Rules Art. 6(2)). ICC Rule 6(2) is quoted in its entirety on page 15 of Global Gold's Memorandum of Law in Support of its Petition, and page 9 of ICC/ICA's Opposition Brief.

An important, undisputed, and dispositive fact here is that an agreement to arbitrate exists. In light of Ayvazian's clear involvement in the matter, as confirmed in the response filed in the arbitration by Respondent Lalazaryan, once the ICC/ICA made the determination that an arbitration clause existed in the SPA agreement (which it did), all issues of arbitral jurisdiction concerning that agreement shall be made by the arbitrators, not the ICC/ICA, and, respectfully, not by a court. In this case, Global Gold clearly has met the *prima facie* standard in Article 6(2) for the case against Mr. Ayvazian to be submitted to the Arbitral Tribunal, so that it can decide whether Ayvazian is bound by the Arbitration clause. Some of the relevant facts are:

- Ayvazian was a secret participant and beneficial owner in the Company when the SPA was signed. (See Childs Decl., Ex. 11, at 1).

- Ayvazian completely controlled the transactions on the seller's side, and the three signatory shareholders negotiated the terms of the SPA on the basis of explicit instructions from Ayvazian. (See Childs Decl., Ex. 4, at 7-8; Ex. 11, at 1).

- Before the SPA was signed, Ayvazian approved all of its terms, *including* the SPA's

clause providing for ICC arbitration as well as the selecting New York law as the governing law. (See Childs Decl., Ex. 4, at 7-8; Ex. 11, at 1).

- After Global Gold paid Batoyan, Janibekian, and Lalazaryan for their shares, Ayvazian collected the entire purchase price and distributed the funds to the other sellers while keeping a share for himself. (See Childs Decl., Ex. 4, at 7; Ex. 11, at 1).

These allegations were *confirmed* by a statement submitted by Respondent Lalazaryan to the ICC in March 19, 2007. In the statement -- which is akin to an Answer under Article 5 of the ICC Rules -- Respondent Lalazaryan admitted the allegations in the Request, except for allegations about his own personal conduct. Respondent Lalazaryan even confirmed that Ayvazian was the undisclosed principle to the agreement by stating ". . . I am not responsible for such violations made by the other shareholders, including the undisclosed to Global Gold shareholder Vardan Ayvazian." (See Childs Decl., Ex. 11, at 1). Further, Ayvazian was served with Global Gold's Request, but elected not to file an Answer responding to the allegations it contains. (See Childs Decl., Ex. 6, at 4). Ayvazian's silence corroborates the allegations made by Global Gold in its Request and underscores that he is a proper Respondent in the arbitration.

Although Global Gold has satisfied the ICA's *prima facie* standard, the ICC/ICA instructed the parties to proceed to arbitration without Ayvazian (see Childs Decl., Ex. 8, at 2), and in August 2007, transmitted only part of the case file to the fully convened Arbitral Tribunal. (See Childs Decl., Ex. 10, at 1). It informed the Tribunal that the place of arbitration would be New York, New York, according to the agreement of the parties (see id. at 3), and that arbitration would proceed against the three signatory shareholders, but not against the non-signatory, Ayvazian. (See id.). Today, the Arbitral Tribunal is poised to adjudicate Global Gold's claims against the three signatory shareholders.

C.      **The Petition to the New York Supreme Court under CPLR Article 75**

On October 29, 2007, Global Gold filed a Petition in New York Supreme Court against the ICC and ICA pursuant to N.Y. C.P.L.R. 7502(a) and 7503(a).  In its Petition, Global Gold claims that the ICC/ICA violated New York law, the FAA, and the ICC Rules by making a determination as to the Arbitral Tribunal's jurisdiction over Ayvazian, and refusing to submit the jurisdictional issue to the Arbitral Tribunal.  (See Childs Decl., Ex. 1, ¶ 39).  Global Gold seeks an Order directing the ICC/ICA to submit to the Arbitral Tribunal the question of its jurisdiction over Ayvazian.  (See id. at 15).

On October 30, 2007, Global Gold caused its Notice of Petition, Petition, and accompanying memorandum of law to be served on Peter M. Robinson at the address of USCIB in New York.  Global Gold named and served Mr. Robinson pursuant to C.P.L.R. 1025 because it understood from the ICC's website, which lists Mr. Robinson as "President and CEO" of the "New York Office" of "ICC United States," (see Childs Decl., Ex. 12), that Mr. Robinson is the United States President of the ICC.

After service, the ICC/ICA removed the lawsuit to federal court.

### III.     ARGUMENT

A.      **Global Gold Has Established a Prima Facie Case that**
        **the Court Has Personal Jurisdiction over the ICC/ICA**

The ICC/ICA contends that Global Gold's complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2) on the ground that Global Gold's Petition under CPLR Article 75 (the "Petition") does not properly allege the basis for the Court's personal jurisdiction over ICC/ICA.  (See Op. Br. at 5-6).  This argument is without merit, and the ICC/ICA's motion

should be denied.[3] Under New York law, there is no requirement that an initial pleading even allege the basis of jurisdiction. Fishman v. Pocono Ski Rental Inc., 82 A.D.2d 906, 907 (2d Dep't 1981) (denying motion to dismiss and stating that under New York law there is "no requirement . . . that the complaint allege the basis for personal jurisdiction").

