UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GLOBAL GOLD MINING LLC,

                              Petitioner,

        -against-

PETER M. ROBINSON, AS PRESIDENT OF
INTERNATIONAL CHAMBER OF COMMERCE,
AN UNINCORPORATED ASSOCIATION, AND
INTERNATIONAL COURT OF ARBITRATION OF
THE INTERNATIONAL CHAMBER OF
COMMERCE, AN UNINCORPORATED
ASSOCIATION,

                              Respondents.

07 Civ. 10492 (GEL)

ECF Case

**ELECTRONICALLY FILED**

### DECLARATION OF LOUISA B. CHILDS
### IN SUPPORT OF PETITIONER'S MEMORANDUM OF LAW
### IN OPPOSITION TO RESPONDENT'S MOTION TO DISMISS

LOUISA B. CHILDS, declares under penalty of perjury as follows:

1.      I am an attorney and counselor at law, duly licensed to practice in the U.S. District Court for the Southern District of New York.  I am an associate at the law firm of King & Spalding LLP ("King & Spalding"), attorneys for Global Gold Mining, LLC ("Global Gold"), the Petitioner in the above-captioned matter. I submit this declaration in support of Petitioner's Memorandum of Law in Opposition to Respondents' Motion to Dismiss.

2.      Attached as Exhibit 1 is a true and correct copy of Petitioner Global Gold's Notice of Petition, Petition, and accompanying memorandum of law, filed in the Supreme Court of the State of New York, County of New York, on October 29, 2007.

3.      Attached as Exhibit 2 is a true and correct copy of excerpts from the SHA, LLC, Share Purchase Agreement, by and between Global Gold Mining, LLC and the Participants of SHA, LLC, made as of December 21, 2003.

4.      Attached as Exhibit 3 is a true and correct copy of the ICC Rules of Arbitration.

5.      Attached as Exhibit 4 is a true and correct copy of a letter from R. Doak Bishop, Partner of King & Spalding, to the Secretariat of the ICA, dated December 28, 2006, attaching Global Gold's Request for Arbitration.

6.      Attached as Exhibit 5 is a true and correct copy of a letter from Erica Stein, Counsel of the Secretariat of the ICA, to Jonathan D. Schiller and Dr. Ivan Zykin, dated March 12, 2007.

7.      Attached as Exhibit 6 is a true and correct copy of a letter from R. Doak Bishop to the ICA, dated March 27, 2007, re: "Claimant's Request to the ICC Court to Reconsider its Application of Article 6(2) of the ICC Rules to Vardan Ayvazian".

8.      Attached as Exhibit 7 is a true and correct copy of a letter from R. Doak Bishop to Erica Stein, dated April 20, 2007, re: "Claimant's Request to the ICC Court to Reconsider its Application of Article 6(2) of the ICC Rules to Vardan Ayvazian".

9.      Attached as Exhibit 8 is a true and correct copy of a letter from Erica Stein to R. Doak Bishop, et al., dated May 14, 2007.

10.      Attached as Exhibit 9 is a true and correct copy of a letter from Victoria Orlowski, Counsel of the Secretariat of the ICC, to R. Doak Bishop, et al., dated August 6, 2007.

11.      Attached as Exhibit 10 is a true and correct copy of a letter from Victoria Orlowski to Prof. Hans Smit, Jonathan D. Schiller, and Dr. Ivan Zykin, dated August 6, 2007.

12.     Attached as <u>Exhibit 11</u> is a true and correct copy of a letter from Yurik Lalazaryan to the International Chamber of Commerce International Court of Arbitration (the "ICA"), dated March 19, 2007.

13.     Attached as <u>Exhibit 12</u> is a true correct copy of the ICC web page entitled "ICC United States," available at http://www.icwbo.org/id15324/index.html (last visited December 21, 2007).

14.     Attached as <u>Exhibit 13</u> is a true and correct copy of excerpts from Volume 18 of the ICA <u>Bulletin</u> from the year 2007.

15.     Attached as <u>Exhibit 14</u> is a true and correct copy of the ICC web page entitled "Costs of Arbitration," available at  http://www.iccwbo.org/court/arbitration/id4088/index.html (last visited December 21, 2007).

16.     Attached as <u>Exhibit 15</u> is a true and correct copy of the ICC press release entitled "News:  New Court Director for North America," dated September 6, 2006, available at http://www.iccwbo.org/iccifda/index.html (last visited December 21, 2007).

17.     Attached as <u>Exhibit 16</u> is a true and correct copy of the USCIB web page entitled "Staff:  Nancy M. Thevenin", available at http://www.uscib.org/index.asp?documentID=2922 (last visited December 21, 2007).

18.     Attached as <u>Exhibit 17</u> is a true and correct copy of the USCIB web page entitled "Meet the Staff:  Josefa Sicard Mirabal", available at http://www.uscib.org/index.asp?documentID=3544 (last visited December 21, 2007).

19.     Attached as <u>Exhibit 18</u> is a true and correct copy of a letter from Edward G. Kehoe, Partner of King & Spalding LLP, to Guy Sebban, Secretary General of the ICC, and

Jason Fry, Secretary General of the ICC, dated November 1, 2007, attaching copies of Global Gold's Notice of Petition, Petition, and accompanying papers.

20.    Attached as <u>Exhibit 19</u> is a true and correct copy of the ICC web page entitled "What the [ICA] Court Does," available at http://www.iccwbo.org/court/arbitration/id4590/index.html (last visited December 21, 2007).

21.    Attached as <u>Exhibit 20</u> is a true and correct copy of excerpts from the ICC Handbook, available at http://www.iccwbo.org/court/ADR/ (last visited December 21, 2007).

22.    Attached as <u>Exhibit 21</u> is a true and correct copy of the ICC pamphlet regarding the ICC event entitled "The Current State of International Arbitration and a Vision of the Future," available at http://www.iccwbo.org/events/id8684/index.html (last visited December 21, 2007).

23.    Attached as <u>Exhibit 22</u> is a true and correct copy of the ICC web page regarding the ICC event entitled "Current Issues in ICC Arbitration," available at http://www.iccwbo.org/events/display12/index.html?CodeICMS=S0605 (last visited December 21, 2007).

24.    Attached as <u>Exhibit 23</u> is a true and correct copy of the USCIB registration form for the USCIB event entitled "USCIB Luncheon of the Arbitration Committee," available at http://www.uscib.org/index.asp?documentID=1407 (last visited December 21, 2007).

25.     Attached as Exhibit 24 is a true and correct copy of the USCIB web page entitled "Calendar of Events," available at http://www.uscib.org/index.asp?documentID=1944 (last visited December 21, 2007).

26.     Attached as Exhibit 25 is a true and correct copy of the Declaration of John C. McCullough, dated December 21, 2007.

27.     Attached as Exhibit 26 is a true and correct copy of the Amended Complaint, in Richardson v. AAA, et al., 888 F. Supp. 604 (S.D.N.Y. 1995).

28.     Attached as Exhibit 27 is a true and correct copy of the Defendant's Memorandum of Law in Support of Its Motion to Dismiss the Complaint or, in the Alternative, to Stay this Action in Favor of Pending Arbitration, in Masefield v. Colonial Oil Industries, Inc., No. 05 Civ. 2231(PKL), 2005 WL 957344 (S.D.N.Y. Apr. 26, 2005).

29.     Attached as Exhibit 28 is a true and correct copy of the Opinion and Order, in Masefield v. Colonial Oil Industries, Inc., No. 05 Civ. 2231(PKL) (S.D.N.Y. Apr. 18, 2005).

LOUISA B. CHILDS (LC0935)
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2246

# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GLOBAL GOLD MINING, LLC,

                              Petitioner,

          -against-

PETER M. ROBINSON, AS PRESIDENT OF
INTERNATIONAL CHAMBER OF COMMERCE,
AN UNINCORPORATED ASSOCIATION, AND
INTERNATIONAL COURT OF ARBITRATION OF
THE INTERNATIONAL CHAMBER OF
COMMERCE, AN UNINCORPORATED
ASSOCIATION,

                              Respondents.

NOTICE OF PETITION
UNDER N.Y. C.P.L.R.
ARTICLE 75

Index No.:07- *603576*

*Filed 10/29/07*

NEW YORK
COUNTY CLERK'S OFFICE

OCT 29 2007

NOT COMPARED
WITH COPY FILE

## NOTICE OF PETITION UNDER C.P.L.R. ARTICLE 75

PLEASE TAKE NOTICE that upon the annexed Petition Under N.Y. C.P.L.R. Article 75, the Affirmation of Louisa B. Childs, dated October 26, 2007, and all exhibits thereto, and the Memorandum of Law in Support of Petitioner Global Gold Mining, LLC's Petition Under N.Y. C.P.L.R. Article 75, an application will be made to Submission Part, Room 130 at the New York County Courthouse, 60 Centre Street, New York, New York on the 29th day of November, 2007, at 9:30 A.M. of that day, or as soon thereafter as counsel can be heard, for an Order directing the International Chamber of Commerce and the International Court of Arbitration of the International Chamber of Commerce to submit to the tribunal of arbitrators in ICA case number 14 770/EBS the question of its jurisdiction over Vardan Ayvazian, and for

such other and further relief as may be just, proper, and equitable, together with the costs and disbursements of this proceeding.

Venue in New York County is based upon the arbitration agreement among the parties and under Article 6(2) of the ICC Rules of Arbitration.

PLEASE TAKE FURTHER NOTICE that, pursuant to Rule 403(b) of the C.P.L.R., any ANSWERING PAPERS shall be served at least seven days prior to the return date of this Petition.

Dated:    New York, New York
          October 26, 2007

KING & SPALDING LLP

_Edward G. Kehoe_

Edward G. Kehoe
Louisa B. Childs
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile:  (212) 556-2246

R. Doak Bishop
Wade M. Coriell
1100 Louisiana, Suite 4000
Houston, TX 77002-5213
Phone: (713) 751-3200
Fax: (713) 751-3290

Kenneth R. Fleuriet
25 Cannon Street
London EC4M 5SE
United Kingdom
Phone:  +44 (0)20-7551-7500
Fax: +44 (0)20-7551-7575

_Attorneys for Petitioner Global Gold Mining, LLC_

TO:    Peter M. Robinson
       President
       International Chamber of Commerce;
       International Court of Arbitration
       c/o U.S. Council for International Business
       1212 Avenue of the Americas
       New York, New York  10036

_Respondents._

891868

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| GLOBAL GOLD MINING, LLC, | <u>PETITION UNDER N.Y.</u> <u>C.P.L.R. ARTICLE 75</u> |
| Petitioner, | Index No.:07-_____ |
| -against- | |
| PETER M. ROBINSON, AS PRESIDENT OF INTERNATIONAL CHAMBER OF COMMERCE, AN UNINCORPORATED ASSOCIATION, AND INTERNATIONAL COURT OF ARBITRATION OF THE INTERNATIONAL CHAMBER OF COMMERCE, AN UNINCORPORATED ASSOCIATION, | |
| Respondents. | |

Petitioner Global Gold Mining, LLC, ("Global Gold"), by and through its attorneys, King & Spalding LLP, for its petition pursuant to CPLR §§ 7502(a) and 7503(a) against respondents, International Chamber of Commerce (the "ICC") and International Court of Arbitration of the International Chamber of Commerce (the "ICA"), an administrative arm of the ICC, states as follows:

## <u>INTRODUCTION</u>

1.     In this case, the International Chamber of Commerce ("ICC") and its affiliate the International Court of Arbitration ("ICA") have violated New York law, the Federal Arbitration Act ("FAA"), and the ICC's own Rules by seeking to expand the scope of their authority into matters that are within the jurisdictional domain of the arbitration tribunal. Specifically, the ICC and ICA improperly have made a determination that an arbitration will not proceed against one of four respondents named in an arbitration action properly commenced by Petitioner Global

Gold Mining, LLC. But issues concerning the jurisdiction of the arbitration tribunal are to be decided by the arbitration tribunal, not the administrative organizations selected by the parties to assist with organizational aspects of administering the arbitration.

2.    In December 2003, Petitioner Global Gold Mining, LLC, executed an agreement to purchase all of the shares of an Armenian company, SHA, LLC (the "Company") from what Global Gold believed to be the three sole shareholders who signed the agreement (either in person or by power of attorney). Unknown to Global Gold at the time, a fourth owner, Vardan Ayvazian, who did not sign the agreement, directed the actions of the others. After the closing, Global Gold discovered that most of the various representations and warranties in the agreement were false and were breached, causing substantial losses to Global Gold.

3.    The sale agreement contained an arbitration clause providing that disputes under the agreement would be settled by a tribunal of three arbitrators under the Rules of the ICC. Under Article 6(2) of these ICC Rules, the ICA makes an initial determination as to whether an arbitration agreement exists. Once an agreement to arbitrate is found to exist, the matter is submitted to arbitration, and the tribunal of three arbitrators selected pursuant to the agreement of the parties decides all matters relating to the arbitration tribunal's own jurisdiction.

4.    In December 2006, Global Gold properly commenced an arbitration against Ayvazian and the three other shareholders by filing a Request for Arbitration with the ICC/ICA. The ICC/ICA reviewed the language of the SPA and correctly concluded that disputes relating to the SPA shall be resolved by arbitration. However, the ICA improperly dismissed Global Gold's claim against the non-signatory, Ayvazian. Under settled New York law of agency and equitable estoppel, Ayvazian is bound by the arbitration clause just as the signatories are bound. But the ICC/ICA improperly refuses to submit that important, substantive question to the arbitrators.

2

Rather, the ICC/ICA has unilaterally dismissed the case against Ayvazian prior to transmitting the case file to the Arbitration Tribunal. The ICC/ICA has no right to make this determination under the governing agreement, applicable law, or even the ICC's own rules. The ICA's decision is particularly unusual because one of the other respondent shareholders submitted an answer in the arbitration to the ICA expressly confirming and admitting that Ayvazian is an "undisclosed to Global Gold shareholder." (See Childs Aff.[1], Ex. A, at 1.) The questions of arbitrability and jurisdiction are to be resolved by the arbitrational tribunal, not the ICC/ICA.

5.      Global Gold respectfully seeks an order from the Court directing the ICC/ICA to submit to the arbitration tribunal (which is already convened) the question of whether Ayvazian, the non-signatory principal, is bound by the written agreement to arbitrate.

## THE PARTIES

6.      Petitioner Global Gold is a limited liability corporation organized under the laws of Delaware with its principal place of business in Greenwich, Connecticut.

7.      Upon information and belief, respondent ICC is a non-profit unincorporated association with its principal place of business in Paris, France, and offices throughout the world, including New York. Upon information and belief, at the time of the commencement of the action, Peter M. Robinson was the United States President thereof.

8.      Upon information and belief, respondent ICA is the administrative body attached to the ICC with its principal place of business in Paris, France, and offices throughout the world, including New York. Upon information and belief, at the time of the commencement of the action, Peter M. Robinson was the United States President of the ICC, which oversees the ICA.

---

[1] "Childs Aff." refers to the Affirmation of Louisa B. Childs, dated October 26, 2007, filed simultaneously with this Petition.

3

## JURISDICTION AND VENUE

9.      Jurisdiction over respondents ICC/ICA is predicated upon CPLR §§ 301 and 302, as well as consent.  By agreeing to administer an arbitration in New York, the ICC/ICA have likewise agreed to submit to the jurisdiction of New York Courts for disputes arising from their conduct in administering that arbitration.

10.      Venue is proper in New York County pursuant to CPLR § 7502(a) because the arbitration clause in the SPA specifies New York County as the place of arbitration.

11.      Jurisdiction and venue are also proper under Article 6(2) of the ICC Rules of Arbitration, which states that where the ICA makes a *prima facie* determination that an arbitration may not proceed, "any party retains the right to ask any court having jurisdiction whether or not there is a binding arbitration agreement."

## FACTUAL BACKGROUND

A.      The Share Purchase Agreement and Ayvazian's Involvement

12.      Global Gold is an American company that invests in Armenia's gold-mining industry.  In the spring of 2003, Global Gold entered into negotiations with the "Company" for the purpose of acquiring its Armenian mining properties.  On December 21, 2003, Global Gold concluded and executed a Share Purchase Agreement ("SPA") with Mayren Batoyan, Edward Janibekian, and Yurik Lalazaryan, all citizens and residents of Armenia, pursuant to which Global Gold purchased all of the issued and outstanding shares of the Company.  (See Childs Aff., Ex. B).  At that time, Global Gold believed that Lalazaryan, Janibekian, and Batoyan were the sole owners of the Company.  The SPA was signed by Lalazaryan on behalf of himself, and, by power of attorney, his two fellow shareholders.  (See Childs Aff., Ex. B, at 103-04).

4

a.   Ayvazian, the Undisclosed Principle,
Negotiates, Approves, And Profits From The SPA

13.   After the SPA was fully executed, and Global Gold had made payment, Global Gold learned from law enforcement personnel that Respondent Ayvazian, who at the time was Armenia's Minister of the Environment,[2] was a secret participant and beneficial owner in the Company when the SPA was signed.  In a March 19, 2007 response to Global Gold's Request for Arbitration, Respondent Lalazaryan confirms this fact by stating, ". . . I am not responsible for such violations made by other shareholders, including the undisclosed to Global Gold shareholder Vardan Ayvazian." (See Childs Aff., Ex. A at 1 (Yurik Lalazaryan's Submission to the ICA)).

14.   Further research by Global Gold has revealed that Ayvazian completely controlled the transaction on the seller's side.   Specifically, Batoyan, Janibekian, and Lalazaryan negotiated the terms of the SPA on the basis of explicit instructions from Ayvazian, and every term in both the preliminary agreement and the SPA was approved by Ayvazian before the agreement was signed. (See Childs Aff., Ex. C, at 7-8; Ex. A, at 1).  Moreover, after Global Gold paid Batoyan, Janibekian, and Lalazaryan for their shares, Ayvazian collected the entire purchase price and distributed the funds to the other sellers while keeping a share for himself. (See Childs Aff., Ex. C, at 7; Ex. A, at 1)  Notably, Ayvazian personally approved and agreed to the SPA's clause providing for ICC arbitration as well as the selection of New York law as the governing law of the SPA. (See Childs Aff., Ex. C, at 8; Ex. A, at 1).

15.   Armenia's preeminent association of investigative journalists, called hetq, has noted in an article entitled "Vardan Ayvazian has a Special Fondness for Goldmines," that Ayvazian has "has registered the majority of his mines in the names of his relatives, friends and

---

[2] Ayvazian has since resigned from his government post.

employees." (See Childs Aff., Ex. D, at 1). Respondent Batoyan has acted as a "representative" for Ayvazian in other gold mine matters. The article describes Batoyan as a "friend and fellow villager of Vardan Ayvazian's wife" who has "also acted as Ayvazian's representative in other organizations . . . [although] Mayren Batoyan has no relation to mining and works at the Yerevan hospital." (See id.) hetq's descriptions of Batoyan, her relationship with the Ayvazians, and her role as Ayvazian's agent in establishing another mining company for Ayvazian strongly support Global Gold's portrayal of the principal-agent relationship between Ayvazian and his fellow shareholders Batoyan, Janibekian, and Lalazaryan.

     b.    Seller Representations and Warranties in the SPA

16.    When Global Gold purchased all shares in the Company, it negotiated certain contractual promises from the former shareholders that would serve to protect the Company's assets and value as an ongoing business. The Company's mining activities depended significantly on the cooperation of Armenian government officials in issuing and respecting licenses, providing certain authorizations for work to be performed, handling official paperwork in a timely fashion, and generally cooperating with the Company in its exploration and mining activities. As a foreign investor, Global Gold sought to protect itself in the event that the Company's Armenian shareholders misrepresented the true value of the Company as an ongoing business, or cooperated illicitly with government officials like Ayvazian to ensure that the Company's shares, once owned by Global Gold, would have little or no real value. While Global Gold was entirely unaware of Ayvazian's status as an undisclosed shareholder when the SPA was signed, it was careful to secure commitments from the selling shareholders that, to the best of their knowledge, the Company's licenses, governmental authorizations, and other approvals were in order and as represented.

6

17.     Specifically, the former shareholders were responsible for full disclosure about the value of the Company's assets and business, the status of any Governmental Authorizations and Legal Requirements applicable at the time of the SPA or potentially applicable in the future, and any actual and potential limitations or restrictions on the Company's assets or business. (See Childs Aff., Ex. B §§ 3, 10). Moreover, the former shareholders promised that the Company was in full compliance with all laws and regulations and that no family members or any other individuals indirectly controlled by the former shareholders were involved in the negotiation of the SPA or in any businesses that competed or might ultimately compete with the Company. (See Childs Aff., Ex. B §§ 3.17, 3.19, 3.25). In sum, the former shareholders made multiple warranties as to the status and ownership of the Company as well as the legal and business environment into which Global Gold was entering by purchasing shares in the Company.

18.     But shortly after the SPA was executed, Global Gold began to realize that the former shareholders were guilty of egregious misrepresentations and omissions. Virtually every representation in the SPA was false, and almost every warranty was breached. For example, although the Sellers had represented and warranted that the Company's exploration licenses extended through 2017, Ayvazian, acting in his capacity as Minister of the Environment, arbitrarily reduced the terms of those licenses at the first available opportunity. (See Childs Aff., Ex. C, at 14; Ex. A, at 1). Although the Sellers had represented and warranted that the Company was in compliance with all Legal Requirements, and that its Governmental Authorizations were valid and in order, Ayvazian decided otherwise in his capacity as Minister of the Environment. Ayvazian justified his attacks on the Company's licenses and license applications based on the Company's alleged non-compliance with the necessary laws and regulations. (See id.). In sum, having made a series of representations to Global Gold about the Company, its licenses, and its

7

legal status, Ayvazian contradicted and reneged on those representations and warranties shortly after the execution of the SPA. .

**B.**     **The Agreement to Arbitrate and the Administrative Role of the ICC**

19.     The SPA contains an arbitration clause (the "Arbitration Clause"), providing that all disputes under the agreement will be referred for final settlement to a panel of three arbitrators under the ICC's Rules of Conciliation and Arbitration, in New York, under New York law. The Arbitration Clause provides:

> **11.5     Arbitration; Jurisdiction; Service of Process**
> The parties acknowledge that they are entering into and shall perform under this Agreement in good faith, and any disputes will be resolved in good faith, with the letter and spirit of this Agreement as the standard. The Parties will use their best efforts to resolve any disputes between themselves within thirty (30) days. During this thirty (30) day period, any party within ten (10) days' notice may request and the other party must agree to meet in good faith to resolve the dispute. After thirty day's [sic] effort, if a dispute is not resolved, any party may refer the dispute for final settlement to and in accord with under the Rules of Conciliation and Arbitration of the International Chamber of Commerce, London, England (the "Rules") by a panel of three (3) arbitrators.
>
> In the case of any matter to be settled under the Rules, each party hereto shall appoint one arbitrator and such two arbitrators shall appoint a third arbitrators; provided, that if all three arbitrators have not been appointed within thirty (30) days after the party submitting the matter in dispute has notified the other party of such submission, either party hereto may apply to the International Chamber of Commerce for appointment of the remaining arbitrators. The place of arbitration of any matter to be settled under the Rules shall be in New York City, or at such other place as the parties shall unanimously choose. On a case-by-case basis, the parties may also agree to alternative dispute resolution methods. Such an Agreement must be in writing and signed by both parties.

(See Childs Aff., Ex. B § 11.5. See also SPA § 11.6 (providing that the agreement is governed by New York law)).

8

20.    The ICC is an association that provides a forum for international business issues and offers various administrative services in connection with dispute resolution.[3] (See Childs Aff., Ex. E (ICC's website describing "What is ICC?", http://www.iccwbo.org/id93/index.html)). Under the ICC's Rules of Arbitration ("ICC Rules"), the ICC organizes the administrative aspects of the arbitration and assists in connection with certain procedural issues. The ICC's administrative responsibilities include facilitating the appointment of arbitrators, collecting fees and reimbursement of expenses for arbitrators, and advising the parties and arbitrators of relevant procedures and timetables established by the Panel of Arbitrators. (See Childs Aff., Ex. F (ICC Rules, Arts. 4, 8, 9, 13, 30, 31)).

21.    A subgroup of the ICC, called the International Court of Arbitration (the "ICA"), handles these administrative tasks on behalf of the ICC. (See id. (ICC Rules, Art. 1(1)). Although the ICA subgroup has the word "Court" in its name, the ICA does not itself adjudicate disputes. Substantive and jurisdictional determinations are made by the independent arbitrators who apply relevant state or national law. (See Childs Aff., Ex. G (ICC's website describing "What the [ICA] Court Does," http://www.iccwbo.org/court/arbitration/id4590/index.html ("The Court organizes and supervises your arbitration and helps in overcoming obstacles. It does not itself resolve disputes, a task that is carried out by independent arbitrators. The Court makes every effort to ensure that the award is enforceable in national courts if need be, although in practice the parties usually comply.")).

---

[3] Arbitration can be institutional or *ad hoc*. Institutional arbitration is conducted under the auspices of an arbitral institution and occurs when the parties agree to apply the rules of that institution. The ICC, the American Arbitration Association (AAA), and the London Court of International Arbitration (LCIA) are the three preeminent arbitration institutions. These organizations do not resolve disputes. They provide administrative support for the arbitration. An *ad hoc* arbitration is one conducted by arbitrators without administrative support from an institutional body.

## C.    Procedural History

22.    On November 2, 2006, Global Gold sent a "Notice of Dispute" to Respondents Ayvazian, Batoyan, Janibekian, and Lalazaryan advising them of a dispute under the SPA (the "Dispute"), as required by the Arbitration Clause (See Childs Aff., Ex. I).  The Respondents did not attempt to resolve the Dispute in good faith within the thirty-day period provided by the Arbitration Clause.  Thus, on December 28, 2006, Global Gold exercised its right under the SPA to arbitrate the Dispute.

23.    In accordance with the ICC Rules, Global Gold submitted a "Request for Arbitration" to the Secretariat of the ICA and named Ayvazian, Batoyan, Janibekian, and Lalazaryan as respondents.  Global Gold also submitted to the ICA a check for $2,500.00 as an advance payment on administrative expenses, and named Jonathan D. Schiller of the law firm Boies, Schiller, and Flexner LLP, as its party appointed arbitrator.[4]  (See Childs Aff., Ex. C, at 6).  The Secretariat of the ICC/ICA then notified Global Gold and the four Respondents that the ICC/ICA was in receipt of the Request for Arbitration and the date of the receipt, and served them with the Request.  (See Childs Aff., Ex. F (ICC Rules, Arts. 4(1),(5)).

24.    On March 12, 2007, the ICC/ICA sent a letter to the parties stating that it had "[d]ecided in accordance with Article 6(2) of the Rules" that arbitration of the Dispute should proceed only against Batoyan, Janibekian, and Lalazaryan, and not against Ayvazian, the non-signatory owner and principal.  (See Childs Aff., Ex. J, at 1).

---

[4] Jonathan D. Schiller is a co-founder and the Managing Partner of Boies, Schiller, and Flexner LLP.  He concentrates on complex litigation and international arbitration, including ICC arbitrations.  Mr. Schiller also serves as an arbitrator in ICC and other arbitrations.  (See Childs Aff., Ex. H (Boies, Schiller, and Flexner LLP's website entitled, "Jonathan D. Schiller," http://www.bsfllp.com/lawyers/data/0002)).

25.     By its terms, Article 6(2) of the ICC Rules directs the ICC/ICA to make an administrative observation and determination as to whether or not an arbitration agreement exists. If an agreement exists, the arbitration goes forward, and the arbitration tribunal decides the merits of the case with the ICC supplying administrative support. Article 6(2) of the ICC's Rules does not permit the ICC/ICA to make preliminary rulings on arbitrability and jurisdiction. Instead, Article 6(2) expressly states that such rulings shall be within the province of the arbitral tribunal itself ("[t]he [ICA] may decide…that the arbitration shall proceed if it is *prima facie* satisfied that an arbitration agreement under the Rules may exist. In such case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself." (See Childs Aff., Ex. F (ICC Rules Art. 6(2)).

26.     The March 12, 2007 letter from the ICC/ICA also confirmed Global Gold's appointment of Jonathan Schiller as arbitrator, and the ICC/ICA directly appointed a second arbitrator, Dr. Ivan Zykin, on behalf of the remaining three respondents because respondents' time to do so had expired.[5] (See Childs Aff., Ex. J, at 1). The ICC/ICA noted that Arbitrators Zykin and Schiller should jointly nominate the Chairman of the Arbitral Tribunal within 30 days. (See id.)

27.     On March 19, 2007, respondent Lalazaryan submitted a response to the Request for Arbitration. Lalazaryan admitted that Ayvazian was an "undisclosed . . . shareholder." (See Childs Aff., Ex. A, at 1).

---

[5] Dr. Zykin currently is a partner of Andrey Gorodissky & Partners, one of Russia's preeminent law firms, where he chairs the international arbitration practice group. He also serves as the Vice President of the International Commercial Arbitration Court at the RF Chamber of Commerce and Industry (ICAC). Dr. Zykin has served as an arbitrator in more than one hundred and fifty cases, including arbitrations under the ICC Rules. (See Childs Aff., Ex. K (Andrew Gorodissky & Partners' website entitled, "Ivan S. Zykin," http://www.agp.org.ru/english/lawyers/zykin.html)).

28.    On March 27, 2007, eight days after Lalazaryan filed his response, Global Gold requested that the ICC/ICA reconsider its decision to dismiss Respondent Ayvazian from the case.[6] (See Childs Aff., Ex. L). But the ICC/ICA refused. (See Childs Aff., Ex. N, at 2).

29.    On May 14, 2007, the ICC/ICA instructed the parties to proceed to arbitration without Ayvazian and advised that it had taken the necessary steps under the ICC Rules to appoint a chairman of the Tribunal. (See Childs Aff., Ex. N, at 2). The ICC/ICA took these steps because Mr. Schiller, the arbitrator nominated by Global Gold, and Dr. Zykin, the arbitrator nominated by the ICC/ICA on behalf of the respondents, had not agreed on the appointment of a chairman within the allotted time period. (See Childs Aff., Ex. I (ICC Rules Article 8(4))). The ICC/ICA also informed the parties that, in accordance with ICC Rules Article 13, it would transfer the case file to the Arbitral Tribunal once the Tribunal was fully convened. (See Childs Aff., Ex. N, at 2).

30.    In July 2007, the ICC/ICA denied a further request by Global Gold to reconsider its decision to dismiss Ayvazian from the case. ((See Childs Aff., Ex. O). By letter dated August 6, 2007, the ICC/ICA informed the parties that it had appointed Professor Hans Smit as Chairman of the Arbitral Tribunal upon the proposal of the Dutch National Committee of the

---

[6] Global Gold supplemented its request for reconsideration to the ICC/ICA on April 20, 2007, with additional evidence that Ayvazian commonly uses Batoyan as an agent to conduct business related to Armenia's mines. (See Childs Aff., Ex. M). Global Gold included a series of articles by Armenia's leading association of investigative journalists, hetq, exposing Ayvazian's acquisition of mineral holdings throughout the country. (See id.). Hetq has used public records to identify the shareholders of a number of companies owned by Ayvazian, his family, and his close associates. (See id.). The articles describe Ayvazian's use of close associates as agents. In particular, the article entitled "Vardan Ayvazian Has a Special Fondness for Goldmines" notes Ayvazian's use of Batoyan -- a "friend and fellow villager of . . . Ayvazian's wife" who has "also acted as Ayvazian's representative in other organizations" -- to establish a company called Grade Redmet Ltd. (See id.).

12

ICC.[7] The ICC/ICA directed the parties to correspond directly with the Arbitral Tribunal. (See Childs Aff., Ex. O, at 2). In compliance with Article 30 of the ICC Rules, the ICC/ICA also fixed advance costs at $280,000 to be divided and paid equally between Global Gold and the Respondents. (See id.). These advance costs are meant to cover the fees and expenses of the arbitrators and the ICC administrative costs. (See Childs Aff., Ex. F (ICC Rules Art. 30(2).).

31.     On August 6, 2007, the ICC/ICA transmitted the case file to the fully convened Arbitral Tribunal. (See Childs Aff., Ex. Q at 1). It informed the Tribunal that the place of arbitration would be New York, New York, according to the agreement of the parties. (See id. at 3). Importantly, in its August 6, 2007 letter, the ICC/ICA addressed its administrative finding as to arbitrability. It noted that on March 9, 2007, "being prima facie satisfied that an arbitration agreement under the Rules may exist, [the ICA] decided that this arbitration would proceed [against Batoyan, Janibekian, and Lalazaryan.] This decision being administrative in nature, the Arbitral Tribunal must still decide on its own jurisdiction in accordance with Article 6(2) of the Rules." (See id. at 5). But the Arbitration Tribunal can *not* decide whether it has jurisdiction over non-signatory Ayvazian, *because the ICA improperly dismissed Ayvazian from the case prior to transmitting the case to the Arbitration Tribunal.*

32.     On October 19, 2007, the ICC/ICA wrote to Global Gold and confirmed that it had received Global Gold's advance costs of $140,000. (See Childs Aff. Ex. R, at 1-2).

33.     Today, the Arbitral Tribunal is poised to adjudicate Global Gold's claims against Batoyan, Janibekian, and Lalazaryan.

---

[7] Hans Smit is the Stanley H. Fuld Professor of Law at Columbia Law School, where he teaches civil procedure, international arbitration, international law and transactions, and conflict of laws. Mr. Smit writes extensively in the area of international arbitration, and he has been knighted by the Queen of the Netherlands (Order of Netherlands Lion). (See Childs Aff., Ex. P (Columbia Law School's website entitled, "Hans Smit," http://www.law.columbia.edu/fac/Hans_Smit)).

34.     Global Gold files this petition pursuant to New York's CPLR, and Article 6(2) of the ICC Rules, which expressly provides that a party retains the right to seek court intervention concerning the ICC/ICA's *prima facie* decision under Article 6(2).

## FIRST CAUSE OF ACTION
### (Declaratory Judgment Requiring the ICC/ICA to Submit the Issue of Arbitrability to the Arbitrators)

35.     Global Gold repeats and realleges each and every allegation contained in paragraphs 1 through 34 of this Petition as though fully set forth herein.

36.     In this case, an agreement to arbitrate exists.

37.     Under Article 6(2) of the ICC Rules, when a *prima facie* arbitration agreement exists, the arbitration tribunal shall decide all issues concerning jurisdiction and enforceability of the arbitration agreement (*i.e.*, arbitrability).

38.     This is consistent with governing federal and New York state law.

39.     By making the determination as to the Arbitration Tribunal's jurisdiction over Ayvazian, and refusing to submit the jurisdictional issue to the Arbitration Tribunal, the ICC/ICA has violated New York law, the FAA and the ICC's Rules.

40.     And, by any measure, Global Gold's Request for Arbitration made a *"prima facie"* demonstration that Ayvazian is subject to the Arbitration Clause in the SPA. Since Ayvazian controlled and orchestrated the entire transaction culminating in the execution of the SPA and personally approved each provision in the SPA (including the Arbitration Clause), Ayvazian is subject to the SPA's arbitration provision under a legal theory of agency.

41.     Because Ayvazian received the direct benefit of the SPA -- his share of the purchase price -- Ayvazian is also subject to the SPA's Arbitration Clause under the theory of equitable estoppel.

14

42.     Global Gold is entitled, under Article 6(2) of the ICC Rules, to have the question of whether Ayvazian is subject to the SPA's Arbitration Clause decided by the Arbitration Tribunal appointed to hear the case.

43.     Global Gold and the ICC/ICA dispute whether the Arbitration Clause is valid and binding between the real parties, and whether the arbitrability of the dispute should be referred to arbitrators to decide.

44.     By reasons of the foregoing, an actual controversy exists between Global Gold and the ICC/ICA with respect to the Global Gold's rights pursuant to the Arbitration Clause of the SPA, New York law, and federal law.

## RELIEF REQUESTED

WHEREFORE, petitioner Global Gold demands:

(i)     on the First Cause of Action, an Order directing the ICC/ICA to submit to the tribunal of arbitrators in ICA case number 14 770/EBS the question of its jurisdiction over respondent Ayvazian;

(ii)    attorneys' fees, costs and other expenses associated with bringing this Petition; and

(iii)   such other and further relief as this Court deems just and proper.

15

Dated: New York, New York
       October 26, 2007

KING & SPALDING LLP

*Edward G. Kehoe*

Edward G. Kehoe
Louisa B. Childs
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile:  (212) 556-2246

R. Doak Bishop
Wade M. Coriell
1100 Louisiana, Suite 4000
Houston, TX 77002-5213
Phone: (713) 751-3200
Fax: (713) 751-3290

Kenneth R. Fleuriet
25 Cannon Street
London EC4M 5SE
United Kingdom
Phone:  +44 (0)20-7551-7500
Fax:  +44 (0)20-7551-7575

*Attorneys for Petitioner Global Gold Mining, LLC*

596

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GLOBAL GOLD MINING, LLC,

                              Petitioner,

              -against-

PETER M. ROBINSON, AS PRESIDENT OF
INTERNATIONAL CHAMBER OF COMMERCE,
AN UNINCORPORATED ASSOCIATION, AND
INTERNATIONAL COURT OF ARBITRATION OF
THE INTERNATIONAL CHAMBER OF
COMMERCE, AN UNINCORPORATED
ASSOCIATION,

                              Respondents.

Index No.: 07-_603 576_

Filed 10/29/07

NEW YORK
COUNTY CLERK'S OFFICE

OCT 29 2007

NOT COMPARED
WITH COPY FILE

**MEMORANDUM OF LAW OF PETITIONER GLOBAL GOLD MINING, LLC
IN SUPPORT OF ITS PETITION UNDER N.Y. C.P.L.R. ARTICLE 75**

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile:  (212) 556-2246

*Attorneys for Petitioner
Global Gold Mining, LLC*

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ............................................................................... 1

II.  STATEMENT OF FACTS ..................................................................................... 2

   A.   The Share Purchase Agreement and Ayvazian's Involvement.......................... 2

   B.   The Agreement to Arbitrate and the Administrative Role of the ICC ............... 6

   C.   Procedural History ...................................................................................... 8

III. ARGUMENT ..................................................................................................... 12

   A.   Questions of the Arbitrators' Jurisdiction Should be Decided by the Arbitration Tribunal,
        Not by the ICA............................................................................................ 12

   B.   Even if the ICA May Decide Issues of Arbitrability and Jurisdiction (which it may not),
        Global Gold has satisfied the ICA's Standards.............................................. 16

CONCLUSION........................................................................................................ 20

i

# TABLE OF AUTHORITIES

CASES

Allied-Bruce Terminix Cos. v. Dobson,
    513 U.S. 265 (1995)..............................................................................................16

Am. Bureau of Shipping v. Tencara Shipyard S.P.A.,
    170 F.3d 349 (2d Cir. 1999)...........................................................................20, 22, 23

Apollo Computer, Inc. v. Berg,
    886 F.2d 469 (1st Cir. 1989)...........................................................................17-18

Burbank Broad. Co. v. Roslin Radio Sales, Inc.,
    99 A.D.2d 976 (1st Dep't 1984) .........................................................................22

In re Chas. A. Stevens Co.,
    79 A.D.2d 545 (1st Dep't 1980) .........................................................................22

Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.,
    347 F.3d 448 (2d Cir. 2003)...............................................................................22

Daiei, Inc. v. U.S. Shoe Corp.,
    755 F. Supp. 299 (D. Haw. 1991) .......................................................................17

Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.,
    9 F.3d 1060 (2d Cir. 1993).................................................................................22

HRH Constr. LLC v. Metro. Transp. Auth.,
    33 A.D.3d 568 (1st Dep't 2006) .........................................................................23

J.P. Endeavors v. Dushaj,
    8 A.D.3d 440 (2d Dep't 2004) ...........................................................................22

Shaw Group Inc. v. Triplefine Int'l Corp,
    322 F.3d 115 (2d Cir. 2003)..........................................................................16, 17

Smith Barney Shearson Inc. v. Sacharow,
    91 N.Y.2d 39 (N.Y. 1997) ............................................................................16, 17


STATUTES

9 U.S.C § § 1, 2 (1999) ................................................................................................16

## ICC Rules of Arbitration

Article 4 ............................................................................................................................... 11

Article 4(1), (5) ..................................................................................................................... 12

Article 6(2) ...................................................................................................................... passim

Article 8(4) ...................................................................................................................... 11, 14

Article 9 ............................................................................................................................... 11

Article 13 .............................................................................................................................. 11

Article 30 .............................................................................................................................. 11

Article 30(2) .......................................................................................................................... 11

Article 31 .............................................................................................................................. 11

## Other Authorities

Yves Derains & Eric A. Schwartz, A Guide to the New ICC Rules of Arbitration (Kluwer
     Law International 1998) ............................................................................................ 20, 2

# I.    PRELIMINARY STATEMENT

In this case, the International Chamber of Commerce ("ICC") and its affiliate the International Court of Arbitration ("ICA") have violated New York law, the Federal Arbitration Act ("FAA"), and the ICC's own Rules by seeking to expand the scope of their authority into matters that are within the jurisdictional domain of the arbitration tribunal. Specifically, the ICC and ICA improperly have made a determination that an arbitration will not proceed against one of four respondents named in an arbitration action properly commenced by Petitioner Global Gold Mining, LLC. But issues concerning the jurisdiction of the arbitration tribunal are to be decided by the arbitration tribunal, not the administrative organizations selected by the parties to assist with organizational aspects of administering the arbitration.

In December 2003, Petitioner Global Gold Mining, LLC, executed an agreement to purchase all of the shares of an Armenian company, SHA, LLC (the "Company") from what Global Gold believed to be the three sole shareholders who signed the agreement (either in person or by power of attorney). Unknown to Global Gold at the time, a fourth owner, Vardan Ayvazian, who did not sign the agreement, directed the actions of the others. After the closing, Global Gold discovered that most of the various representations and warranties in the agreement were false and were breached, causing substantial losses to Global Gold.

The sale agreement contained an arbitration clause providing that disputes under the agreement would be settled by a tribunal of three arbitrators under the Rules of the ICC. Under Article 6(2) of these ICC Rules, the ICA makes an initial determination as to whether an arbitration agreement exists. Once an agreement to arbitrate is found to exist, the matter is submitted to arbitration, and the tribunal of three arbitrators selected pursuant to the agreement of the parties decides all matters relating to the arbitration tribunal's own jurisdiction.

1

In December 2006, Global Gold properly commenced an arbitration against Ayvazian and the three other shareholders by filing a Request for Arbitration with the ICC/ICA. The ICC/ICA reviewed the language of the SPA and correctly concluded that disputes relating to the SPA shall be resolved by arbitration. However, the ICA improperly dismissed Global Gold's claim against the non-signatory, Ayvazian. Under settled New York law of agency and equitable estoppel, Ayvazian is bound by the arbitration clause just as the signatories are bound. But the ICC/ICA improperly refuses to submit that important, substantive question to the arbitrators. Rather, the ICC/ICA has unilaterally dismissed the case against Ayvazian prior to transmitting the case file to the Arbitration Tribunal. The ICC/ICA has no right to make this determination under the governing agreement, applicable law, or even the ICC's own rules. The ICA's decision is particularly unusual because one of the other respondent shareholders submitted an answer in the arbitration to the ICA expressly confirming and admitting that Ayvazian is an "undisclosed to Global Gold shareholder." (See Childs Aff.[1], Ex. A, at 1.) The questions of arbitrability and jurisdiction are to be resolved by the arbitrational tribunal, not the ICC/ICA.

Global Gold respectfully seeks an order from the Court directing the ICC/ICA to submit to the arbitration tribunal (which already is convened) the question of whether Ayvazian, the non-signatory principal, is bound by the written agreement to arbitrate.

## II.     STATEMENT OF FACTS

### A.     The Share Purchase Agreement and Ayvazian's Involvement

Global Gold is an American company that invests in Armenia's gold-mining industry. In the spring of 2003, Global Gold entered into negotiations with the "Company" for the purpose of acquiring its Armenian mining properties. On December 21, 2003, Global Gold concluded and

---

[1] "Childs Aff." refers to the Affirmation of Louisa B. Childs, dated October 26, 2007, filed in support of Global Gold's Petition Under N.Y. C.P.L.R. 75.

executed a Share Purchase Agreement ("SPA") with Mayren Batoyan, Edward Janibekian, and Yurik Lalazaryan, all citizens and residents of Armenia, pursuant to which Global Gold purchased all of the issued and outstanding shares of the Company. (See Childs Aff., Ex. B). At that time, Global Gold believed that Lalazaryan, Janibekian, and Batoyan were the sole owners of the Company. The SPA was signed by Lalazaryan on behalf of himself, and, by power of attorney, his two fellow shareholders. (See Childs Aff., Ex. B, at 103-04).

1.    Ayvazian, the Undisclosed Principle,
      Negotiates, Approves, And Profits From The SPA

After the SPA was fully executed, and Global Gold had made payment, Global Gold learned from law enforcement personnel that Respondent Ayvazian, who at the time was Armenia's Minister of the Environment,[2] was a secret participant and beneficial owner in the Company when the SPA was signed. In a March 19, 2007 response to Global Gold's Request for Arbitration, Respondent Lalazaryan confirms this fact by stating, ". . . I am not responsible for such violations made by other shareholders, including the undisclosed to Global Gold shareholder Vardan Ayvazian." (See Childs Aff., Ex. A at 1 (Yurik Lalazaryan's Submission to the ICA)).

Further research by Global Gold has revealed that Ayvazian completely controlled the transaction on the seller's side. Specifically, Batoyan, Janibekian, and Lalazaryan negotiated the terms of the SPA on the basis of explicit instructions from Ayvazian, and every term in both the preliminary agreement and the SPA was approved by Ayvazian before the agreement was signed. (See Childs Aff., Ex. C, at 7-8; Ex. A, at 1). Moreover, after Global Gold paid Batoyan, Janibekian, and Lalazaryan for their shares, Ayvazian collected the entire purchase price and distributed the funds to the other sellers while keeping a share for himself. (See Childs Aff., Ex.

---

[2]  Ayvazian has since resigned from his government post.

C, at 7; Ex. A, at 1)  Notably, Ayvazian personally approved and agreed to the SPA's clause providing for ICC arbitration as well as the selection of New York law as the governing law of the SPA. (See Childs Aff., Ex. C, at 8; Ex. A, at 1).

Armenia's preeminent association of investigative journalists, called hetq, has noted in an article entitled "Vardan Ayvazian has a Special Fondness for Goldmines," that Ayvazian has "has registered the majority of his mines in the names of his relatives, friends and employees." (See Childs Aff., Ex. D, at 1). Respondent Batoyan has acted as a "representative" for Ayvazian in other gold mine matters.  The article describes Batoyan as a "friend and fellow villager of Vardan Ayvazian's wife" who has "also acted as Ayvazian's representative in other organizations . . . [although] Mayren Batoyan has no relation to mining and works at the Yerevan hospital."  (See id.)  hetq's descriptions of Batoyan, her relationship with the Ayvazians, and her role as Ayvazian's agent in establishing another mining company for Ayvazian strongly support Global Gold's portrayal of the principal-agent relationship between Ayvazian and his fellow shareholders Batoyan, Janibekian, and Lalazaryan.

2.    Seller Representations and Warranties in the SPA

When Global Gold purchased all shares in the Company, it negotiated certain contractual promises from the former shareholders that would serve to protect the Company's assets and value as an ongoing business.  The Company's mining activities depended significantly on the cooperation of Armenian government officials in issuing and respecting licenses, providing certain authorizations for work to be performed, handling official paperwork in a timely fashion, and generally cooperating with the Company in its exploration and mining activities.  As a foreign investor, Global Gold sought to protect itself in the event that the Company's Armenian shareholders misrepresented the true value of the Company as an ongoing business, or cooperated illicitly with government officials like Ayvazian to ensure that the Company's shares,

4

once owned by Global Gold, would have little or no real value. While Global Gold was entirely unaware of Ayvazian's status as an undisclosed shareholder when the SPA was signed, it was careful to secure commitments from the selling shareholders that, to the best of their knowledge, the Company's licenses, governmental authorizations, and other approvals were in order and as represented.

Specifically, the former shareholders were responsible for full disclosure about the value of the Company's assets and business, the status of any Governmental Authorizations and Legal Requirements applicable at the time of the SPA or potentially applicable in the future, and any actual and potential limitations or restrictions on the Company's assets or business. (See Childs Aff., Ex. B §§ 3, 10). Moreover, the former shareholders promised that the Company was in full compliance with all laws and regulations and that no family members or any other individuals indirectly controlled by the former shareholders were involved in the negotiation of the SPA or in any businesses that competed or might ultimately compete with the Company. (See Childs Aff., Ex. B §§ 3.17, 3.19, 3.25). In sum, the former shareholders made multiple warranties as to the status and ownership of the Company as well as the legal and business environment into which Global Gold was entering by purchasing shares in the Company.

But shortly after the SPA was executed, Global Gold began to realize that the former shareholders were guilty of egregious misrepresentations and omissions. Virtually every representation in the SPA was false, and almost every warranty was breached. For example, although the Sellers had represented and warranted that the Company's exploration licenses extended through 2017, Ayvazian, acting in his capacity as Minister of the Environment, arbitrarily reduced the terms of those licenses at the first available opportunity. (See Childs Aff., Ex. C, at 14; Ex. A, at 1). Although the Sellers had represented and warranted that the Company

5

was in compliance with all Legal Requirements, and that its Governmental Authorizations were valid and in order, Ayvazian decided otherwise in his capacity as Minister of the Environment. Ayvazian justified his attacks on the Company's licenses and license applications based on the Company's alleged non-compliance with the necessary laws and regulations. (See id.). In sum, having made a series of representations to Global Gold about the Company, its licenses, and its legal status, Ayvazian contradicted and reneged on those representations and warranties shortly after the execution of the SPA.

**B.**     <u>**The Agreement to Arbitrate and the Administrative Role of the ICC**</u>

The SPA contains an arbitration clause (the "Arbitration Clause"), providing that all disputes under the agreement will be referred for final settlement to a panel of three arbitrators under the ICC's Rules of Conciliation and Arbitration, in New York, under New York law. The Arbitration Clause provides:

> **11.5     Arbitration; Jurisdiction; Service of Process**
> The parties acknowledge that they are entering into and shall perform under this Agreement in good faith, and any disputes will be resolved in good faith, with the letter and spirit of this Agreement as the standard. The Parties will use their best efforts to resolve any disputes between themselves within thirty (30) days. During this thirty (30) day period, any party within ten (10) days' notice may request and the other party must agree to meet in good faith to resolve the dispute. After thirty day's [sic] effort, if a dispute is not resolved, any party may refer the dispute for final settlement to and in accord with under the Rules of Conciliation and Arbitration of the International Chamber of Commerce, London, England (the "Rules") by a panel of three (3) arbitrators.
>
> In the case of any matter to be settled under the Rules, each party hereto shall appoint one arbitrator and such two arbitrators shall appoint a third arbitrators; provided, that if all three arbitrators have not been appointed within thirty (30) days after the party submitting the matter in dispute has notified the other party of such submission, either party hereto may apply to the International Chamber of Commerce for appointment of the remaining arbitrators. The place of arbitration of any matter to be settled under the Rules shall be in New York City, or at such other place

as the parties shall unanimously choose. On a case-by-case basis, the parties may also agree to alternative dispute resolution methods. Such an Agreement must be in writing and signed by both parties.

(See Childs Aff., Ex. B § 11.5. See also Childs Aff., Ex. B § 11.6 (providing that the agreement is governed by New York law)).

The ICC is an association that provides a forum for international business issues and offers various administrative services in connection with dispute resolution.[3] (See Childs Aff., Ex. E (ICC's website describing "What is ICC?", http://www.iccwbo.org/id93/index.html)). Under the ICC's Rules of Arbitration ("ICC Rules"), the ICC organizes the administrative aspects of the arbitration and assists in connection with certain procedural issues. The ICC's administrative responsibilities include facilitating the appointment of arbitrators, collecting fees and reimbursement of expenses for arbitrators, and advising the parties and arbitrators of relevant procedures and timetables established by the Panel of Arbitrators. (See Childs Aff., Ex. F (ICC Rules, Arts. 4, 8, 9, 13, 30, 31)).

A subgroup of the ICC, called the International Court of Arbitration (the "ICA"), handles these administrative tasks on behalf of the ICC. (See id. (ICC Rules, Art. 1(1)). Although the ICA subgroup has the word "Court" in its name, the ICA does not itself adjudicate disputes. Substantive and jurisdictional determinations are made by the independent arbitrators who apply relevant state or national law. (See Childs Aff., Ex. G (ICC's website describing "What the [ICA] Court Does," http://www.iccwbo.org/court/arbitration/id4590/index.html ("The Court

---

[3] Arbitration can be institutional or *ad hoc*. Institutional arbitration is conducted under the auspices of an arbitral institution and occurs when the parties agree to apply the rules of that institution. The ICC, the American Arbitration Association (AAA), and the London Court of International Arbitration (LCIA) are the three preeminent arbitration institutions. These organizations do not resolve disputes. They provide administrative support for the arbitration. An *ad hoc* arbitration is one conducted by arbitrators without administrative support from an institutional body.

organizes and supervises your arbitration and helps in overcoming obstacles. It does not itself resolve disputes, a task that is carried out by independent arbitrators. The Court makes every effort to ensure that the award is enforceable in national courts if need be, although in practice the parties usually comply.")).

**C.     Procedural History**

On November 2, 2006, Global Gold sent a "Notice of Dispute" to Respondents Ayvazian, Batoyan, Janibekian, and Lalazaryan advising them of a dispute under the SPA (the "Dispute"), as required by the Arbitration Clause (See Childs Aff., Ex. I). The Respondents did not attempt to resolve the Dispute in good faith within the thirty-day period provided by the Arbitration Clause. Thus, on December 28, 2006, Global Gold exercised its right under the SPA to arbitrate the Dispute.

In accordance with the ICC Rules, Global Gold submitted a "Request for Arbitration" to the Secretariat of the ICA and named Ayvazian, Batoyan, Janibekian, and Lalazaryan as respondents. Global Gold also submitted to the ICA a check for $2,500.00 as an advance payment on administrative expenses, and named Jonathan D. Schiller of the law firm Boies, Schiller, and Flexner LLP, as its party appointed arbitrator.[4] (See Childs Aff., Ex. C, at 6). The Secretariat of the ICC/ICA then notified Global Gold and the four Respondents that the ICC/ICA was in receipt of the Request for Arbitration and the date of the receipt, and served them with the Request. (See Childs Aff., Ex. F (ICC Rules, Arts. 4(1),(5)).

---

[4] Jonathan D. Schiller is a co-founder and the Managing Partner of Boies, Schiller, and Flexner LLP. He concentrates on complex litigation and international arbitration, including ICC arbitrations. Mr. Schiller also serves as an arbitrator in ICC and other arbitrations. (See Childs Aff., Ex. H (Boies, Schiller, and Flexner LLP's website entitled, "Jonathan D. Schiller," http://www.bsfllp.com/lawyers/data/0002)).

On March 12, 2007, the ICC/ICA sent a letter to the parties stating that it had "[d]ecided in accordance with Article 6(2) of the Rules" that arbitration of the Dispute should proceed only against Batoyan, Janibekian, and Lalazaryan, and not against Ayvazian, the non-signatory owner and principal. (See Childs Aff., Ex. J, at 1).

By its terms, Article 6(2) of the ICC Rules directs the ICC/ICA to make an administrative observation and determination as to whether or not an arbitration agreement exists. If an agreement exists, the arbitration goes forward, and the arbitration tribunal decides the merits of the case with the ICC supplying administrative support. Article 6(2) of the ICC's Rules does not permit the ICC/ICA to make preliminary rulings on arbitrability and jurisdiction. Instead, Article 6(2) expressly states that such rulings shall be within the province of the arbitral tribunal itself ("[t]he [ICA] may decide...that the arbitration shall proceed if it is *prima facie* satisfied that an arbitration agreement under the Rules may exist. In such case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself." (See Childs Aff., Ex. F (ICC Rules Art. 6(2)).

The March 12, 2007 letter from the ICC/ICA also confirmed Global Gold's appointment of Jonathan Schiller as arbitrator, and the ICC/ICA directly appointed a second arbitrator, Dr. Ivan Zykin, on behalf of the remaining three respondents because respondents' time to do so had expired.[5] (See Childs Aff., Ex. J, at 1). The ICC/ICA noted that Arbitrators Zykin and Schiller should jointly nominate the Chairman of the Arbitral Tribunal within 30 days. (See id.)

---

[5] Dr. Zykin currently is a partner of Andrey Gorodissky & Partners, one of Russia's preeminent law firms, where he chairs the international arbitration practice group. He also serves as the Vice President of the International Commercial Arbitration Court at the RF Chamber of Commerce and Industry (ICAC). Dr. Zykin has served as an arbitrator in more than one hundred and fifty cases, including arbitrations under the ICC Rules. (See Childs Aff., Ex. K (Andrew Gorodissky & Partners' website entitled, "Ivan S. Zykin," http://www.agp.org.ru/english/lawyers/zykin.html)).

On March 19, 2007, respondent Lalazaryan submitted a response to the Request for Arbitration. Lalazaryan admitted that Ayvazian was an "undisclosed . . . shareholder." (See Childs Aff., Ex. A, at 1).

On March 27, 2007, eight days after Lalazaryan filed his response, Global Gold requested that the ICC/ICA reconsider its decision to dismiss Respondent Ayvazian from the case.[6] (See Childs Aff., Ex. L). But the ICC/ICA refused. (See Childs Aff., Ex. N, at 2).

On May 14, 2007, the ICC/ICA instructed the parties to proceed to arbitration without Ayvazian and advised that it had taken the necessary steps under the ICC Rules to appoint a chairman of the Tribunal. (See Childs Aff., Ex. N, at 2). The ICC/ICA took these steps because Mr. Schiller, the arbitrator nominated by Global Gold, and Dr. Zykin, the arbitrator nominated by the ICC/ICA on behalf of the respondents, had not agreed on the appointment of a chairman within the allotted time period. (See Childs Aff., Ex. I (ICC Rules Art. 8(4))). The ICC/ICA also informed the parties that, in accordance with ICC Rules Article 13, it would transfer the case file to the Arbitral Tribunal once the Tribunal was fully convened. (See Childs Aff., Ex. N, at 2).

In July 2007, the ICC/ICA denied a further request by Global Gold to reconsider its decision to dismiss Ayvazian from the case. ((See Childs Aff., Ex. O). By letter dated August 6, 2007, the ICC/ICA informed the parties that it had appointed Professor Hans Smit as Chairman

---

[6] Global Gold supplemented its request for reconsideration to the ICC/ICA on April 20, 2007, with additional evidence that Ayvazian commonly uses Batoyan as an agent to conduct business related to Armenia's mines. (See Childs Aff., Ex. M). Global Gold included a series of articles by Armenia's leading association of investigative journalists, hetq, exposing Ayvazian's acquisition of mineral holdings throughout the country. (See id.). Hetq has used public records to identify the shareholders of a number of companies owned by Ayvazian, his family, and his close associates. (See id.). The articles describe Ayvazian's use of close associates as agents. In particular, the article entitled "Vardan Ayvazian Has a Special Fondness for Goldmines" notes Ayvazian's use of Batoyan -- a "friend and fellow villager of . . . Ayvazian's wife" who has "also acted as Ayvazian's representative in other organizations" -- to establish a company called Grade Redmet Ltd. (See id.).

of the Arbitral Tribunal upon the proposal of the Dutch National Committee of the ICC.[7] The ICC/ICA directed the parties to correspond directly with the Arbitral Tribunal. (See Childs Aff., Ex. O, at 2). In compliance with Article 30 of the ICC Rules, the ICC/ICA also fixed advance costs at $280,000 to be divided and paid equally between Global Gold and the Respondents. (See id.). These advance costs are meant to cover the fees and expenses of the arbitrators and the ICC administrative costs. (See Childs Aff., Ex. F (ICC Rules Art. 30(2)).

On August 6, 2007, the ICC/ICA transmitted the case file to the fully convened Arbitral Tribunal. (See Childs Aff., Ex. Q at 1). It informed the Tribunal that the place of arbitration would be New York, New York, according to the agreement of the parties. (See id. at 3). Importantly, in its August 6, 2007 letter, the ICC/ICA addressed its administrative finding as to arbitrability. It noted that on March 9, 2007, "being prima facie satisfied that an arbitration agreement under the Rules may exist, [the ICA] decided that this arbitration would proceed [against Batoyan, Janibekian, and Lalazaryan.] This decision being administrative in nature, the Arbitral Tribunal must still decide on its own jurisdiction in accordance with Article 6(2) of the Rules." (See id. at 5). But the Arbitration Tribunal can *not* decide whether it has jurisdiction over non-signatory Ayvazian, *because the ICA improperly dismissed Ayvazian from the case prior to transmitting the case to the Arbitration Tribunal.*

On October 19, 2007, the ICC/ICA wrote to Global Gold and confirmed that it had received Global Gold's advance costs of $140,000. (See Childs Aff. Ex. R, at 1-2).

---

[7] Hans Smit is the Stanley H. Fuld Professor of Law at Columbia Law School, where he teaches civil procedure, international arbitration, international law and transactions, and conflict of laws. Mr. Smit writes extensively in the area of international arbitration, and he has been knighted by the Queen of the Netherlands (Order of Netherlands Lion). (See Childs Aff., Ex. P (Columbia Law School's website entitled, "Hans Smit," http://www.law.columbia.edu/fac/Hans_Smit)).

Today, the Arbitral Tribunal is poised to adjudicate Global Gold's claims against Batoyan, Janibekian, and Lalazaryan.

## III.    ARGUMENT

A.    **Questions of the Arbitrators' Jurisdiction Should be**
      **Decided by the Arbitration Tribunal, Not by the ICA.**

The ICA administrative body impermissibly has exceeded its authority (and misapplied the ICC's Rules) by making a legal determination that should be submitted to, and decided by, the Arbitration Tribunal.    The question of whether the dispute between Global Gold and Ayvazian should be arbitrated falls squarely within the jurisdictional ambit of the Arbitration Tribunal, not the ICA.    By making that determination itself, and refusing to submit the jurisdictional issue to the Arbitration Tribunal, the ICC/ICA has violated New York law, the FAA and the ICC's Rules.

Under New York law and federal law interpreting the FAA,[8] the question of whether a dispute should be arbitrated (i.e. jurisdiction of the arbitrator, also known as arbitrability) normally is left to the courts, unless the parties have clearly indicated an intent to have issues of arbitrability determined by an arbitrator.    Smith Barney Shearson Inc. v. Sacharow, 91 N.Y.2d 39, 45-46 (N.Y. 1997) ("the question of arbitrability is an issue generally for judicial determination . . . [unless] the parties . . . evince[ ] a 'clear and unmistakable' agreement to arbitrate arbitrability"); Shaw Group Inc. v. Triplefine Int'l Corp, 322 F.3d 115, 120 (2d Cir. 2003) (issue of arbitrability to be decided by the court unless there is clear evidence that the parties intended question of arbitrability to be decided by the arbitrators).

---

[8] In addition to substantive New York law, the FAA applies to this dispute because the SPA and disputes arising from the SPA involve interstate and international commerce.  9 U.S.C § § 1, 2 (1999); Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265 (1995).

When the language of an arbitration agreement broadly states that all disputes concerning or arising from an agreement will be arbitrated, courts conclude that the parties have evinced the requisite clear intent to submit the issue of arbitrability to the arbitrators. See e.g., Smith Barney, 91 N.Y.2d at 46 (holding that language providing for "[a]ny controversy" between the parties to be "settled by arbitration," was sufficiently "plain and sweeping" to indicate an intent to have arbitrability decided by the arbitrators). Similarly, when the parties agree to resolve their disputes in accordance with the Rules of the ICC, a clear intent to submit questions of arbitrability to the arbitrators is present, because Article 6(2) of the ICC's Rules expressly states that "[a]ny decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself." Shaw Group Inc., 322 F.3d at 122 (citing Article 6(2) of the ICC's Rules, the court ruled that the parties who contracted for arbitration in accordance with the ICC rules had thereby agreed to submit questions of arbitrability to the arbitrator),[9] (citing Apollo Computer, Inc. v. Berg, 886 F.2d 469 (1st Cir. 1989) and Daiei, Inc. v. U.S. Shoe Corp., 755 F. Supp. 299 (D. Haw. 1991)). In no circumstance should the issues of jurisdiction and arbitrability rest with the administrative body in a manner that can result in dismissal of a case.

In Apollo Computer, Apollo entered a distribution agreement with Dicoscan Distributed Computing Scandinavia AB ("Dico") containing a clause requiring arbitration of disputes under the ICC Rules. Apollo 886 F.2d at 470. Dico filed for bankruptcy protection, and the trustee assigned to a third party, Helge Berg, the right to bring claims against Apollo for breach of the distribution agreement. Berg commenced an arbitration against Apollo by filing a request for

---

[9] The court in Shaw sometimes loosely referred to the ICA as the "arbitrators." But even the ICA knows and acknowledges that it is not an arbitrator or an arbitration tribunal. See e.g., the ICC's website describing the ICA: "The [ICA] Court organizes and supervises your arbitration and helps in overcoming obstacles. It does not itself resolve disputes, a task that is carried out by independent arbitrators." (See Childs Aff., Ex. G (http://www.iccwbo.org/court/arbitration/id4590/index.html)).

arbitration with the ICC. Id. Apollo filed a lawsuit seeking to stay the arbitration on the ground that no arbitration agreement existed between the Apollo and Berg and that the alleged assignment was precluded by the agreement's non-assignment clause. The district court denied Apollo's request to stay arbitration, and the First Circuit Court of Appeals affirmed, holding: "[b]oth the ICC's Court of Arbitration and the district court determined that a *prima facie* agreement to arbitrate existed. Therefore, they reasoned, Article 8.3 [renumbered 6(2)] requires the arbitrator to determine the validity of the arbitration agreement in this specific instance — in other words, decide whether the arbitration agreement applies to disputes between Apollo and the assignees of Dico [Helge Berg]." Id. at 473.

In this case, the SPA contains broad language that "any dispute" arising from the agreement may be referred "for final settlement" to "a panel of three arbitrators." The SPA also expressly incorporates the Rules of the ICC — placing the issue of arbitrability within the jurisdiction of the Arbitration Tribunal itself.

But the dispute here is not whether the issue of jurisdiction over Ayvazian should be decided by the Arbitration Tribunal or by this Court. Rather, the question is whether that determination should be made by the ICA administrative body. Clearly, the answer is no.

The ICA has exceeded its authority. Despite acknowledging that the ICA "does not resolve disputes, a task that is carried out by independent arbitrators" (see Childs Aff., Ex. G), the ICA resolved the dispute between Global Gold and Ayvazian by dismissing Global Gold's claim against Ayvazian prior to submitting the case to the independent arbitrators.

Article 6(2) of the ICC's Rules, upon which the ICA relies in dismissing Global Gold's claims against respondent Ayvazian, provides that if a respondent does not file an answer or if any party challenges the existence, validity or scope of the arbitration agreement, the ICA may

make an initial inquiry into whether an arbitration agreement exists. If the ICA is *prima facie* satisfied that an arbitration agreement exists, then the arbitration shall proceed and thereafter, any decisions as to the jurisdiction of the Arbitration Tribunal shall be made by the Arbitration Tribunal itself. Article 6(2) of ICC's Rules states in full:

> If the Respondent does not file an Answer, as provided by Article 5, or if any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement, the [ICA] may decide, without prejudice to the admissibility or merits of the plea or pleas, that the arbitration shall proceed if it is *prima facie* satisfied that *an arbitration agreement under the Rules may exist. In such a case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself.* If the [ICA] is not so satisfied, the parties shall be notified that the arbitration cannot proceed. In such a case, any party retains the right to ask any court having jurisdiction whether or not there is a binding arbitration agreement. (emphasis added)

It is irrefuted and irrefutable that the SPA contains an agreement to arbitrate. Indeed, the ICA has made a *prima facie* determination that an arbitration agreement exists. (See Childs Aff., Ex. Q. at 5). The arbitration is proceeding with a fully convened Arbitration Tribunal against the three respondent shareholders who signed the SPA. Once the ICA made its *prima facie* determination that an arbitration agreement exists, the ICA's role concerning arbitrability ended. Thereafter, any and all questions relating to the jurisdiction of the Arbitration Tribunal under the arbitration agreement were to be made by the Arbitration Tribunal itself (not the ICA), including the important question of whether non-signatory Ayvazian is bound by the arbitration agreement under legal doctrines of principal/agency and estoppel, under New York laws.

When selecting the ICC's Rules (including Article 6(2)) to govern some procedural aspects of the arbitration, Global Gold had no belief or expectation whatsoever that the ICA would seek to expand its role into the jurisdictional domain of the Arbitration Tribunal. Nothing in the terms of Article 6(2) leads to this conclusion.

15

As one guide to ICC rules states:

> Article 6(2) does not require that each of the parties to the arbitration must have signed the arbitration agreement, and it may be the case, by virtue of any one of a number of different legal theories (such as, e.g., agency, assignment, alter ego, succession or the so-called "group of companies" theory) that a non-signatory may be bound by an arbitration agreement.

See Yves Derains & Eric A. Schwartz, A Guide to the New ICC Rules of Arbitration (Kluwer Law International 1998), at 92 (emphasis added). See, e.g., Am. Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349, 353 (2d Cir. 1999) (holding that non-signatories were bound to an arbitration agreement under the doctrine of equitable estoppel, one of five legal theories by which this could occur).

In other words, the ICA's authority to make a *prima facie* determination as to the existence of an arbitration agreement pursuant to the rules incorporated and adopted by the parties in their arbitration agreement does not vest in the ICA the right and authority to dismiss claims brought in an arbitration against non-signatories to the arbitration agreement. By refusing to submit Global Gold's claim against Ayvazian to the Arbitration Tribunal, the ICC/ICA has denied Global Gold its contractual right to have its dispute settled by a panel of three independent arbitrators.

**B.    Even if the ICA May Decide Issues of Arbitrability and Jurisdiction (which it may not), Global Gold has satisfied the ICA's Standards.**

The ICC/ICA appears to take the position that even after making a *prima facie* determination that an arbitration agreement exists, the ICA retains the jurisdictional authority to dismiss claims against non-signatories to the agreement if the ICA itself is not persuaded that there are serious issues of fact and laws to be resolved:

> As a general rule ... the [ICA] Court has been inclined to allow arbitrations to proceed against parties who may not have signed, or who may not appear to be parties to, the arbitration agreement in

16

> question, *provided that a plausible argument is made that they may
> nevertheless be bound by the same.* Obviously, a mere allegation
> to this effect will not suffice. *The [ICA] Court must be persuaded
> that there are serious issues of fact or law to be resolved.* This
> may be the case, for example, where it is alleged that a party is
> bound by an arbitration agreement by virtue of its conduct or
> relationship with one of the signatory parties.

Derains & Schwartz, A Guide to the New ICC Rules of Arbitration, at 92.

Global Gold respectfully disagrees with the authors of the Guide that a claimant must "persuade" the ICA that there are serious issues of fact or law to be resolved in its action against a non-signatory. Global Gold must persuade the Arbitration Tribunal (not the ICA), pursuant to the terms of its Arbitration Clause which states that disputes will be resolved by a panel of three arbitrators, and pursuant to the clear and express language of Article 6(2), which states: "if [the ICA] is *prima facie* satisfied that an arbitration agreement under the Rules exists . . . any decision as to the jurisdiction of the Arbitration Tribunal shall be taken by the Arbitration Tribunal itself."

Nevertheless, even if Article 6(2) of the ICC's Rules vested in the ICA authority to dismiss actions against non-signatories to arbitration agreements, thereby denying the Arbitration Tribunal an opportunity to rule on its own jurisdiction, Global Gold has met the ICA's standards. The ICA appears to require a claimant to provide to the ICA's satisfaction a "plausible argument" that the non-signatory is bound by the agreement to arbitrate. Derains & Schwartz, A Guide to the New ICC Rules of Arbitration, at 92. Global Gold has done this in its Request for Arbitration. (See Childs Aff., Ex. C (Request for Arbitration)). By directing the actions of the other shareholders and directly benefiting from the SPA, Ayvazian is bound by the agreement to arbitrate under the law of agency and pursuant to the doctrine of estoppel.

1.    Ayvazian is Bound by the Arbitration
      Agreement Under the Laws of Agency

Applying the FAA, the Second Circuit has held:

17

> While it is true that arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit...a party may be bound by an agreement to arbitrate *even in the absence of a signature. Ordinary principles of contract and agency determine which parties are bound by an agreement to arbitrate.*

Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., 9 F.3d 1060, 1063-64 (2d Cir. 1993) (internal citations omitted and emphasis added). A non-signatory can be bound to an arbitration agreement pursuant to, among other things, theories of agency and estoppel. See Am. Bureau of Shipping, 170 F.3d at 352 (listing theories).

Under New York law, a non-signatory to an arbitration agreement is bound to the agreement if a signatory to the agreement entered into it as the non-signatory's agent. See In re Chas. A. Stevens Co., 79 A.D.2d 545, 545 (1st Dep't 1980) (requiring party to arbitrate a dispute pursuant to an arbitration agreement that was signed by the party's agent).  In this context, a sufficient agency relationship exists where when (i) the principal and agent agree that the agent will act for the principal; (ii) the principal retains a degree of control over the agent; and (iii) the principal specifically authorizes the agent to bind him to submitting a claim to arbitration. Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A., 347 F.3d 448, 462 (2d Cir. 2003) (applying New York law and listing elements of principal / agency relationship); Burbank Broad. Co. v. Roslin Radio Sales, Inc., 99 A.D.2d 976, 977 (1st Dep't 1984) (ordering hearing to determine whether agent had authority to bind the principal to arbitration agreement). The fact that the principle is undisclosed does not change this analysis. An undisclosed principal is "'bound by contracts . . . on his [or her] account by an agent acting within his [or her] authority.'" J.P. Endeavors v. Dushaj, 8 A.D.3d 440, 442 (2d Dep't 2004) (quoting Restatement (Second) of Agency §186).

Here, Ayvazian is subject to the SPA's arbitration clause because Ayvazian was an undisclosed shareholder of the company that was sold pursuant to the SPA, and Batoyan, Janibekian, and Lalazaryan negotiated and executed the SPA as Ayvazian's agents. Ayvazian was the beneficial owner of the Company at the time the SPA was signed, and he agreed with Batoyan, Janibekian, and Lalazaryan that they would negotiate the SPA at his behest, directed their actions through detailed instructions, and specifically approved the arbitration clause, thereby authorizing them to enter into the clause. (See *supra*, at 7-8). Under New York law and the FAA, these facts are sufficient to bind Ayvazian to the Arbitration Clause under a principal / agency theory.

2.    Ayvazian is Bound by the Arbitration
      Agreement Under the Doctrine of Estoppel

There is an equally compelling case that Ayvazian is bound to the Arbitration Clause through equitable estoppel. This doctrine provides that a non-signatory is equitably estopped from denying its obligation to arbitrate when it knowingly receives a "direct benefit" from a contract containing an arbitration clause. See HRH Constr. LLC v. Metro. Transp. Auth., 33 A.D.3d 568, 569 (1st Dep't 2006) (binding non-signatory to arbitration agreement under estoppel theory because it "knowingly assumed performance of the [agreement] and derived a direct benefit therefrom"); Am. Bureau of Shipping, 170 F.3d at 353 (estopping non-signatories to arbitration agreement governed by the FAA and New York law from disavowing obligations to arbitrate because they "received direct benefits" from the agreement). In this case, Ayvazian was the beneficial owner of the Company at the time the SPA was executed, and he received the purchase price, the primary benefit of the bargain due the sellers under the SPA, after the SPA was executed.    (See *supra*, at 7). Under these facts, he should be equitably estopped from disavowing his obligation to arbitrate.

19

## CONCLUSION

For the foregoing reasons, Global Gold respectfully requests that the Court order the ICC/ICA to submit to the Arbitration Tribunal (which already is convened) the question of whether the arbitration may proceed against the non-signatory principle Ayvazian.

Dated: New York, New York
       October 26, 2007

KING & SPALDING LLP

*Edward G. Kehoe*

Edward G. Kehoe
Louisa B. Childs
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile:  (212) 556-2246

R. Doak Bishop
Wade M. Coriell
1100 Louisiana, Suite 4000
Houston, TX 77002-5213
Phone: (713) 751-3200
Fax: (713) 751-3290

Kenneth R. Fleuriet
25 Cannon Street
London EC4M 5SE
United Kingdom
Phone: +44 (0)20-7551-7500
Fax:  +44 (0)20-7551-7575

*Attorneys for Petitioner Global Gold*
*Mining, LLC*

# EXHIBIT 2

SHA, LLC

## SHARE PURCHASE AGREEMENT

by and between

Global Gold Mining, LLC

and

The Participants of SHA, LLC

(for registration purposes)

## ՍՀԱ ՍՊԸ

## ԲԱԺՆԵՄԱՍԻ ԳՆՄԱՆ ՊԱՅՄԱՆԱԳԻՐ

Global Gold Mining, LLC

եւ

ՍՀԱ ՍՊԸ ՄԱՍՆԱԿԻՑՆԵՐԻ

կողմից եւ միջեւ

(գրանցման նպատակներով)

such other addresses and telecopier numbers as a party may designate by notice to the other parties):

11.5     **Arbitration ;Jurisdiction; Service of Process**. The Parties acknowledge that they are entering into and shall perform under this Agreement in good faith, and any disputes will be resolved in good faith, with the letter and spirit of this Agreement as the standard. The Parties will use their best efforts to resolve any disputes between themselves within thirty (30) days. During this thirty (30) day period, any party with ten (10) days' notice may request and the other party must agree to meet in good faith to resolve the dispute. After thirty day's effort, if a dispute is not resolved, any party may refer the dispute for final settlement to and in accord with under the Rules of Conciliation and Arbitration of the International Chamber of Commerce, London, England (the "Rules") by a panel of three (3) arbitrators. In the case of any matter to be settled under the Rules, each party hereto shall appoint one arbitrator and such two arbitrators shall appoint a third arbitrator; provided, that if all three arbitrators have not been appointed within thirty (30) days after the party submitting the matter in dispute has notified the other party of such submission, either party hereto may apply to the International Chamber of Commerce for appointment of the remaining arbitrators. The place of arbitration of any matter to be settled under the Rules shall be in New York City, or at such other place as the parties shall unanimously choose. On a case-by-case basis, the parties may also agree to alternative dispute resolution methods. Such an Agreement must be in writing and signed by both parties.

համապատասխանած հասցեով կամ հեռապատճենիչի ինչպես նշված է ներքևում (կամ այլ հասցեներին) կամ հեռապատճենինի համարներին որոնք կողմերը կներկայացնեն միմյանց ծանուցման միջոցով):

11.5     Արբիտրաժ, Ընդատություն, Գործընթաց: Կողմերն ընդունում են, որ կկնքում են սույն Պայմանագիրը և պետք է գործեն ըստ սույնի բարի կամքի եիման վրա, և որ ցանկացած վեճ պետք է լուծվի ըստ բարի կամքի՝ սույն Պայմանագրի ոգուն եւ տառին համապատասխանած: Կողմերը պետք է իրենց ուժերի սահմաններում գործադրեն բոլոր ջանքերը իրենց միջև ծագած վեճերը երեսուն (30) օրվա ընթացքում լուծելու համար: Այդ երեսուն (30) օրվա ընթացքում ցանկացած կողմ տաս (10) օր առաջ ներկայացված ծանուցմանն կարող է դիմել մյուս կողմին հանդիպման համար, եւ մյուս կողմը պետք է համաձայնվի հանդիպել բարի կամքով վեճը լուծելու համար: Երեսուն օրվա ջանքերից հետո, եթե վեճը դեռ չի լուծված, ցանկացած կողմ կարող է վեճն ուղղել Առևտրի Միջազգային Պալատի (Լոնդոն, Անգլիա) Հաշտեցման եւ Արբիտրաժի Կանոններով (Կանոններ) լուծման համար, երեք արբիտրից բաղկացած դատարանի միջոցով: Ըստ Կանոնների վեճի լուծման դեպքում յուրաքանչյուր կողմ պետք է նշանակի մեկ արբիտր, եւ այդ երկու արբիտրները պետք է նշանակեն երրորդ արբիտրին. պայմանով, որ եթե բոլոր երեք արբիտրները չեն նշանակվում վեճը լուծման ներկայացնող կողմի մյուս կողմին այդ ներկայացման մասին տեղյակ պահելուց հետո երեսուն (30) օրվա ընթացքում, սույնի յուրաքանչյուր կողմ կարող է դիմել Միջազգային Առևտրի Պալատ մնացած արբիտրներին նշանակելու համար: Ըստ Կանոնների վեճի լուծման արբիտրաժի վայրը պետք է հանդիսանա Նյու-Յորք քաղաքը, կամ կողմերի ընտրությամբ մեկ այլ վայր: Որոշ դեպքերում կողմերը կարող են նաեւ համաձայնել վեճերի լուծման այլընտրանքային եղանակների շուրջ: Նման Համաձայնագիրը պետք է լինի գրավոր և ստորագրվի երկու կողմերի

97

signed by both parties.

կողմից:

**11.6 Applicable Law, Institution.** This Agreement is an international Agreement and shall be governed and construed in accordance with the substantive laws of New York, without regard to conflict of laws provisions. Each party hereto hereby irrevocably and unconditionally agrees that any action to enforce a decision rendered in an arbitration proceeding described in Article 8 may be instituted (i) in Armenian courts, (ii) in the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts thereof, or (iii) in the courts of the United Kingdom and hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection of the convenience of the forum of any such legal suit, action or proceeding and irrevocably submits generally and unconditionally to the jurisdiction in any such court in any suit, action or proceeding.

11.6   Կիրառվող Օրենք, Իրավասություն: Սույն Պայմանագիրը համարվում է Միջազգային Պայմանագիր, եւ պետք է ղեկավարվի եւ մեկնաբանվի Նյու Յորքի համապատասխանական օրենքների համաձայն, առանց կոլիզիոն նորմերի կիրառման: Յուրաքանչյուր կողմ հստակորեն եւ անվերապահորեն համաձայնվում է, որ Հոդված 8-ում մեկնաբանված արբիտրաժի որոշման կատարմանն ուղղված ցանկացած գործողություն կարող է իրականացվել. (i) Հայաստանի դատարաններում, (ii) Նյու Յորքի Նահանգի դատարաններում, Ամերիկայի Միացյալ Նահանգների Նյու Յորքի Հարավային Շրջանի դատարաններում եւ նման վճռաբեկ դատարաններում, կամ (iii) Միացյալ Թագավորության դատարաններում, եւ սույնով կիրառելի օրենքով սահմանված առավելագույն չափով հրաժարվում է ցանկացած առարկությունից, որն ինքը կարող է ունենալ այժմ կամ հետագայում նման դատավարության, դատական պրոցեսի տեղի, դատարանի ընտրության, կամ նման դատավարության տեղի հարմարության վերաբերյալ, ինչպես նաև ամբողջապես եւ անվերապահորեն ընդունում է նման դատարանի որոշումները ցանկացած հայցի կամ այլ գործողության վերաբերյալ:

**11.7 Further Assurances.** The parties agree (a) to furnish upon request to each other such further information, (b) to execute and deliver to each other such other documents, and (c) to do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the documents referred to in this Agreement.

11.7   Հետագա Հավաստիացումներ: Կողմից համաձայն են (ա) ըստ միմյանց խնդրանքի միմյանց ներկայացնել տեղեկություններ, (բ) ստորագրել եւ միմյանց տրամադրել այլ փաստաթղթեր, եւ (գ) կատարել այլ նման ինչպես եւ գործողություններ, որոնք միւս կողմը կարող է ողջամտորեն պահանջել սույն Պայմանագրի եւ սույն Պայմանագրում սահմանված փաստաթղթերի մտադրումը կատարելու համար:

**11.8 Waiver.** The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither

11.8   Հրաժարում: Սույն Պայմանագրի կողմերի իրավունքները եւ իրավական միջոցները հավաքական են եւ

98

# EXHIBIT 3

# Rules of Arbitration

in force as from 1 January 1998

**Cost scales effective as of 1 July 2003**



International Chamber of Commerce
*The world business organization*

**International Court of Arbitration**
38, Cours Albert 1er, 75008 Paris, France
Tel. +33 1 49 53 29 05  Fax +33 1 49 53 29 33
E-mail arb@iccwbo.org
**www.iccarbitration.org**

Of the various languages in which the ICC Rules of Arbitration may be published, the English and French versions are the only official texts.

ICC, the ICC logo, CCI, the CCI logo, International Chamber of Commerce, World Business Organization, WBO, International Court of Arbitration, ICC International Court of Arbitration (including Spanish, French, German and Arabic translations) are all trademarks of ICC, registered in several countries.

© **International Chamber of Commerce 2005**
All rights reserved.  No part of this publication may be reproduced by whatever means (electronic, electrostatic, mechanical, photocopying, recording or otherwise) or translated, without the prior permission in writing of the ICC International Court of Arbitration.

## STANDARD ICC ARBITRATION CLAUSE

It is recommended that all parties wishing to make reference to ICC arbitration in their contracts use the following standard clause.

Parties are reminded that it may be desirable for them to stipulate in the arbitration clause itself the law governing the contract, the number of arbitrators and the place and language of the arbitration. The parties' free choice of the law governing the contract and of the place and language of the arbitration is not limited by the ICC Rules of Arbitration.

Attention is called to the fact that the laws of certain countries require that parties to contracts expressly accept arbitration clauses, sometimes in a precise and particular manner.

"All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules."

## STANDARD CLAUSE FOR AN ICC
## PRE-ARBITRAL REFEREE PROCEDURE AND ICC ARBITRATION

Parties wishing to have recourse to both the ICC pre-arbitral referee procedure and ICC arbitration should make specific reference to both procedures in their contracts. The following standard clause is recommended:

"Any party to this contract shall have the right to have recourse to and shall be bound by the pre-arbitral referee procedure of the International Chamber of Commerce in accordance with its Rules for a Pre-Arbitral Referee Procedure.

All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules of Arbitration."

For translations of the above clause, please consult the web site of the ICC International Court of Arbitration:

**www.iccarbitration.org**

# RULES OF ARBITRATION

## INTRODUCTORY PROVISIONS

### Article 1
### International Court of Arbitration

**1**

The International Court of Arbitration (the "Court") of the International Chamber of Commerce (the "ICC") is the arbitration body attached to the ICC. The statutes of the Court are set forth in Appendix I. Members of the Court are appointed by the World Council of the ICC. The function of the Court is to provide for the settlement by arbitration of business disputes of an international character in accordance with the Rules of Arbitration of the International Chamber of Commerce (the "Rules"). If so empowered by an arbitration agreement, the Court shall also provide for the settlement by arbitration in accordance with these Rules of business disputes not of an international character.

**2**

The Court does not itself settle disputes. It has the function of ensuring the application of these Rules. It draws up its own Internal Rules (Appendix II).

**3**

The Chairman of the Court or, in the Chairman's absence or otherwise at his request, one of its Vice-Chairmen shall have the power to take urgent decisions on behalf of the Court, provided that any such decision is reported to the Court at its next session.

**4**

As provided for in its Internal Rules, the Court may delegate to one or more committees composed of its members the power to take certain decisions, provided that any such decision is reported to the Court at its next session.

**5**

The Secretariat of the Court (the "Secretariat") under the direction of its Secretary General (the "Secretary General") shall have its seat at the headquarters of the ICC.

### Article 2
### Definitions

In these Rules:

(i)   "Arbitral Tribunal" includes one or more arbitrators.

(ii)  "Claimant" includes one or more claimants and "Respondent" includes one or more respondents.

(iii) "Award" includes, *inter alia*, an interim, partial or final Award.

### Article 3
### Written Notifications or Communications;
### Time Limits

**1**

All pleadings and other written communications submitted by any party, as well as all documents annexed thereto, shall be supplied in a number of copies sufficient to provide one copy for each party, plus one for each arbitrator, and one for the Secretariat. A copy of any communication from the Arbitral Tribunal to the parties shall be sent to the Secretariat.

**2**

All notifications or communications from the Secretariat and the Arbitral Tribunal shall be made to the last address of the party or its representative for whom the same are intended, as notified either by the party in question or by the other party. Such notification or communication may be made by delivery against

receipt, registered post, courier, facsimile transmission, telex, telegram or any other means of telecommunication that provides a record of the sending thereof.

3

A notification or communication shall be deemed to have been made on the day it was received by the party itself or by its representative, or would have been received if made in accordance with the preceding paragraph.

4

Periods of time specified in or fixed under the present Rules shall start to run on the day following the date a notification or communication is deemed to have been made in accordance with the preceding paragraph. When the day next following such date is an official holiday, or a non-business day in the country where the notification or communication is deemed to have been made, the period of time shall commence on the first following business day. Official holidays and non-business days are included in the calculation of the period of time. If the last day of the relevant period of time granted is an official holiday or a non-business day in the country where the notification or communication is deemed to have been made, the period of time shall expire at the end of the first following business day.

## COMMENCING THE ARBITRATION

**Article 4**
**Request for Arbitration**

1

A party wishing to have recourse to arbitration under these Rules shall submit its Request for Arbitration (the "Request") to the Secretariat, which shall notify the Claimant and Respondent of the receipt of the Request and the date of such receipt.

2

The date on which the Request is received by the Secretariat shall, for all purposes, be deemed to be the date of the commencement of the arbitral proceedings.

3

The Request shall, *inter alia*, contain the following information:
a) the name in full, description and address of each of the parties;
b) a description of the nature and circumstances of the dispute giving rise to the claim(s);
c) a statement of the relief sought, including, to the extent possible, an indication of any amount(s) claimed;
d) the relevant agreements and, in particular, the arbitration agreement;
e) all relevant particulars concerning the number of arbitrators and their choice in accordance with the provisions of Articles 8, 9 and 10, and any nomination of an arbitrator required thereby; and
f) any comments as to the place of arbitration, the applicable rules of law and the language of the arbitration.

4

Together with the Request, the Claimant shall submit the number of copies thereof required by Article 3(1) and shall make the advance payment on administrative expenses required by Appendix III ("Arbitration Costs and Fees") in force on the date the Request is submitted. In the event that the Claimant fails to comply with either of these requirements, the Secretariat may fix a time limit within which the Claimant must comply, failing which the file shall be closed without prejudice to the right of the Claimant to submit the same claims at a later date in another Request.

5

The Secretariat shall send a copy of the Request and the documents annexed thereto to the Respondent for its Answer to the Request once the Secretariat has sufficient copies of the Request and the required advance payment.

6

When a party submits a Request in connection with a legal relationship in respect of which arbitration proceedings between the same parties are already pending under these Rules, the Court may, at the request of a party, decide to include the claims contained in the Request in the pending proceedings provided that the Terms of Reference have not been signed or approved by the Court. Once the Terms of Reference have been signed or approved by the Court, claims may only be included in the pending proceedings subject to the provisions of Article 19.

**Article 5**
**Answer to the Request; Counterclaims**

1

Within 30 days from the receipt of the Request from the Secretariat, the Respondent shall file an Answer (the "Answer") which shall, *inter alia*, contain the following information:

a)  its name in full, description and address;

b)  its comments as to the nature and circumstances of the dispute giving rise to the claim(s);

c)  its response to the relief sought;

d)  any comments concerning the number of arbitrators and their choice in light of the Claimant's proposals and in accordance with the provisions of Articles 8, 9 and 10, and any nomination of an arbitrator required thereby; and

e)  any comments as to the place of arbitration, the applicable rules of law and the language of the arbitration.

2

The Secretariat may grant the Respondent an extension of the time for filing the Answer, provided the application for such an extension contains the Respondent's comments concerning the number of arbitrators and their choice and, where required by Articles 8, 9 and 10, the nomination of an arbitrator. If the Respondent fails to do so, the Court shall proceed in accordance with these Rules.

3

The Answer shall be supplied to the Secretariat in the number of copies specified by Article 3(1).

4

A copy of the Answer and the documents annexed thereto shall be communicated by the Secretariat to the Claimant.

5

Any counterclaim(s) made by the Respondent shall be filed with its Answer and shall provide:

a)  a description of the nature and circumstances of the dispute giving rise to the counterclaim(s); and

b)  a statement of the relief sought, including, to the extent possible, an indication of any amount(s) counterclaimed.

6

The Claimant shall file a reply to any counterclaim within 30 days from the date of receipt of the counterclaim(s) communicated by the Secretariat. The Secretariat may grant the Claimant an extension of time for filing the reply.

**Article 6**
**Effect of the Arbitration Agreement**

1

Where the parties have agreed to submit to arbitration under the Rules, they shall be deemed to have submitted *ipso facto* to the Rules in effect on the date of commencement of the arbitration proceedings, unless they have agreed to submit to the Rules in effect on the date of their arbitration agreement.

2

If the Respondent does not file an Answer, as provided by Article 5, or if any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement, the Court may decide, without

prejudice to the admissibility or merits of the plea or pleas, that the arbitration shall proceed if it is *prima facie* satisfied that an arbitration agreement under the Rules may exist. In such a case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself. If the Court is not so satisfied, the parties shall be notified that the arbitration cannot proceed. In such a case, any party retains the right to ask any court having jurisdiction whether or not there is a binding arbitration agreement.

3

If any of the parties refuses or fails to take part in the arbitration or any stage thereof, the arbitration shall proceed notwithstanding such refusal or failure.

4

Unless otherwise agreed, the Arbitral Tribunal shall not cease to have jurisdiction by reason of any claim that the contract is null and void or allegation that it is non-existent, provided that the Arbitral Tribunal upholds the validity of the arbitration agreement. The Arbitral Tribunal shall continue to have jurisdiction to determine the respective rights of the parties and to adjudicate their claims and pleas even though the contract itself may be non-existent or null and void.

## THE ARBITRAL TRIBUNAL

### Article 7
### General Provisions

1

Every arbitrator must be and remain independent of the parties involved in the arbitration.

2

Before appointment or confirmation, a prospective arbitrator shall sign a statement of independence and disclose in writing to the Secretariat any facts or circumstances which might be of such a nature as to call into question the arbitrator's independence in the eyes of the parties. The Secretariat shall provide such information to the parties in writing and fix a time limit for any comments from them.

3

An arbitrator shall immediately disclose in writing to the Secretariat and to the parties any facts or circumstances of a similar nature which may arise during the arbitration.

4

The decisions of the Court as to the appointment, confirmation, challenge or replacement of an arbitrator shall be final and the reasons for such decisions shall not be communicated.

5

By accepting to serve, every arbitrator undertakes to carry out his responsibilities in accordance with these Rules.

6

Insofar as the parties have not provided otherwise, the Arbitral Tribunal shall be constituted in accordance with the provisions of Articles 8, 9 and 10.

### Article 8
### Number of Arbitrators

1

The disputes shall be decided by a sole arbitrator or by three arbitrators.

2

Where the parties have not agreed upon the number of arbitrators, the Court shall appoint a sole arbitrator, save where it appears to the Court that the dispute is such as to warrant the appointment of three arbitrators. In such case, the Claimant shall nominate an arbitrator within a period of 15 days from

the receipt of the notification of the decision of the Court, and the Respondent shall nominate an arbitrator within a period of 15 days from the receipt of the notification of the nomination made by the Claimant.

**3**

Where the parties have agreed that the dispute shall be settled by a sole arbitrator, they may, by agreement, nominate the sole arbitrator for confirmation. If the parties fail to nominate a sole arbitrator within 30 days from the date when the Claimant's Request for Arbitration has been received by the other party, or within such additional time as may be allowed by the Secretariat, the sole arbitrator shall be appointed by the Court.

**4**

Where the dispute is to be referred to three arbitrators, each party shall nominate in the Request and the Answer, respectively, one arbitrator for confirmation. If a party fails to nominate an arbitrator, the appointment shall be made by the Court. The third arbitrator, who will act as chairman of the Arbitral Tribunal, shall be appointed by the Court, unless the parties have agreed upon another procedure for such appointment, in which case the nomination will be subject to confirmation pursuant to Article 9. Should such procedure not result in a nomination within the time limit fixed by the parties or the Court, the third arbitrator shall be appointed by the Court.

**Article 9**
**Appointment and Confirmation of the Arbitrators**

**1**

In confirming or appointing arbitrators, the Court shall consider the prospective arbitrator's nationality, residence and other relationships with the countries of which the parties or the other arbitrators are nationals and the prospective arbitrator's availability and ability to conduct the arbitration in accordance with these Rules. The same shall apply where the Secretary General confirms arbitrators pursuant to Article 9(2).

**2**

The Secretary General may confirm as co-arbitrators, sole arbitrators and chairmen of Arbitral Tribunals persons nominated by the parties or pursuant to their particular agreements, provided they have filed a statement of independence without qualification or a qualified statement of independence has not given rise to objections. Such confirmation shall be reported to the Court at its next session. If the Secretary General considers that a co-arbitrator, sole arbitrator or chairman of an Arbitral Tribunal should not be confirmed, the matter shall be submitted to the Court.

**3**

Where the Court is to appoint a sole arbitrator or the chairman of an Arbitral Tribunal, it shall make the appointment upon a proposal of a National Committee of the ICC that it considers to be appropriate. If the Court does not accept the proposal made, or if the National Committee fails to make the proposal requested within the time limit fixed by the Court, the Court may repeat its request or may request a proposal from another National Committee that it considers to be appropriate.

**4**

Where the Court considers that the circumstances so demand, it may choose the sole arbitrator or the chairman of the Arbitral Tribunal from a country where there is no National Committee, provided that neither of the parties objects within the time limit fixed by the Court.

**5**

The sole arbitrator or the chairman of the Arbitral Tribunal shall be of a nationality other than those of the parties. However, in suitable circumstances and provided that neither of the parties objects within the time limit fixed by the Court, the sole arbitrator or the chairman of the Arbitral Tribunal may be chosen from a country of which any of the parties is a national.

**6**

Where the Court is to appoint an arbitrator on behalf of a party which has failed to nominate one, it shall make the appointment upon a proposal of the National Committee of the country of which that party is a

national. If the Court does not accept the proposal made, or if the National Committee fails to make the proposal requested within the time limit fixed by the Court, or if the country of which the said party is a national has no National Committee, the Court shall be at liberty to choose any person whom it regards as suitable. The Secretariat shall inform the National Committee, if one exists, of the country of which such person is a national.

## Article 10
## Multiple Parties

1

Where there are multiple parties, whether as Claimant or as Respondent, and where the dispute is to be referred to three arbitrators, the multiple Claimants, jointly, and the multiple Respondents, jointly, shall nominate an arbitrator for confirmation pursuant to Article 9.

2

In the absence of such a joint nomination and where all parties are unable to agree to a method for the constitution of the Arbitral Tribunal, the Court may appoint each member of the Arbitral Tribunal and shall designate one of them to act as chairman. In such case, the Court shall be at liberty to choose any person it regards as suitable to act as arbitrator, applying Article 9 when it considers this appropriate.

## Article 11
## Challenge of Arbitrators

1

A challenge of an arbitrator, whether for an alleged lack of independence or otherwise, shall be made by the submission to the Secretariat of a written statement specifying the facts and circumstances on which the challenge is based.

2

For a challenge to be admissible, it must be sent by a party either within 30 days from receipt by that party of the notification of the appointment or confirmation of the arbitrator, or within 30 days from the date when the party making the challenge was informed of the facts and circumstances on which the challenge is based if such date is subsequent to the receipt of such notification.

3

The Court shall decide on the admissibility and, at the same time, if necessary, on the merits of a challenge after the Secretariat has afforded an opportunity for the arbitrator concerned, the other party or parties and any other members of the Arbitral Tribunal to comment in writing within a suitable period of time. Such comments shall be communicated to the parties and to the arbitrators.

## Article 12
## Replacement of Arbitrators

1

An arbitrator shall be replaced upon his death, upon the acceptance by the Court of the arbitrator's resignation, upon acceptance by the Court of a challenge, or upon the request of all the parties.

2

An arbitrator shall also be replaced on the Court's own initiative when it decides that he is prevented *de jure* or *de facto* from fulfilling his functions, or that he is not fulfilling his functions in accordance with the Rules or within the prescribed time limits.

3

When, on the basis of information that has come to its attention, the Court considers applying Article 12(2), it shall decide on the matter after the arbitrator concerned, the parties and any other members of the Arbitral Tribunal have had an opportunity to comment in writing within a suitable period of time. Such comments shall be communicated to the parties and to the arbitrators.

4

When an arbitrator is to be replaced, the Court has discretion to decide whether or not to follow the original nominating process. Once reconstituted, and after having invited the parties to comment, the Arbitral Tribunal shall determine if and to what extent prior proceedings shall be repeated before the reconstituted Arbitral Tribunal.

5

Subsequent to the closing of the proceedings, instead of replacing an arbitrator who has died or been removed by the Court pursuant to Articles 12(1) and 12(2), the Court may decide, when it considers it appropriate, that the remaining arbitrators shall continue the arbitration. In making such determination, the Court shall take into account the views of the remaining arbitrators and of the parties and such other matters that it considers appropriate in the circumstances.

## THE ARBITRAL PROCEEDINGS

**Article 13**
**Transmission of the File to the Arbitral Tribunal**

The Secretariat shall transmit the file to the Arbitral Tribunal as soon as it has been constituted, provided the advance on costs requested by the Secretariat at this stage has been paid.

**Article 14**
**Place of the Arbitration**

1

The place of the arbitration shall be fixed by the Court unless agreed upon by the parties.

2

The Arbitral Tribunal may, after consultation with the parties, conduct hearings and meetings at any location it considers appropriate unless otherwise agreed by the parties.

3

The Arbitral Tribunal may deliberate at any location it considers appropriate.

**Article 15**
**Rules Governing the Proceedings**

1

The proceedings before the Arbitral Tribunal shall be governed by these Rules and, where these Rules are silent, by any rules which the parties or, failing them, the Arbitral Tribunal may settle on, whether or not reference is thereby made to the rules of procedure of a national law to be applied to the arbitration.

2

In all cases, the Arbitral Tribunal shall act fairly and impartially and ensure that each party has a reasonable opportunity to present its case.

**Article 16**
**Language of the Arbitration**

In the absence of an agreement by the parties, the Arbitral Tribunal shall determine the language or languages of the arbitration, due regard being given to all relevant circumstances, including the language of the contract.

**Article 17**
**Applicable Rules of Law**

**1**

The parties shall be free to agree upon the rules of law to be applied by the Arbitral Tribunal to the merits of the dispute. In the absence of any such agreement, the Arbitral Tribunal shall apply the rules of law which it determines to be appropriate.

**2**

In all cases the Arbitral Tribunal shall take account of the provisions of the contract and the relevant trade usages.

**3**

The Arbitral Tribunal shall assume the powers of an *amiable compositeur* or decide *ex aequo et bono* only if the parties have agreed to give it such powers.

**Article 18**
**Terms of Reference; Procedural Timetable**

**1**

As soon as it has received the file from the Secretariat, the Arbitral Tribunal shall draw up, on the basis of documents or in the presence of the parties and in the light of their most recent submissions, a document defining its Terms of Reference. This document shall include the following particulars:

a) the full names and descriptions of the parties;

b) the addresses of the parties to which notifications and communications arising in the course of the arbitration may be made;

c) a summary of the parties' respective claims and of the relief sought by each party, with an indication to the extent possible of the amounts claimed or counterclaimed;

d) unless the Arbitral Tribunal considers it inappropriate, a list of issues to be determined;

e) the full names, descriptions and addresses of the arbitrators;

f) the place of the arbitration; and

g) particulars of the applicable procedural rules and, if such is the case, reference to the power conferred upon the Arbitral Tribunal to act as *amiable compositeur* or to decide *ex aequo et bono*.

**2**

The Terms of Reference shall be signed by the parties and the Arbitral Tribunal. Within two months of the date on which the file has been transmitted to it, the Arbitral Tribunal shall transmit to the Court the Terms of Reference signed by it and by the parties. The Court may extend this time limit pursuant to a reasoned request from the Arbitral Tribunal or on its own initiative if it decides it is necessary to do so.

**3**

If any of the parties refuses to take part in the drawing up of the Terms of Reference or to sign the same, they shall be submitted to the Court for approval. When the Terms of Reference have been signed in accordance with Article 18(2) or approved by the Court, the arbitration shall proceed.

**4**

When drawing up the Terms of Reference, or as soon as possible thereafter, the Arbitral Tribunal, after having consulted the parties, shall establish in a separate document a provisional timetable that it intends to follow for the conduct of the arbitration and shall communicate it to the Court and the parties. Any subsequent modifications of the provisional timetable shall be communicated to the Court and the parties.

**Article 19**
**New Claims**

After the Terms of Reference have been signed or approved by the Court, no party shall make new claims or counterclaims which fall outside the limits of the Terms of Reference unless it has been authorized to do so by the Arbitral Tribunal, which shall consider the nature of such new claims or counterclaims, the stage of the arbitration and other relevant circumstances.

**Article 20**
**Establishing the Facts of the Case**

**1**

The Arbitral Tribunal shall proceed within as short a time as possible to establish the facts of the case by all appropriate means.

**2**

After studying the written submissions of the parties and all documents relied upon, the Arbitral Tribunal shall hear the parties together in person if any of them so requests or, failing such a request, it may of its own motion decide to hear them.

**3**

The Arbitral Tribunal may decide to hear witnesses, experts appointed by the parties or any other person, in the presence of the parties, or in their absence provided they have been duly summoned.

**4**

The Arbitral Tribunal, after having consulted the parties, may appoint one or more experts, define their terms of reference and receive their reports. At the request of a party, the parties shall be given the opportunity to question at a hearing any such expert appointed by the Tribunal.

**5**

At any time during the proceedings, the Arbitral Tribunal may summon any party to provide additional evidence.

**6**

The Arbitral Tribunal may decide the case solely on the documents submitted by the parties unless any of the parties requests a hearing.

**7**

The Arbitral Tribunal may take measures for protecting trade secrets and confidential information.

**Article 21**
**Hearings**

**1**

When a hearing is to be held, the Arbitral Tribunal, giving reasonable notice, shall summon the parties to appear before it on the day and at the place fixed by it.

**2**

If any of the parties, although duly summoned, fails to appear without valid excuse, the Arbitral Tribunal shall have the power to proceed with the hearing.

**3**

The Arbitral Tribunal shall be in full charge of the hearings, at which all the parties shall be entitled to be present. Save with the approval of the Arbitral Tribunal and the parties, persons not involved in the proceedings shall not be admitted.

**4**

The parties may appear in person or through duly authorized representatives. In addition, they may be assisted by advisers.

**Article 22**
**Closing of the Proceedings**

**1**

When it is satisfied that the parties have had a reasonable opportunity to present their cases, the Arbitral Tribunal shall declare the proceedings closed. Thereafter, no further submission or argument may be made, or evidence produced, unless requested or authorized by the Arbitral Tribunal.

**2**

When the Arbitral Tribunal has declared the proceedings closed, it shall indicate to the Secretariat an approximate date by which the draft Award will be submitted to the Court for approval pursuant to Article 27. Any postponement of that date shall be communicated to the Secretariat by the Arbitral Tribunal.

### Article 23
### Conservatory and Interim Measures

**1**

Unless the parties have otherwise agreed, as soon as the file has been transmitted to it, the Arbitral Tribunal may, at the request of a party, order any interim or conservatory measure it deems appropriate. The Arbitral Tribunal may make the granting of any such measure subject to appropriate security being furnished by the requesting party. Any such measure shall take the form of an order, giving reasons, or of an Award, as the Arbitral Tribunal considers appropriate.

**2**

Before the file is transmitted to the Arbitral Tribunal, and in appropriate circumstances even thereafter, the parties may apply to any competent judicial authority for interim or conservatory measures. The application of a party to a judicial authority for such measures or for the implementation of any such measures ordered by an Arbitral Tribunal shall not be deemed to be an infringement or a waiver of the arbitration agreement and shall not affect the relevant powers reserved to the Arbitral Tribunal. Any such application and any measures taken by the judicial authority must be notified without delay to the Secretariat. The Secretariat shall inform the Arbitral Tribunal thereof.

## AWARDS

### Article 24
### Time Limit for the Award

**1**

The time limit within which the Arbitral Tribunal must render its final Award is six months. Such time limit shall start to run from the date of the last signature by the Arbitral Tribunal or by the parties of the Terms of Reference or, in the case of application of Article 18(3), the date of the notification to the Arbitral Tribunal by the Secretariat of the approval of the Terms of Reference by the Court.

**2**

The Court may extend this time limit pursuant to a reasoned request from the Arbitral Tribunal or on its own initiative if it decides it is necessary to do so.

### Article 25
### Making of the Award

**1**

When the Arbitral Tribunal is composed of more than one arbitrator, an Award is given by a majority decision. If there be no majority, the Award shall be made by the chairman of the Arbitral Tribunal alone.

**2**

The Award shall state the reasons upon which it is based.

**3**

The Award shall be deemed to be made at the place of the arbitration and on the date stated therein.

## Article 26
## Award by Consent

If the parties reach a settlement after the file has been transmitted to the Arbitral Tribunal in accordance with Article 13, the settlement shall be recorded in the form of an Award made by consent of the parties if so requested by the parties and if the Arbitral Tribunal agrees to do so.

## Article 27
## Scrutiny of the Award by the Court

Before signing any Award, the Arbitral Tribunal shall submit it in draft form to the Court. The Court may lay down modifications as to the form of the Award and, without affecting the Arbitral Tribunal's liberty of decision, may also draw its attention to points of substance. No Award shall be rendered by the Arbitral Tribunal until it has been approved by the Court as to its form.

## Article 28
## Notification, Deposit and Enforceability of the Award

1

Once an Award has been made, the Secretariat shall notify to the parties the text signed by the Arbitral Tribunal, provided always that the costs of the arbitration have been fully paid to the ICC by the parties or by one of them.

2

Additional copies certified true by the Secretary General shall be made available on request and at any time to the parties, but to no one else.

3

By virtue of the notification made in accordance with Paragraph 1 of this Article, the parties waive any other form of notification or deposit on the part of the Arbitral Tribunal.

4

An original of each Award made in accordance with the present Rules shall be deposited with the Secretariat.

5

The Arbitral Tribunal and the Secretariat shall assist the parties in complying with whatever further formalities may be necessary.

6

Every Award shall be binding on the parties. By submitting the dispute to arbitration under these Rules, the parties undertake to carry out any Award without delay and shall be deemed to have waived their right to any form of recourse insofar as such waiver can validly be made.

## Article 29
## Correction and Interpretation of the Award

1

On its own initiative, the Arbitral Tribunal may correct a clerical, computational or typographical error, or any errors of similar nature contained in an Award, provided such correction is submitted for approval to the Court within 30 days of the date of such Award.

2

Any application of a party for the correction of an error of the kind referred to in Article 29(1), or for the interpretation of an Award, must be made to the Secretariat within 30 days of the receipt of the Award by such party, in a number of copies as stated in Article 3(1). After transmittal of the application to the Arbitral Tribunal, the latter shall grant the other party a short time limit, normally not exceeding 30 days, from the receipt of the application by that party, to submit any comments thereon. If the Arbitral Tribunal decides to

correct or interpret the Award, it shall submit its decision in draft form to the Court not later than 30 days following the expiration of the time limit for the receipt of any comments from the other party or within such other period as the Court may decide.

**3**

The decision to correct or to interpret the Award shall take the form of an addendum and shall constitute part of the Award. The provisions of Articles 25, 27 and 28 shall apply *mutatis mutandis.*

## COSTS

**Article 30**
### Advance to Cover the Costs of the Arbitration

**1**

After receipt of the Request, the Secretary General may request the Claimant to pay a provisional advance in an amount intended to cover the costs of arbitration until the Terms of Reference have been drawn up.

**2**

As soon as practicable, the Court shall fix the advance on costs in an amount likely to cover the fees and expenses of the arbitrators and the ICC administrative costs for the claims and counterclaims which have been referred to it by the parties. This amount may be subject to readjustment at any time during the arbitration. Where, apart from the claims, counterclaims are submitted, the Court may fix separate advances on costs for the claims and the counterclaims.

**3**

The advance on costs fixed by the Court shall be payable in equal shares by the Claimant and the Respondent. Any provisional advance paid on the basis of Article 30(1) will be considered as a partial payment thereof. However, any party shall be free to pay the whole of the advance on costs in respect of the principal claim or the counterclaim should the other party fail to pay its share. When the Court has set separate advances on costs in accordance with Article 30(2), each of the parties shall pay the advance on costs corresponding to its claims.

**4**

When a request for an advance on costs has not been complied with, and after consultation with the Arbitral Tribunal, the Secretary General may direct the Arbitral Tribunal to suspend its work and set a time limit, which must be not less than 15 days, on the expiry of which the relevant claims, or counterclaims, shall be considered as withdrawn. Should the party in question wish to object to this measure, it must make a request within the aforementioned period for the matter to be decided by the Court. Such party shall not be prevented, on the ground of such withdrawal, from reintroducing the same claims or counterclaims at a later date in another proceeding.

**5**

If one of the parties claims a right to a set-off with regard to either claims or counterclaims, such set-off shall be taken into account in determining the advance to cover the costs of arbitration in the same way as a separate claim insofar as it may require the Arbitral Tribunal to consider additional matters.

**Article 31**
### Decision as to the Costs of the Arbitration

**1**

The costs of the arbitration shall include the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court, in accordance with the scale in force at the time of the commencement of the arbitral proceedings, as well as the fees and expenses of any experts appointed by the Arbitral Tribunal and the reasonable legal and other costs incurred by the parties for the arbitration.

**2**

The Court may fix the fees of the arbitrators at a figure higher or lower than that which would result from the application of the relevant scale should this be deemed necessary due to the exceptional circumstances of the case. Decisions on costs other than those fixed by the Court may be taken by the Arbitral Tribunal at any time during the proceedings.

**3**

The final Award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties.

## MISCELLANEOUS

### Article 32
### Modified Time Limits

**1**

The parties may agree to shorten the various time limits set out in these Rules. Any such agreement entered into subsequent to the constitution of an Arbitral Tribunal shall become effective only upon the approval of the Arbitral Tribunal.

**2**

The Court, on its own initiative, may extend any time limit which has been modified pursuant to Article 32(1) if it decides that it is necessary to do so in order that the Arbitral Tribunal or the Court may fulfil their responsibilities in accordance with these Rules.

### Article 33
### Waiver

A party which proceeds with the arbitration without raising its objection to a failure to comply with any provision of these Rules, or of any other rules applicable to the proceedings, any direction given by the Arbitral Tribunal, or any requirement under the arbitration agreement relating to the constitution of the Arbitral Tribunal, or to the conduct of the proceedings, shall be deemed to have waived its right to object.

### Article 34
### Exclusion of Liability

Neither the arbitrators, nor the Court and its members, nor the ICC and its employees, nor the ICC National Committees shall be liable to any person for any act or omission in connection with the arbitration.

### Article 35
### General Rule

In all matters not expressly provided for in these Rules, the Court and the Arbitral Tribunal shall act in the spirit of these Rules and shall make every effort to make sure that the Award is enforceable at law.

**APPENDIX I**
**STATUTES OF THE INTERNATIONAL**
**COURT OF ARBITRATION**

**Article 1**
**Function**

**1**

The function of the International Court of Arbitration of the International Chamber of Commerce (the "Court") is to ensure the application of the Rules of Arbitration of the International Chamber of Commerce, and it has all the necessary powers for that purpose.

**2**

As an autonomous body, it carries out these functions in complete independence from the ICC and its organs.

**3**

Its members are independent from the ICC National Committees.

**Article 2**
**Composition of the Court**

The Court shall consist of a Chairman, Vice-Chairmen, and members and alternate members (collectively designated as members). In its work it is assisted by its Secretariat (Secretariat of the Court).

**Article 3**
**Appointment**

**1**

The Chairman is elected by the ICC World Council upon the recommendation of the Executive Board of the ICC.

**2**

The ICC World Council appoints the Vice-Chairmen of the Court from among the members of the Court or otherwise.

**3**

Its members are appointed by the ICC World Council on the proposal of National Committees, one member for each Committee.

**4**

On the proposal of the Chairman of the Court, the World Council may appoint alternate members.

**5**

The term of office of all members is three years. If a member is no longer in a position to exercise his functions, his successor is appointed by the World Council for the remainder of the term.

**Article 4**
**Plenary Session of the Court**

The Plenary Sessions of the Court are presided over by the Chairman or, in his absence, by one of the Vice-Chairmen designated by him. The deliberations shall be valid when at least six members are present. Decisions are taken by a majority vote, the Chairman having a casting vote in the event of a tie.

**Article 5**
**Committees**

The Court may set up one or more Committees and establish the functions and organization of such Committees.

**Article 6**
**Confidentiality**

The work of the Court is of a confidential nature which must be respected by everyone who participates in that work in whatever capacity. The Court lays down the rules regarding the persons who can attend the meetings of the Court and its Committees and who are entitled to have access to the materials submitted to the Court and its Secretariat.

**Article 7**
**Modification of the Rules of Arbitration**

Any proposal of the Court for a modification of the Rules is laid before the Commission on Arbitration before submission to the Executive Board and the World Council of the ICC for approval.

**APPENDIX II**
**INTERNAL RULES OF THE INTERNATIONAL**
**COURT OF ARBITRATION**

**Article 1**
**Confidential Character of the Work of the International Court of Arbitration**

**1**

The sessions of the Court, whether plenary or those of a Committee of the Court, are open only to its members and to the Secretariat.

**2**

However, in exceptional circumstances, the Chairman of the Court may invite other persons to attend. Such persons must respect the confidential nature of the work of the Court.

**3**

The documents submitted to the Court, or drawn up by it in the course of its proceedings, are communicated only to the members of the Court and to the Secretariat and to persons authorized by the Chairman to attend Court sessions.

**4**

The Chairman or the Secretary General of the Court may authorize researchers undertaking work of a scientific nature on international trade law to acquaint themselves with Awards and other documents of general interest, with the exception of memoranda, notes, statements and documents remitted by the parties within the framework of arbitration proceedings.

**5**

Such authorization shall not be given unless the beneficiary has undertaken to respect the confidential character of the documents made available and to refrain from any publication in their respect without having previously submitted the text for approval to the Secretary General of the Court.

**6**

The Secretariat will in each case submitted to arbitration under the Rules retain in the archives of the Court all Awards, Terms of Reference and decisions of the Court, as well as copies of the pertinent correspondence of the Secretariat.

**7**

Any documents, communications or correspondence submitted by the parties or the arbitrators may be destroyed unless a party or an arbitrator requests in writing within a period fixed by the Secretariat the return of such documents. All related costs and expenses for the return of those documents shall be paid by such party or arbitrator.

**Article 2**
**Participation of Members of the International Court of Arbitration in ICC Arbitration**

**1**

The Chairman and the members of the Secretariat of the Court may not act as arbitrators or as counsel in cases submitted to ICC arbitration.

**2**

The Court shall not appoint Vice-Chairmen or members of the Court as arbitrators. They may, however, be proposed for such duties by one or more of the parties, or pursuant to any other procedure agreed upon by the parties, subject to confirmation.

**3**

When the Chairman, a Vice-Chairman or a member of the Court or of the Secretariat is involved in any capacity whatsoever in proceedings pending before the Court, such person must inform the Secretary General of the Court upon becoming aware of such involvement.

4

Such person must refrain from participating in the discussions or in the decisions of the Court concerning the proceedings and must be absent from the courtroom whenever the matter is considered.

5

Such person will not receive any material documentation or information pertaining to such proceedings.

## Article 3
### Relations between the Members of the Court and the ICC National Committees

1

By virtue of their capacity, the members of the Court are independent of the ICC National Committees which proposed them for appointment by the ICC World Council.

2

Furthermore, they must regard as confidential, vis-à-vis the said National Committees, any information concerning individual cases with which they have become acquainted in their capacity as members of the Court, except when they have been requested by the Chairman of the Court or by its Secretary General to communicate specific information to their respective National Committees.

## Article 4
### Committee of the Court

1

In accordance with the provisions of Article 1(4) of the Rules and Article 5 of its Statutes (Appendix I), the Court hereby establishes a Committee of the Court.

2

The members of the Committee consist of a Chairman and at least two other members. The Chairman of the Court acts as the Chairman of the Committee. If absent, the Chairman may designate a Vice-Chairman of the Court or, in exceptional circumstances, another member of the Court as Chairman of the Committee.

3

The other two members of the Committee are appointed by the Court from among the Vice-Chairmen or the other members of the Court. At each Plenary Session the Court appoints the members who are to attend the meetings of the Committee to be held before the next Plenary Session.

4

The Committee meets when convened by its Chairman. Two members constitute a quorum.

5

(a)     The Court shall determine the decisions that may be taken by the Committee.

(b)     The decisions of the Committee are taken unanimously.

(c)     When the Committee cannot reach a decision or deems it preferable to abstain, it transfers the case to the next Plenary Session, making any suggestions it deems appropriate.

(d)     The Committee's decisions are brought to the notice of the Court at its next Plenary Session.

## Article 5
### Court Secretariat

1

In case of absence, the Secretary General may delegate to the General Counsel and Deputy Secretary General the authority to confirm arbitrators, to certify true copies of Awards and to request the payment of a provisional advance, respectively provided for in Articles 9(2), 28(2) and 30(1) of the Rules.

2

The Secretariat may, with the approval of the Court, issue notes and other documents for the information of the parties and the arbitrators, or as necessary for the proper conduct of the arbitral proceedings.

**Article 6**
**Scrutiny of Arbitral Awards**

When the Court scrutinizes draft Awards in accordance with Article 27 of the Rules, it considers, to the extent practicable, the requirements of mandatory law at the place of arbitration.

### APPENDIX III
### ARBITRATION COSTS AND FEES

**Article 1**
**Advance on Costs**

**1**

Each request to commence an arbitration pursuant to the Rules must be accompanied by an advance payment of US$ 2,500 on the administrative expenses. Such payment is non-refundable, and shall be credited to the Claimant's portion of the advance on costs.

**2**

The provisional advance fixed by the Secretary General according to Article 30(1) of the Rules shall normally not exceed the amount obtained by adding together the administrative expenses, the minimum of the fees (as set out in the scale hereinafter) based upon the amount of the claim and the expected reimbursable expenses of the Arbitral Tribunal incurred with respect to the drafting of the Terms of Reference. If such amount is not quantified, the provisional advance shall be fixed at the discretion of the Secretary General. Payment by the Claimant shall be credited to its share of the advance on costs fixed by the Court.

**3**

In general, after the Terms of Reference have been signed or approved by the Court and the provisional timetable has been established, the Arbitral Tribunal shall, in accordance with Article 30(4) of the Rules, proceed only with respect to those claims or counterclaims in regard to which the whole of the advance on costs has been paid.

**4**

The advance on costs fixed by the Court according to Article 30(2) of the Rules comprises the fees of the arbitrator or arbitrators (hereinafter referred to as "arbitrator"), any arbitration-related expenses of the arbitrator and the administrative expenses.

**5**

Each party shall pay in cash its share of the total advance on costs. However, if its share exceeds an amount fixed from time to time by the Court, a party may post a bank guarantee for this additional amount.

**6**

A party that has already paid in full its share of the advance on costs fixed by the Court may, in accordance with Article 30(3) of the Rules, pay the unpaid portion of the advance owed by the defaulting party by posting a bank guarantee.

**7**

When the Court has fixed separate advances on costs pursuant to Article 30(2) of the Rules, the Secretariat shall invite each party to pay the amount of the advance corresponding to its respective claim(s).

**8**

When, as a result of the fixing of separate advances on costs, the separate advance fixed for the claim of either party exceeds one half of such global advance as was previously fixed (in respect of the same claims and counterclaims that are the subject of separate advances), a bank guarantee may be posted to cover any such excess amount. In the event that the amount of the separate advance is subsequently increased, at least one half of the increase shall be paid in cash.

**9**

The Secretariat shall establish the terms governing all bank guarantees which the parties may post pursuant to the above provisions.

**10**

As provided in Article 30(2) of the Rules, the advance on costs may be subject to readjustment at any time during the arbitration, in particular to take into account fluctuations in the amount in dispute, changes in the amount of the estimated expenses of the arbitrator, or the evolving difficulty or complexity of arbitration proceedings.

ICC Publication No. 838                                              21 / 25

11

Before any expertise ordered by the Arbitral Tribunal can be commenced, the parties, or one of them, shall pay an advance on costs fixed by the Arbitral Tribunal sufficient to cover the expected fees and expenses of the expert as determined by the Arbitral Tribunal. The Arbitral Tribunal shall be responsible for ensuring the payment by the parties of such fees and expenses.

## Article 2
## Costs and Fees

1

Subject to Article 31(2) of the Rules, the Court shall fix the fees of the arbitrator in accordance with the scale hereinafter set out or, where the sum in dispute is not stated, at its discretion.

2

In setting the arbitrator's fees, the Court shall take into consideration the diligence of the arbitrator, the time spent, the rapidity of the proceedings, and the complexity of the dispute, so as to arrive at a figure within the limits specified or, in exceptional circumstances (Article 31(2) of the Rules), at a figure higher or lower than those limits.

3

When a case is submitted to more than one arbitrator, the Court, at its discretion, shall have the right to increase the total fees up to a maximum which shall normally not exceed three times the fees of one arbitrator.

4

The arbitrator's fees and expenses shall be fixed exclusively by the Court as required by the Rules. Separate fee arrangements between the parties and the arbitrator are contrary to the Rules.

5

The Court shall fix the administrative expenses of each arbitration in accordance with the scale hereinafter set out or, where the sum in dispute is not stated, at its discretion. In exceptional circumstances, the Court may fix the administrative expenses at a lower or higher figure than that which would result from the application of such scale, provided that such expenses shall normally not exceed the maximum amount of the scale. Further, the Court may require the payment of administrative expenses in addition to those provided in the scale of administrative expenses as a condition to holding an arbitration in abeyance at the request of the parties or of one of them with the acquiescence of the other.

6

If an arbitration terminates before the rendering of a final Award, the Court shall fix the costs of the arbitration at its discretion, taking into account the stage attained by the arbitral proceedings and any other relevant circumstances.

7

In the case of an application under Article 29(2) of the Rules, the Court may fix an advance to cover additional fees and expenses of the Arbitral Tribunal and may make the transmission of such application to the Arbitral Tribunal subject to the prior cash payment in full to the ICC of such advance. The Court shall fix at its discretion any possible fees of the arbitrator when approving the decision of the Arbitral Tribunal.

8

When an arbitration is preceded by an attempt at amicable resolution pursuant to the ICC ADR Rules, one half of the administrative expenses paid for such ADR proceedings shall be credited to the administrative expenses of the arbitration.

9

Amounts paid to the arbitrator do not include any possible value added taxes (VAT) or other taxes or charges and imposts applicable to the arbitrator's fees. Parties have a duty to pay any such taxes or charges; however, the recovery of any such charges or taxes is a matter solely between the arbitrator and the parties.

**Article 3**
**ICC as Appointing Authority**

Any request received for an authority of the ICC to act as appointing authority will be treated in accordance with the Rules of ICC as Appointing Authority in UNCITRAL or Other *Ad Hoc* Arbitration Proceedings and shall be accompanied by a non-refundable sum of US$ 2,500.   No request shall be processed unless accompanied by the said sum.   For additional services, ICC may at its discretion fix administrative expenses, which shall be commensurate with the services provided and shall not exceed the maximum sum of US$ 10,000.

**Article 4**
**Scales of Administrative Expenses and Arbitrator's Fees**

1

The Scales of Administrative Expenses and Arbitrator's Fees set forth below shall be effective as of 1 July 2003 in respect of all arbitrations commenced on or after such date, irrespective of the version of the Rules applying to such arbitrations.

2

To calculate the administrative expenses and the arbitrator's fees, the amounts calculated for each successive slice of the sum in dispute must be added together, except that where the sum in dispute is over US$ 80 million, a flat amount of US$ 88,800 shall constitute the entirety of the administrative expenses.

### A. ADMINISTRATIVE EXPENSES

| Sum in dispute (in US Dollars) | Administrative expenses[*] |
|---|---|
| up to 50 000 | $ 2 500 |
| from 50 001 to 100 000 | 3.50% |
| from 100 001 to 500 000 | 1.70% |
| from 500 001 to 1 000 000 | 1.15% |
| from 1 000 001 to 2 000 000 | 0.70% |
| from 2 000 001 to 5 000 000 | 0.30% |
| from 5 000 001 to 10 000 000 | 0.20% |
| from 10 000 001 to 50 000 000 | 0.07% |
| from 50 000 001 to 80 000 000 | 0.06% |
| over 80 000 000 | $ 88 800 |

*(\*) For illustrative purposes only, the table on the following page indicates the resulting administrative expenses in US$ when the proper calculations have been made.*

### B. ARBITRATOR'S FEES

| Sum in dispute (in US Dollars) | Fees[**] | |
|---|---|---|
| | minimum | maximum |
| up to 50 000 | $ 2 500 | 17.00% |
| from 50 001 to 100 000 | 2.00% | 11.00% |
| from 100 001 to 500 000 | 1.00% | 5.50% |
| from 500 001 to 1 000 000 | 0.75% | 3.50% |
| from 1 000 001 to 2 000 000 | 0.50% | 2.75% |
| from 2 000 001 to 5 000 000 | 0.25% | 1.12% |
| from 5 000 001 to 10 000 000 | 0.10% | 0.616% |
| from 10 000 001 to 50 000 000 | 0.05% | 0.193% |
| from 50 000 001 to 80 000 000 | 0.03% | 0.136% |
| from 80 000 001 to 100 000 000 | 0.02% | 0.112% |
| over 100 000 000 | 0.01% | 0.056% |

*(\*\*) For illustrative purposes only, the table on the following page indicates the resulting range of fees when the proper calculations have been made.*

| SUM IN DISPUTE (in US Dollars) | A ADMINISTRATIVE EXPENSES(*) (in US Dollars) | B ARBITRATOR'S FEES (**) (in US Dollars) | |
|---|---|---|---|
| | | Minimum | Maximum |
| up to 50000 | 2500 | 2500 | 17.00% of amount in dispute |
| from 50001 to 100000 | 2500 + 3.50% of amt.over 50000 | 2500 + 2.00% of amt. over 50000 | 8500 + 11.00% of amt. over 50000 |
| from 100001 to 500000 | 4250 + 1.70% of amt.over 100000 | 3500 + 1.00% of amt.over 100000 | 14000 + 5.50% of amt. over 100000 |
| from 500001 to 1000000 | 11050 + 1.15% of amt. over 500000 | 7500 + 0.75% of amt. over 500000 | 36000 + 3.50% of amt. over 500000 |
| from 1000001 to 2000000 | 16800 + 0.70% of amt.over 1000000 | 11250 + 0.50% of amt.over 1000000 | 53500 + 2.75% of amt. over 1000000 |
| from 2000001 to 5000000 | 23800 + 0.30% of amt.over 2000000 | 16250 + 0.25% of amt.over 2000000 | 81000 + 1.12% of amt. over 2000000 |
| from 5000001 to 10000000 | 32800 + 0.20% of amt.over 5000000 | 23750 + 0.10% of amt.over 5000000 | 114800 + 0.618% of amt. over 5000000 |
| from 10000001 to 50000000 | 42800 + 0.07% of amt.over 10000000 | 28750 + 0.05% of amt.over 10000000 | 145400 + 0.193% of amt. over 10000000 |
| from 50000001 to 80000000 | 70800 + 0.06% of amt.over 50000000 | 48750 + 0.03% of amt. over 50000000 | 222600 + 0.136% of amt. over 50000000 |
| from 80000001 to 100000000 | 88800 | 57750 + 0.02% of amt. over 80000000 | 283400 + 0.112% of amt. over 80000000 |
| over 100000000 | 88800 | 61750 + 0.01% of amt. over 100000000 | 285800 + 0.056% of amt. over 100000000 |

(*)(**) See preceding page

ICC Publication No. 838

# EXHIBIT 4 (Part 1)

# KING & SPALDING

King & Spalding LLP
1100 Louisiana Street, Suite 4000
Houston, Texas 77002-5213
Main: 713/751-3200
Fax: 713/751-3290

R. Doak Bishop
Partner
Direct Dial: 713/751-3205
Direct Fax: 713/751-3290
dbishop@kslaw.com

December 28, 2006

The Secretariat of the International Court of Arbitration
38 cours Albert 1er
75008 Paris
France

      **Re:    Global Gold Mining, LLC vs. Vardan Ayvazian, Mayren Batoyan, Edward Janibekian, and Yurik Lalazaryan.**

Dear Sir:

      Enclosed for filing please find an original and eight (8) copies of a Request for Arbitration, submitted on behalf of Global Gold Mining, LLC, as Claimant in the above-captioned matter. Enclosed as well is a check in the amount of US$2,500.00 as an advance payment on administrative expenses.

      Please do not hesitate to contact me if you should have any questions concerning this matter.

      Very truly yours,

      R. Doak Bishop

Enclosures

cc:    Van Z. Krikorian, Global Gold Mining, LLC
       Vardan Ayvazian
       Mayren Batoyan
       Edward Janibekian
       Yurik Lalazaryan

IN THE INTERNATIONAL COURT OF ARBITRATION

OF THE

INTERNATIONAL CHAMBER OF COMMERCE

---

In the Matter of

GLOBAL GOLD MINING, LLC,

Claimant,

vs.

VARDAN AYVAZIAN, MAYREN BATOYAN, EDWARD JANIBEKIAN,
and YURIK LALAZARYAN,

Respondents.

---

## REQUEST FOR ARBITRATION

---

**KING & SPALDING LLP**

1100 Louisiana Street
Suite 4000
Houston, Texas, USA  77002
Tel: 001.713.751.3200
Fax: 001.713.751.3290

25 Cannon Street
London, England  EC4M 5SE
Tel: 00.44.20.7551.7500
Fax: 00.44.20.7551.7575

Email: dbishop@kslaw.com

Counsel for Claimant

Claimant Global Gold Mining, LLC ("Global Gold") files this Request for Arbitration against Respondents Vardan Ayvazian ("Ayzavian"), Mayren Batoyan ("Batoyan"), Edward Janibekian ("Janibekian"), and Yurik Lalazaryan ("Lalazaryan"), and requests that this matter be arbitrated pursuant to the arbitration clause of the Share Purchase Agreement between the parties dated December 21, 2003 (the "SPA")[1] and the Rules of Arbitration of the International Chamber of Commerce.

## I.    INTRODUCTION

1.     Global Gold is an American investor in Armenia's mining industry. In December 2003, it purchased from Respondents Batoyan, Janibekian, and Lalazaryan, citizens and residents of Armenia, all the shares in SHA, LLC, an Armenian limited liability company (the "Company"). The Company owned various exploration licenses and other rights in Armenia's Hankavan and Marjan fields, and by law was entitled to mining licenses and concession agreements for those fields. The Company's license rights extended through the year 2017.

2.     When Global Gold signed the SPA and paid the agreed purchase price to the former shareholders, it did so having secured from those shareholders certain specific promises about the assets and the business it was purchasing. Because the Company was in the process of exploring for gold, not yet mining and exploiting it, Global Gold had to be sure that the Company's assets -- and especially its license rights -- were beyond legal interference. Batoyan, Janibekian, and Lalazaryan therefore provided numerous contractual representations and warranties that the Company's governmental authorizations were in order, it was in compliance with all relevant legal requirements, its licenses were for the terms represented, as well as other representations and warranties.

---

[1] The SPA is attached as Exhibit "A."

2

3.     As it turns out, not only were those representations and warranties false, but the entire negotiation and execution of the SPA had been orchestrated and controlled by a fourth shareholder, an undisclosed principal to the agreement -- Ayvazian, who also happened to be and remains Armenia's Minister of the Environment.  In his official capacity, Ayvazian is able to exercise extraordinary control over the Company's assets and business.

4.     For over a year after the execution of the SPA, Ayvazian illegally interfered with, reduced the terms of, and refused to honor the Company's various exploration and license rights. When Global Gold complained of this treatment, Ayvazian demanded a US$ 3 million bribe to "fix" the problems that he had created.  Global Gold subsequently learned of Ayvazian's secret role as an undisclosed principal of the SPA, and that he and the other Respondents had misrepresented the status of the Company's assets, governmental authorizations, and compliance with various legal requirements.  In short, all four Respondents had lied to Global Gold in making their various seller representations and warranties, and they stood in breach of the SPA.

5.     Ayvazian's actions with respect to the Company are not unique.  He has systematically used his position as Minister of the Environment to grant mining exploration licenses to entities owned and controlled by his family members and close associates.  On numerous occasions, Ayvazian has purported to terminate the license of a company that legitimately owns exploration rights in a certain area, only to issue a new license to one of the entities he controls.  As described in more detail below, Ayvazian purported to do exactly that with respect to the Company's right to explore Armenia's Marjan fields.

6.     Global Gold is thus forced to institute this arbitration proceeding for breach of the SPA against the four other parties to the agreement -- (1) signatories Batoyan, Janibekian, and Lalazaryan, and (2) undisclosed principal Ayvazian, who under ICC practice and under the

3

agreement's governing law of New York is just as liable for breaching the SPA (and subject to the SPA's arbitration clause) as the other three Respondents.

## II.     THE PARTIES

7.     Claimant Global Gold is a Delaware, United States, limited liability company. Its legal domicile is 104 Field Point Road, Greenwich, Connecticut, USA 06830. Claimant is represented in this proceeding by:

King & Spalding LLP

R. Doak Bishop
Wade M. Coriell
1100 Louisiana Street
Suite 4000
Houston, Texas, USA 77002
Tel: 001.713.751.3200
Fax: 001.713.751.3290

Kenneth R. Fleuriet
25 Cannon Street
London, England EC4M 5SE
Tel: 00.44.20.7551.7500
Fax: 00.44.20.7551.7575

Email: dbishop@kslaw.com

8.     Respondent Ayvazian is an individual citizen and resident of Armenia. His legal domicile is Building 22, Block 6, Apartment 16, Charentsavan, Kotaik Region, Armenia, 10 Alex Manukian Street, Yerevan, Armenia.

9.     Respondent Batoyan is an individual citizen and resident of Armenia. Her legal domicile is Apartment 28, b.135, A. Babajanian Street, Yerevan, Armenia.

10.     Respondent Janibekian is an individual citizen and resident of Armenia. His legal domicile is Apartment 1344, b.23, Terian Street, Yerevan, Armenia.

11.     Respondent Lalazaryan is an individual citizen and resident of Armenia. His legal domicile is 66 Spandarian Street, Etchmiadzin, Armenia.

4

### III.   THE ARBITRATION AGREEMENT

12.   Section 11.5 of the SPA ("Arbitration; Jurisdiction; Service of Process") provides:

The Parties acknowledge that they are entering into and shall perform under this Agreement in good faith, and any disputes will be resolved in good faith, with the letter and spirit of this Agreement as the standard. The Parties will use their best efforts to resolve any disputes between themselves within thirty (30) days. During this thirty (30) day period, any party with ten (10) days' notice may request and the other party must agree to meet in good faith to resolve the dispute. After thirty days' effort, if a dispute is not resolved, any party may refer the dispute for final settlement to and in accord with under the Rules of Conciliation and Arbitration of the International Chamber of Commerce, London, England (the "Rules") by a panel of three (3) arbitrators. In the case of any matter to be settled under the Rules, each party hereto shall appoint one arbitrator and such two arbitrators shall appoint a third arbitrator; provided, that if all three arbitrators have not been appointed within thirty (30) days after the party submitting the matter in dispute has notified the other party of such submission, either party hereto may apply to the International Chamber of Commerce for appointment of the remaining arbitrators. The place of arbitration of any matter to be settled under the Rules shall be in New York City, or at such other place as the parties shall unanimously choose. On a case-by-case basis, the parties may also agree to alternative dispute resolution methods. Such an Agreement must be in writing and signed by both parties.

13.   On November 2, 2006, Global Gold sent a "Notice of Dispute" to Respondents advising them of a dispute under the Contract.[2] The Notice of Dispute informed Respondents that they "have materially breached the SPA in a manner entitling Global Gold to monetary damages and equitable remedies," and that the Notice of Dispute "begins the dispute resolution process provided in Section 11.5 of the SPA." Global Gold expressed its "hope that we can agree to a solution that will eliminate [the] damages [caused by Respondents] and allow the actions agreed in the SPA to go forward as anticipated and agreed at the time." Global Gold provided an Armenian translation of the Notice of Dispute, offered promptly to discuss an amicable resolution with Respondents, and specifically requested that Respondents contact Global Gold to facilitate such a discussion.

---

[2] The Notice of Dispute of November 2, 2006, is attached as Exhibit "B."

14.    Despite Global Gold's offer, Respondents did not attempt to resolve the dispute in good faith since receiving notice of it on November 2, 2006.[3]  The 30-day period provided in Section 11.5 of the SPA has now expired, and the parties have not agreed upon an alternative dispute resolution method.  Global Gold hereby exercises its contractual right to refer the dispute to arbitration under the Rules of Arbitration of the International Chamber of Commerce.

## IV.    OTHER PARTICULARS

15.    Global Gold designates Mr. Jonathan D. Schiller as its party-appointed arbitrator. Mr. Schiller's contract details are as follows:

> Boies, Schiller & Flexner, LLP
> 5301 Wisconsin Avenue NW
> Washington, D.C., USA 20015
> Tel: 001.202.237.5340
> Fax: 001.202.237.6131

16.    Claimant requests that this arbitration be conducted in New York City, as provided by the parties' arbitration agreement:

17.    The place of arbitration of any matter to be settled under the Rules shall be in New York City, or at such other place as the parties shall unanimously choose . . .

18.    Claimant requests that the arbitration be conducted in the English language.

---

[3] Janibekian was the only Respondent to respond to Global Gold's Notice of Dispute, in a convoluted letter in which he essentially denied that the sellers had made any relevant representations and warranties in the SPA in the first place.  Janibekian's letter and Global Gold's response to that letter are attached as Exhibit "C."  Ayvazian's Deputy Minister also responded to the Notice of Dispute, in a letter in which he challenged Global Gold's right to communicate in this manner with the Minister of the Environment. This letter, and Global Gold's response, in which it noted that the dispute with Ayvazian is in his individual rather than official capacity, are attached as Exhibit "D."

6

## V.    NATURE OF THE DISPUTE

### A.    Factual Background

#### 1.    Ayvazian negotiates, approves, and profits from the SPA

19.    Global Gold is a significant investor in the Armenian gold-mining sector. In the spring of 2003, it entered into negotiations with the Company for the purpose of acquiring its Armenian mining properties. On December 21, 2003, Global Gold concluded with Respondents the SPA, under which it purchased from Batoyan, Janibekian, and Lalazaryan all of the issued and outstanding shares of participation in the Company. The SPA was signed by Lalazaryan on behalf of himself and, by power of attorney, his fellow two shareholders.[4]

20.    According to information obtained by Global Gold by law enforcement personnel, Ayvazian, who is Armenia's Minister of the Environment, was a secret participant and beneficial owner in the Company at the time the SPA was signed. Ayvazian actually controlled the transaction on the sellers' side. Specifically, Batoyan, Janibekian, and Lalazaryan negotiated the terms of the SPA on the basis of explicit instructions from Ayvazian, and every term in both the preliminary agreement and the SPA was approved by Ayvazian before the agreement was signed. Moreover, Global Gold understands that after it paid Batoyan, Janibekian, and Lalazaryan for their shares, Ayvazian collected the entire purchase price and distributed the funds to the other Respondents while keeping a share for himself. In other words, Ayvazian was an undisclosed principal of the SPA -- and thus just as much a party to its terms as the other Respondents who were the Company's nominal shareholders. Notably, Ayvazian personally

---

[4] On February 17, 2004, Batoyan, Janibekian, and Lalazaryan all signed the SPA in person in front of a notary public at the Notary Public Office in Yerevan. This was for the purpose of officially registering the SPA.

approved and agreed to the SPA's clause providing for ICC arbitration as well as the selection of New York law as the governing law of the SPA.

21.     In sum, Ayvazian exercised behind-the-scenes control throughout the negotiations that culminated in the signing of the SPA, he approved each material term of the agreement (including the ICC arbitration clause), and he ultimately received the purchase price for the shares sold to Global Gold. The nominal shareholders of the Company acted as Ayvazian's agents -- without Global Gold's knowledge -- when they negotiated the sale of their shares. Because of Ayvazian's crucial if undisclosed role in the negotiation and signing of the SPA, he is as liable under New York law for its breach as the other Respondents, and he is subject to an ICC tribunal's jurisdiction along with the other Respondents.

**2.     Seller representations and warranties in the SPA**

22.     When Global Gold purchased all shares in the Company from Respondents, it negotiated certain contractual promises from the former shareholders that would serve to protect the Company's assets and value as an ongoing business. The Company's mining activities depended significantly on the cooperation of Armenian government officials in issuing and respecting licenses, providing certain authorizations for work to be performed, handling official paperwork in a timely fashion, and generally cooperating with the Company in its exploration and mining activities. As a foreign investor, Global Gold sought to protect itself in the event that the Company's Armenian shareholders misrepresented the true value of the Company as an ongoing business, or cooperated illicitly with government officials like Ayvazian to ensure that the Company's shares, once owned by Global Gold, would have little or no real value. While Global Gold was entirely unaware of Ayvazian's status as an undisclosed principal when the SPA was signed, it was careful to extract commitments from the selling shareholders that, to the

8

best of their knowledge, the Company's licenses, governmental authorizations, and other approvals were in order and as represented.

    23.    Respondents made, *inter alia*, the following specific representations and warranties in the SPA:

- Section 3.2(b)(ii) -- Respondents warranted that nothing in the SPA contravened, conflicted with, violated, or gave any person or entity the right to challenge the SPA or exercise any remedy or obtain any relief as against the assets of the Company.

- Section 3.2(b)(iii) -- Respondents warranted that nothing in the SPA contravened, conflicted with, violated, or gave any governmental entity the right to revoke, withdraw, suspend, cancel, terminate, or modify any "Governmental Authorization"[5] held by or related to the business or assets of the Company.

- Section 3.2(b)(v) -- Respondents warranted that nothing in the SPA would cause any of the Company's assets to be reassessed or revalued by any governmental entity.

- Section 3.2(b)(vii) -- Respondents warranted that nothing in the SPA would result in the imposition or creation of any Encumbrance[6] upon or relating to any of the Company's assets.

- Section 3.6 -- Respondents represented that there were absolutely no restrictions or limitations on the Company's ownership of all the assets, including licenses and other Governmental Authorizations, that the Company purported to own as of the date of the SPA.

- Section 3.14 -- Respondents represented that the SPA was signed in compliance with all Governmental Authorizations and Legal Requirements[7] of any sort.

---

[5] Section 1 of the SPA defines a "Governmental Authorization" as "any approval, consent, license, permit, waiver, or other authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement." This is a broad definition that applies to any type of approval or consent -- of whatever form -- required of a governmental entity in order for the Company to carry out its business activities.

[6] Section 1 of the SPA defines an "Encumbrance" as "any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership." This is a broad definition -- especially in its use of such language as "restriction of any kind" -- that applies to any sort of restriction imposed by any person or entity on the ownership or use of any of the Company's assets.

[7] Section 1 of the SPA defines a "Legal Requirement" as "any national, regional, local, municipal, foreign, international, multinational, or other administrative order, constitution, law, ordinance, principle

- Section 3.17(b) -- Respondents warranted that neither they nor any of their Related Persons -- including family members or anyone "indirectly controlled" by Respondents -- had or may acquire any rights or obligations under any contract relating to the business or assets of the Company.

- Section 3.17(d) -- Respondents warranted that the Company was and at all times had been in full compliance with all terms and requirements of each contract (including licenses) under which it had or has any obligations; that other parties to each such contract were similarly in full compliance; and that no event had occurred and no circumstance existed that might contravene, conflict with, violate, or permit any person or entity to terminate, cancel, or exercise any remedy under any such contract.

- Section 3.19 -- Respondents represented that the Company was and at all times had been in full compliance with all environmental laws and regulations, and that there were no pending or threatened claims, Encumbrances, or other restrictions of any nature arising from any environmental law and regulations.

- Section 3.24(a) -- Respondents represented that they had made no omissions of material fact or misleading statements in making their representations in the SPA.

- Section 3.24(c) -- Respondents warranted that they had not failed to disclose in the SPA any fact with any specific application to the SPA.

- Section 3.25 -- Respondents warranted that neither they nor any of their Related Persons had any interest in any property pertaining to the Company's businesses, or in any competitive entity or business.

- Section 10.2 -- Respondents indemnified Global Gold for any damages suffered or caused by Respondents' breaches of or misrepresentations relating to any provision of the SPA.

24.     These numerous seller representations and warranties in the SPA were intended to hold Respondents liable for any misrepresentation they may have made and any relevant fact they may have failed to disclose in the SPA. Specifically, Respondents were responsible for full disclosure about the value of the Company's assets and business, the status of any Governmental Authorizations and Legal Requirements applicable at the time of the SPA or potentially

---

of common law, regulation, statute, or treaty." This is a broad definition that applies to any rule or limitation affecting the Company or its assets by force of law.

applicable in the future, and any actual and potential limitations or restrictions on the Company's assets or business. Moreover, Respondents promised that the Company was in full compliance with all laws and regulations and that no family members or any other individuals indirectly controlled by Respondents were involved in the negotiation of the SPA or in any businesses that competed or might ultimately compete with the Company. In sum, Respondents made multiple warranties as to the status and ownership of the Company as well as the legal and business environment into which Global Gold was entering by purchasing shares in the Company. But almost immediately after the execution of the SPA, Global Gold began to realize that Respondents were guilty of egregious misrepresentations and omissions.

### 3.    The Company's difficulties with Ayvazian

25.    When the SPA was executed in late 2003, the Company owned mining rights to explore the Hankavan and Marjan fields in Armenia through at least the end of the year 2017. The terms for both the Hankavan and Marjan licenses had been fixed in 2002, when they were issued to the Company under the regulatory framework of Armenia's Mineral Code of March 19, 1992. On April 1, 2003, a new Concession Law came into force in Armenia, pursuant to which existing licenses were required to be automatically replaced for administrative reasons by new licenses with the same substantive terms. Specifically, Article 76 of the Concession Law provided that each mining entity owning a mining right prior to the Concession Law's entry into force would be a "transitory license holder" for the 14 months beginning May 1, 2003. The Company was therefore a transitory license holder with respect to the Hankavan and Marjan fields as of the December 2003 execution of the SPA.

26.    During the 14-month transition period, transitory license holders such as the Company were authorized to apply for exploration licenses and special exploration licenses

11

(which authorize the holder to enter into a concession agreement with the government) under which they would be permitted to continue their exploration activities. Under Article 76 of the Concession Law, if a transitory license holder applied for these new licenses, the Armenian Ministry of the Environment -- the government agency responsible for issuing exploration licenses and regulating exploration and mining -- was to provide them on the basis of the original license issued to the licensee under the 1992 Mineral Code. The term of any new license issued under this procedure was to be identical to the term of the old license.

27.     On June 23, 2004 -- prior to the July 1, 2004, end of the transition period under the Concession Law -- the Company applied to Ayvazian's Ministry of the Environment for replacement of its transitory licenses. But although the law envisaged a 15-day period during which new licenses were to be issued, the Ministry failed to issue them to the Company by the deadline of July 8, 2004. Instead, the Ministry issued backdated licenses on July 10, 2004 -- an exploration license certificate for the Hankavan fields valid for one year, and a special exploration license certificate for the Marjan fields set to expire in three years. The license certificates were issued in direct contravention of Article 76 of the Concession Law, which provided (1) special exploration licenses to be issued for Hankavan and Marjan, and (2) the issuance of new licenses with the same terms as the corresponding original licenses. The new Hankavan license should have been a special exploration license entitling the company to enter into a concession agreement with the government, like the new Marjan license, and both new licenses should have been set to expire in 2017, rather than in 2005 and 2007, respectively.

28.     Meanwhile, the Ministry violated other provisions in the Concession Law. In January 2005, the Company applied to the Ministry for permission to conduct additional exploration works in the Hankavan fields within the scope of the original 2002 license. Article

12

10 of the Concession Law provides specific time limitations for the issuance of such exploration licenses; if the Ministry fails to respond to an application within one month, the licenses requested are deemed to be automatically granted. The Ministry of the Environment failed to comply with Article 10. In March 2005, after the requested licenses were automatically granted under Armenian law, Ayvazian purported to deny the Company's request to conduct additional exploration works in the Hankavan fields. According to Ayvazian, the Company's requested area for additional exploration fell within 20 kilometers of an exploration area certified to another mining company. Not only was Ayvazian's response outside the strict one-month period provided for in Article 10 of the Concession Law, but it also failed to rely upon any of the specified reasons for refusal of mining licenses listed in Article 13 of the Concession Law. Thus, Ayvazian's refusal to issue the requested exploration licenses for additional Hankavan sites was both procedurally and substantively illegitimate.

29.    In June 2005, the Company applied for a special exploration license for the Hankavan fields, which should have been issued the previous year. As discussed above, such a license is necessary in order for the Company to be permitted to enter into a concession agreement with the government for exploitation of any gold it discovers. The Concession Law as well as government resolutions interpreting that law clearly required that the new license for Hankavan issued in July 2004 be a special exploration license -- just as they clearly required that license's term to extend to 2017. But Ayvazian responded that a special exploration license may not be issued during the existing term of a regular exploration license for the same fields. He advised that the Company should re-apply after the purported expiration of the one-year exploration license. The Company did so on December 28, 2005, but its application remains unanswered over a year later.

30.    From the summer of 2004 until the summer of 2005, therefore, Ayvazian engaged in the illegal, illegitimate, and systematic obstruction and repudiation of the Company's rights under Armenian law.  In doing so, he violated the numerous seller representation and warranty provisions of the SPA detailed above.  Although Ayvazian and his fellow Respondents had represented and warranted that the Company's exploration licenses extended through 2017, Ayvazian arbitrarily reduced the terms of those licenses at the first available opportunity. Although Ayvazian and his fellow Respondents had represented and warranted that the Company was in compliance with all Legal Requirements, and that its Governmental Authorizations were valid and in order, Ayvazian decided otherwise in his capacity as Minister of the Environment. He justified his attacks on the Company's licenses and license applications based on the Company's alleged non-compliance with the necessary laws and regulations.  In sum, having made a series of representations to Global Gold about the Company, its licenses, and its legal status, Ayvazian contradicted and reneged on those representations and warranties shortly after the execution of the SPA.

4.    **Ayvazian attempts extortion by demanding a substantial bribe**

31.    On July 25, 2005, Global Gold delivered a letter to Ayvazian detailing its numerous objections to his decisions and actions over the previous year.  Four days later, Global Gold's Regional Director Ashot Poghosyan ("Poghosyan") met with Ayvazian at the latter's office.  Also present at the meeting was Mourad Gouloyan ("Gouloyan"), a member of Armenia's National Assembly and a close associate of Ayvazian.  At this meeting, the nature of Ayvazian's intentions became clear to Global Gold.  Instead of attempting to resolve Global Gold's complaints in good faith, Ayvazian demanded a pay-off.  He introduced Gouloyan as a representative of the Company's former shareholders and instructed Poghosyan to deal with

14

Gouloyan on any matter pertaining to the Company. Gouloyan then took Poghosyan to an adjacent room and threatened to oust Global Gold -- or, in Gouloyan's terms, "the Americans" -- from Hankavan unless it agreed to pay an additional US$ 3 million for the Company shares purchased in 2003. According to Gouloyan, he had been a shareholder in the Company in 2003 but had not authorized the sale or signed the SPA; therefore, the Company as controlled by Global Gold was entitled to none of the licenses and authorizations previously issued by the Ministry of the Environment. Gouloyan personally threatened Poghosyan and stated that all such licenses and authorizations would be canceled by the Ministry of the Environment unless Global Gold paid the amount demanded.

32.    In a July 2006 interview in one of Armenia's weekly periodicals,[8] Ayvazian essentially confirmed that the above-described extortion attempt took place. In response to a question about his arbitrary and changing expectations of Global Gold and other foreign investors dealing with the Ministry of the Environment, Ayvazian brazenly stated, "Well, let them pay me and get rid of the problem. Paying the first time is always the most difficult, and after that they will go on by paying . . . How come they don't pay?"

### 5.    Ayvazian steps up his attack on the Company and its assets

33.    Global Gold categorically refused Ayvazian's demand for a bribe, and thereafter, things only got worse for the Company. As discussed above, the Company has the right under Armenian law to the exploration license it requested for additional Hankavan sites in January 2005, but Ayvazian has illegally refused to issue the license certificate. In the summer of 2006, Global Gold learned that Ayvazian had instead issued the license certificate for additional Hankavan sites to a different entity called Interier, LLC ("Interier"). Interier is a front company

---

[8] An English translation of the interview is attached as Exhibit "E."

for Ayvazian and Gouloyan through two of their close associates. The Interier license was issued in contravention of Article 13 of the Concession Law, which prohibits the issuance of exploration licenses covering areas that are already covered by another entity's exploration and mining rights.

34.    Global Gold also learned in the summer of 2006 that Ayvazian had issued the license certificate for the Hankavan fields to an entity called Golden Ore, LLC ("Golden Ore"), which is controlled by Armenia's Minister of Transport and Communication, Andranik Manoukian ("Manoukian"). Manoukian is a close associate of Ayvazian and, through marriage, a relative of Gouloyan. In his dealings with Interier and Golden Ore, Ayvazian has blatantly violated the SPA seller representation that no Related Persons were involved in any way with the Company's assets or any competing business. Ayvazian has behaved similarly in numerous other instances with respect to other rightful owners of mining exploration rights, by illegally issuing conflicting exploration licenses to entities that he controls and from which he profits through his family members and close associates.

35.    On June 2, 2006, Ayvazian sent a letter to the Company purporting to terminate its special exploration license for the Marjan fields. This action was taken in manifest disregard of Armenian law, which requires instances of license default or termination not only to be adjudicated by a competent Armenian court, but also to be preceded by notice and a cure period. Ayvazian ignored these provisions of the law and has continued to do so in response to Global Gold's complaint letters. It is clear that Ayvazian's purported and illegal termination of the Company's Marjan special exploration license -- just like his illegal issuance of a conflicting Hankavan exploration license to an entity controlled by Related Persons under the terms of the SPA -- is a direct response to Global Gold's categorical refusal to make a US$ 3 million pay-off

16

to him.  In fact, Ayvazian sent the letter purporting to terminate the Marjan license just one day after having issued the conflicting Hankavan license to Golden Ore.  Ayvazian has illegally attempted to sell the Company's Marjan exploration rights to various Russian-owned entities.

36.     In sum, Ayvazian has illegally used his position as Armenia's Minister of the Environment to benefit himself financially and pursue a personal vendetta against Global Gold. He orchestrated Global Gold's purchase of the shares in the Company from the other Respondents in 2003, and then proceeded in violation of the representations and warranties made in the SPA to make Global Gold's business activities in Armenia as difficult as possible. Ayvazian attempted to extort a substantial amount of money from Global Gold, and when this effort failed, Ayvazian continued to attack Global Gold through all means available to him.

37.     Ayvazian's illegal attacks have not been limited to the issuance of improper exploration licenses, the refusal to issue exploration license certificates for additional sites as required by law, the refusal to issue special exploration licenses to which the Company is legally entitled, the issuance of conflicting licenses to competing businesses that his family members and close associates own, and the ultimate purported termination of a special exploration license in manifest disregard of Armenian law.  Throughout the past three years, Ayvazian has also, *inter alia*, (1) failed to sign license agreements with the Company as required by law; (2) sent false notices to the Company, for harassment purposes, claiming that it has failed to conduct exploration work, failed to submit required reports, failed to pay concession fees, and illegally transferred mining rights to other entities; (3) conducted inspections of the Company's facilities during which Ministry personnel have urged the Company's employees to report non-existent infringements of certain laws and regulations; (4) ignored letters and other communications from the Company; and (5) refused to provide the Company access to certain information that is

17

required to be public under Armenian law, such as the public roster of mining rights. Ayvazian's actions clearly violate the representations and warranties about the Company, its assets, its Governmental Authorizations, its compliance with necessary Legal Requirements, and the non-involvement of the principals or Related Persons in competitive businesses that Ayvazian and the other Respondents made in signing the SPA.

**B.    Legal Claims**

**1.    Ayvazian is subject to the SPA's arbitration clause**

38.    In many cases, ICC tribunals have bound non-signatories to the terms of an arbitration clause. When, as in the case of Ayvazian here, the non-signatory controls the transaction at issue through his agents or accepts the benefits of the contract, he can be required to arbitrate as if he had signed the underlying agreement and arbitration clause. *See, e.g., Capital India Power Mauritius I and Energy Enterprises (Mauritius) Company v. Maharashtra Power Development Corp. Ltd, Maharashtra State Electricity Board and the State of Maharashtra*, ICC Case No. 12913/MS, Final Award of 27 April 2005 (applying New York law); *Bridas S.A.I.P.I.C., Bridas Energy International, Ltd., Intercontinental Oil & Gas Ventures, Ltd. and Bridas Corporation v. Government of Turkmenistan, Concern Balkannebitgazsenagat and State Concern Turkmenneft*, ICC Arbitration Case No. 9058/FMS/KGA, Partial Award of 25 June 1995.

39.    Article 11.6 of the SPA provides that the agreement is governed by New York law. Under New York's "undisclosed principal" doctrine, a signatory may bind a non-signatory to a contract's terms when acting within his authority as an agent of the non-signatory. *See Old Republic Ins. Co. v. Hansa World Cargo Service, Inc.*, 51 F.Supp.2d 457, 475 (S.D.N.Y. 1999) (applying New York law). In such an instance, the non-signatory is an "undisclosed principal" of the contract, and he may sue or be sued under its terms as if he were a disclosed signatory to

the agreement. *Rogalsky v. Ryan*, 80 N.Y.S.2d 564 (New York Sup. Ct. 1948); *Kirno Hill Corp. v. Holt*, 476 F.Supp. 134 (S.D.N.Y. 1979) (applying New York law).    The    doctrine    of equitable estoppel provides an additional basis under New York law for binding a non-signatory like Ayvazian to an arbitration agreement.    A non-signatory may not object to arbitration "when it receives a 'direct benefit' from a contract containing an arbitration clause." *American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d. Cir. 1999).    This is because "allow[ing] [a party] to claim the benefit of a contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying the Arbitration Act." *Avila Group, Inc. v. Norma J. of California*, 426 F.Supp. 537, 542 (S.D.N.Y. 1977).    *See also Deloitte Noraudit A/S v. Deloitte Haskins & Sells*, 9 F.3d 1060, 1064 (2d. Cir. 1994) (binding a non-signatory to arbitration because it knew of the arbitration agreement and "knowingly accepted the benefits of" that agreement).

40.    Ayvazian is clearly subject to the SPA's arbitration clause under these rules of New York law.    Batoyan, Janibekian, and Lalazaryan acted as agents for Ayvazian in signing the SPA with Global Gold in December 2003.    Ayvazian was a secret participant and beneficial owner in the Company at the time the SPA was signed, and he actually controlled the entire transaction behind the scenes.    Every provision of the SPA was communicated to and approved by Ayvazian, as were the preliminary agreements between the nominal shareholders and Global Gold.    In short, Batoyan, Janibekian, and Lalazaryan negotiated and contracted with Global Gold through detailed instructions from Ayvazian.

41.    Moreover, Ayvazian benefited financially from the execution of the SPA, just as if he had been a disclosed principal like the other Respondents.    Ayvazian received the purchase price from Batoyan, Janibekian, and Lalazaryan after the SPA was executed, and Ayvazian

19

distributed the proceeds to himself and his fellow Respondents. Ayvazian's behavior throughout the negotiation and signing of the SPA is that of an undisclosed principal directing his agents to negotiate certain terms, approving specific contract provisions (including the arbitration clause), and ordering that the purchase price be collected and distributed by him as the party controlling the transaction. Ayvazian is bound by the SPA's arbitration clause and is liable for breaches of the agreement as if he had signed the SPA along with the other Respondents.

### 2. Respondents breached the SPA

42. By signing the SPA with the full knowledge that Ayvazian controlled the transaction and planned to interfere with its assets, business, and legal rights and illegally favor competitors controlled by his associates and family members, Respondents breached, *inter alia*, the seller warranty and representation provisions of the SPA outlined above, for which they are jointly and severally liable:

- Section 3.2(b)(ii) -- Respondents warranted that nothing in the SPA contravened, conflicted with, violated, or gave any person or entity the right to challenge the SPA or exercise any remedy or obtain any relief as against the assets of the Company. But Ayvazian in his position as Minister of the Environment has challenged the Company's rights to several of its licenses on the ground that those licenses were provided to the Company with its original shareholders, not to Global Gold. Because Ayvazian has been working closely from the beginning with the three seller signatories to the SPA -- his agents -- all Respondents breached this section of the agreement.

- Section 3.2(b)(iii) -- Respondents warranted that nothing in the SPA contravened, conflicted with, violated, or gave any governmental entity the right to revoke, withdraw, suspend, cancel, terminate, or modify any "Governmental Authorization" held by or related to the business or assets of the Company. But Ayvazian in his position as Minister of the Environment refused numerous license certificates to the Company, failed to provide the Company with new licenses through 2017 to explore the Hankavan and Marjan fields, and ultimately revoked the Company's Marjan special exploration license.

- Section 3.2(b)(v) -- Respondents warranted that nothing in the SPA would cause any of the Company's assets to be reassessed or revalued by any governmental entity. Again, Ayvazian's failure to provide new licenses under the Concession Law and his revocation of the Marjan special exploration license -- all because Global Gold succeeded to ownership of all shares in the Company -- demonstrate that this representation was false.

- Section 3.2(b)(vii) -- Respondents warranted that nothing in the SPA would result in the imposition or creation of any Encumbrance upon or relating to any of the Company's assets. But Ayvazian used the SPA to justify his reduction of the license periods for exploration of the Hankavan and Marjan fields as well as his revocation of the Marjan special exploration license.

- Section 3.6 -- Respondents represented that there were absolutely no restrictions or limitations on the Company's ownership of all the assets, including licenses and other Governmental Authorizations, that the Company purported to own as of the date of the SPA. But shortly after the execution of the SPA, Ayvazian in his position as Minister of the Environment began imposing such restrictions and limitations, in the forms discussed in detail above.

- Section 3.14 -- Respondents represented that the SPA was signed in compliance with all Governmental Authorizations and Legal Requirements of any sort. But Ayvazian through his Ministry of the Environment began alleging just the opposite shortly after the execution of the SPA, and when Global Gold refused to pay him off, he continued using the Company's purported non-compliance to justify his Ministry's interference with the Company's assets and business.

- Section 3.17(b) -- Respondents warranted that neither they nor any of their Related Persons -- including family members or anyone "indirectly controlled" by Respondents -- had or may acquire any rights or obligations under any contract relating to the business or assets of the Company. This warranty was false when made, as it turns out that Gouloyan -- someone indirectly controlled by Ayvazian -- was an undisclosed shareholder in the SPA. Gouloyan and Ayvazian's associates also control Interier and Golden Ore, businesses that compete with the Company and that were illegally awarded Hankavan exploration and mining rights that legitimately belong to the Company.

- Section 3.17(d) -- Respondents warranted that the Company was and at all times had been in full compliance with all terms and requirements of each contract (including licenses) under which it had or has any obligations; that other parties to each such contract were similarly in full compliance; and that no event had occurred and no circumstance existed that might contravene, conflict with, violate, or permit any person or entity to terminate, cancel, or exercise any remedy under any such contract. For the same reasons as discussed above, this warranty has turned out to be false.

- Section 3.19 -- Respondents represented that the Company was and at all times had been in full compliance with all environmental laws and regulations, and that there were no pending or threatened claims, Encumbrances, or other restrictions of any nature arising from any environmental law and regulations. But shortly after the execution of the SPA, Ayvazian in his position as Minister of the Environment began to accuse the Company of being in violation of various environmental laws and regulations.

21

- Section 3.24(a) -- Respondents represented that they had made no omissions of material fact or misleading statements in making their representations in the SPA. In fact, Respondents' numerous omissions and misleading statements are detailed above, and they include Ayvazian's role as an undisclosed principal, his plan to extort additional payments from Global Gold after the execution of the SPA, and his plan to harass Global Gold continuously while substantially interfering with the Company's assets and business.

- Section 3.24(c) -- Respondents warranted that they had not failed to disclose in the SPA any fact with any specific application to the SPA. Again, Respondents failed to disclose numerous facts relevant to the SPA.

- Section 3.25 -- Respondents warranted that neither they nor any of their Related Persons had any interest in any property pertaining to the Company's businesses, or in any competitive entity or business. This warranty was false when made, as Gouloyan was an undisclosed shareholder in SPA and Gouloyan and Ayvazian's associates control Interier and Golden Ore.

- Section 10.2 -- Respondents indemnified Global Gold for any damages suffered or caused by Respondents' breaches of or misrepresentations relating to any provision of the SPA. Because Global Gold has been damaged by the various misrepresentations and breaches of the SPA by Respondents, Respondents are required to compensate Global Gold for that damage.

## VI.    REMEDIES SOUGHT

43.    Claimant Global Gold respectfully requests that the Tribunal find in favor of Global Gold on all matters and make a Final Award:

44.    Declaring that Respondent Vardan Ayvazian is an undisclosed principal of the SPA, and that he is jointly and severally liable with his agents and disclosed principals, Respondents Mayren Batoyan, Edward Janibekian, and Yurik Lalazaryan, for any breaches of the SPA.

45.    Declaring that Global Gold is entitled to the payment by Respondents of all damages ultimately calculated and claimed based on the facts and contractual and legal grounds expressed herein and in subsequent pleadings. Global Gold reserves the right to quantify at a

22

later date the damages it has suffered.  At present, it believes those damages will exceed US$ 5 million.

46.     Awarding Global Gold its attorneys' fees, costs, and expenses of the arbitration.

47.     Awarding pre-judgment and/or post-judgment interest on the amounts awarded at the applicable rates under New York law.

Houston, Texas
December 28, 2006

Respectfully submitted,

KING & SPALDING LLP

R. Doak Bishop
Wade M. Coriell
1100 Louisiana Street
Suite 4000
Houston, Texas, USA  77002
Tel: 001.713.751.3200
Fax: 001.713.751.3290

Kenneth R. Fleuriet
25 Cannon Street
London, England EC4M 5SE
Tel: 00.44.20.7551.7500
Fax: 00.44.20.7551.7575

Email: dbishop@kslaw.com

### SHA, LLC

### SHARE PURCHASE AGREEMENT

by and between

### Global Gold Mining, LLC

and

### The Participants of SHA, LLC

### (for registration purposes)

### ՍՀԱ ՍՊԸ

### ԲԱԺՆԵՄԱՍԻ ԳՆՄԱՆ ՊԱՅՄԱՆԱԳԻՐ

Global Gold Mining, LLC

եւ

ՍՀԱ ՍՊԸ ՄԱՍՆԱԿԻՑՆԵՐԻ

կողմից եւ միջեւ

(գրանցման նպատակներով).



## SHARE PURCHASE AGREEMENT

This Share Purchase Agreement ("Agreement") is made as of December 21, 2003, by Global Gold Mining, LLC, a Delaware, United States limited liability company ("Buyer"), SHA, LLC an Armenian limited liability company participants Yurik Lalazaryan, an individual resident in Armenia, ("A"), Mayren Batoyan, an individual resident in Armenia ("B"), and Edward Janibekian, an individual resident in Armenia ("C") (collectively "Sellers").

## RECITALS

Sellers desire to sell, and Buyer desires to purchase, all of the issued and outstanding shares (the "Shares") of participation in SHA, LLC, an Armenian limited liability company (the "Company") for the consideration and on the terms set forth in this Agreement.

## AGREEMENT

The parties, intending to be legally bound, agree as follows:

1.     **DEFINITIONS.**  For purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1:

"Acquired Company"--the Company and its Subsidiaries if any, collectively.

"Adjustment Amount"--as defined in Section 2.5.

## ԲԱԺՆԵՄԱՍԻ ԳՆՄԱՆ ՊԱՅՄԱՆԱԳԻՐ

Սույն Բաժնեմասի Գնման Պայմանագիրը («Պայմանագիր») կնքվել է 2003թ-ի դեկտեմբերի 21-ին, Global Gold Mining, LLC, ԱՄՆ Դելավեր Նահանգի սահմանափակ պատասխանատվությամբ ընկերության («Գնորդ»), եւ ՍՀԱ, ՍՊԸ, Հայաստանի Հանրապետության սահմանափակ պատասխանատվությամբ ընկերության մասնակիցներ` Հայաստանի բնակիչ եւ ֆիզիկական անձ Յուրիկ Լալազարյանի («Ա»), Հայաստանի բնակիչ եւ ֆիզիկական անձ Մայրեն Բատոյանի («Բ»), Հայաստանի բնակիչ եւ ֆիզիկական անձ Էդվարդ Ջանիբեկյանի («Գ») (միասնաբար «Վաճառողներ») միջեւ:

## ԱՌԱՐԿԱՆ

Վաճառողները ցանկանում են վաճառել, իսկ Գնորդը ցանկանում է գնել ՍՀԱ, ՍՊԸ-ի Հայաստանի սահմանափակ պատասխանատվությամբ ընկերության («Ընկերություն») բոլորովկված եւ սովորական բոլոր բաժնե_____ («Բաժնեմաս») սույն Պայմանագրի պայմաններին եւ դրույթներին համաձայն:

## ՊԱՅՄԱՆԱԳԻՐ

Կողմերը` իրավականորեն պարտադրված լինելու միտումով, համաձայնում են հետեւյալի մասին:

1.     **ՍԱՀՄԱՆՈՒՄՆԵՐ:** Սույն Պայմանագրի իմաստով, հետեւյալ սահմանումները ունեն սույն Բաժնի 1-ում մասնավորված կամ ներկայացգված իմաստները.

«Ձեռքբերված Ընկերություն» -- Ընկերությունը եւ դրա Դուստր Ընկերությունները եթե կան, միասնաբար:

«Սահմանված Գումար» -- ինչպես սահմանված է Բաժնում 2.5-ում:

1

in Section 2.5.

"Applicable Contract"--any Contract (a) under which the Acquired Company has or may acquire any rights, (b) under which the Acquired Company has or may become subject to any obligation or liability, or (c) by which the Acquired Company or any of the assets owned or used by it is or may become bound:

"Balance Sheet"--as defined in Section 3.4.

"Best Efforts"--the efforts that a prudent Person desirous of achieving a result would use in similar circumstances to ensure that such result is achieved as expeditiously as possible.

"Breach"--a "Breach" of a representation, warranty, covenant, obligation, or other provision of this Agreement or any instrument delivered pursuant to this Agreement will be deemed to have occurred if there is or has been (a) any inaccuracy in or breach of, or any failure to perform or comply with, such representation, warranty, covenant, obligation, or other provision, or (b) any claim (by any Person) or other occurrence or circumstance that is or was inconsistent with such representation, warranty, covenant, obligation, or other provision, and the term "Breach" means any such inaccuracy, breach, failure, claim, occurrence, or circumstance.

"Buyer"--as defined in the first paragraph of this Agreement.

«Կիրառելի Պայմանագիր» -- ցանկացած Պայմանագիր (ա) ըստ համաձայն Ձեռքբերված Ընկերությունը ունի կամ կարող է ձեռք բերել իրավունքներ, (բ) համաձայն որի Ձեռքբերված Ընկերությունը դարձել է կամ կարող է դառնալ որևէ պարտավորության կամ պատասխանատվության սուբյեկտ, կամ (գ) համաձայն որի Ձեռքբերված Ընկերությունը կամ դրա սեփականության հանդիսացող կամ դրա կողմից օգտագործվող որևէ գույքի ենաստանմբ կարող է կիրառվել արգելանք:

«Հաշվեկշիռ» -- ինչպես սահմանված է Բաժնի 3.4-ում:

«Լավագույն Ջանքեր» -- ջանքեր որոնք արդյունքի ձգտող որևէ ողջամիտ Անձ կգործադրեր միանման հանգամանքներում՝ ապահովելու համար որպեսզի այդ արդյունքը ձեռք բերվի ինչքան հնարավոր է կարճ Ժամանակահատվածում:

«Խախտում» -- սույն Պայմանագրի որևէ հայտարարության, երաշխիքի, խոստման, պարտավորության կամ սույն Պայմանագրի որևէ դրույթի կամ սույն Պայմանագրով սահմանված ցանկացած պայմանավորվածության «Խախտումը» կհամարվի տեղի ունեցած եթե առկա է կամ առկա է եղել (ա) այդ հայտարարության, երաշխիքի, խոստման, պարտավորության կամ որևէ դրույթի իրականացման կամ կատարման որևէ անճշտություն կամ խախտում, կամ (բ) որևէ պնդում (որևէ Անձի կողմից) կամ այլ միջադեպ կամ հանգամանք որը հակասում է այդ հայտարարությանը, երաշխիքին, խոստմանը, պարտավորությանը կամ որևէ դրույթին, եւ «Խախտում» սահմանումը նշանակում է ցանկացած նման անճշտություն, խախտում, ձիրականացում, պնդում, հանգամանք կամ միջադեպ:

«Գնորդ» -- ինչպես սահմանված է սույն Պայմանագրի առաջին պարբերությունում:

2

"Closing"--as defined in Section 2.3.

"Closing Date"--the date and time as of which the Closing actually takes place.

"Company"--as defined in the Recitals of this Agreement.

"Consent"--any approval, consent, ratification, waiver, or other authorization (including any Governmental Authorization).

"Contemplated Transactions"--all of the transactions contemplated by this Agreement, including:

(a)    the sale of the Shares by Sellers to Buyer;

(b)    the execution, delivery, and performance of the Promissory Note, the Sellers' Releases, and the Escrow Agreement;

(c)    the performance by Buyer and Sellers of their respective covenants and obligations under this Agreement; and

(d)    Buyer's acquisition and ownership of the Shares and exercise of control over the Acquired Company.

"Contract"--any agreement, contract, obligation, promise, or undertaking (whether written or oral and whether express or implied) that is legally binding.

«Կատարում» -- ինչպես սահմանված է Բաժին 2.3-ում:

«Կատարման Ամսաթիվ» -- փաստացի Կատարման ամսաթիվը եւ ժամանակը:

«Ընկերություն» -- սույն Պայմանագրի Առարկայում սահմանվածի համաձայն:

«Համաձայնություն» -- ցանկացած հաստատում, համաձայնություն, վավերացում, հրաժարում, կամ այլ լիազորություն (ներառյալ ցանկացած Կառավարական Լիազորությունները):

«Նախատեսված Գործարքներ» -- սույն Պայմանագրով նախատեսված բոլոր գործարքները, ներառյալ.

(ա)    Վաճառողների կողմից Բաժնետոմսերի վաճառքը Գնորդին,

(բ)    Մուրհակի ստորագրումը, իրականացումը եւ կատարումը, Վաճառողների Իրավունքի Փոխանցման Հայտարարությունները, եւ Էսքրո Պայմանագիրը։

(գ)    Գնորդների եւ Վաճառողի կողմից իրենց համապատասխան խոստումների եւ պարտավորությունների կատարումը սույն Պայմանագրի համաձայն, եւ

(դ)    Գնորդի կողմից Բաժնետոմսերի ձեռքը եւ տնօրինումը, եւ Ձեռքբերված Ընկերության կառավարման իրականացումը:

«Պայմանագիր» -- ցանկացած համաձայնագիր, պայմանագիր, պարտավորություն, խոստում, կամ ստանձնում (լինի գրավոր կամ բանավոր եւ ուղղակի կամ անուղղակի) որն իրավականորեն պարտավորեցնող է:

3

"Damages"--as defined in Section 10.2.

"Disclosure Letter"--the disclosure letter delivered by Sellers to Buyer concurrently with the execution and delivery of this Agreement.

"Employment Agreements"--as defined in Section 2.4(a)(iii).

"Encumbrance"--any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"Environment"--soil, land surface or subsurface strata, surface waters (including navigable waters, ocean waters, streams, ponds, drainage basins, and wetlands), groundwaters, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life, and any other environmental medium or natural resource.

"Environmental, Health, and Safety Liabilities"--any cost, damages, expense, liability, obligation, or other responsibility arising from or under Environmental Law or Occupational Safety and Health Law and consisting of or relating to:

(a)    any environmental, health, or safety matters or conditions (including

«Վնասներ» -- Բաժին 10.2-ում սահմանվածի համաձայն:

«Բացահայտման Նամակ» -- Վաճառողների կողմից Գնորդին տրված բացահայտման նամակն` տրված սույն Պայմանագրի ստորագրման եւ կնքման հետ միաժամանակ:

«Աշխատանքային Պայմանագիր» -- Բաժին 2.4(ա)(iii)-ում սահմանվածի համաձայն:

«Ծանրաբեռնում» -- ցանկացած մեղադրանք, հայց, համայնքի գույքային շահ, պայման, փոխհատուցվող բաժնեմաս, արգելանք, այլընտրանք, գրավ, ապահովված գրավ, առաջնային իրավունք, կամ ցանկացած տեսակի սահմանափակում, ներառյալ օգտագործմանն, քվեարկության, եկամուտի ստացման, կամ սեփականության ցանկացած այլ գործոնի կիրառման նկատմամբ սահմանափակումներ:

«Միջավայր» -- հող, հողի մակերես կամ հողածածկույթից ցածր մակերեսույթ, մակերեսային ջրեր (ներառյալ նավարկելի ջրեր, օվկիանոսային ջրեր, հոսանքներ, ջրավազաններ, ջրհեժանցային ավազաններ, խմբռու ջրի աղբյուրներ, հոսանքների մնացորդներ, շրջապատող օդ (ներառյալ ներսի օդ), բուսական եւ կենդանական աշխարհ, եւ ցանկացած այլ միջավայր կամ բնական ռեսուրս:

«Միջավայրային, Առողջապահական, եւ Անվտանգության Պարտավորություն» -- Միջավայրային Օրենքից, կամ Աշխատանքային Անվտանգության եւ Առողջապահական Օրենքից ծագող կամ դրանց համաձայն ցանկացած արժեք, վնաս, ծախս, պարտավորություն, պարտավորվածություն, կամ այլ պատասխանատվություն, եւ որը բաղկացած է հետեւյալից կամ կապված է հետեւյալի հետ:

(ա)    ցանկացած միջավայրային, առողջապահական կամ անվտանգության

4

or safety matters or conditions (including on-site or off-site contamination, occupational safety and health, and regulation of chemical substances or products);

(b)     fines, penalties, judgments, awards, settlements, legal or administrative proceedings, damages, losses, claims, demands and response, investigative, remedial, or inspection costs and expenses arising under Environmental Law or Occupational Safety and Health Law;

(c)     financial responsibility under Environmental Law or Occupational Safety and Health Law for cleanup costs or corrective action, including any investigation, cleanup, removal, containment, or other remediation or response actions ("Cleanup") required by applicable Environmental Law or Occupational Safety and Health Law (whether or not such Cleanup has been required or requested by any Governmental Body or any other Person) and for any natural resource damages; or

(d)     any other compliance, corrective, investigative, or remedial measures required under Environmental Law or Occupational Safety and Health Law.

The terms "removal," "remedial," and "response action," include the types of activities covered by Armenian law.

խնդիրներ կամ պայմաններ (ներառյալ տարածքի ներսում կամ դրանից դուրս աղտոտումը, աշխատանքային անվտանգությունն ու առողջապահությունը, քիմիական նյութերի եւ մարմինների կարգավորումով),

(բ)     Միջավայրային Օրենքից, կամ Աշխատանքային Անվտանգության եւ Առողջապահական Օրենքից ծագող կամ դրանց համաձայն տուժմեր, տուգանքներ, դատական որոշումներ, վճիռներ, համաձայնություններ, իրավական եւ վարչական վարույթներ, վնասներ, կորուստներ, հայցեր, պահանջներ եւ պատասխանմներ, հետաքննական, վերականգնողական, կամ ստուգման ծախսեր եւ արժեքներ,

(գ)     Ֆինանսական պատասխանատվություն համաձայն Միջավայրային Օրենքի, կամ Աշխատանքային Անվտանգության եւ Առողջապահական Օրենքի, մաքրման ծախսերի եւ ուղղիչ գործողությունների, ներառյալ ցանկացած հետաքննական, մաքրման, տեղափոխման, տեղայնացման կամ այլ վերականգնողական կամ պատասխան գործողությունների համար («Մաքրում»), որոնք պահանջվում են Միջավայրային Օրենքի, կամ Աշխատանքային Անվտանգության եւ Առողջապահական Օրենքի համաձայն (անկախ այն հանգամանքից թե արդյոք այդ Մաքրումը պահանջվել է որեւէ Կառավարական Մարմնի կամ այլ Անձի կողմից) եւ ցանկացած այլ բնական ռեսուրսի վնասների համար, կամ

(դ)     ցանկացած այլ կատարում, ուղղիչ, հետաքննական կամ վերականգնողական միջոցներ որոնք պահանջվում են Միջավայրային Օրենքի, կամ Աշխատանքային Անվտանգության եւ Առողջապահական Օրենքի համաձայն:

«Տեղափոխում», «վերականգնում» կամ «պատասխան միջոցներ» սահմանումները ներառում են Հայաստանի օրենսդրությամբ պահանջվող գործողությունների տեսակները:

5

"Environmental Law"--any Legal Requirement that requires or relates to:

(a)     advising appropriate authorities, employees, and the public of intended or actual releases of pollutants or hazardous substances or materials, violations of discharge limits, or other prohibitions and of the commencements of activities, such as resource extraction or construction, that could have significant impact on the Environment;

(b)     preventing or reducing to acceptable levels the release of pollutants or hazardous substances or materials into the Environment;

(c)     reducing the quantities, preventing the release, or minimizing the hazardous characteristics of wastes that are generated;

(d)     assuring that products are designed, formulated, packaged, and used so that they do not present unreasonable risks to human health or the Environment when used or disposed of;

(e)     protecting resources, species, or ecological amenities;

(f)     reducing to acceptable levels the risks inherent in the transportation of hazardous substances, pollutants, oil, or other potentially harmful substances;

(g)     cleaning up pollutants that have been released, preventing the threat of

«Միջավայրային Օրենք» -- նշանակում է ցանկացած Օրենքի Պահանջ, որը պահանջում է հետեւյալը կամ կապված է հետեւյալի հետ.

(ա)     համապատասխան իշխանությունների, աշխատողներին եւ հանրությանը բաժինների կամ վտանգավոր նյութերի փաստացի կամ նախատեսվող արտանետումների, արտանետումների սահմանափակումների խախտումների, կամ այլ արգելքների եւ գործողությունների սկսելու վերաբերյալ տեղեկացնելը, ինչպիսիք են հանածոների արդյունահանումը կամ շինարարությունը, որոնք կարող են զգալի ազդեցություն ունենալ Միջավայրի վրա,

(բ)     բախինների կամ վտանգավոր նյութերի Միջավայր արտանետումը կանխելը կամ մինչեւ թույլատրելի մակարդակ նվազեցնումը,

(գ)     կուտակված բախինների քանակների, վտանգավորության աստիճանի նվազեցումը կամ դրանց արտանետման կանխումը,

(դ)     ապրանքների մշակման, կազմման, փաթեթավորման, եւ օգտագործման այպահովումը ձեւով որը բացառում է ապրանքների օգտագործման կամ տիրապետումն ընթացքում մարդու առողջությանը կամ Միջավայրին անցանկալի վտանգը.

(ե)     ռեսուրսների, կենդանական եւ բուսական աշխարհի, կամ բնական հուշարձանների պաշտպանությունը,

(զ)     վտանգավոր նյութերի, բախինների, յուղերի կամ պոտենցիալ վտանգավոր այլ նյութերի տեղափոխման հետ կապված վտանգները մինչեւ ընդունելի մակարդակներ նվազեցնելը,

(է)     արտանետված բախինների մաքրումը, արտանետումների վտանգի

6

have been released, preventing the threat of release, or paying the costs of such clean up or prevention; or

    (b)    making responsible parties pay private parties, or groups of them, for damages done to their health or the Environment, or permitting self-appointed representatives of the public interest to recover for injuries done to public assets.

    "Escrow Agreement"--as defined in Section 2.4.

    "Facilities"--any real property, leaseholds, or other interests currently or formerly owned or operated by the Acquired Company and any buildings, plants, structures, or equipment (including motor vehicles, tank cars, and rolling stock) currently or formerly owned or operated by the Acquired Company.

    "GAAP"--generally accepted United States accounting principles, applied on a basis consistent with the basis on which the Balance Sheet and the other financial statements referred to in Section 3.4(b) were prepared.

    "Governmental Authorization"--any approval, consent, license, permit, waiver, or other authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement.

    "Governmental Body"--any:

    (a)    nation, state, county, city, town, village, district, or other jurisdiction

կանխումը, կամ նման մաքրման կամ կանխման համար վճարելը, կամ

    (բ)    պատասխանատու անձանց պարտադրելը վճարել մասնավոր կողմերի ատողությանը կամ Միջավայրին վնաս հասցնելու համար, կամ հանրային շահի ներկայացուցիչներին թույլ տալը փոխհատուցում ստանալ հանրային գույքին հասցված վնասի համար:

    «Էսքրո Պայմանագիր» -- ինչպես 2.4-ում սահմանված է համաձայն:

    «Միջոցներ» -- ծանկացած անշարժ գույք, վարձակալված գույք, կամ այլ շահ Ձեռքբերված Ընկերության կողմից տնօրինվող կամ օգտագործվող ներկայումս կամ նախկինում և Ձեռքբերված Ընկերության կողմից ներկայումս կամ նախկինում տնօրինվող կամ օգտագործվող ցանկացած շենքեր, գործարաններ, կառույցներ, կամ սարքավորումներ (ներառյալ ավտոմեքենաներ, հերունակատարներ, և փոխադրիչներ):

    «GAAP» -- համընդհանուր ընդունված Միացյալ Նահանգների հաշվապահական նորմեր, որոնք կիրառվում են Բաժին 3.4(բ)-ում սահմանված Հաշվեկշռի և այլ ֆինանսական հաշվետվությունների հիմնավորումներին համապատասխան:

    «Կառավարական Լիազորություն» -- ցանկացած հաստատում, համաձայնություն, լիցենզիա, թույլտվություն, հրաժարում, կամ այլ սրված, շնորհված, այլապիսով կամ ցանկացած Կառավարական Մարմնի իշխանության կամ որևէ Օրենքի Պահանջի համաձայն այլ ձևով տրամադրված ցանկացած լիազորություն:

    «Կառավարական Մարմին» -- ցանկացած

    (ա)    երկիր, պետություն, շրջան,

7

town, village, district, or other jurisdiction of any nature;

(b)     federal, state, local, municipal, foreign, or other government;

(c)     governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal);

(d)     multi-national organization or body; or

(e)     body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

"Hazardous Activity"--the distribution, generation, handling, importing, management, manufacturing, processing, production, refinement, Release, storage, transfer, transportation, treatment, or use (including any withdrawal or other use of groundwater) of Hazardous Materials in, on, under, about, or from the Facilities or any part thereof into the Environment, and any other act, business, operation, or thing that increases the danger, or risk of danger, or poses an unreasonable risk of harm to persons or property on or off the Facilities, or that may affect the value of the Facilities or the Acquired Company.

"Hazardous Materials"--any waste or other substance that is listed, defined, designated, or classified as, or otherwise

քաղաք, ավան, գյուղ, տարածք կամ այլ ցանկացած տեսակի այլ իրընդիշխանություն,

(բ)     համերկրային, պետական, տեղական, քաղաքային, օտարերկրյա կամ այլ կառավարություն,

(գ)     ցանկացած տեսակի կառավարական կամ կիսակառավարական մարմին (ներառյալ ցանկացած կառավարական գործակալություն, մասնաճյուղ, վարչություն, պաշտոնյա, կամ մարմին եւ ցանկացած դատարան կամ դատական այլ մարմին),

(դ)     բազմազգային կազմակերպություն կամ մարմին, կամ

(ե)     ցանկացած վարչական, գործադիր, դատական, օրենսդրական, ոստիկանական, կանոնակարգային, կամ հարկային իշխանություն ցանկացած բնույթի իշխանություն իրականացնող կամ իրականացնելու ցանկացած մարմին.

«Վնասակար Գործողություն» -- Վնասակար Նյութերը Միջոցների ներքեւ մասից դեպի Միջավայր կամ Միջավայրում տարածումը, կուտակումը, կիրառումը, ներկրումը, կիրառումը, արտադրումը, զտումը, վերամշակումը, վերամշակումը, Արտանետումը, պահումը, փոխադրումը, տեղափոխումը, մշակումը կամ օգտագործումը (ներառյալ ընդերքի ջրերի որեւէ ձեւով դուրսբերումն կամ այլ օգտագործումն), եւ վնասակ կամ վտանգի հնարավորությունն ավելացնող, կամ Միջոցների տարածքում կամ դրանից դուրս անձանց կամ գույքին վնասելու վտանգ հարուցող, կամ Միջոցների կամ Ձեռքբերված Ընկերության արժեքի վրա ազդող ցանկացած այլ բայլ գործունեություն, գործողություն կամ երեւույթ:

«Վնասակար Նյութեր» -- ցանկացած բախրիմ կամ նյութ` ներառյալ դրա ցանկացած խառնուրդ կամ լուծույթ, որը նշված է, սահմանված է, նշանակված է,

designated, or classified as, or otherwise determined to be, hazardous, radioactive, or toxic or a pollutant or a contaminant under or pursuant to any Environmental Law, including any admixture or solution thereof, and specifically including petroleum and all derivatives thereof or synthetic substitutes therefore and asbestos or asbestos-containing materials.

"Intellectual Property Assets"--as defined in Section 3.22.

"Interim Balance Sheet"--as defined in Section 3.4.

"Knowledge"--an individual will be deemed to have "Knowledge" of a particular fact or other matter if:

(a)     such individual is actually aware of such fact or other matter; or

(b)     a prudent individual could be expected to discover or otherwise become aware of such fact or other matter in the course of conducting a reasonably comprehensive investigation concerning the existence of such fact or other matter.

A Person (other than an individual) will be deemed to have "Knowledge" of a particular fact or other matter if any individual who is serving, or who has at any time served, as a director, officer, partner, executor, or trustee of such Person (or in any similar capacity) has, or at any time had, Knowledge of such fact or other matter.

"Legal Requirement"--any national, regional, local, municipal, foreign, international, multinational, or other administrative order, constitution, law, ordinance, principle of common law, regulation, statute, or treaty.

կամ որակված է որպես, կամ այլ կերպ համարվում է վնասակար, ռադիոակտիվ, կամ թունավոր կամ բաղկոն կամ աղտոտող Միջավայրային Օրենքի համաձայն կամ համապատասխան, մասնավորապես ներառյալ ծավքը եւ դրա բոլոր վինխավերպումները կամ սինթետական վինխարինիչները, ինչպես նաեւ ասբեստը եւ ասբեստ պարունակող նյութերը։

«Մտավոր Սեփականություն» -- Բաժին 3.22-ում սահմանվածի համաձայն:

«Միջանկյալ Հաշվեկշիռ» -- Բաժին 3.4-ում սահմանվածի համաձայն:

«Իմացություն» -- անձնավորությունը կիմացավելի որդշակի փաստի կամ այլ խնդրի վերաբերյալ «Իմացություն» ունեցող, եթե.

(ա)     անձնավորությունն իրականում տեղյակ է այդ փաստի կամ այլ խնդրի մասին, կամ

(բ)     ողջամիտ անձնավորությունից պետք է որ հայտնաբերեր կամ այլ կերպ տեղեկանար նման փաստի կամ այլ խնդրի մասին փաստի կամ այլ խնդրի գոյության վերաբերյալ ողջամտորեն մանրամասնիս ուսումնասիրություն կատարելու ընթացքում:

Որեւե Անձ (անձնավորությունից բացի) կիմարվի որդշակի փաստի կամ այլ խնդրի վերաբերյալ «Իմացություն» ունեցող, եթե որեւէ անձնավորություն որն Անձի մոտ ծառայում է, կամ որեւէ ժամանակ ծառայել է որպես տնօրեն, պաշտոնյա, գործընկեր, գործադիր, կամ հոգաբարձու (կամ՝ ցանկացած նման որակով) ունի, կամ որեւէ ժամանակ ունեցել է Իմացություն նման փաստի կամ այլ խնդրի մասին:

«Օրենքի Պահանջ» -- ցանկացած ազգային, շրջանային, տեղական, քաղաքային, օտարերկրյա, միջազգային, բազմազգային, կամ այլ վարչական հրամ, սահմանադրություն, օրենք, կանոնակարգ, ընդհանուր օրենքի սկզբունք,

9

regulation, statute, or treaty.

"Occupational Safety and Health Law"--any Legal Requirement designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, and any program, whether governmental or private (including those promulgated or sponsored by industry associations and insurance companies), designed to provide safe and healthful working conditions.

"Order"--any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Body or by any arbitrator.

"Ordinary Course of Business"--an action taken by a Person will be deemed to have been taken in the "Ordinary Course of Business" only if:

(a)    such action is consistent with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person;

(b)    such action is not required to be authorized by the board of such Person (or by any Person or group of Persons exercising similar authority) ; and

(c)    such action is similar in nature and magnitude to actions customarily taken, without any authorization by the board of directors (or by any Person or group of Persons exercising similar authority), in the

կարգ, օրենսդրություն կամ միջազգային պայմանագիր:

«Աշխատանքային Անվտանգության եւ Առողջապահական Օրենք» -- ցանկացած Օրենքի պահանջ որը կոչված է ապահովելու անվտանգ եւ առողջ աշխատանքային պայմանները եւ մեղմելու աշխատանքային անվտանգության եւ առողջապահական ռիսկերը, եւ ցանկացած կառավարական կամ մասնավոր ծրագիր (ներառյալ արդյունաբերողների միություններից եւ ապահովվածպական ընկերություններից կողմից հայտարարված կամ ֆինանսավորվածներ) որը կոչված է ապահովելու աշխատանքային անվտանգ եւ առողջ պայմանները:

«Հրաման» -- ցանկացած դատարանի, վարչական մարմնի, կամ այլ Կառավարական Մարմնի կամ դատավորի կողմից ընդունված, տրված, արված կամ տրամադրած ցանկացած դատավճիռ, որոշում, հրահանգ, վճիռ, հրաման, ցուցում, ծանուցագիր, կամ եզրակացություն:

«Գործունեության Բնականոն Ընթացք» -- որեւէ Անձի կողմից ձեռնարկած միջոցը կհամարվի ձեռնարկվյած «Գործունեության Բնականոն Ընթացում» միայն այն դեպքում, եթե.

(ա)    նման ձեռնարկումը համապատասխանում է այդ Անձի անցյալ փորձին եւ ձեռնարկվել է նրա Անձի առօրյա բնականոն գործունեության ընթացքում,

(բ)    այդ ձեռնարկումը պարտադիր չէ որպեսզի լիազորվի տվյալ Անձի (կամ համանման իրավասություն որեւէ այլ Անձի կամ Անձանց խմբի) խորհրդի կողմից, եւ

(գ)    այդ ձեռնարկումը իր բնույթով եւ կարեւորությամբ համանման է սովորաբար իրականացվող ձեռնարկումներին, առանց տնօրենների (կամ համանման իրավասության որեւէ այլ Անձի կամ Անձանց խմբի) խորհրդի

10

exercising similar authority), in the ordinary course of the normal day-to-day operations of other Persons that are in the same line of business as such Person.

"Organizational Documents"--(a) the articles or certificate of formation a company ; (b) any charter or similar constituent document adopted or filed in connection with the creation, formation, or organization of a Person; and (c) any amendment to any of the foregoing.

"Person"--any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, or other entity or Governmental Body.

"Plan"--as defined in Section 3.13.

"Proceeding"--any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

"Promissory Notes"--as defined in Section 2.4(b)(ii).

"Related Person"--with respect to a particular individual:

«Կազմակերպական Փաստաթղթեր» -- (ա) ընկերության կազմավորման հաստատատում կամ վկայականը, (բ) որևէ կանոնադրություն կամ համանման հիմնական փաստաթուղթ որն ընդունվել կամ տրամադրվել է Անձի ստեղծման, կազմավորման եւ կազմակերպման կապակցությամբ, եւ (գ) վերոհիշյալի որևէ փոփոխություն:

«Անձ» -- որևէ անձնավորություն, կորպորացիա (ներառյալ շահույթ չհետապնդող ցանկացած կորպորացիա), ընդհանրական կամ սահմանափակ պատասխանատվությամբ ընկերություն, սահմանափակ պատասխանատվությամբ ընկերություն, համատեղ ձեռնարկություն, գույք, տրաստ, ընկերություն, կազմակերպարություն, արհեստակցական միություն, կամ այլ կազմավորում կամ Կառավարական Մարմին:

«Ծրագիր» -- Բաժին 3.13-ում սահմանվածի համաձայն:

«Վարույթ» -- ցանկացած ձեռնարկում, արբիտրաժ, աուդիտ, լսում, քննություն, վեճի քննարկում, կամ դատական գործ (քաղաքացիական, քրեական, վարչական, վերաքննչական, կամ ոչ պաշտոնական) որը սկսվել, հարուցվել, անցկացվել, կամ լսվել է որևէ Կառավարական Մարմնի կամ դատավարի կողմից, միջոցով կամ այլ կերպ ընդգրկմամբ:

«Մուրհակներ» -- Բաժին 2.4(բ)(ii)-ում սահմանվածի համաձայն:

«Փոխկապակցված Անձ» -- կոնկրետ անձնավորության առումով.

11

(a)    each other member of such individual's Family;

(b)    any Person that is directly or indirectly controlled by such individual or one or more members of such individual's Family;

(c)    any Person in which such individual or members of such individual's Family hold (individually or in the aggregate) a Material Interest; and

(d)    any Person with respect to which such individual or one or more members of such individual's Family serves as a director, officer, partner, executor, or trustee (or in a similar capacity).

With respect to a specified Person other than an individual:

(a)    any Person that directly or indirectly controls, is directly or indirectly controlled by, or is directly or indirectly under common control with such specified Person;

(b)    any Person that holds a Material Interest in such specified Person;

(c)    each Person that serves as a director, officer, partner, executor, or trustee of such specified Person (or in a similar capacity);

(d)    any Person in which such specified Person holds a Material Interest;

---

(ա)    այդ անձնավորության Ընտանիքի յուրաքանչյուր անդամ,

(բ)    ցանկացած Անձ որն ուղղակիորեն կամ անուղղակիորեն վերահսկվում է այդ անձնավորության կամ նրա Ընտանիքի մեկ կամ ավելի անդամների կողմից,

(գ)    ցանկացած Անձ որում տվյալ անձը կամ նրա Ընտանիքի անդամմերն ունեն (առանձին կամ ընդհանուր) Նյութական Շահ, կամ

(դ)    ցանկացած Անձ որի նկատմամբ տվյալ անձնավորություն կամ նրա Ընտանիքի մեկ կամ ավելի անդամները ծառայում են որպես տնօրեն, պաշտոնյա, գործընկեր, գործադիր, կամ հոգաբարձու (կամ համանման պաշտոնում):

Որոշակի Անձի առումով՝ անձնավորությունից բացի.

(ա)    որևէ Անձ որն ուղղակիորեն կամ անմիջականորեն վերահսկում է տվյալ Անձին, ուղղակիորեն կամ անմիջապ վերահսկվում է տվյալ Անձի կողմից, կամ ուղղակիորեն կամ անմիջականորեն ընդհանուր վերահսկման տակ է գտնվում տվյալ Անձի հետ միասին,

(բ)    որևէ Անձ որն ունի Նյութական Շահ տվյալ Անձի մոտ,

(գ)    յուրաքանչյուր Անձ որը տվյալ Անձի մոտ ծառայում է որպես տնօրեն, պաշտոնյա, գործընկեր, գործադիր, կամ հոգաբարձու (կամ համանման պաշտոնում),

(դ)    որևէ Անձ որի մոտ տվյալ Անձն ունի Նյութական Շահ,

12

*14*

(c)    any Person with respect to which such specified Person serves as a general partner or a trustee (or in a similar capacity); and

(f)    any Related Person of any individual described in clause (b) or (c).

For purposes of this definition, (a) the "Family" of an individual includes (i) the individual, (ii) the individual's spouse, (iii) any other natural person who is related to the individual or the individual's spouse within the second degree, and (iv) any other natural person who resides with such individual, and (b) "Material Interest" means direct or indirect beneficial ownership of voting securities or other voting interests representing at least 25% of the outstanding voting power of a Person or equity securities or other equity interests representing at least 25% of the outstanding equity securities or equity interests in a Person.

"Release"--any spilling, leaking, emitting, discharging, depositing, escaping, leaching, dumping, or other releasing into the Environment, whether intentional or unintentional.

"Representative"—with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

"Securities Act"--the United States Securities Act of 1933 or any successor law, and regulations and rules issued pursuant to that Act or any successor law.

(ե)    որևէ Անձ որի նկատմամբ տվյալ Անձի ծառայում է որպես գլխավոր գործընկեր կամ հոգաբարձու (կամ համանման պաշտոնում), եւ

(զ)    կետ (բ)-ում եւ (գ)-ում նկարագրված անձամաններից որեւէ մեկի հետ կապված Փոխկապակցված Անձ:

Սույն սահմանման իմաստով, (ա) անձնավորության «Ընտանիքը» ներառում է (i) անձնավորությունը, (ii) անձնավորության ամուսինը/կնոջը, (iii) ցանկացած ֆիզիկական անձ որը կապված է անձնավորության կամ նրա ամուսնու/կնոջ երկրորդ աստիճանի ազգականական կապով, եւ (iv) ցանկացած այլ ֆիզիկական անձ որը բնակվում է այդ անձնավորության հետ, եւ (բ) «Նյութական Շահ» նշանակում է Անձի մոտ ուղղակի կամ անուղղակի շահառու սեփականություն առնվազն 25% ձայնի իրավունք տվող կազմնադրական արժեթղթերի կամ նման ձայնի իրավունք տվող կազմնադրական այլ շահերի նկատմամբ, կամ խոստական կազմնադրական արժեթղթերի առնվազն 25% նկատմամբ սեփականության կամ գույքային շահի Անձի նկատմամբ:

«Արտանետում» -- ցանկացած տարածում, արտահոսք, ճառագայթում, արտանետում, կուտակում, ցրում, հիմնայնացում, նետում, կամ Միջավայր այլ ձեւով արտանետում լինի դա կանխամտածված կամ ոչ:

«Ներկայացուցիչ» -- կոնկրետ Անձի իմաստով, ցանկացած տնօրեն, պաշտոնյա, աշխատող, գործակալ, խորհրդատու, խորհրդական, կամ այդ Անձի այլ ներկայացուցիչ, ներառյալ իրավախորհրդատուն, հաշվապահները եւ այլ ֆինանսական խորհրդատուները:

«Արժեթղթերի Ակտ» -- Միացյալ Նահանգների 1933-ի Արժեթղթերի Ակտը կամ որեւէ իրավահաջորդ օրենք, եւ կանոնակարգեր եւ կանոններ ընդունված այդ Ակտի կամ որեւէ իրավահաջորդ օրենքի

13

"Sellers"--as defined in the first paragraph of this Agreement.

"Sellers' Releases"--as defined in Section 2.4.

"Shares"--as defined in the Recitals of this Agreement.

"Subsidiary"--with respect to any Person (the "Owner"), any corporation or other Person of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred) are held by the Owner or one or more of its Subsidiaries; when used without reference to a particular Person, "Subsidiary" means a Subsidiary of the Company.

"Tax Return"--any return (including any information return), report, statement, schedule, notice, form, or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection, or payment of any Tax or in connection with the administration, implementation, or enforcement of or compliance with any Legal Requirement relating to any Tax.

"Threat of Release"--a substantial likelihood of a Release that may require

համաձայն:

«Վաճառողներ» -- սույն Պայմանագրի առաջին պարբերությունում սահմանվածի համաձայն:

«Վաճառողների Իրավունքների Փոխանցման Հայտարարություններ» -- Բաժին 2.4-ում սահմանվածի համաձայն:

«Բաժնեմաս» -- Սույն Պայմանագրի Առարկայում սահմանվածի համաձայն:

«Դուստր Ընկերություն» -- որևէ Անձի («Մեխանական»ատեր») իմաստով, ցանկացած կորպորացիա կամ այլ Անձ որի ընՖորեքսնների խորհրդի կամ այլ գործադիր մարմնի մեծամասնությունը ընտրելու իրավունք տվող արժեթղթերը կամ այլ շահերը, կամ այլ կերպ այդ կորպորացիայի կամ այլ Անձի գործունեության ուղղությունները կամ քաղաքականությունները որոշելու իշխանությունը (բացի արժեթղթերից կամ այլ շահերից որոնց իշխանական ընույթը կախված է տեղի չունեցած հանգամանքից) պատկանում է Սեխպ հիմական կամ դրա մեկ կամ մի քանի Դուստր Ընկերություններին. եթե օգտագործվում է առանց որևէ կոնկրետ Անձի առումով՝ «Դուստր Ընկերություն» նշանակում է Ընկերության Դուստր Ընկերություն:

«Հարկային Հայտարարագիր» -- ցանկացած հայտարարագիր (ներառյալ որևէ տեղեկատվական հայտարարագիր), հաշվետվություն, հայտարարություն, ժամանականացույց, ծանուցում, ձև, կամ այլ փաստաթուղթ կամ տեղեկություն որը ներկայացվել կամ համձծվել է որևէ Կառավարական Մարմնին որևէ Հարկի սահմանման, ստույգման, գանձման, կամ վճարման, կամ որևէ Հարկի' ի կատարումն որևէ Օրենքի Պահանջի կառավարման, կիրառման, կամ պարտադրման կատարման առնչությամբ:

«Արտանետման Վտանգ» -- Միջավայրին Արտանետման արդյունքում

likelihood of a Release that may require action in order to prevent or mitigate damage to the Environment that may result from such Release.

"Threatened"—a claim, Proceeding, dispute, action, or other matter will be deemed to have been "Threatened" if any demand or statement has been made (orally or in writing) or any notice has been given (orally or in writing), or if any other event has occurred or any other circumstances exist, that would lead a prudent Person to conclude that such a claim, Proceeding, dispute, action, or other matter is likely to be asserted, commenced, taken, or otherwise pursued in the future.

2.    SALE AND TRANSFER OF SHARES; CLOSING.

    2.1    Shares.  Subject to the terms and conditions of this Agreement, at the Closing, Sellers will sell and transfer the Shares to Buyer, and Buyer will purchase the Shares from Sellers.

    2.2    Purchase Price.  The purchase price (the "Purchase Price") for the Shares will be Fifteen Thousand US Dollars ($15,000). Purchase Price is inclusive of and the Sellers are solely and separately responsible for all taxes, fees and levies, duties and other charges applicable now or those which may become applicable in the future, including such taxes, duties or other charges acknowledged retroactive, which may be imposed on any of the Purchase Price (including, but not limited to, the property tax, profit or income tax', VAT) (all taxes, duties or other charges hereinafter collectively referred to as the "Taxes"), associated with, or payment of, such Purchase Price. Buyer may calculate.

վնասի պատճառումից պաշտպանելու կամ մեղմելու միջոցառումների կիրառում պահանջող Արտանետման զգալի հավանականություն:

    «Սպառնում» -- հայցը, Վարույթը, վեճը, միջոցը, կամ այլ խնդիրը կհամարվի «Սպառնացած» եթե արվել է որևէ պահանձ կամ հայտարարություն (բանավոր կամ գրավոր) կամ ներկայացվել է որևէ ծանուցում (բանավոր կամ գրավոր), կամ որևէ այլ դեպք տեղի է ունեցել կամ այլ հանգամանքներ առկա են, որոնք որոշակիս Անձին թույլ կտային՝ եզրակացնել որ նման հայցը, Վարույթը, վեճը, միջոցը, կամ այլ խնդիրը հնարավոր է որպեսզի հետապնդում ներկայացվի, սկսվի, կիրառվի, կամ այլ կերպ իրականացվի:

2.    ԲԱԺՆԵՏՈՄՍԻ ՎԱՃԱՌՔԸ ԵՎ ՓՈԽԱՆՑՈՒՄԸ. ԿԱՏԱՐՈՒՄ

    2.1    Բաժնետոմս: Սույն Պայմանագրի պայմաններին և դրույթներին համաձայն, Կատարման ընթացքում, Վաճառողները վաճառում և փոխանցում են Բաժնետոմսը Գնորդին, իսկ Գնորդը գնում է Բաժնետոմսը Վաճառողներից:

    2.2    Գնման Գին: Բաժնետոմսի գնման գինը («Գնման Գին») կազմում է Տասնհինգ Հազար ԱՄՆ Դոլար ($15,000): Գնման Գինը ներառում է ու Վաճառողներն միայնձույն և առանձին-առանձին պատասխանատու են սույն Գնման Գնի կամ դրա վճարման հետ կապված` ներկայումս կամ ապագայում գանձման ենթակա բոլոր և ցանկացած հարկերի, տուրքերի և այլ վճարների, ներառյալ այն հարկերը, տուրքերը կամ վճարները որոնք կհամարվեն վճարման ենթակա ապագայում, որոնք կարող են կիրառվել Գնման Գնի կամ դրա որևէ մասի նկատմամբ (ներառյալ, սակայն չսահմանափակված, գույքահարկը, շահութահարկը, եկամտահարկը, ԱԱՀ-Ğ) (բոլոր հարկերը, տուրքերը կամ այլ վճարները հետայսու միասնաբար

15

such Purchase Price. Buyer may calculate, and withhold from the Purchase Price and pay any Tax on behalf of the Sellers.

2.3    Closing.  The purchase and sale (the "Closing") provided for in this Agreement will take place at the offices of Buyer's counsel at 2a Tamanyan Street, Suite #2 Yerevan , Armenia, at 10:00 a.m. (local time) on December 21, 2003 Subject to the provisions of Section 9, failure to consummate the purchase and sale provided for in this Agreement on the date and time and at the place determined pursuant to this Section 2.3 will not result in the termination of this Agreement and will not relieve any party of any obligation under this Agreement.

2.4    Closing Obligations.  At the Closing:

(a)    Sellers will deliver to Buyer:

(i)    certificates representing the Shares, duly endorsed (or accompanied by duly executed stock powers or equivalent documents), with signatures for transfer to Buyer;

(ii)    releases in the form of Exhibit 2.4(a)(ii) executed by Sellers (collectively, "Sellers' Releases");

---

կանվանվել «Հարկեր»)՝ կապված Գնման Գնի կամ դրա վճարման հետ: Գնորդը կարող է հաշվարկել, Գնման Գնից պահել, եւ Վաճառողների փոխարեն վճարել ցանկացած Հարկ:

2.3    Կատարում: Սույն Պայմանագրով սահմանված առքը եւ վաճառքը («Կատարում») տեղի կունենա Հայաստանի Հանրապետության Երեւան քաղաքի Թամանյան 2ա բնակարան 2 հասցեում գտնվող Գնորդի իրավախորհրդատուի գրասենյակում, տեղական ժամանակով 10:00-ին, 2003թ-ի դեկտեմբերի 21-ին: Բաժին 9-ի դրույթների պայմանով, սույն Բաժին 2.3-ում սահմանված ամսաթվին, ժամին եւ նշված տեղում սույն Պայմանագրով սահմանված առք ու վաճառքը գործարքը չավարտելը չի լուծում սույն Պայմանագիրը եւ չի ազատում որեւէ կողմին սույն Պայմանագրով սահմանված իր պարտավորությունների կատարումից:

2.4    Կատարման Պարտավորություններ: Կատարման ժամանակ.

(ա)    Վաճառողները Գնորդին տրամադրում է.

(i)    Բաժնեմասը ներկայացնող վկայագրերը, պատշաճ ձեռով հաստատատված (կամ պատշաճ ձեռով բաժնեմասային իրավունքի հաստատատումով ուղեկցված կամ համապատազոր փաստաթղթեր), Գնորդին փոխանցման հաստատատող ստորագրություններով;

(ii)    Վաճառողների կողմից հաստատված իրավումքերից փոխանցման հայտարարությունները Հավելված 2.4(ա)(ii)-ում նշված ձեռով (միասնաբար՝ «Վաճառողների

16

Իրավունքների Փոխանցման
Հայտարարություններ»);

       (iii)    an acknowledgment that Buyer is credited with paying Fifteen Thousand US Dollars ($15,000) towards the purchase price paid as of December 21, 2003;

       (iii)    հաստատում առ այն, որ Գնորդը վճարել է Տասանհինգ Հազար ($15 000) ԱՄՆ Դոլար գնման գնից 2003թ-ի դեկտեմբերի 21-ին,

       (iv)    a certificate executed by Sellers representing and warranting to Buyer that each of Sellers' representations and warranties in this Agreement was accurate in all respects as of the date of this Agreement and is accurate in all respects as of the Closing Date as if made on the Closing Date (giving full effect to any supplements to the Disclosure Letter that were delivered by Sellers to Buyer prior to the Closing Date in accordance with Section 5.5. and

       (iv)    Վաճառողների կողմից ստորագրված` Գնորդին համապատասխան և երաշխավորող վկայագիր առ այն, որ Վաճառողների կողմից սույն Պայմանագրում արված յուրաքանչյուր հավաստումներն և երաշխիքները ճիշտ են եղել բոլոր առումներով սույն Պայմանագրի ամսաթվի դրությամբ և ճիշտ են Կատարման Ամսաթվի դրությամբ համարվելով որ արվել են Կատարման Ամսաթվի դրությամբ (իրավական ամբողջական ուժ հաղորդելով Բաժնի 5.5-ի համաձայն Գնորդին Վաճառողների կողմից ներկայացված Բացահայտման Նամակի լրակազմերը հավելմանը), և

       (v) a resolution of SHA, LLC general meeting of participants authorizing transfer of Shares to Buyer.

       (v)    Բաժնեմասը Գնորդին փոխանցելը լիազորող` ՍՀԱ, ՍՊԸ մասնակիցների ընդհանուր ժողովի որոշումը:

       (b)    Buyer will deliver to Sellers:

       (բ)    Գնորդը Վաճառողներին տրամադրում է.

       (i)    an acknowledgement canceling Sellers' obligations to repay the Fifteen Thousand US Dollars ($15,000) previously advanced in connection with this transaction:

       (i)    սույն գործարքի հետ կապված և նախկինում կանխավճարված Տասանհինգ Հազար ԱՄՆ Դոլարը ($15,000) Վաճառողների կողմից վերադարձնելու պարտավորությունը չեղյալ համարելու վերաբերյալ հաստատում;

17

*19*

transaction;

(ii)    the draft of a mutually agreeable royalty agreement payable to A, B, and C jointly to pay a royalty of One US Dollar ($1.00) per Ounce of Gold produced at the Hankavan Mine for the first One Hundred Sixty Thousand Ounces of gold produced, which shall be entered between the parties only if and when Buyer determines that the Hankavan Mine can be economically developed and commercial operations commence and all Governmental Authorizations for the proceeding of such mining operations has been obtained, not to exceed in the total amount of One Hundred Sixty Thousand US Dollars ($160,000) in the form of Exhibit 2.4(b) (the "Royalty Agreement"); and

(iii)    a certificate executed by Buyer to the effect that, except as otherwise stated in such certificate, each of Buyer's representations and warranties in this Agreement was accurate in all respects as of the date of this Agreement and is accurate in all respects as of the Closing Date as if made on the Closing Date;

(ii)    Ա-ին, Բ-ին եւ Գ-ին միասնաբար վճարվող եւ երկրաստնր համաձայնութոյւն առատկա հանիրհսացող ռոյալթիների պայմանագրի նախագիծը՝ Հանքավանի Հանքում արտադրվաձ ոսկու առաջին Հաչյուր Վաթսուն Հազար Ունցիայի համար յուրաքանչյուր Ունցիա հաչվարկով Մեկ ԱՄՆ Դոլար ($1,00) վճարման վերաբերյալ, որը պետք է կողմերի միջեն ստորագրվի միայն այն դեպքում եւ երբ որ Գնորդը որոշի որ Հանքավանի Հանքը կարող է տոնտեսապես շահավետորեն զարգացծւել եւ ձեռնարկատիրական աշխատանքները սկսվեն եւ առավված լինեն բոլոր Կառավարական Լիազորություններն հանքարդյունահանման աշխատանքների համար, վճարվելիք գումարը չգերազանցելով Հաչյուր Վաթսուն Հազար ԱՄՆ Դոլարը ($160,000)՝ ինչպես ներկայացված է Հավելվաձ 2.4(բ)-ում («Ռոյալթիի Պայմանագիր»), եւ

(iii)    Գնորդի կողմից հաստատված մկաչագիր առ այն, բացի այդ մկաչագրում այլ կերպ սահմանված դեպքերի, սույն Պայմանագրով ներկայացված Գնորդի յուրաքանչյուր հավաստումները եւ երաշխիքները ճիշտ են եղել բոլոր առումներով սույն Պայմանագիր ամսաթվի դրությամբ եւ ճիշտ են բոլոր առումներով Կատարման Ամսաթվի դրությամբ որ արվել են Կատարման Ամսաթվի դրությամբ, եւ

18

3. **REPRESENTATIONS AND WARRANTIES OF SELLERS.** Sellers represent and warrant to Buyer as follows:

3.1 <u>Organization and Good Standing</u>.

(a)     Part 3.1 of the Disclosure Letter contains a complete and accurate list for the Acquired Company of its name, its jurisdiction of incorporation, other jurisdictions in which it is authorized to do business, and its capitalization (including the identity of each participant and the number of shares held by each). The Acquired Company is a company duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation, with full company power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all its obligations under Applicable Contracts. The Acquired Company is duly qualified to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification.

3. ՎԱՃԱՌՈՂՆԵՐԻ ՀԱՎԱՍՏՈՒՄՆԵՐԸ ԵՒ ԵՐԱՇԽԻՔՆԵՐԸ: Վաճառողները Գնորդին հավաստում եւ երաշխավորում են հետեւյալը.

3.1 Կազմավորում եւ Պատշաճ Վիճակ:

(ա)     Բացահայտման Նամակի Բաժին 3.1-ը պարունակում է լրիվ եւ ճիշտ ցուցակ ներառելով Ձեռքբերված Ընկերության անունը, նրա կազմավորման օրենսդրությունը, այլ երկրների օրենսդրությունների համաձայն գործունեության ծավալելու իրավունքը, եւ նրա կապիտալացվածման (ներառյալ յուրաքանչյուր մասնակցի ինքնությունը եւ յուրաքանչյուր մասնակցի բաժնեմասերի քանակը): Ձեռքբերված Ընկերությունը պատշաճ կերպով կազմավորված եւ գրանցված է, իրավականորեն գոյություն ունի, եւ գտնվում է պատշաճ վիճակում իր կազմավորման օրենսդրության համաձայն, ունի իր գործունեությունը ամբողջությամբ վարելու` ինչպես որ այն վարվում է ներկայումս, ցանկացած գույքեր եւ միջոցներ տնօրինելու եւ օգտագործելու, եւ Կիրառելի Պայմանագրերի համաձայն իր բոլոր պարտավորությունները կատարելու իշխանությունն եւ իրավասությունը: Ձեռքբերված Ընկերությունը պատշաճ կերպով իրավասու է գործելու որպես օտարերկրյա կորպորացիա եւ պատշաճ վիճակում է յուրաքանչյուր օրենսդրության համաձայն` որոնց համաձայն նրա կողմից տնօրինված կամ օգտագործվող գույքի կամ տնօրինումը կամ օգտագործումը, կամ նրա կողմից իրականացվող գործունեության տեսակները կպահանջեն նման

19

21

իրավունակություն:

(բ) . Վաճառողները
Դ.նորդին տրամադրել են
Ձեռքբերված Ընկերության
Կազմավորման Փաստաթղթերի
պատճենները՝ ներկայումս
իրավականի ուժ ունեցող տեսքով:

(b)    Sellers have
delivered to Buyer copies of the
Organizational Documents of the
Acquired Company, as currently in
effect.

**3.2    Authority: No Conflict.**

3.2    Լիազորություն; Շահերի
Բախման Բացակայություն:

(a)    This Agreement
constitutes the legal, valid, and
binding obligation of Sellers,
enforceable against Sellers in
accordance with its terms. Upon
the execution and delivery by
Sellers of the documents identified
in Article 2.4(a) above,
(collectively, the "Sellers' Closing
Documents"), the Sellers' Closing
Documents will constitute the legal,
valid, and binding obligations of
Sellers, enforceable against Sellers
in accordance with their respective
terms. Sellers have the absolute
and unrestricted right, power,
authority, and capacity to execute
and deliver this Agreement and the
Sellers' Closing Documents and to
perform their obligations under this
Agreement and the Sellers' Closing
Documents.

(ա)    Սույն Պայմանագիրս
սահմանում է Վաճառողների
իրավական, պատշաճ եւ
Վաճառողների պարտադրեցնող
պարտավորություն՝ Վաճառողների
նկատմամբ կիրառելի իր դրույթների
համաձայն: Վաճառողների կողմից
վերը նշված Հոդված 2.4(ա)-ում
սահմանված փաստաթղթերի
ստորագրումից եւ տրամադրումից
հետո (միասնաբար՝ «Վաճառողների
Կատարման Փաստաթղթեր»),
Վաճառողների Կատարման
Փաստաթղթերը կահմանեն
Վաճառողների իրավական,
պատշաճ եւ պարտավորեցնող
պարտավորություններ՝
Վաճառողների հանդեպ կիրառելի
իրենց համապատասխան
դրույթների համաձայն:
Վաճառողներն ունեն բացարձակ եւ
անսահմանափակ իրավունք,
իշխանություն, իրավասություն, եւ
ունակություն ստորագրելու եւ
կատարելու սույն Պայմանագիր եւ
Վաճառողների Կատարման
Փաստաթղթերը եւ կատարելու սույն
Պայմանագրով եւ Վաճառողների
Կատարման Փաստաթղթերով
սահմանված իրենց
պարտավորությունները:

(b)    Except as set forth in
Part 3.2 of the Disclosure Letter,
neither the execution and delivery
of this Agreement nor the

(բ)    Բացի
Բացահայտման Նամակի Բաժին
3.1-ում նշվածից, սույն Պայմանագրի
ստորագրումը եւ կատարումը, կամ

20

of this Agreement nor the consummation or performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time):

    (i)    contravene, conflict with, or result in a violation of any provision of the Organizational Documents of the Acquired Company, or (B) any resolution adopted by the board of directors or the stockholders of the Acquired Company;

    (ii)    contravene, conflict with, or result in a violation of, or give any Governmental Body or other Person the right to challenge any of the Contemplated Transactions or to exercise any remedy or obtain any relief under, any Legal Requirement or any Order to which the Acquired Company or a Seller, or any of the assets owned or used by the Acquired Company, may be subject;

    (iii)    contravene, conflict with, or result in a violation of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate,

---

որեւէ Նախատեսված Գործարքներերի իրականացումը կամ կատարումն՝ ուղղակիորեն կամ անուղղակիորեն (ծանուցմամբ կամ առանց դրա, կամ ժամանակի ընթացքում).

    (i)    չի հակասի, քախման մեջ գտնվի, կամ խախտման արդյունք հանդիսանա Ձեռքբերված Ընկերության Կազմակերպչական Փաստաթղթերի որեւէ դրույթի, կամ (Բ) Ձեռքբերված Ընկերության տնօրինների խորհրդի կամ բաժնետերերի ժողովի կողմից կայացված որեւէ որոշմանը;

    (ii)    չի հակասի, քախման մեջ գտնվի, կամ խախտման արդյունք հանդիսանա, կամ որեւէ Կառավարական Մարմնին կամ այլ Անձին իրավունք վերապահի կասկածի տակ դնել որեւէ Նախատեսված Գործարք կամ Ձեռքբերված Ընկերության կամ որեւէ Վաճառողի, Ձեռքբերված Ընկերության տնօրինման կամ օգտագործման տակ գտնվող որեւէ գույքի հանդեպ կիրառելի որեւէ Օրենքի Պահանջի կամ Հրամանի հիման վրա ծառը բերի իրավունքի պաշտպանության կամ պարտավորությունների կատարումից ազատման միջոց:

    (iii)    չի հակասի, քախման մեջ գտնվի, կամ խախտման արդյունք հանդիսանա, կամ որեւէ Կառավարական Մարմնին իրավունք ընձեռի հետ վերցնել, չեղյալ համարել,

21

suspend, cancel, terminate, or modify, any Governmental Authorization that is held by the Acquired Company or that otherwise relates to the business of, or any of the assets owned or used by, the Acquired Company;

(iv)    cause Buyer or the Acquired Company to become subject to, or to become liable for the payment of, any Tax;

(v)    cause any of the assets owned by the Acquired Company to be reassessed or revalued by any taxing authority or other Governmental Body;

(vi)    contravene, conflict with, or result in a violation or breach of any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any Applicable Contract; or

(vii)    result in the imposition or creation of any Encumbrance upon or with respect to any of the assets owned or used by the Acquired Company.

կասեցնել, կանգնեցնել, վերացնել, կամ փոփոխել Ձեռքբերված Ընկերության կամ դրա գործունեության, տնօրինվող կամ օգտագործվող գույքի հետ որեւէ կերպ առնչվող որեւէ, Կառավարական Լիազորության կամ դրա որեւէ դրույթ կամ պահանձ;

(iv)    Գնորդին կամ Ձեռքբերված Ընկերությանը չի դարձնի առկա, կամ պարտավորված վձարելու, որեւէ Հարկ;

(v)    առկա չի դարձնի Ձեռքբերված Ընկերության կողմից տնօրինվող որեւէ գույք վերագնահատվելու կամ վերարժեքավորվելու որեւէ հարկային Մարմնի կամ այլ Կառավարական Մարմնի կողմից;

(vi)    չի հակասի, բախման մեջ գտնվի, կամ խախտման արդյունք հանդիսանա որեւէ Կիրառելի Պայմանագրի համար, կամ որեւէ Անձին իրավունք չի վերապահի խախտում ձանաչելու կամ իրավունքի պաշտպանությյան միջոց ձեռք բերելու, կամ լուծումը կամ կատարումն արագացնելու, կամ դադարեցնելու, լուծելու, չեղյալ համարելու, կամ փոփոխելու որեւէ Կիրառելի Պայմանագիր, կամ

(vii)    արդյունք չի հանդիսանա որեւէ Ծանրաբեռնման կիրառման կամ ստեղծման համար Ձեռքբերված Ընկերության կողմից տնօրինվող կամ օգտագործվող որեւէ գույքի

22

74

Except as set forth in Part 3.2 of the Disclosure Letter, no Seller or Acquired Company is or will be required to give any notice to or obtain any Consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Contemplated Transactions.

(c)    Sellers are acquiring the Promissory Notes for their own account and not with a view to their distribution within the meaning of Section 2(11) of the Securities Act.

3.3    Capitalization.    Sellers are and will be on the Closing Date the record and beneficial owners and holders of the Shares, free and clear of all Encumbrances. A owns 33% of the Shares, B owns 33% of the Shares, and C owns 34% of the Shares.    No legend or other reference to any purported Encumbrance appears upon any certificate representing equity securities of the Acquired Company. All of the outstanding equity securities of each Acquired Company have been duly authorized and validly issued and are fully paid and nonassessable. There are no Contracts relating to the issuance, sale, or transfer of any equity securities or other securities of the Acquired Company. None of the outstanding equity securities or other securities of the Acquired Company was issued in violation of any other Legal Requirement. The Acquired Company does not own, or has any Contract to

 Նկատմամբ կամ հանդեպ:

Բացի Բացահայտման Նամակի Բաժին 3.2-ում ներկայացվածից, Վաճառողներից ոչ մեկից կամ Ձեռքբերված Ընկերությունից չի պահանջվում որպեսզի որևէ ծանուցեն կամ Համաձայնություն ձեռք բերեն որևէ Անձից սույն Պայմանագրի ստորագրման եւ կատարման կամ Նախատեսված Գործարքներից որևէ մեկի կատարման կամ իրականացման վերաբերյալ:

(q)    Վաճառողները ձեռք են բերում Մուրհակներ իրենց սեփական հաշվին դրանք չշաշխելու նպատակով` համաձայն Արժեթղթերի Ակտի Բաժին 2(11)-ի իմաստի:

3.3    Կապիտալացիա: Վաճառողները հանդիսանում են եւ Կատարման Ամսաթվին կհանդիսանան Բաժնեմասերի գրանցված եւ շահառու սեփականատերեր, Բաժնեմասերն ազատ են զերծ լինելով բոլոր Ծանրաբեռնումներից: Ա-ն տնօրինում է Բաժնեմասի 33%-ը., Բ-տնօրինում է Բաժնեմասի 33%-ը, Գ-ն տնօրինում է Բաժնեմասի 34%-ը: Ձեռքբերված Ընկերության արժեթղթերը ներկայացնող որևէ վկայագրում չի հիշատակվում կամ այլ կերպ հղում չի կատարվում որևէ նախատեսված Ծանրաբեռնումման մասին: Յուրաքանչյուր Ձեռքբերված Ընկերության կանոնադրական արժեթղթերը պատշաճ կերպով լիազորված եւ թողարկված են, ամբողջությամբ վճարվել են հարկային պարտավորություններ չեն կրում: Գույություն չունեն որևէ Պայմանագրեր Ձեռքբերված Ընկերության որևէ կանոնադրական արժեթղթերի կամ այլ արժեթղթերի թողարկման, վաճառքի կամ փոխանցման վերաբերյալ: Ձեռքբերված Ընկերության կանոնադրական

23

does not own, or has any Contract to acquire, any equity securities or other securities of any Person or any direct or indirect equity or ownership interest in any other business.

արժեթղթերից ոչ մեկը չի բռնարկվել որևէ, այլ Օրենքի Պահանջի խախտումներ։ Ձեռքբերված Ընկերությունը չի տնօրինում, յունի որևէ Պայմանագիր ձեռք բերելու համար, այլ Անձի որևէ կանոնադրական արժեթղող կամ այլ արժեթղթեր, կամ ուղղակի կամ անուղղակի մասմարաժին կամ սեփականություն այլ ընկերություններում։

### 3.4    Financial Statements.
Sellers have delivered to Buyer any of the following which exist: (a) balance sheets of the Acquired Company as at December 1, 2003 and the related statements of income, changes in stockholders' equity, and cash flow for each of the fiscal years then ended, (b) a balance sheet of the Acquired Company as at December 1, 2003 (including the notes thereto, the "Balance Sheet"), and the related statements of income, changes in shareholders' equity, and cash flow for the fiscal year then ended.

### 3.4    Ֆինանսական Հաշվետվություններ: Վաճառողները Գնորդին տրամադրել են գոյություն ունեցող հետևյալից յուրաքանչյուրը. (ա) Ձեռքբերված Ընկերության հաշվեկշիռները 2003թ-ի դեկտեմբերի 1-ի դրությամբ և համապատասխանված եկամտահարկի, բաժնետերերի բաժնեմասերի փոփոխության, կանխիկի հոսքերի հաշվետվությունները համապատասխանված տարիների համար, (բ) Ձեռքբերված Ընկերության հաշվեկշիռը (նեբառյալ նշումները «Հաշվեկշիռ»), և համապատասխանված եկամտահարկի, բաժնետերերի բաժնեմասերի փոփոխության, կանխիկի հոսքերի հաշվետվությունները համապատասխանված տարիների համար:

### 3.5    Books and Records. The
books of account, minute books, share record books, and other records of the Acquired Company, all of which have been made available to Buyer, are complete and correct and have been maintained in accordance with sound business practices and legal requirements, including the maintenance of an adequate system of internal controls. The minute books of the Acquired Company contains accurate and complete records of all meetings held of, and corporate action taken by the Acquired Company, and no meeting has been held for which minutes have not been prepared and are not contained in such minute books. At the Closing, all of those books and records will be in the possession of the Acquired Company.

### 3.5    Հաշվապահական Գրքեր և Գրանցումներ: Ձեռքբերված Ընկերության հաշվապահական գրքերը, արձանագրությունների գրքերը, բաժնեմասերի գրանցման գրքերը, և այլ գրքերը` բոլորը տրամադրված լինելով ներկայացվել են Գնորդին, ամբողջական և ճիշտ են և վարվել են գործառույթ լավագույն սովորույթների և իրավական պահանջների համաձայն, ներառյալ կիրառելով ներքին վերահսկողության համապատասխան համակարգ: Ձեռքբերված Ընկերության արձանագրությունների գրքերը ներառում են Ձեռքբերված Ընկերության կողմից հրավիրված բոլոր ժողովների, և ձեռնարկատիրական որոշումների կայացված մասին ճիշտ և ամբողջական արձանագրություններ, և չեն հրավիրվել ժողովներ որոնց արձանագրությունները չեն կազմվել են չեն ներառվել այս

24

Acquired Company.

### 3.6    Title to Properties; Encumbrances.

Part 3.6 of the Disclosure Letter contains a complete and accurate list of all real property, leaseholds, licenses, or other interests therein owned by the Acquired Company. Sellers have delivered to Buyer copies of the deeds and other instruments (as recorded) by which the Acquired Company acquired such real property and interests, and copies of all title insurance policies, opinions, abstracts, and surveys in the possession of Sellers or the Acquired Company and relating to such property or interests. The Acquired Company owns (with good and marketable title in the case of real property, subject only to the matters permitted by the following sentence) all the properties, licenses, and assets (whether real, personal, or mixed and whether tangible or intangible) that it purports to own located in the facilities owned or operated by the Acquired Company or reflected as owned in the books and records of the Acquired Company, including all of the properties and assets reflected in the Balance Sheet and the Interim Balance Sheet (except for assets held under capitalized leases disclosed or not required to be disclosed in Part 3.6 of the Disclosure Letter and personal property sold since the date of the Balance Sheet and the Interim Balance Sheet, as the case may be, in the Ordinary Course of Business), and all of the properties and assets purchased or otherwise acquired by the Acquired Company since the date of the Balance Sheet (except for personal property acquired and sold since the date of the Balance Sheet in the Ordinary Course of Business and consistent with past practice),

արժանագրությունների գրքերի մեջ։ Կատարման պահին բոլոր նման գրքերը եւ գրանցումները կլինեն Ձեռքբերված Ընկերության տրամադրության տակ։

### 3.6    Գույքի նկատմամբ Սեփականության Իրավունքը; Ծանրաբեռնումներ։ Բացահայտման Նամակի Բաժին 3.6-ը ներառում է Ձեռքբերված Ընկերության տնօրինման տակ գտնվող բոլոր անշարժ գույքի, վարձակալությունների, լիցենզիաների, կամ այլ շահերի ամբողջական եւ ճիշտ ցուցակը։ Վաճառողները Գնորդին են տրամադրել Ձեռքբերված Ընկերության բոլոր՝ հաստատագրերի եւ այլ գործառույթների պատճեները (գրանցումների համաձայն) որոնց համաձայն ձեռք են բերվել այդ անշարժ գույքը եւ շահերը, ինչպես նաեւ Վաճառողների կամ Ձեռքբերված Ընկերության տրամադրության տակ գտնվող, նշված գույքի կամ շահերի սեփականության վերաբերյալ ապահովագրական ապլիսների, մասնագիտական կարծիքների, համառոտ նկարագրությունների կամ ուսումնասիրությունների պատճեները։ Ձեռքբերված Ընկերությունը տնօրինում է (անշարժ գույքի մասով ամբողջական եւ ինկնիրավունք՝ հետեվյալ նախապատատությունում սահմանված բացառություններին առկա միայն) Ձեռքբերված Ընկերության տնօրածրտոմ տեղադրված կամ Ձեռքբերված Ընկերության գրքերում եւ գրանցումներում որպես այդպիսին՝ արտացոլված՝ որպես սեփականություն դիտարվող ամբողջ գույքը, լիցենզիաները եւ միջոցները (լինեն դրանք անշարժ, շարժական, կամ խառը, եւ նյութական կամ ոչ նյութական), ներառյալ Հաշվեկշռում եւ Նախնական Հաշվեկշռում արտացոլված գույքը եւ միջոցները (բացառությամբ Բացահայտման Նամակի Բաժին 3.6-ում բացահայտված կամ բացահայտման անհրաժեշտություն չունեցող՝ կապիտալացված վարձակալության տակ գտնվող միջոցները եւ Գործռոնեության Բնականոն Ընթացքում Հաշվեկշռի կամ Նախնական Հաշվեկշռի ամսաթվից հետո վաճառված շարժական

25

Business and consistent with past practice). All material properties and assets reflected in the Balance Sheet and the Interim Balance Sheet are free and clear of all Encumbrances and are not, in the case of real property, subject to any rights of way, building use restrictions, exceptions, variances, reservations, or limitations of any nature except, with respect to all such properties and assets, (a) mortgages or security interests shown on the Balance Sheet or the Interim Balance Sheet as securing specified liabilities or obligations, with respect to which no default (or event that, with notice or lapse of time or both, would constitute a default) exists, (b) mortgages or security interests incurred in connection with the purchase of property or assets after the date of the Interim Balance Sheet (such mortgages and security interests being limited to the property or assets so acquired), with respect to which no default (or event that, with notice or lapse of time or both, would constitute a default) exists, (c) liens for current taxes not yet due, and (d) with respect to real property, (i) minor imperfections of title, if any, none of which is substantial in amount, materially detracts from the value or impairs the use of the property.subject thereto, or impairs the operations of the Acquired Company, and (ii) zoning laws and other land use restrictions that do not impair the present or anticipated use of the property subject thereto. All buildings, plants, and structures owned by the Acquired Company lies wholly within the boundaries of the real property owned by the Acquired Company and do not encroach upon the property of, or otherwise conflict with the property rights of, any other Person.

գույքը), եւ Ձեռքբերված Ընկերության կողմից Հաշվեկշռի ամսաթվից հետո գնված ամբողջ գույքը եւ միջոցները (բացառությամբ Գործունեության Բնականոն Ընթացքում եւ նախկին գործունեությանը համապատասխան Հաշվեկշռի ամսաթվից հետո գնված եւ վաճառված շարժական գույքը)։ Հաշվեկշռում եւ Նախնական Հաշվեկշռում արտացոլված բոլոր նյութական ակտիվներ։ եւ միջոցներն ազատ եւ զերծ են բոլոր Ծանրաբեռնումներից եւ, անշարժ գույքի դեպքում, առկա չեն սերվիտուտների, կառուցէքների օգտագործման սահմանափակումների, բացառությունների, վեներ, կամ որեւէ բնույթի սահմանափակումների բացի, այդ գույքի եւ միջոցների մասով, (ա) Հաշվեկշռում կամ Նախնական Հաշվեկշռում որպես տվյալ պարտատիրությունների կամ պարտականությունների ապահովող արտացոլված գրավներ կամ գրավադրումները, որոնց նկատմամբ գոյություն չունի որեւէ խախտում (կամ դեպք որը, ծանուցմամբ կամ ժամանակի ընթացքում կամ երկու դեպքում էլ, կիսամարվեր խախտում), (բ) գրավներ կամ գրավադրումներ որոնք առաջացել են գույքի կամ միջոցների գնման արդյունքում Նախնական Հաշվեկշռի ամսաթվից հետո (գրավները եւ գրավադրումները սահմանափակվել բացառապես գնված գույքի կամ միջոցների վրա), որոնց նկատմամբ գոյություն չունի որեւէ խախտում (կամ դեպք որը, ծանուցմամբ կամ ժամանակի ընթացքում կամ երկու դեպքում էլ, կիսամարվեր խախտում), (գ) ընթացիկ հարկերի վճարման ժամկետը դեռ չի մոտեցել, եւ (դ) անշարժ գույքի մասով (ի) սեփականության չնչին թերություններ, եթե կան, որոնցից ոչ մեկը գումարի իմաստով զգալի չէ, գյութականացնորեն չեն պակասեցնում Օշված գույքի արժեքը կամ բացառապար չեն ազդում դրա օգտագործման վրա, կամ բացառապար չեն ազդում Ձեռքբերված Ընկերության գործունեության վրա, եւ (ii) գոտիավորման օրենքները եւ հողի օգտագործման այլ սահմանափակումները բացառապար չեն ազդում սույնի առավկա գույքի ներկա կամ սպասվող օգտագործման վրա։ Ձեռքբերված

26

Ընկերության կողմից տնօրինվող իրավ-
ունքները, գործառույթները, եւ կառուցվածքի
տեղակայված են Չեռքբեվրած
Ընկերության կողմից տնօրինվող անվամբ
գույքի սահմաններից ներս, եւ չեն
տարածվում կամ այլ կերպ բախման մեջ
չեն գտնվում այլ Անձի գույքի վրա կամ դրա
գույքային իրավունքների հետ։

<table>
<tr><td>

**3.7**    <u>Condition and Sufficiency of Assets</u>. The buildings, plants, structures, and equipment of the Acquired Company are structurally sound, are in good operating condition and repair, and are adequate for the uses to which they are being put, and none of such buildings, plants, structures, or equipment is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost. The building, plants, structures, and equipment of the Acquired Company are sufficient for the continued conduct of the Acquired Company's business after the Closing in substantially the same manner as conducted prior to the Closing.

</td><td>

**3.7**    <u>Գույքի Վիճակն ու Բավարարությունը</u>։ Ձեռքբերված Ընկերության շենքերը, գործարանները, կառուցցները, եւ սարքավորումներն կառուցվածքային տեսանկյունից պատշաճ վիճակում են, աշխատանքայ լավ վիճակում են վերանորոգված են, եւ համապատասխանում են իրենց օգտագործման նպատակին, եւ այդ շենքերից, գործարաններից, կառուցցներից կամ սարքավորումներից ոչ մեկը կարիք չունի վերանորոգման կամ նորոգման բացի սովորական, առճամանակյա սպասարկումից եւ վերանորոգումը որը իր բնույթով կամ արժեքով էական չէ։ Ձեռքբերված Ընկերության շենքերը, գործարանները, կառուցցները, եւ սարքավորումները բավարար են Չեռքբերված Ընկերության շարունակական գործունեության համար Կատարումից հետո հիմնականորեն նույն ձեւով ինչպես իրականացվել է մինչեւ Կատարումը։

</td></tr>
<tr><td>

**3.8**    <u>Accounts Receivable</u>. All accounts receivable of the Acquired Company that are reflected on the Balance Sheet or the Interim Balance Sheet or on the accounting records of the Acquired Company as of the Closing Date (collectively, the "Accounts Receivable") represent or will represent valid obligations arising from sales actually made or services actually performed in the Ordinary Course of Business. Unless paid prior to the Closing Date, the Accounts Receivable are or will be as of the Closing Date current and collectible net of the respective reserves shown on the Balance Sheet or the Interim Balance Sheet or on the accounting records of the Acquired Company as of the

</td><td>

**3.8**    <u>Ստացվող Հաշիվը</u>։ Ձեռքբերված Ընկերության Հաշվեկշռում կամ Նախնական Հաշվեկշռում արտացոլված ամբողջ ստացվող հաշիվը Կատարման Ամսաթվի դրությամբ (միասնաբար՝ «Ստացվող Հաշիվ») ներկայացնում է կամ կներկայացնի Գործունեության Թնականոն Ընթացքում փաստացիորեն կատարված վաճառքի կամ ծառայությունների մատուցումից առաջացած պարտավորությունները։ Բացի մինչեւ Կատարման Ամսաթիվն վճարված լինելը դեպքերից, Ստացվող Հաշիվը Կատարման Ամսաթվի դրությամբ հանդիսանում է, կամ կհանդիսանա ընթացիկ եւ ատացման տեսանկյունից խուսափ պարտավորության ինչպես

</td></tr>
</table>

27

records of the Acquired Company as of the Closing Date (which reserves are adequate and calculated consistent with past practice and, in the case of the reserve as of the Closing Date, will not represent a greater percentage of the Accounts Receivable as of the Closing Date than the reserve reflected in the Interim Balance Sheet represented of the Accounts Receivable reflected therein and will not represent a material adverse change in the composition of such Accounts Receivable in terms of aging). Subject to such reserves, each of the Accounts Receivable either has been or will be collected in full, without any set-off, within ninety days after the day on which it first becomes due and payable. There is no contest, claim, or right of set-off, other than returns in the Ordinary Course of Business, under any Contract with any obligor of an Accounts Receivable relating to the amount or validity of such Accounts Receivable. Part 3.8 of the Disclosure Letter contains a complete and accurate list of all Accounts Receivable as of the date of the Interim Balance Sheet, which list sets forth the aging of such Accounts Receivable.

ներկայացված է Հաշվեկշռում եւ Նախնական Հաշվեկշռում կամ Ձեռքբերված Ընկերության հաշվապահական գրանցումներում Կատարման Ամսաթվի դրությամբ (որոնք համապատասխանում են եւ հաշվարկված են անցած ժամանակաշրջանների վլույձի համաձայն, եւ Կատարման Ամսաթվի որպես սպասվելիք գրանցվելու լինելու դեպքում, դրանք գումարով Սպասվող Հաստույթի առավել մեծ մաս չեն լինի քան նշված է Հաշվեկշռում կամ Նախնական Հաշվեկշռում եւ չի փոխի Սպասվող Հաստույթի կազմը ժամանակի ընթացքում): Նշված գրանցումների պայմաններում, Սպասվող Հաստույթից յուրաքանչյուրը կամ արդեն ամբողջապես ստացվել է, կամ էլ ամբողջապես կստացվի, առանց հաշվանցման, վճարման ենթակա դառնալու ամսաթվից հնսաման օրվա ընթացքում: Գ-դյությում չունի որեւէ անհամաձայնություն, հայց, կամ հաշվանցման իրավունք, բացի Գ-ործունեության Բնականոն Ընթացքում վճարվելուց, որեւէ Պայմանագրի համաձայն որեւէ սպառապապանի հետ Սպասվող Հաստույթի մասով կապված Սպասվող Հաստույթի ստացվելիք գումարների հետ: Բացահայտման Նամակլ Բաժին 3.8-ը ներառում է ամբողջ Սպասվող Հաստույթի ամբողջ եւ ճիշտ ցուցակը Նախնական Հաշվեկշռի ամսաթվի դրությամբ, որը ներկայացնում է Սպասվող Հաստույթների ստացման ժամանակացույցը:

3.9    **Inventory**. All inventory of the Acquired Company, whether or not reflected in the Balance Sheet or the Interim Balance Sheet, consists of a quality and quantity usable and salable in the Ordinary Course of Business, except for obsolete items and items of below-standard quality, all of which have been written off or written down to net realizable value in the Balance Sheet or the Interim Balance Sheet or on the accounting records of the Acquired Company as of the Closing Date, as the case may be. All inventories not written off have been priced at the lower of cost or market value basis. The quantities

3.9    **Ապրանք**: Ձեռքբերված Ընկերության բոլոր մնացորդները, անկախ Հաշվեկշռում կամ Նախնական Հաշվեկշռում արտացոլված լինելու, հանցանանմբնք, բաղկացած են Գ-ործունեության Բնականոն Ընթացքում օգտագործելի եւ իրացվելի որակից եւ քանակից, բացառությամբ պիտանիությունը կորցրած եւ ցածորակ միավորներից, որոնք բոլորը դուրս են գրվել կամ գրանցվել են իրենց ինքնարժեքով Հաշվեկշռում կամ Նախնական Հաշվեկշռում կամ Ձեռքբերված Ընկերության հաշվապահական գրանցումներում Կատարման Ամսաթվի դրությամբ, կախված դեպքից: Դուրս չգրված բոլոր մնացորդները

28

cost or market value basis. The quantities of each item of inventory (whether raw materials, work-in-process, or finished goods) are not excessive, but are reasonable in the present circumstances of the Acquired Company.

գնահատված են իրենց շուկայական արժեքով: Մնացորդի յուրաքանչյուր միավորի ծավալները (լինի դա հումք, կիսաաստրադրանք, կամ պատրաստունի արտադրանք) չափից ավելիացել են, սակայն ողջամիտ են ներկա Ձեռքբերվող Ընկերության ներկա իրավիճակում:

3.10  **No Undisclosed Liabilities**. Except as set forth in Part 3.10 of the Disclosure Letter, the Acquired Company has no liabilities or obligations of any nature (whether known or unknown and whether absolute, accrued, contingent, or otherwise) except for liabilities or obligations reflected or reserved against in the Balance Sheet or the Interim Balance Sheet.

3.10  <u>Չբացահայտված Պարտավորությունների Բացակայությունը</u>: Բացի Բացահայտումման Նամակի Բաժին 3.10-ում նշվածի, Ձեռքբերվող Ընկերությունը չունի որևէ պարտավորություն կամ որևէ բնույթի պարտք (լինի դա հայտնի թե անհայտ, իրական, տվկրաով բաժրված, պայմանով, կամ այլ ձև) բացի Հաշվեկշռում կամ Նախնական Հաշվեկշռում արտացոլված կամ նախատեսված պարտավորություններից և պարտքերից:

3.11  <u>Taxes.</u>

(a)  The Acquired Company has filed or caused to be filed all Tax Returns that are or were required to be filed by or with respect to any of it, either separately or as a member of a group of corporations, pursuant to applicable Legal Requirements. Sellers have delivered to Buyer copies of, and Part 3.11 of the Disclosure Letter contains a complete and accurate list of, all such Tax Returns. The Acquired Company has paid, or made provision for the payment of, all Taxes that have or may have become due pursuant to those Tax Returns or otherwise, or pursuant to any assessment received by the Acquired Company, except such Taxes, if any, as are listed in Part 3.11 of the Disclosure Letter and are being contested in good faith and as to which adequate reserves have been provided in the Balance Sheet and the Interim Balance

3.11  <u>Հարկեր:</u>

(ա)  Ձեռքբերվող Ընկերությունը ներկայացրել է, կամ ներկայացնել է տվել բոլոր Հարկային Հաշվետվությունները որոնք անհրաժեշտ են, կամ եղել են անհրաժեշտ ներկայացման իր կողմից կամ իր հետ կապված, լինի դա առանձին կամ որպես ընկերությունների խմբի միջոցով ներկայացված, գործող Օրենքի Պահանջի համաձայն: Վաճառողները Գնորդին են տրամադրել պատճեններ, և Բացահայտման Նամակի Բաժին 3.11-ն իր մեջ ներառում է ամբողջական և ճիշտ ցուցակը բոլոր նման Հարկային Հաշվետվությունների: Ձեռքբերվող Ընկերությունը վճարել է, կամ հատկացրել է վճարելու համար, բոլոր Հարկերը որոնք պետք է կամ հնարավոր է որ առկա լինեին վճարման համար համաձայն այդ Հարկային Հաշվետվությունների կամ այլ կերպ, կամ Ձեռքբերվող Ընկերության որևէ ստուգման համաձայն, բացի Հարկերից, եթե

29

Sheet and the Interim Balance
Sheet.

(b)    The Tax Returns of
the Acquired Company subject to
such Taxes have been audited by all
the relevant authorities or are closed
by the applicable statute of
limitations for all taxable years
through the date of Closing.  Part
3.11 of the Disclosure Letter
contains a complete and accurate
list of all audits of all such Tax
Returns, including a reasonably
detailed description of the nature
and outcome of each audit.  All
deficiencies proposed as a result of
such audits have been paid,
reserved against, settled, or, as
described in Part 3.11 of the
Disclosure Letter, are being
contested in good faith by
appropriate proceedings.  Part 3.11
of the Disclosure Letter describes
all adjustments for all taxable years
since 1999.  Except as described in
Part 3.11 of the Disclosure Letter,
no Seller or Acquired Company has
given or been requested to give
waivers or extensions (or is or
would be subject to a waiver or
extension given by any other
Person) of any statute of limitations
relating to the payment of Taxes of
the Acquired Company or for which
the Acquired Company may be .
liable.

այդպիսիքը կան, որոնք
ներկայացված են Բացահայտման
Նամակի Բաժին 3.11-ում եւ որոնց
վճարումը վիճարկվում է բարի
կամքով եւ որոնց վճարման համար
համապատասխան մնացորդներ
պահվել են Հաշվեկշռում եւ
Նախնական Հաշվեկշռում:

(բ)    Հարկերի
վերաբերյալ Ձեռքբերված
Ընկերության Հարկային
Հաշվետվությունները ենթարկվել են
աուդիտի բոլոր համապատասխան
մարմինների կողմից կամ փակվել են
գործող հայցային վաղեմության
պատճառով հարկվող բոլոր
տարիների համար մինչեւ
Կատարման ամսաթիվը:
Բացահայտման Նամակի Բաժին
3.11-ը ներառում է Հարկային
Հաշվետվությունների բոլոր
ստուգումների ամբողջական եւ ճիշտ
ցուցակը, ներառյալ յուրաքանչյուր
ստուգման արդյունքի ողջամտորեն
մանրամասն նկարագրությունը:
Յուրաքանչյուր ստուգման
արդյունքում առաջարկված բոլոր
տարբերությունները վճարվել,
հատկացվել, հաշտեցվել են, կամ,
ինչպես նկարագրված է
Բացահայտման Նամակի Բաժին
3.11-ում, վիճարկվում են բարի
կամքով համապատասխան
վարույթներում: Բացահայտման
Նամակի Բաժին 3.11-ը նկարագրում
է հարկային տարիների համար
կատարված բոլոր ճշգրտումները
1999թ-ից սկսած: Բացի
Բացահայտման Նամակի Բաժին
3.11-ում նկարագրվածից,
Ձեռքբերված Ընկերությունից կամ
որեւէ Վաճառողից չի պահանջվել
հրաժարվել հայցային վաղեմության
որեւէ ժամկետից կամ երկարացնել
հայցային որեւէ ժամկետ (կամ չեն
ենթարկվել կամ չեն ենթարկվել
որեւէ Անձի կողմից հայցային որեւէ
ժամկետից հրաժարման կամ
հայցային որեւէ ժամկետի
երկարացման) որը վերաբերվում է

30

32

(c)     The charges, accruals, and reserves with respect to Taxes on the respective books of the Acquired Company are adequate and are at least equal to the Acquired Company's liability for Taxes.  There exists no proposed tax assessment against the Acquired Company except as disclosed in the Balance Sheet or in Part 3.11 of the Disclosure Letter.  All Taxes that the Acquired Company is or was required by Legal Requirements to withhold or collect have been duly withheld or collected and, to the extent required, have been paid to the proper Governmental Body or other Person.

(d)     All Tax Returns filed by (or that include on a consolidated basis) the Acquired Company are true, correct, and complete.  There is no tax sharing agreement that will require any payment by the Acquired Company after the date of this Agreement.

3.12    No Material Adverse Change.  Since the date of the Balance Sheet, there has not been any adverse change in the business, operations, properties, prospects, assets, or condition of the Acquired Company, and no event

Ձեռքբերված Ընկերության Հարկերի, կամ Հարկերի որոնց վճարման համար Ձեռքբերված Ընկերությունը կարող է պարտավորված համարվել, վճարմանը: .

(գ)     Ձեռքբերված Ընկերության համապատասխան գրքերում Հարկերի մասով կատարված գանձումները, հավելումները եւ հատկացումները շկարկները համապատասխանն են եւ առնվազն համապասար են Հարկերի մասով Ձեռքբերված Ընկերության պարտավորությանը: Ձեռքբերված Ընկերության նկատմամբ գոյություն չունի իրականացված որեւէ ստուգում բացի Հաշվեկշռում արտացոլվածները կամ Բացահայտմման Նամակի Բաժին 3.11-ում ներկայացվածները: Բոլոր Հարկերը, որոնք Ձեռքբերված Ընկերության Օրենքի Պահանջի համաձայն պետք է պահել կամ առանձր պատշաճ կերպով պահիվել կամ ատացվել են եւ, պահանջվլոդ չափով, վճարվել են համապատասխան Կառավարական Մարմնին կամ այլ Անձին:

(դ)     Ձեռքբերված Ընկերության կողմից ներկայացված (կամ Միասնական ծետով ներկայացված) բոլոր Հարկային Հաշվետվությունները ճիշտ են, ճշմարիտ են, եւ ամբողջական են: Գոյություն չունի հարկերի բաժանմման որեւէ պայմանագիր համաձայն որի կպահանջվեր վճարումներ Ձեռքբերված Ընկերության կողմից սույն Պայմանագրի ամսաթվից հետո:

3.12    Նյութական Բացասական Փոփոխության Բացակայություն: Հաշվեկշռի ամսաթվից սկսած, չի եղել Ձեռքբերված Ընկերության գործունեության, աշխատառնբերի, գույքերի, հեռանկարների, միջոցների, կամ

31

of the Acquired Company, and no event has occurred or circumstance exists that may result in such a material adverse change.

վիճակի բացասական փոփոխություն, եւ չի պատռահել որեւէ դեպք կամ գոյություն չունի որեւէ հանգամանք որի արդյունքում կարող է տեղի ունենալ նման նյութական բացասական փոփոխություն:

**3.13    Employee benefits.**

(a)    Part 3.13(i) of the Disclosure Letter contains a complete and accurate list of all Company employee benefit plans and obligations.

(b)    The consummation of the Contemplated Transactions will not result in the payment, vesting, or acceleration of any benefit.

**3.13    Աշխատողների Արտոնություններ:**

(ա)    Բացահայտման Նամակի Բաժին 3.13(i)-ը ներառում է Ընկերության աշխատողների արտոնությունների եւ դրա վերաբերյալ պարտավորությունների ամբողջական եւ ճիշտ ցուցակը:

(բ)    Նախատեսված Գործարքների իրականացումն արդյունքը չի հանգիստանա որեւէ արտոնության վճարման, տրման կամ ծավալման համար:

**3.14    Compliance with Legal Requirements; Governmental Authorizations.**

(a)    Except as set forth in Part 3.14 of the Disclosure Letter:

(i)    The Acquired Company is, and at all times has been, in full compliance with each Legal Requirement that is or was applicable to it or to the conduct or operation of its business or the ownership or use of any of its assets;

(ii)    no event has occurred or circumstance exists that (with or without

**3.14    Օրենքի Պահանջին Ենթարկվելը; Կառավարական Լիազորություններ:**

(ա)    Բացի Բացահայտման Նամակի Բաժին 3.14-ում ներկայացվածի:

(i)    Ձեռքբերված Ընկերությունը ամբողջովին ենթարկվում է, եւ բոլոր ժամանակներում ամբողջովին ենթարկվել է իրեն, իր գործունեության կամ դրա վարմանը, իր ցանկացած միջոցների տնօրինմանը կամ օգագործմանը վերաբերող յուրաքանչյուր Օրենքի Պահանջին;

(ii)    տեղի չի ունեցել որեւէ դեպք կամ գոյություն չունի որեւէ

32

exists that (with or without notice or lapse of time) (A) may constitute or result in a violation by the Acquired Company of, or a failure on the part of the Acquired Company to comply with, any Legal Requirement, or (B) may give rise to any obligation on the part of the Acquired Company to undertake, or to bear all or any portion of the cost of, any remedial action of any nature; and

(iii)    The Acquired Company has not received, at any time, any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding (A) any actual, alleged, possible, or potential violation of, or failure to comply with, any Legal Requirement, or (B) any actual, alleged, possible, or potential obligation on the part of the Acquired Company to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.

(b)    Part 3.14 of the Disclosure Letter contains a complete and accurate list of each Governmental Authorization that is held by the Acquired Company or that otherwise relates to the business of, or to any of the assets owned or used by, the Acquired Company.  Each Governmental Authorization listed or required to

հանգամանք որը (ծանուցմանք կամ առանց դրա կամ ժամանակի ընթացքում) (Ա) կարող է համակել կամ արդյունք հանզիսանալ Ձեռքբերված Ընկերության կողմից որեւէ Օրենքի Պահանջի խախտման կամ չնեզարկվելու, եւ (Բ) կարող է առաջացնել Ձեռքբերված Ընկերության կողմից որեւէ պարտականության կամ դրա որեւէ մասի կատարման, եւ

(iii)    Ձեռքբերված Ընկերությունը չի ստացել, երբեւէ, որեւէ ծանուցում կամ այլ հաղորդագրություն (լինի բանավոր կամ գրավոր) որեւէ Կառավարական Մարմնից կամ այլ Անձից որը վերաբերվում է (Ա) որեւէ Օրենքի Պահանջի որեւէ փաստացի, պասարադրվող, հնարավոր կամ պոտենցիալ խախտմանը, կամ դրան չնեզարկվելուն, կամ (Բ) Ձեռքբերված Ընկերության կողմից որեւէ փաստացի, պարտադրվող, հնարավոր, կամ պոտենցիալ պարտավորությունը հատուցելու, կամ այբողջովին կամ մասամբ վճարելու որեւէ քննւյթի որեւէ փոխխատուցում:

(բ)    Բացահայտման Նամակի Բաժին 3.14-ը ներառում է Ձեռքբերված Ընկերության պատկանող կամ նրա գործմեները, միջոցների տնօրինմանը կամ օգտագործմանը վերաբերող բոլոր Կառավարական Լիազորությունների ամբողջական եւ ճիշտ ցուցակը: Բացահայտման Նամակի Բաժին 3.14-ում

Authorization listed or required to be listed in Part 3.14 of the Disclosure Letter is valid and in full force and effect. Except as set forth in Part 3.14 of the Disclosure Letter:

     (i)   The Acquired Company is, and at all times has been, in full compliance with all of the terms and requirements of each Governmental Authorization identified or required to be identified in Part 3.14 of the Disclosure Letter;

     (ii)   no event has occurred or circumstance exists that may (with or without notice or lapse of time) (A) constitute or result directly or indirectly in a violation of or a failure to comply with any term or requirement of any Governmental Authorization listed or required to be listed in Part 3.14 of the Disclosure Letter, or (B) result directly or indirectly in the revocation, withdrawal, suspension, cancellation, or termination of, or any modification to, any Governmental Authorization listed or required to be listed in Part 3.14 of the Disclosure Letter;

ներկայացված կամ ներկայացման ենթակա յուրաքանչյուր Կառավարական Լիազորություն իրավասու է եւ ունի լրիվ իրավական ուժ եւ ունակություն: Բացի Բացահայտման Նամակի Բաժնի 3.14-ում ներկայացվածը՝

     (i)   Ձեռքբերված Ընկերությունը ամբողջությամբ ենթարկվում եւ բոլոր ժամանակներում ամբողջությամբ ենթարկվել է Բացահայտման Նամակի Բաժնի 3.14-ում ներկայացված կամ ներկայացման ենթակա յուրաքանչյուր Կառավարական Լիազորության բոլոր պայմանների եւ պահանջներին,

     (ii)   տեղի չի ունեցել որեւէ դեպք եւ գոյություն չունի որեւէ հանգամանք որը կարող է (ծանուցմամբ կամ առանց դրա կամ ժամանակի ընթացքում) (Ա)ոտրպակիրրեն կամ անուղղակիորեն հանդիսանա կամ պատճառ դառնա Բացահայտման Նամակի Բաժնի 3.14-ում ներկայացված կամ ներկայացման ենթակա որեւէ Կառավարական Լիազորության որեւէ պայմանի կամ պահանջի խախտման կամ չենթարկվելուն, կամ (Բ) ուղղակիորեն կամ անուղղակիորեն պատճառա հանդիսանա Բացահայտման Նամակի Բաժնի 3.14-ում ներկայացված կամ ներկայացման ենթակա որեւէ Կառավարական Լիազորության չեղյալ

34

(iii)     The Acquired Company has not received, at any time, any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding (A) any actual, alleged, possible, or potential violation of or failure to comply with any term or requirement of any Governmental Authorization, or (B) any actual, proposed, possible, or potential revocation, withdrawal, suspension, cancellation, termination of, or modification to any Governmental Authorization; and

(iv)     all applications required to have been filed for the renewal of the Governmental Authorizations listed or required to be listed in Part 3.14 of the Disclosure Letter have been duly filed on a timely basis with the appropriate Governmental Bodies, and all other filings required to have been made with respect to such Governmental Authorizations have been

հայտարարելուն, հետ վերցնելուն, առկախմանը, չեզրացմանը, կամ վերացմանը, կամ փոխխմանը:

(iii)     Ձեռքբերված Ընկերությունը չի ստացել, երբևէ, որևէ ծանուցում կամ այլ հաղորդագրություն (լինի բանավոր կամ գրավոր) որևէ Կառավարական Մարմնից կամ այլ Անձից որը վերաբերվում է (Ա) որևէ Կառավարական Լիազորության որևէ պայմանի կամ պահանջի որևէ փաստացի, պատռատադրվող, հնարավոր կամ պոտենցիալ խախտմանը, կամ դրան չհետբարկվելուն, կամ (Բ) որևէ Կառավարական Լիազորության որևէ փաստացի, պատռատացվող, հնարավոր, կամ պոտենցիալ չեղյալ հայտարարելուն, հետ վերցնելուն, առկախմանը, չեզրացմանը, կամ վերացմանը, կամ փոփխմանը, եւ

(iv)     Բացահայտման Նամակի Բաժին 3.14-ում ներկայացված կամ ներկայացման ենթակա Կառավարական Լիազորությունների նորացման համար պահանջվող բոլոր դիմումները պատռշճ կերպով եւ ժամանակին ներկայացվել են համապատասխան Կառավարական Մարմիններին, եւ այդ Կառավարական Լիազորությունների

35

Authorizations have been duly made on a timely basis with the appropriate Governmental Bodies.

կապակցությամբ պահանջվող բոլոր այլ գրանցումները պատշաճ կերպով եւ ժամանակին կատարվել են համապատասխան Կառավարական Մարմինների մոտ:

The Governmental Authorizations listed in Part 3.14 of the Disclosure Letter collectively constitute all of the Governmental Authorizations necessary to permit the Acquired Company to lawfully conduct and operate their businesses in the manner they currently conduct and operate such businesses and to permit the Acquired Company to own and use their assets in the manner in which they currently own and use such assets.

Բացահայտման Նամակի Բաժին 3.14-ում ներկայացված Կառավարական Լիազորությունները միասնաբար հանդիսանում են այն բոլոր Կառավարական Լիազորությունները, որոնք անհրաժեշտ են Ձեռքբերված Ընկերության գործունեությունը օրինականորեն վարելու համար այնպես ինչպես վարվում է տվյալ պահին, ինչպես նաեւ Ձեռքբերված Ընկերությունը թույլ տալու համար որպեսզի այն տնօրինի եւ օգտագործի իր միջոցները այնպես ինչպես այն տնօրինվում եւ օգտագործվում է ներկա պահին:

3.15    **Legal Proceedings; Orders.**

3.15    **Իրավական Վարույթներ; Հրամաններ**

(a)    Except as set forth in Part 3.15 of the Disclosure Letter, there is no pending Proceeding:

(ա)    Բացահայտման Նամակի Բաժին 3.15-ում նշվածից բացի գոյություն չունեն ընթացքում գտնվող Վարույթներ`

(i)    that has been commenced by or against the Acquired Company or that otherwise relates to or may affect the business of, or any of the assets owned or used by, the Acquired Company; or

(i)    որոնք սկսվել են Ձեռքբերված Ընկերության կողմից կամ դեմ կամ այլ կերպ առնչվում են կամ կարող են ազդել Ձեռքբերված Ընկերության գործունեությանը կամ նրա կողմից տնօրինվող կամ օգտագործվող որեւէ միջոցներին, կամ

36

(ii)    that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the Contemplated Transactions.

To the Knowledge of Sellers and the Acquired Company, (1) no such Proceeding has been Threatened, and (2) no event has occurred or circumstance exists that may give rise to or serve as a basis for the commencement of any such Proceeding.  Sellers have delivered to Buyer copies of all pleadings, correspondence, and other documents relating to each Proceeding listed in Part 3.15 of the Disclosure Letter.  The Proceedings listed in Part 3.15 of the Disclosure Letter will not have a material adverse effect on the business, operations, assets, condition, or prospects of the Acquired Company.

(b)    Except as set forth in Part 3.15 of the Disclosure Letter:

(i)    there is no Order to which the Acquired Company, or any of the assets owned or used by the Acquired Company, is subject;

(ii)    no Seller is subject to any Order that relates to the business of, or any of the assets owned or used by, the Acquired Company; and

(ii)    որը սպառնում է, կամ կարող է արգելել, հետաձգել, անօրինական դարձնել, կամ այլ կերպ խոչընդոտել Նախատեսվող Գործարքներից որևէ մեկին:

Վաճառողների եւ Ձեռքբերված Ընկերության Իմացությամբ, (1) ոչ մի նման Վարույթ չի Սպառնում, եւ (2) ոչ մի դեպք տեղի չի ունեցել կամ գործություն չունի որեւէ հանգամանք որը կարող է առաջացնել կամ հիմք հանդիսանալ որեւէ նման Վարույթի հարուցմանը: Վաճառողները Գնորդին տրամադրել են Բացահայտումման Նամակի Բաժին 3.15-ում ներկայացված յուրաքանչյուր Վարույթին առնչվող բոլոր միջնորդություններ, նամակագրություններ, եւ այլ փաստաթղթերը: Բացահայտումման Նամակի Բաժին 3.15-ում ներկայացված Վարույթները չեն ունենա նյութական բացասական ազդեցություն Ձեռքբերված Ընկերության գործունեության, աշխատանքների, միջոցների, վիճակի, կամ հեռանկարների վրա:

(բ)    Բացահայտումման Նամակի Բաժին 3.15-ում նշվածից բացի.

(i)    գործություն չունի Հրաման որին ենթակա է Ձեռքբերված Ընկերությունը, կամ նրա տնօրինմման կամ օգտագործմման տակ գտնվող որեւէ միջոցները,

(ii)    ոչ մի Վաճառող ենթակա չի որեւէ Հրամանի որն առնչվում է Ձեռքբերված Ընկերության գործունեությանը, կամ նրա տնօրինմման կամ

37

Company; and

    (iii)   no officer, director, agent, or employee of the Acquired Company is subject to any Order that prohibits such officer, director, agent, or employee from engaging in or continuing any conduct, activity, or practice relating to the business of the Acquired Company.

    (c)   Except as set forth in Part 3.15 of the Disclosure Letter:

    (i)   The Acquired Company is, and at all times has been, in full compliance with all of the terms and requirements of each Order to which it, or any of the assets owned or used by it, is or has been subject;

    (ii)   no event has occurred or circumstance exists that may constitute or result in (with or without notice or lapse of time) a violation of or failure to comply with any term or requirement of any Order to which the Acquired Company, or any of the assets owned or used by the Acquired Company, is

    (iii)   Ձեռքբերված Ընկերության ոչ մի պաշտոնյա, տնօրեն, գործակալ, կամ աշխատող ենթակա չի որևէ Հրամանի որն արգելում է այդ պաշտոնյային, տնօրենին, գործակալին, կամ աշխատողին զբաղվելու կամ շարունակելու Ձեռքբերված Ընկերության գործունեության հետ առնչվող որևէ գործողության, գործունեության, կամ աշխատանքի:

    (գ)   Բացառությամբ Նամակի Բաժին 3.15-ում նշվածից բացի՝

    (i)   Ձեռքբերված Ընկերությունն ամբողջովին ենթարկվում է, և բոլոր ժամանակներում ամբողջովին ենթարկվել է իրենց, իր գործառնության կամ դրա վարմանը, իր ցանկացած միջոցների տնօրինմանը կամ օգտագործմանը ներկայացող կամ անցյալում վերաբերող յուրաքանչյուր Հրամանի;

    (ii)   տեղի չի ունեցել որևէ դեպք կամ գոյություն չունի որևէ հանգամանք որը (ծանուցմամբ կամ առանց դրա կամ ժամանակի ընթացքում) կարող է համարվել կամ արդյունք հանդիսանալ Ձեռքբերված Ընկերության կողմից Ձեռքբերված Ընկերությանը, կամ նրա կողմից տնօրինվող

38

Acquired Company, is
subject; and

կամ օգտագործվող
ցանկացած միջոցներին
վերաբերող որևէ Հրամանի
որևէ պայմանի կամ
պահանջի խախտման կամ
չկատարկվելուն, և

(iii)     the Acquired
Company has not received,
at any time, any notice or
other communication
(whether oral or written)
from any Governmental
Body or any other Person
regarding any actual,
alleged, possible, or
potential violation of, or
failure to comply with, any
term or requirement of any
Order to which the
Acquired Company, or any
of the assets owned or used
by the Acquired Company,
is or has been subject.

(iii)     Ձեռքբերված
Ընկերությունը չի ստացել,
երբևէ, որևէ ծանուցում կամ
այլ հաղորդագրություն (լինի
բանավոր կամ գրավոր)
որևէ Կառավարական
Մարմնից կամ այլ Անձից
որը վերաբերվում է
Ձեռքբերված Ընկերությանը,
կամ նրա կողմից տնօրինվող
կամ օգտագործվող որևէ
միջոցներից վերաբերող
որևէ Հրամանի որևէ
պայմանի կամ պահանջի
որևէ փաստացի,
պատրաստվող, հնարավոր
կամ պոտենցիալ
խախտմանը, կամ դրան
չկատարկվելուն:

3.16    Absence of Certain
Changes and Events.  Except as set forth
in Part 3.16 of the Disclosure Letter, since
the date of the Balance Sheet, the Acquired
Company has conducted its businesses only
in the Ordinary Course of Business and
there has not been any:

3.16    Որոշակի
Փոփոխությունների և Դեպքերի
Բացակայությունը: Բացահայտման
Նամակի Բաժին 3.16-ում ներկայացվածից
բացի, Հաշվեկշռի ամսաթվից սկսած,
Ձեռքբերված Ընկերությունն իր
գործունեությունը վարել է բացառապես
Գործունեության Բնականոն Ընթացքով և
չի եղել որևէ.

(a)     change in the
Acquired Company's authorized or
issued capital; grant of any share
option or right to purchase shares of
capital of the Acquired Company;
issuance of any security convertible
into such capital stock; grant of any
registration rights; purchase,
redemption, retirement, or other
acquisition by the Acquired
Company of any shares; or
declaration or payment of any

(ա)     Ձեռքբերված
Ընկերության կանոնադրական կամ
թողարկված կապիտալի
փոփոխություն, Ձեռքբերված
Ընկերության որևէ բաժնետոմսի կամ
բաժնետոմսի գնման իրավունքի
շնորհում, բաժնետոմսի
փոխակերպվող արժեթղթերի որևէ
թողարկում, որևէ գրանցման
իրավունքների շնորհում, գնում,
մարում, վերացում, կամ
Ձեռքբերված Ընկերության կողմից
ցանկացած բաժնետոմսի ձեռք

# EXHIBIT 4 (Part 2)

.

41

declaration or payment of any dividend or other distribution or payment;

(b)    amendment to the Organizational Documents of the Acquired Company;

(c)    payment or increase by the Acquired Company of any bonuses, salaries, or other compensation to any stockholder, director, officer, or (except in the Ordinary Course of Business) employee or entry into any employment, severance, or similar Contract with any director, officer, or employee;

(d)    adoption of, or increase in the payments to or benefits under, any profit sharing, bonus, deferred compensation, savings, insurance, pension, retirement, or other employee benefit plan for or with any employees of the Acquired Company;

(e)    damage to or destruction or loss of any asset or property of the Acquired Company, whether or not covered by insurance, materially and adversely affecting the properties, assets, business, financial condition, or prospects of the Acquired Company, taken as a whole;

(f)    entry into, termination of, or receipt of notice of termination of (i) any license,

բերում, կամ դիվիդենդների հայտարարում կամ վճարում կամ վճարումների այլ տեսակի բաշխում,

(բ)    Ձեռքբերված Ընկերության Կազմակերպչական Փաստաթղթերի փոփոխություն,

(գ)    Ձեռքբերված Ընկերության կողմից որևէ բաժնետերերին, տնօրեններին, պաշտոնյաներին, կամ (բացի Գործունեության Ընականոն Ընթացքից) աշխատողներին որևէ հավելումների, աշխատավարձերի, կամ այլ փոխհատուցումների վճարում կամ ավելացում կամ աշխատանքային, արձակման նպաստի, կամ համանման Պայմանագրի ստորագրում որևէ տնօրենի, պաշտոնյայի, կամ աշխատողի հետ,

(դ)    Ձեռքբերված Ընկերության աշխատողների հետ որևէ շահույթի կիսման, հավելման, վնայայի փոխհատուցման, խնայման, ապահովագրման, կենսաթոշակի, թոշակի անցնելու, կամ այլ աշխատանքային արտոնությունների ընդունում, կամ վճարման մեջ հավելում կամ այլ արուտնություն,

(ե)    Ձեռքբարված Ընկերության որևէ միջոցի կամ գույքի վնասում, վատնում կամ կորուստ, լինի ապահովագրված կամ ոչ, Ձեռքբերված Ընկերության՝ ամբողջությամբ վերցրած Գույթականների կամ բացասականորեն գույքի, միջոցների, գործունեության, ֆինանսական իրավիճակի, կամ հեռանկարների վրա ազդող,

(զ)    (i) ցանկացած լիցենզիայի, առեւտրային ներկայացուցչություն, դիլերային,

40

of termination of (i) any license, distributorship, dealer, sales representative, joint venture, credit, or similar agreement, or (ii) any Contract or transaction involving a total remaining commitment by or to the Acquired Company of at least $1,000.00 USD;

(g)    sale (other than sales of inventory in the Ordinary Course of Business), lease, or other disposition of any asset or property of the Acquired Company or mortgage, pledge, or imposition of any lien or other encumbrance on any material asset or property of the Acquired Company, including the sale, lease, or other disposition of any of the Intellectual Property Assets;

(h)    cancellation or waiver of any claims or rights with a value to the Acquired Company;

(i)    material change in the accounting methods used by the Acquired Company; or

(j)    agreement, whether oral or written, by the Acquired Company to do any of the foregoing.

3.17    Contracts; No Defaults.

(a)    Part 3.17(a) of the Disclosure Letter contains a

վաճառքի ներկայացուցչության, համատեղ ձեռնարկության, վարկի, կամ համանման պայմանագրերի, կամ (ii) Ձեռքբերված Ընկերության կողմից առնվազն $1,000.00 ԱՄՆ Դոլարի ընդհանուր մնացորդային պարտավորվածություն պահանջող ցանկացած Պայմանագրի կամ գործարքի կնքում, լուծում, կամ լուծման ծանուցման ստացում,

(է)    Ձեռքբերված Ընկերության որևէ միջոցի կամ գույքի վաճառք (բացի Գործունեության Բնականոն Ընթացքում ապրանքների վաճառքից), վարձակալություն, կամ այլ տեղաբաշխում, կամ Ձեռքբերված Ընկերության որևէ նյութական միջոցի կամ գույքի գրավադրում, գրավ, կամ այլ պարտավորության տեղաբաշխում կամ ծանրաբեռնում, ներառյալ որևէ Մտավոր Սեփականության Միջոցների վաճառքը, վարձակալությունը, կամ այլ կերպ տեղաբաշխումը,

(թ)    արժեք ունեցող որևէ պահանջի կամ իրավունքի վերացումը կամ դրանցից հրաժարվելը Ձեռքբերված Ընկերության նկատմամբ,

(ժ)    Ձեռքբերված Ընկերության կողմից օգտագործվող հաշվապահական մեթոդների նյութական փոփոխությունը, կամ

(ի)    Ձեռքբերված Ընկերության համաձայնությունը, բանավոր կամ գրավոր, վերոհիշյալից որևէ մեկն իրականացնելու վերաբերյալ։

3.17    Պայմանագրեր, Խախտման Բացակայություն։

(ա)    Բացահայտման Նամակի Բաժին 3.17(ա)-ն

41

Disclosure Letter contains a complete and accurate list, and Sellers have delivered to Buyer true and complete copies, of:

(i)       each Applicable Contract that involves performance of services or delivery of goods or materials by the Acquired Company;

(ii)      each Applicable Contract that involves performance of services or delivery of goods or materials to the Acquired Company;

(iii)     each Applicable Contract that was not entered into in the Ordinary Course of Business;

(iv)     each lease, rental or occupancy agreement, license, installment and conditional sale agreement, and other Applicable Contract affecting the ownership of, leasing of, title to, use of, or any leasehold or other interest in, any real or personal property;

Ներառում է ամբողջական եւ ճիշտ ցուցակեր, եւ Վաճառողներն Գնորդին տրամադրել են հետևյալը.

(i)     յուրաքանչյուր Կիրառելի Պայմանագիրը որը ներառում է Ձեռքբերված Ընկերության կողմից ծառայությունների մատուցում կամ ապրանքների կամ նյութերի առաքում,

(ii)    յուրաքանչյուր Կիրառելի Պայմանագիրը որը ներառում է Ձեռքբերված Ընկերությանը ծառայությունների մատուցում կամ ապրանքների եւ նյութերի առաքում,

(iii)   յուրաքանչյուր Կիրառելի Պայմանագիրը որը չի ստորագրվել Գործունեության Բնականոն Ընթացքում,

(iv)    յուրաքանչյուր վարձակալությունը, վարձույթի կամ օգտագործման պայմանագիրը, լիցենզիան, պայմանական եւ տեղադրման վճարի պայմանագիրը, այլ Կիրառելի Պայմանագիրը որն ազդում է որևէ անշարժ կամ շարժական գույքի տնօրինմանը, վարձակալմանը, սեփականատիրման իրավունքին, օգտագործմանը, վարձակալությամբ տրման կամ այլ գործառքին,

42

44

(v)    each licensing agreement or other Applicable Contract with respect to patents, trademarks, copyrights, or other intellectual property, including agreements with current or former employees, consultants, or contractors regarding the appropriation or the non-disclosure of any of the Intellectual Property Assets;

(vi)    each collective bargaining agreement and other Applicable Contract to or with any labor union or other employee representative of a group of employees;

(vii)    each joint venture, partnership, and other Applicable Contract (however named) involving a sharing of profits, losses, costs, or liabilities by the Acquired Company with any other Person;

(viii)    each Applicable Contract containing covenants that in any way purport to restrict the business activity of the Acquired Company or any Affiliate of the Acquired Company or limit the

(v)
յուրաքանչյուր լիցենզիայի պայմանագիրը կամ այլ Կիրառելի Պայմանագիրն առնչվող պատենտներին, առեւտրային նշաններին, հեղինակային իրավունքներին, կամ այլ մտավոր սեփականությանը, ներառյալ պայմանագրերը ներկա եւ նախկին աշխատողների, խորհրդատուների, կամ կապալառուների հետ կամ Մտավոր Սեփականության Միջոցների յուրացմամբ վերաբերյալ,

(vi)
յուրաքանչյուր կոլեկտիվ պայմանագիր կամ այլ Կիրառելի Պայմանագիր արհեստակցական միության հետ կամ միջ եւ կամ այլ աշխատողների խմբի ներկայացուցչի,

(vii)
յուրաքանչյուր համատեղ ձեռնարկության, համագործակցության, եւ այլ Կիրառելի Պայմանագիր (ինչպես էլ որ անվանված լինի) որը ներառում է Ձեռքբերված Ընկերության կողմից որեւէ այլ Անձի հետ շահույթի, կորուստի, ինքնարժեքի կամ պարտավորությունների բաշխում,

(viii)
յուրաքանչյուր Կիրառելի Պայմանագիր որն ներառում է պարտավորություններ որոնք ինչ որ ձեւով հնարավոր է որ արգելակեն Ձեռքբերված Ընկերության

43

Company or limit the freedom of the Acquired Company or any Affiliate of the Acquired Company to engage in any line of business or to compete with any Person;

(ix)    each Applicable Contract providing for payments to or by any Person based on sales, purchases, or profits, other than direct payments for goods;

(x)    each power of attorney that is currently effective and outstanding;

(xi)    each Applicable Contract entered into other than in the Ordinary Course of Business that contains or provides for an express undertaking by the Acquired Company to be responsible for consequential damages;

(xii)    each Applicable Contract for capital expenditures in excess of Two Thousand United States Dollars ($2,000.00);

կամ Ձեռքբերված Ընկերության որեւէ Աֆիլացված Անձի գործունեությունը կամ սահմանափակեն Ձեռքբերված Ընկերության կամ Աֆիլացված Անձի ազատությունը զբաղվելու գործունեության ցանկացած տեսակով կամ մրցակցել այլ Անձի հետ,

(ix) յուրաքանչյուր Կիրառելի Պայմանագիր որը սահմանում է որեւէ Անձին կամ նրանից վճարում կատարված վաճառքի, գնումների, կամ շահույթի հետ՝ բացի ապրանքների համար ուղղակի վճարումներից,

(x) յուրաքանչյուր լիազորագիր որը ներկայումս գտնվում է ուժի մեջ կամ ժամկետանց է,

(xi) յուրաքանչյուր Կիրառելի Պայմանագիր որն ստորագրվել է Գործունեության Բնականոն Ընթացքից դուրս որը ներառում կամ սահմանում է Ձեռքբերված Ընկերության կողմից արդյունքում ստեղծված վնասների համար հստակ պատասխանատվություն,

(xii) յուրաքանչյուր Կիրառելի Պայմանագիր Երկու Հազար ($2,000.00) ԱՄՆ Դոլարից ավելի արժողությամբ կապիտալ ծախսեր պահունակող,

44

46

(xiii)   each written warranty, guaranty, and or other similar undertaking with respect to contractual performance extended by the Acquired Company other than in the Ordinary Course of Business; and

(xiii) յուրաքանչյուր գրավոր երաշխիք, երաշխավորություն, եւ կամ այլ համանման պարտավորություն առնչվող Ձեռքբերված Ընկերության կողմից Գործունեության Բնականոն Ընթացքից դուրս պայմանագրային պարտավորությունների կատարմանը, եւ

(xiv)   each amendment, supplement, and modification (whether oral or written) in respect of any of the foregoing.

(xiv) յուրաքանչյուր փոփոխություն, հավելյալ, եւ նորացում (լինի բանավոր կամ գրավոր) վերոհիշյալին առնչվող:

Part 3.17(a) of the Disclosure Letter sets forth reasonably complete details concerning such Contracts, including the parties to the Contracts, the amount of the remaining commitment of the Acquired Company under the Contracts, and the Acquired Company's office where details relating to the Contracts are located.

Բացահայտման Նամակի Բաժին 3.17(ա)-ն ներկայացնում է նման Պայմանագրերի ողջամտորեն ավարտուն մանրամասները, ներառյալ Պայմանագրի կողմերին, Պայմանագրերի համաձայն Ձեռքբերված Ընկերության պարտավորությունների մնացորդները, եւ Ձեռքբերված Ընկերության գրասենյակը որտեղ տեղադրված են Պայմանագրերին առնչվող մանրամասները:

(b)   Except as set forth in Part 3.17(b) of the Disclosure Letter:

(բ)  Բացահայտման Նամակի Բաժին 3.17(բ)-ում ներկայացվածից բացի`

(i)   No Seller (and no Related Person of a Seller) has or may acquire any rights under, and no Seller has or may become subject to any obligation or liability under, any Contract that relates to the business

(i)   ոչ մի Վաճառող (եւ որեւէ Վաճառողի ոչ մի Փոխկապակցված Անձ) չունի կամ չի կարող ձեռք բերել որեւէ իրավունք, եւ ոչ մի Վաճառող չունի եւ չի կարող ման կացմել որեւէ

45

that relates to the business of, or any of the assets owned or used by, the Acquired Company; and

Պայմանագրի պարտավորությունն կամ պատասխանատվությունն որն առնչվում է, Ձեռքբերվ., Ընկերության գործունեությանը, նրա կողմից տնօրինվող կամ օգտագործվող միջոցներին, եւ

(ii)    no officer, director, agent, employee, consultant, or contractor of the Acquired Company is bound by any Contract that purports to limit the ability of such officer, director, agent, employee, consultant, or contractor to (A) engage in or continue any conduct, activity, or practice relating to the business of the Acquired Company, or (B) assign to the Acquired Company or to any other Person any rights to any invention, improvement, or discovery.

(ii)    Ձեռքբերված Ընկերության ոչ մի պաշտոնյա, տնօրեն, գործակալ, աշխատող, խորհրդատու, կամ կապալառու պարտավորված չէ որեւէ Պայմանագրով որը հնարավոր է որ սահմանափակի նման պաշտոնյայի, տնօրենի, գործակալի, աշխատողի, խորհրդատուի, կամ կապալառու ունակությունը (Ա) զբաղվելու կամ շարունակելու զբաղվել գործով, գործունեությամբ, կամ աշխատանքով առնչվող Ձեռքբերված Ընկերության գործունեությանը, կամ (Բ) Ձեռքբերված Ընկերությանը կամ ցանկացած այլ Անձին շնորհելու ցանկացած գյուտի, բարելավման, կամ հայտնագործության իրավունքներ:

(c)    Except as set forth in Part 3.17(c) of the Disclosure Letter, each Contract identified or required to be identified in Part 3.17(a) of the Disclosure Letter is in full force and effect and is valid and enforceable in accordance with its terms.

(q)    Բացառությամբ Նամակի Բաժնի 3.17(q)-ում ներկայացվածից բացի, Բացառությամբ Նամակի Բաժին 3.17(ա)-ում ներկայացված կամ ներկայացման ենթակա յուրաքանչյուր Պայմանագիր ունի լրիվ իրավական ուժ եւ խախտական է եւ կիրառելի է իր պայմաններին համաձայն:

(d)    Except as set forth in Part 3.17(d) of the Disclosure Letter:

(դ)    Բացառությամբ Նամակի Բաժնի 3.17(դ)-ում ներկայացվածից բացի՝

46

Letter:

(i)     The Acquired Company is, and at all times has been, in full compliance with all applicable terms and requirements of each Contract under which the Acquired Company has or had any obligation or liability or by which the Acquired Company or any of the assets owned or used by the Acquired Company is or was bound;

(ii)     each other Person that has or had any obligation or liability under any Contract under which the Acquired Company has or had any rights is, and at all times has been, in full compliance with all applicable terms and requirements of such Contract;

(iii)     no event has occurred or circumstance exists that (with or without notice or lapse of time) may contravene, conflict with, or result in a violation or breach of, or give the Acquired Company or other Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any Applicable Contract; and

(i)     Ձեռքբերված Ընկերությունը ամբողջովին ենթարկվում է, եւ բոլոր ժամանակներում ամբողջովին ենթարկվել է իրեն, իր գործունեության կամ դրա վարմանը, իր ցանկացած միջոցների տնօրինմանն կամ օգտագործման նկատմամբ ներկայումս կամ անցյալում կիրառելի յուրաքանչյուր Պայմանագրի պայմաններին եւ պահանջներին;

(ii)     յուրաքանչյուր այլ Անձ որն ունի կամ ունեցել է որեւէ պարտավորություն համաձայն որեւէ Պայմանագրի համաձայն որի Ձեռքբերված Ընկերությունն ունի կամ ունեցել է որեւէ իրավունք ամբողջովին ենթարկվում է, եւ բոլոր ժամանակներում ամբողջովին ենթարկվել է նման Պայմանագրի գործող պայմաններին եւ պահանջներին,

(iii)     տեղի չի ունեցել որեւէ դեպք կամ գոյություն չունի որեւէ հանգամանք որը (ծանուցմամբ կամ առանց դրա կամ ժամանակի ընթացքում) կարող է որեւէ Կիրառելի Պայմանագրին հակասել, բախմամծ պատմատ հանդիսանալ, կամ արդյունքում խախտել կամ չենթարկվել, կամ Ձեռքբերված Ընկերությանը կամ այլ Անձին իրավունք տալ խախտում հայտարարելու կամ

47

Applicable Contract; and

փոխխատուցում
պահանջելու, կամ
կատարումը կամ լրումնն
արագացնելու, կամ չեղյալ
համարելու, լուծելու, կամ
փոփոխելու այն, եւ

(iv)    the Acquired Company has not given to or received from any other Person, at any time, any notice or other communication (whether oral or written) regarding any actual, alleged, possible, or potential violation or breach of, or default under, any Contract.

(iv)    Ձեռքբերված Ընկերությունը չի ստացել, երբեւէ, որեւէ ծանուցում կամ այլ հաղորդագրություն (լինի բանավոր կամ գրավոր) որեւէ Կատասվարական Մարմնից կամ այլ Անձից որը վերաբերվում է Ձեռքբերված Ընկերությանը, կամ նրա կողմից տնօրինվող կամ օգտագործվող որեւէ միջոցներին վերաբերող որեւէ Պայմանագիր որեւէ պայմանի կամ պահանջի որեւէ խախտումից, պարտավորվելով, հնարավոր կամ պոտենցիալ խախտումանը, կամ դրանց չկանխարկվելուն:

(e)    There are no renegotiations of, attempts to renegotiate, or outstanding rights to renegotiate any material amounts paid or payable to the Acquired Company under current or completed Contracts with any Person and no such Person has made written demand for such renegotiation.

(ե)    Գոյություն չունեն որեւէ վերաբանակցությունյուններ, վերաբանակցելու փորձեր, կամ իրավունքներ վերաբանակցելու որեւէ Ընթական գումար վճարված կամ վճարվելիք Ձեռքբերված Ընկերությանը ներկա կամ կատարված Պայմանագրերով որեւէ Անձի հետ եւ ոչ մի նման Անձ չի պահանջել գրավոր նման վերաբանակցություն վերաբերյալ:

(f)    The Contracts relating to the sale, design, manufacture, or provision of products or services by the Acquired Company has been entered into in the Ordinary Course of Business and have been entered into without the commission of any act alone or in concert with any other Person, or any consideration having been paid or promised, that

(զ)    Ձեռքբերված Ընկերության վաճառքներին, նախագծմանը, արտադրությանը, կամ ապրանքների կամ ծառայությունների մատակարարմանն վերաբերող Պայմանագրերը կնքվել են Գործունեության Բնականոն Ընթացքում եւ կնքվել են առանց այլ Անձի կոմիսին վճարների եւ առանց որեւէ ներգուրկման, կամ առանց որեւէ խոստումա կամ վճարի որ

48

having been paid or promised, that is or would be in violation of any Legal Requirement.

3.18    Insurance.

(a)    Sellers have delivered to Buyer:

(i)    true and complete copies of all policies of insurance to which the Acquired Company is a party or under which the Acquired Company, or any official of the Acquired Company, is or has been covered at any time;

(ii)    true and complete copies of all pending applications for policies of insurance; and

(iii)    any statement by the auditor of the Acquired Company's financial statements with regard to the adequacy of such entity's coverage or of the reserves for claims.

(b)    Part 3.18(b) of the Disclosure Letter describes:

(i)    any self-insurance arrangement by or affecting the Acquired

համարվում է կամ կարող է համարվել որևէ Օրենքի Պահանջի խախտում։

3.18    Ապահովագրություն:

(ա)    Վաճառողները Գնորդին տրամադրել են.

(i)    բոլոր ապահովագրական պոլիսների ամբողջական պատճեները որոնցում Ձեռքբերված Ընկերությունը հանդիսանում է որպես կողմ, կամ որոնցով Ձեռքբերված Ընկերության որևէ պաշտոնյա որևէ ժամանակ ապահովագրվել է,

(ii)    ապահովագրական պոլիսների համար ներկայացված ընթացքում գտնվող բոլոր դիմումների ճիշտ եւ ամբողջական պատճեները, եւ

(iii)    Ձեռքբերված Ընկերության ֆինանսական հաշվետվությունների աուդիտորի կողմից կատարած որևէ հայատարարություն առնչվող նշված մարմնի ապահովագրության կամ կատարված հայցապահանջների վերաբերյալ վերապահումները:

(բ)    Բացահայտման Նամակի Բաժինը 3.18(բ) ներկայացնում է

(i)    Ձեռքբերված Ընկերությանը վերաբերվող կամ նրա կողմից

49

affecting the Acquired Company, including any reserves established thereunder;

կատարված ինքնաապահովագրության վերաբերյալ բոլոր գործարքները, ներառյալ դրանցով նախատեսված ցանկացած պահուստային ֆոնդերը,

(ii)    any contract or arrangement, other than a policy of insurance, for the transfer or sharing of any risk by the Acquired Company; and

(ii)    բոլոր գործառնները եւ պայմանագրերը՝ ապահովագրական պոլիսներից բացի, որոնցով փոխանցվում կամ բաշխվում են Ձեռքբերված Ընկերության ցանկացած ռիսկեր, եւ

(iii)    all obligations of the Acquired Company to third parties with respect to insurance (including such obligations under leases and service agreements) and identifies the policy under which such coverage is provided.

(iii)    Ձեռքբերված Ընկերության երրորդ կողմերի նկատմամբ ապահովագրության վերաբերյոր բոլոր պարտավորությունները (ներառյալ վարձակալության եւ ծառայությունների պայմանագրերով սահմանվածները) եւ պոլիսները որոնցով տրվում են այդ ապահովագրությունները:

(c)    Part 3.18(c) of the Disclosure Letter sets forth, by year, for the current policy year and each of the preceding policy years:

(q)    Բացահայտման Նամակի Բաժին 3.18(q)-ն ներկայացնում է, տարիների կտրվածքով, ընթացիկ պոլիսային տարվա եւ անցած պոլիսային տարիների համար՝

(i)    a summary of the loss experience under each policy;

(i)    յուրաքանչյուր պոլիսի ներքո վնասի առաջացման պրակտիկայի կրճատ նկարագրությունը,

(ii)    a statement describing each claim under an insurance policy which sets forth:

(ii)    ապահովագրական պոլիսի ներքո ներկայացված

50

sets forth:

(A)    the name of the claimant;

(B)    a description of the policy by insurer, type of insurance, and period of coverage; and

(C)    the amount and a brief description of the claim; and

(iii)    a statement describing the loss experience for all claims that were self-insured, including the number and aggregate cost of such claims.

(d)    Except as set forth on Part 3.18(d) of the Disclosure Letter:

(i)    All policies to which the Acquired Company is a party or that provide coverage to any Seller, the Acquired Company, or any officer of the Acquired Company:

(A)    are valid, outstanding,

---

յուրաքանչյուր հայցը նկարագրող հաշվետվություն որը ներկայացնում է`

(Ա)    հայցվորի անունը,

(Բ)    ապահովագրի ողի կողմից պալիսի նկարագրությունը եւ ապահովագրության ժամանակարգբացքը , եւ

(Գ)    հայցի գումարը եւ կրճատ նկարագրությունը, եւ

(iii)    ինքնապահովագրով ած բոլոր դեպքերի հայցերի համար վնաս առաջացման պրակտիկին, ներառյալ հայցերի թվաքանակի եւ ընդհանուր գումարի վերաբերյալ հաշվետվություն:

(դ)    Բացահայտման Նամակի Բաժին 3.18(դ)-ում ներկայացվածից բացի`

(i)    բոլոր պոլիսները որոնցում Ձեռքբերված Ընկերությունը համարվում է կողմ կամ որոնք ապահովագրություն են տրամադրում որեւէ Վաճառողի, Ձեռքբերված Ընկերության, կամ Ձեռքբերված Ընկերության որեւէ պաշտոնյանի վրա`

(Ա)    իսկական են,

51

valid, outstanding, and enforceable;

(B) are issued by an insurer that is financially sound and reputable;

(C) taken together, provide adequate insurance coverage for the assets and the operations of the Acquired Company and for all risks to which businesses such as the Acquired Company are normally exposed;

(D) are sufficient for compliance with all Legal Requirements and Contracts to which the Acquired Company is a party or by which it is bound;

(E) will continue in full force and effect following the consummation of the Contemplated Transactions; and

իրական, եւ կիրառելի,

(Բ) տրամադրվա ծ են ապահովագրողի կողմից որը ֆինանսապես ապահով է եւ ունի բարի համբավ,

(Գ) միասին վերցրած, Ձեռքբերված Ընկերության միջոցների եւ գործունեության նկատմամբ, եւ Ձեռքբերված Ընկերության գործունեության տեսակի համար սովորական համապատո ռիսկերի համար տրամադրում են համապատասխան ապահովագրություն,

(Դ) բավարար են ենթարկվելու համար բոլոր Օրենքի Պահանջներին եւ Պայմանագրերին որոնցում Ձեռքբերված Ընկերությունը համարվում է կողմ կամ դրանք կիրառելի են իր նկատմամբ,

(Ե) կշարունակվե ն ամբողջ իրավական ուժով եւ ունենալույամբ Նախատեսվող Գործարքների

52

5 7

կատարումից հետո,
եւ

(F)     do not provide for any retrospective premium adjustment or other experienced-based liability on the part of the Acquired Company.

(Ձ)     Ձեռքբերված Ընկերության նկատմամբ չեն սահմանում որեւէ հետոհին ուժ ունեցող պարտավորություննե ր վճարման առումով կամ այլ՝ նախկին փորձի հիման վրա սահմանված պարտավորություննե ր:

(ii)     No Seller or the Acquired Company has received (A) any refusal of coverage or any notice that a defense will be afforded with reservation of rights, or (B) any notice of cancellation or any other indication that any insurance policy is no longer in full force or effect or will not be renewed or that the issuer of any policy is not willing or able to perform its obligations thereunder.

(ii)     ոչ մի վաճառող կամ Ձեռքբերված Ընկերություն չի ստացել (Ա) ապահովագրության որեւէ մերժում կամ իրավունքների վերապահումով պաշտպանություն ծանուցում, կամ (Բ) չեղյալ համարելու որեւէ ծանուցում կամ ցանկացած այլ փաստացակ առ այն որ որեւէ ապահովագրական պոլիս այլեւս լրիվ իրավական ուժ կամ ունենյություն չունի կամ որ այն չի նորոգվի կամ որ ապահովախզռողը չի կարող կամ չի ուզում կատարել իր պարտավորությունները:

(iii)     The Acquired Company has paid all premiums due, and have otherwise performed all of their respective obligations, under each policy to which the Acquired Company is a party or that provides coverage to the Acquired Company or director thereof.

(iii)     Ձեռքբերված Ընկերությունը վճարել է պահանջվող բոլոր ապահովագրական վճարները, եւ այլ կերպ կատարել է իր բոլոր պարտականությունները, յուրաքանչյուր պոլիսի ներքո որում կողմ է հանդիսանում Ձեռքբերված Ընկերությունը կամ որն ապահովագրություն է տարածում Ձեռքբերված Ընկերության կամ նրա

53

տնօրենի ներկայությամբ:

(iv)  The Acquired Company has given notice to the insurer of all claims that may be insured thereby.

(iv)  Ձեռքբերված Ընկերությունը ծանուցել է ապահովագրողին իրա կողմից ապահովագրության ենթակա բոլոր հայցերի վերաբերյալ:

### 3.19  Environmental Matters.
Except as set forth in part 3.19 of the disclosure letter:

3.19  Միջավայրային Խնդիրներ: Բացառությամբ Նամակի Բաժին 3.19-ում սահմանվածից բացի՝

(a)  The Acquired Company is, and at all times has been, in full compliance with, and has not been and is not in violation of or liable under, any Environmental Law. No Seller or the Acquired Company has any basis to expect, nor has any of them or any other Person for whose conduct they are or may be held to be responsible received, any actual or Threatened order, notice, or other communication from (i) any Governmental Body or private citizen acting in the public interest, or (ii) the current or prior owner or operator of any Facilities, of any actual or potential violation or failure to comply with any Environmental Law, or of any actual or Threatened obligation to undertake or bear the cost of any Environmental, Health, and Safety Liabilities with respect to any of the Facilities or any other properties or assets (whether real, personal, or mixed) in which Sellers or the Acquired Company has had an interest, or with respect to any property or Facility at or to which Hazardous Materials were generated, manufactured, refined, transferred, imported, used, or processed by Sellers, the Acquired

(ա)  Ձեռքբերված Ընկերությունը ամբողջությամբ ենթարկվում է, եւ բոլոր ժամանակներում ամբողջությամբ ենթարկվել է ցանկացած Միջավայրային Օրենքին, չի խախտում եւ չի խախտում այն: Ոչ մեկ Վաճառող կամ Ձեռքբերված Ընկերություն հիմք չունեն սպասելու, ոչ էլ նրանցից որեւէ մեկն կամ ցանկացած այլ Անձ որի գործունեության համար նրանք պատասխանատու են կամ կարող են ճանաչվել այդպիսին, ստացած փաստաթղի կամ Սպառնացող իրական, ծանուցում, կամ այլ հաղորդագրություն (i) հանրային շահերը ներկայացնող որեւէ Կառավարական Մարմնից կամ մասնավոր քաղաքացուց, կամ (ii) որեւէ Միջոցների նախկին տիրոջից կամ աշխատեցնողից, որեւէ Միջավայրային Օրենքի որեւէ փաստացի կամ պոտենցիալ խախտման կամ չենթարկվելու վերաբերյալ, կամ որեւէ Միջավայրային, Առողջական, կամ Անվտանգության Պարտավորությունների ծախսերը կրելու կամ կատարելու որեւէ փաստացի կամ Սպառնացող պարտավորության որեւէ Միջոցների կամ այլ գույքի (լինի այն անշարժ, շարժական կամ խառը) վերաբերյալ, որոնց հետ կապված Վաճառողները կամ Ձեռքբերված Ընկերությունն ունեցել են

54

processed by Sellers, the Acquired Company, or any other Person for whose conduct they are or may be held responsible, or from which Hazardous Materials have been transported, treated, stored, handled, transferred, disposed, recycled, or received.

(b)     There are no pending or, to the Knowledge of Sellers and the Acquired Company, Threatened claims, Encumbrances, or other restrictions of any nature, resulting from any Environmental, Health, and Safety Liabilities or arising under or pursuant to any Environmental Law, with respect to or affecting any of the Facilities or any other properties and assets (whether real, personal, or mixed) in which Sellers or the Acquired Company has or had an interest.

(c)     No Seller or Acquired Company has any basis to expect, nor has any of them or any other Person for whose conduct they are or may be held responsible, received, any citation, directive, inquiry, notice, Order, summons, warning, or other communication that relates to Hazardous Activity.

բաժնետմասեր, կամ որևէ գույքի կամ Միջոցների վերաբերյալ որոնց վրա կամ որոնց ընստանմանծ կւոատակվել, այրստադրվել, ցնվել, փոխանցվել, ներկրվել, օգտագործվել, կամ վերամշակվել են Վտանգավոր Նյութեր Վաճառողների, Ջեռթբերված Ընկերության, կամ որևէ այլ ԱնձԻ կողմից որի գործելակերպի համար պատասխանատու են կամ կարող են այղպիսին համարվել նրանք, կամ որոնցից Վտանգավոր նյութերը փոխադրվել, վերամշակվել, պահեստավորվել, օգտագործվել, տեղափոխվել, տնօրինվել, շրջապտարձվել, կամ ստացվել են:

(p)     Գոյություն չունեն ընթացքում գտնվող կամ, Վաճառողների և Ջեռքբերված Ընկերության Իմացությամբ, Սպառնացող հայցեր, Ծանրաբեռնումներ, կամ որևէ բնույթի այլ սահմանափակումներ, որոնք արդյունք են Միջավայրային, Առողջապահական, կամ Անվտանգության Պարտավորությունների կամ սկիզբ են առնում որևէ Միջավայրային օրենքից համաձայն կամ համապատասխան, որոնք վերաբերվում են կամ ազդում են որևէ Միջոցների կամ ցանկացած այլ գույքերի և միջոցների վրա (լիներ դրանք անշարժ, շարժական կամ խառը) որոնցում Վաճառողները կամ Ջեռքբերված Ընկերությունը ունեն կամ ունեցել են բաժնեմաս:

(q)     ոչ մի Վաճառող կամ Ջեռքբերված Ընկերություն չունի որևէ հիմք սպասելու, ոչ էլ նրանցից որևէ մեկը կամ որևէ այլ Անձ որի գործելակերպի համար իրենք պատասխանատու են կամ կարող են այղպիսին համարվել, ստանալ որևէ հրամ, ուղղություն, հարցում, Հրաման, կանչ, ցգուշացում, կամ այլ հաղորդագրություն որը

55

that relates to Hazardous Activity, Hazardous Materials, or any alleged, actual, or potential violation or failure to comply with any Environmental Law, or of any alleged, actual, or potential obligation to undertake or bear the cost of any Environmental, Health, and Safety Liabilities with respect to any of the Facilities or any other properties or assets (whether real, personal, or mixed) in which Sellers or the Acquired Company had an interest, or with respect to any property or facility to which Hazardous Materials generated, manufactured, refined, transferred, imported, used, or processed by Sellers, the Acquired Company, or any other Person for whose conduct they are or may be held responsible, have been transported, treated, stored, handled, transferred, disposed, recycled, or received.

(d)     No Seller or the Acquired Company, or any other Person for whose conduct they are or may be held responsible, has any Environmental, Health, and Safety Liabilities with respect to the Facilities or with respect to any other properties and assets (whether real, personal, or mixed) in which Sellers or the Acquired Company (or any predecessor), has or had an interest, or at any property

վերաբերվում է Գործածվող Գործունեությանը, Վտանգավոր Նյութերին, կամ ցանկացած ենթադրվող, փաստացի, կամ պոտենցյալ խախտմանը կամ չնեռաբկելուն որեւէ Միջավայրային Օրենքին, կամ որեւէ ենթադրվող, փաստացի կամ պոտենցիալ պարտավորության կրելու կամ կատարելու որեւէ Միջավայրային Օրենքի, Առողջապահական, կամ Անվտանգության Պարտավորությունների ծախսերը որեւէ Միջոցների կամ այլ գույքի կամ միջոցների (իՆֆ այն ամշարդ, շարժական կամ խառը) վերաբերյալ, որոնցում Վաճառողները կամ Ձեռքբերված Ընկերությունն ունեցել են բաժնեմասեր, կամ որեւէ գույքի կամ Միջոցների վերաբերյալ որոնց վրա կամ որոնց ենխատմամբ կոտատակվել, արտադրվել, զտվել, փոխանցվել, ներկրվել, օգտագործվել, կամ վերամշակվել են Վտանգավոր Նյութեր Վաճառողների, Ձեռքբերված Ընկերության, կամ որեւէ այլ ԱՆձի կողմից որի գործունեության համար պատասխանատու են կամ կարող են այդպիսին համարվել Նրանք, կամ որոնցից Վտանգավոր նյութերը փոխադրվել, վերամշակվել, պահեստավորվել, օգտագործվել, տեղավորվել, անօրինել, շրջադարձվել, կամ ստացվել են:

(դ)     Ոչ մի Վաճառող կամ Ձեռքբերված Ընկերություն, կամ այլ Անձ որի գործեյակներայի համար Նրանք պատասխանատու են կամ կարող են այդպիսին ճանաչվել, ունեն որեւէ Միջավայրային, Առողջապահական, կամ Անվտանգության Պարտավորություններ առՆչվող Միջոցների կամ առՆչվող ցանկացած այլ գույքի կամ միջոցներին (իՆեն դրանք ամշարդ, շարժական, կամ խառը) որոնցում

interest, or at any property geologically or hydrologically adjoining the Facilities or any such other property or assets.

(e)     There are no Hazardous Materials present on or in the Environment at the Facilities or at any geologically or hydrologically adjoining property, including any Hazardous Materials contained in barrels, above or underground storage tanks, landfills, land deposits, dumps, equipment (whether moveable or fixed) or other containers, either temporary or permanent, and deposited or located in land, water, sumps, or any other part of the Facilities or such adjoining property, or incorporated into any structure therein or thereon.  No Seller, the Acquired Company, any other Person for whose conduct they are or may be held responsible, or any other Person, has permitted or conducted, or is aware of, any Hazardous Activity conducted with respect to the Facilities or any other properties or assets (whether real, personal, or mixed) in which Sellers or the Acquired Company has or had an interest.

(f)     There has been no Release or, to the Knowledge of Sellers and the Acquired Company, Threat of Release, of any Hazardous Materials at or from the

Վաճառողները կամ Ձեռքբերված Ընկերությունը (կամ ցանկացած այլ նախկին սեփականատեր), ունեն կամ ուներ բաժնեմաս, կամ այլ գույքին որը երկրաբանորեն կամ ջրաբանորեն միանում է Միջոցներին կամ ցանկացած այլ գույքին եւ միջոցներին:

(ե)     Գոյություն չունեն Վտանգավոր Նյութեր Միջոցների Միջավայրում կամ այլ երկրաբանորեն կամ ջրաբանորեն միացված գույքերում, ներառյալ տակառներում, վերգետնյա եւ ստորգետնյա պահեստային տարաներում, հորերում, ստորգետնյա փոսերում, աղբահորերում, սարքավորումներում (լինեն դրանք անշարժ կամ շարժական) կամ այլ տարաներում, հիմնական եւ ժամանակավոր, տեղադրշխված կամ տեղավորված հողի, ջրի, առուների մեջ, կամ Միջոցների այլ մասերում կամ համակցված այլ գույքում, կամ միավցված ցանկացած կառուցվածքում ամենուր: Ոչ մեկ Վաճառող, Ձեռքբերված Ընկերությունը, կամ այլ Անձ որի գործերիսեյերյի համար պատասխանատատուն են կամ կարող են այդպիսին ճանաչվել նրանք, կամ ցանկացած այլ Անձ, չի թույատրել կամ կատարել, Միջոցների կամ ցանկացած այլ գույքի եւ միջոցների (լինեն դրանք անշարժ, շարժական, կամ խառը) որոնցում Վաճառողներ կամ Ձեռքբերված Ընկերությունը ունեն կամ ունեցել է բաժնեմաս, ինչատմամբ կատարված ցանկացած Վտանգավոր Գործունեություն, կամ տեղյակ չէ այդ մասին:

(զ)     Չի կատարվել որեւէ Արտամեետում կամ, Վաճառողների եւ Ձեռքբերված Ընկերության Իմացությամբ, Արտամեետման Վտանգ, որեւէ Վտանգավոր Նյութի

57

Hazardous Materials at or from the Facilities or at any other locations where any Hazardous Materials were generated, manufactured, refined, transferred, produced, imported, used, or processed from or by the Facilities, or from or by any other properties and assets (whether real, personal, or mixed) in which Sellers or the Acquired Company has or had an interest, or any geologically or hydrologically adjoining property, whether by Sellers, the Acquired Company, or any other Person.

Միջոցներից կամ Միջոցների նկատմամբ կամ ցանկացած այլ տեղում որտեղ կուտակվել, արտադրվել, զտվել, տեղափոխվել, պատրաստվել, ներկրվել, օգտագործվել, կամ վերամշակվել են Վտանգավոր Նյութերը Միջոցների կողմից կամ Միջոցներով, կամ ցանկացած այլ գույքի կամ միջոցների կողմից կամ դրանցով (լինեն դրանք անշարժ, շարժական, կամ խառը) որոնցում Վաճառողները կամ Ձեռքբերված Ընկերությունն ունի կամ ունեցել է բաժնեմաս, կամ որևէ երկրաբանորեն կամ ջրաբանորեն փոխկապակցված միջոցներով, լինի դա Վաճառողների, Ձեռքբերված Ընկերության, կամ ցանկացած այլ Անձի կողմից։

(g) Sellers have delivered to Buyer true and complete copies and results of any reports, studies, analyses, tests, or monitoring possessed or initiated by Sellers or the Acquired Company pertaining to Hazardous Materials or Hazardous Activities in, on, or under the Facilities, or concerning compliance by Sellers, the Acquired Company, or any other Person for whose conduct they are or may be held responsible, with Environmental Laws.

(է) Վաճառողները տրամադրել են Գնորդին Վաճառողների կամ Ձեռքբերված Ընկերության տրամադրության տակ գտնվող կամ նրանց կողմից սկզբնավորված Միջոցների մեջ, վրա կամ տակ եղած Վտանգավոր Նյութերին կամ Վտանգավոր Գործողություններին վերաբերող կամ Վաճառողների, Ձեռքբերված Ընկերության, կամ ցանկացած այլ Անձի որի գործողություներն համար նրանք պատասխանատու են կամ կարող են պատասխան համարվել, Միջավայրային Օրենքներին ենթարկվելու վերաբերյալ ցանկացած զեկույցների, ուսումնասիրությունների, վերլուծությունների, փորձարկումների, կամ դիտարկումների ճիշտ եւ ամբողջական պատճեներ եւ արդյունքները։

3.20   Employees.

(a) Part 3.20 of the Disclosure Letter contains a complete and accurate list of the

3.20   Աշխատողներ։

(ա) Բացահայտման Նամակի Բաժին 3.20-ը ներկայացնում է ամբողջական եւ

58

complete and accurate list of the following information for each employee, official, or participant of the Acquired Company, including each employee on leave of absence or layoff status: employer; name; job title; current compensation paid or payable and any change in compensation since January 1, 2003; vacation accrued; and service credited for purposes of vesting and eligibility to participate under the Acquired Company's pension, retirement, profit-sharing, thrift-savings, deferred compensation, stock bonus, stock option, cash bonus, employee stock ownership (including investment credit or payroll stock ownership), severance pay, insurance, medical, welfare, or vacation plan, other Employee Pension Benefit Plan or Employee Welfare Benefit Plan, or any other employee benefit plan or any other plan.

(b)    No employee or official of the Acquired Company is a party to, or is otherwise bound by, any agreement or arrangement, including any confidentiality, noncompetition, or proprietary rights agreement, between such employee or director and any other Person ("Proprietary Rights Agreement") that in any way adversely affects or will affect (i) the performance of his duties as an employee or director of the Acquired Companies, or (ii) the ability of the Acquired Company to

Ճիշտ ցուցակը Ձեռքբերված Ընկերության յուրաքանչյուր աշխատողի, պաշտոնյայի, կամ մասնակցի վերաբերյալ հետևյալ տեղեկելության մասին, ներառյալ արձակուրդում գտնվող կամ հեռացված կարգավիճակ ունեցող աշխատողները․ գործատուում, անունը, պաշտոնը, վճարվելիք կամ վճարվող ընթացիկ փոխխատուցումն կամ փոխխատուցման ցանկացած փոփոխություն սկսած 2003թ-ի հունվարի 1-ից, անցկացված արձակուրդը, Ձեռքբերված Ընկերության կանսաթոշակը, թոշակը, շահույթի բաշխումը, խնայումը, փողային փոխխատուցումը, բաժնեմասի ճկատումար արոտունթյունիը, աշխատողի կողմից բաժնեմասի տիրապետմունը (ներառյալ ներդրումային վարկավկություն կամ բաժնեմասի վարձատրտմունի տիրապետումը), արձակման նպաստը, ապահովագրությունը, բժշկական, կեննաբշջական, կամ արձակուրդային պլանը, այլ Աշխատողի Թոշակի Արտոնության Պլանը կամ Աշխատողի Կեննաթոշակի Արտոնության Պլանը, կամ ցանկացած այլ աշխատողի արտոնության կամ այլ պլանն աշխատողի վրա տարածելու գործառնները։

(p)    Ձեռքբերված Ընկերության ոչ մի աշխատող կամ պաշտոնյա կողմ չի հանդիսանում, կամ այլ կերպ պարտասվրված չէ, որևէ պայմանագրի կամ գործառսըքի, ներառյալ ցանկացած գաղտնապահության, չմրցակցելու, կամ սեփականազնության իրավունքի պայմանագրերը, նման աշխատողի կամ տնօրենի եւ ցանկացած այլ Անձի միջեւ («Սեփականության Իրավունքի Պայմանագիր») որը որեւէ ձեւով բացասականորեն ազդում է կամ կազդի (i) որպես Ձեռքբերված Ընկերության աշխատող կամ տնօրեն իր

ability of the Acquired Company to conduct its business, including any Proprietary Rights Agreement with Sellers or the Acquired Company by any such employee or director.

պարտականությունները կատարելու վրա, կամ (ii) Ձեռքբերված Ընկերության կողմից իր գործունեությունը, ներառյալ որևէ Վաճառողների կամ Ձեռքբերված Ընկերության ցանկացած Սեփականության Իրավունքի Պայմանագիրը ծմած աշխատողի կամ տնօրենի կողմից իրականացնելու վրա:

(c)     Part 3.20 of the Disclosure Letter also contains a complete and accurate list of the following information for each retired employee or director of the Acquired Company, or their dependents, receiving benefits or scheduled to receive benefits in the future: name, pension benefit, pension option election, retiree medical insurance coverage, retiree life insurance coverage, and other benefits.

(գ)     Բացահայտման Նամակի Բաժին 3.20-ը նաև ներառում է ամբողջական եւ ճիշտ ցուցակը Ձեռքբերված Ընկերության յուրաքանչյուր թոշակի անցած աշխատողի կամ տնօրենի, կամ դրանց ընտանիքի անդամների, որոնք ստանում են կամ սպասվում է որ ապագայում կստանան արտոնություններ, վերաբերյալ. անունը, թոշակի արտոնությունը, թոշակի այլընտրանքի ընտրությունը, թոշակի անցածի բժշկական ապահովագրության տարածումը, եւ այլ արտոնություններ:

**3.21     Labor Relations; Compliance.** The Acquired Company has not been and is not a party to any collective bargaining or other labor Contract. The Acquired Company has complied in all respects with all Legal Requirements relating to employment, the payment of social security and similar taxes, occupational safety and health, and other employee relations. Acquired Company is not liable for the payment of any compensation, damages, taxes, fines, penalties, or other amounts, however designated, for failure to comply with any of the applicable Legal Requirements.

3.21     Աշխատանքային Հարաբերություններ. Ենթարկում: Ձեռքբերված Ընկերությունը մաս չի կազմում, եւ չի կազմել որեւէ կոլեկտիվ համաձայնության կամ այլ աշխատանքային Պայմանագրի: Ձեռքբերված Ընկերությունը ենթարկվել է բոլոր առումներով բոլոր Օրենքի Պահանջներին աշխատանքի ընդունմանը, սոցաաս եւ համանման հարկերի վճարման, աշխատանքային անվտանգության եւ առողջապահության, եւ այլ աշխատանքային հարաբերությունների հետ առնչվող: Ձեռքբերված Ընկերությունը պատասխանատու չէ վճարոը որեւէ փոխխատուցման, վճասներ, հարկեր, տուգանքներ, տույժեր, կամ այլ գումարներ, որոնք ինչ որ կերպ առնչվություն ունեն որեւէ գործող Օրենքի Պահանջին չենթարկվելու հետ:

3.22  Intellectual Property.

    (a)    Intellectual Property Assets. The term "Intellectual Property Assets" includes:

    (i)    the names SHA, LLC and Hankavan Mine, all fictional business names, trading names, registered and unregistered trademarks, service marks, and applications (collectively, "Marks");

    (ii)    all patents, patent applications, and inventions and discoveries that may be patentable (collectively, "Patents");

    (iii)    all copyrights in both published works and unpublished works (collectively, "Copyrights"); and

    (iv)    all know-how, trade secrets, confidential information, software, technical information, data, process technology, plans, drawings, and blue prints , including but not limited to all relevant GKZ records.

3.22  Մտավոր Սեփականություն:

    (ա)    Մտավոր Սեփականության Միջոցներ: «Մտավոր Սեփականության Միջոցներ» սահմանումը ներառում է.

    (i)    ՍՀԱ, ՍՊԸ և Հանքավանի Հանքավայր անվանումները, բոլոր մտածածին ձեռնարկատիրական անվանումները, առևտրային անունները, գրանցված և չգրանցված ֆիրմային անվանումները, ծառայական նշանները, և դրանց կիրառումները (միասնաբար՝ «Նշաններ»),

    (ii)    բոլոր պատենտները, պատենտների կիրառումները, և գյուտերը և հայտնագործությունները որոնք կարող են պատենտավորվել (միասնաբար՝ «Պատենտներ»),

    (iii)    բոլոր հեղինակային իրավունքները հրապարակված կամ չհրապարակված աշխատանքների վերաբերյալ (միասնաբար՝ «Հեղինակային Իրավունք»), և

    (iv)    Ձեռքբերված Ընկերության կողմից որպես լիցենզատու կամ լիցենզատու անօրինական, օգտագործվող, կամ լիցենզավորվող բոլոր նոու-հաուները, առևտրային գաղտնիքները, գաղտնի ինֆորմացիան, կոմպյուտերային ծրագրերը,

61

E3

relevant GKZ records, (collectively, "Trade Secrets"); owned, used, or licensed by the Acquired Company as licensee or licensor.

(b)    Agreements.  Part 3.22(b) of the Disclosure Letter contains a complete and accurate list and summary description, including any royalties paid or received by the Acquired Company, of all Contracts relating to the Intellectual Property Assets to which the Acquired Company is a party or by which the Acquired Company is bound  There are no outstanding and, to Sellers' Knowledge, no Threatened disputes or disagreements with respect to any such agreement.

(c)    Know-How Necessary for the Business.

(i)    The Intellectual Property Assets are all those necessary for the operation of the Acquired Company's businesses as they are currently conducted and contemplated to be conducted.  The Acquired Company is the owner of all right, title, and interest in and to each of the Intellectual Property Assets, free and clear of all liens, security interests, charges, encumbrances. equities and

տեխնիկական ինֆորմացիան, տեղեկությունը, վերամշակման տեխնոլոգիան, ծրագրերը, գծագրերը, եւ գրաֆիկները, ներառյալ սակայն չսահմանափակված ԳԿՀ գրանցումները (միասնաբար՝ «Առեւտրային Գաղտնիք»):

(p)    Պայմանագրեր: Բացահայտմանն Նամակի Բաժին 3.22(p)-ն ներկայացնում է Մտավոր Սեփականության Միջոցներին առնմվող Պայմանագրերի ամբողջական եւ ճիշտ ցուցակը եւ կրճատ նկարագրությունը, ներառյալ Ձեռքբերված Ընկերության կողմից վճարված կամ ստացված բոլոր ռոյալթիները, որոնց Ձեռքբերված Ընկերությունը կողմ է կամ որոնք տարածվում են Ձեռքբերված Ընկերության վրա: Գոյություն չունեն ընթացքի մեջ գտնվող եւ, Վաճառողների Իմացությամբ, Սպառնացող վեճեր կամ անհամաձայնություններ այդ պայմանագրերի հետ կապված:

(q)    Գործունեության համար անհրաժեշտ Նոու-Հաու:

(i)    Մտավոր Սեփականության Միջոցները Ձեռքբերված Ընկերության գործունեության համար անհրաժեշտ միջոցներն են որոնցով ներկայումս այդ գործունեությունն իրականացվում կամ նախատեսվում է իրականացվել: Ձեռքբերված Ընկերությունը տանիրոջումն է յուրաքանչյուր եւ ցանկացած Մտավլորական Սեփականության Միջոցների ամբողջ իրավունքը, տիտղոսը, եւ բաժնեմասը ազատ եւ զերծ

62

encumbrances, equities, and other adverse claims, and has the right to use without payment to a third party all of the Intellectual Property Assets.

(ii)     Except as set forth in Part 3.22(c) of the Disclosure Letter, no employee of the Acquired Company has entered into any Contract that restricts or limits in any way the scope or type of work in which the employee may be engaged or requires the employee to transfer, assign, or disclose information concerning his work to anyone other than the Acquired Company.

(d) .    Patents.

(i)     Part 3.22(d) of the Disclosure Letter contains a complete and accurate list and summary description of all Patents. The Acquired Company is the owner of all right, title, and interest in and to each of the Patents, free and clear of all liens, security interests, charges, encumbrances, entities, and other adverse claims.

բոլոր գրավներից, կալանադրումներից, զանձումներից, ծանրաբեռնումներից, այլ անձանց բաժնեմասերից, եւ այլ բացասական բնույթի հայցերից, եւ ունի բոլոր Մտավոր Սեփականության Միջոցներն առանց երրորդ անձանց վճարման օգտագործելու իրավունք:

(ii)     Բացառությամբ Նամակի Բաժին 3.22(գ)-ում ներկայացվածից բացի, Ձեռքբերված Ընկերության ոչ մի աշխատող Պայմանագրի մեջ չի մտել որն իրեն արգելում կամ սահմանափակում է որեւէ ձեւով աշխատանքի կողմից ինքնավար ներգրավված աշխատանքի բնույթ կամ բնագավառ կամ պահանջում է որպեսզի աշխատողը փոխանցի, նշանակի, կամ բացահայտի իր աշխատանքի վերաբերյալ տեղեկություններ որեւէ մեկին Ձեռքբերված Ընկերությունից բացի:

(դ) Պատենտներ:

(i)

Բացառությամբ Նամակի Բաժին 3.22(դ)-ն ներկայացնում է բոլոր Պատենտների ամբողջական եւ ճիշտ ցուցակը եւ կրճատ նկարագրությունը: Ձեռքբերված Ընկերությունը տնօրինում է յուրաքանչյուր Պատենտի բոլոր իրավունքներդը, տիտղոսը, եւ բաժնեմասը, ազատ եւ չերծ բոլոր գրավներից, կալանադրումներից,

63

other adverse claims.

(ii)    All of the issued Patents are currently in compliance with formal legal requirements (including payment of filing, examination, and maintenance fees and proofs of working or use), are valid and enforceable, and are not subject to any maintenance fees or taxes or actions falling due within ninety days after the Closing Date.

(iii)    No Patent has been or is now involved in any interference, reissue, reexamination, or opposition proceeding. To Sellers' Knowledge, there is no potentially interfering patent or patent application of any third party.

(iv)    No Patent is infringed or, to Sellers' Knowledge, has been challenged or threatened in any way. None of the products manufactured and sold, nor any process or know-how used, by the Acquired Company infringes or is alleged to infringe any patent or other

գառձումներից, ծանրաբեռնումներից, այլ անձանց բաժնեմասերից, եւ այլ բացասական բնույթի հայցերից:

(ii)    բոլոր թողարկված Պատենտները ներկայումս համապատասխանում են պաշտոնական օրենքի պահանջներին (ներառյալ գրանցման, ստուգման, եւ պահպանման, եւ գործելու եւ օգտագործելու ապացույցների համար վճարումները), իրական եւ կիրառելի են, եւ ենթակա չեն որեւէ պահպանման վճարումների կամ հարկերի կամ այլ գործողությունների որոնք պետք է կատարվել Կատարման Ամսաթից ինննսուն օրվա ընթացքում:

(iii)    Ոչ մի Պատենտ չի ենթարկվել սահմանափակմման, վերաթողարկման, վերաստուգման, կամ բողոքարկված գործընթացի: Վաճառողների Իմացությամբ, գոյություն չունի երրորդ անձանից կողմից ստացված միջակայող պատենտ կամ նման պատենտի համար ներկայացված դիմում:

(iv)    Ոչ մի Պատենտ սահմանափակված չէ կամ, Վաճառողների Իմացությամբ, բողոքարկված կամ որեւէ կերպ կասկածի տակ դրված չէ: Ձեռքբերված Ընկերության կողմից արտադրված կամ վաճառված ոչ մի ապրանք, օգտագործված ոչ մի

infringe any patent or other proprietary right of any other Person.

(e)    Trademarks.

(i)    Part 3.22(e) of Disclosure Letter contains a complete and accurate list and summary description of all Marks. The Acquired Company is the owner of all right, title, and interest in and to each of the Marks, free and clear of all liens, security interests, charges, encumbrances, equities, and other adverse claims.

(ii)    All Marks that have been registered are currently in compliance with all formal legal requirements (including the timely post-registration filing of affidavits of use and incontestability and renewal applications), are valid and enforceable, and are not subject to any maintenance fees or taxes or actions falling due within ninety days after the Closing Date.

ընթացք կամ նորս-հատ, չի սահմանափակում կամ ենթադրվում որ կարող է սահմանափակվել որևէ երրորդ Անձին պատկանող որևէ պատետնա կամ որևէ առաջնային իրավունք:

(ե)    Առևտրային Նշաններ:

(i)    Բացահայտման Նամակի Բաժին 3.22(ե)-ն ներկայացնում է բոլոր Նշանների ամբողջական եւ ճիշտ ցուցակը եւ կրճատ նկարագրությունը: Ձեռքբերված Ընկերությունը տնօրինում է յուրաքանչյուր Նշանի բոլոր իրավունքները, տիրույթը, եւ բաժնեմասը, ազատ եւ զերծ բոլոր գրավներից, կալանադրումներից, զանձումներից, ծանրաբեռնումներից, այլ անձանց բաժնեմասերից, եւ այլ բացասական բնույթի հայցերից:

(ii)    բոլոր գրանցված Նշանները ներկայումս համապատասխանում են պաշտոնական օրենքի պահանջներին (ներառյալ օգտագործման ապացույցների ժամանակին գրանցումը եւ մրցակցությունը եւ նորացման համար դիմումները), իրական եւ կիրառելի են, եւ ենթակա չեն որևէ պահպանման վճարումների կամ հարկերի կամ այլ գործողությունների որոնք պետք է կատարվել Կատարման Ամսաթվից ինննսուն օրվա ընթացքում:

(iii)    No Mark has been or is now involved in any opposition, invalidation, or cancellation and, to Sellers' Knowledge, no such action is Threatened with the respect to any of the Marks.

(iv)    To Sellers' Knowledge, there is no potentially interfering trademark or trademark application of any third party.

(v)    No Mark is infringed or, to Sellers' Knowledge, has been challenged or threatened in any way.  None of the Marks used by the Acquired Company infringes or is alleged to infringe any trade name, trademark, or service mark of any third party.

(vi)    All products and materials containing a Mark bear the proper federal registration notice where permitted by law.

(f)    Copyrights.

(i)    Part 3.22(f) of the Disclosure Letter contains a complete and accurate list and summary

(iii)    Ոչ մի Նշան չի ենթարկվում եւ չի ենթարկվել բողոքարկման, չեղյալ չի համարվել, չի դադարեցվել կամ ուժնյացվել եւ, Վաճառողների Իմացությամբ, ոչ մի նման գործողություն չի Սպառնում Նշաններից որեւէ մեկին:

(iv)    Վաճառողների Իմացությամբ, գոյություն չունի որեւէ երրորդ անձի պոտենցիալ խանգարող առեւտրային Նշան կամ առեւտրային Նշանի դիմում:

(v)    Ոչ մի Նշան սահմանափակված չէ կամ, Վաճառողների Իմացությամբ, բողոքարկված կամ որեւէ կերպ կասկածի տակ դրված չէ: Ձեռքբերված Ընկերության կողմից օգտագործվող որեւէ Նշան չի սահմանափակում կամ ենթադրվում որ կարող է սահմանափակել որեւէ երրորդ կողմին պատականող որեւէ առեւտրային անուն, առեւտրային Նշան, կամ ծառայության Նշան:

(vi)    Նշանը կրող բոլոր ապրանքները եւ նյութերը կրում են պետական գրանցման նիշշ՞ օրենքով թույլատրվող դեպքերում:

(ق)    Հեղինակային Իրավունքներ:

(i)    Բացահայտման Նամակի Բաժին 3.22(ق)-ն

66

accurate list and summary description of all Copyrights. The Acquired Company is the owner of all right, title, and interest in and to each of the Copyrights, free and clear of all liens, security interests, charges, encumbrances, equities, and other adverse claims.

ներկայացնում է բոլոր Հեղինակային Իրավունքների ամբողջական եւ ճիշտ ցուցակն եւ կրճատ նկարագրությունը: Ձեռքբերված Ընկերությունն տնօրինում է յուրաքանչյուր Հեղինակային Իրավունքի բոլոր իրավունքները, տիտղոսը, եւ բաժնեմասն, ազատ եւ զերծ բոլոր գրավներից, կալանաառումներից, ջամձունցերից, ծանրաբեռնումներից, այլ անձանց բաժնեմասներից, եւ այլ բացասական բնույթի հայցերից:

(ii)     All the Copyrights have been registered and are currently in compliance with formal legal requirements, are valid and enforceable, and are not subject to any maintenance fees or taxes or actions falling due within ninety days after the date of Closing.

(ii)     բոլոր Հեղինակային Իրավունքները գրանցված են եւ ներկայումս համապատասխանում են պաշտոնական օրենքի պահանջներին, իրական եւ կիրառելի են, եւ ենթակա չեն որեւէ պահպանման վճարումների կամ հարկերի կամ այլ գործողությունների որոնք պետք է կատարվել Կատարման Ամսաթվից իննսուն օրվա ընթացքում:

(iii)     No Copyright is infringed or, to Sellers' Knowledge, has been challenged or threatened in any way. None of the subject matter of any of the Copyrights infringes or is alleged to infringe any copyright of any third party or is a derivative work based on the work of a third party.

(iii)     Ոչ մի Հեղինակային Իրավունք սահմանափակված չէ կամ, Վաճառողների Իմացությամբ, բողոքարկված կամ որեւէ կերպ սպառնացումի տակ դրված չէ: Ձեռքբերված Ընկերության կողմից օգտագործվող որեւէ Հեղինակային Իրավունք չի սահմանափակում կամ ենթադրվում որ կարող է սահմանափակել որեւէ երրորդ կողմից պատկանող որեւէ հեղինակային

67

(iv)    All works encompassed by the Copyrights have been marked with the proper copyright notice.

(g)    Trade Secrets.

(i)    With respect to each Trade Secret, the documentation relating to such Trade Secret is current, accurate, and sufficient in detail and content to identify and explain it and to allow its full and proper use without reliance on the knowledge or memory of any individual.

(ii)    Sellers and the Acquired Company have taken all reasonable precautions to protect the secrecy, confidentiality, and value of their Trade Secrets.

(iii)    The Acquired Company has good title and an absolute right to use the Trade Secrets.  The Trade Secrets are not part of the

իրավունք կամ չի հանգիսանում երրորդ անձի որեւէ աշխատանքի աձանցյալը:

(vi)
Հեղինակային Իրավունքի մեջ ներառված բոլոր աշխատանքները կրում են համապատասխան հեղինակային իրավունքի նշանը:

(է)    Առեւտրային Գաղտնիքը:

(i)
Յուրաքանչյուր Առեւտրային Գաղտնիքի մասով, այդ Առեւտրային Գաղտնիքին վերաբերող փաստաթղթերն արդիական, ճիշտ, եւ բավարար են մանրամասներ եւ իմաստի առումով այն սահմանելու եւ բացատրելու համար եւ թույլ են տալիս դրա ամբողջական եւ պատշաճ օգտագործումն առանց որեւէ անձնավորության իմացության կամ հիշողության վրա հենվելու:

(ii)
Վաճառողները եւ Ձեռքբերված Ընկերությունը ձեռք են առել բոլոր զգուշության միջոցները պաշտպանելու համա Առեւտրային Գաղտնիքների գաղտնիությունը, խորհրդապահությունը, եւ արժեքը:

(iii)    Ձեռքբերված Ընկերությունը տնօրինում է Առեւտրային Գաղտնիքներն ամբողջությամբ եւ դրանց օգտագործման ընատմամբ

68

Secrets are not part of the public knowledge or literature, and, to Sellers' Knowledge, have not been used, divulged, or appropriated either for the benefit of any Person (other than the Acquired Company) or to the detriment of the Acquired Company. No Trade Secret is subject to any adverse claim or has been challenged or threatened in any way.

ունեն անհամընդհանուր իրավունք։ Առևտրային Գաղտնիքները հանրային իմացության կամ գրականության առարկա չեն, եւ, Վաճառողների Իմացությամբ, չեն օգտագործվել, բացահայտվել, կամ փոխանցվել ի շահ որևէ Անձի (բացի Ձեռքբերված Ընկերությունից) կամ ի վնաս Ձեռքբերված Ընկերության: Ոչ մի Առևտրային Գաղտնիք ենթակա չէ որևէ բացասական հայցի, չի բողոքարկվել կամ սպառնալիքի ենթարկվել որևէ այլ կերպ:

3.23 **Certain Payments**. Neither the Acquired Company nor any participant, officer, agent, or employee of the Acquired Company, or any other Person associated with or acting for or on behalf of the Acquired Company, has directly or indirectly (a) made any contribution, gift, bribe, rebate, payoff, influence payment, kickback, or other payment to any Person, private or public, regardless of form, whether in money, property, or services (i) to obtain favorable treatment in securing business, (ii) to pay for favorable treatment for business secured, (iii) to obtain special concessions or for special concessions already obtained, for or in respect of the Acquired Company or any Affiliate of the Acquired Company, or (iv) in violation of any Legal Requirement, (b) established or maintained any fund or asset that has not been recorded in the books and records of the Acquired Companies.

3.23 Որոշակի Վճարումներ: Ոչ Ձեռքբերված Ընկերությունը եւ ոչ էլՁեռքբերված Ընկերության որևէ մասնակից, պաշտոնյա, կամ աշխատող, կամ Ձեռքբերված Ընկերության հետ կապ ունեցող կամ նրա անունից գործող որևէ այլ Անձ, ուղղակիորեն կամ անուղղակիորեն չի տվել (ա) որևէ ներդրում, նվեր, կաշառք, զեղչ, վճար, ազդեցության վճար, շնորհավճար, կամ այլ վճար որևէ Անձի, հանրույեն կամ առանձին, անկախ ձեւից, գումարով, գույքով, կամ ծառայություններեի ձեւով (i) ձեռք բերելու գործունեության ապահովության համար բարենպաստ վերաբերմունք, (ii) վարճահատուցյց լինելու համար գործունեության ապահովության բարենպաստ վերաբերմունքի համար, (iii) Ձեռքբերված Ընկերության կամ Ձեռքբերված Ընկերության·որևէ Փոխկապակցված Անձի համար կամ առնչությամբ ձեռք բերելու համար հատուկ զիջումներ կամ վարձահատուցյց լինելու ձեռք բերված հատուկ զիջումների համար, կամ (iv) որևէ Օրենքի Պահանջի խախտումով, (բ) ստեղծել կամ պահել է որևէ դրամագլուխ կամ ցուլք որը չի գրանցվել Ձեռքբերված Ընկերության գրքերում եւ գրանցումներում:

69

3.24  Disclosure.

(a)    No representation or warranty of Sellers in this Agreement and no statement in the Disclosure Letter omits to state a material fact necessary to make the statements herein or therein, in light of the circumstances in which they were made, not misleading.

(b)    No notice given pursuant to Section 5.5 will contain any untrue statement or omit to state a material fact necessary to make the statements therein or in this Agreement, in light of the circumstances in which they were made, not misleading.

(c)    There is no fact known to either Seller that has specific application to any Seller or the Acquired Company (other than general economic or industry conditions) and that materially adversely affects the assets, business, prospects, financial condition, or results of operations of the Acquired Companies (on a consolidated basis) that has not been set forth in this Agreement or the Disclosure Letter.

3.25    Relationships with Related Persons.  No Seller or any Related Person of Sellers or of the Acquired Company has.

3.24    Բացահայտում:

(ա)    Վաճառողների Սույն Պայմանագրում արված ոչ մի հայտարարություն կամ տրված երաշխիք եւ Բացահայտումնան Նամակում կատարվածն ոչ մի հայտարարություն չի պարտունակում ոչ մի էական փաստի բացթողում որն անհրաժեշտ է յուրաքանչյուր փաստաթղթում կատարվելած հայտարարություները ոչ ապակողմնորոշող դարձնելու համար՝ հանգամանքներում որոնցում դրանք կատարվելու են:

(բ)    Բաժին 5.5-ի համաձայն տրվելած ծանուցումներից ոչ մեկը չի պարունակելի որեւէ ոչ ճիշտ հայտարարություն կամ որեւէ էական փաստի բացթողում որն անհրաժեշտ է կատարված հայտարարությունները դրանցում կամ սույն Պայմանագրում հանգամանքներում որոնցում դրանք արվել են, ոչ ապակողմնորոշող դարձնելու համար:

(գ)    Գոյություն չունի որեւէ Վաճառողին հայտնի փաստ որը հատուկ կիրառում ունի որեւէ Վաճառողի կամ Ձեռքբերված Ընկերության նկատմամբ (բացի ընդհանուր տնտեսական կամ արտադրական միջակո) եւ որը էականորեն ազդեցության ունի Ձեռքբերված Ընկերության գույքի, գործունեության, հեռանկարների, ֆինանսական վիճակի կամ գործունեության արդյունքների վրա (միասնական հիմունքներով) որը չի ներկայացվել սույն Պայմանագրում կամ Բացահայտուման Նամակում:

3.14    Փոխկապակցված Անձանց հետ Հարաբերություններ: Ոչ մի Վաճառող կամ Վաճառողի կամ Ձեռքբերված

70

of Sellers or of the Acquired Company has, or since has had, any interest in any property (whether real, personal, or mixed and whether tangible or intangible), used in or pertaining to the Acquired Company's businesses. No Seller or any Related Person of Sellers or of the Acquired Company is, or since has owned (of record or as a beneficial owner) an equity interest or any other financial or profit interest in, a Person that has (i) had business dealings or a material financial interest in any transaction with the Acquired Company, or (ii) engaged in competition with the Acquired Company with respect to any line of activities of the Acquired Company (a "Competing Business") in any market presently served by the Acquired Company. Except as set forth in Part 3.25 of the Disclosure Letter, no Seller or any Related Person of Sellers or of the Acquired Company is a party to any Contract with, or has any claim or right against, the Acquired Company.

Ընկերության հետ Փոխկապակցված Անձ յանցի, եւ չի ունեցել, որեւէ բաժնեմաս որևէ. գույքի մեջ (լինի դա անշարժ, շարժական, կամ խառը եւ նյութական կամ ոչ նյութական), որն օգտագործվում է կամ առնչվում է Ձեռքբերված Ընկերության գործունեությանը: Ոչ մի Վաճառող կամ Վաճառողի կամ Ձեռքբերված Ընկերության հետ Փոխկապակցված Անձ չի տնօրինում, եւ չի տնօրինել (որպես ուղղակի կամ անուղղակի սեփականատեր) որեւէ բաժնեմաս կամ որեւէ ֆինանսական կամ շահութային բաժնեմաս մի Անձի մոտ որը (i) գործնական շփումներ կամ նյութական ֆինանսական շահեր է ունեցել որեւէ գործարքում Ձեռքբերված Ընկերության հետ, կամ (ii) ներգրավված է եղել Ձեռքբերված Ընկերության հետ Ձեռքբերված Ընկերության որեւէ գործունեության բնագավառում («Մրցակցող Ձեռնարկություն») Ձեռքբերված Ընկերության կողմից ներկայումս ծառայող որեւէ շուկայում: Բացառությամբ Նամակի Բաժին 3.25-ում ներկայացվածից բացի, ոչ մի Վաճառող կամ Վաճառողների կամ Ձեռքբերված Ընկերությանց Փոխկապակցված Անձ կողմ չի հանդիսանում որեւէ Պայմանագրի, կամ չունի որեւէ հայց կամ իրավունք, Ձեռքբերված Ընկերության հետ:

3.26  **Brokers or Finders.** Sellers and their agents have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement.

3.26  Բրոկերներ եւ Գտնողներ.

Վաճառողները եւ նրանց գործռւկալները չունեն որևէ պարտականոււթյուններ կամ պարտավորություններ, պայմանական կամ այլ կերպ, բրոկերների կամ գտնողների վճարների կամ գործռւկալների շահավճարների կամ այլ համանման վճարների մասով սույն Պայմանագրի հետ կապված:

4.  **REPRESENTATIONS AND WARRANTIES OF BUYER.** Buyer represents and warrants to Sellers as follows:

4.  ԳՆՈՐԴԻ ՀԱՅՏԱՐԱՐՈՒԹՅՈՒՆՆԵՐ ԵՒ ԵՐԱՇԽԻՔՆԵՐ: Գնորդը հայտարարում եւ երաշխավորում է Վաճառողներին հետեւյալով.

71

**4.1** **Organization and Good Standing.** Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware, USA.

**4.2** **Authority; No Conflict.**

(a)    This Agreement constitutes the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms. Upon the execution and delivery by Buyer of the Escrow Agreement and the Promissory Notes (collectively, the "Buyer's Closing Documents"), the Buyer's Closing Documents will constitute the legal, valid, and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms. Buyer has the absolute and unrestricted right, power, and authority to execute and deliver this Agreement and the Buyer's Closing Documents and to perform its obligations under this Agreement and the Buyer's Closing Documents.

(b)    Except as set forth in Schedule 4.2, neither the execution and delivery of this Agreement by Buyer nor the consummation or performance of any of the Contemplated Transactions by Buyer will give any Person the right to prevent, delay, or otherwise interfere with any of the

**4.1** **Կազմավորում եւ Պատշաճ Վիճակ:** Գնորդը ԱՄՆ Դելավեր նահանգի օրենսդրությամբ պատշաճ կազմակերպված, իրավականորեն գոյություն ունեցող, եւ պատշաճ վիճակական գտնվող սահմանափակ պատասխանատվությամբ ընկերություն է:

**4.2** **Լիազորություն; Շահերի Բախման Բացակայություն:**

(ա)    Սույն Պայմանագիրը սահմանում է Գնորդի իրավական, պատշաճ եւ Գնորդին պարտավորեցնող պարտավորություն՝ կիրառելի իր դրույթների համաձայն: Գնորդի կողմից Էսքրո Պայմանագրի եւ Մուրհակի ստորագրումից եւ տրամադրումից հետո (միասնաբար՝ «Գնորդի Կատարման Փաստաթղթեր»), Գնորդի Կատարման Փաստաթղթերը կսահմանեն Գնորդի իրավական, պատշաճ եւ պարտավորեցնող պարտավորությունները՝ Գնորդների հանդեպ կիրառելի իրենց համապատասխան դրույթների համաձայն: Գնորդն ունի բացարձակ եւ անսահմանափակ իրավունք, իշխանություն, իրավասություն, եւ ունակություն ստորագրելու եւ կատարելու սույն Պայմանագիրը եւ Գնորդի Կատարման Փաստաթղթերը եւ կատարելու սույն Պայմանագրով եւ Գնորդի Կատարման Փաստաթղթերով սահմանված պարտավորությունները:

(բ)    Բացի Բացառությամբ Նշմանելի Բաժնի 4.2-ում նշվածի, սույն Պայմանագրի ստորագրումն եւ կատարումը, կամ Գնորդի կողմից որեւէ Նախատեսված Գործարքների իրականացումն կամ կատարումը չի Գնորդի որեւէ Անձի իրավունքներ այցելելու, ուշացնելու, կամ այլ կերպ խանգարելու որեւէ Նախատեսված Գործարքներ համաձայն.

72

interfere with any of the Contemplated Transactions pursuant to:

    (i)    any provision of Buyer's Organizational Documents;

    (ii)    any resolution adopted by the board of directors or the stockholders of Buyer;

    (iii)    any Legal Requirement or Order to which Buyer may be subject; or

    (iv)    any Contract to which Buyer is a party or by which Buyer may be bound.

Except as set forth in Schedule 4.2, Buyer is not and will not be required to obtain any Consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Contemplated Transactions.

    **4.3**    <u>Investment Intent</u>.  Buyer is acquiring the Shares for its own account.

    **4.4**    <u>Certain Proceedings</u>. There is no pending Proceeding that has been commenced against Buyer and that challenges, or may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the Contemplated Transactions.  To Buyer's Knowledge, no such Proceeding has been Threatened.

    (i)    Գնորդի Կազմավորման Փաստաթղթերի,

    (ii)    Գնորդի տնօրենների կամ բաժնետերերի ժողովի կողմից կայացված որոշման,

    (iii)    որևէ Օրենքի Պահանջի կամ Հրամանի որին Գնորդը կարող է ենթակա լինել, կամ

    (iv)    որևէ Պայմանագրի որին կողմ է Գնորդը կամ որով Գնորդը կարող է պարտավորվել:

Քացառությամբ Նախակի Բաժին 4.2-ում ներկայացվածից բացի, Գնորդից չի պահանջվում ձեռք բերել որևէ Համաձայնություն որևէ Անձից սույն Պայմանագրի ստորագրման և կատարման կամ Նախատեսված Գործարքներից որևէ մեկի կատարման կամ իրականացման վերաբերյալ:

    **4.3**    <u>Ներդնելու Նպատակը</u>: Գնորդը Բաժնեմասը ձեռք է բերում իր հաշվին:

    **4.4**    <u>Որոշ Գործընթացներ</u>: Գոյություն չունեն ընթացքի մեջ գտնվող Գործարքներ որոնք մեկնարկվել են Գնորդի դեմ ևւ որոնք սպառնում են, կամ կարող են արգելել, ուշացնել, անօրինական դարձնել, կամ այլ կերպ խանգարել Նախատեսված Գործարքներից որևէ մեկը: Գնորդի Իմացությամբ, նման ոչ մի Գործընթաց չի սպառնացել:

73

**4.5** <u>Brokers or Finders</u>. Buyer and its officers and agents have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement and will indemnify and hold Sellers harmless from any such payment alleged to be due by or through Buyer as a result of the action of Buyer or its officers or agents.

**5.** <u>COVENANTS OF SELLERS PRIOR TO CLOSING DATE.</u>

**5.1** <u>Access and investigation</u>. Between the date of this Agreement and the Closing Date, Sellers will, and will cause the Acquired Company and its Representatives to, (a) afford Buyer and its Representatives and prospective lenders and their Representatives (collectively, "Buyer's Advisors") full and free access to the Acquired Company's personnel, properties (including subsurface testing), contracts, books and records, and other documents and data, (b) furnish Buyer and Buyer's Advisors with copies of all such contracts, books and records, and other existing documents and data as Buyer may reasonably request, and (c) furnish Buyer and Buyer's Advisors with such additional financial, operating, and other data and information as Buyer may reasonably request.

4.5 Բրոքերներ եւ Գտնողներ: Գնորդը եւ իր պաշտոնյաներն եւ գործակալները չունեն որեւէ պարտավորություններ կամ պարտականություններ, պայմանական կամ այլ կերպ, բրոքերների կամ գտնողների վճարների կամ գործակալների շահավճարների կամ այլ համանման վճարների մասով սույն Պայմանագրի հետ կապված, եւ կփոխհատուցեն եւ Վաճառողներին զերծ կպահեն Գնորդի միջոցով վճարման առկա որպես Գնորդի եւ իր պաշտոնյաների գործողությունների արդյունք ենթադրվող բոլոր նման վճարներից:

5. ՎԱՃԱՌՈՂԻ ՊԱՐՏԱՎՈՐՈՒԹՅՈՒՆՆԵՐԸ ՄԻՆՉԵՎ ԿԱՏԱՐՄԱՆ ԱՄՍԱԹԻՎԸ:

5.1 Մուտք եւ Ստուգում: Սույն Պայմանագրի ամսաթվի եւ Կատարման Ամսաթվի միջեւ ընկած ժամանակահատվածում, Վաճառողները անձամբ, եւ Ձեռքբերված Ընկերության եւ նրա Ներկայացուցիչների միջոցով, (ա) Գնորդին եւ նրա ներկայացուցիչներին եւ հեռանկարային վարկատուներին եւ նրանց Ներկայացուցիչներին (միասնաբար՝ «Գնորդի Խորհրդատուներ») կցուցաբերեն ազատ եւ անկաշկանդ մուտքով Ձեռքբերված Ընկերության աշխատակազմին, գույքի (ներառյալ ստորգետնյա ստուգումները), պայմանագրերին, գրքերին եւ գրանցումների, եւ այլ փաստաթղթերի եւ տեղեկությույան նկատմամբ, (բ) Գնորդին եւ Գնորդի Խորհրդատուներին կտրամադրեն նման բոլոր պայմանագրերի, գրքերի եւ գրանցումների, եւ այլ գոյություն ունեցող փաստաթղթերի եւ տեղեկության պատճեներով համաձայն Գնորդի ողջամիտ խնդրանքի, եւ (գ) Գնորդին եւ Գնորդի Խորհրդատուներին կտրամադրեն նման հավելյալ ֆինանսական, աշխատանց," եւ այլ տեղեկատվությունը համաձայն Գնորդի ողջամիտ խնդրանքի:

74

5.2    **Operation of the Businesses of the Acquired Company.** Between the date of this Agreement and the Closing Date, Sellers will, and will cause the Acquired Company to:

(a)    conduct the business of such Acquired Company only in the Ordinary Course of Business;

(b)    use their Best Efforts to preserve intact the current business organization of such Acquired Company, keep available the services of the current officers, employees, and agents of the Acquired Company, and maintain the relations and good will with suppliers, customers, landlords, creditors, employees, agents, and others having business relationships with the Acquired Company;

(c)    confer with Buyer concerning operational matters of a material nature; and

(d)    otherwise report periodically to Buyer concerning the status of the business, operations, and finances of the Acquired Company.

5.3    **Negative Covenant.** Except as otherwise expressly permitted by this Agreement, between the date of this Agreement and the Closing Date, Sellers

5.2    Ձեռքբերված Ընկերության Գործունեության Կատավարումը: Սույն Պայմանագրի ամսաթվի եւ Կատարդման Ամսաթվի միջեւ ընկած ժամանակաշրջացում Վաճառողները անձամբ, եւ Ձեռքբերված Ընկերության միջոցով`

(ա)    Ձեռքբերված Ընկերության գործունեությունը կկատավարեն բացառապես Գործունեության Բնականոն Ընթացքով,

(բ)    կօգտագործեն իրենց Լավագույն Ջանքերը ամբողջականը պահպանելու համար Ձեռքբերված Ընկերության գործավարական կազմակորպվածությունը, կպահպանեն Ձեռքբերված Ընկերության ընթացիկ պաշտոնյաների եւ գործակալների ծառայությունները, եւ կպահպանեն մատակարարների, հաճախորդների, գույքատերերի, վարկատուների, աշխատողների, գործակալների, եւ այլոց հետ ունեցող գործնական հարաբերությունները ունեն Ձեռքբերված Ընկերության հետ բարի հարաբերություններն եւ բարի կամքը:

(գ)    կխորհրդակցեն Գնորդի հետ նյութական բնույթ ունեցող աշխատանքային հարցերով, եւ

(դ)    այլ կերպ պարբերաբար կզեկուցեն Գնորդին Ձեռքբերված Ընկերության գործունեության, աշխատանքների, եւ ֆինանսների վերաբերյալ:

5.3    Բացասական Պարտավորություն: Սույն Պայմանագրում հստակորեն այլ կերպ սահմանված բացի, սույն Պայմանագրի ամսաթվի եւ Կատարման Ամսաթվի միջեւ ընկած

75

Agreement and the Closing Date, Sellers will not, and will cause the Acquired Company not to, without the prior consent of Buyer, take any affirmative action, or fail to take any reasonable action within their or its control, as a result of which any of the changes or events listed in Section 3.16 is likely to occur.

5.4  **Required Approvals.**  As promptly as practicable after the date of this Agreement, Sellers will, and will cause each Acquired Company to, make all filings required by Legal Requirements to be made by them in order to consummate the Contemplated Transactions.  Between the date of this Agreement and the Closing Date, Sellers will, and will cause each Acquired Company to, (a) cooperate with Buyer with respect to all filings that Buyer elects to make or is required by Legal Requirements to make in connection with the Contemplated Transactions, and (b) cooperate with Buyer in obtaining all consents identified in Schedule 4.2.

5.5  **Notification.**  Between the date of this Agreement and the Closing Date, each Seller will promptly notify Buyer in writing if such Seller or the Acquired Company becomes aware of any fact or condition that causes or constitutes a Breach of any of Sellers' representations and warranties as of the date of this Agreement, or if such Seller or the Acquired Company becomes aware of the occurrence after the date of this Agreement of any fact or condition that would (except as expressly contemplated by this Agreement) cause or constitute a Breach of any such representation or warranty had such representation or warranty been made as of the time of occurrence or discovery of

ժամանակակարգնթացքում, Վաճառողներն անձամբ, եւ Ձեռքբերված Ընկերության միջոցով, առանց Գնորդի նախնիր համաձայնության, չեն կատարի որեւէ պատասխան գործողություն, կամ որեւէ անգործություն իրենց իրավասությունների սահմաններում, որի արդյունքում կարող են առաջանալ Բաժին 3.16-ում նախատեսված փոփոխություններից կամ դեպքերից որևէ մեկը:

5.4  **Պահանջվող Հաստատումներ:** Սույն Պայմանագրի ամսապից ինչքան հնարավոր է շուտ, Վաճառողներն անձամբ, եւ Ձեռքբերված Ընկերության միջոցով, կկատարեն Օրենքի Պահանջով պահանջվող բոլոր գրանցումները իրականացնելու համար Նախատեսված Գործարքները: Սույն Պայմանագրի ամսապից եւ Կատարման Ամսաթվի միջեւ ընկած ժամանակահատվածի ընթացքում, Վաճառողներն անձամբ, եւ Ձեռքբերված Ընկերության միջոցով, (ա) կհամագործակցեն Գնորդի հետ Գնորդի կողմից ընտրված կամ Օրենքի Պահանջով պահանջվող բոլոր գրանցումներում Նախատեսված Գործարքների հետ կապված, եւ (բ) կհամագործակցեն Գնորդի հետ Բաժնի 4.2-ում նախանշված բոլոր թույլտվությունների ստացման գործում:

5.5  **Ծանուցումներ:** Սույն Պայմանագրի ամսապվի եւ Կատարման Ամսաթվի միջեւ ընկած ժամանակահատվածում ընթացքում, յուրաքանչյուր Վաճառող անմիջապես գրավոր կծանուցի Գնորդին եթե այդ Վաճառողը կամ Ձեռքբերված Ընկերությունը տեղեկանա որևէ փաստի կամ իրավիճակի մասին որը հարուցում կամ սահմանում է Վաճառողների որևէ հայտարարությունների եւ երաշխիքների խախտում սույն Պայմանագրի ամսապվի դրությամբ, կամ եթե Վաճառողը կամ Ձեռքբերված Ընկերությունը սույն Պայմանագրի ամսապվից հետո տեղեկանան նման փաստի կամ իրավիճակի մասին որը կհարուցեր կամ կհասարեր արված հայտարարության կամ

76

as of the time of occurrence or discovery of such fact or condition. Should any such fact or condition require any change in the Disclosure Letter if the Disclosure Letter were dated the date of the occurrence or discovery of any such fact or condition, Sellers will promptly deliver to Buyer a supplement to the Disclosure Letter specifying such change. During the same period, each Seller will promptly notify. Buyer of the occurrence of any Breach of any covenant of Sellers in this Section 5 or of the occurrence of any event that may make the satisfaction of the conditions in Section 7 impossible or unlikely.

**5.6    Payment of Indebtedness by Related Persons.** Except as expressly provided in this Agreement, Sellers will cause all indebtedness owed the Acquired Company by any Seller or any Related Person of a Seller to be paid in full prior to Closing.

**5.7    No Negotiation.** Until such time, if any, as this Agreement is terminated pursuant to Section 9, Sellers will not, and will cause the Acquired Company and each of its Representatives not to, directly or indirectly solicit, initiate, or encourage any inquiries or proposals from, discuss or negotiate with, provide any non-public information to, or consider the merits of any unsolicited inquiries or proposals from, any Person (other than Buyer) relating to any transaction involving the sale of the business or assets (other than in the Ordinary Course of Business) of the Acquired Company, or any of the capital of

Երաշխիքի Խախտում եթե այդ փաստը կամ իրավիճակը հայտնաբերվեն կամ գյուտություն ունենային այդ հայտապատրաստությունների կամ երաշխիքների կատարման ժամանակ։ Եթե նման փաստը կամ իրավիճակը պահանջի Բացահայտումման Նամակի որևէ փոփոխություն այն դեպքում երբ Բացահայտումման Նամակը ամսագրված լիներ նման փաստի կամ իրավիճակի հայտմաբերման կամ գյուտության ունենալու ժամանակ, ապա Վաճառողները Գնորդին անհապաղ կտրամադրեն այդ փոփոխությունն արտացոլող Բացահայտումման Նամակի հավելվածում։ Նույն ժամանակահատվածի ընթացքում, յուրաքանչյուր Վաճառող Գնորդին անհապաղ կտեղեկացնի Բաժին 5-ում սահմանված Վաճառողի որևէ պարտավորության որևէ Խախտման առաջացման վերաբերյալ կամ որևէ դեպքի կամ երևույթի վրա հասնելու վերաբերյալ, որը կարող է Բաժին 7-ի պայմաններին բավարարումը դարձնել անհնար կամ ոչ հավանական։

**5.6    Փոխկապակցված Անձանց կողմից Պարտքերի Վճարումը:** Սույն Պայմանագրում հատուկ սահմանվածից բացի, Վաճառողները ամբողջությամբ վճարել կստան Ձեռքբերված ԸՆկերությանը որևէ Վաճառողի կամ Վաճառողի Փոխկապակցված Անձի պարտքը մինացած գումարները մինչև Կատարումը:

**5.7    Բանակցություններ- Բացակայությունը:** Բացի մինչև այն ժամանակը, եթե տեղի ունենա, երբ սույն Պայմանագիրը կդադարի Բաժին 9-ի համաձայն, Վաճառողները անձամբ, եւ Ձեռքբերված ԸՆկերության եւ նրա յուրաքանչյուր Ներկայացուցչի միջոցով թույլ չեն տա, ուղղակիորեն կամ անուղղակիորեն կամենա, մեկնարկի, կամ խրախի երևէ Անձի կողմից որևէ հարցում կամ առաջարկություններ, կամ նրա կողմից որևէ խարտոնված հարցման կամ առաջարկության որևէ խնդրի քննարկում (բացի Գնորդից) առնվյող որևէ գործառքի որը կներառե Ձեռքբերված ԸՆկերության գործունեության կամ գույքի վաճառքը

Acquired Company, or any of the capital of the Acquired Company, or any merger, consolidation, business combination, or similar transaction involving the Acquired Company.

(բացի Դորձունեության Ընկական6 (Ընկգթից), կամ Ջեռքբերվա Ընկերության որեւէ կապիստավի վաճառքը, կամ որեւէ միացում, միավորում, գործունեության համատեղում, կամ համանման գործառս որը կներառի Ջեռքբերված Ընկերությանը:

5.8   **Best Efforts.**  Between the date of this Agreement and the Closing Date, Sellers will use their Best Efforts to cause the conditions in Sections 7 and 8 to be satisfied.

5.8   Լավագույն Ջանքեր: Սույն Պայմանագրի ամսաթվի եւ Կատարման Ամսաթվի միջեւ ընկած ժամանակահատվածում, Վաճառողները կգործադրեն իրենց Լավագույն Ջանքերը բավարարելու համար Բաժին 7-ի եւ Բաժին 8-ի պայմանները:

6.   **COVENANTS OF BUYER PRIOR TO CLOSING DATE.**

6.   ԳՆՈՐԴԻ ՊԱՐՏԱՎՈՐՈՒԹՅՈՒՆՆԵՐԸ ՄԻՆՉԵՒ ԿԱՏԱՐՄԱՆ ԱՄՍԱԹԻՎԸ:

6.1   **Approvals of Governmental Bodies.**  As promptly as practicable after the date of this Agreement, Buyer will, and will cause each of its Related Persons to, make all filings required by Legal Requirements to be made by them to consummate the Contemplated Transactions. Between the date of this Agreement and the Closing Date, Buyer will, and will cause each Related Person to, (i) cooperate with Sellers with respect to all filings that Sellers are required by Legal Requirements to make in connection with the Contemplated Transactions, and (ii) cooperate with Sellers in obtaining all consents identified in Part 3.2 of the Disclosure Letter; provided that this Agreement will not require Buyer to dispose of or make any change in any portion of its business or to incur any other burden to obtain a Governmental Authorization.

6.1   Կառավարական Մարմիններդ Հաստատումները: Սույն Պայմանագրի ամսաթվից ինչքան որ հնարավոր է շուտ, Գնորդդ անձամբ, եւ իր Փոխկապակցված Անձանց միջոցով, կատարելդ Օրենքի Պահանջով6 նախատեսված բոլոր գրանցումները որոնք անհրաժեշտ են իրականացնելու համար Նախատեսված Գործարքները: Սույն Պայմանագրի ամսաթվի եւ Կատարման Ամսաթվի միջեւ ընկած ժամանակահատվածում, Գնորդ6 անձամբ, եւ իր Փոխկապակցված Անձանց միջոցով, (i) կհամագործակցի Վաճառողների հետ Օրենքի Պահանջով պատահանցելդ բոլոր գրանցումների կատարման մեջ կապված6 Նախատեսված Գործարքների հետ, եւ (ii) կհամագործակցի Վաճառողների հետ Բացահայտման Նամակի Բաժին 3.2-ում նեղկայացված բոլոր թույլտվությունների ստացման գործում. պայմանով որ սույն Պայմանագիրը չի պահանջի Գնորդին վռոժել կամ փոփոխել իր գործունեության առարկա6 կամ կրել Կառավարական Լիազորության ստանալու ծանրաբեռնում:

6.2   **Best Efforts.**  Except as set forth in the provision to Section 6.1.

6.2   Լավագույն Ջանքեր: Բաժին 6.1-ում ներկայացվածից բացի,

78

forth in the provison to Section 6.1, between the date of this Agreement and the Closing Date, Buyer will use its Best Efforts to cause the conditions in Sections 7 and 8 to be satisfied.

## 7. CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE. 

Buyer's obligation to purchase the Shares and to take the other actions required to be taken by Buyer at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Buyer, in whole or in part):

### 7.1 Accuracy of Representations.

(a)    All of Sellers' representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), must have been accurate in all material respects as of the date of this Agreement, and must be accurate in all material respects as of the Closing Date as if made on the Closing Date, without giving effect to any supplement to the Disclosure Letter.

(b)    Each of Sellers' representations and warranties in Sections  must have been accurate in all respects as of the date of this Agreement, and must be accurate in all respects as of the Closing Date as if made on the Closing Date, without giving effect to any supplement to the Disclosure Letter.

սույն Պայմանագրի ամասպփի եւ Կատարմ ն Ամսապֆ միջեն ընկած ժամանակահատվածում, Գնորդը պեարո ւ. եցզաատգրոծ իր լավ ագույ ջաֆբերլ ապալկըետու համար Բաժինն ե 7-ի ե 8-ի պայմանն եի բավ արարմ ն:

## 7. ԳՆՈՐԴԻ ԿԱՏԱՐՄԱՆ ՊԱՐՏԱՎՈՐՈՒԹՅԱՆ ԻՐԱԿԱՆԱՑՄԱՆ ՆԱԽԱՊԱՅՄԱՆՆԵՐԸ: 

Վաճառնմսր զներու եւ Կատարմ ն ժամ ն ան Գնորդից պահանֆցվ ն այլ գործողությունն եի կատ նբելւ պաստռանվրոթյունն ապ վ մ նվ որմ ն է լրենություն ապ վ մ նն եից յուր նանՅյուր բ վ արարմ ն (որն ՅQ զանկ ցաց«ն կ թ ո֊ ն հն յ ն հ համ ռ գ ե Գնորդի կողմ ից, ամբ ող ջ ությ մբ կ մ մ ս մբ) Կատ րմ ն ժ մ ն ն կ մ դ անֆց ն ռ֊ ջ

### 7.1 Հայտ ր ր ությունն եի Ճ նrt ությ ն:

(ա)    Վ ս ռ ղ ն եի սույն Պ լ մ ն գ ռ մ ն ր վ ծ բ ն հ յ ш ш ր ր ություննeն եu եր ш ֆ ш ш ф ր ություննeն ր (մ ш ш ն ֆ ն վ ertfg վ ), ե y ur ф ш ն ff ur այ ս հ յ т w ш ր ր ությունն եu եra ֆ ш ш ф ր ությու նn ը (ш ш ш ն ֆ ին վ ertfg վ ), պ ե ր t է ֆ ֆ еն ֆ շ w բ ն բ ш ն ա ш ռ ум ն e ру ш у ն Պ լ մ ն գ ռ ի ш ш ш ф պ ф դ ր ությ մ դ, e պ ե ր t է ֆ ֆ են ֆ շ w բ ն բ ш ն ա ш ռ ум ն e ру ш ն Կ ш ш ш ф մ ն Ա մ ш ш ф լ ф դ ր ությ մ դ յ ф գ т ф ф կ ш ш ш ф վ ф n Կ ш ш ш ф ման Ա մ ш ш ф լ ф դ ր ությու մ դ, ш ш ш g հ ш ф լ tf ш ա պ ш ш ф ш ш н եrw Բ ш g ш հ l տ m ш ն Ն ш ш ш l ф ն:

(բ)    Բ ш ֆ ֆ ն ն e րum Վ ш ս ռ ղ ն ե ի հ յ ш ш ш ռ ր ությունն ե ր ш ш ns е ը ш ֆ ш ш ш ф ր ությունն ե ը պ ф е ր ת է ֆ ֆ ֆ շ w բ ն բ ш ն ա ш ռ ум ն e ру ш ն ս n ú ն Պ լ մ ن գ ռ ի ш ш ш ф պ ф դ ր ությ մ դ, e պ ե ր t է ֆ ֆ են ֆ շ w բ ն բ ш ն ա ш ռ ум ն e ру ш ն Կ ш ш ш ф մ ն Ա մ ш ш ф լ ф դ ր ությ մ դ յ ф գ т կ ш ш ш ф վ ф n е n Կ ш ш ш ф ман Ա մ ш ш ф լ ф ն, ш ш ш g

*81*

Բացահայտման Նամակին
հավելյալ պատմաթելու:

### 7.2 Sellers' Performance.

(a)    All of the covenants and obligations that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been duly performed and complied with in all material respects.

(b)    Each document required to be delivered pursuant to Section 2.4 must have been delivered, and each of the other covenants and obligations in Sections must have been performed and complied with in all respects.

### 7.3 Consents. Each of the Consents identified in the Disclosure Letter, and each Consent identified in Schedule 4.2, must have been obtained and must be in full force and effect.

### 7.4 Additional Documents. Sellers must have delivered additional documents reasonably by Buyers:

### 7.5 No Proceedings. Since the date of this Agreement, there must not have been commenced or Threatened against Buyer, or against any Person affiliated with Buyer, any Proceeding (a) involving any challenge to, or seeking damages or other

### 7.2 Վաճառողի Գործելակերպը:

(ա)    Կատարման ժամանակ կամ դրանից առաջ սույն Պայմանագրի համաձայն Վաճառողների կողմից կատարման ենթակա բոլոր պարտավորությունները եւ պարտականությունները (միասին վերցված), եւ յուրաքանչյուր այս պարտավորությունները եւ պարտականությունները (առանձին վերցված), պետք է պատշաճ ձեւով կատարվեն եւ իրականացվեն բոլոր էական առումներով:

(բ)    Բաժին 2.4-ի համաձայն տրամադրման ենթակա բոլոր փաստաթղթերը պետք է տրամադրված լինեն, եւ Բաժիններում ներկայացված յուրաքանչյուր այլ պարտավորությունները եւ պարտականությունները պետք է կատարված եւ իրականացված լինեն բոլոր առումներով:

### 7.3 Համաձայնություններ: Բացահայտման Նամակում ներկայացված բոլոր Համաձայնությունները, եւ Բաժին 4.2-ում ներկայացված յուրաքանչյուր Համաձայնություն պետք է ձեռք բերված լինի, եւ լինի լրիվ ուժի մեջ եւ ունենա ուժակություն:

### 7.4 Հավելյալ Փաստաթղթեր: Վաճառողները պետք է տրամադրած լինեն Գնորդի կողմից ողջամտորեն պահանջված փաստաթղթերը:

### 7.5 Վարույթների Բացակայություն: Սույն Պայմանագրի ամսաթվից Գնորդի, կամ Գնորդի հետ աֆիլացված այլ Անձի դեմ չպետք է սկսված կամ Սպառնացած լինեն, որեւէ Վարույթներ (ա) որոնք ներառում են որեւէ սպառնալիք որեւէ Նախատեսված Գործարքի

80

*82*

challenge to, or seeking damages or other relief in connection with, any of the Contemplated Transactions, or (b) that may have the effect of preventing, delaying, making illegal, or otherwise interfering with any of the Contemplated Transactions.

**7.6** **No Claim Regarding Stock Ownership or Sale Proceeds.** There must not have been made or Threatened by any Person any claim asserting that such Person (a) is the holder or the beneficial owner of, or has the right to acquire or to obtain beneficial ownership of, any stock of, or any other voting, equity, or ownership interest in, the Acquired Company, or (b) is entitled to all or any portion of the Purchase Price payable for the Shares.

**7.7** **No Prohibition.** Neither the consummation nor the performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time), materially contravene, or conflict with, or result in a material violation of, or cause Buyer or any Person affiliated with Buyer to suffer any material adverse consequence under, (a) any applicable Legal Requirement or Order, or (b) any Legal Requirement or Order that has been published, introduced, or otherwise proposed by or before any Governmental Body.

**8.** **CONDITIONS PRECEDENT TO SELLERS' OBLIGATION TO CLOSE.** Sellers' obligation to sell the Shares and to take the other actions required to be taken by Sellers at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Sellers, in whole or in part):

նկատմամբ, կամ վնասների կամ այլ փոխհատուցման խնդիրներ դնելու հետ կապված, կամ (բ) որը կարող է արգելելու, ուշացնելու, անօրինական դարձնելու, կամ այլ կերպ խանգարելու ազդեցություն ունենալու որևէ Նախատեսված Գործարքի նկատմամբ:

**7.6** **Բաժնեմասի Սեփինակման կամ Վաճառքի Գումարների Վերաբերյալ Հայցի Բացակայություն:** Չպետք է ներկայացվել կամ Սպառնա ներկայացվելու որևէ հայց որևէ Անձի կողմից այնպիսով որ այդ Անձն (ա) Չերքբերիված Ընկերության տիրապետունոզ կամ անմիդրակի սեփականատերն է, կամ ունի դրա, դրա որևէ բաժնեմասի, կամ դրա որևէ ձայնի, գոչբի, կամ բաժնեմասի ձեռքբերված կամ անմիդրակի սեփականանիրման իրավունք, կամ (բ) իրավասուտ է Բաժնեմասի Գնման Գ-ֆի կամ դրա որևէ մասի նկատմամբ:

**7.7** **Արգելման Բացականայություն:** Նախատեսված Գործարքների իրականացումն կամ կատարումն ուղղակիորեն կամ անմիդղակիորեն (ծանուցմամբ կամ առանց դրա կամ ժամանակի ընթացքում), նյութականորեն չի հակասի, կամ բախում առաջացնի, կամ Նյութական խախտման արդյունք հանդիսանա, կամ Գնորդին կամ Գնորդի հետ Փոխկապակված Անձին հարուցի սոտմել որևէ նյութականնորեն բացասական հետևանքներից որոնք առաջանում են (ա) որևէ գործող Օրենքի Պահանջի կամ Հրամանի արդյունքում, կամ (բ) որևէ Օրենքի Պահանցի կամ Հրամանից որը հրատարակվել է, ներկայացվել է, կամ այլ կերպ առաջարկվել է որևէ Կառավարական Մարմնի կողմից կամ նրան:

**8.** **ՎԱՃԱՌՈՂԻ ԿՍՏԱՐՄԱՆ ՊԱՐՏԱՎՈՐՈՒԹՅԱՆ ԻՐԱԿԱՆԱՑՄԱՆ ՆԱԽԱԴՊԱՅՄԱՆՆԵՐԸ:** Բաժնեմասը վաճառելու և Կատարման ժամանակ Վաճառողներից պահանձվոլմ այլ գործողությունները կատարելու պարտավորությունը պայմանավորված է հետևյալ պայմանների յուրաքանչյուրի բավարարմամբ (որոնցից ցանկացածը կարող է չեղյալ համարվել Վաճառողների

waived by Sellers, in whole or in part):

8.1 **Accuracy of Representations**. All of Buyer's representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), must have been accurate in all material respects as of the date of this Agreement and must be accurate in all material respects as of the Closing Date as if made on the Closing Date.

8.2 **Buyer's Performance**.

(a)     All of the covenants and obligations that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been performed and complied with in all material respects.

(b)     Buyer must have delivered each of the documents required to be delivered by Buyer pursuant to Section 2.4 and must have made the cash payments required to be made by Buyer pursuant to Sections 2.4(b)(i) and 2.4(b)(ii).

8.3 **Consents**. Each of the Consents identified in the Disclosure Letter must have been obtained and must be in full force and effect.

կույմից, ամբողջությամբ կամ մասամբ) Կատարման ժամանակ կամ դրանից առաջ

8.1 Հայտարարությունների Ճշգրտումը: Գնորդի սույն Պայմանագրում արված բոլոր հայտարարությունները եւ երաշխավորությունները (միասնին վերցված), եւ յուրաքանչյուր այս հայտարարությունները եւ երաշխավորությունները (առանձին վերցված), պետք է լինեն ճիշտ բոլոր էական առումներով սույն Պայմանագրի ամսաթվի դրությամբ, եւ պետք է լինեն ճիշտ բոլոր էական առումներով Կատարման Ամսաթվի դրությամբ իբր թե կատարուլ են Կատարման Ամսաթվի դրությամբ, առանց հավելյալ պատմառելու Բացահայտման Նամակին:

8.2 Գնորդի Գործառությներ:

(ա)     Կատարման ժամանակ կամ դրանից առաջ սույն Պայմանագրի համաձայն Գնորդի կողմից կատարման ենթակա բոլոր պարտավորությունները եւ պարտականությունները (միասին վերցված), եւ յուրաքանչյուր այս պարտավորությունները եւ պարտականությունները (առանձին վերցված), պետք է կատարված եւ իրականացվեն բոլոր էական առումներով:

(բ)     Գնորդի պետք է տրամադրած լինի Բաժնի 2.4-ի համաձայն Գնորդի կողմից տրամադրման ենթակա բոլոր փաստաթղթերը, եւ կատարած լինի Գնորդի կողմից վճարման ենթակա կանխիկ վճարումները համաձայն Բաժինների 2.4(բ)(i) եւ 2.4(բ)(ii)-ի:

8.3 Համաձայնություններ: Բացահայտման Նամակում ներկայացված բոլոր Համաձայնությունները պետք է ձեռք բերված լինեն, եւ լինեն լրիվ ուժի մեջ եւ ունենան ուժակորություն:

82

*84*

**8.4     Additional Documents**.  Buyer must have delivered to Sellers additional documents reasonably requested by Sellers.

**8.5     No Injunction**.  There must not be in effect any Legal Requirement or any injunction or other Order that (a) prohibits the sale of the Shares by Sellers to Buyer, and (b) has been adopted or issued, or has otherwise become effective, since the date of this Agreement.

**9.     TERMINATION.**

**9.1     Termination Events**.  This Agreement may, by notice given prior to or at the Closing, be terminated:

(a)     by either Buyer or Sellers if a material Breach of any provision of this Agreement has been committed by the other party and such Breach has not been waived;

(b)     (i) by Buyer if any of the conditions in Section 7 has not been satisfied as of the Closing Date or if satisfaction of such a condition is or becomes impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) and Buyer has not waived such condition on or before the Closing Date; or (ii) by Sellers, if any of the conditions in Section 8 has not been satisfied of the Closing Date or if satisfaction of such a condition is or becomes impossible (other than through the failure of Sellers to comply with their obligations under this Agreement) and Sellers have

8.4     Հավելյալ Փաստաթղթեր: Գնորդը Վաճառողներին պետք է տրամադրած լինեն Վաճառողների կողմից ողջամտորեն պահանջված փաստաթղթերը:

8.5     Դատական Արգելանքի Բացակայություն: Ոչ մի Օրենքի Պահանջ կամ որևէ դատական արգելյանք չպետք է ուժի մեջ գտնվի որը (ա) կարգելի Բաժնեմասի վաճառքը Վաճառողների կողմից Գնորդին, եւ (բ) որն ընդունվված կլինի, կամ այլ կերպ ուժ մեջ մտած կլինի, սույն Պայմանագրի ամսաթվից հետո:

9.     ԴԱԴԱՐՈՒՄ

9.1     Դադարման Դեպքեր: Սույն Պայմանագիրը կասող է, մինչեւ Կատարումը կամ դրա ժամանակ ծանուցում ітпшу միջոցով, դադարիել`

(ա)     կամ Գնորդի կամ Վաճառողների կողմից եթե սույն Պայմանագրի որևէ դրույթի էլյության Խախտում կատարվել մյուս կողմ կողմից եւ այդ Խախտումը չեղյալ չհամարվել,

(բ)     (i) Գնորդի կողմից եթե Բաժինե 7-ի որևէ պայմանի չբավարարվել Կատարման Ամսաթվի դրությամբ կամ եթե նման պայմանի բավարարարումը համարվել կամ դառ անհնար (բացի Գնորդի կողմից սույն Պայմանագրով իր պարտավորությունների չկատարման դեպքերի միջոցով) եւ Գնորդը չեղյալ չհամարի նման պայմանը Կատարման Ամսաթվից առաջ կամ դրա ժամանակ, կամ (ii) Վաճառողների կողմից եթե Բաժինե 8-ի որևէ պայմանի չբավարարվել Կատարման Ամսաթվի դրույթյամբ կամ եթե նման պայմանի բավարարումը համարվել կամ դառնա անհնարին (բացի Վաճառողների կողմից սույն Պայմանագրով իրենց

85

this Agreement) and Sellers have not waived such condition on or before the Closing Date;

(c)    by mutual consent of Buyer and Sellers; or

(d)    by either Buyer or Sellers if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before December 31, 2003, or such later date as the parties may agree upon.

պարտավորությունների չկատարման դեպքերի միջոցով) և Վաճառողները չեղյալ չհամարեն նման պայմանը Կատարման Ամսաթվից առաջ կամ դրա ժամանակ,

(գ)    Գնորդի և Վաճառողների երկուստեք համաձայնությամբ, կամ

(դ)    կամ Գնորդի կամ Վաճառողների կողմից եթե Կատարումը տեղի չունենա (բացի սույն Պայմանագրի դադարման մեջ շահագրգռված կողմի կողմից սույն Պայմանագրով սահմանված իր պարտավորությունների կատարումից խուսափելու դեպքերը) 2003թ-ի դեկտեմբերի 31-ը, կամ կողմերի կողմից համաձայնած ավելի ուշ ժամկետ:

**9.2    Effect of Termination.** Each party's right of termination under Section 9.1 is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of a right of termination will not be an election of remedies. If this Agreement is terminated pursuant to Section 9.1, all further obligations of the parties under this Agreement will terminate, except that the obligations in Sections 11.1 and 11.3 will survive; provided, however, that if this Agreement is terminated by a party because of the Breach of the Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal remedies will survive such termination unimpaired.

**9.2    Դադարման Հետևանքը:** Բաժին 9.1-ի համաձայն յուրաքանչյուր կողմի դադարեցնելու իրավունքը հավելում է սույն Պայմանագրով կամ այլ կերպ նրանց ունեցած ցանկացած իրավունքներին, և դադարեցնելու իրավունքի օգտագործումը չի նշանակում վճռաման փոխխատուցման ընտրություն: Եթե սույն Պայմանագիրը դադարի Բաժին 9.1-ի համաձայն, սույն Պայմանագրով սահմանված կողմերի բոլոր հետագա պարտավորությունները դադարում են, բացի Բաժիններ 11.1-ում և 11.3-ում սահմանված պարտավորությունները որոնք մնում են ուժի մեջ, պայմանով, սակայն, որ եթե սույն Պայմանագիրը դադարի որևէ կողմի կողմից մյուս կողմից Պայմանագրի Խախտման պատճառով կամ դադարեցնող կողմի՝ սույն Պայմանագրով սահմանված մեկ կամ մի քանի պայմանները մյուս կողմի՝ սույն Պայմանագրով սահմանված իր պարտավորությունները չկատարելու հետևանքով չբավարարելու պատճառով, դադարեցնող կողմի՝ իրավական փոխխատուցում հետապնդելու իրավունքը պետք է մնա ուժի մեջ:

# EXHIBIT 4 (Part 3)

86

## 10. INDEMNIFICATION; REMEDIES.

### 10.1 Survival; Right to Indemnification not Affected by Knowledge.

All representations, warranties, covenants, and obligations in this Agreement, the Disclosure Letter, the supplements to the Disclosure Letter, the certificate delivered pursuant to Section 2.4(a)(v), and any other certificate or document delivered pursuant to this Agreement will survive the Closing. The right to indemnification, payment of Damages or other remedy based on such representations, warranties, covenants, and obligations will not be affected by any investigation conducted with respect to, or any Knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing Date, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant, or obligation. The waiver of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect the right to indemnification, payment of Damages, or other remedy based on such representations, warranties, covenants, and obligations.

### 10.2 Indemnification and Payment of Damages by Sellers.

Sellers, jointly and severally, will indemnify and hold harmless Buyer, the Acquired Company, and their respective Representatives, stockholders, controlling persons, and affiliates (collectively, the

10. ՓՈԽՀԱՏՈՒՑՈՒՄ

### 10.1 Ուժի Մեջ Մնալը, Իրացության Հետևանօր Չունենալը Փոխհատուցմանե Վրա:

Սույն Պայմանագրի, Բացահայտմանե Նամակի, Բացահայտմանե Նամակի հավելումների, Բաժին 2.4(ա)(v)-ի համաձայն տրամադրած վկայականների, և սույն Պայմանագրի համաձայն ցանկացած այլ տրամադրած վկայականի կամ փաստաթղթի բոլոր հայտարարարությունները, երաշխավորությունները, խոստումները, և պարտավորությունները մնում են ուժի մեջ Կատարումից հետո: Փոխհատուցմանե, Վնասների վճարմանե, կամ այլ փոխհատուցման իրավունքը հիմնված այդ հայտարարությունների, երաշխավորությունների, խոստումների, և պարտավորությունների վրա չպետք է խախտվի որևէ ենան հայտարարության, երաշխիքի, խոստման, կամ պարտավորության ճշտության կամ անճշտության կամ դրանց իրականացման վերաբերյալ կատարված որևէ ստուգմամ, կամ դրա վերաբերյալ որևէ Ժամանակ ձեռք բերված (կամ ձեռք բերման հնարավորության) Իմացության, ինչ դա սույն Պամմանագրի ստորագրումից և տրամադրումից կամ Կատարման Ամսաթվից առաջ կամ հետո, համգատանգներում: Որևէ հայտարարության կամ երաշխավորության, կամ որևէ խոստման կամ պարտավորության կատարմաե որևէ պայմանի չեղյալ համան ելը շի ազդում այդ հայտարարության, երաշխավորության, խոստմաե կամ պարտավորության հիմնաե վրա փոխհատուցման, Վնասների վճարմաե, կամ այլ փոխհատուցման իրավունքի վրա:

### 10.2 Վաճառողների Կողմից Փոխհատուցումն ու Վնասների Վճարումը:

Վաճառողները, միասնաբար և առանձին, Գնորդին, Ձեռքբերված Ընկերությանը, և նրանց համապատասխան Ներկայացուցիչներին, բաժնետերերին, վերահսկող անձանց, և փոխկապակցված

85

persons, and affiliates (collectively, the "Indemnified Persons") for, and will pay to the Indemnified Persons the amount of, any loss, liability, claim, damage (including incidental and consequential damages), expense (including costs of investigation and defense and reasonable attorneys' fees) or diminution of value, whether or not involving a third-party claim (collectively, "Damages"), arising, directly or indirectly, from or in connection with:

անձանց (միասնաբար՝ «Փոխհատուցված Անձանց») կփոխհատուցեն եւ զերծ կպահեն, ցանկացած կորստից, պարտավորությունից, հայցից, վնասից (ներառյալ պատահական եւ իրրեն հետեւանք առաջացած վնասները), ծախսից (ներառյալ ստուգման եւ պաշտպանության եւ փաստաբանների ողջամիտ ծախսերը) կամ արժեքի անկումից, անկախ երրորդ կողմից հայցի ներկայացման հանգամանքից (միասնաբար՝ «Վնասներ»), եւ Փոխհատուցված Անձանց կվճարեն այն համապատասխան գումարները, որոնք կծագեն, ուղղակիորեն կամ անուղղակիորեն, հետեւյալից կամ դրա հետ կապված․

(a)    any Breach of any representation or warranty made by Sellers in this Agreement (without giving effect to any supplement to the Disclosure Letter), the Disclosure Letter, the supplements to the Disclosure Letter, or any other certificate or document delivered by Sellers pursuant to this Agreement;

(ա)    սույն Պայմանագրում (առանց Բացահայտման Նամակի վրա ազդելու կամ հավելյալ առաջացնելու), Բացահայտման Նամակում, Բացահայտման Նամակի հավելումներում, կամ սույն Պայմանագրի համաձայն Վաճառողների կողմից տրամադրած որեւէ վկայագրում կամ փաստաթղթում Վաճառողների կողմից կատարված ցանկացած հայտարարության կամ երաշխավորության խախտումից,

(b)    any Breach of any representation or warranty made by Sellers in this Agreement as if such representation or warranty were made on and as of the Closing Date without giving effect to any supplement to the Disclosure Letter, other than any such Breach that is disclosed in a supplement to the Disclosure Letter and is expressly identified in the certificate delivered pursuant to Section 2.4(a)(v) as having caused the condition specified in Section 7.1 not to be satisfied;

(բ)    սույն Պայմանագրում Վաճառողների կողմից կատարված որեւէ հայտարարության կամ երաշխավորության խախտումը՝ իբր ճման հայտարարությունը կամ երաշխիքը կատարված լինի Կատարման Ամսաթվի դրությամբ առանց Բացահայտման Նամակին հավելյալ հարուցելու, բացի Բացահայտման Նամակում բացահայտված եւ Բաժին 2.4(ա)(v)-ի համաձայն տրամադրված վկայագրում հստակորեն նկարագրված ցանկացած Խախտում որի հետեւանքով Բաժին 7.1-ում սահմանված պայմանը չի

86

բավարարվել,

(c)　　any Breach by either Seller of any covenant or obligation of such Seller in this Agreement;

(գ)　　սույն Պայմանագրի՝ Վաճառողներից կորմից ցանկացած Խախտումը, կամ, Վաճառողներից կորմից կատատարված որևէ խոստման կամ պարտավորության խախտումը,

(d)　　any product shipped or manufactured by, or any services provided by, the Acquired Company prior to the Closing Date;

(դ)　　մինչեւ Կատարման Ամսաթիվը Ձեռքբերված Ընկերության կորմից ուղարկված կամ արտադրված որևէ ապրանքը, կամ մատուցած որևէ ծառայությունը,

(e)　　any matter disclosed in the Disclosure Letter; or

(ե)　　Բացահայտման Նամակում բացահայտած որևէ խնդիրը, կամ

(f)　　any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by any such Person with either Seller or the Acquired Company (or any Person acting on their behalf) in connection with any of the Contemplated Transactions.

(զ)　　բրոկերների կամ գտնողների վճարների կամ շահավճարների վերաբերյալ ցանկացած Անձի հայցը որը հիմնված է նման ցանկացած Անձի եւ որևէ Վաճառողի կամ Ձեռքբերված Ընկերության (կամ նրանց կորմից գործող ցանկացած Անձի) հետ ենթադրվող պայմանագրի վրա կապված որևէ Նախատեսվող Գործարքի հետ:

The remedies provided in this Section 10.2 will not be exclusive of or limit any other remedies that may be available to Buyer or the other Indemnified Persons. The Buyer also has a the right of set off against any royalty payments.

Սույն Բաժին 10.2-ում ներկայացված փոխհատուցումները բացառիկ չեն կամ չեն սահմանափակում որևէ այլ փոխխատուցում Գնորդին կամ այլ Փոխհատուցվող Անձին հասանելի ցանկացած այլ փոխխատուցումները: Գնորդը նաեւ իրավունք ունենի հաշվանցումներ կատարելու ցանկացած ռոյալթիի վճարման ընտատմամբ:

10.3　　__Indemnification and Payment of Damages by Sellers; Environmental Matters__.  In addition to the provisions of Section 10.2. Sellers.

10.3　　Վաճառողների Կողմից Փոխխատուցումն եւ Վնասների Վճարումը, Միջավայրային Խնդիրներ: Ի լրումն Բաժին 10.2-ի դրույթների, Վաճառողները, միասին

87

the provisions of Section 10.2, Sellers, jointly and severally, will indemnify and hold harmless Buyer, the Acquired Company, and the other Indemnified Persons for, and will pay to Buyer, the Acquired Company, and the other Indemnified Persons the amount of, any Damages (including costs of cleanup, containment, or other remediation) arising, directly or indirectly, from or in connection with:

(a)    any Environmental, Health, and Safety Liabilities arising out of or relating to: (i) (A) the ownership, operation, or condition at any time on or prior to the Closing Date of the Facilities or any other properties and assets (whether real, personal, or mixed and whether tangible or intangible) in which Sellers or the Acquired Company has or had an interest, or (B) any Hazardous Materials or other contaminants that were present on the Facilities or such other properties and assets at any time on or prior to the Closing Date; or (ii) (A) any Hazardous Materials or other contaminants, wherever located, that were, or were allegedly, generated, transported, stored, treated, Released, or otherwise handled by Sellers or the Acquired Company or by any other Person for whose conduct they are or may be held responsible at any time on or prior to the Closing Date, or (B) any Hazardous Activities that were, or were allegedly, conducted by Sellers or the Acquired Company or by any other Person for whose conduct they are or may be held responsible; or

և առանձին, Գ-նորդին, Ձեռքբերված Ընկերությանը, և այլ Փոխհատուցվյած Անձանց կփոխհատուցեն և զերծ կպահեն ցանկյացած Ամաներից (ներառյալ մաքրման, մեկուսացման, կամ այլ վերականգնման ծախսերը), և Գ-նորդին, Ձեռքբերված Ընկերությանը, և այլ Փոխհատուցվյած Անձանց կվճարեն գումարները, որոնք կծագեն, ուղղակիորեն կամ անուղղակիորեն, հետևյալից կամ դրա հետ կապված․

(ա)    ցանկյացած Միջավայրային, Առողջապահական, կամ Անվտանգության Պարտավորություններից որը ծագում է կամ կապված է․ (i) (Ա) Միջոցների կամ ցանկյացած այլ գույքի կամ միջոցների (լինի անշարժ, շարժական, կամ խառը և ն]յութական կամ ն]յութական) մինչև Կատարման Ամսաթիվը որևէ ժամանակ ունօրինելուց, աշխատեցնելուց, կամ այլ վիճակից, որոնցում Վաճառողները կամ Ձեռքբերվա Ընկերություն ունեցել է բաժնեմաս, կամ (Բ) որևէ Վտանգավոր Նյութից կամ այլ աղտոտիչից որոնք առկա են եղել Միջոցներին, կամ նման այլ գույքի կամ միջոցների վրա Կատարամման Ամսաթիից առաջ որևէ ժամանակ, կամ (ii) (Ա) որևէ Վտանգավոր Նյութից կամ այլ աղտոտիչից, անկախ տեղակայից, որոն եղել կամ ենթադրվում է որ եղել են կոտտակվկված, տեղափոխված, պահեստավորպված, մշակկված, Արտանեետևված, կամ այլ կերպ օգտագործվ]ած Վաճառողների կամ Ձեռքբերված Ընկերության կամ ցանկացած այլ Անձի կողմից որի գործերակերպի համար պատտասփախմատտու են կամ կարող են պատտասֆախմատտու համարվել նրանք ցանկյացած Ժամանակ մինչև Կատարման Ամսաթիվը, կամ (Բ) ցանկացած Վտոսագավոր Գ-ործողություններից որոնք եղել են, կամ ենթադրվում է որ եղել են, կատարված Վաճառողների կամ

88

90

(b) any bodily injury (including illness, disability, and death, and regardless of when any such bodily injury occurred, was incurred, or manifested itself), personal injury, property damage (including trespass, nuisance, wrongful eviction, and deprivation of the use of real property), or other damage of or to any Person, including any employee or former employee of Sellers or the Acquired Company or any other Person for whose conduct they are or may be held responsible, in any way arising from or allegedly arising from any Hazardous Activity conducted or allegedly conducted with respect to the Facilities or the operation of the Acquired Company prior to the Closing Date, or from Hazardous Material that was (i) present or suspected to be present on or before the Closing Date on or at the Facilities (or present or suspected to be present on any other property, if such Hazardous Material emanated or allegedly emanated from any of the Facilities and was present or suspected to be present on any of the Facilities on or prior to the Closing Date) or (ii) Released or allegedly Released by Sellers or the Acquired Company or any other Person for whose conduct they are or may be held responsible, at any time on or prior to the Closing Date.

Ձեռքբերված Ընկերության կամ ցանկացած այլ Անձի կողմից որի գործելակերպի համար պատասխանատու են կամ կարող են պատասխանատու գանվել նրանք, կամ

(բ) ցանկացած մարմնական վնասվածքից (ներառյալ հիվանդությունը, անմղամղությունուը, եւ մահը, եւ անկախ հանգամանքից թե երբ է նման մարմնական վնասվածք առաջացել, ենթադրվել որ առաջացել է, թե իր մասին հայցննի դարձրել), անձնական վնասվածքից, գույքի վնասվածքից (ներառյալ անձամղ գույքի ջարջաշհումը, փշացումը, ապօրինի տիրապատումունումը, օգտագործման որեւէ բացառումը), կամ ցանկացած Անձի կողմից կամ Անձին հասցրած վնասից, ներառյալ Վաճառողների կամ Ձեռքբերված Ընկերության կամ ցանկացած Անձի' որի գործելակերպի համար նրանք պատասխանատու են կամ կարող են համարվել պատասխանատու, ցանկացած աշխատողին կամ նախկին աշխատողին, որեւէ կերպ որեւէ Վտանգավոր Գործունեությունից' Միջոցների ենկատմամբ կատարված կամ ենթադրյալ կատարված, կամ Ձեռքբերված Ընկերության աշխատանքից միշեւ Կատարման Ամսաթիվը, բխող կամ ենթադրաբար բխող կամ Վտանգավոր Նյութերից որանք (i) միշեւ Կատարման Ամսաթիվը կամ դրա ժամանակ առկա են եղել կամ կասկածվում է որ առկա են եղել Միջոցներում կամ դրանց վրա (կամ առկա են եղել կամ կասկածվում են որ առկա են եղել որեւէ այլ գույքերի վրա, եթե այդ Վտանգավոր Նյութերը ծագել են կամ ենթադրվում է որ ծագել են Միջոցներից եւ առկա են եղել կամ ենթադրվում է որ առկա են եղել որեւէ Միջոցների վրա միշեւ Կատարման Ամսաթիվը) բխող կամ

89

ենթադրյալ բիլող, կամ (ii) Վաճառողների, Ջեռբերլված Ընկերության կամ որևէ այլ Անձի կողմից' որի գործեսյկերի համար պատասխանատու են կամ կարող են պատասխանատու լինել նրանք, Արտանեետւած կամ ենթադրյալ Արտանեետւած որևէ ժամանակ մինչև Կատարման Ամսաթիվ:

Գնորդդ իրավասու կլինի վերահսկելու որևէ Մաքրում, որևէ կապակցված Վարույթ, և, բացի հաջորդ նախադասությունում սահմանվածից, ցանկացած այլ Վարույթ որի առնչությամբ կարող է հետապնդվել փոխհատուցում Բաժին 10.3-ի համաձայն: Բաժին 10.9-ում նկարագրված գործընթացը կկիրառվի բաժին 10.3-ին առկա որևէ խնդրի հետ կապված գումարային վնասների վերաբերյալ ցանկացած հայցի նկատմամբ:

Buyer will be entitled to control any Cleanup, any related Proceeding, and, except as provided in the following sentence, any other Proceeding with respect to which indemnity may be sought under this Section 10.3. The procedure described in Section 10.9 will apply to any claim solely for monetary damages relating to a matter covered by this Section 10.3.

10.4    **Indemnification and Payment of Damages by Buyer**. Buyer will indemnify and hold harmless Sellers, and will pay to Sellers the amount of any Damages arising, directly or indirectly, from or in connection with (a) any Breach of any representation or warranty made by Buyer in this Agreement or in any certificate delivered by Buyer pursuant to this Agreement, (b) any Breach by Buyer of any covenant or obligation of Buyer in this Agreement, or (c) any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by such Person with Buyer (or any Person acting on its behalf) in connection with any of the Contemplated Transactions.

10.4    Գնորդի Կողմից Կատարվող Փոխհատուցումն եւ Վնասների Վճարումն: Գնորդը կփոխհատուցի եւ Վաճառողներին զերծ կպահի, եւ Վաճառողներին կվճարի ցանկացած Վնասների գումարներ որոնք կառաջանան, ուղղակիորեն կամ անուղղակիորեն, (ա) սույն Պայմանագրում կամ Գնորդի կողմից սույն Պայմանագրի համաձայն տրամադրված որևէ այլ վկայագրում Գնորդի կողմից արված որևէ հայտարարությունն կամ երաշխիքի որևէ Խախտման, (բ) սույն Պայմանագրով Գնորդի կողմից տրված որևէ խոստումնի կամ պարտավորության որևէ Խախտման, կամ (գ) որևէ Անձի կողմից բրոկերների կամ գտնողների վճարնների կամ չհավակմարման կամ համանման վճարումների հետ կապված որևէ հայցից այդ Անձի եւ Գնորդի (կամ նրա անունից գործող այլ Անձի) միջեւ պայմանագրի կամ ենթադրյալ պայմանագրի կամ պայմանանզությւածություն հիման վրա' կատրված Նախատեսված Գործարքներից որևէ մեկի հետ:

90

10.5  **Time Limitations**. If the Closing occurs, Sellers will have no liability (for indemnification or otherwise) with respect to any representation or warranty, or covenant or obligation to be performed and complied with prior to the Closing Date, other than those in Sections 3.3, 3.11, 3.13, and 3.19, unless on or before January 1, 2007 Buyer notifies Sellers of a claim specifying the factual basis of that claim in reasonable detail to the extent then known by Buyer; a claim with respect to Section 3.3, 3.11, 3.13, or 3.19, or a claim for indemnification or reimbursement not based upon a representation or warranty or any covenant or obligation to be performed and complied with prior to the Closing Date, may be made at any time. If the Closing occurs, Buyer will have no liability (for indemnification or otherwise) with respect to any representation or warranty, or covenant or obligation to be performed and complied with prior to the Closing Date

10.5  **Ժամանակի Սահմանափակում:** Եթե Կատարումն տեղի ունենա, Վաճառողները չեն ունենա որևէ պարտավորություն (փոխհատուցման կամ այլ) առանչվող որևէ հայտարարության կամ երաշխավորության, կամ խոստումնան կամ պարտավորության կատարման և իրականացման հետ միմչև Կատարման Ամսաթիվը՝ բացի Բաժիններ 3.3, 3.11, 3.13 և 3.19-ում նշվածները, եթե Գնորդը՝ 2007թ-ի հունվարի 1-ին կամ դրանից առաջ Վաճառողներին չծանուցի որևէ հայցի մասին մասնավորելով այդ հայցի փաստացի հիմք ողջամիտ մանրամասներով և Գնորդին հայտնի չափով. Բաժիններ 3.3, 3.11, կամ 3.19-ի, կամ որևէ հայտարարության կամ երաշխավորության կամ որևէ խոստման կամ պարտավորության միմչև Կատարման Ամսաթիվն իրականացման վրա չհիմնված փոխհատուցման կամ վճարների հատուցման հայցերը կարող են ներկայացվել ցանկացած ժամանակ: Եթե Կատարումն տեղի ունենա, Գնորդը չի ունենա որևէ պարտավորության (փոխհատուցման համար կամ այլ) առանչվող որևէ հայտարարության, կամ խոստումնան կամ պարտավորության միմչև Կատարման Ամսաթիվն կատարվածի կամ իրականացվածի հետ:

10.6  **Procedure for Indemnification--Third Party Claims.**

    (a)    Promptly after receipt by an indemnified party under Section 10.2, 10.4, or (to the extent provided in the last sentence of Section 10.3) Section 10.3 of notice of the commencement of any Proceeding against it, such indemnified party will, if a claim is to be made against an indemnifying party under such Section, give notice to the indemnifying party of the commencement of such claim, but the failure to notify the indemnifying party will not relieve

10.6  **Փոխհատուցման Գործընթացը -- Երրորդ Կողմի Հայցեր:**

    (ա)    Փոխհատուցված կողմի կողմից Բաժիններ 10.2, 10.4, կամ (Բաժին 10.3-ի վերջին նախադասության մեջ ներկայացված չափով) Բաժին 10.3-ի համաձայն իր դեմ որևէ Վարույթի սկսելու վերաբերյալ ծանուցում ստանալուց անմիջապես հետո այդ փոխհատուցվող կողմը կծանուցի փոխհատուցող կողմից նման հայցի ներկայացված առնչությամբ եթե հայցը պետք է ներկայացվի փոխհատուցող կողմին համաձայն նշված Բաժնի, սակայն փոխհատուցող կողմին չծանուցելը

*93*

indemnifying party will not relieve the indemnifying party of any liability that it may have to any indemnified party, except to the extent that the indemnifying party demonstrates that the defense of such action is prejudiced by the indemnifying party's failure to give such notice.

(b)    If any Proceeding is brought against an indemnified party and it gives notice to the indemnifying party of the commencement of such Proceeding, the indemnifying party will, unless the claim involves Taxes, be entitled to participate in such Proceeding and, to the extent that it wishes (unless (i) the indemnifying party is also a party to such Proceeding and the indemnified party determines in good faith that joint representation would be inappropriate, or (ii) the indemnifying party fails to provide reasonable assurance to the indemnified party of its financial capacity to defend such Proceeding and provide indemnification with respect to such Proceeding), to assume the defense of such Proceeding with counsel satisfactory to the indemnified party and, after notice from the indemnifying party to the indemnified party of its election to assume the defense of such Proceeding, the indemnifying party will not, as long as it diligently conducts such defense, be liable to the indemnified party under this Section 10 for any fees of other counsel or any other expenses with respect to the defense of such

չի ազատի փոխհատուցող կողմին որևէ փոխհատուցվված կողմի ընկատմամբ ունեցած որևէ պատասխանատվությից, բացի այն դեպքերից երբ փոխհատուցող կողմն ապրհատուցող կողմին իմ ապրհատուցող մանմանված որոշված լավիով (բացառությամբ այն դեպքերի երբ այն վիճակ ծանուցման չներկայացնելու փաստով:

(ը)    Նթե որևէ Վարույթ հարուցվի փոխհատուցվված կողմի դեմ եև նա ծանույց փոխհատուցող կողմին նշված Վարույթի հարուցման մասին, փոխհատուցող կողմը բացի այն դեպքից երբ հայցր ներառում է Հարկերիհ վերաբերող խնդիրներ, իրավասու կլինի մասնակցել այդ Վարույթին իմ ցանկությամբ որոշված լավիով (բացառությամբ այն դեպքերի երբ (i) փոխհատուցող կողմը նույնպես հանդիսանում է այդ Վարույթի կողմ եւ երբ փոխհատուցվված կողմը որոշում է բարի կյանքի համաձայն որ միասնական ներկայացուցչությունը նպատակահարմար չէ, կամ (ii) փոխհատուցող կողմը փոխհատուցվող կողմին չի ներկայացնում իմ ֆինանսական ունակության վերաբերյալ համապատասխանանեն ճնաճ Վարույթը պաշտպանելու եւ ճնան Վարույթի վերաբերյալ փոխհատուցմ տրամադրելու վերաբերյալ), փոխհատուցվված կողմին բավարարող խորհրդատուի մասնակցությամբ ընդունի Վարույթման պաշտպանություն եւ, փոխհատուցող կողմից ճնան Վարույթի պաշտպանությունը ընդունելու մասին ծանուցումը փոխհատուցվված կողմին տրամադրելուց հետո, փոխհատուցող կողմն այլեւս պատասխանատվություն չի ունենա փոխհատուցվված կողմի նստակկնամբ

92

respect to the defense of such Proceeding, in each case subsequently incurred by the indemnified party in connection with the defense of such Proceeding, other than reasonable costs of investigation. If the indemnifying party assumes the defense of a Proceeding, (i) it will be conclusively established for purposes of this Agreement that the claims made in that Proceeding are within the scope of and subject to indemnification; (ii) no compromise or settlement of such claims may be effected by the indemnifying party without the indemnified party's consent unless (A) there is no finding or admission of any violation of Legal Requirements or any violation of the rights of any Person and no effect on any other claims that may be made against the indemnified party, and (B) the sole relief provided is monetary damages that are paid in full by the indemnifying party; and (iii) the indemnified party will have no liability with respect to any compromise or settlement of such claims effected without its consent. If notice is given to an indemnifying party of the . commencement of any Proceeding and the indemnifying party does not, within ten days after the indemnified party's notice is given, give notice to the indemnified party of its election to assume the defense of such Proceeding, the indemnifying party will be bound by any determination made in such Proceeding or any compromise or settlement effected by the indemnified party.

սույն Բաժնի 10-ի համաձայն այլ խորհրդատուների վճարների կամ ծչված Վարուրյում պաշտպանության յուրաքանչյուր դեպքում ծչված Վարույում փոխհատուցված կողմի համար պաշտպանության վերաբերյալ այլ ծախսերի մասով բացի դեն այն պատշաճ քեղպել իրականացնում է այդ պաշտպանությունը՝ քննության ողջամիտ ծախսերից բացի: Եթե փոխհատուցող կողմն ընդունի Վարույթի պաշտպանությունը, (i) սույն Պայմանագրի նպատակներով ամերկբա կիսատատվլի որ այդ Վարույում ներկայացվ ծ հայցերը գտնվում են փոխհատուցման շրջանակներում եւ համապատասխանում են դրա առարկային, (ii) առանց փոխհատուցված կողմի համաձայնության ծչված հայցի վերաբերյալ փոխհատուցող կողմի կողմից չի կատարվի որեէ զիջում կամ ձեռ չի բերվի որեէ համաձայնության բացառությամբ այն դեպքերի երբ (Ա) չի պարզվել կամ հայտնաբերվել Օրենքի Պահանջի որեէ խախտում կամ որեէ Անձի իրավունքների որեէ խախտում եւ գոյություն չունի որեէ ազդեցություն փոխհատուցված անձի դեմ հնարավոր ցանկացած այլ հայցի վրա, եւ (Բ) միակ փոխհատուուցունը դրամական փոխհաացումներ են որոնք վճարվում են ամբողջականորեն փոխխատուցող անձի կողմից, եւ (iii) փոխհատուցվել անձի չի ունենա որեէ պատասխանատվություն առնչվող որեէ զիջման կամ համաձայնության հետ որոնք տրվել են առանց իր համաձայնության: Եթե որեէ Վարույթի մասին ծանուցումները տրվել են փոխհատուցող կողմին եւ փոխհատուցող անձը փոխհատուցված անձից ծանուցումը ստանալուց հետո փոխհատուցված անձին չի ծանուցում Վարույթի պաշտպանությունն ընդունելու

93

վերաբերյալ, փոխխատուցող անձին պարտավորված կլինի տվյալ Վարույթի որևէ որոշմամբ կամ որևէ զիջմամբ կամ համաձայնությամբ որը կրճնդուևվի փոխխատուցվսծ անձև կռղմից:

(c)     Notwithstanding the foregoing, if an indemnified party determines in good faith that there is a reasonable probability that a Proceeding may adversely affect it or its affiliates other than as a result of monetary damages for which it would be entitled to indemnification under this Agreement, the indemnified party may, by notice to the indemnifying party, assume the exclusive right to defend, compromise, or settle such Proceeding, but the indemnifying party will not be bound by any determination of a Proceeding so defended or any compromise or settlement effected without its consent (which may not be unreasonably withheld).

(q)     Չնայած վերը նշվածին, եթե փոխխատուցված անձը որոշի բարի կամքի համաձայն որ գոյություն ունի ողջամիտ հնարավորություն որ Վարույթը կարող է բացասաբար ազդել իր կամ իր փոխկապակցված անձանց վերաբերյալ բացի դրամարային վնասները որոց համար նա իրավասուտ է փոխխատուցման սույն Պայմանագրի համաձայն, փոխխատուցված անձը կարող է, փոխխատուցող անձին ծանուցելով, ընդունել բացառիկ իրավունքը պաշտպանելու, զիջելու, կամ համաձայնության գալու ճմաև Վարույթում, սակայն փոխխատուցող անձը իր պարտավորված չի լինի Վարույթի որևէ որոշմամբ եթե այն պաշտպանվելի կամ զիջվի կամ դրա նկատմամբ համաձայնություն ձեռքբերվի առանց իր համաձայնության (որը չի կարող անողջամտորեն մերժվել):

(d)     Sellers hereby consent to the non-exclusive jurisdiction of any court in which a Proceeding is brought against any Indemnified Person for purposes of any claim that an Indemnified Person may have under this Agreement with respect to such Proceeding or the matters alleged therein, and agree that process may be served on Sellers with respect to such a claim anywhere in the world.

(դ)     Վաճառողներս սույնով համաձայնում են որևէ դատարանին ոչ բացառիկ ընդդատությունը որտեղ որևէ Վարույթ կիրառվելի որևէ Փոխխատուցված Անձի դեմ որևէ հայցի նպատակակերով որը Փոխխատուցված Անձն կարող է ունենա սույն Պայմանագրի համաձայն ճմաև Վարույթի առնչույթյամբ կամ դրանով ենթադրվող խնդիրների վերաբերյալ, եև համաձայն է որ գործընթացը կարող է կիրառվել Վաճառողներին նկատմամբ ճմաև հայցի առնչույթյամբ աշխարհի որևէ մասում:

94

**10.7  Procedure for Indemnification—Other Claims.** A claim for indemnification for any matter not involving a third-party claim may be asserted by notice to the party from whom indemnification is sought.

**11.  GENERAL PROVISIONS.**

**11.1  Expenses.** Except as otherwise expressly provided in this Agreement, each party to this Agreement will bear its respective expenses incurred in connection with the preparation, execution, and performance of this Agreement and the Contemplated Transactions, including all fees and expenses of agents, representatives, counsel, and accountants in connection with this Agreement and the Contemplated Transactions. Sellers will cause the Acquired Companies not to incur any out-of-pocket expenses in connection with this Agreement. In the event of termination of this Agreement, the obligation of each party to pay its own expenses will be subject to any rights of such party arising from a breach of this Agreement by another party.

**11.2  Public Announcements.** Any public announcement or similar publicity with respect to this Agreement or the Contemplated Transactions will be issued, if at all, at such time and in such manner as Buyer determines. Unless consented to by Buyer in advance or required by Legal Requirements, prior to the Closing Sellers shall, and shall cause the Acquired Company to, keep this Agreement strictly confidential and may not make any disclosure of this Agreement to any Person. Sellers and Buyer will consult with each other concerning the means by which the Acquired Company's

**10.7  Փոխհատուցման Գործընթացը -- Այլ Հայցեր:** Նրբորդ անձի հայց չպարունակող որեւէ խնդրի վերաբերյալ փոխհատուցման հայցը կարող է հարուցվել ծանուցման միջոցով անձին ումից պահանջվում է փոխհատուցում:

**11.  ԸՆԴՀԱՆՈՒՐ ԴՐՈՒՅԹՆԵՐ:**

**11.1  Ծախսեր:** Սույն Պայմանագրում այլ կերպ ներկայացվածից բացի, սույն Պայմանագրի յուրաքանչյուր կողմ կկրի իր համապատասխան ծախսերը որոնք կգոյանան սույն Պայմանագրի եւ Նախատեսված Գործառքների պատրաստմման, ստորագրման, եւ իրականացման հետ կապված, ներառյալ բոլոր գործակալների, ներկայացուցիչների, խորհրդատուի, եւ հաշվապահների վճարները եւ ծախսերը կապված սույն Պայմանագրի եւ Նախատեսված Գործառքների հետ: Վաճառողները Ձեռքբերված Ընկերությունները թույլ չեն տա կրել որեւէ կողմնակի ծախսեր կապված սույն Պայմանագրի հետ: Սույն Պայմանագրի դադարման դեպքում, յուրաքանչյուր կողմի պարտավորությունը կապված իր սեփական ծախսերի կրման հետ ենթակա է մյուս կողմի կողմից սույն Պայմանագրի խախտումից ծագած այդ կողմի ցանկացած իրավունքների մաս:

**11.2  Հանրային Հայտարարություններ:** Սույն Պայմանագրի կամ Նախատեսված Գործառքների հետ կապված որեւէ հանրային հայտարարություն կկատարվի, եթե ընդհանրապես կատարվի, Գնորդի կողմից որոշված ժամանակ եւ ձեւով: Բացի Գնորդի կողմից նախորոք համաձայնեցրած եւ Օրենքի Պահանջով պահանջված դեպքերից, մինչեւ Կատարման Ամսաթիվը Վաճառողները անձամբ, եւ Ձեռքբերված Ընկերության միջոցով, պետք է պահեն սույն Պայմանագիրը խիստ գաղտնի եւ չպետք է բացահայտեն սույն Պայմանագիրը որեւէ Անձի: Վաճառողները եւ Գնորդը կխորհրդակցեն միմյանց հետ

95

means by which the Acquired Company's employees, customers, and suppliers and others having dealings with the Acquired Companies will be informed of the Contemplated Transactions, and Buyer will have the right to be present for any such communication.

11.3 **Confidentiality.** Between the date of this Agreement and the Closing Date, Sellers will maintain in confidence, and will cause the officers, employees, agents, and advisors of Buyer and the Acquired Company to maintain in confidence this Agreement or the Contemplated Transactions, unless (a) such information is already known to such party or to others not bound by a duty of confidentiality or such information becomes publicly available through no fault of such party, (b) the use of such information is necessary or appropriate in making any filing or obtaining any consent or approval required for the consummation of the Contemplated Transactions, or (c) the furnishing or use of such information is required by legal proceedings.

11.4 **Notices.** All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by telecopier (with written confirmation of receipt), provided that a copy is mailed by registered mail, return receipt requested, or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested), in each case to the appropriate addresses and telecopier numbers set forth below (or to such other addresses and telecopier

Նախատեսված Գործարքների մասին Ձեռքբերված Ընկերության աշխատողներին, հաճախորդներին, եւ առաքողներին եւ այլ գործ ունեցողներին կտրվեր տեղեկակալու միջոցների վերաբերյալ, եւ Գնորդը իրավունք կունենա ներկա գտնվելու նման յուրաքանչյուր տեղեկացման ժամանակ:

11.3 **Գաղտնապահություն:** Սույն Պայմանագրի եւ Կատարման Ամսաթվի միջեւ ընկած ժամանակահատվածում, Վաճառողները գաղտնի կպահեն, եւ Ձեռքբերված Ընկերության եւ Գնորդի պաշտոնյաներին, աշխատողներին, գործակալներին, եւ խորհրդատուներին գաղտնի պահել կստանա սույն Պայմանագիրը եւ Նախատեսված Գործարքները, բացառությամբ, եթե (ա) նշված տեղեկությունն արդեն հայտնի է այդ կողմերին կամ գաղտնապահության պարտավորվլած այլ կողմերին կամ եթե նշված տեղեկությունը դառնում է հայտնի հանրությանը առանց նման կողմի մեղքի, (բ) նշված տեղեկության օգտագործումն անհրաժեշտ եւ համապատասխան է որեւէ գրանցում կատարելու կամ որեւէ համաձայնություն կամ հաստատում ստանալու համար որը կպահանջվի Նախատեսված Գործարքների իրականացման համար, կամ (գ) նշված տեղեկության տրամադրումը կամ օգտագործումը պահանջվում է իրավական գործընթացներով:

11.4 **Ծանուցումներ:** Սույն Պայմանագրով սահմանված բոլոր ծանուցումները, համաձայնությունները, եւ այլ հաղորդագրությունները պետք է լինեն գրավոր եւ կհամարվեն պատշաճ կերպով տրված երբ (ա) ուղղարկվել անձամբ (ստացման գրավոր հաստատումմվ), (բ) ուղղարկվել հեռապատճենով (ստացման գրավոր հաստատումով), պայմանով որ պատճենը ուղղարկվել գրանցված փոստով, ստացման ստացական պահանջելվ, կամ (գ) երբ ստացվում է հասցեատիրոջ կողմից, եթե ուղղարկվել է ազգորեն հանճնահյուտ սուրհանդակային ծառայությամբ (ստացական պահանջելով), յուրաքանչյուր դեպքում ուղղարկված լինելով

such other addresses and telecopier numbers as a party may designate by notice to the other parties):

11.5     **Arbitration ;Jurisdiction; Service of Process.** The Parties acknowledge that they are entering into and shall perform under this Agreement in good faith, and any disputes will be resolved in good faith, with the letter and spirit of this Agreement as the standard. The Parties will use their best efforts to resolve any disputes between themselves within thirty (30) days. During this thirty (30) day period, any party with ten (10) days' notice may request and the other party must agree to meet in good faith to resolve the dispute. After thirty day's effort, if a dispute is not resolved, any party may refer the dispute for final settlement to and in accord with under the Rules of Conciliation and Arbitration of the International Chamber of Commerce, London, England (the "Rules") by a panel of three (3) arbitrators. In the case of any matter to be settled under the Rules, each party hereto shall appoint one arbitrator and such two arbitrators shall appoint a third arbitrator; provided, that if all three arbitrators have not been appointed within thirty (30) days after the party submitting the matter in dispute has notified the other party of such submission, either party hereto may apply to the International Chamber of Commerce for appointment of the remaining arbitrators. The place of arbitration of any matter to be settled under the Rules shall be in New York City, or at such other place as the parties shall unanimously choose. On a case-by-case basis, the parties may also agree to alternative dispute resolution methods. Such an Agreement must be in writing and signed by both parties.

համապատասխան հասցեով կամ հեռապատճենիչ ինչպես նշված է ներքևում (կամ այլ հասցեներին կամ հեռապատճենիչ համարներին որոնք կողմերը կնշեն):

11.5     **Արբիտրաժ, Ընդդատություն, Գործընթաց:** Կողմերն ընդունում են, որ նրանք մտնում են սույն Պայմանագիրը և պետք է գործեն ըստ սույնի բարի կամքի հիման վրա, և որ ցանկացած վեճ պետք է լուծվի ըստ բարի կամքի՝ սույն Պայմանագրի ոգուն եւ տառին համապատասխան: Կողմերը պետք է իրենց ուժերի սահմաններում գործադրեն բոլոր ջանքերը իրենց միջև ծագած վեճերը երեսուն (30) օրվա ընթացքում լուծելու համար: Այդ երեսուն (30) օրվա ընթացքում ցանկացած կողմ տաս (10) օր առաջ ներկայացված ծանուցմամբ կարող է դիմել մյուս կողմին հանդիպմ��ան համար, եւ մյուս կողմը պետք է համաձայնվի հանդիպել բարի կամքով վեճը լուծելու համար: Երեսուն օրվա ջանքերից հետո, եթե վեճը դեռ չի լուծված, ցանկացած կողմ կարող է վեճն ուղղել Առևտրի Միջազգային Պալատի (Լոնդոն, Անգլիա) Հաշտեցման եւ Արբիտրաժի Կանոններով (Կանոններ) լուծման համար, երեք արբիտրից բաղկացած դատարանին միջոցով: Ըստ Կանոնների վեճի լուծման ներքում յուրաքանչյուր կողմ պետք է նշանակի մեկ արբիտոր, եւ այդ երկու արբիտորները պետք է նշանակեն երրորդ արբիտորին. պայմանով, որ եթե բոլոր երեք արբիտորները չեն նշանակվում վեճը լուծման ներկայացնող կողմի մյուս կողմին այդ ներկայացման մասին տեղյակ պահելուց հետո երեսուն (30) օրվա ընթացքում, սույնի յուրաքանչյուր կողմ կարող է դիմել Միջազգային Առևտրի Պալատ մնացած արբիտորներին նշանակելու համար: Ըստ Կանոնների վեճի լուծման արբիտրաժի վայրը պետք է հանդիսանա Նյու-Յորք քաղաքը, կամ կողմերի ընդունությամբ մեկ այլ վայր: Որոշ դեպքերում կողմերը կարող են մաս��ավորել վեճերի լուծման այլընտրանքային եղանակներ��ր շուրջ: Նման Համաձայնագիր պետք է լինի գրավոր և ստորագրվի երկու կողմերի

97

signed by both parties.

կողմից:

**11.6  Applicable Law, Institution.** This Agreement is an international Agreement and shall be governed and construed in accordance with the substantive laws of New York, without regard to conflict of laws provisions. Each party hereto hereby irrevocably and unconditionally agrees that any action to enforce a decision rendered in an arbitration proceeding described in Article 8 may be instituted (i) in Armenian courts, (ii) in the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts thereof, or (iii) in the courts of the United Kingdom and hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection of the convenience of the forum of any such legal suit, action or proceeding and irrevocably submits generally and unconditionally to the jurisdiction in any such court in any suit, action or proceeding.

**11.6  Կիրառվող Օրենք, Իրականացում:** Սույն Պայմանագիրը համարվում է Միջազգային Պայմանագիր, եւ պետք է ղեկավարվի եւ մեկնաբանվի Նյու Յորքի համապատասխան օրենքների համաձայն, առանց կոլիզիոն նորմերի կիրառման: Յուրաքանչյուր կողմ հստակորեն եւ անվերապահորեն համաձայնվում է, որ Հոդված 8-ում մեջբերվածՑ այլընտրանքի որոշման կատարմանն ուղղված ցանկացած գործողություն կարող է իրականացվել. (i) Հայաստանի դատարաններում, (ii) Նյու Յորքի նահանգի դատարաններում, Ամերիկայի Միացյալ Նահանգների Նյու Յորքի Հարավային Շրջանի դատարաններում եւ նման վերաբերեկ դատարաններում, կամ (iii) Միացյալ Թագավորության դատարաններում, և սույնով կիրառելի օրենքով սահմանված առավելագույն չափով հրաժարվում է ցանկացած առարկությունից, որն իմբը կարող է ունենալ այժմ կամ հետագայում նման դատավարության, դատական սլրոցեսի տեղի, դատարանի ընդրության, կամ նման դատավարության տեղի հարմարության վերաբերյալ, ինչպես նաև ամբողջապես եւ անվերապահորեն ընդունում է նման դատարանի որոշումները ցանկացած հայցի կամ այլ գործողության վերաբերյալ:

**11.7  Further Assurances.** The parties agree (a) to furnish upon request to each other such further information, (b) to execute and deliver to each other such other documents, and (c) to do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the documents referred to in this Agreement.

**11.7  Հետագա Հավաստիացումներ:** Կողմիցֆ համաձայն են (ա) ըստ միմյանց խնդրանքների միմյանց ներկայացնել տեղեկություններ, (բ) ստորագրել եւ միմյանց տրամադրել այլ փաստաթղթեր, եւ (գ) կատարել այլ նման քայլեր եւ գործողություններ, որոնք միյու կողմը կարող է ողջամտորեն պահանջել սույն Պայմանագրի եւ սույն Պայմանագրում սահմանված փաստաթղթերի միտումն կատարելու համար:

**11.8  Waiver.** The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither

**11.8  Հրաժարում:** Սույն Պայմանագրի կողմերի իրավունքները եւ իրավական միջոցները հավաքական են եւ

98

are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

**11.9   Entire Agreement and Modification.** This Agreement supersedes all prior agreements between the parties with respect to its subject matter and constitutes (along with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. This Agreement may not be amended except by a written agreement executed by the party to be charged with the amendment.

ոչ ընտրողական: Սույն Պայմանագրով կամ սույն Պայմանագրում սահմանված որևէ, փաստաթղթերի համաձայն որևէ իրավունքի, իրավասության կամ արտոնության չկիրառումն չի սահմանում նման իրավունքից, իրավասությունից կամ արտոնությունից հրաժարում, և նման իրավունքի, իրավասության կամ արտոնության մեկ անգամյա կամ մասնակի կիրառումն չի սահմանափակում այդ իրավունքի հետագա կիրառում։ Գործող օրենսդրությամբ սահմանված առավելագույն չափով, (ա) սույն Պայմանագրից կամ սույն Պայմանագրով սահմանված փաստատղթերից բխող ոչ մի հայց կամ իրավունք չի կարող սպառվել կողմերից մեկի կողմից, ամբողջությամբ կամ մասամբ, հայցից կամ իրավունքից հրաժարման կամ ժեղյալ համարելու միջոցով բացի մյու կողմի կողմից գրավոր և ստորագրած փաստաթղթի ներկայացման դեպից, (բ) կողմերից մեկի կողմից տրված հրաժարումն չի կարող կիրառելի ողամնալ բացի որոշակի դեպքում որի համար տրվել է, և (գ) որևէ կողմին ներկայացված որևէ ծանուցում կամ պահանջ չի կարող համարվել այն կողմի որևէ պարտավորությունից հրաժարում կամ ծանուցումն կամ պահանջը ներկայացնող կողմի՝ սույն Պայմանագրի կամ սույն Պայմանագրով սահմանված փաստաթղթերի համաձայն հետագա քայլեր առանց ծանուցման կամ պահանջ ներկայացնելու կիրառման որևէ իրավունքից հրաժարում:

**11.9   Ամբողջ Համաձայնություն և Փոփոխություն։** Սույն Պայմանագիրը գերակայում է կողմերի միջև սույն խնդրի վերաբերյալ բոլոր նախկին պայմանագրերի նկատմամբ և հանդիսանում է (սույն Պայմանագրում սահմանված փաստաթղթերի հետ միասին) կողմերի միջև սույն խնդրո առարկայալի վերաբերյալ պայմանագրի պայմանների ամբողջական և բացառիկ ամբողջական և բացառիկ համաձայնություն: Սույն Պայմանագիրը չի կարող փոփոխվել բացի փոփոխությանը ենթարկվող կողմի գրավոր համաձայնության:

99

*101*

11.10  Disclosure Letter.

(a)  The disclosures in the Disclosure Letter, and, those in any Supplement thereto, must relate only to the representations and warranties in the Section of the Agreement to which they expressly relate and not to any other representation or warranty in this Agreement.

(b)  In the event of any inconsistency between the statements in the body of this Agreement and those in the Disclosure Letter (other than an exception expressly set forth as such in the Disclosure Letter with respect to a specifically identified representation or warranty), the statements in the body of this Agreement will control.

11.11  Assignments. Successors and No Third Party Rights.  Neither party may assign any of its rights under this Agreement without the prior consent of the other parties, which will not be unreasonably withheld, except that Buyer may assign any of its rights under this Agreement to any Subsidiary of Buyer. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the parties. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this

11.10  Բացահայտման Նամակ:

(ա)  Բացահայտման Նամակում կատարված բացահայտումները, եւ դրա Հավելման մեջ կատարված բացահայտումները, պետք է վերաբերվեն սույն Պայմանագրի այն Բաժնում կատարված հայտարարություններին եւ երաշխավորություններին որոնց դրանք վերաբերվում են, եւ ոչ սույն Պայմանագրի ցանկացած այլ հայտարարության կամ երաշխիքին:

(բ)  Սույն Պայմանագրի եւ Բացահայտման Նամակի որեւէ սահմանումների միջեւ անհամապատասխանության դեպքում (բացի Բացահայտման Նամակում հստակ կերպով սահմանված բացառությամբ մասնավորապես հստակեցված հայտարարության կամ երաշխիքի առնչությամբ սրդված), գերակայում են սույն Պայմանագրի սահմանումները:

11.11  Փոխանցումներ: Իրավահաջորդներ եւ Երրորդ Կողմերի Իրավունքների Բացակայություն: Կողմերից ոչ մեկի չի կարող փոխանցել սույն Պայմանագրով սահմանված իր որեւէ իրավունքները առանց մյուս կողմերի նախնական համաձայնության, որը չպետք է մերժվի անհրաժեշտորեն, բացառությամբ որ Գնորդը կարող է փոխանցել սույն Պայմանագրով իր ցանկացած իրավունքները իր որեւէ Դուստր Ընկերությանը: Նախորդ նախապատաստության պայմանով, սույն Պայմանագիրը կիրառավի, կպարտավորեցնի բոլոր առումներով, եւ կիրավականացվի կողմերի իրավահաջորդների եւ ներկայացուցիչների նկատմամբ: Սույն Պայմանագրում սահմանված ոչինչ չի կարող մեկնաբանվել որպես սույն Պայմանագրի կողմերից բացի

100

*102*

this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

որեւէ Անձին իրավական կամ օրինական իրավունք, փոխհատուցում, կամ սույն Պայմանագրի կամ նրա որեւէ դրույթի համաձայն որեւէ հայց շ2նորհող: Սույն Պայմանագրի բոլոր դրույթները եւ պայմանները պետք է ծառայեն միայն եւ բացառապես սույն Պայմանագրի կողմերին եւ նրանց իրավահաջորդներին եւ ներկայացուցիչներին:

**11.12  Severability.** If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**11.12  Տրոհելիություն:** Եթե սույն Պայմանագրի որեւէ դրույթ ճանաչվի ոչ իրական կամ ոչ կիրառելի որեւէ ընդդատություն ունեցող դատարանի կողմից, սույն Պայմանագրի մնացած դրույթները կմնան ուժի մեջ: Սույն Պայմանագրի որեւէ դրույթ որը ճանաչվում է ոչ իրական կամ ոչ կիրառելի որեւէ մասով կամ աստիճանով կմնա ուժի մեջ եւ կիրառելի մնացած մասով կամ աստիճանով:

**11.13  Section Headings, Construction.** The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All references to "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

**11.13  Բաժինների Վերնագրեր, Կառուցվածք:** Սույն Պայմանագրի Բաժինների վերնագրերը ներկայացված են բացառապես հարմարության համար եւ չեն ազդում դրա կառուցվածքի կամ մեկնաբանման վրա: «Բաժին»-ին կամ «Բաժիններ»-ին կատարված բոլոր հղումները վերաբերվում են սույն Պայմանագրի Բաժնին կամ Բաժիններին կատարված: Սույն Պայմանագրում օգտագործված բոլոր բառերը պետք է մեկնաբանվեն սեռով կամ թվով ինչպես կպահանջեն հանգամանքները: Բացառությամբ այլ կերպ սահմանվածի, «ներառյալ» բառը չի սահմանափակում նախորդ բառերը կամ սահմանումները:

**11.14  Time of Essence.** With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**11.14  Ժամանակի Կարեւորություն:** Սույն Պայմանագրում ներկայացված ամսաթվերի եւ ժամանակահատվածների առումով, ժամանակը կարեւոր է:

**11.15  Governing Law.** This Agreement will be governed by the laws of the State of New York without regard to

**11.15  Կիրառվող Օրենք:** Սույն Պայմանագիրը պետք է ղեկավարվի Նյու Յորքի նահանգի օրենքներով առանց

101

the State of New York without regard to conflicts of laws principles.

11.16  Counterparts, Language. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. This Agreement has been prepared in English. All documents, notices, waivers and all other communication written or otherwise between the parties hereto in connection with this Agreement shall be in English. This Agreement shall also be translated into and executed in Armenian. If there is any inconsistency between the versions, English version shall prevail.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

Կոլիզիոն նորմերի կիրառման:

11.16  Կրկնօրինակներ, Լեզու: Սույն Պայմանագիրը կարող է ստորագրվել մեկ կամ մի քանի կրկնօրինակներով, որոնցից յուրաքանչյուրը պետք է համարվի սույն Պայմանագրի բնօրինակն եւ որոնցից բոլորը, միասին վերցված, պետք է համարվեն մեկ եւ միեւնույն պայմանագիրը: Սույն Պայմանագիրը պատրաստվել է անգլերեն լեզվով: Սույն Պայմանագրի հետ կապված, կողմերի միջեւ գրավոր կամ այլ կերպ կատարվող բոլոր փաստաթղթերը, ծանուցումները, հրաժարումները եւ այլ հաղորդագրությունները պետք է լինեն անգլերեն: Սույն Պայմանագիրը պետք է նաեւ թարգմանվի եւ ստորագրվի հայերեն լեզվով: Տարբերակների միջեւ որեւէ անհամապատասխանության դեպքում գերակայում է անգլերեն տարբերակը:

Ի ՎԿԱՅՈՒԹՅՈՒՆ ՈՐԻ, կողմերը ստորագրում եւ տրամադրում են սույն Պայմանագիրը վերը նշված ամսաթվին:

Signed for and on behalf of the Sellers

Signed for and on behalf of the Buyers

Ստորագրված է Վաճառողների անունից եւ կողմից

Ստորագրված է Գնորդի անունից եւ կողմից

Yuri Hatazyan

Van Krikorian Vice President Global Gold Mining, LLC

Grigor Lusparyan

Van Krikoryan Փոխնախագահ Global Gold Mining, LLC

Mayren Batoyan

Bagrat Jehirich Maiken

Sargsen Kullodyan

Edward Janibekian

Edvard Janibekyan

*104*

Երկու հազար չորս թվականի _վիթորնակցի ջառանիայի_

սույն պատճանագիրը վավերացված է իմ՝ *Կենտրոն* նոտարական տարածքի նոտար

Էլենա Ռ. Սարգսյանիս կողմից:

Կողմերը պայմանագիրը ստորագրեցին իմ ներկայությամբ: Կողմերի, նրանց

ներկայացուցիչների ինքնությունը, գործունակությունը և (կամ) իրավունակությունը

ստուգված են:

Գրանցված է սեղանամատյանում _2606_ -ով

Ջանձնված են ակնրական և ժառայունթյան տուրքեր համաձայ
ԲՋնոսական տուրքի Սեսւն և ենորաֆիրաի մսաֆին օրենքներ

Նոտար

Երկու հազար վեց թվականի *ՕԿՏեմբերի* *ջաստաբորբI*
ես, ՀՀ « ԿԵՆՏՐՈՆ » նոտարական տարածքի նոտար Նունե Սարգսյանս
վավերացնում եմ սույն պատճենի իսկությունը իսկականի հետ: Վերջինում
ուղղումներ, ջնջված բառեր և այլ չճանաբացրված ուղղումներ կամ ուրիշ
առանձնահատկություններ չհայտնաբերվեցին:

« ՀՀ Նոտարիատի մասին » օրենքի 65 հոդվածի համաձայն հաստատում
ես փաստաթղթի պատճենի համապատասխանությունը բնօրինակի հետ, այլ
ոչ թե դրանում շարադրված փաստերը:

Գրանցված է սեղանամատյանում հ. *1994 49*

Գանձված է տուրք և ծառայության
վճար համաձայն
ՀՀ« Պետական տուրքի մասին » և
« Նոտարիատի մասին » օրենքների

Ն. ՍԱՐԳՍՅԱՆ





## DISCLOSURE LETTER

December 21, 2003
Global Gold Mining, LLC
104 Field Point Road
Greenwich, CT 06830

Gentlemen:

We refer to the Stock Purchase Agreement (the "Agreement") to be entered into today between the undersigned individuals ("Sellers") and Global Gold Mining, LLC ("Buyer") pursuant to which Sellers are to sell and Buyer is to purchase all of the issued and outstanding capital stock of SHA, LLC (the "Company") as provided in the Agreement.

This letter constitutes the Disclosure Letter referred to in Section 3 of the Agreement. The representations and warranties of Sellers in Section 3 of the Agreement are made and given subject to the disclosures in this Disclosure Letter. The disclosures in this Disclosure Letter are to be taken as relating to the representations and warranties in the section of the Agreement to which they expressly relate and to no other representation or warranty in the Agreement.

Terms defined in the Agreement are used with the same meaning in this Disclosure Letter. References to Appendices are to the Appendices to this Disclosure Letter.

## ԲԱՑԱՀԱՅՏՄԱՆ ՆԱՄԱԿ

21 դեկտեմբերի, 2003թ
Global Gold Mining, LLC
104 Field Point Road
Greenwich, CT 06830

Պարոնայք.

Սույնը վերաբերում է Բաժնեմասի Գնման Պայմանագրին («Պայմանագիր») որը ստորագրվում է այսօր՝ ներքոհիշյալ անձանց («Վաճառողներ») եւ Global Gold Mining, LLC-ի («Գնորդ») կողմից, որի համաձայն Վաճառողները վաճառում իսկ Գնորդը ձեռք է բերում ՍՀԱ ՍՊԸ-ի («Ընկերություն») ամբողջ թողարկված եւ սովորական կապիտալ բաժնեմասը Պայմանագրում սահմանվածի կարգով:

Սույն նամակը համարվում է Պայմանագրի Բաժին 3-ում հիշատակված Բացահայտման Նամակը: Պայմանագրի Բաժին 3-ում ներկայացված Վաճառողների հայտարարությունները եւ երաշխավորությունները կատարվածեն եւ արված են սույն Բացահայտման Նամակի բացահայտումների համաձայն: Սույն Բացահայտման Նամակի բացահայտումները պետք է ընդունվեն Պայմանագրի կոնկրետ բաժնում կատարված հայտարարությունները եւ երաշխավորությունները կապակցությամբ որոնց վրա նրանք հստակորեն վերաբերվում են, եւ ոչ Պայմանագրի այլ հայտարարությունների կամ երաշխավորությունների կապակցությամբ:

Պայմանագրում սահմանված սահմանումները սույն Բացահայտման Նամակում օգտագործված են նույն իմաստներով: Հավելվածներին կատարված հղումները կատարված են սույն Բացահայտման Նամակի Հավելվածների նկատմամբ:

Պայմանագրի Բաժին 3-ի մասով

By reference to Section 3 of the Agreement (using the numbering in such Section), the following matters are disclosed:

3.1 **Acquired Company:**
SHA, LLC

**Jurisdiction:**
Republic of Armenia

**Other Jurisdiction:**
None

**Capitalization:**

| | | |
|---|---|---|
| Yurik Lalazarian | – | 33% |
| Mayren Batoyan | – | 33% |
| Edward Janibekian | – | 34% |

**Certificate of Foundation and Charter:**

Attached (Armenian & English)

3.2 **Exceptions:**
None

3.4 **Financial Statements:**
Attached

3.6 **Property:**
Valid Armenian General Exploration License – Attached with property description (Armenian & English), Valid and exclusive exploration rights to Hankavan and Marjan mines – Attached with property description (Armenian & English)

3.8 **Accounts Receivable:**
None

3.10 **Liabilities:**
None

(թվագրությունը նշված Բաժնի համամայն թերլված լինելով), բացահայտվում է հետևյալը.

3.1 Ձեռքբերված Ընկերությունը
ՍՀԱ, ՍՊԸ

Օրենսդրությունը
Հայաստանի Հանրապետություն

Այլ Օրենսդրություն
Չկա

Կապիտալիզացիա
Յուրիկ Լալազարյան – 33%
Մայրեն Բաթոյան – 33%
Էդվարդ Ջանիբեկյան – 34%

Գրանցման Վկայագիր եւ Կանոնադրությունը
Կցվում են (հայերեն եւ անգլերեն)

3.2 Բացառություններ`
Չկան

3.4 Ֆինանսական Հաշվետություններ`
Կցվում են

3.6 Գույք`
Գործող Հայկական Ընդհանուր Հետախուզման Լիցենզիա –Կցվում է գույքի նկարագրության հետ (հայերեն եւ անգլերեն) Հանքավանի եւ Մարջանի հանքավայրերի Իրավական եւ Բացառիկ Հետախուզման Իրավունքներ – Կցվում են գույքի նկարագրության հետ (հայերեն եւ անգլերեն)

3.8 Ստացվող Հաշուր`
Չկա

3.10 Պարտավորություններ`
Չկան

3.11 Հարկեր/հասույթներ`

3.11 **Taxes/Returns**:
No liabilities, no returns due, no audits

3.13 **Employee Benefits**:
None, no employees

3.14 **Legal Compliance with Law: Government Authorizations**:
No exceptions, 25 year Exploration License, Exclusive Rights to Hankavan and Marjan Mines -- Attached (Armenian & English), no exceptions to validity

3.15 **Legal Proceedings**:
None

3.16 **Absence of Changes**:

No disclosures applicable

3.17 **Contracts**:
Hankavan and Marjan Mines Exploration Agreements Attached (Armenian & English)

3.17(a) **Contract Details**:
(see attached)

3.17(b), (c), and (d)   **Contract Matters**:
No exceptions

3.18 **Insurance**:
No insurance

3.19 **Environmental Matters**:
No exceptions

3.20 **Employees**:
No employees

3.22 **Intellectual Property**:
Not applicable

Պարտավորություններ չկան, հաստույթներ չեն սպասվում, աուդիտներ չկան

3.13 **Աշխատողների Արտոնություններ`**
Չկան, աշխատողներ չկան

3.14 **Օրենքին Ենթարկվելը. Կառավարական Լիազորություններ.**
Առանց բացառությունների, 25 տարվա Հետախուզության Լիցենզիա, Հանքավանի եւ Մարջանի Հանքավայրերի ընկառումը բացառիկ իրավունքներ -- Կցվում են (հայերեն եւ անգլերեն), իսկականն լինելու իմաստով բացառություններ չկան

3.15 **Իրավական Վարույթներ`**
Չկան

3.16 **Փոփոխությունների Բացակայություն`**
Կիրառելի բացահայտումներ չկան

3.17 **Պայմանագրեր`**
Հանքավանի և Մարջանի հանքավայրերի հետախուզությունների պայմանագրեր Կցվում են (հայերեն եւ անգլերեն)

3.17(ա) **Պայմանագրերի մանրամասներ**
(տես կից)

3.17(բ),(գ), եւ (դ)   **Պայմանագրերի Խնդիրներ`**
Բացառություններ չկան ։

3.18 **Ապահովագրություն`**
Ապահովագրություն չկա

3.19 **Միջավայրային Խնդիրներ`**
Բացառություններ չկան

3.20 **Աշխատողներ`**
Աշխատողներ չկան

3.22 **Մտավոր Սեփականություն`**
Չի կիրառվում

Not applicable

Very truly yours,                              Հարգանքով՝

_____          _____
Sellers                                         Վաճառողներ

Buyer acknowledges receipt of the        Գնորդը հաստատում է Բացահայտման
Disclosure Letter of which this is a        Նամակի ստացումը որի պատճեն է
duplicate (including the Appendices         հանդիսանում սույնը (ներառյալ սույնում
referred to therein).                          հիշատակված Հավելվածները):

Dated: _____          Ամսաթիվ՝ _____

BUYER:                                   ԳՆՈՐԴ՝
By:

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

November 2, 2006

Scott Horton
(212) 336-2820
shorton@pbwt.com

Mr. Yurik Lalazaryan
66 Spandarian Street
Etchmiadzin, Armenia

Mr. Edward Janibekian
Apt. 44, b.18, A. Khachatryan Street
Yerevan, Armenia

Ms. Mayren Batoyan
Apt. 28, b.135, A. Babajanian Street
Yerevan, Armenia

Mr. Vardan Ayvazian
Building 22, Block 6
Apt. 16
Charentsavan, Kotaik Region
Armenia
10 Alex Manukian Street
Yerevan, Armenia

## NOTICE OF DISPUTE UNDER SECTION 11.5 OF DECEMBER 21, 2003 SHA, LLC SHARE PURCHASE AGREEMENT

Dear Ms. Batoyan and Messrs. Ayvazian, Janibekyan, and Lalazarian:

This firm represents Global Gold Mining, LLC ("Global Gold") which was the Buyer and your counterparty in the December 21, 2003 share purchase agreement (the "SPA") of all of your shares in the Armenian company SHA, LLC, the license holder to the Marjan and Hankavan mines. Mr. Ayvazian, you are named with the other sellers because based on information from law enforcement authorities, we have learned that in fact you were an undisclosed principal, reviewed and approved the SPA before it was signed, authorized its signature, controlled the transaction, and personally received payment of the purchase price. None of this was known to Global Gold at the time of the transaction. Nevertheless, under the governing law of the SPA stated in Section 11.15 of both the English and the Armenian language versions, you are personally jointly and severally liable for breaches as if you signed the contract in your own name.

Through this letter, and as contemplated in Section 11.5 of the SPA, Global Gold advises you that you have materially breached the SPA in a manner entitling Global Gold to monetary damages and equitable remedies. This letter begins the dispute resolution process provided in Section 11.5 of the SPA. There is now a thirty-day period to resolve our disputes on a good-faith, amicable basis prior to the right to commence international arbitration. For example, and without limiting the generality of the foregoing, the SPA represented and warranted that the licenses for Hankavan and Marjan were valid through 2017. In Mr. Ayvazian's official capacity, however, he has himself purported to terminate the licenses and in



November 2, 2006
Page 2

the case of Hankavan actually issued a competing illegal license to another company, which is a mere shell. In addition, there have been multiple interferences with Global Gold's and SHA's abilities to operate under the transferred licenses and a complete failure to act in good faith. All of this has been documented and unfortunately been made the subject of media attention and libelous statements by Mr. Ayvazian. This course of behavior and situation has resulted in actual and potential damage to Global Gold which if not corrected we expect to be in the millions of dollars.

In beginning this process, we hope that we can agree to a solution that will eliminate this damage and allow the actions agreed in the SPA to go forward as anticipated and agreed at the time. You or your attorney can contact me via the fax or email coordinates on this letter with a mandatory copy to Global Gold's Regional Director in Yerevan. You should understand that your diligent attention to this matter is necessary. As a convenience to you an Armenian translation of this letter is also provided. We look forward to an amicable resolution, but please be assured that if none is forthcoming promptly, enforcement of Global Gold's rights under domestic and international law will not be compromised.

Very truly yours,

Scott Horton

Cc:  Global Gold Mining
      Greenwich, CT - Yerevan, Armenia

1321349v1

November 15, 2006-11-24                                    Yerevan

TO: Global Gold Mining
    Mr. Scott Horton
    (through lawyer Hrayr Ghoukassian)


Dear Sir,


I received your November 2, 2006, letter addressed to me, in which you are trying to put in claims towards me, as a shareholder/member of SHA LLC, that, allegedly, some provisions of the share purchase agreement (SPA) were violated that has become a reason for financial losses. In regard with this, I would like to state the following: The geological exploration license #076, which makes an indivisible part of the SPA and was provided to SHA LLC for the time period until April 5, 2017, refers to the implementation of geological exploration at deposits of metal and non-metal minerals and it has never had and could never have any relation to the exploration issues at certain deposits. In other words, the aforementioned license is a permit for implementation of such type of activities and nothing else. As for the issue of implementation of geological researches at certain deposits, then, according to the legislation, which was valid as of the day of the SPA signing, they were being regulated by a permit for implementation of geological and exploration works at relevant deposit, and it [*the permit*] is issued by the Ministry of Environment for a certain term. And attached to the SPA we transferred to you the permit #221 dated April 26, 2002, which was provided to SHA LLC for implementation of geological and exploration works at Marjan deposit. And the term of its validity was from II quarter of 2002–IV quarter of 2007. In addition to this, we transferred to you the permit #F-02-13/1 for Hankavan deposit, the term of validity of which was from III quarter of 2002– IV quarter of 2003. By the way, this factor is recorded also in paragraph 3.6 of the "disclosure letter."

Factually, these are the arrangements, which the LLC transferred to you under the agreement and which were assessed by you at the time of the agreement's signing as full-value from the legal point of view and enough for implementation of geological exploration at the afore-mentioned deposits under your own responsibility. As for the relationship, which was later established between you and the state authorized body, the shareholders/members have no any relation to it.

By the way, we appointed a shareholder/member of the LLC—Yuri Lalazarian, to the post of Executive Director of the LLC. And he continues holding this post and is competent for providing comments concerning the arrangements reached within the framework of the SPA.

And finally, as for the role, which was ascribed to Mr. Aivazyan in your letter, during the preparation and making of this transaction, I hear about it, as a shareholder/member, for the first time from you. And I would like to notify you that my actions in this issue were not directed by anybody.

Hopefully, these comments by me will clarify our relations.

Best regards,

/signature/

Janibekian

15.11.2006թ                                                    ք. Երևան


                                              Գլոբալ Գոլդ Մայնինգ
                                              պարոն Սթոուն Հորբրոնին
                                              (փաստաբան Հրայր
                                              Դուլասյանի միջոցով)



        Հարգելի պարոն

        Ստացա ինձ հասցեագրված Ձեր նամակը, որը թվագրված է 2 Նոյեմբերի 2006թ.
և որում դուք փորձում եք ինձ որպեսզի ՍՀԱ ՍՊԸ-ի բաժնետեր ներկայացնել պահանջ
այն մասին, որ իրը բաժնետերերի զննման պայմանագրով նախատեսված
պայմանավորվածությունների մի մասը խախտվել է և պատռում դադրել ըստ սույնի
վճաումների։ Այս կասպակցությամբ ուզում եմ Ձեզ ներկայացնել հետևյալը։ ԲԳՊ-ի
ամբողջմենի մաս հանդիսացող ԵՈՒՊԼ N076 լիցենզիային, որը տրված է եղել ՍՀԱ
ՍՊԸ-ը մինչև 2017թ. ապրիլի 5-ը ժամկետով, վերաբերվում է մետաղային և ոչ
մետաղադային օգտակար հանածների հանքավայրերում երկրաբանական
ուսումնասիրություն կատարելու գործմնեությանը և դրել առնչուքյուն չունին և չեր եք
կարող ունենալ կոնկրետ հանքավայրերի ուսումնասիրության խնդիրների հետ։ Այս
կերպ ստաճ վերը նշված լիցենզիան նման տիպի գործռունեության կատարելու
թույլտվություն է և ուրիշ ոչինչ։ Ինչ վերաբերվում է կոնկրետ հանքավայրում
երկրաբանական ուսումնասիրությունններ կատարելու խնդրին, ապա ԲԳՊ-ի կնքման
օրվա դրությամբ գործող օրենսդրության համաձայն դրանք կարգավորվում էին
համապատասխանվա հանքավայրում երկրաբանահետախուզական աշխատանմների
կատարման թույլտվությամբ, որը տրվում է ՀՀ Բնապահպանուիյան նախարարության
կողմից կոնկրետ ժամկետով։ Եվ ԲԳՊ-ին կից մենք Ձեզ ենք փոխանցել Մարջանի
հանքավայրում երկրաբանահետախուզական աշխատանմների կատարման
վերաբերյալ ՍՀԱ ՍՊԸ-ին տրամադրված 26.04.02թ. N221 թույլտվությունը, որի
գործողության ժամկետո նախատեսված էր II եռ. 2002թ-IV եռ. 2007թ.։ Ինչպես նաև
Հանքավայի հանքավայրի վերաբերյալ Ֆ-02-13/1 թույլտվությունը, որի գործողության
ժամկետո էր III եռ. 2002թ – IV եռ. 2003թ։ Ի դեպ այս հանցամանքը արձանագրված է
նաև «բացահայտման նամակի» 3.6 կետում։
        Այս ըստ ուեջյան այն պայմանավորվածությունները որոնք ՍՊԸ-ը համաձայն
պայմանագրի փոխանցել է Ձեզ և որոնք Ձեր կողմից պայմանագիր կնքելու պահին
գնահատվել են իրավական առումով լիարժեք և բավարար սեռական
պատասխանատվությամբ ու արտ օբյած հանքավայրերում երկրաբանական
ուսումնասիրություններ կատարելու համար։ Թե հետագայում ինչպիսի
հարաբերություններ են ծևավորվել Ձեր և պետական կատավարման լիագր մարմնի
միջև բաժնետերերը դրա հետ որևէ առնչություն չունեն։
        Ի դեպ ՍՊԸ –ե բաժնետերերից մեկը՝ պարոն Ջուլ Լավագսդյանը մեր կողմից
Ձշանակվել էր ՍՊԸ գործադիր տնօրեն և այսոր էլ աշխատում է այդ պաշտոնում,
միաժամանակ իրավասու է ԲԳՊ-ի շրջանակներում ձեռք բերված
պայմանավորվածությունների մեկնաբանությունների հարցում։
        Եվ վերջապես, ինչ վերաբերվում է Ձեր նամակում նշված պարոն Վ.
Այվազյանինը վերագրված դեղականտարմունը այդ գործառցի նախապատրաստմանմ և

կնքման ընթացքում ես որպես բաժնետեր առաջին անգամ եմ ձեզանից տեղեկանում այդ մասին և տեղեկացնում եմ, որ իմ գործողությունները այս խնդրում որևէ մեկի կողմից չեն ուղղորդվել:

Հուսով եմ, իմ այս մեկնաբանությունները պարզություն կմտցնեն մեր փոխհարաբերություններում:

Հարգանքներով Ձեր                                    Էդ. Զանիբեկյան

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

December 4, 2006

Scott Horton
(212) 336-2820
shorton@pbwt.com

Mr. Yurik Lalazaryan
66 Spandarian Street
Etchmiadzin, Armenia

Mr. Edward Janibekian
Apt. 44, b.18, A. Khachatryan Street
Yerevan, Armenia

Ms. Mayren Batoyan
Apt. 28, b.135, A. Babajanian Street
Yerevan, Armenia

Mr. Vardan Ayvazian
Building 22, Block 6
Apt. 16
Charentsavan, Kotaik Region
Armenia
10 Alex Manukian Street
Yerevan, Armenia

Re:    **CONFIDENTIAL DRAFT RESPONSE**

Dear Ms. Batoyan and Messrs. Ayvazian, Janibekyan and Lalazarian:

We have received a letter from Mr. Janibekian (the "Letter") dated November 15, 2006, received by Global Gold Mining, LLC Armenian Branch on November 24, 2006 in response to my letter of November 2, 2006. I am writing in response, as the Letter seemed to take the bizarre position that the sellers of SHA somehow did not actually transfer the valid "25 year Exploration License [with,] Exclusive Rights to Hankavan and Marjan Mines" despite the quoted language of Section 3.14 of the Disclosure Letter and the explicit terms of the Share Purchase Agreement. In the context of the quoted language, your response can be read to support a contention that the sellers perpetrated a fraud on Global Gold Mining, LLC (the "Buyer"). I would recommend that you take another look at the Share Purchase Agreement ("SPA") provisions.

The position taken in the Letter actually establishes a clear violation the SPA under the governing New York law, and thereby admits liability for all damages incurred by Buyer. We wrote to initiate good faith negotiations as called for in the SPA; this type of response (attempting to justify fraudulent behavior) is absolutely counterproductive. A Manager of Buyer is planning to be in Yerevan during the week of December 11. Please contact Ashot Boghossian if any of you would like to meet him to explore a good faith resolution; otherwise, we will have to plan to go ahead and pursue the International Chamber of Commerce arbitration in New York City option as agreed in the SPA.

With respect to the assertions made under Armenian law, we have consulted with local counsel, and based on that, bring the following to your attention:

December 4, 2006
Page 2

The Letter states that the exploration license No. 076 issued to SHA for the term until April 5, 2017 is not an exploration license, but just an "activity" license, and that it has "nothing to do with certain deposits." The Letter also states that "as for the exploration of certain deposits, according to Armenian law in force as of the day of signing the SPA, exploration works were regulated by permits issued for certain terms by the Ministry of Environment." The Letter further states that the participants of SHA and parties to the SPA, transferred mining rights for Marjan deposit only until the fourth quarter of 2007, and for Hankavan only until forth quarter of 2003. Despite the clear contractual provisions, the Letter claims that the Disclosure Letter section 3.6 reflects that circumstance.

However, Disclosure Letter section 3.6 refers to License No. 076 as the exploration license for Hankavan and Marjan mines, that license was made a part of the SPA and is attached to the SPA. It is sealed and notarized by Notary Office No. 1 in Yerevan. You signed the SPA at the Notary Office in person, before the Notary, in February 17, 2004. SPA Article 3.14 and the Disclosure Letter point 3.14 both state that SHA has an exploration rights for 25 years for both Hankavan and Marjan mines, with no exception. Armenian License Law, the only Armenian law regulating "activity" licenses, in force at the time of issuance of license No. 076 specifically states that Armenian License Law does not cover licenses for the use of minerals (Article 1, Armenian License Law). In addition, even if the law could possibly be read as the Letter, the Armenian License Law itself does not provide for the activity licensed in License No. 076. In fact, License 076 was issued under 1992 Armenian Mineral Code, and the Armenian Government specifically authorized the Ministry of Environment to issue such licenses as provided under 1992 Armenian Mineral Code. Thus, license No. 076 can not be a mere "activity" license under Armenian law, contrary to the claims set out in the Letter. The contractual and government issued documents as well as Armenian law are all quite clear that objectively the exclusive exploration rights to Hankavan and Marjan for 25 years were transferred to Buyer.

As of the day of signing the SPA at the Notary in Yerevan, Armenian Concession Law which was in force since in April 1, 2003 until today (note that this law entered into force almost eleven months before signing of the SPA), provides that mining rights shall be provided under licenses issued under Armenian Concession Law (including exploration licenses) (Armenian Concession Law Article 3). In fact, Armenian Concession Law specifies "licenses" as the only authorization to carry out exploration works at metal mines, such as Hankavan and Marjan mines, under Armenian law. The Armenian Concession Law does not authorize exploration at metal mines and deposits "under permits for explorations works issued by the Ministry of Environment" as you stated in your letter. In addition, Armenian Concession Law Article 76 acknowledges mining rights held by license holders before Armenian Concession Law entered into force (before April 1, 2003, such as the license No. 076 at issue), and specifically states that the terms of the new licenses under Armenian Concession Law issued by the Ministry of Environment to replace the licenses held by the license holders before Armenian Concession Law entered into force, shall be the same as the terms of the licenses issued before Armenian Concession law entering into force (Armenian Concession Law Article 76).

1328862v2

December 4, 2006
Page 3

It is now surprising to learn from the Letter that Hankavan mining rights, for example, were valid until only the end of 2003, while the SPA transferring the Hankavan mining rights was signed by you and other SHA former participants at the Notary only on February 17, 2004.  Considering the clear representations you and other SHA participants made in the SPA, and the fact that the SPA was signed by you before the Notary in person, it is inexplicable to see the Letter make clearly contradicting representations.

Regarding Mr. Aivazyan's role in this transaction, it is enough to note that we already have information to support the claim against him; you may want to reconsider the position taken in the Letter.

The content of this letter is for settlement and compromise purposes only and cannot be used for any other purpose.  Neither this letter nor its contents may be introduced as evidence against Buyer or any affiliate on any issue or be used to bind, prejudice or estop Buyer or any affiliate in any way.

I hope this response is helpful in your understanding the actual standing of this matter, and I again encourage you to be in touch to attempt an amicable, negotiated resolution.  Thank you for your attention to this matter.

Very truly yours,

Scott Horton

cc:    Global Gold Mining
       Greenwich, CT - Yerevan, Armenia

1328862v2

**UNOFFICIAL TRANSLATION**

FROM:.    ROA Deputy Minister of Environment
TO:       Ashot Boghossian,
          Director of Yerevan Representation of the Company
          (Please deliver to Scott Horton)
DATE:     December 8, 2006
NUMBER:   0000452

Sirs,

We were informed through your representatives of the November 2, 2006 letter on behalf of Patterson Belknap Webb & Tyler LLL, which was signed by Scott Horton and addressed to Yu. Lalazarian, Ed. Janibekian, M. Batoyan and ROA Minister of Environment Mister V. Aivazyan.

It is evident from the letter's implication that an attempt is made to personalize the problems of administrative-legal nature arisen as a result of illegal actions by Global Gold Mining Company, and to transfer them to another level. It is quite clear that some irresponsible companies may disapprove the administration implemented as a result of fulfillment of the Minister's official powers. However, it does not provide you with the right to address a slanderous letter of disrespectful and threatening nature to an official of another country, who holds a political post, trying to hamper the fulfillment of the latter's powers, through concealing it as a letter addressed to citizen Vardan Aivazyan. The behavior exhibited in the letter is not only a gross violation of principles fixed in the international law norms, but is also an evident manifestation of complete absence of lawyer's professional ethics. To avoid your, including the represented sides', possible responsibility provided under the law, I suggest that you submit comprehensive information and evidences confirming the facts mentioned in the aforementioned letter to the Ministry and relevant bodies during 10 days.

/signature/
Arsen Darbinian



# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

December 19, 2006

Scott Horton
Partner
(212) 336-2820
shorton@pbwt.com

Mr. Arsen Darbinian, Deputy Minister of Environment
Republic of Armenia
Yerevan, Armenia

Dear Deputy Minister Darbinian:

I am in receipt of your December 8, 2006 letter and refer you to my November 2, 2006 letter and more recent letter dated December 4, 2006, to the four addressees thereof, including Mr. Vardan Ayvazian.

In response to your letter, I specifically note that my November 2 and December 4 letters, Mr. Ayvazian is not addressed in an official capacity, but rather is addressed in his personal capacity. Your characterization of my letter, as an effort to sway or influence the functioning of a ministry, is baseless. I also do not understand the basis for your response on Mr. Ayvazian's behalf – no power of attorney or other authorization is shown.

I had earlier sent a letter, dated June 20, 2006, to Mr. Ayvazian in his official capacity, addressing substantive issues concerning specific licenses, but neither you nor he chose to respond to that letter.

I hope this response is helpful in your understanding the actual standing of this matter. We regret that Mr. Ayvazian did not avail himself of the opportunity we gave to meet last week with a manager of Global Gold Mining, LLC to attempt an amicable, negotiated resolution.

Thank you for your attention to this matter.

Very truly yours,

Scott Horton

cc:    Global Gold Mining
       Greenwich, CT – Yerevan, Arm

168 Zham Weekly
Translation

July 6-7, 2006



# "IF MINING GOLD IS NOT PROFITABLE, LET THEM GO AND SELL GREENS"

## Says the Minister of Environment Mr. Vardan Ayvazyan

- *Mr. Ayvazyan, the relations between the Ministry of Environment of RA and the companies "Ararat Gold Recovery Company" (AGRC) and "Global Gold Mining" seem to have become strained. What is the conflict about?*

- Our relations cannot go beyond or under the scopes stipulated by the law. That is, a company engaged in gold mining, naturally, has certain obligations and the state – as a regulatory body – should conduct the relevant controls. All companies engaged in mining shall respect the laws of this country, respect and follow them strictly. Now, a few words about AGRC. For some reasons, no inspections have been conducted at this company before the years 2002-2003. After the year 2003 we made some inspection works and revealed violations. Reserves of about 460 grams of gold had been concealed. Violations for about 1 ton are registered by the second assessment act.

- *But the second act was for 600 kg.*

- No, it was about 1 ton. Our studies and assessments showed that the total estimated cost of the difference in unpaid mining fees and the missing ore amounted to 1 ton. The assessment act has been submitted to the Tax Inspection and to other relevant bodies.

- *But the lawyer of the company Mr. Armen Ter-Tachatyan states that it is impossible to conceal the earth for one ton of gold.*

- If they extract the rich mineral bodies containing 8-10 grams of gold and don't extract the adjacent 1-2 grams, they impoverish the ore and the mine. And now when we see that they went through that territory and didn't extract 1 gram which you should have extracted, and now it should be written (as concealed), they treat it very negatively. Let their lawyer say whatever he wants. The state has provided you with national treasury, you should go with the plan. Not only you are obliged to mine the rich ore, but also the poor. No one allows you to mine the gold from wherever you want. The mine shall be mined equally. They may dispute and say many things, but I can give you one fact, which is our achievement, that in the years of 2001-2003 the content of gold in 1 ton of ore at Zod was presented as being 2,4 grams, while after our first inspections in the years 2003-2005 it has become 6,8 grams. There are also violations of other nature – starting from the investments and the quantity of cyanide used for extraction of gold. I don't know what investments they made. From the technical aspect, they haven't used the newest equipment (though I think it is a secondary issue). There have been numerous accidents, which have led to death of people and criminal suits. The average salary is low, etc.

- *You turned down their proposal to construct a new plant in the Lake Sevan basin. The Director of AGRC says that they have submitted the second proposal, which is 35 km far from Sevan. They say you turned down that proposal as well.*

- We turn down locations concerning the Lake Sevan basin. They proposed to construct a plant in the Lake Sevan basin twice, and we turned that down twice, since the issues we are having with Sevan are valued more than the gold. Whether they agree or not, they are in Armenia and they have to act in accordance with our laws. We have also registered that the mining they are conducting is done in a very rough manner, i.e. the works envisaged under the working plan are not being implemented. Besides, the other thing, they say that everything is bad, we suffer losses, the transportation expenses are very high and we don't make profit from mining gold. Well. Let them go and sell greens then. If companies don't make profit from gold mining, what

else they are making profit from? If it's bad, drop it, we will take it back. Who said you are the God's only chosen people to mine that mine.

- *The managers of AGRC have applied to you to propose a suitable location for the plant.*

- Pardon me, if I suggest him to construct the plant on the other side of Dilijan or Vardenis, where there is no communication, no rail line, no electricity line, will he agree? Then he will say I did it deliberately, because I don't want to assist them as the investors. The plant, when we were selling and they were buying, was in Ararat. Besides, they were supposed to build an enrichment plant in Meghradzor. Did they do it? Not until today. Well, what is the reason? Why it was not done? Is this a breach of agreements, or what? True, afterwards we compromised. And now when we are telling him just once, hey boy, work properly, they feel uncomfortable. If we did the same thing in their country they would kill us with slingshots.

- *OK, but if you are so displeased with AGRC and you discovered so many violations, why haven't you taken the relevant measures for such a long time?*

- I have already proposed to the government to deprive this company of the right to exploit the Zod property. Since they have purchased the gold plant, let them work it properly. I shut down that plant for 3 months, since the release of cyanide was higher than the norm.

- *AGRC was a joint venture before, with 50/50 shares, the share of each of the two companies in the charter capital was USD 11 million. In the year 2003, when the Indians purchased the remaining 50 percent from our state, they paid only USD 3,5 million. Don'' you think that USD 14,5 is too small of an amount for a mine promising 80 tones of gold?*

- It is none of my business. In my opinion, as a mining company they don't do their work property, and they feel very bad if they are reprimanded for it. I know one thing, if they don't work properly, they will answer for it to the full extent. No matter what kind of investors they are – big or small, famous or unknown. I'd like to repeat – I can't understand how it is possible to make no profit from gold mining. If I punish a fisherman in Sevan who wins his family's daily bread by that, how can I leave this company unpunished? Won't you ask how it happened?

- *You have mentioned that no assessments were conducted at that plant before the year 2003, wide opportunities had been given to them in the course of time. Don't you think that such violations were due to these extensive opportunities?*

- It might be so, but now, if they want to work, they should carry out all their obligations.

- *You seem to be in the same conflict with the company "Global Gold Mining" (GGM).*

- There is no "Global Gold Mining" company registered for geological explorations at the Ministry of Environment, I don't know them. In this case, so called mining rights were provided to SHA and Athelea companies. However, the local companies which took the mine for exploration or mining, having no investment means, transferred its actives to another company, which became the founder or the owner of that company. At present, the Ministry of Environment has deprived SHA company of the exploration right. In 2002 that company was provided with the special license for 5 years for Marjan property, and for 3 years for Hankavan property. Hankavan mine exploration license expired in December 2005. No works were done in Marjan during the years of 2002 – 2006, and we deprived him from the license.

- *They say it is a border zone, that is why they had difficulties, and they bring paper bureaucracy as another reason for the delay.*

- If it's a border zone, we say return it to the state, why should you go there, if you go you may get shot. And I know that they have purchased and resold a number of deposits in Armenia – "Terterasar", "Sipan-1". It makes profit as well. And now they declare openly throughout the world that they explore for uranium in Armenia. RA law regulates clearly that exploration for

radioactive materials shall be done in accordance with a certain procedure determined by the government. It is not greens, it is radioactive material. And it is utterly incomprehensible, that Athelea LLC purchased by GGM doesn't mention in its plan what it is exploring for.

- *But they say that they send the ore to the laboratory to assay its content. It might be uranium there too.*

- No problem, but he should have a permission for that.

- *But he has an exploration license.*

- He has a license to explore for gold, on the way to explore gold he sees that there is also uranium there. He must say, Mr. State, I work in your country and I found radioactive material, what do you say. And I apply to the government, which is to decide what to do. Not that I get up and declare around the world that I found uranium. And I say to him, Athelea LLC, if you don't tell me during three months what you found, I will deprive you. It turns out as if the employees of GGM are to decide themselves whether they should be engaged in uranium in Armenia or not. And I am being asked from abroad: hey, are you about to engage in uranium mining? How am I to know where the roots of this company go to, I don't know? I didn't know what kind of a company this GGM is, because the licenses were given to SHA and Athelea.

- *In relation with Marjan deposit your specialist said that there were new proposals made.*

- Yes, we are also working out a new procedure of geological exploration and exploitation of deposits, to rule out such re-sale and to organize exploitation of mines through tenders that would make them pay to the state.

- *Was the proposal for Marjan submitted by a local or a foreign company?*

- Frankly speaking, I don't care about it, the important aspect is that it should do its work. We have 139 registered explorations, I don't' know which of them are local and which are foreign. But I know that foreign companies are very interested in metal deposits, particularly – in non-ferrous metals.

- *Mr. Ayvazyan, the managers of the both companies imply that your expectations of them have increased, that is why the relations have become strained.*

- What kind of expectations, I have taken money and now I want more, isn't it? Well, let them pay me and get rid of the problem. Paying the first time is always the most difficult, and after that they will go on by paying …How come they don't pay? I have said and I repeat: both companies should act within the scopes of their obligations and the laws of RA.

Armine Avetyan

# EXHIBIT 5



**International Chamber of Commerce**
*The world business organization*

· **International Court of Arbitration** ● **Cour internationale d'arbitrage**

12 March 2007/ml

**14 770/EBS**

GLOBAL GOLD MINING, LLC (U.S.A.) vs/ 1. Mayren Batoyan (Armenia) 2. Edward Janibekian (Armenia) 3. Yurik Lalazaryan (Armenia)

Counsel in charge of the file: Ms. Erica Stein (dir. tel: 33 1 49 53 28 32 - dir. fax: 33 1 49 53 57 80) Email: ica5@iccwbo.org

Jonathan D. Schiller, Esq.
BOIES SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue NW
Washington, DC 20015
U.S.A.                                                                                    *By DHL*

Dr. Ivan Zykin
6 Illinka Street
Moscow 109012
Russia                                                                                   *By DHL*

Dear Sirs,

The Secretariat informs you that the Court, at its session of 9 March 2007, took the following decisions:

1.   Decided in accordance with Article 6(2) of the Rules that this arbitration shall proceed only between the following:

     GLOBAL GOLD MINING, LLC (U.S.A.) vs/ 1. Ms. Mayren Batoyan (Armenia) 2. Mr. Edward Janibekian (Armenia) 3. Mr. Yurik Lalazaryan (Armenia)

2.   Confirmed Jonathan Schiller, Esq., as co-arbitrator nominated by Claimant;

3.   Directly appointed Dr. Ivan Zykin as co-arbitrator on behalf of Respondents, in accordance with Article 9(6) of the Rules;

4.   Granted the co-arbitrators 30 days to nominate jointly the Chairman of the Arbitral Tribunal; and

5.   Fixed the advance on costs at US$ 280 000, subject to later readjustments.

As the provisional advance has been fully paid, the file shall be transmitted to you in accordance with Article 13 of the Rules, after the complete constitution of the Arbitral Tribunal.

Pursuant to the Court's decision, the co-arbitrators have been granted **30 days** from the day following the date of receipt of this letter to nominate jointly the Chairman of the Arbitral Tribunal. In order to assist you in the selection of the Chairman, please find enclosed, for your information, a copy of the Request for Arbitration.

                                                                                        .../...

**ICC International Court of Arbitration ● Cour internationale d'arbitrage de la CCI**
38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28   Faxes +33 1 49 53 29 29 / +33 1 49 53 29 33
Website www.iccarbitration.org    E-mail arb@iccwbo.org

**14 770/EBS**                                                                    **Page 2**

---

Please draw the attention of the nominee to the relevant provisions of the Rules, including, in particular, Article 7(1), which provides that every arbitrator must be and remain independent of the parties involved in the arbitration. Also, please invite the prospective arbitrator to confirm in writing, on the enclosed Declaration of Acceptance and Statement of Independence, that in accordance with Article 7(2), there do not exist any facts or circumstances which might be of such a nature as to call into question the prospective arbitrator's independence in the eyes of the parties.

In addition, you should be satisfied that the nominee will be able to devote all the time and effort necessary for the conduct of the arbitration in accordance with the requirements of the Rules and the time limits set forth therein. The Secretariat furthermore stresses that the arbitral mission demands of the arbitrator the utmost respect for the confidential nature of the proceedings.

As the place of arbitration is New York, New York (U.S.A.), the nominee must be prepared and willing to conduct the arbitration at this location.

Please also ensure that the nominee is familiar with the scale of arbitrator's fees contained in Appendix III to the Rules. In this connection, please inform the nominee that an arbitrator's fees are fixed exclusively by the Court and that separate fee arrangements between the parties and an arbitrator are not permitted.

The nominee should also be advised that the arbitral fees are fixed only at the end of the proceedings, although advances on fees and reimbursement of expenses may be granted upon the completion of concrete steps in the arbitration. In setting an arbitrator's fees, the Court considers the factors set forth in Article 2(2) of Appendix III to the Rules. The Court thus takes into account the diligence of the arbitrator, the time spent, the rapidity of the proceedings and the complexity of the dispute. An arbitrator's usual hourly rate or the usual systems of remuneration in an arbitrator's profession in his or her country are not taken into consideration by the Court in determining fees.

When the Arbitral Tribunal is composed of three members, unless the arbitrators inform us in writing that they have agreed to a different allocation, the Court normally fixes the fees of the arbitrators so that the Chairman receives 40% of the total fees and each co-arbitrator receives 30%. However, the Court may decide upon a different allocation based on the circumstances of the case.

As a general indication, on the basis of the information available at present, the fees of an arbitrator may vary between US$ 23 750 and US$ 114 600.

.../...

**14 700/EBS**                                                            **Page 3**

For the information of the parties and the Court, please provide us with the enclosed forms once completed by the nominee.

We look forward to receiving your joint nomination within the granted time period.

Yours faithfully,

Erica Stein
Counsel
Secretariat
ICC International Court of Arbitration

Encl.:   Request for Arbitration
        Blank Declaration of Acceptance and Statement of Independence
        Blank *curriculum vitae*
        *Curriculum vitae* of your fellow arbitrator

c.c.:    R. Doak Bishop, Esq.
        Wade M. Coriell, Esq.
        Kenneth R. Fleuriet, Esq
        *(by mail and fax without enclosures)*

        Ms. Mayren Batoyan
        Mr. Edward Janibekian
        Mr. Yurik Lalazaryan
        *(by DHL without enclosures)*

# EXHIBIT 6

# KING & SPALDING

1100 Louisiana Street, Suite 4000
Houston, Texas 77002-5213
Fax: 713/751-3290
www.kslaw.com

R. Doak Bishop
Direct Dial: 713/751-3205
Direct Fax: 713/751-3290
dbishop@kslaw.com

March 27, 2007

ICC International Court of Arbitration
38, Cours Albert 1er
75008 Paris
France

*via courier and facsimile*

Re:    GLOBAL GOLD MINING, LLC, Claimant, vs. VARDAN AYVAZIAN,
       MAYREN BATOYAN, EDWARD JANIBEKIAN, and YURIK
       LALAZARYAN, Respondents.

       ICC Case No. 14 770/EBS

       **Claimant's Request to the ICC Court to Reconsider its Application of Article
       6(2) of the ICC Rules to Vardan Ayvazian**

Dear Members of the ICC Court:

On March 12, 2007, we were informed that the ICC International Court of Arbitration (the "Court"), at its session of March 9, 2007, "[d]ecided in accordance with Article 6(2) of the Rules that this arbitration shall proceed only between the following: GLOBAL GOLD MINING, LLC (U.S.A.) vs/ 1. Ms. Mayren Batoyen (Armenia) 2. Edward Janibekian (Armenia) 3. Mr. Yurik Lalazaryan (Armenia)." The Court apparently determined that this arbitration may not proceed against Vardan Ayvazian, the fourth Respondent named in Global Gold Mining LLC's Request for Arbitration ("RFA") dated December 28, 2006. Mr. Ayvazian had been serving as Armenia's Minister of the Environment at the time Claimant's RFA was submitted. However, following the death of Armenia's Prime Minister on March 25, 2007, the Armenian government — including Mr. Ayvazian — resigned on March 26, 2007, as required by the Armenian Constitution. The new Armenian government should be formed within 20 days.[1] In any event, Mr. Ayvazian's term in office would have ended in May 2007.

---

[1] *See* Exhibit C.

Request to ICC Court to Reconsider
Its Application of Article 6(2)
Page 2

Global Gold Mining LLC ("Global Gold") respectfully submits that the Court erred in excluding Mr. Ayyazian from this arbitration proceeding and requests that the Court reconsider its application of Article 6(2) of the ICC Rules to Mr. Ayyazian. Mr. Ayyazian is the "undisclosed principal" who directed the other three Respondents to enter into the parties' arbitration agreement. Although not a signatory to the arbitration agreement, Mr. Ayyazian is clearly bound by it under well-established doctrines of agency applicable under New York law, which governs the interpretation and application of the arbitration agreement in this case.

Article 6(2) of the ICC Rules states that an arbitration shall proceed against a particular Respondent if the Court "is *prima facie* satisfied that an arbitration agreement under the Rules may exist. In such a case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself." Article 6(2) of the ICC Rules entitles the Court to review whether a valid arbitration agreement exists between a claimant and a particular respondent. However, that review is only supposed to be "*prima facie*" in nature: as long as there is a plausible argument that a party may be bound by an arbitration agreement, the Court should permit the arbitration to proceed and enable the arbitral tribunal to determine the scope of the arbitration agreement.[2] Under the terms of Article 6(2) and the tenet of *compétence-compétence*, an ICC tribunal is the judge of its own jurisdiction.

Article 6(2) does *not* require a respondent to have signed the arbitration agreement, as noted by Messrs. Derains and Schwartz in their authoritative guide to the ICC Rules:

> Article 6(2) does not require that each of the parties to the arbitration must have signed the arbitration agreement, and it may be the case, by virtue of any one of a number of different legal theories (such as, e.g., agency, assignment, alter ego, succession or the so-called "group of companies" theory) that a non-signatory may be bound by an arbitration agreement.[3]

In practice, the Court has usually applied Article 6(2) to non-signatories as deferentially as its terms suggest:

> As a general rule ... the Court has been inclined to allow arbitrations to proceed against parties who may not have signed, or who may not appear to be parties to, the arbitration agreement in question, provided that a plausible argument is made that they may nevertheless be bound by the same. Obviously, a mere allegation to this effect will not suffice. The Court must be persuaded that there are serious issues of fact or law to be resolved. This may be the case, for example, where it is alleged that a party is bound by

---

[2] *See* Yves Derains and Eric A. Schwartz, A GUIDE TO THE NEW ICC RULES OF ARBITRATION (Kluwer Law International 1998), at p. 92.
[3] *Id.* (emphasis added).

Request to ICC Court to Reconsider
Its Application of Article 6(2)
Page 3

an arbitration agreement by virtue of its conduct or relationship with one of the signatory parties.[4]

This is precisely a case in which it is alleged that a party — Mr. Ayvazian — is bound by an arbitration agreement by virtue of his conduct and relationship with the signatory parties (the other Respondents). Global Gold's RFA explained that Mr. Ayvazian controlled the entire transaction between Global Gold and Respondents Batoyan, Janibekian, and Lalazaryan that culminated in the signing of the share purchase agreement ("SPA") containing the ICC arbitration clause:

> Batoyan, Janibekian, and Lalazaryan acted as agents for Ayvazian in signing the SPA with Global Gold in December 2003. Ayvazian was a secret participant and beneficial owner in the Company at the time the SPA was signed, and he actually controlled the entire transaction behind the scenes. Every provision of the SPA was communicated to and approved by Ayvazian, as were the preliminary agreements between the nominal shareholders and Global Gold. In short, Batoyan, Janibekian, and Lalazaryan negotiated and contracted with Global Gold through detailed instructions from Ayvazian.

> Moreover, Ayvazian benefited financially from the execution of the SPA, just as if he had been a disclosed principal like the other Respondents. Ayvazian received the purchase price from Batoyan, Janibekian, and Lalazaryan after the SPA was executed, and Ayvazian distributed the proceeds to himself and his fellow Respondents. Ayvazian's behavior throughout the negotiation and signing of the SPA is that of an undisclosed principal directing his agents to negotiate certain terms, approving specific contract provisions (including the arbitration clause), and ordering that the purchase price be collected and distributed by him as the party controlling the transaction. Ayvazian is bound by the SPA's arbitration clause and is liable for breaches of the agreement as if he had signed the SPA along with the other Respondents.[5]

Under a section in its RFA entitled "Ayvazian is subject to the SPA's arbitration clause," Global Gold explained that Mr. Ayvazian is legally bound by the SPA's arbitration clause under ICC practice and the governing law of New York:

> In many cases, ICC tribunals have bound non-signatories to the terms of an arbitration clause. When, as in the case of Ayvazian here, the non-signatory controls the transaction at issue through his

---

[4] Id.

[5] See Global Gold's Request for Arbitration ("RFA") dated December 28, 2006, at ¶¶ 40-41.

Request to ICC Court to Reconsider
Its Application of Article 6(2)
Page 4

agents or accepts the benefits of the contract, he can be required to arbitrate as if he had signed the underlying agreement and arbitration clause. [citations]

Article 11.6 of the SPA provides that the agreement is governed by New York law. Under New York's "undisclosed principal" doctrine, a signatory may bind a non-signatory to a contract's terms when acting within his authority as an agent of the non-signatory. [citation] In such an instance, the non-signatory is an "undisclosed principal" of the contract and he may sue or be sued under its terms as if he were a disclosed signatory to the agreement. [citations] The doctrine of equitable estoppel provides an additional basis under New York law for binding a non-signatory like Ayvazian to an arbitration agreement. A non-signatory may not object to arbitration "when it receives a 'direct benefit' from a contract containing an arbitration clause," [citation] This is because "allow[ing] [a party] to claim the benefit of a contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying the Arbitration Act." [citations]

Ayvazian is clearly subject to the SPA's arbitration clause under these rules of New York law.[6]

By any measure, Global Gold's RFA made a *"prima facie"* demonstration that Mr. Ayvazian is subject to the ICC arbitration clause in the SPA. Since Mr. Ayvazian controlled and orchestrated the entire transaction culminating in the execution of the SPA and personally approved each provision in the SPA (including its arbitration clause), Mr. Ayvazian is certainly subject to the SPA's arbitration provision under a legal theory of agency such as New York's "undisclosed principal" doctrine.[7] Having established a *"prima facie"* case that Mr. Ayvazian is subject to the SPA's arbitration clause, Global Gold is entitled, under Article 6(2) of the ICC Rules, to have the matter decided by the Tribunal appointed to hear this case.

Mr. Ayvazian was served with Global Gold's RFA by the ICC as well as by Global Gold, and he undoubtedly reviewed the allegations contained in the RFA.[8] Yet he elected not to file an Answer responding to those allegations as he was entitled to do under Article 5 of the ICC Rules. Under the rules of many legal systems, such a failure to respond to a legal complaint is deemed an admission of the allegations contained therein. If Mr. Ayvazian did not believe that he had been properly named as a Respondent in Global Gold's RFA, he surely would have responded in

---

[6] *See id,* at ¶¶ 38-40.
[7] To the extent it may be relevant, Armenian law contains similar principles of agency that would bind Mr. Ayvazian to the arbitration agreement.
[8] Global Gold attaches courier receipts demonstrating delivery of the RFA to Mr. Ayvazian at the Armenian Ministry of Environment as well as his personal address in Yerevan. *See* Exhibit A.

Request to ICC Court to Reconsider
Its Application of Article 6(2)
Page 5

some way. His silence corroborates the allegations made by Global Gold in its RFA and underscores that he is a proper Respondent in this proceeding.

The matter is now put beyond doubt by a statement submitted by Respondent Lalazaryan to the ICC, a copy of which was received by Global Gold on March 23, 2007, and is attached to the present Request.[9] In his statement -- which is akin to an Answer under Article 5 of the ICC Rules -- Respondent Lalazaryan agrees with the allegations in Global Gold's RFA, apart from several matters that do not involve Mr. Ayvazian. In other words, Mr. Lalazaryan confirms that Mr. Ayvazian orchestrated and controlled the SPA transaction as explained by Global Gold in its RFA. Respondent Lalazaryan even states that Mr. Ayvazian was an "undisclosed shareholder" in the transaction, precisely as alleged by Global Gold:

> I received the Request for Arbitration submitted on behalf of Global Gold Mining, LLC (the "Request"), in connection of which I would like to state that I agree with the provisions of the Request, except that I did not violate the SPA provisions, including any representation and warranties made therein on my behalf ... and that I am not responsible for such violations made by other shareholders, including the undisclosed to Global Gold shareholder Vardan Ayvazian. ...
>
> I acted in good faith during all the time and tried my best not to allow a breach or a dispute; however, I had no control over the other shareholders, including Vardan Ayvazian, to prevent the situation we are facing at this time. ...
>
> Sincerely,
>
> Yurik Lalazarian
> March 19, 2007[10]

These compelling admissions from Respondent Lalazaryan demonstrate that Mr. Ayvazian was the "undisclosed principal" behind the SPA and the parties' arbitration agreement, as alleged by Global Gold in its RFA. The Court has now been provided with far more than a *"prima facie"* showing that Mr. Ayvazian is subject to the SPA's ICC arbitration clause and is a proper Respondent in this case. Subject to the application of New York law -- a task for the Tribunal -- the basis for including Mr. Ayvazian as a Respondent has now been proved by the submission of a fellow Respondent.[11] If the Court were to ignore Respondent Lalazaryan's

---

[9] See Statement of Yurik Lalazarian dated March 19, 2007, Exhibit B.

[10] *Id.* (emphasis added).

[11] Global Gold has evidence in its possession conclusively demonstrating that Mr. Ayvazian controlled and orchestrated the entire transaction culminating in the execution of the SPA and its arbitration clause. The evidence involves one or more persons resident in Armenia, and it has not been submitted out of serious concern for the

Request to ICC Court to Reconsider
Its Application of Article 6(2)
Page 6

submission and maintain its refusal to name Mr. Ayvazian as a Respondent, the arbitration provision in the SPA would be rendered futile, and the primary wrongdoer in this case — Mr. Ayvazian — would effectively be immunized from an arbitration agreement that he negotiated and approved.

The ICC Rules must be applied to Mr. Ayvazian as they would be applied to any other individual named as a respondent in a request for arbitration submitted to the ICC. Global Gold has brought this arbitration against Mr. Ayvazian in his personal capacity, and the fact that he is an official in the Armenian government is immaterial. Article 6(2) of the ICC Rules merely requires a "*prima facie*" demonstration that a respondent such as Mr. Ayvazian is subject to the relevant arbitration agreement, beyond which jurisdictional questions are appropriately left to the arbitral tribunal. The Court's practice under Article 6(2) has been to require nothing more than a "plausible argument" that a respondent who has not signed the arbitration agreement is nevertheless bound by it. The Tribunal in this case will be far better placed than the Court to carefully review all of the issues of fact and law relevant to determining whether Mr. Ayvazian is subject to the Tribunal's jurisdiction, which is why Article 6(2) reserves "any decision as to the jurisdiction of the Arbitral Tribunal" to "the Arbitral Tribunal itself."

Global Gold plausibly explained the factual and legal grounds for naming Mr. Ayvazian as a Respondent in its RFA. Respondent Lalazaryan has now confirmed that Mr. Ayvazian was, in fact, an unnamed party to the SPA and its ICC arbitration clause, as alleged by Global Gold. Respondent Lalazaryan's submission goes markedly beyond the "*prima facie*" threshold articulated in Article 6(2) and requires that the Tribunal appointed in this case be permitted to determine its jurisdiction over Mr. Ayvazian. The wording of Article 6(2), the Court's past practice in applying that article, the facts and governing law relevant to this case, and basic notions of justice demand that the Tribunal be afforded that opportunity.

---

physical safety of the person[s] involved. With appropriate safeguards, Global Gold would be willing to disclose the evidence in question to the Court or to the Tribunal. However, Respondent's Lalazaryan's statement should render such a submission unnecessary, at least for purposes of the Court's application of the "*prima facie*" standard in Article 6(2).

Global Gold is also prepared to show that Mr. Ayvazian's control and orchestration of the SPA transaction — which was unknown to Global Gold at the time but has now been confirmed by Respondent Lalazaryan — is not unique. Rather, it is part of a pattern of Ayvazian and his family members acquiring personal interests in mining properties throughout Armenia that has occurred during Ayvazian's tenure as Minister of the Environment. Investigators and law enforcement authorities in Armenia have uncovered over 30 mining properties in which Ayvazian and his wife, brother, and son hold undisclosed ownership interests. For instance, investigators have learned that Ayvazian's wife and brother own 100% of Nagin, LLC, which controls the Hrazdan and Aboyvan iron deposits; Ayvazian's wife owns 50% of Interior, LLC, which controls four mining sites at Hankavan and three at Megradzor; and Ayvazian's son owns 50% of Alexis, LLC, which controls the Ararat Travertine, Martiros Felsite, and Kaps Tuff deposits. Ayvazian is widely known for running his Ministry for personal profit, and the issues of corruption in this case — disturbing as they are — are by no means unique.

Request to ICC Court to Reconsider
Its Application of Article 6(2)
Page 7


Global Gold therefore respectfully requests that the Court reconsider its application of Article 6(2) of the ICC Rules to Vardan Ayvazian and permit this arbitration to proceed against Mr. Ayvazian.

Sincerely,

R. Doak Bishop


Attachments (Exhibits A, B and C)


RDB/KRF/jb

**EXHIBIT A**



**Exhibit A (1)**

Translation A (1)

Addressee of the item:       Vardan Aivazyan,
                             ROA Ministry of Environment
                             Governmental build. #3, Yerevan

Name:  Global Gold Mining LLC

Street and No:  1/1 Zarobian Str.

Locality and country:  Yerevan

Date received and signed for:  01/07/07



Exhibit A (2)

Translation A (2)

Addressee of the item:        Vardan Alvazyan
                              House #22, 6th Block, Apt. 16, Charentsavan

Name:  Global Gold Mining LLC

Street and No:  1/1 Zarobian Str.

Locality and country:  Yerevan

Date received and signed for:  01/07/07



**EXHIBIT B**

TRANSLATION

International Court of Arbitration of
International Chamber of Commerce

VIA FAX

To the attention of:
Jennifer Sharman
Tel:    +33 1 49 53 28 61
Fax:   + 33 1 49 53 57 80

Dear Sirs:

I received the Request for Arbitration submitted on behalf of Global Gold Mining, LLC (the "Request"), in connection of which I would like to state that I agree with the provisions of the Request, except that I did not violate the SPA provisions, including any representation and warranties made therein on my behalf, since I believed that SHA had all the assets and governmental authorizations, and that SHA complied under legal requirements as represented in the SPA, as I was assured before signing of the SPA, and that I am not responsible for such violations made by other shareholders, including the undisclosed to Global Gold shareholder Vardan Ayvazian.

Specifically, my reservation with the Request point 4 is that I did not lie to Global Gold, based on the aforementioned. Regarding the Request point 14, I acted in good faith during all the time and tried my best not to allow a breach of a dispute, however, I had no control over the other shareholders, including Vardan Ayvazian, to prevent the situation we are facing at this time.

I remained as a director of SHA after signing of the SPA, and worked towards the benefit of SHA, including towards the fulfillment of any and all representations and warranties I made on my behalf to Global Gold. I regret that the other shareholders took this path which concluded into the situation we are all facing now.

Sincerely,

Yurik Lalazarian
March 19, 2007

I as a lawyer of Mr. Yurik Lalazaryan
presented and explained the content of
the current paper to my client and
certify that both Armenian and English
version of this letter are identical.

Aram Karakhanyan
march 19, 2007

**Exhibit B**

**EXHIBIT C**

Monday, March 26, 2007

# Armenia Holds Government Meeting After Premier's Death



Andranik Markarian died on March 25
(epa)

YEREVAN, March 25, 2007 (RFE/RL) -- Armenian President Robert Kocharian has chaired an emergency meeting of government officials following the death of Prime Minister Andranik Markarian, RFE/RL's Armenian Service reported.

Armenia's government resigned, as required by the constitution, following Markarian's death. Kocharian accepted the cabinet's resignation and asked ministers to continue serving in their positions until a new government is formed.

Under the constitution, a temporary prime minister should be appointed within 10 days, while a new government should be formed within 20 days.

Markarian, 55, died suddenly of a heart attack at his home on March 25.

Markarian, leader of the ruling Republican Party, had served as prime minister for nearly seven years.

"It is very heavy blow to the state, to the people and to the party, because for many years Andranik Markarian was one of the pillars, and when there were difficulties he was the key man who could bring closer very distant positions," Tigran Torosian, speaker of the Armenian parliament and a leading member of the Republican Party, told RFE/RL. "Thanks to his efforts, we were able to avoid various shocks."

Markarian came to power in 2000 during a politically tense period in Armenia following the October, 1999, armed attack on parliament that killed eight politicians, including Prime Minister Vazgen Sargsian.

Kocharian today called for a national day of mourning on March 28, when Markarian's funeral will be held.

(with material from Reuters, AFP, ITAR-TASS)

Radio Free Europe / Radio Liberty © 2007 RFE/RL, Inc. All Rights Reserved.

**Exhibit C**

# EXHIBIT 7

# KING & SPALDING

King & Spalding International LLP
25 Cannon Street
London EC4M 5SE
Fax  +44 (0) 20 7551 7575
www.kslaw.com

Kenneth R. Fleuriet
Direct Dial: +44 (0) 20  7551 7555
kfleuriet@kslaw.com

April 20, 2007

Ms. Erica Stein
Counsel
ICC International Court of Arbitration
38, Cours Albert 1er
75008 Paris
France                                                    *via courier and facsimile*

Re:   GLOBAL GOLD MINING, LLC, Claimant, vs. VARDAN AYVAZIAN,
      MAYREN BATOYAN, EDWARD JANIBEKIAN, and YURIK
      LALAZARYAN, Respondents, ICC Case No. 14 770/EBS.

      **Claimant's Request to the ICC Court to Reconsider its Application of Article
      6(2) of the ICC Rules to Vardan Ayvazian**

Dear Ms. Stein:

On March 27, 2007, Global Gold Mining LLC requested that the ICC International Court of Arbitration reconsider its decision to exclude Vardan Ayvazian from this proceeding. In its request, Global Gold demonstrated that Mr. Ayvazian was the "undisolosed principal" behind the parties' share purchase agreement ("SPA"), which contains the parties' agreement to submit this dispute to ICC arbitration. Respondents Batoyan, Janibekian, and Lalazaryan acted as Mr. Ayvazian's agents during the transaction culminating in the SPA, as confirmed by one of the Respondents in a statement submitted to the ICC on March 19, 2007. Global Gold noted that Mr. Ayvazian's orchestration of the SPA in this case was not unique, but rather part of a pattern of Ayvazian and his family members acquiring interests in mining properties throughout Armenia, often through the use of agents.

Since Global Gold submitted its request for reconsideration to the ICC, Armenia's leading association of investigative journalists, Hetq, has published a series of articles exposing Mr. Ayvazian's acquisition of mineral holdings throughout the country. Hetq has used public records to identify the shareholders of a number of companies owned by Mr. Ayvazian, his

King & Spalding International LLP is a limited liability partnership registered in England and Wales under registered number OC303151
and is regulated by the Law Society. A list of the members and their professional qualifications is open for inspection at the registered office.
Registered Office: 25 Cannon Street, London EC4M 5SE.

Associated offices in Atlanta, Houston, New York and Washington, D.C.

Ms. Erica Stein
April 20, 2007
Page 2

family, and his close associates, and has connected those companies to mining licenses issued by Ayvazian's ministry. Please find enclosed copies of those articles, entitled "Vardan Ayvazian Has a Special Fondness for Goldmines," "An Apple of Discord Beneath Hankavan," and "Vardan Ayvazian's Business Project," respectively.

The articles are available at www.hetq.am, and similar stories about Mr. Ayvazian have recently appeared in other Armenian news publications. In fact, Mr. Ayvazian owns additional mining properties that are not mentioned in the Hetq articles. Mr. Ayvazian has been interviewed by many of the publications, but has not denied the reports. In addition to describing how Mr. Ayvazian has acquired a sizeable proportion of Armenia's mineral wealth, the articles indicate that Mr. Ayvazian is attempting to sell his interests before the election of a new Armenian government next month. The Hankavan properties discussed in the article entitled "An Apple of Discord Beneath Hankavan," as well as Ayvazian's issuance of competing Hankavan licenses to "Interior Ltd.," are at issue in this arbitration and are discussed in Global Gold's Request for Arbitration.

Hetq's articles are directly relevant to Global Gold's request to the ICC to reconsider its decision to exclude Mr. Ayvazian, because they describe Mr. Ayvazian's use of close associates as agents. In particular, the article entitled "Vardan Ayvazian Has a Special Fondness for Goldmines" notes Mr. Ayvazian's use of Mayren Batoyan, another Respondent in this case, to establish a company called Grade Redmet Ltd. According to Hetq, Ayvazian's ministry granted Grade Redmet Ltd. a license to the Fioletovo gold mine at Lori Marz.

The article describes Respondent Batoyan as a "friend and fellow villager of Vardan Ayvazian's wife" who has "also acted as Ayvazian's representative in other organizations." It continues:

Mayren Batoyan, a founder of Grade Redmet Ltd., has a close relationship with the Ayvazians. She is a friend of Mariam Ginosyan's, Vardan Ayvazian's wife. They both are natives of the village of Karzakh of the Akhaltsikhe region of Georgia. Mayren Batoyan has no relation to mining and works at a Yerevan hospital.

Hetq's descriptions of Respondent Batoyan, her relationship with the Ayvazians, and her role as Mr. Ayvazian's agent in establishing another mining company for Mr. Ayvazian strongly support Global Gold's portrayal of the principal-agent relationship between Mr. Ayvazian and Respondents Batoyan, Janibekian, and Lalazaryan. When combined with another Respondent's recent admission to the ICC that Mr. Ayvazian was the "undisclosed principal" behind the SPA and the parties' arbitration agreement, there should be no question that Mr. Ayvazian is subject to the SPA's ICC arbitration clause under well-established doctrines of agency applicable under the governing law of New York. Accordingly, Global Gold has clearly made a "*prima facie*" showing that Mr. Ayvazian is subject to the SPA's ICC arbitration clause, as required by Article 6(2) of the ICC Rules.

Ms. Erica Stein
April 20, 2007
Page 3

Mr. Ayvazian did not respond to Global Gold's Request for Arbitration or object to being named as a Respondent, and he has apparently not responded or objected to Global Gold's request for reconsideration of March 27, 2007. One Respondent has admitted to the ICC that he served as Mr. Ayvazian's agent in concluding the SPA and its ICC arbitration clause, and Hetq has now demonstrated that another Respondent has served as Mr. Ayvazian's agent in a nearly identical situation. Global Gold respectfully submits that it has gone markedly beyond a *"prima facie"* showing that Mr. Ayvazian is subject to ICC arbitration as the principal who orchestrated the SPA and its arbitration agreement. Under the terms of Article 6(2) and the tenet of *compétence-compétence*, the arbitral tribunal in this case should be permitted to determine the scope of the arbitration agreement and its jurisdiction over Mr. Ayvazian.

For the foregoing reasons and the reasons expressed in its request for reconsideration of March 27, 2007, Global Gold requests that the ICC Court permit this arbitration to proceed against Mr. Ayvazian. We kindly ask that the present letter and enclosed materials be submitted to the ICC Court along with Global Gold's request of March 27, 2007.

Thank you for your attention to this matter.

Sincerely,

R. Doak Bishop
Kenneth R. Fleuriet
Wade M. Coriell

KRF/jb

enclosures



**hetq**online

◄ Back

## economy

about us
politics
society
economy
court
culture
ecology
interview
technologies
photostory
contact us

archive



# Vardan Ayvazyan Has a Special Fondness for Goldmines

[April 16, 2007]

As we have reported, Minister of Nature Protection Vardan Ayvazyan has registered the majority of his mines in the names of his relatives, friends and employees (See also: An Apple of Discord Beneath Hankavan and Vardan Ayvazyan's Business Project). In the case of the Hematite and Grade Redmet Companies, Hasmik Harutyunyan plays this role. She is the wife of Yervand Hovhannisyan, the head of the department responsible for assessing and monitoring the environmental impact of mining activities of the State Nature Protection Inspection. Hematite Ltd is registered at Yervand Hovhannisyan's home address. This ministry official who carries out mine inspections is very close to Vardan Ayvazyan.

The two companies have licenses to explore five gold mines.

| Organization | Location and license type | Term of license | Registration address | Founders |
|---|---|---|---|---|
| Hematite Ltd | Syunik Marz, License to explore the Verin Vardanidzor Gold Mine | Dec. 7, 2005 – Dec. 31, 2007 | Yerevan, 23 Mashtots Ave., # 21 (Yervand Hovhanisyan's home address) | Hasmik Harutyunyan (Yervand Hovhanisyan's wife), Mayak Gasparyan |
| Hematite Ltd | Syunik Marz, License to explore the Tashtuni Gold Mine | – – – – | – – – – | – – – – |
| Hematite Ltd | Aragatsotn Marz, License to explore the Sipan Gold Mine | – – – – | – – – – | – – – – |
| Hematite Ltd | Syunik Marz, License to explore the Mazra Gold Mine | Dec. 23, 2005 – Dec. 20, 2008 | – – – – | – – – – |
| Grade Redmet Ltd | Lori Marz, License to explore the Fioletovo Gold Mine | Feb. 27, 2006 – Dec. 31, 2008 | Yerevan, 7 Arinberd Street | Mayren Batoyan (friend and fellow villager of Vardan Ayvazyan's wife who has also acted as Ayvazyan's representative in other organizations), Vardan Margaryan, Hasmik Harutyunyan |

Mayren Batoyan, a founder of Grade Redmet Ltd., has a close relationship with the Ayvazyans. She is a friend of Mariam Ginosyan's, Vardan Ayvazyan's wife. They both are natives of the village of Karzakh of the Akhaltsikhe region of Georgia. Mayren Batoyan has no relation to mining and works at a Yerevan hospital.

Following our publications, a great many people called us wondering what is going to change now that the facts have been made public. As of now, our response is, nothing. We are simply informing the public what one of our ministers is occupied with. According to our sources, the only thing that has happened at the Ministry of Nation Protection is that representatives of the companies mentioned in our publications have been called into the minister's office. What the minister discussed with them is not yet known.

In the meantime, according to other information, the minister has managed to sell one of the Hematite Ltd. mines.

*To be continued...*

**Edik Baghdasaryan**



**hetq**online

## economy

◄ Back



### An Apple of Discord Beneath Hankavan

[April 9, 2007]

We have reported recently that the Minister of Nature Protection has given several deposits with total mineral resource content of about 3 billion tons to members of his own family and is now trying to sell them off (See Vardan Ayvazyan's Business Project). To compare, the approved mineral reserves of the Kajaran mine, which is the largest Armenian deposit, make up 450 million tons. The Kajaran mine was sold through an international tender at a price of $US 120 million.

Minister of Nature Protection Vardan Ayvazyan has a special fondness for Armenia's gold deposits. This attitude was especially clear on December 19, 2005, when he issued seven geological exploration licenses simultaneously to Interior Ltd established by his assistant, Tigran Krmoyan. Krmoyan was the minister's aid until October 6, 2006. Currently he manages the Ayvazyan's mineral and non-mineral resources, including his real estate business.

Interior Ltd is unique among companies granted license for geological investigation. The licenses for all seven sites were granted to Interior Ltd on the same day; i.e. there was no desire at all to issue licenses on different dates. The license agreements were signed the next day, December 20, 2005.

All seven licenses for geological exploration were granted to Interior Ltd until September 30, 2008

| Organization | Location, Type and term of the license | Registration address | Founders and their addresses |
|---|---|---|---|
| Interior Ltd. | Kotayk Marz, License for exploring the Hankavan Ore Field, Batsat Lich site, December 19, 2005-September 30, 2008 | Yerevan, 54 Komitas Street | Ibraruri Atenesyan, Armen Bunatyan, Tigran Krmoyan (assistant to the minister of Nature Protection). |
| Interior Ltd. | Kotayk Marz, License for exploring the Hankavan Ore Field, Samakhbyour site. | ----- | |
| Interior Ltd. | Kotayk Marz, License for exploring the Hankavan Ore Field, Tsits Kar site. | ----- | |
| Interior Ltd. | Kotayk Marz, License for exploring the Hankavan Ore Field, Aya Pavle site. | ----- | |
| Nagin, Ltd. | Kotayk Marz, License for exploring the Megradzor Ore Field, Zar site. | ----- | |
| Interior Ltd. | Kotayk Marz, License for exploring the Megradzor Ore Field, Arjasar site. | ----- | |
| Interior Ltd. | Kotayk Marz, License for exploring the Megradzor Ore Field, Nor site. | ----- | |

It is interesting to note that SHA Ltd had already been granted the right to geological exploration of the areas adjoining the village of Hankavan in the Kotayk Marz on December 19, 2005 when Interior Ltd was granted the seven licenses for geological exploration of the same area, although the law prohibits issuance of double licenses for the same area. SHA Ltd was bought by the American Global Gold Corporation, which means that the international treaty on mutual protection of investments signed between Armenia and the US is applicable in respect to SHA Ltd.

This American company has made investments and conducted exploration at those sites since 2004, i.e. for three years. Meanwhile Interior Ltd, which actually belongs to the Minister, neither conducts nor is going to conduct any works at those sites, as it hasn't incurred any required mobilization expenses based on the data of tax authorities.

Minister Ayvazyan has declared many times that Global Gold Corporation hasn't conducted any work and therefore he has terminated that company's license. However, Global Gold Mining has made substantial investments in the exploration of those sites according to the data of the same tax

about us / politics / society / economy / court / culture / ecology / interview / technologies / photostory / contact us / archive

authorities, bringing in competent foreign companies to assist in the work. The minister made no reference to the lack of work by companies that he owns, including Interior Ltd.

One of our sources in the Ministry of Nature Protection informed us that Ayvazyan is currently negotiating with one of the foreign companies operating in Georgia to sell the mines granted to Interior Ltd. The price set by the minister is in the tens of millions this time.

It's difficult to say whether making these facts public will change anything in this sector. But it is well known that Global Gold Corporation has brought an action against the Government of the Republic of Armenia in the World Bank's International Centre for Settlement of Investment Disputes, for granting its licenses to other companies and on other grounds, as provided for by the international treaty signed between the two countries. It is clear that the Republic of Armenia is in a difficult position, but Vardan Ayvazyan will not be the loser.

*To be continued...*

**Edik Baghdasaryan**

Copyright © 2002-2007 Hetq Online. All rights reserved.

ARMENIAN Design & support by NetFlut



## hetqonline

### economy

Back



home
about us
politics
society
economy
court
culture
ecology
interview
technologies
photostory
contact us
archive

## Vardan Ayvazyan's Business Project

[April 2, 2007]

Every minister in Armenia considers the agency entrusted to him or her to be his or her personal business project. Minister of Nature Protection Vardan Ayvazyan, whose name often emerges in the media in connection with various scandals, is squeezing everything possible out of his ministry, aware that he cannot hold office forever.

If you examine Armenia's underground resources you find yourself in a web in which almost all of the family and friendly ties of our various officials can be seen. Who owns these resources? There is one unambiguous answer to this question – high-level officials of the Republic of Armenia and parliament members, who as a rule acquire the licenses to explore and exploit mines in the names of their relatives and friends, and go on to sell them later. Profits are especially high when the buyers are foreign companies.

Starting today, Hetq will present the real owners of our mines. Topping the list is, not surprisingly naturally, the head of the agency in charge of the mines – Minister of Nature Protection Vardan Ayvazyan. The first group of mines that he owns is listed below.

Surart, Ltd., which is represented by Vardan Ayvazyan's brother, Suren Ayvazyan, received licenses for two mines on the same day.

| Organization | Location, Type and term of the license | Registration address | Founders and their addresses | Reserves Million Tons |
|---|---|---|---|---|
| Surart, Ltd. | Lori Marz, License to explore and develop the Bazum iron deposits. Valid July 20, 2009 | Yerevan, Arabkir, 7 H. Emin St., # 46 (residential address of Tigran Krmoyan, Assistant to the Minister of Nature Protection). | Suren Ayvazyan (Vardan Ayvazyan's brother) 22-16 District # 6, Charentsavan | 400 |
| Surart, Ltd. | Syunik Marz, License to develop the Kamakar mine | ----- | Suren Ayvazyan (Vardan Ayvazyan's brother) 22-16 District # 6 Charentsavan | 1000 |
| Nagin, Ltd. | Kotayk Marz, License to appraise and explore the Hrazdan iron mine. Valid December 31, 2007. | 22-16 District # 6 Charentsavan (Vardan Ayvazyan's registration address) | Mariam Ginosyan (Vardan Ayvazyan's wife), Gagik Ayvazyan (Vardan Ayvazyan's son) and two other persons registered in Charentsavan | 150 |
| Nagin, Ltd. | Kotayk Marz, License to appraise and explore the Abovyan iron mine. Valid December 31, 2007. | ----- | ----- | 400 |
| Nagin, Ltd. | Syunik Marz, License to explore and develop the Svarants iron mine. Valid December 31, 2008. | ----- | ----- | 1000 |
| Alexis, Ltd. | Ararat Marz, License to develop | Yerevan, Arabkir, 7H. Emin St., # 46 | Suren Ayvazyan (Vardan Ayvazyan)'s brother 22-16 | |

| a travertine mine. | District # 6 Charentsavan. Artur Alexanyan (Vahagn Hovnanian's son-in-law) Vahagni Residential Complex # 5165. |
|---|---|

On January 26, 2007 **Nagin, Ltd** was granted a license to exploit the first two mines. According to reliable sources, intensive negotiations are being conducted at this moment out to sell the mines that belong to the minister. The minister is personally taking part in the negotiations. Among the buyers is an Indian company, and the price set by the minister for just one mine is several million dollars. These are only a few of several dozens of mines that Vardan Ayvazyan owns. The minister has a special fondness for gold, copper, molybdenum, and iron deposits.

*To be continued...*

**Edik Baghdasaryan**

Copyright © 2002-2007 Hetq Online. All rights reserved.

ARMENIAN Design & support by NetPlut

# EXHIBIT 8

14/05 2007 16 01 FAX  33 1 49 53 28 88     ICC ARBITRATION                    ☎001/003





**International Chamber of Commerce**
*The world business organization*

## International Court of Arbitration • Cour internationale d'arbitrage

### TELECOPIER
### TRANSMISSION PAR TELECOPIE

14 MAY 2007                                                CASE 14 770/EBS

RECIPIENTS                                                 FAX NUMBER

R. Doak Bishop, Esq.                                      00 1 71: 751 3290
Wade M. Coriell, Esq.
Kenneth R. Fleuriet, Esq.                                 00 44 20 7 551 7575
Jonathan D. Schiller, Esq.                                00 1 20: 237 6131
Dr. Ivan Zykin                                            00 7 49: 203 9226

SENDER                    TELEPHONE NUMBER                FAX NUMBER

Erica Stein               +33 1 49 53 28 32              +33 1 4) 53 57 80

PAGES (INCLUDING COVER SHEET):      3

IN CASE OF ANY PROBLEMS WITH THIS TRANSMISSION, PLEASE CALL +33 1 49 53 28 56/29 82

THE INFORMATION CONTAINED IN THIS FAX IS CONFIDENTIAL INFORMATION ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION OR COPYING OF THIS COMMUNICATION IS PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE POSTAL SERVICE. THANK YOU.

LES INFORMATIONS CONTENUES DANS CETTE TELECOPIE SONT CONFIDENTIELLES ET SONT DESTINEES A L'USAGE EXCLUSIF DU(DES) DESTINATAIRE(S). LA PERSONNE QUI REÇOIT CETTE TELECOPIE ET QUI N'EST PAS LE DESTINATAIRE, L'UN DE SES EMPLOYES OU UN MANDATAIRE HABILITE A REMETTRE CE MESSAGE AU DESTINATAIRE EST AVISE QU'IL EST INTERDIT D'EN DIVULGUER OU D'EN REPRODUIRE LE CONTENU. SI VOUS AVEZ REÇU CETTE COMMUNICATION PAR ERREUR, NOUS VOUS SAURIONS GRE DE NOUS LE FAIRE CONNAITRE PAR TELEPHONE DANS LES MEILLEURS DELAIS ET DE NOUS RETOURNER CELLE-CI PAR VOIE POSTALE. MERCI.

ICC International Court of Arbitration • Cour internationale d'arbitrage de la CCI
38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 29 05  Fax +33 1 49 53 29 29 / +33 1 49 53 29 33
Website www.iccarbitration.org   E-mail arb@iccwbo.org

14/05 2007 16 02 FAX  33 1 49 53 29 33    ICC ARBITRATION    @002/003


**International Chamber of Commerce**
*The world business organization*

## International Court of Arbitration • Cour internationale d'arbitrage

14 May 2007/es:ml

14 770/EBS

GLOBAL GOLD MINING, LLC (U.S.A.) vs/ 1. Mayren Batoyan (Armenia) 2. Edward Janibekian (Armenia) 3. Yurik Lalazaryan (Armenia)

---

Counsel in charge of the file: Ms. Erica Stein (dir. tel: 33 1 49 53 28 32 - dir. fax: 33 1 49 53 57 80)
Email: ica5@iccwbo.org

R. Doak Bishop, Esq.
Wade M. Coriell, Esq.
KING & SPALDING LLP
1100 Louisiana Street, Suite 4000
Houston, Texas 77002-5213
U.S.A.                                          *By mail and fax 00 1 713 751 3290*

Kenneth R. Fleuriet, Esq.
KING & SPALDING LLP
25 Cannon Street
London EC4M 5SE
United Kingdom                                 *By mail and fax 00 44 207 551 7575*

Mr. Vardan Ayvazian
Building 22, Block 6, Apartment 16
Charentsavan - Kotaik Region
Armenia                                         *By DHL*

Mr. Vardan Ayvazian
10 Alex Manukian Street
Yerevan
Armenia                                         *By DHL*

Ms. Mayren Batoyan
Apartment 28, b.135, A. Babajanian Street
Yerevan
Armenia                                         *By DHL*

Mr. Edward Janibekian
Apartment 1344, b.23, Terian Street
Yerevan
Armenia                                         *By DHL*

Mr. Yurik Lalazaryan
66 Spandarian Street
Etchmiadzin
Armenia                                         *By DHL*

.../..

ICC International Court of Arbitration • Cour internationale d'arbitrage de la CCI
38, Cours Albert 1er 75008 Paris France
Telephone +33 1 49 53 28 28 - Email +33 1 49 53 29 29 - +33 1 49 53 29 33
Website: www.iccarbitration.org  E-mail arbitrationcc@iccwbo.org

14/05 2007 16 02 FAX  33 1 49 53 29 33    ICC ARBITRATION                    @003/003

14 770/EBS                                                                   Page 2
_____    _____

Dear Madame,
Dear Sirs,

The Secretariat informs you that the Court took the following decisions at its session of
11 May 2007:

1.    Decided not to reconsider its decision dated 9 March 2007, deciding in accordance with
      Article 6(2) of the Rules that this matter shall only proceed between the following:

      GLOBAL GOLD MINING, LLC (U.S.A.) vs/ 1. Ms. Mayren Batoyan (Armenia) 2.
      Mr. Edward Janibekian (Armenia) 3. Mr. Yurik Lalazaryan (Armenia)

2.    Took the necessary steps for the appointment of the Chairman of the Arbitral Tribunal.

We remind the parties that as the provisional advance has been fully paid, the file shall be
transmitted to the Arbitral Tribunal, once fully constituted, in accordance with Article 13 of the
Rules.

Yours faithfully,

Erica Stein
Counsel
Secretariat
ICC International Court of Arbitration

c.c.:    Jonathan D. Schiller, Esq.
         Dr. Ivan Zykin
         (by mail and fax)

# EXHIBIT 9



**International Chamber of Commerce**

*The world business organization*



International Court of Arbitration ● Cour internationale d'arbitrage

## TELECOPIER
## TRANSMISSION PAR TELECOPIE

| 6 AUGUST 2007 | | CASE 14 770/EBS/VRO |
|---|---|---|

| RECIPIENTS | | FAX NUMBER |
|---|---|---|
| R. Doak Bishop, Esq. | | 00 1 713 751 3290 |
| Wade M. Coriell, Esq. | | |
| Kenneth R. Fleuriet, Esq. | | 00 44 20 7 551 7575 |
| Prof. Hans Smit | | 00 1 212 322 4256 |
| Jonathan D. Schiller, Esq. | | 00 1 202 237 6131 |
| Dr. Ivan Zykin | | 00 7 495 203 9226 |

| SENDER | TELEPHONE NUMBER | FAX NUMBER |
|---|---|---|
| Victoria Orlowski | +33 1 49 53 28 32 | +33 1 49 53 57 80 |

PAGES (INCLUDING COVER SHEET):   10 (FOR THE PARTIES)
                                            20 (FOR THE CHAIRMAN)
                                            28 (FOR THE CO-ARBITRATORS)

IN CASE OF ANY PROBLEMS WITH THIS TRANSMISSION, PLEASE CALL +33 1 49 53 28 56/29 82

THE INFORMATION CONTAINED IN THIS FAX IS CONFIDENTIAL INFORMATION ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE.  IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION OF COPYING OF THIS COMMUNICATION IS PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE POSTAL SERVICE. THANK YOU

LES INFORMATIONS CONTENUES DANS CETTE TELECOPIE SONT CONFIDENTIELLES ET SONT DESTINEES A L'USAGE EXCLUSIF DU(DES) DESTINATAIRE(S). LA PERSONNE QUI REÇOIT CETTE TELECOPIE ET QUI N'EST PAS LE DESTINATAIRE, L'UN DE SES EMPLOYES, OU UN MANDATAIRE HABILITE A REMETTRE CE MESSAGE AU DESTINATAIRE EST AVISE QU'IL EST INTERDIT D'EN DIVULGUER OU D'EN REPRODUIRE LE CONTENU. SI VOUS AVEZ REÇU CETTE COMMUNICATION PAR ERREUR, NOUS VOUS SAURIONS GRE DE NOUS LE FAIRE CONNAITRE PAR TELEPHONE DANS LES MEILLEURS DELAIS ET DE NOUS RETOURNER CELLE-CI PAR VOIE POSTALE. MERCI.

**ICC International Court of Arbitration ● Cour internationale d'arbitrage de la CCI**
38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28.  Faxes +33 1 49 53 29 29 / +33 1 49 53 29 33
Website www.iccarbitration.org    E-mail arbitration@iccwbo.org

06/08 2007 18 19 FAX  33 1 49 53 28 33    ICC ARBITRATION                   ☎ 008/010



**International Chamber of Commerce**

*The world business organization*

International Court of Arbitration • Cour internationale d'arbitrage

6 August 2007/cj:mlk

14 770/EBS/VRO

GLOBAL GOLD MINING, LLC (U.S.A.) vs/ 1. Mayren Batoyan (Armenia) 2. Edward Janibekian (Armenia) 3. Yurik Lalazaryan (Armenia)

---

Counsel in charge of the file: Ms. Victoria Orlowski (dir. tel: 33 1 49 53 28 32 - dir. fax: 33 1 49 53 57 80)
Assistant Counsel responsible for file: Mr. Matthias Kuscher (dir. tel: 33 1 49 5 1 28 61)
Email: ica5@iccwbo.org

R. Doak Bishop, Esq.
Wade M. Coriell, Esq.
KING & SPALDING LLP
1100 Louisiana Street, Suite 4000
Houston, Texas 77002-5213
U.S.A.

*By mail and fax 00 1 713 751 3290*

Kenneth R. Fleuriet, Esq.
KING & SPALDING LLP
25 Cannon Street
London EC4M 5SE
United Kingdom

*By mail and fax 00 44 207 551 7575*

Ms. Mayren Batoyan
Apartment 28, b.135, A. Babajanian Street
Yerevan, 375000
Armenia

*By DHL*

Mr. Edward Janibekian
Apartment 1344, b.23, Terian Street
Yerevan, 375000
Armenia

*By DHL*

Mr. Yurik Lalazaryan
66 Spandarian Street
Echmiadzin, 378310
Armenia

*By DHL*

Dear Madame, Dear Sirs,

The Secretariat informs you that the Court, at its session of 27 July 2007:

1.   Decided not to reconsider its decision dated 11 May 2007 that this matter shall only proceed between the following:

GLOBAL GOLD MINING, LLC (U.S.A.) vs/ 1. Ms. Mayren Batoyan (Armenia) 2. Mr. Edward Janibekian (Armenia) 3. Mr. Yurik Lalazaryan (Armenia)

38, Cours Albert 1er, 75008 Paris, France.
Telephone +33 1 49 53 28 28 - Fax +33 1 49 53 29 29/33 1 49 53 29 33
Website www.iccarbitration.org  E-mail arb@iccwbo.org

14 770/EBS/VRO                                                        Page 2

2.    Appointed Professor Hans Smit as Chairman of the Arbitral Tribunal upon the proposal
      of the Dutch National Committee.

As the provisional advance has been fully paid, in accordance with Article 13 of the Rules, the
file is being transmitted to the Arbitral Tribunal today.

The parties should henceforth correspond directly with the Arbitral Tribunal and send copies of
their correspondence to the other parties and to the Secretariat.

In conformity with Article 30(3) of the Rules, the parties are invited to pay within <u>30 days</u>
from the day following the date of receipt of this letter the advance or costs fixed by the Court
at US$ 280 000, subject to later readjustments, in the following manner:

      Claimant:      US$  73 000 (US$ 140 000 less US$ 67 000 already paid)
      Respondents:   US$ 140 000

by transfer to our bank account according to the following instructions

Beneficiary (Account holder):        International Chamber of Commerce
                                     38, cours Albert 1er
                                     75008 Paris, France

Bank of Beneficiary:                 UBS SA
                                     35, rue des Noirettes
                                     P.O. Box 2600
                                     1211 Geneva 2, Switzerland

IBAN:                                CH06 0024 0240 2245 3461 R

Swift Code/BIC:                      UBSWCHZH80A

Please include the reference 14 770/EBS/VRO/Claimant or 14 770/EBS/VRO/Respondents
on your payment for its prompt and accurate crediting.

Yours faithfully,

Victoria Orlowski
Counsel
Secretariat
ICC International Court of Arbitration

c.c.:   Prof. Hans Smit
        Jonathan D. Schiller Esq.
        Dr. Ivan Zykin
        (by DHL and fax)

# EXHIBIT 10



**International Chamber of Commerce**
*The world business organization*

International Court of Arbitration • Cour internationale d'a bitrage

6 August 2007/cj:mlk

14 770/EBS/VRO

GLOBAL GOLD MINING, LLC (U.S.A.) vs/ 1. Mayren Batoya n (Armenia) 2. Edward Janibekian (Armenia) 3. Yurik Lalazaryan (Armenia)

---

Counsel in charge of the file: Ms. Victoria Orlowski (dir. tel: 33 1 49 53 28 32 - dir. fax: 33 1 49 53 57 80)
Assistant Counsel responsible for file: Mr. Matthias Kuscher (dir. tel: 33 1 49 5 | 28 61)
Email: ica5@iccwbo.org

Prof. Hans Smit
COLUMBIA LAW SCHOOL
435 West 116th Street
New York, New York 10027
U.S.A.

By DHL a d fax 00 1 212 222 4256

Jonathan D. Schiller Esq.
BOIES SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue N.W., Suite 800
Washington, D.C. 20015-2015
U.S.A.

By DHL a d fax 00 1 202 237 6131

Dr. Ivan Zykin
6 Illinka Street
109012 Moscow
Russian Federation

By DHL ai d fax 00 7 495 203 9226
00 7 495 929 0334

Dear Sirs,

The Secretariat informs you that the Court, at its session of 27 July 200 7:

1.    Decided not to reconsider its decision dated 11 May 2007 that this matter shall only proceed between the following:

GLOBAL GOLD MINING, LLC (U.S.A.) vs/ 1. Ms. Ma ren Batoyan (Armenia) 2. Mr. Edward Janibekian (Armenia) 3. Mr. Yurik Lalazaryan ( Armenia)

2.    Appointed Professor Hans Smit as Chairman of the Arbitral Tr bunal upon the proposal of the Dutch National Committee.

The Secretariat herewith forwards to you the file in the above-referenced case, in accordance with Article 13 of the Rules. The file consists of the documents on the attached list.

The Secretariat takes this opportunity to draw your attention to the foll wing points:

.../...

---

ICC International Court of Arbitration • Cour internationale d'arbitrage de la CCI
38. Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28   Faxes +33 1 49 53 28 29 / +33 1 49 53 29 33
Website www.iccarbitration.org   E-mail arb@iccwbo.org

14 770/EBS/VRO                                                      Page 2
---------------------------------------------------------------------------

**I.    Constitution of the Arbitral Tribunal:**

On 9 March 2007, the Court, confirmed Jonathan D. Schiller, Esq., as co-arbitrator upon the nomination of Claimant, and directly appointed Dr. Ivan Zykin as co-arbitrator on behalf of Respondents, who failed to nominate a co-arbitrator.

**II.    Names and addresses of the parties to the proceedings:**

Claimant:

    GLOBAL GOLD MINING, LLC
    104 Field Point Road
    Greenwich, Connecticut 06830
    U.S.A.

Counsel for Claimant is:

    R. Doak Bishop, Esq.
    Wade M. Coriell, Esq.
    KING & SPALDING LLP
    1100 Louisiana Street, Suite 4000
    Houston, Texas 77002-5213
    U.S.A.

    Kenneth R. Fleuriet, Esq.
    KING & SPALDING LLP
    25 Cannon Street
    67-69 Lindoln's Inn Fields, London EC4M 5SE
    United Kingdom

Respondents:

    Mayren Batoyan
    Apartment 28, b.135, A. Babajanian Street
    Yerevan, 375000
    Armenia

    Edward Janibekian
    Apartment 1344, b.23, Terian Street
    Yerevan, 375000
    Armenia

    Yurik Lalazaryan
    66 Spandarian Street
    Echmiadzin, 378310
    Armenia

    Respondents are not represented by counsel.

                                                                    .../...

14 770/EBS/VRO                                                           Page 3
------------------------------------------------------------------------------

We note that the Request was originally filed against four Respondents. The Court, at its session of 9 March 2007, decided, pursuant to Article 6(2) of the Rules, that this arbitration shall proceed only between:

GLOBAL GOLD MINING, LLC (U.S.A.) vs/ 1. Ms. Mayren Basoyan (Armenia) 2. Mr. Edward Janibekian (Armenia) 3. Mr. Yurik Lalazaryan (Armenia)

III.  **Place of arbitration:**

New York, New York, U.S.A. is the place of arbitration.

IV.  **Financial status of the file:**

Based on the information in the Secretariat's possession, the Secretary General fixed the provisional advance at US$ 67 000, which is intended to cover the costs of this arbitration until the Terms of Reference have been drawn up, in accordance with Article 30(1) of the Rules.

The provisional advance has been fully paid by Claimant.

The Court, at its session of 9 March 2007, fixed the advance on costs at US$ 280 000, subject to later readjustments. To date, the advance on costs has been paid by the parties in the following manner:

     Claimant:    US$ 67 000
     Respondents: US$ .     0

As indicated in Article 30(2) of the Rules and Article 1(4) of Appendix III, the advance on costs covers the fees of the Arbitral Tribunal, the reimbursable expenses and the ICC administrative expenses.

Depending on the evolution of the matter, the Court may readjust the advance on costs at a later date.

The amount in dispute is partially quantified at US$ 5 000 000 for the principal claims.

The Secretariat encourages the Arbitral Tribunal to state the amount in dispute in the Terms of Reference as precisely as possible. Furthermore, during the course of the proceedings, the Arbitral Tribunal should inform the Secretariat of any change in the amount in dispute in order to permit the Court to consider whether any adjustment of the advance on costs is appropriate.

V.  **Procedure:**

Your first task is to establish the Terms of Reference and the procedural timetable, in accordance with Article 18 of the Rules. In this regard, we draw your attention to the time limit of two months within which the Terms of Reference must be transmitted to the Court.

                                                                    .../...

14 770/EBS/VRO                                                                    Page 4

----------------------------------------------------------------------------------------

The Court attaches particular importance to the rapid resolution of arbitrations conducted under its Rules. You should therefore make every effort to finalize the Terms of Reference within the period provided for in the Rules. Although extensions of time may be granted by the Court, avoidable delay in the completion of the Terms of Reference may be taken into account by the Court in fixing the arbitrators' fees (see Article 2(2) of Appendix III). Moreover, Article 12(2) of the Rules provides that an arbitrator shall be replaced when the Court decides that he is not fulfilling his functions within the prescribed time limits.

You are also advised that:

(i)     when drawing up the Terms of Reference, or as soon as possible thereafter, the Arbitral Tribunal, after having consulted with the parties, shall establish in a separate document a provisional timetable that it intends to follow for the conduct of the arbitration and shall communicate it to the Court and the parties (see Article 18(4) of the Rules);

(ii)    in accordance with Article 24(1) of the Rules, the time limit within which the Arbitral Tribunal must render its Final Award is six months, running from the date of the last signature of the Terms of Reference, or in case of application of Article 18(3) of the Rules, from the date of the Secretariat's notification to the Arbitral Tribunal of the Court's approval of the Terms of Reference;

(iii)   although the Rules permit this time limit to be extended by the Court if necessary, we would like to emphasize the importance of conducting the arbitration proceedings as rapidly as may be reasonably possible in the circumstances;

(iv)    whenever the Arbitral Tribunal is to issue an Award with respect to all or part of the case, the Arbitral Tribunal should declare the proceedings closed as to the issues to be decided and indicate to the Secretariat an approximate date by which the draft Award will be submitted for scrutiny by the Court (see Article 22 of the Rules); and

(v)     in accordance with Article 27 of the Rules, every draft Award shall be submitted to the Court for scrutiny and no Award can be rendered by the Arbitral Tribunal until it has been approved by the Court as to its form. Parties should not be communicated the text of any Award before it has been approved by the Court and notified by the Secretariat.

VI.    **Payment of fees and reimbursement of expenses:**

As a general indication, on the basis of the information available at present, the fees of an arbitrator may vary between US$ 23 750 and US$ 114 600 for this matter, in view of the amount in dispute.

With regard to remuneration, we urge you to familiarize yourself with the relevant provisions of the Rules and the scale of arbitrator's fees contained in Appendix III thereto. Please note, in particular, that an arbitrator's fees are fixed exclusively by the Court and that separate fee arrangements between the parties and an arbitrator are not permitted. Arbitral fees are moreover fixed only at the end of the proceedings, although advances on fees and reimbursement of expenses may be granted upon the completion of concrete steps in the arbitration.  In setting an arbitrator's fees, the Court considers the factors set forth in Article 2(2) of Appendix III to the Rules. The Court thus takes into account the diligence of the arbitrator, the time spent, the rapidity of the proceedings and the complexity of the dispute. An arbitrator's usual hourly rate or the systems of remuneration in an arbitrator's profession in his or her country are not taken into consideration by the Court in determining fees.

.../...

Please find enclosed a note concerning the reimbursement of arbitrators' expenses.

Further, the Secretariat invites you to complete the enclosed Banking Instructions form in full. Please be sure to include the swift code, the absence of which may cause payments to be delayed.

Finally, we draw your attention to the fact that under French taxation law, the ICC must declare annually to the French tax authorities the amount of fees (including advances on fees) paid to each arbitrator during the calendar year, as well as the expenses reimbursed to each arbitrator by the ICC during the same time period.

## VII.  VAT, Taxes, Charges and Imposts Applicable to Arbitrators' Fees:

Also enclosed is the Note on VAT, Taxes, Charges and Imposts Applicable to Arbitrators' Fees (hereafter "Note on VAT").

In accordance with the Note on VAT, the ICC proposes a new service through which it acts as depositary for funds that arbitrators subject to VAT may ask the parties to pay.

It is up to any arbitrator who wishes to use the service to follow the steps set forth in the Note.

## VIII. International Centre for Expertise:

Should you require the assistance of an expert in connection with the arbitration, please do not hesitate to call upon the ICC International Centre for Expertise (+ 33 1 49 53 30 53). The Centre will be pleased to propose the name of an expert free of charge in an ICC arbitral proceeding upon request of the Arbitral Tribunal. The Centre is also available to assist parties in need of an expert for a fee of US$ 2 500. More information about the services provided by the Centre can be found at www.iccexpertise.org.

## IX.  Correspondence:

From now on, the parties should correspond directly with the Arbitral Tribunal and send copies of their correspondence to the other parties and to the Secretariat. The Arbitral Tribunal is invited to send a copy of all their correspondence with the parties to the Secretariat.

## X.  Article 6(2) of the Rules:

At its session of 9 March 2007, the Court, being *prima facie* satisfied that an arbitration agreement under the Rules may exist, decided that this arbitration would proceed. This decision being administrative in nature, the Arbitral Tribunal must still decide on its own jurisdiction in accordance with Article 6(2) of the Rules.

.../...

---

<u>Secretariat of the ICC International Court of Arbitration</u>

Should you have any questions with regard to the above, please do not hesitate to contact:

| | |
|---|---|
| Ms. Victoria Orlowski, Counsel | (direct dial number +33 1 49 53 28 32) |
| Mr. Matthias Kuscher, Assistant Counsel | (direct dial number +33 1 49 53 28 61) |
| Ms. Michele E. O'Brien, Assistant Counsel | (direct dial number +33 1 49 53 29 53) |
| Ms. Carmel Jantzen, Secretary | (direct dial number +33 1 49 53 29 82) |
| Ms. Melinda Liyanage-Paaris, Secretary | (direct dial number +33 1 49 53 28 56) |

Yours faithfully,

Victoria Orlowski
Counsel
Secretariat
ICC International Court of Arbitration

Encl.:  Copy of the Secretariat's letter of today to the parties
        List of Documents and documents mentioned therein (*documents by DHL only*)
        Note regarding Personal and Arbitral Tribunal Expenses
        Banking Instructions form
        Note on VAT, taxes, charges and imposts applicable to arbitrators' fees
        *Curriculum vitae of the Chairman (for the co-arbitrators only)*
        *Curriculum vitae of the co-arbitrators (for the Chairman only)*

c.c.:   R. Doak Bishop, Esq.
        Wade M. Coriell, Esq.
        Kenneth R. Fleuriet, Esq.
        (*by mail and fax without enclosures*)

        Ms. Mayren Batoyan
        Mr. Edward Janibekian
        Mr. Yurik Lalazaryan
        (*by DHL only without enclosures*)

06/08 2007 18 19 FAX  33 1 49 53 29 33    ICC ARBITRATION                    @008/010



**International Chamber of Commerce**
*The world business organization*

International Court of Arbitration • Cour internationale d'arbitrage

## ICC CASE N° 14 770/EBS/VRO

### LIST OF DOCUMENTS

**A.    DOCUMENTS SUBMITTED BY CLAIMANT:**

1. Letter to the Secretariat dated 28 December 2006
2. Request dated 28 December 2006
3. Letter to the Secretariat dated 2 January 2007
4. Letter to the Secretariat dated 27 March 2007
5. Letter to the Secretariat dated 20 April 2007
6. Letter to the Secretariat dated 8 June 2007
7. Letter to the Barton Legum dated 28 June 2007
8. Letter to the Secretariat dated 24 July 2007

*(The co-arbitrators have already received copies of the Request for Arbitration).*

**B.    DOCUMENTS SUBMITTED BY RESPONDENTS:**

1. Mr. Yurik Lalazaryan's letter to the Secretariat dated 19 March 2007

**C.    DOCUMENTS SUBMITTED BY THE SECRETARIAT:**

1. Letter to Claimant dated 9 January 2007
2. Letter to Respondents 1 – 4 dated 9 January 2007
3. Letter to the parties dated 13 February 2007
4. Letter to the parties dated 26 February 2007
5. Letter to the parties dated 12 March 2007
6. Letter to Mr. Vardan Ayvazian dated 14 March 2007
7. Letter to the parties dated 6 April 2007
8. Letter to the parties dated 11 May 2007
9. Letter to the parties dated 14 May 2007
10. Letter to the parties dated 18 June 2007, with attached letter from Mr. Barton Legum dated 15 June 2007
11. Letter to the parties dated 19 July 2007

ICC International Court of Arbitration • Cour internationale d'arbitrage de la CCI
38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28  Fax+33 1 49 53 29 29 / +33 1 49 53 29 33
Website www.iccarbitration.org  E-mail arbit@iccwbo.org

# EXHIBIT 11

TRANSLATION

International Court of Arbitration of
International Chamber of Commerce

VIA FAX

To the attention of:
Jennifer Sharman
Tel:   +33 1 49 53 28 61
Fax:   +33 1 49 53 57 80

Dear Sirs:

I received the Request for Arbitration submitted on behalf of Global Gold Mining LLC (the "Request"), in connection of which I would like to state that I agree with the provisions of the Request, except that I did not violate the SPA provisions, including any representation and warranties made therein on my behalf, since I believed that SHA had all the assets and governmental authorizations and that SHA complied under legal requirements as represented in the SPA, as I was assured before signing of the SPA, and that I am not responsible for such violations made by other shareholders, including the undisclosed to Global Gold shareholder Vardan Ayvazian.

Specifically, my reservation with the Request point 4 is that I did not lie to Global Gold, based on the aforementioned. Regarding the Request point 14, I acted in good faith during all the time and tried my best not to allow a breach or a dispute, however, I had no control over the other shareholders, including Vardan Ayvazian, to prevent the situation we are facing at this time.

I remained as a director of SHA after signing of the SPA, and worked towards the benefit of SHA, including towards the fulfillment of any and all representations and warranties I made on my behalf to Global Gold. I regret that the other shareholders took this path which completed into the situation we are all facing now.

Sincerely,

_[signature]_

Yurik Lelazarian
March 19, 2007

_I as a lawyer of Mr. Yurik Lalazaryan presented and explained the content of the current paper to my client and certify that both Armenian and English version of this letter are identical._

_Arsen Karakhanyan_  _[signature]_
_march 19, 2007_

Միջազգային Ներդրող Դրամատ
Միջազգային Արժութային Դրամագին

ՀՐԱՄ ՄԵՆՃՈՒՆ

Ռունվեր Գրոստան ուղղարկուծ

հեռախոս    +33 1 49 53 28 61
ֆաքս       +33 1 49 53 57 80

Հարգելի պարոններ,

[text redacted / illegible]

[text redacted / illegible]

[text redacted / illegible]

Հարգանքներով

Ֆիլիպ Լապարարան
1? սՄարտ, 2007թ

# EXHIBIT 12

**United States**

# ICC United States

| | |
|---|---|
| **Address:** | (New York Office)<br>US Council for International Business (USCIB)<br>1212 Avenue of the Americas<br>New York, NY 10036<br>USA<br>(Washington D.C. Office)<br>US Council for International Business<br>1400 K Street, NW, Suite 905<br>Washington, DC 20005<br>USA |
| **Email:** | Click here to send an email |
| **Tel:** | +1 212 354 44 80 |
| **Fax:** | +1 212 575 03 27 |
| **Web:** | http://www.uscib.org/ |

**New York Office:**

| | |
|---|---|
| **Chair:** | William Parrett |
| **Vice Chairs:** | Ronald O. Baukol, William D. Eberle, Edward Galante, Charles O. Holliday, Richard D. McC<br>Niles |
| **President and CEO:** | Peter M. Robinson |
| **Executive Vice-President and Senior Policy Officer:** | Ronnie L. Goldberg |
| **Senior Vice President, Carnet and Customs Operations:** | Cynthia Duncan |
| **Secretary:** | John E. Merow |

**Washington Office:**

| | |
|---|---|
| **Senior Vice President:** | Timothy E.Deal |
| **Secretary:** | Edna Fox |

The USCIB is an ICC national committee. These national bodies comprise leading companies and busir countries or territories. National committees shape ICC policies and alert their governments to internatic Companies and business associations interested in joining are invited to contact the USCIB.

# EXHIBIT 13

# International Court of Arbitration

# Bulletin

**Volume 18 No. 1 — 2007**

2006 Statistical Report

ICC Arbitration News

Techniques for Controlling Time and Costs in Arbitration

ICC Dispute Board Rules: Practitioners' Views

*Amiable Composition* and ICC Arbitration

Extracts from ICC Arbitral Awards Relating to *Amiable Composition*



International Chamber of Commerce
*The world business organization*

## Awards

Most commonly chosen places of arbitration

| Country | No. of times selected during 2006 | City | No. of times selected during 2006 |
|---|---|---|---|
| France | 102 | Paris | 101 |
| Switzerland | 95 | Geneva | 49 |
| United Kingdom | 40 | Zurich | 41 |
| USA | 33 | London | 40 |
| Germany | 20 | New York City | 17 |
| Brazil | 14 | Singapore | 12 |
| Singapore | 12 | Mexico City | 11 |
| Mexico | 11 | Brussels | 10 |
| Belgium | 10 | Frankfurt | 9 |
| China | 10 | Hong Kong | 9 |
| Netherlands | 10 | The Hague | 9 |
| Canada | 8 | Madrid | 6 |
| Italy | 8 | São Paulo | 6 |
| Spain | 7 | Rio de Janeiro | 5 |

### Number of awards

A total of 293 awards were approved by the Court in 2006. They included 179 final awards, 82 partial awards and 32 awards by consent. The last twenty years have seen an increase in the proportion of partial awards from 24% of all awards approved during the period 1987–1996 to 28% of all awards approved during the period 1997–2006. Whilst the proportion of final awards remained relatively stable over the same periods, the percentage of awards by consent dropped from 13% between 1987 and 1996 to 10% between 1997 and 2006.

### Languages

Around three-quarters of the awards rendered in 2006 were in English. French and Spanish were the next most common languages, followed by German, Italian and Portuguese. In the course of the year an award was also rendered in each of the following languages: Arabic, Serbian, Swedish and Turkish.

### Making of the award

The great majority of awards rendered by three-member tribunals were made unanimously. In 2006, the number of awards in which the arbitrators failed to reach unanimity was 23. All of these were majority awards; on no occasion was it necessary for the award to be rendered by the chairman of the tribunal alone.

### Scrutiny

Awards made by ICC arbitral tribunals are submitted to the Court for approval pursuant to Article 27 of the ICC Rules of Arbitration. When scrutinizing awards for purposes of approval, the Court may lay down modifications as to the form of the award or draw the arbitral tribunal's attention to points of substance. This it did when approving 248 awards in 2006, leaving just 45 awards approved without commentary by the Court. On a further 29 occasions, the Court requested that the tribunal resubmit its award for approval.

### Correction/Interpretation

If, after an award has been rendered and notified, it proves necessary to correct or interpret any part of the award, the tribunal may issue an addendum pursuant to Article 29 of the ICC Rules of Arbitration. A total of 23 addenda were issued by ICC tribunals in the course of 2006. Seventeen decisions were issued by arbitral tribunals rejecting applications for the correction or interpretation of their awards.

### Article 27

Before signing any Award, the Arbitral Tribunal shall submit it in draft form to the Court. The Court may lay down modifications as to the form of the Award and, without affecting the Arbitral Tribunal's liberty of decision, may also draw its attention to points of substance. No Award shall be rendered by the Arbitral Tribunal until it has been approved by the Court as to its form.

*Full text of the Rules of Arbitration available in ICC Publication 838 and at www.iccarbitration.org*

## Place of arbitration

In 86.6% of the cases filed in 2006, the parties themselves decided where their arbitration would be seated. In the remaining 13.4% of cases, where the parties disagreed or had made no clear choice, the Court fixed the place of arbitration.

A total of 89 different cities in a record 52 countries were selected for ICC arbitrations in 2006. France and Switzerland continued to be the most commonly chosen countries. In Central and East Europe the range of countries chosen continued to widen, as was also the case in sub-Saharan Africa, where for the first time ICC arbitrations were seated in Mali and Togo.

As far as the cities are concerned, those most frequently selected have remained the same since 2000 (Paris, London, Geneva, Zurich, New York, Singapore), although the order of frequency has varied from year to year. As in previous years, Paris was by far the preferred place of arbitration in 2006 followed by Geneva, Zurich and London, and then New York and Singapore. A notable development was the emergence of São Paulo and Rio de Janeiro in Brazil

With regard to the arbitrations located in the USA, 17 were seated in the State of New York, three in Washington D.C., two each in California, Florida, Minnesota, Texas and Virginia, and one each in Colorado, Illinois and Ohio.

| Country | Number of times agreed by the parties | Number of times fixed by the Court* | Total | Country | Number of times agreed by the parties | Number of times fixed by the Court* | Total |
|---|---|---|---|---|---|---|---|
| ALGERIA | 2 | 0 | 2 | MALI | 1 | 0 | 1 |
| ARGENTINA | 3 | 0 | 3 | MEXICO | 9 | 2 | 11 |
| AUSTRIA | 2 | 1 | 3 | MOROCCO | 2 | 0 | 2 |
| BAHAMAS | 1 | 0 | 1 | NEPAL | 2 | 0 | 2 |
| BANGLADESH | 1 | 0 | 1 | NETHERLANDS | 10 | 0 | 10 |
| BELGIUM | 7 | 3 | 10 | NEW ZEALAND | 1 | 0 | 1 |
| BRAZIL | 12 | 2 | 14 | NIGERIA | 1 | 0 | 1 |
| CANADA | 5 | 3 | 8 | NORWAY | 2 | 0 | 2 |
| CHILE | 1 | 0 | 1 | PAKISTAN | 1 | 0 | 1 |
| CHINA | 9 | 1 | 10 | PHILIPPINES | 3 | 0 | 3 |
| INCL. H. KONG. | 8 | 1 | 9 | POLAND | 3 | 0 | 3 |
| CROATIA | 1 | 0 | 1 | PORTUGAL | 2 | 0 | 2 |
| DENMARK | 3 | 0 | 3 | ROMANIA | 2 | 0 | 2 |
| FINLAND | 1 | 0 | 1 | SAUDI ARABIA | 1 | 0 | 1 |
| FRANCE | 81 | 21 | 102 | SERBIA | 1 | 0 | 1 |
| GERMANY | 18 | 2 | 20 | SINGAPORE | 11 | 1 | 12 |
| GREECE | 4 | 0 | 4 | SLOVAKIA | 1 | 0 | 1 |
| HUNGARY | 1 | 0 | 1 | SPAIN | 7 | 0 | 7 |
| INDIA | 2 | 0 | 2 | SRI LANKA | 3 | 0 | 3 |
| INDONESIA | 1 | 0 | 1 | SWEDEN | 4 | 1 | 5 |
| ITALY | 8 | 0 | 8 | SWITZERLAND | 82 | 13 | 95 |
| IVORY COAST | 1 | 0 | 1 | TOGO | 1 | 0 | 1 |
| JAPAN | 3 | 1 | 4 | TURKEY | 1 | 1 | 2 |
| JORDAN | 1 | 0 | 1 | U. ARAB EMIRATES | 1 | 0 | 1 |
| KOREA (REP. OF) | 1 | 0 | 1 | UNITED KINGDOM | 37 | 3 | 40 |
| LEBANON | 1 | 0 | 1 | USA | 28 | 5 | 33 |
| LITHUANIA | 1 | 0 | 1 | | | | |

*\* In a number of these cases, the Court merely fixed the city, the parties having chosen the country.*

# EXHIBIT 14

# Costs of arbitration

## Overview

The costs of the arbitration include the fees and expenses of the arbitrators and the ICC administrative costs fixed by the Court in accordance with the scale in force, as well as the fees and expenses of any experts appointed by the Arbitral Tribunal and the reasonable legal and other costs incurred by the parties for the arbitration (**Article 31 (1)**).

Once the arbitrators' fees and expenses and the ICC administrative costs have been fixed by the Court at the end of the proceedings, the Arbitral Tribunal fixes the costs of the arbitration in the Award and decides which of the parties shall bear them or in what proportion they shall be borne by the parties (**Article 31(3)**).

## Fees and administrative expenses calculator

 This **calculator** enables prospective parties to an ICC arbitration to apply the scales of Appendix III for ICC administrative expenses and arbitrators' fees.

## Costs of the arbitration - Details

- **Arbitrators' fees**

The arbitrators' fees are managed by the Court and fixed on the basis of the relevant scale found in Appendix III (**Article 4 (B)**), taking into consideration the diligence of the arbitrators, the time spent, the rapidity of the proceedings and the complexity of the dispute (Appendix III, **Article 2 (2)**). Based on the amount in dispute, the scale provides a minimum and a maximum for one arbitrator.

The fees are multiplied by the number of arbitrators up to a maximum which shall normally not exceed three times the fees of one arbitrator. In case of necessity due to exceptional circumstances, the Court may fix the fees of the arbitrators at a figure higher or lower than that which would result from the application of the relevant scale (**Article 31 (2)**). Where the sum in dispute is not stated, the Court fixes the arbitrators' fees at its discretion.

- **Arbitrators' expenses**

The arbitrators' expenses are also managed by the Court and include such expenses as for travel, accommodation, meals, couriers and facilities for hearings.

- **ICC administrative expenses**

The "administrative expenses", also referred to as "administrative costs", represent the fee charged by the ICC Court for the administration of an arbitration case. The amount of US$ 2500, the payment of which accompanies the Request, is an advance on administrative expenses. Since this first advance is not refundable, it is often called the registration fee, or filing fee. The Court fixes the administrative expenses on the basis of the scales set out in Appendix III (**Article 4 (A)**), or, where the sum in dispute is not stated, at its discretion. In exceptional

circumstances, the Court may fix the administrative expenses at a lower or higher figure than that which would result from the application of the scale (Appendix III, **Article 2 (5)**) provided the expenses shall normally not exceed the maximum amount of the scale (US$ 88 800).

- **Fees and expenses for expert(s)**

In those cases where an expertise is ordered by the Arbitral Tribunal, the latter fixes the fees and expenses of the expert(s) and is responsible for the management and payment of such fees and expenses by the parties. The costs of an expertise are not covered by the advance on costs required by ICC, although the Secretariat may administer the accounts as a service to the Arbitral Tribunal.

## Legal costs

The cost of legal representation and the other costs incurred by the parties for the arbitration are not covered by the advance on costs required by ICC. They are included in the costs of the arbitration as fixed by the Arbitral Tribunal in the Award.

## Advances on costs

The ICC advance on costs system is designed to ensure that an arbitration may proceed as soon as the relevant fees and expenses of the arbitrators and the institution are covered. The advances do not cover legal costs nor the fees and expenses of an expert. Payment is staggered as follows:

- **Advance on administrative expenses (filing fee)**

A first advance on administrative expenses of US$ 2500 is payable by the Claimant with the Request for Arbitration.

- **Provisional advance**

After a review of the Request, the Secretary General normally requires the Claimant to pay a provisional advance in an amount intended to cover the costs of the arbitration until the Terms of Reference have been drawn up. This advance shall normally not exceed the amount obtained by adding together (1) the administrative expenses resulting from the scale, (2) the minimum on the scale of arbitrators' fees, and (3) the expected reimbursable expenses of the Arbitral Tribunal incurred with respect to the drawing of the Terms of Reference (Appendix III, **Article 1(2)**). These calculations are made on the basis of the Claimant's claim only. Current practice indicates that the provisional advance is usually in the range of 25% to 35% of the advance as calculated for the entire arbitration.

- **Advance on costs**

As soon as practicable, the Court, taking account of all claims and counter-claims, fixes the advance on costs payable in equal shares by Claimant and Respondent (the amount of the provisional advance that has already been paid, which includes the initial US$ 2500, is credited to the Claimant's share). In certain circumstances, the Court may fix separate advances in respect of a principal claim and a counter-claim. The advance fixed by the Court is calculated for the entire arbitration and can be revised at any stage of the procedure. A special calculator is provided here to help parties make an assessment of arbitrators' fees and administrative expenses. As the arbitrators' expenses are not determinable beforehand, they are not included in the computation made by the calculator.

If the Claimant or the Respondent pays its share of the advance on costs and the other refuses to pay, the former

will be invited to pay on behalf of the latter.

# EXHIBIT 15

## New Court Director for North America
Paris, 6 September 2006

Josefa Sicard-Mirabal has taken up her new position as Director, Arbitration and ADR, North America, for the ICC International Court of Arbitration. She succeeds Lorraine M. Brennan, who is returning to private practice with a leading international law firm in the United States.

Ms Sicard-Mirabal graduated in law from the Universidad Catolica Madre y Maestra in the Dominican Republic and continued her studies in the US at Fordham University School of Law. She began her legal career as judge and subsequently chief justice in the Dominican Republic. Since 1989 she has been a practising attorney with major law firms in the US, specializing in international arbitration and litigation, and international business transactions including mergers and acquisitions and capital market transactions. Ms Sicard-Mirabal is admitted to practise in both the Dominican Republic and the State of New York and is the founder and chair of Dominicans on Wall Street, a non-profit organization that serves as a liaison between Dominican companies seeking access to US and international capital markets and US companies wishing to invest in the Dominican Republic. Ms Sicard-Mirabal speaks English, French and Spanish.



The International Court of Arbitration's new Director of Arbitration and ADR for North America, Josefa Sicard-Mirabal.

As Director of ICC Arbitration and ADR in North America, Ms Sicard-Mirabal will represent and promote ICC dispute resolution services in the US and Canada. She is assisted by Nancy M. Thevenin, the Court's Deputy Director, Arbitration and ADR, North America. Both Ms Sicard-Mirabal and Ms Thevenin may be reached at the offices of ICC's US national committee, the US Council for International Business (USCIB).

Contact details:

Josefa Sicard-Mirabal
jsicard-mirabal@uscib.org
Tel. +1 212 703 5065
Fax + 1 212 575 0327

Nancy M. Thevenin
nthevenin@uscib.org
Tel. +1 212 703 5060
Fax +1 212 575 0327

Additional Information
- **The International Court of Arbitration**

# EXHIBIT 16





Search [ ]  GO

About USCIB | Global Network | What's New

Press Center   Email a Friend   Members Only

Home | Policy Advocacy | Dispute Resolution | Calendar of Events | Business Services | ATA Carnet

**USCIB**   **About USCIB**   Staff

Welcome!

USCIB at a Glance

Mission Statement

Officers

Executive Committee

Trustees

Meet the Staff

List of USCIB members

List of Committees

Press Center

USCIB Publications

Employment Opportunities

▶ Contact Us
▶ Membership Info
▶ Site Map

**NANCY M. THEVENIN**
**Deputy ICC Director, Arbitration & ADR/North America**
(212) 703-5065 or nancy.thevenin@iccwbo.org

Nancy M. Thevenin is deputy director of arbitration and ADR for North America for the ICC International Court of Arbitration in New York. In that capacity, she advises North American attorneys and companies on all phases of ICC arbitration, as well as on the ICC Appointing Authority, Pre-Arbitral Referee, ADR, Dispute Board and Expertise Rules.

Before joining ICC in 2004, Ms. Thevenin practiced with a boutique law firm for international litigation and arbitration in Miami, Florida, specializing in international commercial litigation, international arbitration, creditors' rights and business torts.

Ms. Thevenin currently serves as a vice chair of the Latin America and Caribbean Committee, vice chair of the Young Lawyers Interest Network, and as the law liaison to the ICC Court for the American Bar Association's Section of International Law. She is a member of the executive council of the International Law Section of the Florida Bar, vice chair of the Arbitration Committee for the Inter-American Bar Association, and co-chair of Arbitration and ADR Committee of the International Law and Practice Section of the New York State Bar Association.

Ms. Thevenin holds a bachelor's degree from Cornell University in history and Spanish literature. She received her law degree from Tulane Law School and obtained certificates in European legal practice and in commercial arbitration. Ms. Thevenin also studied the French legal system and European Community Law at the University of Paris at Panthéon-Assas. She is fluent in English, Spanish, French, and Haitian-Creole.

**More on ICC Arbitration and Dispute Resolution**

**More on USCIB's Arbitration Committee**

# EXHIBIT 17





About USCIB | Global Network | What's New

Search [          ] GO    Press Center  Email a Friend  Members Only

Home | Policy Advocacy | Dispute Resolution | Calendar & Events | Business Services | ATA Carnet

**USCIB**     **About USCIB**                     Meet the Staff

Welcome!

USCIB at a Glance

Mission Statement

Officers

Executive Committee

Trustees

Meet the Staff

List of USCIB members

List of Committees

Press Center

USCIB Publications

Employment Opportunities

▶ Contact Us
▶ Membership Info
▶ Site Map



**JOSEFA SICARD–MIRABAL**
**ICC Director, Arbitration & ADR/North America**
(212) 703-5065 or jsl@iccwbo.org

Josefa Sicard-Mirabal serves as Director of Arbitration and ADR in North America for ICC's International Court of Arbitration. In this capacity, she represents and promotes ICC dispute resolution services in the United States and Canada, and advises North American attorneys and companies on all phases of arbitration, including negotiation of arbitration clauses, requests for arbitration, procedural issues and enforcement of arbitration awards.

Ms. Sicard-Mirabal began her legal career in the Dominican Republic, first as a judge in a small claims court and subsequently as chief justice of the Civil, Commercial and Labor Court. Since 1989, she has been in private practice in the United States, serving as Of Counsel in the New York office of Winston & Strawn and in the Miami office of Greenberg Traurig, and as an associate at the New York office of Thelen Reid and Priest.

Raised and educated in New York City, Ms. Sicard-Mirabal moved to the Dominican Republic and received a law degree from the Pontificia Universidad Católica Madre y Maestra. She continued her legal studies at Fordham University School of Law in New York. She is admitted to the New York State bar and the Dominican Republic bar. She is fluent in English, French, and Spanish.

Ms. Sicard-Mirabal founded and chairs Dominicans on Wall Street, Inc., a non-profit organization created primarily to serve as a liaison between Dominican companies seeking access to the U.S. and international capital markets and American companies wishing to invest in the Dominican Republic. She has been named one of the "20 Leading Latinas in Business" by Hispanic Enterprise magazine, in its September 2007 issue, one of the "100 Most Influential Hispanics" by Hispanic Business Magazine in its October 2006 issue, and was a 2006 recipient of the DTM Magazine Latino Trendsetters Award.

**More on ICC Dispute Resolution services**

# EXHIBIT 18

# KING & SPALDING

King & Spalding LLP
1185 Avenue of the Americas
New York, New York 10036-4003
www.kslaw.com

Edward G. Kehoe
Direct Dial: (212) 556-2246
Direct Fax: (212) 556-2222
ekehoe@kslaw.com

November 1, 2007

**VIA OVERNIGHT MAIL**

Guy Sebban
Secretary General
International Chamber of Commerce
38,Cours Albert 1er
75008 Paris, France

Jason Fry
Secretary General
ICC International Court of Arbitration
38, Cours Albert 1er
75008 Paris, France

   Re: **Global Gold Mining, LLC, Petitioner, v. Peter M. Robinson, as
      President of International Chamber of Commerce, an Unincorporated
      Association and the International Court of Arbitration of the International
      Chamber of Commerce, an Unicorporated Association, Respondents (in
      the Supreme Court of the State of New York, County of New York).**

      **Global Gold Mining, LLC, Claimant, vs. Vardan Ayvazian,
      Mayren Batoyan, Edward Janibekian, and Yurik
      Lalazaryan, Respondents (ICC Case No. 14 770/EBS).**

Dear Gentlemen:

   Enclosed please find copies of a Notice of Petition, Petition, and accompanying papers,
filed by Global Gold Mining, LLC, in the Supreme Court of the State of New York, County of
New York, on October 29, 2007. The Petition names the ICC and ICA as respondents.

   The Petition challenges the ICA's March 9, 2007 decision, rendered under Article 6(2) of
the ICC Rules, that Case No. 14 770/EBS may not proceed against Vardan Ayvazian, one of four
Respondents named in Global Gold's December 28, 2006 Request for Arbitration. Article 6(2)
invites a party in the face of such an administrative ruling to request court intervention in such a
case.

November 1, 2007
Page 2

        In order to avoid the time and expense involved in litigating this issue in New York state court, Global Gold LLC again requests that the ICC/ICA reconsider its March 9 decision refusing to permit the Arbitration Tribunal to rule on its own jurisdiction.

                            Very truly yours,

                            Edward G. Kehoe

EGK

Enclosures

cc:     Victoria Orlowski
        Counsel to the Secretariat
        ICC International Court of Arbitration
        38, Cours Albert 1er
        75008 Paris, France

        R. Doak Bishop
        Kenneth R. Fleuriet

892730

**KING & SPALDING**
**DAILY SHIPMENT DETAIL REPORT**
11/01/07 07:57 PM

Pickup Date: 11/01/07
Pickup Record No.: 4398159 69 0

UPS Account No.: A8138R
Sorted By: Order of Shipment

---

Ship To: Victoria Orlowski
ICC Intl Court of Arbitration
38, Cours Albert 1er
Paris 75008
France

Ship From: MAILROOM
KING & SPALDING
35TH FLOOR
6TH AVENUE
NEW YORK NY 10036

| | | |
|---|---|---|
| Service Type: | UPS EXPRESS PLUS | Shipment Service Charge:  $  145.92 |
| Total Packages: | 1 | |
| Shipment Id: | A613 6RQ9 QTZ | |
| Hundredweight: | No | |
| Billable Wt.: | 5.0 | |
| Billing Option: | Prepaid | |
| Invoice No.: | 13914 | |
| Purchase No.: | 211002 | |

| | | |
|---|---|---|
| Tracking No.: | 1ZA8138R5478509330 | |
| Package Type: | Package | |
| Weight: | 4.4 | |
| Invoice No.: | 13914 | |
| Purchase No.: | 211002 | |
| Package Ref No.3: | 1426819 | Shipper Amt:  $  145.92 |
| Package Ref No.4: | 7748 | UPS Total Charge*:  $  145.92 |

KING & SPALDING
DAILY SHIPMENT DETAIL REPORT
11/01/07 07:57 PM

Pickup Date: 11/01/07
Pickup Record No.: 4390159 69 0

UPS Account No.: A8138R
Sorted By: Order of Shipment

| Name/Address | Shipment Detail | Options | Reference Rate Charges |
|---|---|---|---|
| Ship To: Guy Sebban, Secretary General<br>Int'l Chamber of Commerce<br>38, Cours Albert 1 er<br>Paris 75008<br>France<br><br>Ship From: MAILROOM<br>KING & SPALDING<br>35TH FLOOR<br>6TH AVENUE<br>NEW YORK NY 10036 | Service Type: UPS EXPRESS PLUS<br>Total Packages: 1<br>Shipment Id: A813 8RQB CV3<br>Hundredweight: No<br>Billable Wt.: 5.0<br>Billing Option: Prepaid<br>Invoice No.: 13914<br>Purchase No.: 211002 | Shipment Service Charge: | $ 145.92 |
| | Tracking No.: 1ZA8138R5478810747<br>Package Type: Package<br>Weight: 4.4<br>Invoice No.: 13914<br>Purchase No.: 211002<br>Package Ref No.3: 1426809<br>Package Ref No.4: 7748 | Shipper Amt:<br>UPS Total Charge*: | $ 145.92<br>$ 145.92 |
| Ship To: Jason Fry, Secretary General<br>ICC Int'l Court of Arbitration<br>38, Cours Albert 1 er<br>Paris 75008<br>France<br><br>Ship From: MAILROOM<br>KING & SPALDING<br>35TH FLOOR<br>6TH AVENUE<br>NEW YORK NY 10036 | Service Type: UPS EXPRESS PLUS<br>Total Packages: 1<br>Shipment Id: A813 8RPR HGQ<br>Hundredweight: No<br>Billable Wt.: 5.0<br>Billing Option: Prepaid<br>Invoice No.: 13914<br>Purchase No.: 211002 | Shipment Service Charge: | $ 145,92 |
| | Tracking No.: 1ZA8138R5476349954<br>Package Type: Package<br>Weight: 4.4<br>Invoice No.: 13914<br>Purchase No.: 211002<br>Package Ref No.3: 1426817<br>Package Ref No.4: 7748 | Shipper Amt:<br>UPS Total Charge*: | $ 145.92<br>$ 145.92 |

UPS: Tracking Information                                      Page 1 of 1



☒Close Window

# Tracking Summary

**Tracking Numbers**

**Tracking Number:**   1Z A81 38R 54 7850 933 0
Type:                  Package
Status:                **Delivered**
Delivered On:          11/05/2007
                       8:42 A.M.
Delivered To:          PARIS, FR
Signed By:             ESTELLE
Service:               EXPRESS PLUS

**Tracking Number:**   1Z A81 38R 54 7861 074 7
Type:                  Package
Status:                **Delivered**
Delivered On:          11/05/2007
                       8:42 A.M.
Delivered To:          PARIS, FR
Signed By:             ESTELLE
Service:               EXPRESS PLUS

**Tracking Number:**   1Z A81 38R 54 7634 995 4
Type:                  Package
Status:                **Delivered**
Delivered On:          11/05/2007
                       8:42 A.M.
Delivered To:          PARIS, FR
Signed By:             ESTELLE
Service:               EXPRESS PLUS

Tracking results provided by UPS:  12/20/2007 8:39 P.M.  ET

NOTICE: UPS authorizes you to use UPS tracking systems solely to track shipments tendered by or for you to UPS for delivery and for no other purpose. Any other use of UPS tracking systems and information is strictly prohibited.

☒Close Window

Copyright © 1994–2007 United Parcel Service of America, Inc. All rights reserved.

# EXHIBIT 19

rbitration

## What the Court does

The Court organizes and supervises your arbitration and helps in overcoming obstacles. It does not itself resolve disputes, a task that is carried out by independent arbitrators. The Court makes every effort to ensure that the award is enforceable in national courts if need be, although in practice the parties usually comply.

# EXHIBIT 20

# ICC

**International Chamber of Commerce**
*The world business organization*

## The Handbook

| | |
|---|---|
| ICC at a glance | 2 |
| | |
| **ICC Governing Bodies** | **3** |
| Chairmanship | 3 |
| International Secretariat | 3 |
| Executive Board | 3 |
| World Council | 6 |
| Finance Committee | 9 |
| | |
| **ICC International Secretariat** | **10** |
| Whom to contact | 10 |
| Offices | 13 |
| Directory | 14 |
| | |
| **ICC Divisions** | **16** |
| Policy Commissions and Advisory Groups | 16 |
| ICC Dispute Resolution Services | 25 |
| ICC Events | 27 |
| Institute of World Business Law | 28 |
| World Chambers Federation | 29 |
| ATA Carnet System | 30 |
| Commercial Crime Services | 31 |
| Publications Department | 32 |
| | |
| **ICC Membership** | **33** |
| National Committees and Groups | 34 |
| Direct Members | 51 |
| | |
| **Indices** | **52** |
| Chairs of ICC | 52 |
| Secretaries General of ICC | 52 |
| Updating the handbook | 53 |

# ICC Events

ICC's programme of conferences and seminars is the essential channel for passing on the world business organization's expertise to a wider audience. ICC Events spotlight policy issues of direct concern to business such as banking techniques and practices, e-business, IT and telecoms, piracy and counterfeiting.

ICC Events also runs training courses on international arbitration and negotiating international contracts for business-people, corporate counsel, lawyers and legal practitioners involved in international trade.

| | |
|---|---|
| **Director** | Laetitia de Montalivet |
| **Executive Assistant** | Sabine Stenzel |
| **Marketing Coordinator** | Aisling Mullett |
| **Project Coordinator** | Katharine Bernet |
| **Project Coordinator** | Stéphanie Goubelle |
| **Project Coordinator** | Charlotte Strandberg-Dangla |

## 2007 Agenda

| | |
|---|---|
| **26 January**<br>*Paris* | Understanding the UCP 600 |
| **29 Jan-1 February**<br>*Paris* | PIDA / Negotiating, Drafting, Managing International Contracts & Conflict Resolution |
| **19-22 February**<br>*Paris* | PIDA / International Commercial Arbitration |
| **12-13 March**<br>*Paris* | International Advanced Arbitration Practice Workshop (IAAP) |
| **16-18 April**<br>*Paris* | Amicable Dispute Resolution |
| **22-23 April**<br>*Dubai* | ICC-FIDIC conference /The resolution of disputes under international construction contracts |
| **18 May**<br>*Cannes* | 21st Conference on International, Audiovisual Law |
| **11 June**<br>*Paris* | Understanding the UCP 600 |
| **12 June**<br>*Paris* | Workshop on UCP 600 |
| **11-12 June**<br>*San Francisco* | Arbitration Workshop |
| **17-20 September**<br>*Paris* | PIDA / Negotiating, Drafting, Managing International Contracts & Conflict Resolution |
| **4-5 October***<br>*Paris* | ICC-FIDIC conference /The resolution of disputes under international construction contracts |
| **8-11 October**<br>*Paris* | PIDA / International Commercial Arbitration |
| **22 October**<br>*Paris* | Arbitration: a Corporate Viewpoint |
| **29-30 October**<br>*Paris* | Dispute Resolution in International Oil and Gas Contracts |
| **4-6 November**<br>*Miami, Florida* | International Commercial Arbitration in Latin America: *The ICC Perspective* |
| **16 November**<br>*Paris* | 24th AAA/ICC/ICSID Joint Colloquium on International Arbitration |
| **19-20 November**<br>*Paris* | International Advanced Arbitration Practice Workshop (IAAP) |
| **26 November**<br>*Paris* | Annual Meeting of the ICC Institute of World Business Law |

\* to be confirmed

# EXHIBIT 21

Co-organized by

 **SERVICES**
An affiliate of the International Chamber of Commerce
**Events Department**

*Under the auspices of the*
**International Court of Arbitration®**

 **I C D R** International Centre
for Dispute Resolution

**A Division of the
American Arbitration Association**



# The Current State of International Arbitration and a Vision of the Future

**Date:** **31 January 2008**

**Venue: The Penn Club of New York**
30 West 44th Street, New York, NY 10036 (United States)

**EARN**
**4 CLE Credits**
**3.5 MCLE Credits**
**3.5 CPD Hours**
**3.5 CNB Hours**

## Objective

The proliferation of international commercial disputes is an inevitable by-product of the global economy. Today's business and operating conditions underscore arbitration's advantages over litigation, especially in cross-border disputes. Two of the most pre-eminent arbitration institutions bring together the point of view of all actors – in-house counsels, counsels, arbitrators, ADR practitioners and academics – with the purpose of contemplating the role and state of international arbitration today. A future outlook will also be provided and possible alternative dispute resolution methods will be considered. This event will also focus on the intrinsic heterogeneity of international arbitration and attempts at harmonization.

## Who should attend?

The topics covered will be of interest to practicing lawyers, corporate counsel, arbitrators, mediators, academics, ADR experts and users, and businesspersons who wish to learn more about international arbitration and dispute resolution.

## ICC International Court of Arbitration®

The ICC International Court of Arbitration is the leading body in international commercial arbitration. Founded to resolve business disputes of an international character, its strict impartiality and effectiveness are recognized everywhere. Countless business contracts, including many where one party is a government body, now refer to the ICC Rules of Arbitration. www.iccarbitration.org

## ICDR–AAA

The International Centre for Dispute Resolution® (ICDR), the international division of the American Arbitration Association (AAA), was established in 1996 to provide high-quality alternative dispute resolution (ADR) services to individuals and organizations around the globe. Like the AAA, the ICDR administers cases impartially and efficiently while successfully tackling the additional challenges of resolving international conflicts. The ICDR's expertise in the administration of international arbitrations is well recognized and it manages several hundred multinational cases each year. The ICDR has offices in Dublin, Ireland, Mexico City and Singapore.

*With the support of*
**The United States Council
for International Business**
The US affiliate of ICC

 **USCIB**

**Register online at www.adr.org/events**

**ICC Events**

Photographic credit: Copyright © www.photos.com/en/

**Thursday 31 January 2008**                                    **09:00 – 13:00**

**08:30 – 09:00**

**Registration**

**Welcome remarks and introduction**
- Report on the findings of several studies (ICDR–AAA)
- Report on techniques for controlling time and cost in arbitration (ICC)

**Current voice of the arbitration community and a vision of the future**
The panel, made up of an academic, an in-house counsel, a counsel, an arbitrator and an ADR specialist, will tackle several issues such as the attitude of state courts towards international arbitration, arbitration clauses, time and costs in arbitration as well as interim measures. The speakers will also address questions such as why we need arbitration, the future role of arbitration as well as the possible relevance of other methods of dispute resolution.

**Discussion**

**Has arbitration procedure become homogenous?**
The session will deal with the different ways of "conducting arbitrations" and the implications of diverse systems of law and cultural backgrounds in the arbitral process. The impact of incentives such as the IBA Rules on Evidence and the UNCITRAL notes on organization of the procedure will also be considered. The panel will also discuss the steps that need to be taken in order to reach a homogeneous arbitral process and whether this is actually a desirable goal.

**Discussion**

**13:00**       **End of the conference**
**13:15 – 14:30**   *Lunch*

### Speakers

- **Guillermo Aguilar Alvarez**, Partner, Weil, Gotshal & Manges LLP, New York, NY, United States
- **Nabil N. Antaki**, Associate Director, Centre for Business Law & International Commerce, Faculty of Law, University of Montreal, Montreal, Quebec, Canada; Member, ICC International Court of Arbitration
- **Mark C. Baker**, Senior Partner and Co-Head International Practice, Fulbright & Jaworski LLP, Houston, TX, United States
- **Jason A. Fry**, Secretary General, ICC International Court of Arbitration, Paris
- **Hans van Houtte**, Professor, Institute for International Trade Law, University of Leuven, Belgium
- **John J. Kerr Jr.**, Partner, Simpson Thacher & Bartlett, New York, NY, United States
- **Kap-You (Kevin) Kim**, Partner and Head of the International Litigation and Arbitration Group, Bae, Kim & Lee LLC, Republic of Korea; Vice Chair, International Arbitration Committee, ICC Korea; Vice-President, Korean Council for International Arbitration; Member, ICC International Court of Arbitration
- **Richard Naimark**, Senior Vice President, International Center for Dispute Resolution (ICDR) / American Arbitration Association (AAA), New York
- **Roland Schroeder**, Senior Counsel, General Electric, Fairfield, CT, United States
- **Jernej Sekolec**, Director, International Trade Division, Office of Legal Affairs Secretary, United Nations Commission on International Trade Law (UNCITRAL), Vienna
- **Audley Sheppard**, Partner, Clifford Chance LLP, United Kingdom
- **Maria-Mercedes Tarrazón Rodón**, Lawyer & Independent Arbitrator, Spain; Court Member, ICC International Court of Arbitration
- **Pierre Tercier**, Chairman, ICC International Court of Arbitration, Paris
- **Nathalie Voser**, Attorney-at-Law, Schellenberg Wittmer, Switzerland

**Programme**

## Working language

This conference will be held in English.

## How to register

**To register online\*: www.adr.org/events** (*\*Secured payment by credit card*)

Or complete and return the registration form indicating method of payment to:

**Attn:**   Noelia Martinez

**E-mail:**  AAAUniversity@adr.org

**Fax:**    +1 212-716-5904

**Post:**   International Centre for Dispute Resolution
           1633 Broadway, 10th floor
           New York, NY 10019, United States

Registration will be confirmed upon receipt of the registration form and registration fee.

**For more information, please call +1 212-716-3977.**

## Registration fees

For ICC Members and ICDR Panelists
- **US$ 250**

For Non-Members
- **US$ 300**

The registration fee includes all conference activities, documentation, coffee breaks and lunch.

## Travel and accommodation

Participants are responsible for making their own travel and hotel arrangements. A list of local hotels is available upon request.

## Credits and hours

ICC Events is eligible for CLE credit under **New York**'s approved jurisdiction procedures, is a State Bar of **California** approved MCLE provider and is a Solicitors Regulation Authority and the General Council of the Bar of **England** and **Wales** External CPD Course Provider.
**French Bars:** this conference has been sent for CNB approval.

## Cancellation charge

Please note that space availability is limited. Should you need to cancel your registration, a refund of 50% of the registration fee paid is available for cancellation received **by Friday, January 18, 2008.**
We regret that no refund can be made after that date.

**logistical note**

## I**CC** SERVICES

**An affiliate of the International Chamber of Commerce**

S.A.S. au capital de 305 562 euros   R.C.S. Paris B 313 975 237   N° de TVA intracommunautaire FR 45 313 975 237
38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28   Fax +33 1 49 53 30 30   E-mail events@iccwbo.org   Website www.iccwbo.org/events



## Registration form

# The Current State of International Arbitration and a Vision of the Future

*Co-organized by* **ICC and ICDR–AAA**

**Date**  
**31 January 2008**

**Venue**  
**The Penn Club of New York**  
30 West 44th Street, New York, NY 10036 (United States)

Register online  
**www.adr.org/events**  
*Secured payment by credit card*

**Participant information**

| | |
|---|---|
| TITLE / FIRST NAME / LAST NAME | |
| POSITION | |
| COMPANY NAME | |
| ADDRESS | |
| CITY / STATE / ZIP CODE | |
| COUNTRY | TEL. |
| CONTACT E-MAIL | FAX |

*Please tick the appropriate box*

### Registration fees

For ICC Members and ICDR Panelists  
☐ US$ 250

For Non-Members  
☐ US$ 300

### How to contact us

**Attn:** Noelia Martinez  
**E-mail:** AAAUniversity@adr.org    **Fax:** +1 212-716-5904    **Tel:** +1 212-716-3977  
**Post:** International Centre for Dispute Resolution  
1633 Broadway, 10th floor – New York, NY 10019, United States

### Method of payment

☐ **By credit card:**    ☐ American Express    ☐ Master card    ☐ Visa

Card number ........................................................    Expiry date ...........................................

Name of cardholder ...................................................................................................

☐ **By check:** Made payable to the International Centre for Dispute Resolution.  
Reference: ICDR/ICC program

☐ **By bank transfer:** Wire payments will also be accepted. *Please contact us for instructions.*

Date ........................................    Signature ...........................................................

**Data protection information**

*The details you provide on this form will be used for registration purposes. They will be stored in ICC's databases for the sole use of ICC (the International Chamber of Commerce and its wholly owned affiliate ICC Services). Under the French law Informatique et liberté of 6 January 1978, you may have access to these details and request deletions and corrections at any time by contacting ICC at registrationevents@iccwbo.org. The details you provide may be used by ICC to keep you informed of developments in your area of activity through publications, subscriptions, events and other commercial offers. Please indicate if you wish to receive such information:*    ☐ Yes    ☐ No  
*Please tick below if you wish to receive commercial offers from associated organizations, including in particular ICC National Committees:*    ☐ Yes

Photographic credit: Copyright © www.photos.com/es/

# EXHIBIT 22

**Programme    Supporters    Logistical notes    Registration online**

## Current Issues in ICC Arbitration:
*What You Need to Know to Enhance Your International Practice*

*Under the auspices of the* International Court of Arbitration®

**15 November 2006**
**The Cornell Club, 6 East 44th Street, New York, N.Y. 10017, United**
**States**

# Introduction

**Objective**

**EARN CREDITS**
**4.6  MCLE State bar of California**
**5.6  CLE State bar of New York**
**4.5  CPD Law Society & Bar of UK**

here for print friendly version of the brochure

The skillful practice of ICC arbitration comes from an awareness and
understanding of the procedure. This conference offers a rare opportunity
for current and future users of ICC arbitration to learn more from those
directly involved, including past and present members of the ICC
International Court of Arbitration and its Secretariat. The speakers will draw
on their first-hand and long-standing experience to offer enlightening
reflections on issues facing arbitration practitioners today.

**Participants**
The topics covered will be of interest to practicing lawyers, corporate
counsel, arbitrators, mediators, academics, ADR experts and users, and
business persons who wish to learn more about ICC arbitration.

**International Court of Arbitration®**
Since its creation in 1923, the ICC International Court of Arbitration has
handled over 14,000 cases. The worldwide scope of its activity was again
evidenced in 2005 with over 500 cases filed involving 1,422 parties from
117 countries and independent territories. The Court itself is characterized
by its broad representation, comprising members from 88 countries with
diverse legal backgrounds. Over the years, ICC has developed a range of
other dispute resolution rules, in addition to arbitration, and now offers a
comprehensive package of dispute resolution services to meet the needs
and challenges of international commerce today.

 Click here for print friendly version of the brochure

**With the support of**

**The United States Council**

# EXHIBIT 23



## USCIB Luncheon of the Arbitration Committee

### Thursday, February 15, 2007

*Allen & Overy LLP*
*1221 Avenue of the Americas*
*(49th Street) 21st Floor*
*New York, NY 10020*

**12:00 p.m. – 2:00 p.m.**

Featured Speaker:

### Anne Marie Whitesell
Secretary General of the
ICC International Court of Arbitration

| USCIB MEMBER FEE: | NON-MEMBER FEE: | I will attend |
|---|---|---|
| $45.00 | $65.00 | |

| PAYMENT OPTIONS: | | |
|---|---|---|
| Visa | MasterCard | American Express |
| | | |
| Card Number | | Exp. Date |
| | | |
| Check or Money Order | | |

Please note, all checks must be payable in U.S. dollars and drawn on a U.S. bank. *Checks should be made out to:* United States Council for International Business

Name _____

Title _____

Company _____

Street _____

City _____ State __ Zip ____

Telephone/Fax _____

E-mail Address _____

### ~ Cancellation Policy ~

We regret that no refunds will be made for cancellations unless they are received in writing at least three business days prior to this function. Please see address below.

*Please return form to:*

Kate Yang
Arbitration Assistant
ICC International Court of Arbitration/USCIB
1212 Avenue of the Americas
New York, NY 10036
T: (212) 703-5044
F: (212) 575-0327
kathryn.yang@iccwbo.org

# EXHIBIT 24



http://www.uscib.org/index.asp?documentID=1944

**USCIB**

Search [        ] Go

► Contact Us
► Membership Info
► Site Map

Dispute Resolution
    ICC Services
    ICC Rules
    Arbitration Committee
    Arbitration Calendar
    Arbitrator / Mediator /
        Expert Database
    FAQs on ICC
        Arbitration
    Past Events
    USCIB Publications

Home | Policy Advocacy | Dispute Resolution | Calendar of Events | Business Services | ATA Carnet

Press Center    Email a Friend    Members Only

About USCIB | Global Network | What's New

## Calendar of Events    | Arbitration

**USCIB Arbitration Committee Calendar**

SAVE THE DATE

The next ICC International Court of Arbitration event will take place in New York on January 31, 2008.

Please click on the event link below for more information about the agenda for the conference. For further inquiries, please feel free to contact Nancy M. Thevenin at nthevenin@uscib.org.

**2008**

**January**

31 — New York, NY — **ICC/AAA The Current State of International Arbitration and a Vision of the Future**

**February**

15-18 — Paris, France — **3ʳᵈ ICC International Commercial Mediation Competition**

**June**

2-4 — Houston, TX — **Arbitration Conference on Construction Contracts**

**September**

15 — New York, NY — **Third Annual ICC New York Conference**

**November**

2-4 — Miami, FL — **International Commercial Arbitration in Latin America:**

http://www.uscib.org/index.asp?documentID=1944

Arbitration Calendar

*The ICC Perspective*

# EXHIBIT 25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GLOBAL GOLD MINING LLC,

                                    Petitioner,

            -against-

PETER M. ROBINSON, AS PRESIDENT OF
INTERNATIONAL CHAMBER OF COMMERCE,
AN UNINCORPORATED ASSOCIATION, AND
INTERNATIONAL COURT OF ARBITRATION OF
THE INTERNATIONAL CHAMBER OF
COMMERCE, AN UNINCORPORATED
ASSOCIATION,

                                    Respondents.

07 Civ. 10492 (GEL)

ECF Case

**ELECTRONICALLY FILED**

---

## DECLARATION OF JOHN C. McCULLOUGH

JOHN C. McCULLOUGH, declares under penalty of perjury as follows:

1.      I am not a party to the action, am over 18 years of age, and am employed by the

law firm of King & Spalding LLP, attorneys for Peationer Global Gold Mining LLC.

2.      On October 29, at approximately 4:00 pm, I served true copies of the Notice of

Petition, Petition, Affirmation of Louisa B. Childs, dated October 26, 2007, and including

Exhibits, Memorandum of Law in Support of Petitioner Global Gold Mining, LLC's Petition

Under N.Y. C.P.L.R. Article 75 and Request for Judicial Intervention with Statement in Support

of Request for Assignment to Commercial Division (collectively, "Global Gold's Petition and

Accompanying Papers") upon Peter M. Robinson, as President of International Chamber of

Commerce, an unincorporated association, and the International Court of Arbitration of the

International Chamber of Commerce, and unincorporated association, at the business address of

the International Chamber of Commerce, located at the U.S. Council for International Business

(USCIB), 1212 Avenue of the Americas, New York, New York 10036, by personally delivering and leaving the same with Peter M. Robinson.

3.     A woman who identified herself as Nancy Thevenin was present when I delivered and left Global Gold's Petition and Accompanying Papers with Mr. Robinson. While I was present, Mr. Robinson asked Ms. Thevenin to review the papers with him.

JOHN C. McCULLOUGH

# EXHIBIT 26

[12/13/07  THU 15:39  [TX/RX NO 5066]

#18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEIDRA C. RICHARDSON
*Petitioner*

-against-

AMERICAN ARBITRATION ASSOCIATION
St. Lukes-Roosevelt Hospital Center
and
New York State Nurses Association
*Respondents*

AMENDED
COMPLAINT

CASE 93-CIV-6128 (MGC)

DEC 1 — 1993
A.E.

DEIDRA C. RICHARDSON, by her attorney Daryll Boyd Jones, 133-21 Francis Lewis Blvd., Laurelton, New York as an for her amended complaint alleges as follows:

FIRST: This action arises under Title VII of the Civil Rights Act of 1964, Section 703(a)(1), 42 U.S.C. § 2000e-2(a)(1), 301 of the Labor Management Relation Action, 29 U.S.C. §1985, the Arbitration Act 9 U.S.C. §1 et seq. The matter in controversey exceeds, exclusive of interest and cost, the sum of $50,000.

Petitioner DEIDRA C. RICHARDSON ("Petitioner"), was a registered nurse practicing in New York County as an employee of the defendant, St. Lukes-Roosevelt Hospital Center from 1982 until her termination on January 16, 1992--and is now a resident of New Jersey.

SECOND: At all times hereinafter mentioned, defendant, the American Arbitration Association [hereinafter referred to as "AAA"], was and is now a New York not-for-profit corporation with offices at 140 West 51st street, New York,

Amended Complaint  Page: 1

12/13/07 THU 13:39 [TX/RX NO 5056]

N.Y. and is in the business of providing settings for dispute resolution services in the New York City area.

THIRD: At all times hereinafter mentioned, defendant, the St. Lukes-Roosevelt Hospital Center [hereinafter referred to as the "Hospital"] is a not-for-profit hospital corporation organized under the laws of the State of New York with its headquarters at 428 West 59th Street, New York, N.Y. and is an employer in an industry affecting commerce within the meaning of the National Labor Relations Act, as amended, 29 U.S.C. § 141 et. seq. ("the Act")

FOURTH: At all times hereinafter, defendant, New York State Nurses Association [hereinafter referred to as "NYSNA"] is a New York not-for-profit corporation engaged in activities as a labor organization in an industry affecting commerce within the meaning of Section 2(5) of the Act, 29 U.S.C. § 152 (5), with offices at One Madison Avenue, New York, New York. At all relevant times, NYSNA was the exclusive collective bargaining representative of a unit of employees, including petitioner Richardson, employed by the Hospital. The terms and conditions of petitioner Richardson's employment were embodied in, and governed by, a collective-bargaining agreement between the Hospital and NYSNA.

FIFTH: On July 4, 1988 petitioner Richardson filed a memorandum with the Hospital noting her religious objection to blood transfusions and abortions.

SIXTH: On November 15, 1990 the hospital submitted a formal request of petitioner Richardson asking for official documentation supporting her religious beliefs against blood transfusions and abortions. The letter further stated that they would consider accommodating her if the proof was

Amended Complaint  Page: 2

[9090 ON XY/XLI  6E:SI ∩HL L0/EI/ZI]

submitted.

SEVENTH: On or about June 6, 1991 petitioner met with union representatives and the Ms. Loringer, Director of Nursing to discuss petitioner's eminent transfer out of the department of Labor and Delivery.

EIGHTH: On July 3, 1991 petitioner submitted a letter asking for educational leave to begin August 10, 1991.

NINTH: On or about August 4, 1992 petitioner submitted a memorandum asking for per diem assignments during her educational leave on Thursdays and Fridays.

TENTH: On or about August 5, 1991 petitioner received approval from the Director of Nursing granting her an education leave from August 10, 1991 to August 10, 1992.

ELEVENTH: On or about August 6, 1991 petitioner received a memorandum from the Director of Nursing stating the petitioner presented a high risk to patient care and that other assignments were being explored, but now that she was on educational leave the search had discontinued. Shortly thereafter, petitioner received notification that her request for per diem work during her educational leave was denied without explanation.

TWELFTH: On or about August 20, 1991 petitioner executed a memorandum to the Director of Nursing rescinding her request for educational leave and asking for permission to return to her position in Labor and Delivery Unit which was her right under the collective bargaining agreement. At the same time petitioner filed a grievance with NYSNA claiming a violation of §17 and §13 of the collective bargaining agreement.

Amended Complaint  Page: 3

THIRTEENTH: On August 27, 1991 petitioner filed another grievance claiming a violation of §8.02 of the Collective Bargaining Agreement.

FOURTEENTH: On September 6, 1991 petitioner received a letter from Personnel instructing her to go to the Recruitment Office of the Hospital for possible placement in another position. Petitioner was offered various positions which either included the task of assisting in or administering blood transfusions or positions for which she was not educationally qualified to perform.

FIFTEENTH: On September 26, 1991, petitioner filed for arbitration on the issue of her transfer and violations of personal leave policy.

SIXTEENTH: On January 16, 1992 petitioner was issued a letter of termination from the Hospital.

SEVENTEENTH: On April 3rd, April 9th and April 20th, of 1992 an Arbitration took place wherein AAA designated Jonas Aarons, Esq. as the arbitrator to preside over and render a decision in an action involving the Hospital and NYSNA involving petitioner Richardson's personal leave, transfer and ultimate termination.

EIGHTEENTH: On several occasions through-out the arbitration NYSNA nursing representative Danielle Beiliveur told petitioner that the arbitrator Jonas Aarons was biased in that he was an Atheist and commonly rendered decisions in favor of Management.

NINETEENTH: On April 20, 1992 NYSNA nursing representative Danielle Beiliveur was abruptly removed from petitioner's case and replaced by E.Conaway. Petitioner has it on information and belief that Ms. Beiliveur was

Amended Complaint Page: 4

12/13/07 THU 15:39 [TX/RX NO 6056]

involved in a major scandal involving breach of her fiduciary to her clients by being in communicating an cooperating with her adversary the Hospital.

TWENTIETH: On information and belief, during the arbitration none of the Hospital witnesses were sequestered or otherwise excluded from the room during the testimony of other witnesses for the Hospital.

TWENTY-FIRST: On May 10, 1993 the Arbitrator issued a decision sustaining petitioners termination, involuntary transfer of petitioner and refusal to reinstate petitioner.

TWENTY-SECOND: On information and belief the defendant Hospital violated petitioners civil rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000(e) and N.Y. Civil Rights Law § 79-1 in that petitioner was terminated because of her religious beliefs and defendant Hospital failed to accommodate her in a manner required under the Federal Law.

TWENTY-THIRD: The defendant Hospital violated petitioners rights by breaching the collective bargaining agreement in failing to return petitioner to her original position after she rescinded her educational leave request and in failing to comply with Article 17 of the collective bargaining agreement which requires the Hospital to abide by all Federal, State and Local laws regarding prohibition of discrimination against employees on the basis of political and religious beliefs in termination decisions; and in failing to comply with Article 13 of the collective bargaining agreement which prohibits arbitrary and capricious termination decisions by Hospital management.

TWENTY-FOURTH: The defendant Hospital violated the National Labor Relation Act's provision against religious discrimination which has been

<center>Amended Complaint  Page: 5</center>

12/13/07 THU 15:39 [TX/RX NO 5056]

extended to include voluntary and not-for-profit health care institutions.

TWENTY-FIFTH: The defendant AAA through the conduct of Arbitrator Aarons violated its duty to fair and unbiased supervision of the proceedings in failing to abide by generally accepted rules of civil procedure during the arbitration and in failing to recuse herself given her own religious belief and predisposition.

TWENTY-SIXTH: The Defendant NYSNA through the conduct of Danielle Belliveur violated petitioners right to competent and uncompromising representation in permitting the arbitration to continue with information of the arbitrators bias.

TWENTY-SEVENTH: The Defendant NYSNA also prejudiced petitioner's case by abruptly changing attorneys for petitioner during the last leg of the petition and in failing to adequately develop the record by including more of the facts regarding petitioner's case.

TWENTY-EIGHTH: By reason of the foregoing, petitioner sustained economic and non-economic loss to her professional reputation as a practicing registered nurse in the state of New York. Petitioner has lost earnings resulting from the wrongful termination and continues to be underemployed as a result thereof. Petitioner suffer from mental anguish and depression surrounding her termination. Petitioner also claims intentional and/or negligent infliction of emotional distress.

WHEREFORE, plaintiff demands reinstatement to her original position in

Amended Complaint  Page: 6

[12/13/07 THU 15:39 [TX/RX NO 5056]

the Labor and Delivery Unit, back pay for lost wages from the time of discharge with interest, and judgment against all the defendants jointly and severally, in the sum of one million ($1,000,000.00) dollars for pain and suffering damages and emotional distress, together with her costs and disbursements and attorney's fee in this action and interest according to law, together with such other, different and further relief as the Court deems just and proper.

Dated: Queens, New York
December 12, 1994

Yours, etc.

Daryll Boyd Jones, Esq.
133-21 Francis Lewis Blvd.
Laurelton, New York 11434
(718)-528-8548
*Attorney(s) for*
Deidra C. Richardson
*Petitioner*

TO: Richard J. Silber
Attorney for New York State
Nurses Association
275 1/2 Lark Street
Albany, New York 12210

David H. Diamond, Esq
Proskauer, Rose, Goetz & Mendelson
Attorney for
St. Lukes-Roosevelt Hospital Center
1585 Broadway
New York, N.Y. 10036

Rosemary Page
Associate General Counsel
American Arbitration Association
140 West 51st Street
New York, N.Y. 10020

Amended Complaint  Page: 7

Westlaw.

888 F.Supp. 604                                                                               Page 1
888 F.Supp. 604
(Cite as: 888 F.Supp. 604)

**H**Richardson v. American Arbitration Ass'n
S.D.N.Y.,1995.

United States District Court,S.D. New York.
Deidra C. RICHARDSON, Petitioner,
v.
AMERICAN ARBITRATION ASSOCIATION, et
al., Respondents.
No. 93 Civ. 6128 (LAK).

June 20, 1995.

Union member brought action against American
Arbitration Association (AAA), as administrator of
arbitration conducted pursuant to collective
bargaining agreement (CBA), claiming that AAA
was responsible for arbitrator's allegedly
inappropriate conduct. AAA moved for summary
judgment. The District Court, Kaplan, J., held that:
(1) AAA could not be sued on theory that arbitrator
was biased and failed to sequester witnesses during
arbitration hearing, and (2) union member, although
not signatory to CBA, was bound by CBA's terms,
including provision for arbitration under AAA rules
releasing AAA from liability for any act or omission
in connection with arbitration under rules.

Motion granted.
West Headnotes
[1] Labor and Employment 231H ☞1576

231H Labor and Employment
    231HXII Labor Relations
        231HXII(H) Alternative Dispute Resolution
            231HXII(H)4 Proceedings
                231Hk1576 k. Appointment and
Competency of Arbitrators. Most Cited Cases
    (Formerly 232Ak455 Labor Relations)

**Labor and Employment 231H ☞1582**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(H) Alternative Dispute Resolution
            231HXII(H)4 Proceedings
                231Hk1582 k. Hearing. Most Cited
Cases
    (Formerly 232Ak455 Labor Relations)

American Arbitration Association (AAA), as
administrator of arbitration conducted pursuant to
collective bargaining agreement, could not be sued
on theory that arbitrator was biased and failed to
sequester witnesses during arbitration hearing.

[2] Labor and Employment 231H ☞1547

231H Labor and Employment
    231HXII Labor Relations
        231HXII(H) Alternative Dispute Resolution
            231HXII(H)3 Arbitration Agreements
                231Hk1543 Construction and Operation
                    231Hk1547 k. Parties; Successor
Employers. Most Cited Cases
    (Formerly 232Ak433.2 Labor Relations)
Union member, although not signatory to collective
bargaining agreement (CBA), was bound by CBA's
terms, including provision for arbitration under
American Arbitration Association's (AAA) rules
releasing AAA from liability for any act or omission
in connection with arbitration under rules.

*604 Daryll Boyd Jones, Laurelton, NY, for
petitioner.
Rosemary S. Page, New York City, for respondent
American Arbitration Ass'n.

MEMORANDUM OPINION
KAPLAN, District Judge.
[1] This case presents the question whether the
American Arbitration Association ("AAA"), as the
administrator of an arbitration conducted pursuant to
a collective bargaining agreement ("CBA"), may be
sued on the theory that the arbitrator was biased and
failed to sequester witnesses during the arbitration
hearing. The Court concludes that it may not.

Petitioner Deidra C. Richardson was a registered
nurse at St. Lukes-Roosevelt Hospital Center from
1982 until she was terminated on January 16, 1992. It
is unnecessary to recount the events leading to her
termination other than to say that she began in 1988
to object on religious grounds to blood transfusions
and abortions and that she filed grievances pursuant
to the CBA between the hospital and the New York
State Nurses Association. The arbitration was held
under the auspices of the AAA before Jonas Aarons
as arbitrator, who ruled for the hospital on petitioner's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

888 F.Supp. 604
888 F.Supp. 604
(Cite as: 888 F.Supp. 604)

Page 2

several complaints. Petitioner claims that Aarons is an atheist and therefore prejudiced against her on religious grounds, that Aarons was biased in *605 favor of management, and that Aarons failed to exclude the hospital's witnesses from the hearing room during the testimony of other hospital witnesses. The claim against the AAA is that it is responsible for Aarons' allegedly inappropriate conduct. (AmCpt ¶ 25)

The question of the susceptibility of the AAA and organizations performing similar functions from suits like this has been considered carefully both by the Sixth Circuit and by another judge of this Court. Both have held that organizations administering arbitrations like this are immune from suit. *Corey v. New York Stock Exchange,* 691 F.2d 1205 (6th Cir.1982); *Austern v. Chicago Board Options Exchange,* 716 F.Supp. 121 (S.D.N.Y.1989), *aff'd,*898 F.2d 882 (2d Cir.), *cert. denied,*498 U.S. 850, 111 S.Ct. 141, 112 L.Ed.2d 107 (1990). Petitioner has offered no persuasive reason that they should not be followed. Accordingly, the Court holds that the AAA is entitled to summary judgment dismissing the complaint on the ground that it is immune from suit on this claim.

[2] The AAA contends, in the alternative, that it has been released from liability. The CBA in question provides for arbitration under the AAA's then-existing rules. Section 42 of the Voluntary Labor Arbitration Rules in effect at the date in question provided that "[n]either the AAA nor any arbitrator shall be liable to any party for any act or omission in connection with any arbitration under these rules." The AAA maintains that petitioner, although not a signatory to the CBA, is bound by its terms, and the Court agrees. *See Bowen v. United States Postal Service,* 459 U.S. 212, 224-26, 103 S.Ct. 588, 595-96, 74 L.Ed.2d 402 (1983) (waiver by union in CBA of employee rights binding on employee).

Accordingly, the motion of the AAA for summary judgment dismissing the complaint as to it is granted. As the issues presented by this motion are entirely distinct from the other aspects of the case and this decision disposes of all claims against the AAA, there is no just reason for delay and the Clerk shall enter final judgment with respect to the AAA.

SO ORDERED.

S.D.N.Y.,1995.
Richardson v. American Arbitration Ass'n
888 F.Supp. 604

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 27

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

MASEFIELD AG and MASEFIELD LTD.,                    :

                                        Plaintiffs    :        05 Civ. 2231 (PKL)

              -against-                              :

COLONIAL OIL INDUSTRIES, INC.,                      :

                                        Defendant.    :

-----------------------------------------------------------------------x


**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION TO DISMISS THE COMPLAINT
OR, IN THE ALTERNATIVE, TO STAY THIS ACTION
IN FAVOR OF A PENDING ARBITRATION**


WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200

*Attorneys for Defendant
Colonial Oil Industries, Inc.*

# TABLE OF CONTENTS

**Page**

Table of Authorities ...................................................................................................(ii)

Preliminary Statement...................................................................................................1

Statement of Facts.........................................................................................................2

I.     The Parties and their Affiliates ..........................................................................2

II.    The Contract and the ICC Arbitration Clause.....................................................2

III.   Performance of the Contract ..............................................................................3

IV.    Default under the Contract and the ICC Arbitration...........................................4

Argument ......................................................................................................................5

I.     This Litigation Should be Dismissed in Favor of the Pending Arbitration ..................5

       A.     The Arbitral Tribunal Has Jurisdiction to Determine whether Plaintiffs
              Must Arbitrate with Colonial ...................................................................5

              1.    The ICC Arbitration Clause is Broad..........................................7

              2.    Article 6(2) of the ICC Rules Expressly Assigns Questions
                    of Arbitrability to the Arbitral Tribunal.......................................7

       B.     The Strong Federal Policy in Favor of Arbitration Require a Dismissal...........9

       C.     Plaintiffs Will Likely Be Found Obligated to Arbitrate with Colonial .............9

              1.    Estoppel....................................................................................10

              2.    Alter Ego ..................................................................................11

II.    In the Alternative, this Litigation Should be Stayed in Favor of the Pending
       Arbitration.........................................................................................................12

Conclusion ..................................................................................................................14

## TABLE OF AUTHORITIES

*Abram Landau Real Estate v. Benova*, 123 F.3d 69, (2d Cir. 1997) ...................................6

*Am. Bureau of Shipping v. Tencara Shipyard, S.P.A* , 170 F.3d 349 (2d Cir. 1999)...................11

*Apollo Computer, Inc. v. Berg*, 866 F.2d 469, 472-73 (1st Cir. 1989) .............................8

*AT&T Tech., Inc. v. Communications Workers*, 475 U.S. 643 (1986) ..............................5

*Bell v. Cendant Corp.*, 293 F.3d 563 (2d Cir. 2002)....................................................6

*Clinton v. Jones*, 520 U.S. 681 (1997)....................................................................13

*Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385 (S.D.N.Y. 2003) .............6, 10, 11

*Daiei, Inc. v. United States Shoe Corp.*, 755 F.Supp. 299 (D.Haw. 1991).........................8

*Deloitte Noraudit A/S v. Deloitte Haskins & Sells*, 9 F.3d 1060 (2d Cir. 1993) ...........................10

*Discount Trophy & Co., Inc. v. Plastic Dress-up Co.*, No. Civ. 3:03CV2167 (MRK), 2004 WL 350477 (D.Conn. Feb. 19, 2004) ..................................................8

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995)...................................5, 6

*Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840 (2d Cir. 1987) ...................................9

*Limonium Maritime, S.A. v. Mizushima Marinera, S.A.*, 201 F.3d 431, 1999 WL 1070070 ........13

*Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. Custom Air Sys.*, 357 F.3d 266 (2d Cir. 2004)..................................................................10

*MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58 (2d Cir. 2001) .....................................................................................10, 12

*McAllister Bros., Inc. v. A&S Transp. Co.*, 621 F.2d 519 (2d Cir. 1980).......................10

*Moses H. Cone Mem'l Hosp. v. Mercury Construction Corp.*, 460 U.S. 1 (1983)..........................9

*Optibase, Ltd. v. Merrill Lynch Inv. Managers*, No. 02 Civ. 9813(LTS), 2003 WL 1587244 (S.D.N.Y. Mar. 27, 2003) ..................................................7

*Oriental Commercial & Shipping Co., Ltd. v. Rosseel, N.V.*, 609 F. Supp. 75 (S.D.N.Y. 1985) ..........................................................................................12

*PaineWebber Inc. v. Bybyk*, 81 F.3d 1193 (2d Cir. 1996) ...................................8

*Shaw Group Inc. v. Triplefine Intern. Corp.*, 322 F.3d 115 (2d Cir. 2003)..........................6, 7, 8, 9

*Smith Barney Shearson Inc. v. Sacharow*, 91 N.Y.2d 39 (NY Ct. App. 1997) ......................6, 7, 8

*Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l*, 198 F.3d 88 (2d Cir. 1999) ...................................................................................................................10, 11, 12

*Specht v. Netscape Communications Corp.*, 306 F.3d 17 (2d Cir. 2002) ........................................9

*Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773 (2d Cir. 1995)............................10, 12

## PRELIMINARY STATEMENT

Defendant Colonial Oil Industries, Inc. ("Colonial") submits this Memorandum of Law in support of its motion to dismiss the complaint or, in the alternative, to stay this action in favor of an arbitration commenced on October 29, 2004 before the International Chamber of Commerce ("ICC").

Plaintiffs Masefield AG and Masefield Ltd. ("Plaintiffs") are two of the three respondents in the pending ICC arbitration. The third respondent is another Masefield entity, namely Masefield America, Inc. ("Masefield America"). Plaintiffs request that this Court declare that they are not bound to arbitrate with Colonial.[1] Plaintiffs' relationship with Colonial is governed by a broad arbitration clause, providing for ICC arbitration and incorporating the ICC Rules of Arbitration ("ICC Rules"). The ICC Rules expressly assign to the arbitral tribunal responsibility to determine issues as to its jurisdiction. This action should be dismissed and Plaintiffs should be required to arbitrate their claims.

On March 8, 2005, this Court granted Plaintiffs' application for an order to show cause ("OTC") regarding a preliminary injunction prohibiting Colonial from pursuing arbitration against Plaintiffs. While Colonial responds to the OTC in a separate brief submitted simultaneously with this motion to dismiss the complaint,[2] Colonial sometimes refers to Plaintiffs' OTC papers in this motion to dismiss.[3]

---

[1] Plaintiffs also request an injunction barring Colonial from pursuing ICC arbitration against them.
[2] Colonial and Plaintiffs agreed on March 4, 2005 on a consolidated briefing schedule for Plaintiffs' complaint and OTC.
[3] Plaintiffs' OTC papers include a declaration of Stanley McDermott III ("McDermott OTC Decl."), a declaration of James Daley ("Daley OTC Decl."), a declaration of Kenhardt Scheepers ("Scheepers OTC Decl."), and a memorandum in support of the application for a OTC ("Memorandum in Support of OTC").

## STATEMENT OF FACTS

**I.     The Parties and their Affiliates**

Colonial is one of the largest independent oil distributors in the Southeast. Incorporated in Georgia, Colonial is headquartered in Savannah, Georgia.

Masefield AG is an energy trading company, incorporated in Switzerland, with offices in Zug, Switzerland and elsewhere.  (Daley OTC Decl. ¶¶ 1, 7)  Masefield Ltd., incorporated in England and with offices in London, provides operational and accounting services to the "Masefield Group."  (Daley OTC Decl. ¶¶ 1, 4, 8)

Masefield America is a physical trader of crude oil and refined products incorporated in Delaware with offices in Houston, Texas.  (Scheepers OTC Decl. ¶ 2)

Masefield Ltd. is 100% owned by Masefield AG, and Masefield AG in turn is 90% owned by James Daley.  Mr. Daley also "indirectly own[s]" Masefield America (through his 100% ownership of Masefield Trading AG -- yet another entity within the "Masefield group of companies" -- which is the "parent company of Masefield America").  (Daley OTC Decl. ¶¶ 5-6, 9; Scheepers OTC Decl. ¶¶ 2-3)

**II.    The Contract and the ICC Arbitration Clause**

On September 23, 2003, Colonial and Masefield America entered into a contract for the sale by Masefield America, and the purchase by Colonial, of 50,000 metric tons +/- 10% of specified fuel oil, during each month of a one-year period, November 1, 2003 to October 31, 2004 ("Contract").  (McDermott OTC Decl. ¶ 4 & Exh. 1 thereto)

The ICC arbitration clause is contained in Paragraph 19 the Contract:[4]

"Unless otherwise agreed between the parties in writing any
disputes between them shall be resolved by Arbitration in the city
of New York, United States of America under the rules of
Conciliation and Arbitration of the International Chamber of
Commerce, each party appointing its own Arbitrator with a third
being appointed by the two so chosen."

## III.    Performance of the Contract

Plaintiffs -- which are close affiliates of the Masefield entity which was the

signatory to the Contract -- significantly participated in the performance of the Contract between

Colonial and Masefield America.

Plaintiff Masefield Ltd. is identified in the Contract.  Paragraph 21 of the Contract

required that "[a]ll operational enquiries & other matters arising should be forwarded solely to"

Masefield Ltd. (emphasis in original).  The parties thus undeniably intended that Masefield Ltd.

would participate in the performance of the Contract, and Masefield Ltd. in fact did so.  Masefield

Ltd. was involved with (i) amendments to the letter of credit posted under the Contract, (ii) a letter

of indemnity, (iii) a conversion factor in the Contract, and (iv) the identification of the appropriate

bank to use for payment of delivery under the Contract.  (McDermott OTC Decl., Exh. 8 (Exh. 4-

9))

---

[4] Paragraph 19 of the Contract also provides:

"The construction, validity and performance of the agreement shall be
governed by the laws of the State of New York, United States of
America (without reference to any conflict of law rules).  Each party
expressly submits to the exclusive jurisdiction of the State and Federal
Courts situated in New York City, Borough of Manhattan, and service of
process by registered mail.

The United Nations Convention on the Contract for the International Sale
of Goods of Vienna, 11th April 1980, shall not apply to this transaction."

Plaintiff Masefield AG, although not named in the Contract, was likewise involved in the performance of the Contract. It received all the proceeds of the eight cargoes of fuel oil purchased by Colonial pursuant to the Contract, before the default. Masefield America's invoices expressly instructed Colonial to pay "further credit" to Masefield AG, and Colonial did so pay to Masefield AG. (McDermott OTC Decl., Exh. 8 (Exh. 10-16))

## IV.    Default under the Contract and the ICC Arbitration

The last two monthly allotments of fuel oil due under the Contract were not delivered. (Daley OTC Decl. ¶ 12; Scheepers OTC Decl. ¶ 10)

This default is the subject of Colonial's request for arbitration filed with the ICC on October 29, 2004. Colonial's request names three respondents: Masefield America, Masefield Ltd., and Masefield AG. (McDermott OTC Decl. Exh. 2)

Masefield Ltd. and Masefield AG requested that the ICC discontinue the arbitration as against them, and Colonial opposed that request. (McDermott OTC Decl. Exh. 4-10) On January 31, 2005, the ICC International Court of Arbitration ("ICA") exercised its discretion under Article 6(2) of the ICC Rules and decided that the arbitration shall proceed against all three respondents. (McDermott OTC Decl. Exh. 11)

Article 6(2) of the ICC Rules provides, in pertinent part:

"[Sentence 1] If ... any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement, the [ICA] may decide, without prejudice to the admissibility or merits of the plea or pleas, that the arbitration shall proceed if it is *prima facie* satisfied that an arbitration agreement under the Rules may exist. [Sentence 2] In such case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself."

4

# ARGUMENT

This Court should dismiss Plaintiffs' complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, alternatively, stay this proceeding pending the outcome of the ongoing arbitration. Accepting the allegations of the complaint as true, no relief can be granted.

## I.     This Litigation Should be Dismissed in Favor of the Pending Arbitration

The issue in this litigation is whether Plaintiffs are bound by the arbitration clause in the Contract between Colonial and Masefield America. That question will be decided in the pending arbitration. It has already been addressed by the ICA under the discretion afforded to it by Article 6(2) (sentence 1) of the ICC Rules, and it will be determined by the arbitral tribunal ("Tribunal") within its discretion under sentence 2 of the same article.

### A.     The Arbitral Tribunal Has Jurisdiction to Determine whether Plaintiffs Must Arbitrate with Colonial

Colonial agrees with Plaintiffs that, according to *First Options of Chicago, Inc. v. Kaplan*, the question of arbitrability is for the courts (and not for arbitral tribunals), unless there is "'clea[r] and unmistakabl[e]' evidence" that the parties provided otherwise. 514 U.S. 938, 944 (1995) (*quoting AT&T Tech., Inc. v. Communications Workers*, 475 U.S. 643, 649 (1986)). (Plaintiff's Memorandum in Support of OTC p. 5)

Colonial, however, disagrees with the conclusion which Plaintiffs draw from *First Options, i.e.,* that, just because "Plaintiffs have not entered into any contract with Colonial containing an arbitration agreement," they could not be bound to arbitrate the question of arbitrability. (Plaintiff's Memorandum in Support of OTC p. 5)

5

Although Plaintiffs are non-signatories to the Contract containing the arbitration clause, they are required under that clause to arbitrate the question of arbitrability. Indeed, *First Options* itself concerned non-signatories to the arbitration clause in question in that case. *See First Options*, 514 U.S. at 941 ("MKI, having signed the only workout document (out of four) that contained an arbitration clause, accepted arbitration. The Kaplans, however, who had not personally signed that document, denied that that their disagreement with First Options was arbitrable and filed written objections to that effect with the arbitration panel.") *See also Bell v. Cendant Corp.*, 293 F.3d 563, 568 (2d Cir. 2002) ("Even if the existence of an arbitration agreement were in dispute, the Court would still be bound to analyze the parties' intent under the *First Options* standard, as *First Options* itself focused on the absence of an agreement to arbitrate." (*citing Abram Landau Real Estate v. Benova*, 123 F.3d 69, 73 (2d Cir. 1997) (stating that *First Options* clarified "the evidence needed to submit to arbitration a dispute regarding whether the parties ever entered into a valid arbitration agreement at all"))).

New York follows the *First Options* standard. *See Shaw Group Inc. v. Triplefine Intern. Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) ("New York law follows the same rule, *i.e.*, it acknowledges the 'well settled proposition that the question of arbitrability is an issue generally for judicial determination,' but at the same time it recognizes an 'important legal and practical exception' when parties 'evince[ ] a "clear and unmistakable" agreement to arbitrate arbitrability.'" (*quoting Smith Barney Shearson Inc. v. Sacharow*, 91 N.Y.2d 39, 45-46 (NY Ct. App. 1997))). *See also Currency Conversion Fee Antitrust Litig.*, 265 F.Supp.2d 385, 404 (S.D.N.Y. 2003).

The ICC arbitration clause in the Contract "clearly and unmistakably" demonstrates that the Tribunal, rather than this Court, is to determine questions of arbitrability. The clause is

broad, and it incorporates the ICC Rules which expressly afford the Tribunal responsibility to determine questions as to its jurisdiction.

### 1.    The ICC Arbitration Clause is Broad

The ICC arbitration clause contained in the Contract provides that "any disputes" shall be resolved in ICC arbitration. The clause is "plain and sweeping"[5] and indicates the parties' intention to have arbitrability decided by the Tribunal. *Sacharow*, 91 N.Y.2d at 43, 46 (holding that, under New York law, language providing for "[a]ny controversy" to be "settled by arbitration" was "plain and sweeping" so as to indicate an intent to have the tribunal decide arbitrability). *Accord Shaw*, 322 F.3d at 121-22 (finding that, under New York law, clause stating that "[a]ll disputes ... concerning or arising out of" contract shall be arbitrated was broad and meant that the tribunal was to decide arbitrability). *See also Optibase, Ltd. v. Merrill Lynch Inv. Managers*, No. 02 Civ. 9813(LTS), 2003 WL 1587244, at *4 (S.D.N.Y. Mar. 27, 2003) (finding that, under New York law, clause providing that "any controversies which may arise with [Merrill Lynch]" shall be arbitrated required that the tribunal decide issues of arbitrability).

### 2.    Article 6(2) of the ICC Rules Expressly Assigns Questions of Arbitrability to the Arbitral Tribunal

The ICC Rules, which are incorporated into the arbitration clause, specifically provide for the Tribunal to resolve any jurisdictional disputes.

Article 6(2) of the ICC Rules establishes that "the [ICA] may decide, without prejudice to the admissibility or merits of the plea or pleas, that the arbitration shall proceed if it is *prima facie* satisfied that an arbitration agreement under the Rules may exist," and proceeds that

---

[5] In fact, the arbitration clause could not be any broader. Specifically, by omitting additional language, such as, "arising out of or relating to this agreement," the clause is not even limited to disputes concerning the Contract.

"[i]n such case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself."

Incorporation of the ICC Rules reflects a broad grant of power to the ICC tribunal so as to evidence the clear intent to determine issues of arbitrability in arbitration. *See Shaw*, 322 F.3d at 122-23. In *Shaw*, the Second Circuit relied upon Article 6(2) of the ICC Rules in deciding that, when a contract provides for arbitration under the ICC Rules, questions of arbitrability go to the tribunal. *Id.* (citing the First Circuit in *Apollo Computer, Inc. v. Berg*, 866 F.2d 469, 472-73 (1st Cir. 1989) and *Daiei, Inc. v. United States Shoe Corp.*, 755 F.Supp. 299, 303 (D.Haw. 1991) (holding that even where an arbitration clause does not specifically authorize the tribunal to determine questions of arbitrability, a clause to have all disputes resolved according to the ICC rules evidences the understanding that questions of arbitrability are to be arbitrated)).

The Second Circuit reached a similar conclusion with respect to arbitration clauses incorporating the rules of another entity, the National Association of Securities Dealers ("NASD"), which equally assign questions of arbitrability to arbitration. *See PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1202 (2d Cir. 1996). *Accord* by New York Court of Appeals in *Sacharow*, 91 N.Y.2d at 46-47 (NASD rules). *See also Discount Trophy & Co., Inc. v. Plastic Dress-up Co.*, No. Civ. 3:03CV2167 (MRK), 2004 WL 350477, at *3 (D.Conn. Feb. 19, 2004) (Commercial Arbitration Rules of the American Arbitration Association ("AAA"); holding that "the parties' arbitration agreement is broadly worded and [the AAA rules] authorize the arbitrator to decide issues relating to the scope of the arbitration agreement," and deciding that "*The Shaw Group* suggests that the dispute should be tendered to the arbitrator in the first instance").

"In sum, because the parties' arbitration agreement is broadly worded ... and because it provides for arbitration to be conducted under the rules of the ICC, which assign the

8

arbitrator initial responsibility to determine issues of arbitrability, ... the agreement clearly and unmistakably evidences the parties' intent to arbitrate questions of arbitrability." *Shaw*, 322 F.3d at 124-25.

B.   The Strong Federal Policy in Favor of Arbitration Require a Dismissal

The arbitration has been underway for several months. If permitted to go forward, Plaintiffs' lawsuit will be wholly duplicative with (certain of) the issues determined in the arbitration. Apart from being a waste of time and money, duplicative proceedings would create a risk of inconsistent verdicts from this Court and the Tribunal.

Dismissal of the litigation would be consistent with the "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). "Arbitration is indicated unless it can be said with 'positive assurance' that an arbitration clause is not susceptible to an interpretation that covers the asserted dispute." *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 35 (2d Cir. 2002). *Accord Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 847 (2d Cir. 1987) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.").

C.   Plaintiffs Will Likely Be Found Obligated to Arbitrate with Colonial

As shown above, the determination that Plaintiffs are to arbitrate should be left to the Tribunal. There will be ample opportunity in the arbitration to show that Plaintiffs' participation in the performance of the Contract amounts to "estoppel," that Plaintiffs were Masefield America's "agents," and that Masefield America is no more than Plaintiffs' "alter ego." This section briefly previews the arguments that Colonial will advance.

All of Plaintiffs' arguments turn on the fact that they did not sign the Contract including the arbitration clause. These arguments are without merit. Non-signatories may be subject to arbitration agreements, as is true in the case of Plaintiffs.

An arbitration agreement must be interpreted to prevent injustice. *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995). To that end, the Second Circuit has "repeatedly found that non-signatories to an arbitration agreement may nevertheless be bound according to 'ordinary principles of contract and agency.'" *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l*, 198 F.3d 88, 97 (2d Cir. 1999) (*quoting McAllister Bros., Inc. v. A&S Transp. Co.*, 621 F.2d 519, 524 (2d Cir. 1980) and *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993)). These principles include: "(1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter-ego; and (5) estoppel." *Thomson-CSF*, 64 F.3d at 776. *Accord Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. Custom Air Sys., Inc.*, 357 F.3d 266, 268 (2d Cir. 2004); *Currency Conversion Fee*, 265 F.Supp.2d at 401-02.

Plaintiffs are bound to arbitrate with Colonial based on at least three of those five theories: "estoppel," "agency" and "veil-piercing/alter ego." By way of example in this lawsuit:

1.    Estoppel

"Under the estoppel theory, a company knowingly exploiting an agreement with an arbitration clause can be estopped from avoiding arbitration despite having never signed the agreement." *MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 61 (2d Cir. 2001) (*quoting Thomson CSF*, 64 F.3d at 778; internal quotation marks and brackets omitted). This is the case "when a non-signatory receives a direct benefit under the agreement containing the arbitration clause." *Currency Conversion Fee*, 265 F.Supp.2d at 402. *See also Deloitte Noraudit*,

10

9 F.3d at 1064. Thus, in *Am. Bureau of Shipping v. Tencara Shipyard, S.P.A.*, non-signatory owners of a vessel were found to directly benefit from an agreement containing an arbitration clause between a shipyard and a classification society, where the classification of the vessel enabled owners to obtain insurance at cheaper rates (and to fly the vessel under the flag of a certain country). *See* 170 F.3d 349, 351, 353 (2d Cir. 1999).

If, in *Tencara*, the non-signatories' advantage under (insurance) agreements separate from the agreement that contained the arbitration clause sufficed to find a "direct benefit" for purposes of binding the non-signatories under the arbitration clause, then -- Claimant urges -- the receipt by Masefield AG of all the proceeds of the eight cargoes of fuel oil purchased by Colonial (before the default) pursuant to the Contract containing the arbitration clause must even more so establish a "direct benefit" for Masefield AG. Masefield AG is thus estopped from avoiding arbitration.

2.    Alter Ego

The "veil-piercing/alter ego" theory provides further ground for finding that Plaintiffs are bound to arbitrate with Colonial. In this context, Plaintiffs' affiliate corporate relationship with Masefield America is only a starting point.

In *Smith/Enron*, the court found it significant that "virtually all the correspondence [of the various affiliate companies] is mailed to the same address in Texas, 'c/o Enron Development Corp.'" 198 F.3d at 97. This is strikingly similar to the role of Masefield Ltd. under Paragraph 21 of the Contract as "sole[]" recipient of "[a]ll operational inquiries & other matters arising" under the Contract and the fact that, during the Contract's performance, Masefield Ltd. in fact largely functioned in that role (emphasis in original). Likewise, as the *Smith/Enron* court proceeded to note, "[p]erhaps most telling is SCI's own reference to the various Enron companies

11

... as the 'Enron Group.'" *Id.* Again, this is very similar to Plaintiffs' own repeated reference to the "Masefield Group" and "Masefield group of companies."

"Veil-piercing" determinations are "fact specific" and differ with "the circumstances of each case." *Thomson-CSF*, 64 F.3d at 777-78. *Accord MAG Portfolio*, 268 F.3d at 63; *Smith/Enron*, 198 F.3d at 97. The same is true for determinations as to "estoppel" and "agency." In any event, as shown above, the theories according to which Plaintiffs are bound to arbitrate should be addressed before, and determined by, the Tribunal. If, however, this Court does not dismiss (or, in the alternative, stay) the action, Colonial respectfully requests expedited discovery for purposes of further briefing of those theories before this Court. *See Oriental Commercial & Shipping Co., Ltd. v. Rosseel, N.V.*, 609 F.Supp. 75, 77, 79 (S.D.N.Y. 1985) (Leisure, J.) (ordering discovery in a case where, similar to here, the signatory to a contract including an arbitration clause and the non-signatory were owned by the same entity (though not in the same ownership chain), and where there were "insufficient facts before the Court" to determine whether the alter ego doctrine could be applied).

## II.    In the Alternative, this Litigation Should be Stayed in Favor of the Pending Arbitration

In the event that this Court is unable to grant the motion to dismiss this action in favor of the pending arbitration, the Court should stay the case. Each of the prudential reasons for dismissal applies equally to the issuance of a stay. A stay would conserve judicial and corporate resources, minimize the risk of inconsistent rulings, and promote the strong public policy of favoring arbitration.

As a practical matter, if the Court stayed this lawsuit pending the ongoing arbitration and the Tribunal were to accept Plaintiffs' position (*i.e.*, that they are not bound to

arbitrate), the action pending in this Court would be moot. If the Court stayed this lawsuit and the Tribunal were to accept Colonial's position (*i.e.*, that Plaintiffs are bound to arbitrate), a stay would allow this Court in subsequent proceedings to take notice of the Tribunal's ruling and to frame the remaining issues accordingly. In either event, a stay would allow the arbitration to proceed with a maximum of judicial economy and a minimal risk of inconsistent rulings.

In the event that a dismissal is unavailable, a stay would represent "sound … judicial economy." *Limonium Maritime, S.A. v. Mizushima Marinera, S.A.*, 201 F.3d 431, 1999 WL 1070070, at **1 (2d Cir. Nov. 18, 1999) ("The district court deferred consideration of whether the nonsignatories were parties until after the arbitration was completed … for sound reasons of judicial economy … because there would be no need to address that issue if the ongoing arbitration was decided adversely to the signatories and guarantor. To adjudicate the nonsignatories [sic] status first while delaying arbitration would not expedite final resolution of the case but might actually delay it." (*citing Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its docket.")).

Thus, if not dismissed outright, this action should at least be stayed pending the ongoing arbitration.

13

**CONCLUSION**

For the foregoing reasons, defendant Colonial respectfully requests that this Court

dismiss the complaint or, in the alternative, stay this action in favor of a pending arbitration, and

award such further relief as the Court may deem proper.

Dated: New York, New York
      March 21, 2005

<div style="margin-left:40%">

Respectfully submitted,

WHITE & CASE LLP

By: *Paul Freedland (FW)*

Paul D. Friedland (PF 5575)
Felix Weinacht (FW 0564)

1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200

*Attorneys for Defendant*
*Colonial Oil Industries, Inc.*

</div>

14

# EXHIBIT 28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MASEFIELD AG and MASEFIELD LTD.,

 Plaintiffs,

- against -

COLONIAL OIL INDUSTRIES, INC.,

 Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/18/05

**OPINION AND ORDER**

05 Civ. 2231 (PKL)

**APPEARANCES**

STANLEY MCDERMOTT III, ESQ.
DLA Piper Rudnick Gray Cary US LLP
1251 Avenue of the Americas
New York, New York 10020-1104

Attorneys for Plaintiffs


FELIX WEINACHT, ESQ.
White & Case LLP
1155 Avenue of the Americas
New York, New York 10036

Attorneys for Defendant

**LEISURE, District Judge:**

In this action, plaintiffs, Masefield AG and Masefield Ltd., seek injunctive relief

enjoining defendant from pursuing arbitration against them before the International Chamber of

Commerce ("ICC"). Plaintiffs also request judgment declaring that they have no agreement to

arbitrate with defendant and are not bound to arbitrate with defendant. Plaintiffs now petition the

Court for a preliminary injunction barring defendant from arguing before the three-member

Arbitration Tribunal (the "Tribunal"), to be formed by the ICC, that the Tribunal has the power

to determine whether plaintiffs must arbitrate defendant's demands. After filing their written

submissions, the parties appeared before the Court for oral argument on April 12, 2005. For the

reasons that follow, plaintiffs' request for a preliminary injunction is GRANTED.

## BACKGROUND

According to the complaint, on September 23, 2003, defendant, a large independent oil

distributor, entered into a purchase agreement (the "Contract") with Masefield America ("MA"),

a company affiliated with plaintiffs. (See Complaint ("Compl.") ¶ 13.) The Contract provided

that MA would sell approximately 50,000 tons of fuel oil to defendant each month of the one-

year period beginning November 1, 2003 through October 31, 2004. (Id.) The Contract also

contained an arbitration provision, which stated in pertinent part:

> Unless otherwise agreed between the parties in writing any
> disputes between them shall be resolved by Arbitration in
> City of New York, United States of America, under the
> rules of Conciliation and Arbitration of the International
> Chamber of Commerce, each party appointing its own
> Arbitrator with a third being appointed by the two so
> chosen.

(Id. ¶ 14.)

2

On October 29, 2004, defendant filed a demand for arbitration (the "Arbitration Demand") with the ICC, alleging that MA, along with plaintiffs, defaulted on the Contract by failing to deliver fuel oil during the months of September and October 2004. (Id. ¶ 13.) Defendant claimed that this breach caused it to sustain damages of $3,644,520. (Id.)

Plaintiffs' action was triggered by defendant's decision to name plaintiffs, along with MA, as parties in the Arbitration Demand, even though plaintiffs are not signatories to the Contract. (Id. ¶ 2.) The complaint states that, though affiliated with plaintiffs, MA is a separate and independent company, and neither Masefield AG nor Masefield Ltd. is a parent or a subsidiary of MA.[1] (Id. ¶ 3.) Thus, while MA filed a response to the Arbitration Demand, denying that it breached the Contract, (id. ¶ 13), plaintiffs, in several submissions to the ICC, argued that they were not parties to any arbitration agreement with defendant, should not be included as respondents in this arbitration, and are not subject to ICC jurisdiction, (id. ¶ 17).

On January 31, 2005, the ICC informed plaintiffs that it was referring the threshold issue of arbitrability to the Tribunal. (Id. ¶18.) As a result, plaintiffs filed the instant action on February 17, 2005, seeking (1) injunctive relief barring defendant from pursuing any arbitration against them, and (2) a declaratory judgment that they have no agreement to arbitrate with defendant and are not bound to arbitrate with defendant. On March 8, 2005, the Court endorsed plaintiffs' application for an order to show cause why the preliminary injunction and the declaratory judgment should not be granted, and, as noted above, the parties appeared before the Court for oral argument on April 12, 2005.

---

[1] A declaration filed with plaintiffs' papers explains the relationship between MA and plaintiffs more fully. James Daley owns 90% of Masefield AG, which is the parent company of Masefield Ltd. Daley is the sole owner of Masefield Trading AG, which is a non-party affiliate company and the parent company of MA. Therefore, plaintiffs are affiliated companies of MA, but not in the same ownership chain. (See Declaration of James Daley, dated March 1, 2005, ¶ 5-6.)

3

## DISCUSSION

I.    **Arbitrability To Be Determined by the Court**

As a preliminary matter, the parties dispute whether the Court or the Tribunal should decide whether plaintiffs have agreed to arbitrate with defendant. Both sides primarily rely upon First Options of Chicago, Inc. v. Kaplan, wherein the Supreme Court ruled that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." 514 U.S. 938, 944 (1995) (quoting At&T Tech., Inc. v. Communications Workers, 475 U.S. 643, 651 (1986)); see also Abram Landau Real Estate v. Benova, 123 F.3d 69, 72 (2d Cir. 1997) ("When parties disagree about whether they ever entered into an arbitration agreement, a court decides that issue, absent a clear and unmistakable delegation of that authority to an arbitrator.") (citations omitted). Plaintiffs argue that the Court should decide this issue because they have not entered into any contract with defendant containing an arbitration provision, much less demonstrated any intention to give the Tribunal the power to determine whether they agreed to arbitrate with defendant. (See Plaintiffs' Memorandum Of Law In Support Of Their Application For An Order To Show Cause Why This Court Should Not Prohibit Colonial Oil Industries, Inc. From Asserting Its Right To Arbitrate Against Plaintiffs ("Pls. Mem.") at 5.) Defendant, on the other hand, contends that the Tribunal, not the Court, should determine the issue of arbitrability because the Contract's broad arbitration provision constitutes "clear and unmistakable evidence" of the parties' intentions to refer this decision to the arbitrators. (See Defendant's Response to Order to Show Cause ("Def. Mem.") at 3.)

In First Options, the Supreme Court directs lower courts to apply "ordinary state-law principles that govern the formation of contracts" when determining whether the parties agreed

4

to arbitrate a particular issue, including arbitrability.  See First Options, 514 U.S. at 944

(citations omitted).  Under New York law, which applies here pursuant to paragraph 19 of the

Contract, it is axiomatic that the formation of a contract requires 1) offer, 2) acceptance, and 3)

consideration.  See Deutsche Asset Mgmt. v. Callaghan, No. 01 Civ. 4426, 2004 U.S. Dist.

LEXIS 5945, *47 (S.D.N.Y. Apr. 7, 2004) (Motley, J.) (citations omitted).  Moreover, the intent

of the parties assumes "central importance" when determining whether a contract was formed.

Id. (citations omitted).

      Here, defendant simply presumes that plaintiffs are parties to the Contract before arguing

that the broad arbitration provision contained within it manifests plaintiffs' intent to submit the

issue of arbitrability to the Tribunal.  Defendant has not attempted to explain why the Contract

agreed to by MA and defendant should be considered probative of plaintiffs' intent to agree with

defendant.  Furthermore, defendant does not challenge plaintiffs' assertion that they played no

role in negotiating the terms of the Contract with defendant.  (See Declaration of Kenhardt

Scheepers ("Scheepers Decl."), dated March 1, 2005, ¶¶ 5-6.)  Thus, on the present record, the

Court is unwilling to interpret the Contract as anything more than a manifestation of the

intentions of MA and defendant, and rejects defendant's contention that the arbitration provision

clearly and unmistakably reveals plaintiffs' desire to arbitrate arbitrability with defendant.

Because defendant relies solely on the breadth of the Contract's arbitration provision[2] and does

not direct the Court to any clear and unmistakable evidence that plaintiffs agreed with defendant

on any issue, much less the issue of arbitration, the Court will decide whether plaintiffs are

bound to arbitrate with defendant.  See First Options, 514 U.S. at 944.

---

[2] Defendant also argues that the broad arbitration provision incorporates the ICC Rules,
including Article 6(2), which expressly grants the Tribunal the responsibility of determining
questions pertaining to its jurisdiction.  (See Def. Mem. at 7-9.)  However, this assertion is also
founded upon the unproven assumption that the arbitration provision reflects plaintiffs' intent.

## II.    The Arbitration Provision May Not Be Enforced Against Plaintiffs

As this Court has stated in the past, "[i]t is fundamental that arbitration agreements are creatures of contract law." Scher v. Bear Stearns & Co., 723 F. Supp. 211, 214 (S.D.N.Y. 1989) (Leisure, J.) (citation omitted). Thus, "'a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit.'" Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995) (quoting United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960)). "Absent an express agreement to arbitrate, [the Second Circuit] has recognized only 'limited theories upon which [it] is willing to enforce an arbitration agreement against a non-signatory.'" Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125, 129 (2d Cir. 2003) (quoting Thomson, 64 F.3d at 780). The five recognized theories are: "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." Id. at 129 (quoting Thomson, 64 F.3d at 776). Defendant maintains that three of the five theories apply to plaintiffs in this case. Specifically, defendant asserts that plaintiffs are bound to arbitrate, even though they are not signatories to the Contract, because (1) plaintiffs' participation in the performance of the Contract amounts to estoppel; (2) plaintiffs were MA's agents; and (3) MA is no more than plaintiffs' alter ego. (See Def. Mem. at 5.) The Court will address each argument in seriatim.

### A.    Estoppel

Guided by ordinary principles of contract and agency, the Second Circuit has reasoned that a non-signatory may be bound by an agreement containing an arbitration provision where the non-signatory knowingly exploited and accepted the benefits of an agreement.[3] See MAG

---

[3] The courts of this Circuit have also developed an "alternative estoppel theory," which provides that a signatory will be estopped from avoiding arbitration with a non-signatory when "'the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement

Portfolio, 268 F.3d at 61 (quoting Thomson, 64 F.3d at 778, and citing Deloitte Noraudit A/S v.

Deloitte Haskins & Sells, U.S., 9 F.3d 1060, 1064 (2d Cir. 1993)).  The Circuit has emphasized

that "[t]he benefits must be direct – which is to say, flowing directly from the agreement."  Id.

(citing Thomson, 64 F.3d at 779).  In Am. Bureau of Shipping v. Tencara Shipyard, S.P.A., 170

F.3d 349, 353 (2d Cir. 1999), for example, non-signatory owners of a vessel were found to

directly benefit from an agreement containing an arbitration provision between a shipyard and a

classification society, where the classification of the vessel enabled the owners to secure

insurance at lower rates and sail the vessel under a certain country's flag.  Similarly, a non-

signatory to an agreement, which governed the use of a trade name and contained an arbitration

clause, was estopped from arguing that it was not bound to arbitrate after it had received a copy

of the agreement, did not object to it when given the opportunity to do so, and utilized the trade

name pursuant to the terms of the agreement.  See Deloitte, 9 F.3d at 1064.

     Conversely, where "the agreement [is] not the direct source of the benefit," a non-

signatory is not bound to arbitrate.  Thomson, 64 F.3d at 778-79.  In Thomson, two companies

entered into an exclusive trade agreement.  Id. at 775.  Subsequently, a third party competitor

acquired one of the companies in an apparent attempt to force the remaining company out of the

market.  Id.  The unacquired signatory was now bound to trade only with a company that was a

subsidiary of its competitor and the level of trading declined.  Id.  The Court ruled that the non-

signatory was not subject to arbitration because the benefit derived by the non-signatory flowed

from its acquisition of one of the signatories, not directly from the agreement itself.  Id. at 779.

---

that the estopped party has signed,' and the signatory and non-signatory parties share a close
relationship."  MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 62
(2d Cir. 2001) (quoting Thomson, 64 F.3d at 779).  This theory does not apply to cases like the
present one where a signatory is attempting to bind a non-signatory.

Defendant contends that Masefield AG is estopped from avoiding arbitration because its receipt of all of the proceeds from the eight cargoes of fuel oil purchased by defendant constituted a direct benefit flowing from the Contract.  (See Def. Mem. at 5.)  Plaintiffs concede that Masefield AG assisted MA in directing defendant to make its payments under the Contract directly to Masefield AG for a debt owed by MA to Masefield AG.  (See Scheepers Decl. ¶ 9). However, plaintiffs argue, *inter alia*, that the proceeds are an indirect benefit, and therefore insufficient for estoppel purposes, because Masefield AG only exploited the contractual relationship between MA and defendant, and not the Contract itself.  (See Plaintiffs' Memorandum Of Law In Response To Defendant's Response To Order To Show Cause And Defendant's Motion To Dismiss The Complaint ("Pls. Reply") at 6 (citing MAG Portfolio, 268 F.3d at 61).)

While at first blush the Contract may appear to be the direct source of defendant's payments to Masefield AG, Masefield AG's benefit here actually flows directly from MA's prior debts to Masefield AG.  Indeed, the Contract only addresses defendant's purchase of fuel oil from MA and makes no mention of Masefield AG or its receipt of the proceeds.  Though Masefield AG may be taking advantage of MA's agreement with defendant to secure repayment of MA's prior obligations, any benefit derived from it is indirect.

Moreover, unlike the non-signatories in Am. Bureau and Deloitte that were estopped from avoiding arbitration, there is no evidence on the present record that Masefield AG specifically contemplated exploiting the terms of the Contract prior to its formation.  In Am Bureau, upon which defendant relied at oral argument, the agreement at issue was between a shipyard and a classification society, which inspected vessels and declared them seaworthy.  See 170 F.3d at 351.  It is evident from the non-signatory vessel owners' earlier agreement with the

8

shipyard, wherein the parties agreed that the vessel would be inspected by the classification society with whom the shipyard later contracted, that the vessel owners contemplated deriving some benefit from the particular terms of the later agreement. Id. In a similar fashion, when the non-signatory company in Deloitte received the agreement concerning the use of a trade name, chose not to object to it, and then proceeded to use the trade name pursuant to the terms of the agreement, it may be inferred that the non-signatory considered the terms of the agreement and determined that it would later seek to benefit from them. See 9 F.3d at 1064.

By contrast, there has been no showing here that Masefield AG was even aware of MA's agreement with defendant, much less considered its specific terms, when it decided to loan MA the funds, which were repaid, at least in part, with the proceeds from the Contract. It appears to the Court that this case is more analogous to Thomson, than to Am. Bureau or Deloitte. Just as the benefit derived by the non-signatory in Thomson flowed from its position as the parent of one of the signatories, see Thomson, 64 F.3d at 779, Masefield AG's benefit here results from its position as MA's lender, and not from the Contract itself. Furthermore, the Thomson Court explained that the non-signatory would have been estopped from avoiding arbitration if it had attempted to exploit specific provisions of the agreement containing the arbitration provision. See Thomson, 64 F.3d at 779. Likewise, had Masefield sought to invoke or enforce particular aspects of the Contract, it too would be compelled to arbitrate. However, there is no evidence on the present record that it did so. Accordingly, the Court finds that Masefield AG is not estopped from avoiding arbitration with defendant.

**B.     Agency**

In its papers, defendant claims, without more, that plaintiffs should be compelled to arbitrate because they were MA's agents. (See Def. Mem. at 5.) When pressed further on the

issue at oral argument, defense counsel argued that the agency theory should apply to Masefield

Ltd. because paragraph 21 of the Contract provides that "[a]ll operational enquiries & other

matters arising should be forwarded solely to: Masefield Ltd." In addition, Masefield AG

allegedly acted as MA's agent in receiving all of defendant's payments under the Contract.

The Second Circuit has cautioned that "conclusory allegations of a general agency

relationship between a signatory and non-signatory do not suffice to compel . . . unwilling non-

signatories to arbitrate under that theory." Alco Int'l, E.C. v. Merrill Lynch & Co., 98 Fed.

Appx. 44, 46-47 (2d Cir. 2004) (citing Merrill Lynch, 337 F.3d at 130-31). A full showing of

agency supported by an accepted theory of agency or contract law is required, and generalized

allegations of affiliation are insufficient. See Merrill Lynch, 337 F.3d at 130-31 (citing

Thomson, 64 F.3d at 780). "'Agency is the fiduciary relation which results from the

manifestation of consent by one person to another that the other shall act on his behalf and

subject to his control, and consent by the other so to act.'" Merrill Lynch, 337 F.3d at 130

(quoting Restatement (Second) of Agency, § 1 (1958)).

In its conclusory argument, defendant fails to establish that plaintiffs, as the alleged

agents, acted subject to MA's control with respect to the Contract. While plaintiffs concede that

Masefield Ltd. provided MA with some operational support until MA hired an operations

manager and that Masefield AG assisted MA in directing defendant to pay Masefield AG

directly (see Scheepers Decl. ¶¶ 8-9), these facts do not demonstrate that plaintiffs consented to

act at the direction of MA. Accordingly, an agency relationship is not evident at this stage and

plaintiffs cannot be compelled to arbitrate under this theory.

## C.    Alter Ego/Veil-Piercing

In certain circumstances, a court may pierce the corporate veil of one corporation and hold a second corporation legally accountable for the actions of the first if the second corporation (1) exercised complete domination over the first with respect to the transaction at issue, and (2) such domination was used to defraud or injure the party seeking to pierce the veil. See MAG Portfolio, 268 F.3d at 63; Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997). Determining whether one corporation has completely dominated another is a "fact specific" inquiry, in which courts consider many factors, including:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

MAG Portfolio, 268 F.3d at 63 (quoting Freeman v. Complex Computing Co., 119 F.3d 1044, 1053 (2d Cir. 1997)). Thus, a non-signatory may be bound to arbitrate where it exercised complete domination over a signatory and employed that domination to injure another signatory to the agreement. See, e.g., Thomson, 64 F.3d at 777-78. However, the conduct at issue must reveal "a virtual abandonment of separateness." Id. (citations omitted).

Defendant's veil-piercing argument falls well short of the standard set forth above. Citing Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 97 (2d Cir. 1999), wherein the Court found it significant to the veil-piercing analysis that virtually of the correspondence of various affiliate companies was mailed to the same address and that the affiliates were referred to as a "group" of companies, defendant contends that MA is no more

11

than plaintiffs' alter ego because the Contract directs all inquiries to be sent to Masefield Ltd. and plaintiffs have described themselves, along with MA, as the "Masefield Group" or "Masefield group of companies." (See Def. Mem. at 5-6.) Considering these two relatively minor facts in the context of the unchallenged declarations of Scheepers and Daley, which state that MA, Masefield AG, and Masefield Ltd. are each fully capitalized, independent companies with minimal personnel overlap that deal with one another in an arm's length manner, the Court is not persuaded that either plaintiff completely dominated defendant for the purpose of harming defendant. The present record does not reflect a "virtual abandonment of separateness" and therefore, it would be improper to pierce MA's corporate veil.

## III.    A Preliminary Injunction Should Issue

It is well established that in order to obtain a preliminary injunction, the movant must show: (a) irreparable harm; and, (b) either, (1) likelihood of success on the merits; or, (2) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. See, e.g., Sweeney v. Bane, 996 F.2d 1384, 1388 (2d Cir. 1993); Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979). Whether injunctive relief should issue or not "'rests in the sound discretion of the district court which, absent abuse of discretion, will not be disturbed on appeal.'" Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990) (quoting Thornburgh v. Am. Coll. of Obstetricians and Gynecologists, 476 U.S. 747, 755 (1986)).

Irreparable harm is "'the single most important prerequisite for the issuance of a preliminary injunction.'" Reuters Ltd., 903 F.2d at 907 (quoting Bell & Howell: Mamiya Co. v. Masel Co. Corp., 719 F.2d 42, 45 (2d Cir. 1983)). Irreparable harm is an "injury for which a

monetary award cannot be adequate compensation." Javaraj v. Scappini, 66 F.3d 36, 39 (2d Cir.

1995) (citing Jackson Dairy, 596 F.2d at 72).  Further, "[i]rreparable harm must be shown by the

moving party to be imminent, not remote or speculative." Reuters, 903 F.2d at 907 (citing

Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 972 (2d Cir. 1989)).  The movant is

required to establish not a mere possibility of irreparable harm, but that it is "*likely* to suffer

irreparable harm if equitable relief is denied." JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d

75, 79 (2d Cir. 1990).  "Likelihood sets, of course, a higher standard than 'possibility.'" Id.

 Within the arbitration context, the Second Circuit has held that irreparable harm results

from arbitrating a dispute involving a party who is not covered by the arbitration agreement.  See

Maryland Casualty Co. v. Realty Advisory Bd. on Labor Relations, 107 F.3d 979, 985 (2d Cir.

1997) ("[T]he time and resources [plaintiff] would expend in arbitration is not compensable by

any monetary award of attorneys' fees or damages pursuant to the provisions of the [arbitration

agreement] or the Arbitration Act.")); see also Merrill Lynch, 337 F.3d at 129.

 Here, plaintiffs advance the same argument to establish both irreparable harm and a

likelihood of success on the merits.  They maintain that, because they are not signatories to the

Contract and none of the five theories for binding non-signatories properly apply to them, the

Contract's arbitration provision may not be enforced against them.  Thus, if forced to arbitrate

against defendant, they will (1) suffer irreparable harm pursuant to Maryland Casualty, and (2)

will likely prevail on the merits of their claim to preclude defendant from arbitrating against

them.  (See Pls. Mem. at 6.)

 Plainly, the force of plaintiffs' argument for preliminary injunctive relief largely depends

upon whether the Contract's arbitration provision may be enforced against them.  As discussed

in Part II supra, on the present record, defendant cannot demonstrate that plaintiffs, as non-

signatories, are bound to arbitrate along with MA. As a result, at this stage, plaintiffs would suffer irreparable harm if compelled to arbitrate with defendant, see Maryland Casualty, 107 F.3d at 985, and, because plaintiffs' claim is limited to preventing defendant from arbitrating with them, there appears to be a likelihood of success on the merits. Moreover, the balance of hardships tips decidedly in plaintiffs' favor here, as defendant should not be permitted to compel two non-signatories to arbitrate under the Contract without a clear basis in the law. Meanwhile, defendant is not left without a remedy as it may continue to pursue its claim in arbitration against MA.

## IV.    Rule 65 Requirements

A court issuing a preliminary injunction must be specific and describe in reasonable detail the act or acts sought to be restrained. See Fed. R. Civ. P. 65(d). Thus, during the pendency of this action, the Court hereby enjoins defendant from asserting to the Tribunal in the arbitration proceeding against MA that the Tribunal has the power to determine whether plaintiffs must arbitrate defendant's demands.

In addition, Federal Rule of Civil Procedure 65(c) provides in pertinent part:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Fed. R. Civ. P. 65(c).

"The purpose of requiring security prior to issuance of an injunction or a temporary restraining order is to guarantee payment of costs and damages incurred by a party who is wrongfully enjoined or restrained." Interlink Int'l Fin. Servs., Inc. v. Block, 145 F. Supp. 2d 312, 314 (S.D.N.Y. 2001) (quoting 13 Moore's Federal Practice at 65-94.1 (3d. ed. 1997)).

14

Generally, the amount of the bond posted is the limit that a wrongfully restrained party may recover. See id. District courts in the Second Circuit are vested with wide discretion in determining the amount of the bond that the moving party must post. See Doctor's Assocs., Inc. v. Stuart, 85 F.3d 975, 985 (2d Cir. 1996); Ferguson v. Tabah, 288 F.2d 665, 675 (2d Cir. 1961). Indeed, in cases where the non-movant has not shown a likelihood of harm, the district court may properly set no bond. See Doctor's Assocs., 85 F.3d at 985; Ferguson, 228 F.2d at 675.

Though the parties did not address the bond issue in their filings, the Court requested their views at oral argument. Plaintiffs maintained that no bond is necessary because the merits of defendant's Arbitration Demand are not at issue in plaintiffs' request for a preliminary injunction; the sole issue is whether plaintiffs can be compelled to arbitrate. Conversely, defendant argued that, because MA is a shell company and any future judgment against it may not be collectible, the bond amount should equal the amount at stake in the arbitration, namely $3,644,520. Defendant's position assumes that, if it ultimately prevails against MA but cannot collect from MA, it necessarily should be able to arbitrate against plaintiffs. As discussed above, defendant, thus far, has not established that it can arbitrate against plaintiffs for the amount claimed in its Arbitration Demand. If defendant later demonstrates that plaintiffs should be subject to arbitration, then the preliminary injunction may be vacated and defendant would be free to pursue its claims against plaintiffs. Consequently, on the present record, defendant cannot show a likelihood of harm and the Court will not require plaintiffs to post a bond.

## CONCLUSION

For the foregoing reasons, plaintiffs' request for a preliminary injunction is GRANTED.

**SO ORDERED.**

New York, New York
April 18 2005

U.S.D.J.

Copies of this Opinion and Order have been sent to:

Stanley McDermott III, Esq.
DLA Piper Rudnick Gray Cary US LLP
1251 Avenue of the Americas
New York, New York 10020-1104
Attorneys for Plaintiffs

Felix Weinacht, Esq.
White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Attorneys for Defendant

16

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 21, 2007, the foregoing Declaration of Louisa B. Childs and the Exhibits thereto, and the Memorandum of Law in Opposition to Respondent's Motion to Dismiss, were filed with the Clerk of Court using CM/ECF and were caused to be served by electronic delivery and mailing true and correct copies of the same by overnight mail to the following counsel at the address listed:

Louis B. Kimmelman
Dana C. MacGrath
Chintan V. Panchal
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York 10020
*Attorneys for Respondents*

900076