Although it was not required to plead its jurisdictional basis, Global Gold did so. Global Gold states in its Petition that the ICC/ICA has an office in New York, and that it administers arbitrations in New York. (See Childs Decl., Ex. 1, ¶¶ 8, 9). These allegations establish a *prima facie* case of "general jurisdiction" under N.Y. C.P.L.R. 301.[4] (See *infra*). Further, Global Gold's Petition states that the ICC/ICA agreed to administer and coordinate Global Gold's arbitration against the four shareholders in New York, and that this cause of action arises out of the ICC/ICA's performance of those administration and coordination duties. (See Childs Decl., Ex. 1 ¶¶ 9, 39). These allegations establish a *prima facie* case of "specific jurisdiction" under New York's long arm statute, C.P.L.R. 302(a). (See *infra*).

Tellingly, the ICC/ICA does not argue that this Court lacks jurisdiction over it. (Op. Br. 5-7). Because it cannot. C.P.L.R. 301 allows a court to exercise personal jurisdiction over a foreign, unincorporated association that is "doing business" in New York. Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria, 937 F.2d 44, 50 (2d Cir. 1991) (applying C.P.L.R. 301 to unincorporated associations). A non-profit organization is deemed to be "doing business" for purposes of the rule where it "carries on, within this state, with reasonable continuity, the activities it was organized to perform." N.Y. City Jaycees, Inc. v. U.S. Jaycees, Inc., 377 F. Supp. 481, 486 (S.D.N.Y. 1974) (internal

---

[3] Alternatively, Global Gold requests discovery and/or an evidentiary hearing to resolve issues of personal jurisdiction.

[4] A federal court applies state law to resolve questions of personal jurisdiction. See PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1108 (2d Cir. 1997).

quotations omitted), rev'd on other grounds, 512 F.2d 856 (2d Cir. 1975). Relevant factors include the presence of an office in the state, solicitation of business in New York, and the presence of employees or other agents in the state. Courts look at the quality, not the quantity, of the respondent's contacts with the state, and do not require the existence of one or any specific combination of factors. Katz Agency, Inc. v. Evening News Ass'n, 514 F. Supp. 423, 427 (S.D.N.Y. 1981), aff'd, 705 F.2d 20 (2d Cir. 1983). For example, courts have exercised jurisdiction over non-profit organizations that do not maintain offices or employees in New York simply because they collect dues from and enforce membership policies through independently organized chapter organizations within the state. See N.Y. City Jaycees, Inc., 377 F. Supp. at 486 (exercising personal jurisdiction where non-profit organization organized outside of New York "receive[d] dues from" and "enforce[d] its membership policies and decrees incidental to its management" through an independently organized New York chapter); accord B.K. Bruce Lodge, Inc. v. The Grand United Order of Odd Fellows in Am., 208 A.D. 100 (1st Dep't 1924).

Applying this standard, the ICC/ICA "carries on, within this state, with reasonable continuity, the activities it was organized to perform" pursuant to C.P.L.R. 301. N.Y. City Jaycees, Inc., 377 F. Supp. at 486. The ICC was established to "further the development of an open world economy" (see Robinson Decl. ¶ 10), and it engages in a wide range of activities to advance this goal. Two of its primary activities are organizing and administering arbitrations conducted under the ICC Rules of Arbitration and sponsoring events related to arbitration and world commerce. (See Childs Decl., Ex. 1, ¶¶ 20-21; Robinson Decl. ¶ 11 (noting the ICC's arbitration-related activities); Childs Decl., Ex. 20, at 27).[5] The ICC conducts both of these

---

[5] In a 12(b) motion, "a court may take judicial notice of information publicly announced on a party's website, so long as the website's authenticity is not in dispute and it is capable of accurate and ready determination." See Arista Records LLC v. Lime Group LLC, No. 06 Civ.

activities within New York state. With respect to its arbitration services, for example, the ICA Bulletin states that in each of the years 2000 to 2006, New York City was one of the five most commonly chosen places of arbitrations administered by the ICC/ICA. (See Childs Decl., Ex. 13).[6] With respect to its events program, the ICC regularly sponsors conferences and seminars in New York City. (See, e.g., Childs Decl., Exs. 21 & 22).

Another indicia of the ICC's presence in New York State is that the ICC maintains an office in New York City at the New York office of the UCSIB. (See Childs Decl., Ex. 12). The ICC advertises a New York address, telephone number, and fax number.[7] (See id.). Likewise, the USCIB represents to the public that it houses the ICC's New York office. The USCIB, for example, posts on its website a registration form for a past USCIB-sponsored event, and the form requests that the form be returned to an "Arbitration Assistant" of *ICC International Court of Arbitration/USCIB*", at the USCIB's New York office. (See id., Ex. 23 (emphasis added)).

The ICC employs people who work in New York, which is another factor demonstrating that the ICC conducts systematic activities within the state. The ICC website indicates that at

---

5936(GEL), 2007 WL 4267190, at *8 n.20 (S.D.N.Y. Dec. 3, 2007) (Lynch, J.) (quoting Doron Precision Sys., Inc. v. FAAC, Inc., 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006)).

[6] For each ICC/ICA arbitration in New York state, the ICC/ICA facilitates the appointment of arbitrators, collects fees and expenses for arbitrators, and advises the parties on relevant procedures and timetables. (See Childs Decl., Ex. 1, ¶ 20). Additionally, the ICC collects fees for these services. (See Childs Decl., Ex. 14 ("The 'administrative expenses' . . . represent the fee charged by the ICC Court for the administration of an arbitration case.")))

[7] Even if the ICC did not maintain an office in New York, the fact that ICC advertises that it has such an office on its website is alone sufficient to overcome a motion to dismiss on jurisdictional grounds. For example, in Revlon Inc. v. United Overseas Ltd., the plaintiff alleged that defendant United Overseas Ltd. ("UOL") had represented to customers that it had a New York office located within the office of a separate entity. No. 93 Civ. 0863(SS), 1994 WL 9657, at *2-3 (S.D.N.Y. Jan. 12, 1994). On a motion to dismiss, UOL argued that it did not actually maintain an office in New York. The Court denied UOL's motion because plaintiff had alleged that UOL had "held itself out to the world" as having an office in New York. Id. (quoting N.Y. Marine Managers, Inc. v. M.V. Topor-1, 716 F. Supp. 783, 785 (S.D.N.Y. 1989)).

least two ICA executives, Nancy M. Thevenin and Josefa Sicard-Mirabal, work out of USCIB's New York office.  The ICC website lists these employees as having New York telephone numbers.  (See Childs Decl., Ex. 15).  Furthermore, Ms. Thevenin and Ms. Sicard-Mirabal perform significant functions for the ICC.  According to USCIB's website, "Ms. Thevenin is deputy director of arbitration and ADR for North America for the ICC International Court of Arbitration in New York," and "she advises North American attorneys and companies on all phases of ICC arbitration, as well as on the ICC Appointing Authority, Pre-Arbitral Referee, ADR, Dispute Board and Expertise Rules." (See Childs Decl., Ex. 16).  Ms. Sicard-Mirabal is Director of ICC Arbitration and ADR in North America.  Her job responsibilities include "represent[ing] and promot[ing] ICC dispute resolution services in the United States and Canada." (See Childs Decl., Ex. 17).  Ms. Thevenin and Ms. Sicard-Mirabal also perform functions related specifically to the ICC's activities in New York.  For example, Ms. Thevenin is the ICC's  contact person for an upcoming ICC/ICA event in New York City.  (See Childs Decl., Ex. 24).

Finally, the ICC's presence in New York is supported by the fact that the ICC collects dues from, solicits participation in its activities through, and enforces its membership policies and decrees incidental to its management through the USCIB, a not-for-profit corporation organized under the laws of New York serving as the ICC "National Committee" for the United States (see Robinson Decl. ¶¶ 3, 13).  Under New York law, these factors are alone sufficient to establish "doing business" jurisdiction in New York state.  See N.Y. City Jaycees, Inc, 377 F. Supp. at 486; B.K. Bruce Lodge, Inc., 208 A.D. at 102.

The Court also may assert specific jurisdiction under New York's long-arm statute, C.P.L.R. 302(a).  Under Rule 302(a), a New York court may exercise jurisdiction over any non-

domiciliary "who in person or through an agent…transacts any business within the state or contracts anywhere to supply goods or services in the state." C.P.L.R. 302(a); see Liberatore v. Calvino, 293 A.D.2d 217, 220-21 (1st Dep't 2002) (finding an out of state attorney subject to personal jurisdiction under CPLR 302(a) as a result of his contract to supply legal services within New York). Here, the ICC agreed to administer the Arbitration at issue in New York City, and although it improperly has failed to include Respondent Ayvazian as a Respondent, the ICC/ICA is administering the Arbitration in New York. (See Childs Decl., Ex.10, at 3). Global Gold's action is based on the ICC's performance of these agreed-upon services in New York, and thus gives rise to jurisdiction over the ICC/ICA pursuant to C.P.L.R. 302.

**B.    The ICC/ICA Should be Estopped from**
**from Contesting Sufficiency of Service of Process**

The ICC/ICA also argues that Global Gold's complaint must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(5) because Global Gold served Peter M. Robinson, who is the President of USCIB, but allegedly not the president of the ICC. (See Op. Br. at 5). Even if Mr. Robinson is not the ICC's president, the Court should estop the ICC/ICA from contesting sufficiency of process, and ICC/ICA's motion should be denied.

In New York, typical principles of apparent authority and estoppel by agency apply to principal / agent relationships created for purposes of service of process. Under these principles, if a petitioner proves that it "knew of and relied upon definite conduct or other manifestations" of the respondent which "justif[ied] it in believing that [a party] was authorized to accept service on its behalf," a court may estop the respondent from contesting service. See Sullivan Realty Org., Inc. v. Syart Trading Corp., 68 A.D.2d 756, 771 (2d Dep't 1979); Society Milion Athena v. Nat'l Bank of Greece, 2 N.Y.S.2d 155, 163 (Sup. Ct. 1937) (estopping entity from contesting service

to a third party entity because it had advertised that party as its agent). This is particularly true where the real party in interest receives actual notice.

In <u>Society Milion Athena v. National Bank of Greece</u>, defendant Bank of Greece advertised that Hellenic Bank Trust Company, located in New York, was one of its branches. 2 N.Y.S.2d at 163. Based on Bank of Greece's advertisements and applicable law which made a branch of a foreign bank an agent of the bank for purposes of service of process, the plaintiff commenced an action against Bank of Greece by serving Hellenic Bank Trust Company. <u>Id.</u> On a motion to dismiss, the Bank of Greece argued that service was improper because Hellenic Bank Trust Company was actually a separate entity. The Court estopped Bank of Greece from contesting service. The Court reasoned that once Bank of Greece held Hellenic Bank Trust Company out as its agent, it could not then argue that service was improper because Hellenic Bank Trust Company was not in fact its agent. <u>Id.</u> at 164.

The principles enunciated in <u>Society Milion Athena</u> require that Global Gold's service on Mr. Robinson be deemed sufficient in this case. The ICC/ICA has held out Mr. Robinson as its United States President. The ICC's own website lists Mr. Robinson as "President and CEO" of the "New York Office" of "ICC United States." (<u>See</u> Childs Decl., Ex. 12 ("ICC United States," http://www.iccwbo.org/id15324/ index.html)). And, Global Gold was justified in presuming that information on the ICC's website as to its president was accurate. Finally, New York law provides that the president of the unincorporated association is the association's agent for purposes of service of process. <u>See</u> <u>McGinn v. Morrin</u>, 286 N.Y.S. 410, 410-11 (Sup. Ct. 1936) (citing N.Y. Gen. Assoc. L. § 13). Accordingly, just as in <u>Society Milion Athena</u>, the ICC/ICA should be estopped from contesting sufficiency of service because it held out Mr. Robinson as its agent for purposes of service of process.

12

The ICC has not suffered any prejudice here because Global Gold served Robinson rather than some other individual. Global Gold sent copies of the petition to the ICC's offices in Paris via overnight mail shortly after serving Robinson. (See Childs Decl., Ex. 18). The ICC/ICA, not Mr. Robinson, has appeared as the true and proper respondent in the action. (See Op. Br. at 1 n.1 ("Although the caption of this proceeding refers to 'Peter M. Robinson, as President of International Chamber of Commerce,' Mr. Robinson is not a Respondent.")).

Further, Global Gold's service on the ICC/ICA is sufficient under federal law. Federal Rule of Civil Procedure 4(h)(1) provides that service of process upon an unincorporated association may be effected "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process." Fed. R. Civ. P. 4(h)(1); accord 1 James Wm. Moore, et al., Moore's Federal Practice § 4.54(2) (3d. 1997 & Supp. 2007). Even if Mr. Robinson does not qualify, Ms. Thevenin, who is an executive of the ICC/ICA (see supra), was present when service was effected. (See Childs Decl., Ex. 25). Ms. Thevenin is plainly a "representative so integrated with the organization that [she] will known what to do with the papers[,]" and "stands in such a position as to render it fair, reasonable, and just to imply the authority on [her] part to receive service." See Montclair Elec., Inc., v. Electra/Midland Corp., 326 F. Supp. 839, 842 (S.D.N.Y. 1971); cf. Fed. Ins. Co. v. Al Qaida (In re Terrorist Attack on Sept. 11, 2001), No. 03 MDL 1570, 03 Civ. 6978(RCC), 2004 WL 1348996 (S.D.N.Y. June 14, 2004) (holding that whether a person is a managing or general agent qualified to receive service will depend on the factual circumstances surrounding his authority within the association).

**C.    Global Gold Properly Seeks Judicial Review of the ICA's Administrative Finding**

    1.    The ICA's Administrative Decision is Subject to
            Judicial Review Under the ICC Rules and Federal Law

United States courts applying the FAA have recognized that by its express terms, ICC Rule 6(2) confers upon a party to an ICC arbitration the right to seek judicial review of an ICA administrative determination that an arbitration agreement does not exist. In Shaw Group Inc. v. Triplefine International Corp., the Second Circuit noted the availability of judicial review of an administrative determination by the ICA that a dispute is not arbitrable under ICC Rule 6(2). 322 F.3d 115, 121 & n.3 (2d Cir. 2003).

The authorities upon which the ICC/ICA rely are inapposite. First, despite the express wording of ICC Rule 6(2) providing for judicial review, the ICC/ICA wrongly concludes that administrative decisions by the ICC Court are not subject to judicial review. (See Op. Br. at 12, quoting Craig, et al, International Chamber of Commerce Arbitration, at 161 ("As explained in one of the leading treatises on ICC arbitration, an administrative decision by the ICC Court 'is not subject to judicial review.'")). The ICC/ICA reaches this erroneous conclusion by relying upon a portion of a sentence rather than the full sentence in the leading treatise on ICC arbitrations to which it quotes. The full sentence states: "These typical judgments confirm that a decision by the Court of Arbitration finding *prima facie* arbitral jurisdiction over a dispute *and referring the matter to an arbitral tribunal for a determination of all issues (including jurisdiction) retains its administrative character and is not subject to judicial review.*" (emphasis added). By relying upon only a portion of the full sentence, the ICC/ICA fails to appreciate the distinction between a positive versus negative ruling by the ICA on the *prima facie* issue of whether to refer the dispute to an arbitral tribunal. When the ICC/ICA makes a positive ruling and submits all matters to the tribunal (including issues of the tribunal's jurisdiction over non

signatories), there is no appeal to court, and no need for an appeal to court, because the arbitrators will decide the issues. But when the ICC/ICA makes a negative ruling, and refuses to pass to the arbitral tribunal for determination all issues in the case (including jurisdiction), then appeal to the courts is the only alternative left to a Claimant, for which ICC Rule 6(2) expressly provides, and which Global Gold takes advantage of here.

Second, the cases from the French courts to which the ICC/ICA refers do not stand for the proposition that there is no judicial review of ICC/ICA administrative determinations. (See Op. Br. at 13). To the contrary, in each case, the French Court appears to have reviewed the ICC/ICA's determination for compliance with the ICC Rules and concluded that the ICC/ICA had applied them properly. Id. Reviewing a decision and deciding that it is correct or incorrect (judicial review) is different than refusing to review it at all (no judicial review). Further, the case summaries provided by the ICC/ICA do not indicate the French courts' rationale for upholding the ICC/ICA's actions, and are thus not helpful to the parties or Court here. Id.

2.    In Seeking Judicial Review Under Article 6(2),
      Global Gold Properly Named the ICC/ICA as Respondents

Contrary to the ICC/ICA's assertions, the ICC Rules do *not* require that a party seek judicial review by moving to compel arbitration against "the party that refuses to arbitrate." (See Op. Br. at 19). Nor do the ICC Rules forbid a party from seeking judicial review by bringing an action for declaratory relief against the ICC. (See Childs Decl., Ex. 3). Indeed, the Rules are silent as to the parties that must be named in such a proceeding, and it is unfair and improper for the ICC to attempt to read into its Rules language that does not appear there. (See id.).

It is a basic tenet of New York contract law that any ambiguities in contracts should be construed against the drafter. See, e.g., Jacobson v. Sassower, 489 N.E.2d 1283, 1284 (N.Y. 1985). In this case, the ICC Rules are essentially a contract between the ICC and Global Gold as

to the administration of the arbitration. The ICC drafted its Rules, and the ICC easily could have included a provision setting forth the procedure to be followed to "ask any court" "whether . . . there is a binding arbitration clause" under Article 6(2). But, the ICC did not do so. Thus, any procedural ambiguity should be construed against the ICC and in favor of Global Gold.

Further, under New York and federal law, the ICC is a proper party in the action for judicial review of an administrative determination by the ICA. First, Global Gold is challenging the actions of the ICC/ICA in refusing to allow the arbitral tribunal to hear this jurisdictional issue. This procedural dispute is not with Respondent Ayvazian, but rather with the ICC due to its failure to follow the law and its own rules. In <u>Diemaco v. Colt's Manufacturing Company</u>, the District of Connecticut chastised the petitioner for not naming the AAA as a respondent in an action seeking an order compelling the AAA to reverse an interlocutory decision in an arbitration. 11 F. Supp. 2d 228, 231 n.6 (D. Conn. 1998). The court noted that "[t]he actions complained of are those of the AAA," so "the AAA should have been named as a defendant in this suit." <u>Id.</u> (citing cases). Just as in <u>Diemaco</u>, Global Gold is challenging the actions of the ICC/ICA, which refused to allows its arbitration to proceed against Ayvazian, so the ICC/ICA is the proper party to the suit. At this juncture, Ayvazian is not even a nominal Respondent in the arbitration. Irrespective of what the Court might decide on a hypothetical motion to compel arbitration brought by Global Gold against Ayvazian, as suggested by ICC/ICA, the ICC/ICA would not be bound by any such ruling.

Moreover, a motion to compel Ayvazian to arbitrate would not be procedurally proper. The ICA, which is empowered by the ICC Rules to act as a "gate keeper" (<u>see</u> Op. Br. at 10), has prevented the currently constituted Arbitral Tribunal from even considering Global Gold's claims against Ayvazian, because those claims did not survive the ICA's administrative review

of arbitrability. (See, e.g., Childs Decl., Ex. 10, at 3). The ICC Rules confer no authority upon the Arbitral Tribunal to adjudicate disputes between parties that are different than those approved by the ICA and submitted to the Arbitral Tribunal for resolution. And, no ICC Rule speaks to the joinder of new parties once the file has been transferred. (See Childs Decl., Ex. 3 (ICC Rules)). Accordingly, without order from the Court directing the ICC/ICA to submit the question of arbitrability of the dispute over Ayvazian to the Arbitral Tribunal, the Arbitral Tribunal is unlikely to venture beyond the ICC Rules to consider the question, absent voluntary acquiescence by the ICC/ICA.

On the other hand, a court order directing the ICC/ICA to submit the question of arbitrability of the dispute over Ayvazian to the Arbitral Tribunal would afford Global Gold complete relief. Even if Ayvazian failed to appear before the Arbitral Tribunal empowered to consider Global Gold's claims against him,[8] the ICC Rules allow the Tribunal to proceed with the hearing. (See Childs Decl., Ex. 3 (ICC Rules, Art. 21(2))). The ICC maintains, without any basis in its Rules, that a party must make a motion to compel arbitration. A better and more logical interpretation of the Rules is that if Ayvazian wishes to challenge the Arbitral Tribunal's jurisdiction over him, he should either appear in arbitration and make that challenge, or file a motion with this Court to stay an arbitration against him. The ICC's attempt to shift the burden to Global Gold in this manner is both inappropriate and unjustified by the law or the ICC Rules.

3.    Arbitral Immunity Does Not Apply Here

The ICC/ICA misapplies the concept of arbitral immunity, and arbitral immunity does not bar judicial review of the ICC/ICA's erroneous determination here. Global Gold does not seek money damages from the ICC/ICA. Global Gold seeks an equitable affirmative injunction

---

[8] Ayvazian has not indicated that he refuses to arbitrate.

compelling the ICC/ICA to submit the question of arbitrability to the Arbitral Tribunal. It is well-settled under federal law that, "as a matter of law, arbitral ... immunity . . . does not shield an [arbitrator] from claims for equitable relief." Trans World Airlines, Inc. v. Sinicropi, No. 93 Civ. 3094(CSH), 1994 WL 132233, at *1 (S.D.N.Y. Apr. 14, 1994); accord Kemner v. Dist. Council of Painting and Allied Trades No. 36, 768 F.2d 1115, 1120 (9th Cir. 1985). This is because arbitral immunity is derived from judicial immunity, see, e.g., Austern v. Chi. Bd. Options Exch., 898 F.2d 882, 886 (2d Cir. 1990), and judicial immunity does not extend to actions for injunctive relief.[9] Courts reason that arbitral immunity should be the same as, but not more extensive, than the immunity afforded judges. See Trans World Airlines, 1994 WL 132233, at *1-2. For example, in Kemner, the Ninth Circuit refused to dismiss an action against arbitrators seeking to vacate one arbitration award and confirm another because "the policy concerns underlying the judicial and arbitral immunity from *damages actions* do not obtain [in suits for equitable relief]." Kemner, 768 F.2d at 1120 (emphasis added).

None of the cases cited by Respondents contradict this proposition. Austern, Richardson, and Corey all involved claims for money damages and did not address whether arbitral immunity extends to injunctive relief. See Austern, 898 F.2d at 884-85, 887 (action against arbitral institution for money damages for mental anguish and reimbursement of legal fees); Amended Complaint, at 6-7, Richardson v. AAA, et al., 888 F. Supp. 604 (S.D.N.Y. 1995) (No. 93 Civ. 6128) (Childs Decl., Ex. 26) (action against arbitrators for money damages)); Corey v. N.Y.

---

[9] See, e.g., Heimbach v. Village of Lyons, 597 F.2d 344, 347 (2d Cir. 1979) (refusing to dismiss claims against a judge because the judge "is not immune . . . from suit for injunctive relief"); Truong v. McGoldrick, No. 06 Civ. 1430(SAS), 2006 WL 1788960, at *4 & n.45 (S.D.N.Y. June 27, 2006) ("[N]either judicial immunity nor quasi-judicial immunity bars a claim for prospective injunctive relief.") (citing Pulliam v. Allen, 466 U.S. 522, 536-37, 541-42 (1984) (holding that "judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity")).

Stock Exch., 691 F.2d 1205, 1208 (6th Cir. 1982) (action for money damages against arbitrators for punitive damages for mental anguish and physical problems resulting from an arbitration). Similarly, despite Respondents' claim, (see Op. Br. at 15), the First Circuit's decision in New England Cleaning Services, Inc. v. AAA does not stand for the proposition that arbitral immunity bars injunctive relief. Although the plaintiff in the case initially sought injunctive relief and money damages from the American Arbitration Association, the district court resolved the claim for injunctive relief on grounds not related to arbitral immunity. The district court's decision was not appealed, and the First Circuit addressed only whether arbitral immunity barred the plaintiff's claim for money damages. 199 F.3d 542, 544 (1st Cir. 1999).

Additionally, the ICC/ICA erroneously contends that Article 34 of the ICC Rules prevents Global Gold from bringing this action. (See Op. Br. at 16 n.6). Although Article 34 states that "[n]either the arbitrators, nor the Court and its members, nor the ICC . . . shall be liable to any person for any act or omission in connection with the arbitration," (see Childs Decl., Ex. 3, Art. 34), the Article applies to liability for money damages only. In this case, Global Gold seeks only injunctive relief. Accordingly, neither arbitral immunity nor Article 34 of the ICC Rules shields the ICC/ICA from this CPLR Article 75 Petition.

**D.    Global Gold has Alleged a Violation of Federal Law, New York law, and the ICC's own Rules Sufficient to Overcome a 12(b)(6) Motion for Failure to State a Claim**

Under New York law and federal law interpreting the FAA, the question of whether a dispute should be arbitrated (i.e., the jurisdiction of the arbitrator, also known as arbitrability), normally is left to the courts, unless the parties clearly have indicated an intent to have issues of arbitrability determined by an arbitrator. See, e.g., Shaw Group Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 120 (2d Cir. 2003) (noting that the issue of arbitrability is to be decided by the court unless there is clear evidence that the parties intended the question of arbitrability to be

decided by the arbitrators).[10] Courts uniformly have found that when the parties agree to resolve their disputes in accordance with the Rules of the ICC, a clear intent to submit questions of arbitrability to the arbitrators is present, because Article 6(2) of the ICC's Rules expressly states that "[a]ny decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself." Shaw Group Inc., 322 F.3d at 122 (citing Article 6(2) of the ICC's Rules, the court found that the parties who contracted for arbitration in accordance with the ICC rules had thereby agreed to submit questions of arbitrability to the arbitrator),[11] (citing Apollo Computer, Inc. v. Berg, 886 F.2d 469 (1st Cir. 1989) and Daiei, Inc. v. U.S. Shoe Corp., 755 F. Supp. 299 (D. Haw. 1991)). The ICC's instant interpretation of its Article 6(2) conflicts directly with this point of law. Specifically, by now claiming that issues of arbitral jurisdiction must be decided by this Court pursuant to a motion to compel arbitration brought against Ayvazian, the ICC ignores the fact that parties adopting the ICC Rules have expressed a clear intent to have the issues decided by the arbitrators. In addition to the fact that incorporating the ICC Rules evidences the clear intent to have arbitrability issues decided by the arbitrators, the SPA itself makes it clear with broad language stating that "any dispute" arising from the agreement may be referred "for final settlement" "to a panel of three (3) arbitrators." (See Childs Decl., Ex. 2, § 11.5). The ICC/ICA should have transferred the file to the arbitral panel with Ayvazian as a respondent so that the Tribunal could decide whether he is bound as principle to the arbitration clause.

---

[10] Courts engage in a fact-specific inquiry to determine whether the parties have clearly indicated this intent. See, e.g., First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 946 (1995) (analyzing "the record before the court" to determine the non-signatory's intent).

[11] The court in Shaw sometimes loosely referred to the ICA as the "arbitrators." But even the ICA knows and acknowledges that it is not an arbitrator or an arbitral tribunal. See e.g., the ICC's website describing the ICA: "The [ICA] Court organizes and supervises your arbitration and helps in overcoming obstacles. It does not itself resolve disputes, a task that is carried out by independent arbitrators." (See Childs Decl., Ex. 19).

Respondents ICC and ICA argue that this clear precedent should not apply here because Respondent Ayvazian did not physically sign the agreement to arbitrate. (See Op. Br. at 17). This argument is without merit. First, through his three agents Ayvazian directed the Company's negotiation and execution of the SPA containing the arbitration clause, evidencing an intent to be bound by it. (See supra). Second, Ayvazian knew that the ICC Rules would apply to an arbitration under the SPA, and adopting the ICC's Rules into an arbitration agreement evidences an intent to have jurisdictional issues decided by the arbitrators. Third, the cases upon which the ICC/ICA relies are inapposite.

In its motion to dismiss, the ICC/ICA erroneously relies on First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995), and Masefield v. Colonial Oil Industries, Inc., No. 05 Civ. 2231(PKL), 2005 WL 957344 (S.D.N.Y. Apr. 26, 2005), for the proposition that there is no "clear and unmistakable" evidence of Ayvazian's intent to arbitrate any disputes with Global Gold. (See Op. Br. at 16-17). Although First Options stands for the proposition that "[c]ourts should not assume the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so," the Supreme Court made clear that intent is a fact-specific determination. In First Options, the Supreme Court ruled only that parties' appearance before the arbitration panel to argue arbitrability did not indicate their intent to arbitrate that issue. 514 U.S. at 946-47 ("On the record before us, First Options cannot show that the Kaplans clearly agreed to have the arbitrators decide . . . the question of arbitrability) (emphasis added). Similarly, in Masefield,[12] the Court addressed the defendant's argument that non-signatories were bound by the arbitration clause in a contract signed by an affiliate company because the

---

[12] Further, Masefield's statements regarding the arbitrators' power to rule on arbitrability were made in dicta. The holding of Masefield was based on the fact that the court already had considered the defendants' arguments in a prior proceeding. See 2005 WL 957344 at *1 & n.1. The order in the prior proceeding is attached as Exhibit 28 to the Childs Declaration.

non-signatories had performed under the contract. The defendant did not contend that the non-signatories had themselves expressed any *intent* to be bound to the broad arbitration clause in the contract, had negotiated the contract, or had even known about it prior to their performance. (See Childs Decl., Ex. 28 (Masefield at 5,9 (S.D.N.Y. Apr. 17, 2005) (noting that defendant had failed to argue that a non-signatory "was even aware of [the Contract], much less [had] considered its specific terms," or to "challenge [the non-signatories'] assertion that they played no role in negotiating the terms of the Contract")); Childs Decl., Ex. 27, at 5-12 (Defendant's Memorandum of Law in Support of Its Motion to Dismiss the Complaint, at 5-12, Masefield, (Mar. 22, 2005)). In neither decision did the Courts speak to a case where, as here, there is unrefuted evidence that the non-signatory specifically negotiated the agreement that contained the arbitration provision and that was signed expressly at his direction by his agents.

Further, the ICC/ICA mistakenly contends that Shaw, Apollo, and Daiei do not support Global Gold's argument that there exists "clear and unmistakable evidence" of an agreement to arbitrate, because each case involved a challenge to a positive Article 6(2) determination by the ICA, and that the issue of whether Ayvazian is required to arbitrate with Global Gold must be determined by a court, and not an arbitrator. The ICC/ICA fails to explain how a determination by the ICA -- which is not a party to the dispute or to the arbitration agreement -- can alter a court's interpretation of the agreement.[13]

Regardless, the ICC/ICA's arguments miss the point. The dispute here is not whether the issue of jurisdiction over Ayvazian should be decided by the Arbitral Tribunal or by this Court.

---

[13] Contrary to the ICC/ICA's assertion, the Second Circuit did not recognize in Shaw that the proper means of redressing a negative Article 6(2) determination by the ICC/ICA would be to bring a court action against non-signatories. Although the Second Circuit noted the availability of judicial review of a negative Article 6(2) decision, see *supra*, it did not address the parties to be named in such a suit or the procedure to be followed. See Shaw, 322 F.3d at 122 n.3.

Rather, the question is whether that determination should be made exclusively by the ICA administrative body. Clearly, the answer is "no."

As the ICC/ICA acknowledges, Global Gold selected the ICC Rules (including Article 6(2)) to govern certain procedural aspects of the arbitration. (See Op. Br. at 8). But, in so doing, Global Gold had no belief or remote expectation that the ICA would seek to expand its role into the jurisdictional domain of the Arbitral Tribunal. For one, nothing in the terms of Article 6(2) leads to this conclusion. Article 6(2) of the ICC's Rules provides that if a respondent does not file an answer or if any party challenges the existence, validity or scope of the arbitration agreement, the ICA may make an initial inquiry into whether an arbitration agreement exists. If the ICA "is *prima facie* satisfied that an *arbitration agreement . . . may exist*," then "the arbitration shall proceed" and thereafter, "any decisions as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself." (See Childs Decl., Ex. 3, Art. 6(2) (emphasis added). Considering Global Gold's claim that Ayvazian was an undisclosed principal acting through his agents who signed the SPA, once the ICA made a *prima facie* determination that an arbitration agreement exists, as it did in this case, the ICA's role concerning arbitrability and jurisdiction ended. Thereafter, any and all questions relating to the jurisdiction of the Arbitral Tribunal under the arbitration agreement should be made by the Arbitral Tribunal itself (not the ICA), including the important question of whether non-signatory Ayvazian is bound by the arbitration agreement under legal doctrines of principal/agency and estoppel, under New York laws.

As one guide to ICC rules states:

> *Article 6(2) does not require that each of the parties to the arbitration must have signed the arbitration agreement*, and it may be the case, by virtue of any one of a number of different legal theories (such as, *e.g.*, agency, assignment, alter ego, succession or

23

the so-called "group of companies" theory) that a non-signatory
may be bound by an arbitration agreement.

Derains & Schwartz, <u>A Guide to the New ICC Rules of Arbitration</u>
(1998) at 92 (emphasis added). In other words, the ICA's authority to make a *prima facie*
finding as to the existence of an arbitration agreement pursuant to the rules incorporated and
adopted by the parties in their arbitration agreement does not vest in the ICA the right and
authority to dismiss claims brought in an arbitration against non-signatories. By refusing to
submit Global Gold's claim against Ayvazian to the Arbitral Tribunal, the ICC/ICA has denied
Global Gold its contractual right to have its dispute settled by a panel of independent arbitrators.

Even if the ICC/ICA were correct (which it is not) that Article 6(2) vested in the ICA
authority to dismiss actions against non-signatories to arbitration agreements (<u>see</u> Op. Br. at 11-
12), thereby denying the Arbitral Tribunal an opportunity to rule on its own jurisdiction, the ICA
has misapplied its standards here. Under the ICA's own standards, the ICA will transmit a case
against a non-signatory to an arbitral tribunal if the claimant makes a "plausible argument" that
the non-signatory is bound by the agreement to arbitrate. Derains & Schwartz, *supra*, at 92.
Global Gold has done this in its Request for Arbitration. (<u>See</u> Childs Decl., Ex. 4). As discussed
in Global Gold's Memorandum of Law in support of its Petition, Ayvazian is bound to the
arbitration agreement between Global Gold and the signatory shareholders under the law of
agency and pursuant to the doctrine of estoppel. (<u>See</u> GG Br. at 16-19).

ICC/ICA mistakenly relies on <u>York Hannover Holding A.G. v. AAA</u>, No. 92 Civ.
1643(CSH), 1993 WL 159961, at *5 (S.D.N.Y. May 11, 1993), <u>Diemaco v. Colt's
Manufacturing Co.</u>, 11 F. Supp. 2d 228, 232 (D. Conn. 1998), and <u>York Research Corp. v.
Landgarten</u>, 927 F.2d 119, 123 (2d Cir. 1991), to support the proposition that Global Gold is
bound by the ICC's erroneous interpretation of Article 6(2). In <u>York Hannover</u> and <u>Diemaco</u>,

the courts rely on a AAA rule which does not provide for judicial review of the arbitral institution's decision, as does ICC Article 6(2). See Diemaco, 11 F. Supp. 2d at 231-33; York Hannover, 1993 WL 159961, at *5. Likewise, the court's decision in York Research Corp. is distinguishable based on its procedural context. In that case, the losing party to an arbitration sought post-award review of a procedural decision of the arbitral institution where the governing rules of arbitration did not provide for judicial review on those grounds. 927 F.2d at 122-23.[14]

The ICC/ICA apparently alleges that Global Gold should be required to reimburse the ICC/ICA for costs and attorneys' fees because Global Gold is bound by ICC Rule 34, which states that the ICC/ICA shall not "be liable to any person for any act or omission in connection with the arbitration." (See Op. Br. at 21). The ICC/ICA is mistaken. As stated above, ICC Rule 34 does not prevent actions for equitable relief, like this one, and it does not provide a basis for awarding costs and attorneys' fees in any event.

## CONCLUSION

For the foregoing reasons, the Court should deny the ICC/ICA's motion to dismiss in its entirety and issue an Order directing the ICC/ICA to submit to the Arbitral Tribunal in ICA case number 14 770/EBS the question of its jurisdiction over respondent Ayvazian.

---

[14] At the end of their brief, the Respondents make the additional argument that Global Gold has not met the standard for an injunction in this case. But, the ICC/ICA misconstrues the standard. Global Gold easily meets the irreparable harm requirement here because Global Gold does not seek any money damages, and money damages are not an appropriate remedy. See Shapiro v. Cadman Towers, Inc., 51 F.3d 328, 332 (2d Cir. 1995) ("To establish irreparable harm, a plaintiff must demonstrate an injury . . . that cannot be remedied *by an award of monetary damages*.") (emphasis added) (internal punctuation omitted); Mason Tenders District Council v. Laborer's Int'l Union , 884 F. Supp. 823, 831 (S.D.N.Y. 1995) ("Irreparable injury is one that cannot be redressed through a *monetary award*.") (emphasis added). The ICC/ICA argues that Global Gold should move to compel arbitration against Ayvazian, but this too is a form of equitable relief, and allegations of alternative equitable remedies do not eviscerate a plaintiff's showing of irreparable harm. 42 Am. Jur. 2d Injunctions § 33 (2007) ("[A] plaintiff is threatened with 'irreparable injury' when he or she is unlikely to be made whole by an award of monetary damages or some other legal, as opposed to equitable, remedy at the conclusion of the trial.").

Dated: New York, New York
      December 21, 2007

KING & SPALDING LLP

Edward G. Kehoe (EK 2615)
Louisa B. Childs (LC 0935)
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2246

R. Doak Bishop
Wade M. Coriell
1100 Louisiana, Suite 4000
Houston, TX 77002-5213
Phone: (713) 751-3200
Fax: (713) 751-3290

Kenneth R. Fleuriet
25 Cannon Street
London EC4M 5SE
United Kingdom
Phone: +44 (0)20-7551-7500
Fax: +44 (0)20-7551-7575

*Attorneys for Petitioner Global Gold
Mining, LLC*

26

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 21, 2007, the foregoing Declaration of Louisa B. Childs and the Exhibits thereto, and the Memorandum of Law in Opposition to Respondent's Motion to Dismiss, were filed with the Clerk of Court using CM/ECF and were caused to be served by electronic delivery and mailing true and correct copies of the same by overnight mail to the following counsel at the address listed:

Louis B. Kimmelman
Dana C. MacGrath
Chintan V. Panchal
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York 10020
*Attorneys for Respondents*