UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GLOBAL GOLD MINING, LLC,

                                 Petitioner,

            - against -

PETER M. ROBINSON, AS PRESIDENT OF
INTERNATIONAL CHAMBER OF COMMERCE,
AN UNINCORPORATED ASSOCIATION, AND
INTERNATIONAL COURT OF ARBITRATION
OF THE INTERNATIONAL CHAMBER OF
COMMERCE, AN UNINCORPORATED
ASSOCIATION,

                            Respondents.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

07 Civ. 10492 (GEL)

ECF CASE

**ELECTRONICALLY FILED**

**RESPONDENTS' REPLY MEMORANDUM OF LAW
IN OPPOSITION TO PETITIONER'S PETITION AND
IN SUPPORT OF RESPONDENTS' MOTION TO DISMISS**

**ALLEN & OVERY LLP**
Louis B. Kimmelman
Dana C. MacGrath
Chintan V. Panchal

1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 610-6300
Facsimile: (212) 610-6399

*Attorneys for Respondents*
International Chamber of Commerce and
International Court of Arbitration of the
International Chamber of Commerce

January 11, 2008

## TABLE OF CONTENTS

Table of Authorities ........................................................................................................ ii

Preliminary Statement ..................................................................................................... 1

Argument .......................................................................................................................... 2

I.      THIS COURT SHOULD NOT REVIEW THE ICC COURT'S
        ADMINISTRATIVE DETERMINATION UNDER ARTICLE 6(2) OF
        THE ICC RULES ................................................................................................... 2

        A.      Article 6(2) of the ICC Rules Does Not Provide for Judicial
                Review of the ICC Court's Administrative Determinations ................................... 2

        B.      Federal Law Does Not Permit this Court to Review the ICC
                Court's Article 6(2) Administrative Determination ................................................. 4

                1.      The Federal Arbitration Act Does Not Authorize Judicial
                        Review of an Arbitral Institution's Administrative
                        Determination ................................................................................. 4

                2.      Global Gold's Claim is Barred by the Doctrine of Arbitral
                        Immunity ........................................................................................... 5

        C.      Having Adopted the ICC Rules, Global Gold Is Bound by the ICC
                Court's Interpretation and Application of Article 6(2) ........................................... 8

II.     GLOBAL GOLD IS NOT ENTITLED TO MANDATORY
        INJUNCTIVE RELIEF ......................................................................................... 9

III.    GLOBAL GOLD SHOULD PAY FOR RESPONDENTS' COSTS AND
        FEES ..................................................................................................................... 10

Conclusion ..................................................................................................................... 10

i

## TABLE OF AUTHORITIES

### CASES

*Austern v. Chicago Bd. of Options Exch., Inc.*,
  898 F.2d 882 (2d Cir.), *cert. denied*, 498 U.S. 850 (1990)................................................. 7, 8

*Bernard v. Local 100, Transp. Workers Union*,
  873 F. Supp. 824 (S.D.N.Y. 1995)......................................................................... 9

*Blake v. Constantino*,
  710 F. Supp. 450 (E.D.N.Y. 1989) ......................................................................... 7

*Blanksteen v. New York Mercantile Exch.*,
  879 F. Supp. 363 (S.D.N.Y. 1995)......................................................................... 9

*Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v. MedPartners, Inc.*,
  203 F.R.D. 677 (S.D. Fla. 2001) ......................................................................... 6

*Calderon v. Conn.*,
  No. 3:07cv1476, 2007 WL 3124717 (D. Conn. Oct. 24, 2007)................................................. 6

*Diemaco v. Colt's Mfg. Co., Inc.*,
  11 F. Supp. 2d 228 (D. Conn. 1998)......................................................................... 5

*First Options of Chicago v. Kaplan*,
  514 U.S. 938 (1995)......................................................................... 9

*Fluor Daniel Intercontinental, Inc. v. Gen. Elec. Co.*,
  06 Civ. 3294 (GEL), 2007 WL 766290 (S.D.N.Y. Mar. 13 2007)......................................... 4

*Freeplay Music, Inc., v. Cox Radio, Inc.*,
  No. 04 Civ. 5238 (GEL), 2005 WL 1500896 (S.D.N.Y. Jun. 23, 2005 .................................. 2

*Gregory v. Stetson*,
  133 U.S. 579 (1890)......................................................................... 4

*Int'l Med. Group, Inc. v. Am. Arbitration Ass'n, Inc.*,
  312 F.3d 833 (7th Cir. 2002) ......................................................................... 5

*Kemner v. Dist. Council of Painting and Allied Trades*,
  768 F.2d 1115 (9th Cir. 1985) ......................................................................... 7

*Michaels v. Mariform Shipping, S.A.*,
  624 F.2d 411 (2d Cir. 1980)......................................................................... 4

ii

*New England Cleaning Servs., Inc. v. Am. Arbitration Assn.*,
    199 F.3d 542 (1st Cir. 1999)...........................................................................5, 7

*Painewebber v. Bybyk*,
    91 F.2d 1193 (2d Cir. 1996)................................................................................ 3

*Pfannenstiel v. Merrill Lynch, Pierce, Fenner & Smith*,
    477 F.3d 1155 (10th Cir. 2007) ......................................................................7, 8

*Precision Mech., Inc. v. Karr*,
    No. 6:05-cv-1353, 2005 WL 3277966 (C.D. Fla. Dec. 2, 2005) ........................... 6

*Prudential Bache-Secs. (Hong Kong) Ltd. v. NASD Dispute Resolution, Inc.*,
    289 F. Supp. 2d 438 (S.D.N.Y. 2003).................................................................. 6

*R.D. Herbert & Sons Co. v. Local Union No. 177*,
    No. 3:06-0826, 2006 WL 3230808 (M.D. Tenn. Nov. 3, 2006)............................. 5

*Shaw Group v. Triplefine Int'l Corp.*,
    322 F.3d 115 (2d Cir. 2003)..........................................................................3, 4, 5

*Tamari v. Conrad*,
    552 F.2d 778 (7th Cir. 1977) .............................................................................. 5

*Trans World Airlines, Inc. v. Sinicropi*,
    No. 93 Civ. 3094 (CSH), 1994 WL 132233 (S.D.N.Y. Apr. 14, 1994) ...............6, 7

*York Research Corp. v. Landgarten*,
    927 F.2d 119 (2d Cir. 1991)................................................................................ 9

*Willner v. Frey*,
    421 F. Supp. 2d 913, 925 (E.D. Va. 2006) ......................................................... 7

## STATUTES AND RULES

Fed. R. Civ. P. 12(b)(6).............................................................................................. 2

9 U.S.C. § 4..........................................................................................................3, 9

9 U.S.C. § 206......................................................................................................3, 9

New York C.P.L.R Article 75....................................................................................... 4

## OTHER AUTHORITIES

W. LAURENCE CRAIG, WILLIAM W. PARK AND JAN PAULSSON,
INTERNATIONAL CHAMBER OF COMMERCE ARBITRATION
(Oceana Publications, Inc., 3d ed. 2000) ................................................................. 8

FOUCHARD, GAILLARD, GOLDMAN ON INTERNATIONAL COMMERCIAL ARBITRATION
(Emmanuel Gaillard and John Savage, eds., Kluwer Law Int'l 1999) ........................................ 4

Respondents submit this reply memorandum of law in response to Global Gold's

Memorandum of Law in Opposition to Respondents' Motion to Dismiss ("GG Opp.").[1]

**Preliminary Statement**

Global Gold does not dispute that:

- Global Gold agreed to arbitration under the ICC Rules, including Article 6(2), administered by the ICC Court.  GG Opp. at 2.

- Under Article 6(2), the ICC Court made a *prima facie* determination as to whether an arbitration agreement under the ICC Rules "may exist" as between Global Gold and each of the four respondents named in Global Gold's Request for Arbitration.  GG Opp. at 3.

- The ICC Court made a positive Article 6(2) *prima facie* determination as to whether an arbitration agreement under the ICC Rules "may exist" between Global Gold and each of the Three Shareholders who signed the SPA.  GG Opp. at 3.

- The ICC Court made a negative Article 6(2) *prima facie* determination as to whether an arbitration agreement under the ICC Rules "may exist" between Global Gold and non-signatory Ayvazian.  GG Opp. at 3.

- In this Proceeding, Global Gold seeks a mandatory injunction compelling Respondents to reverse the administrative determination made by the ICC Court under Article 6(2) of the ICC Rules as to non-signatory Ayvazian and refer the issue of whether there is an arbitration agreement between Global Gold and Ayvazian to the arbitral tribunal.  GG Opp. at 17-18.

Neither the ICC Rules nor federal law permits this Court to review and reverse the ICC

Court's Article 6(2) administrative determination and grant a mandatory injunction.  As a result, the

Petition should be dismissed and Respondents should recover their legal costs.[2]

---

[1] The defined terms in Respondents' opening Memorandum of Law in Opposition to Petitioner's Petition and in Support of Respondents' Motion to Dismiss are incorporated herein.

[2] In response to Respondents' jurisdictional and service objections, Global Gold asserts that Respondents administer arbitrations in New York, sponsor arbitration events in New York, maintain an office "at the New York office of the USCIB" and employ people who work "out of USCIB's New York office."  *See* GG Opp. at 7-11.  The record establishes that Respondents administer ICC arbitrations from their office in Paris, France regardless of the place of arbitration, that Respondents sponsor arbitration events around the world, including New York, that Respondents do not maintain an ICC office in New York and that Respondents employ two people who work in New York.  Furthermore, contrary to Global Gold's assertions, the ICC website plainly indicates that Peter Robinson is the President and CEO of the USCIB, not ICC United States (which is not an entity).  Since Global Gold is only required to make a *prima facie* showing of jurisdiction and allegations of jurisdictional fact must be construed in the light most favorable to Petitioner, *Freeplay Music, Inc., v.*

<u>**Argument**</u>

I.    **THIS COURT SHOULD NOT REVIEW THE ICC COURT'S ADMINISTRATIVE**
      **DETERMINATION UNDER ARTICLE 6(2) OF THE ICC RULES**

Global Gold argues that it is entitled to judicial review of the ICC Court's administrative

determination under Article 6(2) of the ICC Rules because the ICC Court allegedly made an

"erroneous determination" and "improperly dismissed" non-signatory Ayvazian from Global Gold's

arbitration.  *See* GG Opp. at 1.  Global Gold's argument is based on a fundamental misreading of the

ICC Rules and federal law.

   A.    **Article 6(2) of the ICC Rules Does Not Provide for Judicial Review of**
         **the ICC Court's Administrative Determinations**

Under Article 6(2), the ICC Court makes administrative determinations as to whether or not it

is *prima facie* satisfied that an arbitration agreement under the ICC Rules "may exist" as to each party

named in a Request for Arbitration.  *See* ICC Rules, Art. 6(2).  If the ICC Court is *prima facie*

satisfied that an arbitration agreement under the ICC Rules may exist as to certain parties, the case as

to those parties is sent to the arbitral tribunal to determine whether in fact there is a binding

arbitration agreement.  *Id.*  If the ICC Court is not *prima facie* satisfied that an arbitration agreement

under the ICC Rules may exist as to other parties, then the case as to those parties is not sent to the

tribunal and "any party retains the right to ask any court having jurisdiction whether or not there is a

binding arbitration agreement."  *Id.*

Global Gold argues that the "express terms" of Article 6(2) of the ICC Rules "confers upon a

party … the right to seek judicial review of an [ICC Court] administrative determination that an

arbitration agreement does not exist."  GG Opp. at 14.  That is incorrect.  The ICC Court does not

determine whether an arbitration agreement does or does not exist.  Rather, the ICC Court makes a

---

*Cox Radio, Inc.*, No. 04 Civ. 5238(GEL), 2005 WL 1500896, at *2 (S.D.N.Y. Jun. 23, 2005), it appears that there is an
adequate jurisdictional basis for the Court to dismiss the Petition pursuant to Fed. R. Civ. P. 12(b)(6).

*prima facie* determination as to whether an arbitration agreement under the ICC Rules "may exist." ICC Rules, Art. 6(2). Furthermore, the ICC Rules do not provide for judicial review of the ICC Court's negative Article 6(2) *prima facie* determination. Instead, the ICC Rules recognize that where the ICC Court has made a negative Article 6(2) *prima facie* determination, "any party retains the right to ask any court having jurisdiction whether or not there is <u>a binding arbitration agreement.</u>" ICC Rules, Art. 6(2) (emphasis added).

Global Gold also argues that the ICC Rules do not require that it move to compel arbitration against non-signatory Ayvazian and do not specify who are the proper parties to such a proceeding. *See* GG Opp. at 15. The ICC Rules do not require Global Gold to do anything after a negative Article 6(2) *prima facie* determination. Rather, they recognize Global Gold's "right" to seek a judicial determination of whether there is "a binding arbitration agreement." ICC Rules, Art. 6(2). In the United States, federal law provides that such a determination shall be made in a proceeding to compel arbitration. *See* 9 U.S.C. §§ 4, 206.

In a proceeding to compel arbitration, "the role of courts is 'limited to determining two issues: i) whether a valid agreement or obligation to arbitrate exists, and (ii) whether one party to the agreement has failed, neglected or refused to arbitrate." *Shaw Group, Inc. v. Stone & Webster, Inc.*, 322 F.3d 115, 120 (2d Cir. 2003) (quoting *Painewebber v. Bybyk*, 81 F.2d 1193, 1198 (2d Cir. 1996)). That is precisely the issue that Article 6(2) of the ICC Rules recognizes may be decided by a national court where the ICC Court has rendered a negative Article 6(2) *prima facie* determination.

Furthermore, federal law, not the ICC Rules, specifies who are the proper parties to a proceeding to compel arbitration. It is the party who contends that there is a valid agreement to arbitrate and the party who has "failed, neglected or refused to arbitrate" who must be before the court. *See* 9 U.S.C. §§ 4, 206. Otherwise, a judicial determination as to whether there is a valid

arbitration agreement between the parties would not be binding on the party refusing to arbitrate. *See Gregory v. Stetson*, 133 U.S. 579, 586 (1890) ("it is an elementary principle that a court cannot adjudicate directly upon a person's right without having him either actually or constructively before it."). Here, Global Gold has failed to bring the party allegedly refusing to arbitrate before the Court.

### B. Federal Law Does Not Permit this Court to Review the ICC Court's Article 6(2) Administrative Determination

#### 1. The Federal Arbitration Act Does Not Authorize Judicial Review of an Arbitral Institution's Administrative Determination

Global Gold commenced this Proceeding under New York CPLR Article 75, the state analogue to the Federal Arbitration Act, seeking judicial relief in aid of arbitration. However, neither state nor federal law authorizes judicial review of an arbitral institution's administrative decisions.[3]

This is illustrated by the Second Circuit's decision in *Shaw Group*. Global Gold contends that *Shaw Group* stands for the proposition that a court can review an ICC Court's negative Article 6(2) administrative determination. GG Opp. at 14. To the contrary, *Shaw Group* demonstrates that where the ICC Court has rendered a negative Article 6(2) determination, a dissatisfied party can ask a court to resolve whether a binding arbitration agreement exists between the parties. *Shaw Group,* 322 F.3d at 122 n.3. Since the parties as to whom the ICC Court had reached a negative Article 6(2) determination were "already before the district court" in connection with their motion to stay the pending arbitration, the Second Circuit recognized that there was no "need to initiate court proceedings pursuant to the last sentence" of Article 6(2) of the ICC Rules. *Id.* Notably, the ICC and

---

[3] This Court has recognized that under the Federal Arbitration Act, it "does not have the power to review an interlocutory ruling by an arbitration panel." *Fluor Daniel Intercontinental, Inc. v. Gen. Elec. Co.*, 06 Civ. 3294 (GEL), 2007 WL 766290, *2 (S.D.N.Y. Mar. 13 2007) (quoting *Michaels v. Mariform Shipping, S.A.*, 624 F.2d 411, 414 (2d Cir. 1980)). *Cf.* FOUCHARD, GAILLARD, GOLDMAN ON INTERNATIONAL COMMERCIAL ARBITRATION, at 542 (Emmanuel Gaillard and John Savage, eds., Kluwer Law Int'l 1999) (a decision by the ICC Court under Article 6(2) is "not capable of appeal.").

ICC Court were not parties to the *Shaw Group* litigation nor did the Second Circuit suggest that they should be.[4]

    2.    <u>Global Gold's Claim is Barred by the Doctrine of Arbitral Immunity</u>

The federal doctrine of arbitral immunity also bars Global Gold's claim.  Global Gold argues that the doctrine of arbitral immunity does not apply here because "it is well settled under federal law" that arbitral immunity does not extend to actions for injunctive relief.  GG Opp. at 18.  Global Gold is incorrect.  The doctrine of arbitral immunity applies to claims for retrospective equitable or injunctive relief.  *See, e.g., Int'l Med. Group, Inc. v. Am. Arbitration Ass'n, Inc.,* 312 F.3d 833, 842-45 (7th Cir. 2002) (affirming dismissal of request for injunctive relief and damages against AAA because "the AAA is immune from a suit based on the wrongful exercise of jurisdiction"); *New England Cleaning Servs, Inc. v. Am. Arbitration Ass'n,* 199 F.3d 542, 545-46 (1st Cir. 1999) (affirming dismissal of request for damages and injunctive relief against the AAA);[5] *Tamari v. Conrad*, 552 F.2d 778, 780 (7th Cir. 1977) (arbitral immunity bars injunctive relief "where the authority of an arbitrator to resolve a dispute is challenged."); *R.D. Herbert & Sons Co. v. Local Union No. 177*, No. 3:06-0826, 2006 WL 3230808, at *2 (M.D. Tenn. Nov. 3, 2006) (arbitral immunity barred claims for declaratory and injunctive relief against arbitral sponsoring board regarding "administrative tasks [the board] performs [that are] integrally related to the arbitration");

---

[4] Global Gold incorrectly relies on *Diemaco v. Colt's Mfg. Co.*, 11 F. Supp. 2d 228, n.6 (D. Conn. 1998), for the proposition that the ICC and ICC Court are proper parties to this Proceeding.  GG Opp. at 16.  In *Diemaco*, the Petitioner sought to compel a party to arbitrate before an arbitral tribunal that the AAA had replaced in favor of a replacement tribunal.  The court explained that the Petitioner "actually seeks a mandatory injunction requiring the AAA to reverse itself and reconvene Panel I," and found that the court did not have authority to review the AAA's procedural decision. *Id.* at 232-33.  While finding that it "is improper to speculate as to the AAA's reasoning in setting aside Panel I," the court noted that the AAA "should have been named as a defendant in this suit."  *Id.*  Since the court had already found that it lacked authority to review the AAA's decision, this phrase is *dicta.*

[5] Global Gold erroneously argues that in *New England Cleaning Services,* the First Circuit "addressed only whether arbitral immunity barred the plaintiff's claim for money damages" and that "the district court resolved the claim for injunctive relief on grounds not related to arbitral immunity." GG Opp. at 19.  In fact, the First Circuit opinion states that the "Plaintiff-appellant…appeals from the district court's dismissal of its complaint <u>for an injunction</u> and damages." 199 F.3d at 543 (emphasis added).

*Precision Mech., Inc. v. Karr*, No. 6:05-cv-1353, 2005 WL 3277966, at *8 n.24 (C.D. Fla. Dec. 2, 2005) (dismissing claim for injunctive relief, stating "[a]rbitrators have been found to be immune from suit where only equitable relief is sought."); *Prudential Bache-Secs. (Hong Kong) Ltd. v. NASD Dispute Resolution, Inc.,* 289 F. Supp. 2d 438, 440 (S.D.N.Y. 2003) (dismissing claims to enjoin the NASD Dispute Resolution from proceeding with an arbitration, and concluding "that arbitrators and their sponsors are immune from suit for jurisdictional determinations made in their capacity as arbitrators."); *Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v. MedPartners, Inc*., 203 F.R.D. 677, 688 (S.D. Fla. 2001) (dissolving *ab initio* an injunction against the AAA because it was immune from "a suit designed to interfere with arbitral jurisdiction.").

Global Gold wrongly relies on *Trans World Airlines, Inc. v. Sinicropi*, No. 93 Civ. 3094 (CSH), 1994 WL 132233 (S.D.N.Y. Apr. 14, 1994). *See* GG Opp. at 17-18. *Sinicropi* involved a motion to vacate an arbitral award and for injunctive and declaratory relief under ERISA. The defendants were the prevailing parties to the arbitration as well as certain of the arbitrators. The court denied a motion to dismiss a claim for injunctive relief based on arbitral immunity, stating, "I find as a matter of law, arbitral or judicial immunity does not shield an individual from claims for equitable relief. It is well settled that judges do not have absolute immunity from suits for prospective relief." *Sinicropi,* 1994 WL 132233, at 2.

Unlike the situation in *Sinicropi*, Global Gold seeks retrospective, not prospective, injunctive relief. Global Gold is asking this Court to require the ICC Court to reverse its negative Article 6(2) *prima facie* determination as to Ayvazian and send the case against him to the arbitral tribunal. *See Calderon v. Conn.*, No. 3:07cv1476, 2007 WL 3124717, at *2 (D. Conn. Oct. 24, 2007) (a party's request for "injunctive relief" to prohibit her denial of unemployment compensation "amount[ed] to an appeal of [the Department's] eligibility determination and a request for retrospective relief rather

than a request for prospective injunctive relief."); *Willner v. Frey*, 421 F. Supp. 2d 913, 925 (E.D. Va. 2006) (a request for injunctive relief overturning a past decision by a state court was "retrospective, not prospective," and therefore barred by immunity); *Blake v. Constantino*, 710 F. Supp. 450, 451 (E.D.N.Y. 1989) (claim barred by immunity where plaintiff "does not seek prospective relief").[6]  As illustrated by the cases cited above, federal courts have applied the doctrine of arbitral immunity to bar claims for retrospective injunctive relief.

The rationale for immunizing arbitrators and arbitral institutions from claims for damages equally applies to claims for retrospective injunctive relief.  Arbitral immunity is essential "to protect the decision-makers from undue influence and protect the decision-making process from reprisals by dissatisfied litigants."  *New England Cleaning Servs*., 199 F.3d at 545.  Courts have uniformly held that "arbitration forums and sponsors, like courts of law, are immune from liability for actions taken in connection with administering arbitration."  *Pfannenstiel v. Merrill Lynch, Pierce, Fenner & Smith*, 477 F.3d 1155, 1159 (10th Cir. 2007).  The "scope of arbitral immunity is defined by the functions it protects and serves."  *Austern v. Chicago Bd. of Options Exch., Inc*., 898 F.2d 882, 886 (2d Cir.), *cert. denied*, 498 U.S. 850 (1990).  The key question is whether the claim seeks "to challenge the decisional act" by an arbitrator or arbitral institution.  *Pfannenstiel*, 477 F.3d at 1159.

Global Gold concedes that its "Petition challenges the [ICC Court's] March 9, 2007 decision, rendered under Article 6(2) of the ICC Rules, that Case No. 14770/EBS may not proceed against Vardan Ayvazian."  *See* Declaration of Louisa B. Childs, filed on December 21, 2007 ("Childs Supp. Decl."), Ex. 18.  In notifying Respondents of this Proceeding, Global Gold urged that "[i]n order to avoid the time and expense involved in litigating this issue in New York state court, Global Gold

---

[6] Global Gold's reliance on *Kemner v. Dist. Council of Painting and Allied Trades*, 768 F.2d 1115 (9th Cir. 1985) (cited in *Sinicropi*), is similarly misplaced.  *Kemner* involved a petition under Section 301 of the Labor Management Relations Act and 9 U.S.C. § 10 to set aside an arbitral award.  *Id*. at 1116.  The plaintiff in *Kemner* sought relief provided by statute, not equitable or injunctive relief.

LLC again requests that the ICC/ICA reconsider its March 9 decision." *Id.* This Proceeding is plainly an attempt by a dissatisfied litigant to influence the decision-making process of the ICC Court. As such, Global Gold's claim falls squarely within the scope of the doctrine of arbitral immunity. *See Austern*, 898 F.2d at 886 ("arbitral immunity is essential to protect the decision-maker from undue influence and protect the decision-making process from reprisals by dissatisfied litigants.").

C.    **Having Adopted the ICC Rules, Global Gold Is Bound by the ICC Court's Interpretation and Application of Article 6(2)**

Global Gold argues that Article 6(2) required the ICC Court to refer the issue of whether there is an arbitration agreement with non-signatory Ayvazian to the arbitral tribunal because the ICC Court made a *prima facie* determination that an arbitration agreement "may exist" between Global Gold and the Three Shareholders. GG Opp. at 4, 20-21.[7] This is incorrect.

The ICC Court makes an Article 6(2) administrative determination as to each party, and only refers a case to the arbitral tribunal as to those parties for whom the ICC Court "is *prima facie* satisfied that an arbitration agreement under the Rules may exist." ICC Rules, Article 6(2). That is precisely what occurred here. *See* Childs Supp. Decl., Ex. 10 at 3. The ICC Court has "not infrequently determined that the arbitration may not proceed against some of the named parties." W. LAURENCE CRAIG, WILLIAM W. PARK AND JAN PAULSSON, INTERNATIONAL CHAMBER OF COMMERCE ARBITRATION (Oceana Publications, Inc., 3d ed. 2000), at 157. By adopting the ICC Rules, Global Gold agreed to the ICC Court's role in administering its arbitration "in accordance with the Rules" and "ensuring the application of these Rules." ICC Rules, Art. 1(1), (2). Global Gold also agreed to Article 6(2) of the ICC Rules and the ICC Court's interpretation and application of that

---

[7] Global Gold asserts that "[a]n important, undisputed, and dispositive fact here is that an agreement to arbitrate exists." GG Opp. at 4. Certainly with respect to non-signatory Ayvazian, this statement is false. *See* Childs Decl., Exs. N, O.

rule.[8]  Having done so, Global Gold cannot now complain to this Court about the ICC Court's

administrative decisions.

## II.    GLOBAL GOLD IS NOT ENTITLED TO MANDATORY INJUNCTIVE RELIEF

Global Gold concedes that it seeks an "affirmative injunction" and argues that it has no

adequate remedy at law because an action to compel Ayvazian to arbitrate would be another "form of

equitable relief."  GG Opp. at 25 n.14.  Global Gold is wrong.  An order compelling arbitration under

the Federal Arbitration Act is a legal, not equitable, remedy.  *See* 9 U.S.C. §§ 4, 206.  A remedy

expressly provided by statute is a remedy at law and precludes a finding that there is irreparable

harm.  *See Blanksteen v. New York Mercantile Exch.*, 879 F. Supp. 363, 367 (S.D.N.Y. 1995) ("a

statutory remedy preclude[s] a finding of irreparable harm because the plaintiff ha[s] an adequate

remedy at law.");  *Bernard v. Local 100, Transp. Workers Union*, 873 F. Supp. 824, 827-28 (S.D.N.Y.

1995) (party would not be irreparably harmed by union election where statute provided legal method

for overturning results following the election).  Here, Global Gold has failed to pursue the remedy

available to it at law.  For whatever reason, Global Gold has not sought an order compelling

arbitration against Ayvazian, the party with whom it purportedly wants to arbitrate.  Global Gold

cannot establish the irreparable harm requirement for a mandatory injunction against Respondents.[9]

---

[8] *See, e.g., York Research Corp. v. Landgarten*, 927 F.2d 119, 123 (2d Cir. 1991) ("Given the parties' designation of the AAA as the supervisory authority regarding the resolution of disputes under the agreement, the AAA's view of the meaning of its rules is of considerable significance.").  Nor does Respondents' interpretation of Article 6(2) conflict with the presumption in *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995), as to whether a court or an arbitral tribunal must decide issues of arbitrability.  Where the ICC Court makes a negative Article 6(2) *prima facie* determination, Article 6(2) expressly provides that the issue of whether there is a binding arbitration agreement is for a court of competent jurisdiction to decide.  *See* ICC Rules, Art. 6(2).

[9] Even if Global Gold could establish the requirements for mandatory injunctive relief, an order requiring Respondents to submit the question of whether Global Gold has a binding arbitration agreement with Ayvazian to the arbitral tribunal in Global Gold's pending arbitration would not afford Global Gold "complete relief."  The relief that Global Gold seeks would violate the ICC Rules and lead to a potentially unenforceable award.  Requiring Ayvazian to submit to the arbitral tribunal in Global Gold's case without having had the opportunity to participate in the nomination of that tribunal would violate the ICC Rules.  *See* ICC Rules, Art. 10(1) (providing that "multiple Respondents, jointly, shall nominate an arbitrator.").  This would also make any resulting award by the arbitral tribunal against Ayvazian subject to challenge.  *See* New York Convention, Art. V(1)(d) (recognition and enforcement may be refused where composition of the arbitral

3137846

III.    **GLOBAL GOLD SHOULD PAY FOR RESPONDENTS' COSTS AND FEES**

By improperly filing this Proceeding to influence Respondents' decision-making process with respect to the administration of an arbitration, Global Gold has exposed Respondents to liability for the costs and attorneys' fees required to defend this lawsuit.  This violates Article 34 of the ICC Rules.  Global Gold argues that Article 34 of the ICC Rules applies to "liability for money damages only."  GG Opp. at 19.  Nothing in the language of Article 34 limits its application.  Global Gold recognized that the "time and expense involved in litigating this issue in New York state court" would involve a burden to Respondents.  Childs Supp. Decl., Ex. 18.  Article 34 serves to protect Respondents from such a financial burden arising from alleged liability for an "erroneous determination" under Article 6(2) of the ICC Rules.

## Conclusion

For the reasons stated above and in Respondents' opening memorandum, Respondents respectfully request that the Court dismiss the Petition with prejudice and award Respondents the costs and attorneys' fees incurred in defending this Proceeding.

Dated:  New York, New York            Respectfully submitted,
       January 11, 2008

                                   ALLEN & OVERY LLP

                                   By:   /s/ Louis B. Kimmelman
                                     Louis B. Kimmelman

                                   1221 Avenue of the Americas
                                   New York, New York  10020
                                   Telephone:  (212) 610-6300
                                   Facsimile:  (212) 610-6399
                                   Email:  benno.kimmelman@allenovery.com

                                   *Attorneys for Respondents*

---

tribunal was not in accordance with the parties' agreement).  In contrast, Global Gold can seek to compel Ayvazian to arbitrate under the Federal Arbitration Act and any resulting order would be consistent with the ICC Rules and the New York Convention.

3137846

*Westlaw.*

Slip Copy                                                                                       Page 1
Slip Copy, 2007 WL 3124717 (D.Conn.)
**(Cite as: Slip Copy)**

Calderon v. Connecticut
D.Conn.,2007.
Only the Westlaw citation is currently
available.
United States District Court,D. Connecticut.
Marty CALDERON, Plaintiff
v.
State of CONNECTICUT, Commissioner of
the Department of Labor, and Richard
Bowden, Defendants.
**Civil Action No. 3:07cv1476.**

Oct. 24, 2007.

Marty Calderon, Verplanck, NY, pro se.

### ORDER OF DISMISSAL
CHRISTOPHER F. DRONEY, United States
District Judge.
**\*1** Marty Calderon brought this action
pursuant to 42 U.S.C. §§ 1981, 1983, 1985,
and 1986 pro se [FN1] and in forma pauperis.
For the reasons set forth below, the complaint
is dismissed.

>        FN1. Calderon is, however, a law
>        school graduate.

### I. Background

Calderon alleges that the Defendants, the
state of Connecticut, the Commissioner of
the Connecticut Department of Labor (DOL)
and DOL hearing examiner Richard Bowden,
discriminated against her on the basis of her
race, gender, and disability status in the
adjudication of a "wage enforcement" claim
and her claim for unemployment benefits,
and denied her fair hearings in violation of
various constitutional rights. According to
Calderon's complaint and annexed
documents, her previous employment with a

Connecticut lawyer terminated after she
moved from Connecticut to New York and
informed the lawyer that it was difficult for
her to continue commuting to Connecticut
for work. Bowden found that Calderon
voluntarily left suitable employment, and
thus that she was not entitled to
unemployment benefits.

Calderon claims that denial of her claim for
unemployment benefits has prevented her
from engaging in a thorough job search in
New York, and that consequently additional
constitutional rights have been violated.
Calderon further claims that she thereby
suffered intentional infliction of emotional
distress.

Calderon appealed Bowden's benefits denial
to the Employment Security Appeals
Division within the DOL and her claim was
again denied.

### II. Legal Standard

Pursuant to 28 U.S.C. § 1915(e)(2)(B)"the
court shall dismiss the case at any time if the
court determines that ....the action ... (i) is
frivolous or malicious; (ii) fails to state a
claim on which relief may be granted; or (iii)
seeks monetary relief against a defendant
who is immune from such relief."Thus, the
dismissal of a complaint by a district court
under any of the three enumerated sections in
28 U.S.C. § 1915(e)(2)(B) is mandatory
rather than discretionary. *See Cruz v. Gomez,*
202 F.3d 593, 596 (2d Cir.2000). For
example, "claims in which the defendants are
clearly immune from suit ... would be
considered indisputably meritless."*Nance v.
Kelly,* 912 F.2d 605, 606 (2d Cir.1990). In
addition, "[w]henever it appears ... that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                              Page 2
Slip Copy, 2007 WL 3124717 (D.Conn.)
**(Cite as: Slip Copy)**

court lacks jurisdiction of the subject matter, the court shall dismiss the action."Fed.R.Civ.P. 12(h)(3).*See, e.g., Lyndonville Sav. Bank & Trust Co. v. Lussier,* 211 F.3d 697, 700-01 (2d Cir.2000) ("If subject matter jurisdiction is lacking, the action must be dismissed.")

### III. Discussion

### A. Immunity under Eleventh Amendment and Sovereign Immunity

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."U.S. Const. amend. XI. Such immunity extends to agencies and officers acting in their official capacities on behalf of the State. *See, e.g., Pennhurst State Sch. and Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).42 U.S.C. §§ 1981, 1983, 1985, and 1986 do not abrogate the Eleventh Amendment immunity of the States. *See Quern v. Jordan,* 440 U.S. 332, 345, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (§ 1983); *Evans v. New York State Dept. of Health,* Nos. 98-7160L, 98-7930 CON, 1999 WL 568052, at *1 (2d Cir. July 30, 1999) (§§ 1981, 1983, 1985).

**\*2** "[A] plaintiff may sue a state official acting in his official capacity-notwithstanding the Eleventh Amendment-for prospective, injunctive relief from violations of federal law."*In re Deposit Ins. Agency,* 482 F.3d 612, 617 (2d Cir.2007) (internal quotation marks omitted); *see also Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Calderon requests injunctive relief to prohibit the DOL

"from denying her right to unemployment compensation."This amounts to an appeal of the DOL's eligibility determination and a request for retrospective relief rather a request for prospective injunctive relief. *See Edelman v. Jordan,* 415 U.S. 651, 670, 94 S.Ct. 1347, 1359 (1974) (holding that the Eleventh Amendment bars payment of benefits found to have been wrongfully withheld in the past).

Similarly, under Connecticut law, "[t]he state is immune from suit unless it consents to be sued by appropriate legislation waiving sovereign immunity in certain prescribed cases."*White v.. Burns,* 213 Conn. 307, 312 (1990).FN2 This immunity extends to state officials sued in their official capacities. *Fetterman v. University of Connecticut,* 192 Conn. 539, 473 A.2d 1176 (Conn.1984).

> FN2. While Connecticut permits appeals from unemployment decisions of the DOL, this does not amount to a waiver of immunity for all claims related to the unemployment claim review process. *See Bloom v. Department of Labor,* 93 Conn.App. 37, 40-41, 888 A.2d 115, 118 (Conn.App.2006) (holding that, with regard to unemployment compensation claims, sovereign immunity was only waived for purposes of judicial review pursuant to the statutory scheme set forth in Conn. General Statutes §§ 31-241 through 31-249).

Accordingly, Calderon's federal and state law claims against the State of Connecticut and against the Commissioner of the DOL and Bowden in their official capacities are dismissed in their entirety.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 3
Slip Copy, 2007 WL 3124717 (D.Conn.)
**(Cite as: Slip Copy)**

## B. Absolute Immunity for Quasi-Judicial Actors

Courts have recognized two forms of immunity: absolute and qualified. *See Buckley v. Fitzsimmons,* 509 U.S. 259, 268, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993)."The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties," and hence courts are "quite sparing" in their recognition of absolute immunity. *Burns v. Reed,* 500 U.S. 478, 486-87, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (citations omitted). Absolute immunity is accorded to judges functioning in their official capacities and is extended to officials of government agencies "performing certain functions analogous to those of" a judge. *Butz v. Economou,* 438 U.S. 478, 515, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (extending absolute immunity to federal administrative agency officials functioning in role similar to prosecutor). In considering whether the procedures used by the agency are sufficiently similar to judicial process to warrant a grant of absolute immunity, courts employ a "functional approach." *Cleavinger v. Saxner,* 474 U.S. 193, 201-02, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985).

Six factors are key to determining whether administrative officials share enough of the characteristics of the judicial process to be granted absolute immunity:
(a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

**\*3**\*Cleavinger,* 474 U.S. at 202, 106 S.Ct. 496 (citing *Butz,* 438 U.S. at 512, 98 S.Ct. 2894).*See also Carrubba v. Moskowitz,* 274 Conn. 533, 542, 877 A.2d 773, 781 (Conn.2005) (adopting *Butz* factors to determine whether a defendant is entitled to absolute immunity).

Once a court determines that an official was functioning in a core judicial capacity, absolute immunity applies "however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff" and regardless of motive. *Cleavinger,* 474 U.S. at 199-200, 106 S.Ct. 496 (internal quotations and citations omitted).

In Connecticut, review of claims for unemployment benefits is a quasi-judicial process. Claims are initially heard by an "examiner" designated by the Commissioner of the DOL. Conn. Gen.Stat. § 31-241. Where eligibility for unemployment benefits is unclear, the examiner conducts a "predetermination hearing." Regs. of Conn. State Agencies (hereinafter "Conn. Regs.") § 31-244-2a. At the hearing, the examiner hears "evidence or testimony presented in such a manner as the administrator shall prescribe, including in person, in writing, by telephone or by other electronic means at a hearing called for such purpose."Conn. Gen.Stat. § 31-241; *see also*Conn. Regs. § 31-244-3a (describing procedures for predetermination hearings). At such a hearing the claimant and employer have "(1) the right to be represented by any person, including an attorney; (2) the right to present evidence, documents and witnesses; and (3) the right to cross-examine witnesses and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 4
Slip Copy, 2007 WL 3124717 (D.Conn.)
**(Cite as: Slip Copy)**

parties, so long as the Administrator deems such cross-examination to be appropriate and relevant."Conn. Regs. § 31-244-3a (g). Hearings are informal and the common law rules of evidence do not apply. Conn. Regs. § 31-244-8a. However, the examiner may exclude "incompetent, irrelevant, unduly repetitious or otherwise improper" material and the examiner must "accurately summarize and record in writing the relevant statements of both parties and any witnesses in a predetermination hearing and ... use best efforts to verify that the statement accurately reflects the parties' testimony."*Id.*

The examiner then evaluates claims "on the basis of the facts found by him," to determine eligibility for benefits. Conn. Gen.Stat. § 31-241. The examiner is required to issue a decision setting forth the reasons supporting that decision and the availability of an appeal. *Id.* No examiner may "participate in any case in which he is an interested party."*Id.* A benefits determination is subject to three levels of appeal: A first appeal is before a referee in the Employment Security Appeals Division. Conn. Gen.Stat. § 31-237j. A second appeal is before the Employment Security Board of Review (the "Board").Conn. Gen.Stat. § 31-249. Finally, an appeal to the Superior Court of the state of Connecticut is also possible. Conn. Gen.Stat. § 31-249b.

**\*4** Decisions of the referees and the Board have precedential effect: "Final decisions of the Referees and the principles of law declared in their support shall be binding upon the Administrator and shall further be persuasive authority in subsequent Referee proceedings. Final decisions of the Board shall be binding as precedent in all subsequent proceedings involving similar questions."Conn. Regs. § 31-237g-6.

Decisions of the Board may be appealed to the state Superior Court. Conn. Gen.Stat. § 31-249b.

Thus, the unemployment proceedings of the DOL contain safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; are insulated from political influence; rely on precedent and have precedential effect; are adversarial in nature; and contain multiple layers of appellate review to correct any errors. Furthermore, as Calderon's repeated complaints against the DOL illustrate,[FN3] there is a "need to assure that the individual can perform his functions without harassment or intimidation."Accordingly, the unemployment proceedings of the DOL share enough of the characteristics of the judicial process to be entitled to absolute quasi-judicial immunity. *Cf. White v. Martin,* 26 F.Supp.2d 385, 390 (D.Conn.1998) (holding that CHRO reasonable cause determinations were adjudicatory functions entitled to absolute immunity); *Petyan v. Ellis,* 200 Conn. 243, 510 A.2d 1337 (1986) (holding that the employment security division of the labor department acts in a quasi-judicial capacity when it handles claims for unemployment compensation) *superseded by statute on other grounds as recognized in Chadha v. Charlotte Hungerford Hosp.,* 272 Conn. 776, 865 A.2d 1163 (2005). Thus, Calderon's federal and state law claims against the Commissioner of the DOL and Bowden in their individual capacities are dismissed.

> FN3.*See Calderon v. Commissioner Conn. Dept. Of Labor,* 3:05-cv-00710-MRK.

### IV. Conclusion

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 5
Slip Copy, 2007 WL 3124717 (D.Conn.)
**(Cite as: Slip Copy)**


Accordingly, Calderon's complaint is
dismissed.

SO ORDERED.

D.Conn.,2007.
Calderon v. Connecticut
Slip Copy, 2007 WL 3124717 (D.Conn.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                          Page 1
Slip Copy, 2007 WL 766290 (S.D.N.Y.)
**(Cite as: Slip Copy)**

Fluor Daniel Intercontinental, Inc. v.
General Elec. Co.
S.D.N.Y.,2007.
Only the Westlaw citation is currently
available.
United States District Court,S.D. New York.
In the Matter of the Arbitration Between:
FLUOR DANIEL INTERCONTINENTAL,
INC., and Fluor Arabia Limited,
Claimants-Respondents,
andGENERAL ELECTRIC COMPANY,
GE Power Systems, Inc., General Electric
International, Inc., General Electric
Technical Services Company, Inc., and Saudi
American General Electric Company,
Respondents-Petitioners.
**No. 06 Civ. 3294 GEL.**

March 13, 2007.

H. James Wulfsberg, Wulfsberg Reese
Colvig & Firstman, P.C., Oakland, CA; and
William J. Postner, Schiff Hardin LLP, New
York, NY, for Claimants-Respondents.
Richard L. Abramson and Howard M. Rosen,
Peckar & Abramson, P.C., New York, NY,
for Respondents-Petitioners.

*OPINION AND ORDER*
LYNCH, J.
**\*1** Respondents-Petitioners General Electric
Company, GE Power Systems, Inc., General
Electric International, Inc., General Electric
Technical Services Company, Inc., and Saudi
American General Electric Company
("SAMGE") (collectively, "General
Electric" or "GE") move, pursuant to 9 U.S.C.
§ 9, for an order confirming a partial
arbitration award. The motion will be granted
with respect to all claims finally and
definitely disposed of by the award, subject
to the procedure described below.

BACKGROUND

This case is one of a series of legal
proceedings arising out of a dispute related to
the construction of a power plant in Rabigh,
Saudi Arabia. In October 1998, Fluor Daniel
Intercontinental, Inc. and Fluor Arabia
Limited (collectively, "Fluor") filed a civil
fraud action in the United States District
Court for the Southern District of New York
against General Electric, seeking $160
million in damages due to General Electric's
alleged intentional misrepresentation,
innocent misrepresentation, concealment,
negligent misrepresentation, and breach of
contract relating to the construction project.
General Electric moved to compel arbitration,
pursuant to the Federal Arbitration Act
("FAA"), 9 U.S.C. § 3. The court granted the
motion to compel arbitration and a final
judgment issued. *Fluor Daniel Intercont'l,
Inc. v. Gen. Elec. Co.,* No. 98 Civ. 7181,
1999 WL 637236 (S.D.N.Y. Aug. 20, 1999).
After agreeing upon an arbitral panel and
rules for the proceedings, the parties engaged
in an extensive, 28-day arbitration
proceeding, American Arbitration
Association Case No. 50 T 110 00373 99,
divided into two phases. Phase I focused on
the issue of fraud and was held in April 2001.
Phase II focused on liability and damages
and was held in June and December 2002 and
January 2003. (GE Pet. to Conf. 4.)

The arbitral tribunal issued a lengthy and
thorough "Corrected Partial Award" dated
June 24, 2005. (GE Pet. to Conf. Exh. H (the
"Partial Award").) On April 28, 2006,
General Electric initiated the present civil
action to confirm this partial award,
acknowledging that the Arbitral Tribunal

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(also referred to as "the Panel") still retains jurisdiction over many of the original claims. Fluor argues that the motion to confirm should be denied on the grounds that, inter alia, the Partial Award is not "final and complete."

On June 5, 2006, Fluor submitted to the Panel a request for clarification of the Panel's intent as to the Partial Award, arguing that the Partial Award was not final and should not be confirmed. (Rosen Decl. Exhs. A-B.) The Panel responded with a brief letter, stating that the Award "is final only with respect to matters resolved in that Award."(Rosen Decl. Exh. C.)

The issue now presented is whether the partial award is sufficiently final to be confirmed; Fluor does not raise any objections to the content of the award.

DISCUSSION

The FAA includes a strong presumption that if an award is final and neither party has a legitimate objection, the court should confirm it. *See* 9 U.S.C. § 207; *see also* *Wall Street Assocs., L.P. v. Becker Paribas Inc.,* 27 F.3d 845, 849 (2d Cir.1994). There are thus two questions that are presented here: (1) whether we may confirm *any* part of the partial award and (2) if so, what parts of the award may be considered final and confirmable.

I. *The Confirmation of Partial Awards*

**\*2** Under the FAA, "a district court does not have the power to review an interlocutory ruling by an arbitration panel."*Michaels v. Mariform Shipping, S.A.,* 624 F.2d 411, 414 (2d Cir.1980).*See also* *Yonir Techs, Inc. v. Duration Sys. (1992) Ltd.,* 244 F.Supp.2d

195, 206 (S.D.N.Y.2002) (there is no judicial authority over "an interlocutory order related to an ongoing arbitration.").

However, a district court is not precluded from confirming final resolutions of claims that have been decided once and for all by the arbitrators, where the arbitrators have expressly confirmed that the award was intended to be final with respect to those claims fully adjudicated. "[A]n award which finally and definitely disposes of a separate independent claim may be confirmed although it does not dispose of all the claims that were submitted to arbitration."*Metallgesellschaft A.G. v. M/V Capitan Constante,* 790 F.2d 280, 283 (2d Cir.1986). Thus, a partial award that is "independent and separate from the remaining issues before the arbitrators and [can] be finally determined without reference to those legally irrelevant issues" may be confirmed. *Id.* at 282. *See also* *Yonir Techs.,* 244 F.Supp.2d at 204 ("[D]isposition of an issue that is separate from other issues before the arbitrators can be deemed final and subject to judicial review."(internal citations omitted)).

Fluor correctly points out that *Michaels* prohibits the confirmation of "interim" awards. In *Michaels,* the arbitrators had resolved only some of the many liability issues at hand, had not addressed damages at all, and were still actively receiving testimony. The Court thus regarded the interim award as interlocutory. *Id.* at 413-14. Subsequent case law, however, has recognized *Michaels* for the proposition that partial and severable claims *can* be confirmed as final when they were intended as such by the arbitrator. *See* *Private Sanitation Local 813, Int'l Bhd. of Teamsters v. V & J Rubbish Removal,* No. 89 Civ. 5945,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                    Page 3
Slip Copy, 2007 WL 766290 (S.D.N.Y.)
**(Cite as: Slip Copy)**

1990 WL 144207, at *2 (S.D.N.Y. Sept. 26, 1990) (collecting cases).

This Court is to determine if the Partial Award at issue here resolves issues "definitively enough so that the rights and obligations of the two parties ... do not stand in need of further adjudication."*Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.,* 157 F.3d 174, 176 (2d Cir.1998). The Partial Award at issue here generally conforms to these standards, and is quite different from the one at issue in *Michaels,* which did not decide any of one entity's claims, did not determine damages on any of the counterclaims pressed, reserved judgment on one counterclaim, and, most importantly, did not "purport to be final." 624 F.2d at 412-13.

Here, the Partial Award by its terms makes quite clear that it is intended as a final disposition of at least some of the claims and counterclaims: "The Tribunal hereby disposes of those issues decided herein while reserving to a full award on those matters still subject to its deliberation."(Partial Award 1.) This language clearly indicates that some matters are *not* "still subject to its deliberation." The Partial Award indicates that matters yet to be decided are limited to the quantification of damages, interest, and "previously-filed claims and counterclaims that were not decided in this Partial Award."(Partial Award 306.)

**\*3** Similarly, Arbitrator William W. Park's response to Fluor's request for clarification clearly implies that the award is final with respect to some matters:
(i) the Tribunal retains jurisdiction to all *outstanding* claims and
(ii) the Corrected Partial Award of 24 June 2005 is *final only with respect to matters*

*resolved* in that Award.

(Rosen Decl. Exh. C.; emphasis added.) Thus, there can be no doubt that at least some claims in the Partial Award are final.

## II. *Fluor's Arguments Against Permissive Confirmation*

In its opposition to confirmation, Fluor advances a number of theories that suggest that, even if this Court is able to confirm the partial award, the Court should exercise discretion not to do so. None of these theories are persuasive.

Despite Fluor's suggestions otherwise, Petitioners-Respondents' motives in seeking confirmation are not relevant to the decision regarding whether to confirm the Award. That being said, it is not clear why GE decided to seek confirmation at this time, as opposed to waiting for a final award that disposes of all issues. Fluor has agreed to stipulate to an extension of the one-year statute of limitations, removing one possible source of urgency. (Fluor Mem. 4.) *SeePhotopaint Techs., LLC v. Smartlens Corp.,* 335 F.3d 152 (2d Cir.2003) (holding that one-year statute of limitations can be waived by agreement). If Fluor should later attempt to oppose confirmation of any award at a latter date based on the one-year statute of limitations, it would be judicially estopped from doing so. *SeeMitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 6-7 (2d Cir.1999).

Regardless of whether GE is *required* to file a motion for confirmation within one year, however, it certainly is not barred from doing so. And although Fluor may be correct that GE would suffer no adverse consequences should the award not be confirmed until the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 4
Slip Copy, 2007 WL 766290 (S.D.N.Y.)
**(Cite as: Slip Copy)**

end of all arbitration, a lack of prejudice is not enough to deny a confirmation for which the moving party otherwise qualifies, particularly in light of the FAA's presumption of confirmability, as discussed above. Finally, though this Court always appreciates efforts to conserve its time and energy, concern for judicial economy is not an adequate reason to deny confirmation of the partial award.

### III. *The Need to Determine Which Parts of the Partial Award Are Final and Confirmable*

Although it is clear that some parts of the award are final, it is equally clear that some parts are not. GE's Petition does not specifically elucidate which parts of the Partial Award should be confirmed at this time, simply urging that the award as a whole be confirmed. The Partial Award determined entitlement, but not damages, on a variety of claims asserted by Fluor, and both entitlement and damages as to GE's counterclaims. While the financial awards, findings of liability, and dismissals of claims contained in the Partial Award are not made conditionally, or based on any further findings that may arise in the future, the actual calculation of damages has not been completed in regards to some of these claims, and will be further addressed by the Tribunal. (Partial Award 306.)

**\*4** Some of the components of the awards appear to be more final than others. For example, the Tribunal awards GE slightly over $4 million in disposing of its counterclaim related to the completion of Fluor's work. (Partial Award 310.) The Tribunal also dismisses without prejudice Fluor's request for a declaration relating to the "backstop" letter of credit. (*Id.*)

The claims that are dismissed, and the claims on which damages are awarded, would seem to be finally resolved. But as to the claims where only liability has been determined, the Partial Award cannot be confirmed. As *Michaels* notes, "in order for a claim to be completely determined, the arbitrators must have decided not only the issue of liability of a party on the claim, but also the issue of damages." 624 F.2d at 413-14. This general rule has been extended post-*Metallgesellschaft.* In *Kerr-McGee Refining Corp. v. M/T Triumph,* 924 F.2d 467, 471 (2d Cir.1991), the Second Circuit found that a partial award did not "finally dispose of an independent claim because it left open the question of damages" when it left the issues of punitive or RICO damages, costs and attorneys' fees open to question. *But see Advest, Inc. v. Asseoff,* No. 92 Civ. 2269, 1993 WL 119690, at \*6 (S.D.N.Y. Apr. 14, 1993) (finding the issue of attorneys' fees alone to be a sufficiently separate claim to allow confirmation of resolved issues).

Beyond the claims that only determine liability and not damages, there are several decisions made in the Partial Award that do not fully dispose of claims, but merely decide issues that bear on future determinations as to claims that still must be made, such as the finding of no evidence justifying the "piercing of the corporate veil" in order to establish liability. (Partial Award 310 .) As discussed above, the Court will only confirm the arbitration award as to the disposition of claims, not to determinations of mere issues like this one.[FN1]

> FN1. Parties' counsels have engaged in significant correspondence about whether Respondent-Petitioner's motion to confirm would deprive the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 5
Slip Copy, 2007 WL 766290 (S.D.N.Y.)
**(Cite as: Slip Copy)**

Tribunal of jurisdiction over supplemental claims raised by Fluor. Since this opinion only holds that claims that have been considered once and for all decided by the Arbitral Tribunal are confirmed, it is clear that any new claim which the Tribunal has not had a chance to consider or rule on will not be barred by confirmation.

As the parties acknowledge, it is not this Court's responsibility to investigate the 312-page award page by page in order to determine which claims GE seeks to be confirmed as final. However, the Court disagrees with GE's assertion that there "is no need to parse through the extensive Partial Award in order to make it clear in the confirmation judgment that those remaining claims are not confirmed...." (GE Reply 8.) The Court cannot partially confirm the Partial Award until it, and the parties, are clear on what it is confirming.

CONCLUSION

Accordingly, the award will be confirmed to the extent that it represents a final resolution of severable claims under the standards set forth above. GE shall submit by April 16, 2007, a draft judgment listing those claims that have been thus resolved. Fluor may submit any opposition by April 30, 2007. Now that the standards have been clarified, however, the parties should be able to resolve these issues without much difficulty, and the Court expects that they will make good faith efforts to do so.

**\*5** SO ORDERED.

S.D.N.Y.,2007.
Fluor Daniel Intercontinental, Inc. v. General

Elec. Co.
Slip Copy, 2007 WL 766290 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 2005 WL 1500896 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Freeplay Music, Inc. v. Cox Radio, Inc.
S.D.N.Y.,2005.
Only the Westlaw citation is currently
available.
United States District Court,S.D. New York.
FREEPLAY MUSIC, INC., Plaintiff,
v.
COX RADIO, INC., Cumulus Media, Inc.,
Entercom Communications Corp., Beasley
Broadcast Group, Inc., Citadel Broadcasting
Corp., and Viacom Inc., Defendants.
**No. 04 Civ. 5238GEL.**

June 23, 2005.

Gabriel Fischbarg, Toptani Law Offices,
New York, NY, for Plaintiff.
Bruce P. Keller, Debevoise & Plimpton LLP,
New York, NY, for Defendant Beasley
Broadcast Group, Inc.

OPINION AND ORDER
LYNCH, J.
**\*1** Freeplay Music, Inc. ("Freeplay"), the
owner of copyrights in certain musical
compositions and sound recordings, brings
this action against defendants, corporate
owners of various radio stations, charging
violations of copyright and related claims. In
a separate opinion issued this day, the Court
grants in part and denies in part a motion to
dismiss for failure to state a claim by all
defendants. This opinion addresses the
motion to dismiss for lack of personal
jurisdiction by one defendant, Beasley
Broadcast Group, Inc. ("Beasley"). Freeplay
alleges that Beasley's contacts with New
York are sufficient to support personal
jurisdiction over it. Beasley argues that
Freeplay's conclusory allegations merely
parrot the relevant statutory language, and
that the actual facts alleged in the complaint

are facially insufficient to support
jurisdiction.[FN1] For the reasons that follow,
Beasley's motion will be granted. Freeplay's
request for jurisdictional discovery regarding
Beasley's contacts with New York is denied.

> FN1. Freeplay's memorandum in
> opposition to Beasley's motion
> contains additional allegations not
> stated in its complaint. Although a
> motion to dismiss for lack of personal
> jurisdiction is normally decided
> based on the pleadings, the Court
> considers the additional allegations
> here in the interests of fairness and of
> a full and efficient consideration of
> the jurisdictional issues in this case.

BACKGROUND

Freeplay is a New York corporation which
creates musical compositions and sound
recordings. Freeplay alleges that Beasley
"produced, exploited and distributed in
interstate commerce certain radio
programming containing certain of
[Freeplay's] [c]ompositions and [s]ound
[r]ecordings," when Beasley broadcast
Freeplay's musical works "synchronized"
with other audio works. (Compl. ¶ 17; P.
12(b)(6) Mem. at 3.) Freeplay holds the
copyright registrations for the 155 musical
compositions and sound recordings at issue
in this action. (Compl. ¶ 15; *see* Compl. Exs.
1-9.) Freeplay contracted with Broadcast
Music, Inc. ("BMI"), a performing rights
society, to license permission to perform
these compositions and recordings on
Freeplay's behalf. (P. 12(b)(6) Mem. at 6.)
Freeplay argues that although Beasley is
licensed by BMI to perform the Freeplay
musical works in question, that license does

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1500896 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

not grant Beasley the necessary "synchronization rights" that would allow Beasley to use Freeplay's musical works in the manner alleged. (P. 12(b)(6) Mem. at 3; Fischbarg 12(b)(6) Decl. ¶ 3, Ex. B.) *Seegenerally Freeplay Music, Inc. v. Cox Radio, Inc.,* No. 04 Civ. 5238(GEL), 2005 WL ---- (S.D.N.Y. June 22, 2005).

Beasley is a Delaware corporation with its principal place of business in Naples, Florida. (Compl.¶ 8.) Beasley "produc[es], distribut[es], sell[s] and otherwise commercially exploit[s] radio programming" at its 41 radio stations. (Compl. ¶ 8; Fischbarg 12(b)(6) Decl. Ex. F.) Beasley alleges, and Freeplay does not dispute, that it does not have an office or employees in New York, that it does not own or operate a radio station in New York, and that none of its stations' over-the-air broadcast signals can reach New York. (Beasley Decl. ¶ 7.) Several of Beasley's radio stations, however, have websites accessible in New York through which the stations simulcast their radio broadcasts. (P. Mem. 3; Fischbarg Decl. ¶ 6, Ex. E.)

**\*2** In addition to Beasley's websites, Freeplay alleges that Beasley has several other forms of contact with New York. Beasley radio stations syndicate radio programming produced in New York such as "The Howard Stern Radio Show," "Imus in the Morning," "ABC News," and "Bloomberg Radio News." (Fischbarg Decl. ¶ 3, Ex. B.) Beasley executives travel to New York approximately four times per year to meet with investment bankers. (P. Mem.1.) Beasley executives have also spoken at radio industry conferences and seminars in New York at least six times since 2002. (*Id.* at 2.) New York companies purchase advertising time on Beasley radio stations. (*Id.*) Beasley

also makes payments to performing rights societies based in New York, such as BMI and the American Society of Composers, Authors, and Publishers, for licenses to perform certain musical works. (*Id.*) Beasley has contracted with the New York investment bank Harris Nesbitt in connection with a $25 million stock buy-back scheduled to be completed within the next year. (*Id.* at 1-2, citing D. Mem. 4.) In March 2004, Beasley announced the completion of a $225 million revolving credit facility, funded by a consortium of lenders, and jointly arranged by two New York banks, Harris Nesbitt and Bank of New York. (*Id.*)

DISCUSSION

I. *Legal Standard*

On a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden to establish jurisdiction. *In re Magnetic Audiotape Antitrust Litig.,* 334 F.3d 204, 206 (2d Cir.2003). Where no jurisdictional discovery has been conducted, the plaintiff need only establish a prima facie case, and allegations of jurisdictional fact must be construed in the light most favorable to the plaintiff. *CutCo Indus. Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986). The motion must be denied if those allegations suffice as a matter of law.*Magnetic Audiotape,* 334 F.3d at 206.

A federal court sitting in diversity may exercise jurisdiction over a foreign defendant if the defendant is amenable to process under the law of the forum state. *Omni Capital Int'l Ltd. v. Rudolf Wolff & Co.,* 484 U.S. 97, 105, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987); *Metro. Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 567 (2d Cir.1996). In New York, a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

court may exercise general jurisdiction over a non-domiciliary under New York Civil Practice Laws and Rules ("C.P.L.R.") § 301, and long-arm jurisdiction under C.P.L.R. § 302. The exercise of personal jurisdiction must also comport with constitutional due process requirements under *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).*Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.,* 264 F.3d 32, 37 (2d Cir.2001).

## II. *General Jurisdiction in New York; C.P.L.R. § 301*

Under C.P.L.R. § 301, a New York court may exercise jurisdiction over a defendant "engaged in such a continuous and systematic course of 'doing business' in New York as to warrant a finding of its presence in the state."*Jazini v. Nissan Motor Co., Ltd.,* 148 F.3d 181, 184 (2d Cir.1998)."A defendant is doing business such that jurisdiction pursuant to § 301 is appropriate if it does business in New York 'not occasionally or casually, but with a fair measure of permanence and continuity.'"*Mantello v. Hall,* 947 F.Supp. 92, 97 (S.D.N.Y.1996), quoting *Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.,* 918 F.2d 1039, 1043 (2d Cir.1990). This standard has been described as "stringent," because a defendant who is found to be doing business in New York in a permanent and continuous manner "may be sued in New York on causes of action wholly unrelated to acts done in New York."*Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG,* 160 F.Supp.2d 722, 731 (S.D.N.Y.2001), quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.,* 902 F.2d 194, 198 (2d Cir.1990).

**\*3** Courts have relied on the following

"traditional indicia" when "deciding whether a foreign corporation is doing business in New York ...:(1) the existence of an office in New York; (2) the solicitation of business in New York; (3) the existence of bank accounts or other property in New York; and (4) presence of employees of the foreign defendant in New York."*Mantello,* 947 F.Supp. at 97, citing *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 58 (2d Cir.1985). Freeplay contends that its allegations regarding Beasley's activity demonstrate Beasley's legal presence in New York, even though Beasley has no office in New York, and no employees working on a regular basis in New York. Freeplay's allegations, however, do not show that Beasley has a permanent or continuous presence in New York sufficient to justify a finding of general jurisdiction.

Beasley's licenses and radio programming purchases from New York corporations are insubstantial activity to warrant general jurisdiction in New York. New York courts have held that "obtaining licenses is not 'doing business' " for the purposes of general jurisdiction. *Mantello,* 947 F.Supp. at 98. Further, "the purchase of goods from New York by a[d]efendant, even if on large scale, would not, in an of itself, amount to 'doing business' within the state."*Agency Rent A Car System, Inc. v. Grand Rent A Car Corp.,* 916 F.Supp. 224, 229 (E.D.N.Y.1996), *rev'donothergrounds,* 98 F.3d 25 (2d Cir.1996). Therefore, Beasley's purchases of programming and licenses to broadcast copyrighted materials are insufficient to justify general jurisdiction.

Similarly, Freeplay's allegation that Beasely solicits advertising for its radio stations from New York companies reflects a mere business relationship insufficient to confer

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4
Not Reported in F.Supp.2d, 2005 WL 1500896 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

general jurisdiction. *Reers v. Deutsche Bahn AG,* 320 F.Supp.2d 140, 155 (S.D.N.Y.2004). Solicitation of business contracts can reach a level sufficient to support general jurisdiction only through "extensive conduct directed toward or occurring in New York."*Id.* at 150.Even actual advertising within New York is not considered to reach the level of substantial solicitation that would suffice for general jurisdiction. *See,e.g.Muollo v. Crestwood Vill. Inc.,* 155 A.D.2d 420, 547 N.Y.S.2d 87, 88 (2d Dept.1989) (finding defendant's advertisements in the New York Times and on the radio insufficient to support personal jurisdiction); *seealsoHolness v. Maritime Overseas Corp.,* 251 A.D.2d 220, 676 N.Y.S.2d 540, 543 (1st Dept.1998) ("New York has no jurisdiction over a foreign defendant company whose only contacts with New York are advertising and marketing activities plus representatives' occasional visits to New York."). Freeplay's allegations do not suggest that Beasley solicited advertising from local New York businesses, or advertising that was directed toward a New York audience, as opposed to advertising from national companies incorporated or headquartered in New York. Freeplay's allegation that Beasley solicits business from New York companies does not show that Beasley solicited that business in New York, or that the solicitation was extensive or substantial. Thus, Beasley's advertising contracts with New York companies are insufficient to justify general jurisdiction.

**\*4** Freeplay also alleges (and Beasley acknowledges) that Beasley has a contract with the New York bank Harris Nesbitt for the purposes of a $25 million stock buy-back. Regarding the stock buy-back, New York courts "accord [ ] foreign corporations substantial latitude" in connection with management of their securities on New York-based stock exchanges without subjecting themselves to New York jurisdiction for unrelated occurrences. *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 97 (2d Cir.2000); *seealsoReers,* 320 F.Supp.2d at 156 ("[T]he fact that [defendant's] stock may be purchased in New York, and that [defendant] retains New York-based market makers to assist in its sales of stock, is another important factor but is insufficient to confer general jurisdiction."). Beasley's stock buy-back venture is limited in purpose and temporary in duration such that it does not create legal presence in New York.

Bank accounts can be grounds for general jurisdiction because they are a permanent locus of property or assets within the state. However, a "bank account[ ] standing alone cannot create jurisdiction unless [it is] used for 'substantially all' of [the defendant's] business."*Id.*[FN2] Freeplay alleges in a conclusory manner that Beasley runs its "day-to-day operations" through a revolving credit facility jointly administered by Harris Nesbitt and the Bank of New York (P. Mem.2), but fails to make any specific allegations as to the role the credit facility plays in Beasley's business. By definition, however, a "credit facility" is a financing arrangement, not an operational bank account. *Seegenerally* GE Commercial Finance Corporate Lending, *Frequently Asked Questions,at* ht tp://www.gelending.com/Clg/Resources/len dingFAQs.html. Plaintiff's allegation thus appears to assert, at most, that Beasley's "day-to-day operations" are financed entirely by borrowing through this credit facility, and not that its ordinary payroll and checking transactions are performed through the credit

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 2005 WL 1500896 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

facility. Generally, "[a] single financing arrangement, such as [a] credit facility, is insufficient to constitute the continuous and systematic activity required to warrant the exercise of general personal jurisdiction."*Int'l Telecom, Inc. v. Generadora Electrica del Oriente S.A.,* No. 00 Civ. 8695(WHP), 2002 WL 465291, at *2 (S.D.N.Y.2002). Therefore, Freeplay's allegation regarding Beasley' credit facility is insufficient to support a finding of general jurisdiction.[FN3]

> FN2. Factors that have led courts to conclude that a bank account is a "substantial" part of a defendant's business include: (1) receipt and deposit of substantial portion of company revenue, (2) use for payment of employees, (3) use for payment of expenses, and (4) assistance from bank personnel in carrying out company business. *United Rope Distrib., Inc. v. Kimberly Line,* 785 F.Supp. 446, 450-451 (S.D.N.Y.1992).

> FN3. Further, Beasley's relationship to Harris Nesbitt and the Bank of New York via the credit facility does not amount to the type of true principal/agent relationship that, in other contexts, might serve as a basis for general jurisdiction. To be considered an "agent," the banks "must be primarily employed by the defendant and not engaged in similar services for other clients."*Jacobs,* 160 F.Supp.2d at 737. Neither of these conditions exist in this case. Hence, the relationship between Beasley and the banks cannot serve as a basis for general jurisdiction.

Freeplay also alleges that Beasley's radio broadcasts are available in New York via their websites. However, "the fact that a foreign corporation has a website accessible to New York is insufficient to confer jurisdiction under C.P.L.R. § 301."*Spencer Trask Ventures, Inc. v. Archos S.A.,* No. 01 Civ. 1169(LAP), 2002 WL 417192, at *6 (S.D.N.Y. Mar.18, 2002). Unlike a conventional radio station that requires a nearby physical presence in order to broadcast to a given geographical region, a webcast can be transmitted to a distant state without any further indicia of permanence in that state such as an office or employees. "Moreover, even if such an exercise of jurisdiction were proper under § 301, it would not be permissible under the Due Process Clause [of the Fourteenth Amendment to the U.S. Constitution] absent, at a minimum, an allegation that ... the website was purposefully directed toward New York."*Drucker Cornell v. Assicurazioni Generali S.p.A. Conso.,* No. 97 Civ. 2262(MBM), 2000 WL 284222, at *2 (S.D.N.Y. Mar.16, 2000).

**\*5** It is undisputed that Beasley's radio stations, business premises, and employees are all located outside New York, and that the broadcast signals from none of its stations are heard in New York. The occasional and insubstantial contacts alleged by plaintiff, taken singly or together, are insufficient to amount to "doing business" in New York. Accordingly, Freeplay fails to allege any facts that justify general jurisdiction over Beasley.

III. *New York's Long-Arm Statute: C.P.L.R. § 302*

A. *Transacting Business in New York: C.P.L.R. § 302(a)(1)*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                     Page 6
Not Reported in F.Supp.2d, 2005 WL 1500896 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Under C.P.L.R. § 302(a)(1), New York courts have specific jurisdiction over "any nondomiciliary [who] transacts any business within the state or contracts anywhere to supply goods or services in the state.""A nondomiciliary 'transacts business' under C.P.L.R. § 302(a)(1) when he purposefully avails [himself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws."*CutCo,* 806 F.2d at 365 (internal citations omitted). The "ultimate determination" as to whether a foreign defendant "transacts business" in New York is made based on the totality of the circumstances. *Agency Rent A Car,* 98 F.3d at 29. The Second Circuit has said that a "variety of factors" may be considered in making this determination, including: (1) whether the defendant has an on-going contractual relationship with a New York corporation, (2) whether the contract was negotiated or executed in New York, and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract relationship; (3) what the choice-of-law clause is in any such contract; and (4) whether the contract requires franchises to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state. *Id.*"Cumulative minor activities that, individually, may be insufficient, may suffice ... as long as the cumulative effect creates a significant presence within the state."*O'Brien v. Hackensack Univ. Med. Ctr.,* 305 A.D.2d 199, 760 N.Y.S.2d 425, 427 (1st Dept.2003). Jurisdiction is only proper under this statutory provision where the cause of action "arises out of the subject matter of the business transacted."*Citigroup Inc. v. City Holding Co.,* 97 F.Supp.2d 549,

564 (S.D.N.Y.2000)."A suit will be deemed to have arisen out of a party's activities in New York if there is an 'articulable nexus,' or 'substantial relationship,' between the claims asserted and the actions that occurred in New York."*Henderson v. I.N.S.,* 157 F.3d 106, 123 (2d Cir.1998) (internal citations omitted).

Individually, each of Freeplay's allegations with respect to Beasley's relationships with New York enterprises might not necessarily be sufficient to support a finding that Beasley transacts business in New York. *See,e.g.,J.L.B. Equities, Inc. v. Ocwen Fin. Corp.,* 131 F.Supp.2d 544, 551 n. 3 (S.D.N.Y.2001) (finding that defendant did not transact business in New York even though defendant held a New York bank account and had various other business communications with New York parties). Taken together, however, Freeplay's allegations could show that Beasley has "on-going contractual relationship[s] with New York corporation[s]," and could therefore support a finding that Beasley transacts business in New York. *Agency Rent A Car,* 98 F.3d at 29.

**\*6** Nevertheless, jurisdiction fails under § 302(a)(1) because the infringing conduct in question cannot be said to have arisen out of these business transactions. "For a tort claim to arise out of transaction of business in New York, the connection between the transaction and the claim must be direct."*Mantello,* 947 F.Supp. at 100. No relationship exists between Beasley's business transactions in New York and the alleged copyright infringement. Therefore, Beasley's contractual contacts with New York are not a proper basis for jurisdiction under C.P.L.R. § 302(a)(1).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7
Not Reported in F.Supp.2d, 2005 WL 1500896 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

The case is different with respect to Beasley's maintenance of a website through which internet users in New York could access the programming of at least of some of Beasley's radio stations. Freeplay's claims arise from the production and broadcast of such programming. Accordingly, if the maintenance of such websites constitute their transaction of business in New York, Freeplay's claims would have a significant nexus with those transactions.

The internet has complicated questions of personal jurisdiction. Although Second Circuit case law provides little guidance on this subject, Judge Sweet has aptly summarized the state of the law as it has developed around the country:

[T]he courts have identified a spectrum of cases involving a defendant's use of the internet. At one end are cases where the defendant makes information available on what is essentially a 'passive' web site. This use of the internet has been analogized to an advertisement in a nationally-available magazine or newspaper, and does not without more justify the exercise of jurisdiction over the defendant. At the other end of the spectrum are cases in which the defendant clearly does business over the internet, such as where it knowingly and repeatedly transmits computer files to customers in other states. Finally, occupying the middle ground are cases in which the defendant maintains an interactive web site which permits the exchange of information between users in another state and the defendant, which depending on the level and nature of the exchange may be a basis for jurisdiction.

*Citigroup,* 97 F.Supp.2d at 565 (citations omitted). Although this "sliding scale" model provides a useful guide to how courts have approached such claims in the recent past, it does not amount to a separate framework for analyzing internet-based jurisdiction, and traditional statutory and constitutional principles remain the touchstone of the inquiry. *SeeHy Cite Corp. v. Badbusinessbureau.com, L.L.C.,* 297 F.Supp.2d 1154, 1160-61 (W.D.Wisc.2004) (rejecting notion that sliding scale framework represents a "specialized test" for internet jurisdiction, but finding that "[t]he website's level of interactivity may be one component of a determination whether a defendant has availed itself purposefully of the benefits or privileges of the forum state"); *Winfield Collection, Ltd. v. McCauley,* 105 F.Supp.2d 746, 750 (E.D.Mich.2000) ("[T]he ultimate question can still as readily be answered by determining whether the defendant did, or did not, have sufficient 'minimum contacts' in the forum state.").

**\*7** Beasley's alleged broadcast of sound compositions over its stations' websites cannot serve as a basis for jurisdiction under § 302(a)(1). Although there may be interactive elements to the websites, the simulcasts of the radio broadcasts are as passive an enterprise as are the radio broadcasts themselves. *SeeRealuyo v. Villa Abrille,* No. 01 Civ. 10158(JGK), 2003 WL 21537754, at \*6 (S.D.N.Y. July 8, 2003) (finding that the "sheer availability" of an allegedly defamatory article on the defendant's website, "where it can be downloaded in New York at no cost" could not be considered a transaction of business sufficient to sustain jurisdiction under either C.P.L.R. § 302(a)(1) or due process). Freeplay also fails to allege that New York residents ever accessed Beasley websites for the purposes of listening to Beasley radio station simulcasts. It stretches the meaning of "transacting business" too far to subject

Not Reported in F.Supp.2d                                                                Page 8
Not Reported in F.Supp.2d, 2005 WL 1500896 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

defendants to personal jurisdiction in any state merely for operating a website, however commercial in nature, that is capable of reaching customers in that state, without some evidence or allegation that commercial activity in that state actually occurred or was actively sought. *Cf.Citigroup,* 97 F.Supp.2d at 566 (finding personal jurisdiction where bank not only maintained website equipped to take loan applications and provide online chat with bank representatives, but also engaged in direct mail solicitation of New York businesses). Therefore, Beasley does not transact business in New York when it simulcasts its radio programming via its websites, and is not subject to jurisdiction under § 302(a)(1).

B. *Tortious Action Within New York: C.P.L.R. § 302(a)(2)*

Alternatively, under C.P.L.R. § 302(a)(2), a foreign defendant may be subject to personal jurisdiction in New York if he "commits a tortious act within the state."New York courts have interpreted the statutory language "within the state" literally, such that jurisdiction is only proper over a defendant who commits a tortious act when the defendant is physically present in the state. *SeeBensusan Restaurant Corp. v. King,* 126 F.3d 25, 28 (2d. Cir.1997) ("The official Practice Commentary to C.P.L.R. § 302 explains that 'if a New Jersey domiciliary were to lob a bazooka shell across the Hudson River at Grant's tomb, [New York case law] would appear to bar the New York courts from asserting personal jurisdiction over the New Jersey domiciliary in an action by an injured New York plaintiff.' "). In copyright claims, § 302(a)(2) jurisdiction exists only when the allegedly infringing work is offered, displayed or sold in New York. *Mantello,* 947 F.Supp. at 101.

It appears that Freeplay means to allege that because the infringing sound compositions were broadcast via Beasley websites, they were made available in New York such that jurisdiction under C.P.L.R. § 302(a)(2) is appropriate. However, "[a]lthough it is in the very nature of the internet that the allegedly infringing [material] contained in these web sites can be viewed anywhere, this does not mean that the infringement occurred everywhere."*Citigroup,* 97 F.Supp.2d at 567. "[C]ourts have held that in the case of web sites displaying infringing [material] the tort is deemed to be committed where the web site is created and/or maintained. *Id.* at 567;*seealsoBensusan,* 126 F.3d at 29 (holding that a jazz club in Missouri with the same name as a famous jazz club in New York was not to be subject to jurisdiction under § 302(a)(2) on the basis of its website since the website was created and maintained in Missouri). Freeplay makes no assertions that the websites were created or maintained in New York, and thus, Beasley is not subject to jurisdiction under § 302(a)(2).

C. *Tortious Action Outside New York: C.P.L.R. § 302(a)(3)*

**\*8** Under C.P.L.R. § 302(a)(3), a foreign defendant may be subject to personal jurisdiction in New York if he "commits a tortious act without the state causing injury to person or property within the state ... if he ... (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.""Courts determining whether there is injury in New York sufficient to warrant § 302(a)(3) jurisdiction must generally apply a 'situs-of-injury' test, ... locat[ing] the 'original event which caused the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 9
Not Reported in F.Supp.2d, 2005 WL 1500896 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

injury.'"*DiStefano v. Carozzi, Inc.,* 286 F.3d 81, 84 (2d Cir.2001). The original event is "distinguished [both] from the initial tort [and] from the final economic injury."*Id.* For New York courts to have jurisdiction over a tortfeasor outside of New York, the first injury resulting from the tort must be felt inside New York. *See,e.g.,Hermann v. Sharon Hosp., Inc.,* 135 A.D.2d 682, 522 N.Y.S.2d 581, 583 (2d Dept.1987) (finding that the first injury was felt outside of New York when a New York plaintiff received negligent medical treatment in Connecticut, even though the plaintiff continued to feel the injury when she returned to New York).

Freeplay has alleged that Beasley used its copyrighted sound recordings and musical compositions without the requisite "synchronization license." In cases of commercial torts, "the place of injury will usually be located where the 'critical events associated with the dispute took place.'"*Rolls-Royce Motors, Inc. v. Charles Schmitt & Co.,* 657 F.Supp. 1040, 1054. In this case, the "critical events" are Beasley's alleged unlicensed use of Freeplay's recordings and compositions. Yet, Freeplay has not alleged that the Beasley's unlicensed use took place in New York, or even that New York residents accessed Beasley's webcasts and listened to the infringing sound performances. Freeplay claims only economic loss as a result of the alleged unlicensed use of their copyrighted material. Any economic loss suffered, however, is only a consequence of the injurious unlicensed use and is not the injury itself. *SeePlunket v. Doyle,* No. 99 Civ. 11006(KMW), 2001 WL 175252, at *3 (S.D.N.Y. Feb.22, 2001) (finding a New York copyright holder is injured where the infringing use occurred, and "the mere fact that the plaintiff resides in New York and

therefore ultimately experiences a financial loss there is not a sufficient basis for jurisdiction under § 302(a)(3)"). Therefore, jurisdiction under C.P.L.R. § 302(a)(3) is not justified.

*CONCLUSION*

Defendant's motion to dismiss for lack of personal jurisdiction is granted.

SO ORDERED.

S.D.N.Y.,2005.
Freeplay Music, Inc. v. Cox Radio, Inc.
Not Reported in F.Supp.2d, 2005 WL 1500896 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                  Page 1
Slip Copy, 2006 WL 3230808 (M.D.Tenn.)
**(Cite as: Slip Copy)**

R.D. Herbert & Sons Co. v. Local Union
No. 177
M.D.Tenn.,2006.
Only the Westlaw citation is currently
available.
United States District Court,M.D.
Tennessee,Nashville Division.
R.D. HERBERT & SONS CO.
v.
LOCAL UNION NO. 177, Sheet Metal
Workers International Association, et al.
**No. 3:06-0826.**

Nov. 3, 2006.

Charles J. Mataya, Luther Wright, Jr., Boult,
Cummings, Conners & Berry, Nashville, TN,
for Plaintiff.
Robert Jan Jennings, Branstetter, Stranch &
Jennings, Nashville, TN, David A. Prather,
Ford & Harrison, LLP, Memphis, TN, for
Defendant.

MEMORANDUM
TODD J. CAMPBELL, District Judge.
**\*1** Pending before the Court is Defendant
The National Joint Adjustment Board for the
Sheet Metal Industry, Inc.'s Motion to
Dismiss (Docket No. 24). For the reasons
stated herein, the Motion is GRANTED. All
claims against Defendant National Joint
Adjustment Board for the Sheet Metal
Industry, Inc. are dismissed.

FACTS

Plaintiff is a Tennessee corporation engaged
in the roofing and sheet metal business.
Defendant National Joint Adjustment Board
for the Sheet Metal Industry, Inc. ("NJAB")
is a Virginia corporation which provides
arbitration services, pursuant to various

collectively bargained agreements, for the
administration of certain labor-management
disputes.

Plaintiff filed a Verified Complaint for
Injunctive and Declaratory Relief (Docket
No. 1) asking the Court to enjoin the
Defendants from proceeding with arbitration
of a specific grievance [FN1] and to declare that
Plaintiff is not required to submit that
grievance to arbitration under its "Working
Agreement" with the Local Union. The
parties dispute whether the grievance
concerning a "supervisory employee" falls
within the arbitration provision of the
Working Agreement.

> FN1. The grievance at issue
> challenges the discharge by Plaintiff
> of Larry Gant, Plaintiff's former
> Superintendent of Outside Sheet
> Metal.

Defendant NJAB has moved to dismiss the
claims against it because it is entitled to
arbitral immunity for all the acts which form
the basis of Plaintiff's claims.[FN2]

> FN2. Defendant also makes
> arguments concerning the Court's
> jurisdiction under the Labor
> Management Relations Act and the
> Norris-LaGuardia Act. Those
> arguments have previously been
> rejected by this Court on the other
> Defendants' Motions to Dismiss.
> *See* Docket No. 27.

MOTIONS TO DISMISS

In considering a motion to dismiss for failure
to state a claim on which relief can be granted,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the court must accept as true all factual allegations in the complaint. *Broyde v. Gotham Tower, Inc .,* 13 F.3d 994, 996 (6th Cir.1994). The motion should be granted only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Id.*

A motion to dismiss for failure to state a claim upon which relief can be granted must be viewed in the light most favorable to the party opposing the motion. *State of Ohio ex rel. Fisher v. Louis Trauth Dairy, Inc.,* 856 F.Supp. 1229, 1232 (S.D.Ohio 1994). The purpose of a motion to dismiss for failure to state a claim is to allow the defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true. *Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir.1993).

ARBITRAL IMMUNITY

The issue in this lawsuit is whether a grievance concerning an alleged "supervisory employee" falls within the arbitration provision of an agreement between the employer (Plaintiff) and the union (Defendant Local Union). Defendant NJAB is not a party to that agreement.

Aside from the claim of arbitral immunity, the Court notes that Defendant NJAB is not a real party in interest in this case. A claim intended to determine whether an arbitral body has the authority to proceed is one in which the arbitral body itself has no real interest. *International Medical Group, Inc. v. American Arbitration Ass'n,* 149 F.Supp.2d 615, 629 (S.D.Ind.2001).

**\*2** In addition, the Court finds that Defendant NJAB is entitled to arbitral immunity for

these claims. Because an arbitrator's role is functionally equivalent to a judge's role, courts have uniformly extended judicial and quasi-judicial immunity to arbitrators. *Corey v. New York Stock Exchange,* 691 F.2d 1205, 1209-1211 (6th Cir.1982); *New England Cleaning Services, Inc. v. American Arbitration Ass'n,* 199 F.3d 542, 545 (1st Cir.1999); *Ross v. MBNA Bank,* 2005 WL 2334297 at \* 3 (E.D.Tenn. Sept. 23, 2005). Like judicial and quasi-judicial immunity, arbitral immunity is necessary to protect decisionmakers from undue influence and the decisionmaking process from attack by dissatisfied litigants. *Olson v. National Ass'n of Securities Dealers,* 85 F.3d 381, 382 (8th Cir.1996).

Organizations that sponsor arbitrations, as well as arbitrators themselves, enjoy this immunity from civil liability. *New England Cleaning,* 199 F.3d at 545. A sponsoring organization's immunity extends to the administrative tasks it performs, insofar as these are integrally related to the arbitration.*Id.; see also Tamari v.. Conrad,* 552 F.2d 778, 780-81 (7th Cir.1977) (arbitral immunity should be extended to cases where the authority of an arbitrator to resolve a dispute is challenged). Arbitral immunity protects all acts within the scope of the arbitral process. *Olson,* 85 F.3d at 383.

Plaintiff argues that Defendant NJAB is not entitled to arbitral immunity because it has "overstepped the bounds of arbitral immunity by attempting to schedule an arbitration hearing in spite of Plaintiff's objections...."Docket No. 32.Arbitral immunity does not apply if there is a clear absence of jurisdiction. *New England Cleaning,* 100 F.3d at 546.

The Court finds that, in this case, Defendant

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                     Page 3
Slip Copy, 2006 WL 3230808 (M.D.Tenn.)
**(Cite as: Slip Copy)**


NJAB did not overstep the bounds of arbitral immunity. Defendant NJAB did not conduct arbitration proceedings at all, much less "sham arbitrations," as in the authority Plaintiff cites. Defendant NJAB has no interest in the outcome of the underlying disputes between Plaintiff and the Union or between Plaintiff and Mr. Gant. In that neutral role, it receives arbitral immunity.

Accordingly, Defendant NJAB's Motion to Dismiss is GRANTED, and Plaintiff's claims against Defendant NJAB are dismissed.

IT IS SO ORDERED.

M.D.Tenn.,2006.
R.D. Herbert & Sons Co. v. Local Union No. 177
Slip Copy, 2006 WL 3230808 (M.D.Tenn.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1
Not Reported in F.Supp.2d, 2005 WL 3277966 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

C Precision Mechanical, Inc. v. Karr
M.D.Fla.,2005.
Only the Westlaw citation is currently available.
United States District Court,M.D. Florida.
PRECISION MECHANICAL, INC.,
Precision Air Conditioning of Brevard, Inc.
& Precision Fabricating & Cleaning Co., Inc.,
Plaintiffs,
v.
Susan E. KARR, Ralph E. Carver, Michael J.
Jeske, Dan Sinclair, Florida Smacna, Inc.,
and Sheet Metal Workers' Internaional
Association Local 15, AFL-CIO,
Defendants.
**No. 6:05 CV 1353 ORL 31K.**

Dec. 2, 2005.

Edward J. Kinberg, R. Brent Blackburn, Kinberg & Associates, LLC, Melbourne, FL, for Plaintiffs.
James G. Brown, Ford & Harrison LLP, Christopher Charles Skambis, Jr., The Skambis Law Firm, Joseph Egan, Jr., Egan, Lev & Siwica, P.A., Orlando, FL, Lee A. Lastovich, Felhaber Larson Ferlor & Vogt, Minneapolis, MN, for Defendants.

ORDER
PRESNELL, J.
**\*1** The Plaintiffs in this case, Precision Mechanical, Inc. ("PMI"), Precision Air Conditioning of Brevard, Inc. ("PACB"), and Precision Fabricating & Cleaning Co., Inc. ("PFCC") (collectively referred to, where appropriate, as the "Plaintiffs") seek to challenge an arbitration award arising out of a labor dispute.[FN1] This matter is before the Court on Motions to Dismiss filed by Ralph Carver ("Carver") and Dan Sinclair ("Sinclair"), (Doc. 16; Memorandum in

Support at Doc. 17), Susan Karr ("Karr") and Florida SMACNA, Inc. ("Florida SMACNA") (Doc. 18; Memorandum in Support at Doc. 19), and Michael Jeske ("Jeske") and Sheet Metal Workers' International Association Local 15, AFL-CIO (the "Union"), (Doc. 20). The Plaintiffs filed a responsive memorandum. (Doc. 29). The Court held a hearing on November 30, 2005, at which the parties presented oral argument.

FN1. The Plaintiffs' Complaint appears at Doc. 2.

I. Background

A. Parties

PMI, PACB and PFCC are Florida corporations doing business in Brevard County, Florida.[FN2] Karr, Carver, Jeske and Sinclair are Florida residents.[FN3] Carver, Jeske and Sinclair were members of the Florida SMACNA Local Joint Adjustment Board ("Local Joint Adjustment Board"), which was convened by Karr and Florida SMACNA. Florida SMACNA is a Florida corporation doing business in Brevard County.[FN4] The Union is a labor union with offices in Seminole County, Florida, that represents workers in the sheet metal industry, including those working in Brevard County.

FN2. During part of the time relevant to this case, PMI did business as "Precision Air Conditioning" ("PAC").

FN3. Karr, Carver, Jeske and Sinclair reside in Brevard County, Orange

Not Reported in F.Supp.2d                                        Page 2
Not Reported in F.Supp.2d, 2005 WL 3277966 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

County, Hillsborough County, and Orange County, respectively.

FN4. During part of the time relevant to this case, Florida SMACNA was known as "Central Florida SMACNA, Inc."

### B. Facts

#### 1) The collective bargaining agreement

PMI and the Union entered into a collective bargaining agreement (the "CBA"), which set forth the terms of employment for employees engaged in certain types of sheet metal, roofing, ventilating and air conditioning work.[FN5](*See* Doc. 2, Att. 2, Ex. A). Article 10 of the CBA sets out the procedures to be followed for filing and appealing grievances. (*Id.* at 7). Section 1 provides that grievances must be raised within thirty days following the occurrence giving rise to the grievance, or within thirty days of the first knowledge of the facts giving rise to the grievance.[FN6](*Id.*). Grievances arising out of the interpretation or enforcement of the CBA must be settled between the relevant employer and the Union, if possible. (*Id.*). Section 2 provides that grievances not settled under Section 1 may be appealed to a Local Joint Adjustment Board.[FN7](*Id.*). Notices of appeal must be given within thirty days after the termination of the procedures described in Section 1.[FN8](*Id.* at 8).

FN5. The CBA originally became effective on July 1, 1999. The parties subsequently agreed, in August of 2002, to maintain the terms of the CBA pending the negotiation and execution of a successor agreement. (*See* Doc. 2, Att. 2, Ex. A at 1).

FN6. This requirement is also included in the Summary of Procedural Rules for Local Joint Adjustment Board Proceedings. (*See* Doc. 2, Att. 5, Ex. N at 1).

FN7. Section 7 provides that the failure to exercise the right of appeal within the required time period voids any right of appeal applicable to the facts and remedies of the grievances involved. (Doc. 2, Att. 2, Ex. A at 8).

FN8. The charging party must "spell out explicitly the violation of the agreement complained of, including therein a clear definition of the dispute ... [and][t]he defending party must be given a copy of the charges filed against him in time for him to prepare his defense."(Doc. 2, Att. 5 at 20; *see also* Doc. 2, Att. 5, Ex. N at 1 (stating that a dispute submitted to the Local Joint Adjustment Board must state the specific provision of the CBA alleged to have been violated, the facts giving rise to the dispute, and the position of the grieving party)).

The Local Joint Adjustment Board must meet no more than fourteen days following the request for its services, unless the time is extended by mutual agreement of the parties or the Local Joint Adjustment Board. (*Id.* at 7). The Local Joint Adjustment Board consists of equal numbers of representatives of the Union and the employer. (*Id.*). At a hearing before the Local Joint Adjustment Board, the charging party must submit evidence, including witnesses and/or affidavits in support of the charges, and the defending party must have an opportunity to

Not Reported in F.Supp.2d                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 3277966 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

present evidence, and may introduce witnesses or affidavits, and may cross-examine witnesses.[FN9](Doc. 2, Att. 5, Ex. M at 20).

> FN9.*See* Doc. 2, Att. 5, Ex. N at 45 (stating that the grieved party "must be allowed to present defenses, introduce witnesses or affidavits, and may cross examine witnesses.").

**\*2** Section 5 provides that Local Joint Adjustment Boards are empowered to render decisions and grant relief to either party as necessary, including the award of damages or other compensation. (Doc. 2, Att. 2, Ex. A at 8). Except in cases of deadlock, the decision of the Local Joint Adjustment Board is final and binding.[FN10](*Id.* at 7). Individuals that serve as members of a Local Joint Adjustment Board act as arbitrators, and thus are "generally immune from civil liability for their decisions, so long as they are acting without bias and within the scope of their authority."(Doc. 2, Att. 5, Ex. N at 45).

> FN10. Grievances not settled as provided in section 3 of Article 10 may be appealed to the National Joint Adjustment Board. (Doc. 2, Att. 2, Ex. A at 8). Section 4 of Article 10 expressly incorporates the Procedural Rules of the National Joint Adjustment Board. (*Id.*).

### 2) The grievances and submission to the Local Joint Adjustment Board

On February 28, 2005, the Union filed a grievance (the "February Grievance") for actions allegedly committed by PMI, PAC and PACB, when they allegedly employed non-union workers performing work "within the trade and territorial jurisdiction of the Agreement/Union," in violation of the CBA.[FN11](*See* Doc. 2, Att. 2, Ex. B). The Union did not appeal the February Grievance to Florida SMACNA.

> FN11. PACB provides residential and light commercial air conditioning and refrigeration sales and service. To do so, PACB employed both Union members and non-Union air conditioning and refrigeration service technicians and helpers. PMI's position was that these non-Union workers were necessary because Union members (sheet metal workers) are neither permitted nor trained to perform the work of air conditioning and refrigeration service technicians, and thus the non-Union workers were outside the scope of the Union's jurisdiction. (Doc. 29, Att.2, Ex. A). The Union believed that these non-Union workers were performing work within the trade and territorial jurisdiction of the Union, and that these non-Union workers were employed in violation of the CBA. (Doc. 2, Att.2, Ex. B).

On April 28, 2005, the Union filed another grievance (the "April Grievance") containing the same language as the February Grievance. (*See* Doc. 2, Att. 2, Ex. C). The Union appealed the April Grievance to Florida SMACNA on May 5, 2005, and requested that a Local Joint Adjustment Board be convened to hear the grievance. (*See id.* at Ex. D). Accordingly, Florida SMACNA was designated as the arbitral forum.

### 3) Hearing in front of the Local Joint Adjustment Board

Counsel for the Plaintiffs was notified on

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 4
Not Reported in F.Supp.2d, 2005 WL 3277966 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

June 7, 2005, that the Local Joint Adjustment Board had scheduled a hearing for June 10, 2005, to consider the Union's April Grievance. On June 7, 2005, PMI's president spoke with the Union's Assistant Business Manager, who verbally agreed to a continuance of the hearing. (*See* Doc. 2, Att. 3, Ex. F and G). That same day, PMI's president faxed a confirmation of that agreement to Karr at Florida SMACNA.[FN12](*See id.* at Ex. F). On June 8, 2005, Plaintiff's counsel spoke with Karr to attempt a rescheduling of the hearing. Karr initially told Plaintiff's counsel that "there was no problem with the continuance."However, on June 9, 2005, the Union's Assistant Business Manager stated that there would be no continuance because PMI had not given a reasonable excuse for postponing the hearing, and that the hearing would take place on June 10, 2005, the date initially requested by PMI. (*See* Doc. 2, Att. 3 at 13). Later that same day, Karr advised Plaintiff's counsel that the Union's Assistant Business Manager would not postpone the hearing. (*See* Doc. 2, Att. 3, Ex. I).

> FN12. At that time, Karr served as Florida SMACNA's Executive Vice President.

Thus, on June 10, 2005, PMI's President, along with Plaintiff's counsel, attended the Local Joint Adjustment Board [FN13] hearing concerning the Union's April Grievance, and raised objections to the Local Joint Adjustment Board's jurisdiction and to alleged procedural irregularities in violation of the CBA and the Local Joint Adjustment Board's rules. On June 24, 2005, Plaintiff's counsel submitted to the Local Joint Adjustment Board certain evidence regarding certifications held by the Plaintiffs' employees, as well as written objections to

the manner in which the Local Joint Adjustment Board conducted the hearing.[FN14](*See* Doc. 2, Att. 4, Ex. J).

> FN13. The Local Joint Adjustment Board included Carver, Jeske and Sinclair, as well as one other individual who is not a party to this suit.

> FN14. Specifically, those objections included: (1) the Union failed to file a grievance within thirty days of the date of the occurrence in question; (2) the Union did not give specific notice of the CBA provision that was violated, and failed to provide factual support in advance of the hearing; (3) the Union failed to attempt to resolve the grievance through a direct meeting with PMI; and (4) the Union failed to submit its grievance to the Local Joint Adjustment Board within thirty days of the termination of the parties' efforts to resolve the grievance between themselves because, assuming there was a meeting at which the grievance was discussed (Plaintiff's counsel asserts, in the letter to the Local Joint Adjustment Board, that a March 6, 2005 meeting between PMI and the Union did not cover the topic of the grievance in question), this meeting took place more than thirty days before the date the Union submitted the grievance to the Local Joint Adjustment Board. (Doc. 2, Att. 4, Ex. J at 1-2).

**\*3** Plaintiff's counsel also asserted that: (1) the Union was aware of the issues presented to the Local Joint Adjustment Board no later than February 28, 2005, when the Union first

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 5
Not Reported in F.Supp.2d, 2005 WL 3277966 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

submitted a grievance to PMI; (2) the February Grievance is identical to the April Grievance which was first forwarded to Florida SMACNA on May 5, 2005; (3) the Union "advanced" the date on the copy of the grievance submitted to Florida SMACNA by two months; (4) because the grievances were identical, and because the Union "advanced" the date of the later grievance, it was clear that the Union failed to submit its grievance to Florida SMACNA within the required time period; and (5) even if the April Grievance was the first grievance filed with PMI, the Union failed to follow the requirement that it meet with PMI prior to submitting the grievance to the Local Joint Adjustment Board. (*Id.* at 2-3). Finally, Plaintiff's counsel noted that the Board would not permit PMI to present witnesses to address the allegations raised by the Union at the hearing. (*Id.* at 3).

PMI also submitted an affidavit stating that the reason PMI/PACB did not utilize Union members for certain work was that Union members were not qualified. (*See* Doc. 2, Att. 4 at 11). More specifically, PMI asserted that PACB installs, services and repairs HVAC (heating, ventilation, and/or air conditioning) systems, for which PACB employs specialized workers. (*Id.* at 9). Because of the type of work associated with HVAC systems, those workers must be properly trained and certified in a number of areas. (*Id.* at 11). Sheet metal workers, including those represented by the Union, do not have the proper training, because they are not EPA-qualified to handle refrigerants, and are not properly trained in the necessary electrical work. (*Id.*).

*4) The Local Joint Adjustment Board's decision*

The Local Joint Adjustment Board issued a unanimous decision regarding the April Grievance on August 15, 2005, in which it specifically found that: (1) all procedural requirements had been met; (2) the grievance was timely; (3) the grievance was properly before the Local Joint Adjustment Board for consideration; (4) PMI/PACB were co-mingled in that they had substantially identical management, ownership, business purpose, operation, equipment and customers; (5) the creation of a second company was for the purpose (at least in part) of avoiding the requirements of the CBA; (6) because one company was essentially the alter ego of the other, they would be treated as a single employer subject to the terms of the CBA; (7) the company violated the CBA; (8) due to the violation, PMI/PACB were liable for damages in the amount of $232,130.85; and (9) PMI/PACB would be given an opportunity to substantiate the amount of actual damages by providing relevant payroll records to the Local Joint Adjustment Board. (*See* Doc. 2, Att. 5, Ex. L).

C. Claims and Arguments [FN15]

> FN15. Both in their Response and at the hearing on this matter, the Plaintiffs stated that they withdraw Counts VI, VII and VIII, inasmuch as those claims specifically relate to alleged breaches of the CBA. Although in their Response (and at the hearing) the Plaintiffs attempted to re-cast these claims as breach of contract claims, the Plaintiffs have not sought leave to file an amended complaint, and thus the Court will not address those three Counts here. Therefore, the only Defendants remaining at this time are Florida SMACNA, Karr, Carver, Jeske and

Not Reported in F.Supp.2d                                                   Page 6
Not Reported in F.Supp.2d, 2005 WL 3277966 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

Sinclair, against whom Counts I through V are asserted.

The Plaintiffs originally filed this action in State court. The Defendants removed based on Federal question jurisdiction, specifically Section 301 of the Labor Management Relations Act. The Plaintiff has not sought remand.[FN16]

> FN16. However, both in their Response and at the hearing, the Plaintiffs suggested that the Court does not have subject matter jurisdiction.

**\*4** In Count I, the Plaintiffs seek to enjoin the enforcement of the Local Joint Adjustment Board's August 15, 2005 decision. The Plaintiffs assert that (1) there was a bias against them at the hearing because they were represented by counsel; (2) the Defendants violated Article 10 of the CBA by failing to comply with certain procedures; (3) the Defendants violated both the CBA and various procedural rules by permitting the Union to submit the same grievance twice; (4) the Union's April grievance was heard by the Local Joint Adjustment Board in violation of Article 10, section 7 of the CBA which voids future rights to appeal if original appeal procedures are not followed; (5) a damages penalty was assessed against the Plaintiffs despite a lack of evidence to support the figure arrived at; (6) by disregarding various procedural requirements, Florida SMACNA, Karr, Carver, Jeske and Sinclair have facilitated Florida SMACNA's breach of the CBA and the Union's failure to bargain in good faith with PMI; and (7) the failure to adhere to the CBA and to bargain in good faith has resulted in the certainty that the Local Joint Adjustment Board will impose upon PMI a severe monetary penalty without any factual or legal basis for doing so, leaving the Plaintiffs without an adequate remedy at law.

In Count II, the Plaintiffs re-allege the various deficiencies they associate with the grievance process, and seek a declaratory judgment stating that the Defendants have failed to comply with, and must comply in the future with, the requirements of the Joint Adjustment Board rules. In Count III, the Plaintiffs assert that the Local Joint Adjustment Board serves as a board of arbitrators, and thus is subject to the Florida Arbitration Code. The Plaintiffs allege that the Local Joint Adjustment Board's August 15, 2005 decision violated several provisions of the Florida Arbitration Code, including Florida Statutes section 682.13(1), resulting in the certainty that the Local Joint Adjustment Board will impose a severe penalty on PMI without any factual or legal basis for doing so, and in violation of the Florida Arbitration Code. Thus, the Plaintiffs allege, they are in doubt as to their rights under the CBA and they do not have an adequate remedy at law to redress the enforcement of the Local Joint Adjustment Board's August 15, 2005 decision. Accordingly, the Plaintiffs seek a declaratory judgment stating that the Defendants have failed to comply with, and must comply in the future with, the Florida Arbitration Code.

In Count IV, the Plaintiffs assert that under the Florida Arbitration Code, a party to an arbitration has the right to be represented by an attorney at any arbitration or hearing, but that certain Local Joint Adjustment Board Rules are "designed to intimidate, limit and restrict the participation of attorneys to being mere observers in [Local Joint Adjustment Board] hearings in contravention of a party's right to be represented by counsel."(Doc. 2 at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3277966 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

15). The Plaintiffs allege that the implementation of these rules effectively denied the Plaintiffs the right to counsel at the Local Joint Adjustment Board hearing, resulting in a certainty that the Plaintiffs will incur damages in the form of a severe monetary penalty. Thus, the Plaintiffs seek a declaratory judgment requiring that Local Joint Adjustment Board Rules II.E.1 and II.E.2 be stricken from the [Local Joint Adjustment Board's] rules.

**\*5** In Count V, pursuant to Florida Statute section 682.13(1), the Plaintiffs seek a judgment vacating the award required by the Local Joint Adjustment Board's August 15, 2005 decision, because they allege that the Defendants violated various provisions of the Florida Arbitration Code. [FN17]

> FN17. In both Counts III and V, the Plaintiffs do not provide any factual allegations detailing how the Defendants allegedly violated the Florida Arbitration Code. Instead, the Plaintiffs merely cite four sections of that Code, which is, on its face, a conclusory legal assertion that is insufficient to state a claim for relief.

Because the Plaintiffs withdrew Counts VI through VIII, what remains are essentially two claims. First, that Florida SMACNA is obliged by an implied contract to follow its arbitration rules and that its failure to do so violates a contractual obligation to the Plaintiffs. Second, that the individual defendants are liable for this failure to comply with the rules.

The Defendants assert that these claims must be dismissed because: (1) the Norris LaGuardia Act, 29 U.S.C. § 101, *et seq.,* precludes the Court from issuing injunctions in cases involving labor disputes, particularly those involving arbitration proceedings; (2) the Plaintiffs' state law claims are pre-empted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA"); and (3) SMACNA and the individual defendants are entitled to arbitral immunity.

## II. Standard of Review

In ruling on a motion to dismiss, this Court must view the complaint in the light most favorable to the Plaintiff, *Cannon v. Macon County,* 1 F.3d 1558, 1565 (11th Cir.1993), and must limit its consideration to the pleadings and any exhibits attached thereto. FED. R. CIV. P. 10(c); *see also GSW, Inc. v. Long County, Ga.,* 999 F.2d 1508, 1510 (11th Cir.1993). The Court will liberally construe the complaint's allegations in the Plaintiffs' favor, *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969), and will not dismiss a complaint for failure to state a claim unless it appears beyond a doubt that the Plaintiff cannot prove any set of facts that support a claim for relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In ruling on a motion to dismiss, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal."*Davila v. Delta Air Lines, Inc.,* 326 F.3d 1183, 1185 (11th Cir.2003).

In reviewing a complaint on a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), "courts must be mindful that the Federal Rules require only that the complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief."*U.S. v. Baxter Intern., Inc.,* 345 F.3d 866, 880 (11th Cir.2003) (*citing*FED. R. CIV. P. 8(a)). This is a liberal pleading requirement, one that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 8
Not Reported in F.Supp.2d, 2005 WL 3277966 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

does not require a plaintiff to plead with particularity every element of a cause of action.*Roe v. Aware Woman Ctr. for Choice, Inc.,* 253 F.3d 678, 683 (11th Cir.2001). Instead, the complaint need only "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."*Id.* (internal citation and quotation omitted)."A complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests."*Sams v. United Food and Comm'l Workers Int'l Union,* 866 F.2d 1380, 1384 (11th Cir.1989).

### III. Legal Analysis

### A. Pre-Emption by Federal Labor Law

**\*6** Section 301 provides, in relevant part:
Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). Accordingly, the Supreme Court has concluded "that the substantive law to apply in suits under [Section] 301(a) is federal law, which the courts must fashion from the policy of our national labor laws."*Textile Workers Union of Am. v. Lincoln Mills of Ala.,* 353 U.S. 448, 456 (1957); *see also Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Lucas Flour Co.,* 369 U.S. 95, 103-104, 82

S.Ct. 571, 7 L.Ed.2d 593 (1962) ("The dimensions of [Section] 301 require the conclusion that substantive principles of federal labor law must be paramount in the area covered by the statute.... [I]n enacting [Section] 301 Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules."). Thus, a "state rule that purports to define the meaning or scope of a term in a contract suit ... is pre-empted by federal labor law."*Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 210, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985).

Section 301 governs both claims directly founded on rights created by collective bargaining agreements, and claims substantially dependent upon the analysis of such an agreement.[FN18]*Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 410 n. 10, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988). Therefore, the "application of state law is pre-empted by [Section 301] ... only if such application requires the interpretation of a collective-bargaining agreement."*Id.* at 413.Accordingly,

> FN18. However, "not every dispute tangentially involving a provision of a collective-bargaining agreement[ ] is pre-empted by § 301."*Lingle,* 486 U.S. at 413 n. 12 (internal citation, quotation and punctuation omitted).

if the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted and federal labor-law principles-necessarily uniform throughout the Nation-must be employed to resolve the dispute. *Id.* at 406.The Supreme Court has therefore

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 9
Not Reported in F.Supp.2d, 2005 WL 3277966 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

concluded that "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law."*Allis-Chalmers,* 471 U.S. at 220 (internal citation omitted).

### 1) Plaintiffs' claims depend on the CBA

Each of the Plaintiffs' claims asserts, whether directly or indirectly, a violation of certain rights that arise from the CBA. In Count I, the Plaintiffs directly assert that Florida SMACNA, Karr, Carver, Jeske and Sinclair violated the CBA. (*See* Doc. 2, par. 35, 37, 38, 39, 40). Further, the Plaintiffs assert that these Defendants violated the National Joint Adjustment Board's rules which, as the Plaintiffs acknowledge in their Complaint, are incorporated into the CBA. (*See* Doc. 2 at 2; Doc. 2, Att. 2 at 8). In Count II, the Plaintiffs assert that Florida SMACNA, Karr, Carver, Jeske and Sinclair violated the CBA, and that the Plaintiffs are in doubt as to their rights under the CBA. (*See* Doc. 2 at par. 43). In Count III, although the Plaintiffs couch this claim in terms of a violation of the Florida Arbitration Code, it is clear that such violation arises out of the Defendants' alleged violation of the procedures established by and incorporated in the CBA. This conclusion is made even more clear in that the Plaintiffs assert that as a result of the Defendants' alleged violation of the Florida Arbitration Code, the Plaintiffs are in doubt as to their rights under the CBA. (*See* Doc. 2 at par. 49). Counts IV and V similarly assert that the Plaintiffs have been damaged as a result of violations of the Local Joint Adjustment Board's rules, as well as of the CBA, (*see* Doc. 2 at par. 54), and are little more than restatements of the earlier

claims.[FN19] Therefore, the Plaintiffs' claims depend on the CBA.

> FN19. Even without the explicit references to the CBA in the Complaint, it would still be clear that this case arises out of, or depends upon, a collective bargaining agreement, inasmuch as it is clear that the Plaintiffs are asserting that they have been or will be damaged as a result of the alleged violations of certain rights to which they are only entitled based on procedures established by, and/or incorporated into, the CBA. Not only does the present case arise out of a dispute regarding the procedural aspect of a collective bargaining agreement, but the original underlying dispute, arising as it did from a question of whether certain workers were covered by the CBA, is unquestionably a labor dispute.

### 2) Federal question jurisdiction[FN20]

> FN20. "To exercise federal court jurisdiction under section 301, [a court] must find (1) a claim for violations of (2) a contract (3) between an employer and a labor organization."*United Paperworkers Int'l. Union v. Int'l Paper Co.,* 920 F.2d 852, 859 (11th Cir.1991). Clearly those requirements are met in this case. (*See* discussion in section IV(A)(1), *supra* ).

**\*7** "The federal district courts have jurisdiction over suits for violations of contracts between an employer and a labor organization under [Section 301]."*In re Carter,* 618 F.2d 1093, 1103 (5th Cir.1980);

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN21]*see also Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers,* 390 U.S. 557, 560, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968) (claim under a collective bargaining agreement arises under the laws of the United States and is within the meaning of original jurisdiction of the District Courts within the meaning of 28 U.S.C. §§ 1441(a) and (b)). Inasmuch as this case arises out of a dispute regarding the rights and procedures to which the Plaintiffs claim they are entitled under a collective bargaining agreement (the very essence of a labor dispute), the Court has subject matter jurisdiction over this case.

> FN21. All decisions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent on courts within the Eleventh Circuit.*Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

### 3) Plaintiffs' claims are pre-empted

The Plaintiffs' claims, based as they are upon procedures and rights established by and incorporated in the CBA, would require the Court to analyze the language of the CBA to determine whether the Defendants abided by its terms. Thus, the Plaintiffs' claims, notwithstanding the Plaintiffs' attempts to couch them solely in terms of state contract law, are pre-empted by Section 301. *See United Steelworkers of Am., AFL-CIO-CLC v. Rawson,* 495 U.S. 362, 110 S.Ct. 1904, 109 L.Ed.2d 362, (1990) (where claim would require court to ascertain nature of rights under collective bargaining agreement, claim could not withstand pre-emptive force of Section 301); *Turner v. Am. Fed'n of Teachers Local 1565,* 138 F.3d 878, 884 (11th Cir.1998). Accordingly, the Plaintiffs' claims must be dismissed. *See Deakins v. U.S.*

*Postal Serv.,* 146 F.Supp.2d 1290, 1293 (M.D.Fla.2001); *Williams v. Lear Operations Corp.,* 73 F.Supp.2d 1377, 1382 (N.D.Ga.1999).

### B. Plaintiffs' "Implied Contract" Theory

The Plaintiffs argue that this case ultimately boils down to the issue of whether the individual defendants and Florida SMACNA did what they promised to do when they agreed to arbitrate this dispute. In other words, according to the Plaintiffs, when Florida SMACNA agreed to arbitrate this dispute, at that point Florida SMACNA (and possibly the individual Defendants) entered into an implied contract with the Plaintiffs (and the Union) to follow its own rules and procedures. The Plaintiffs, however, offer no authority to support this novel position, nor has the Court found any.[FN22]Further, the Plaintiffs do not assert claims against the individual Defendants and Florida SMACNA for exceeding their powers (or for any other violation of Federal labor law). Instead, according to the Plaintiffs, their claims against these Defendants are based on alleged violations of procedural rules on an implied contract theory, which not only appears to have no support in law, but seems to contradict well-established principles of contract law. Therefore, the Court rejects the Plaintiffs' theory.[FN23]

> FN22. Indeed, in the only case the Court was able to find in which a similar argument was presented, where a plaintiff claimed "to be a third-party beneficiary of the arbitrator's implied contract with the Federal Mediation & Conciliation Service requiring the arbitrator to comply with its regulations," the court simply commented that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaintiff's argument was part of a "strange mixture of theories," and did not address it further. *Hill v. Aro Corp.,* 9 Ohio Misc. 217, 263 F.Supp. 324, 326 (N.D.Ohio 1967). In this case, the basis for the Plaintiffs' claim is entirely unclear because their Complaint is devoid of any facts to support their theory: they have not asserted that they are the third party beneficiary of a contract between the Union and Florida SMACNA, nor have they asserted that the existence of a specific contract among the Union, Plaintiffs and Florida that arose when this arbitration process began. Instead, the Plaintiffs simply have attempted to manufacture an *implied* contract out of the mere circumstance by which Florida SMACNA became involved in the arbitration.

FN23. In any event, the Plaintiffs appear to have made this "implied contract" argument solely in regard to those Counts (VI, VII and VIII) which they subsequently withdrew at the hearing and thus, regardless of the manner in which the Plaintiffs attempt to support those claims, they have been rendered invalid at this point.

C. Arbitral Immunity

The concept of judicial immunity has been extended not only to public officials, but to private citizens such as arbitrators in circumstances where these individuals perform the function of resolving disputes between parties or adjudicating private rights. *Antoine v. Byers & Anderson, Inc.,* 508 U.S. 429, 433 n. 8, 113 S.Ct. 2167, 124 L.Ed.2d 391 (1993); *Olson v. Nat'l Ass'n of Sec. Dealers,* 85 F.3d 381, 382 (8th Cir.1996) (because the arbitrator's role is functionally equivalent to that of a judge, courts of appeal have uniformly extended judicial and quasi-judicial immunity to arbitrators; *Tamari v. Conrad,* 552 F.2d 778, 780 (7th Cir.1977). Courts have determined that arbitral immunity is "essential to protect the decision-makers from undue influence and protect the decision-making process from reprisals by dissatisfied litigants."*New England Cleaning Servs., Inc. v. Am. Arbitration Ass'n,* 199 F.3d 542, 545 (1st Cir.1999).

**\*8** Accordingly, arbitrators are immune from civil liability for all acts performed in their arbitral capacity.[FN24]*Austern v. Chicago Bd. Options Exch., Inc.,* 898 F.2d 882, 886 (2nd Cir.1990) (arbitrator absolutely immune from liability in damages for all acts within scope of arbitral process, including allegations of defective notice and improper selection of arbitration panel). Moreover, the commercially sponsoring organization is entitled to immunity for all functions integrally related to the arbitral process, *id.; see also New England Cleaning,* 199 F.3d at 545, and is even entitled to immunity when its actions violate the organization's own rules. *Olson,* 85 F.3d at 383;*see also Corey v. N.Y. Stock Exch.,* 691 F.2d 1205, 1208-1209 (6th Cir.1982) (in suit against organization alleging wrongdoing by arbitrators for which organization was allegedly liable, where allegations included selection of panel in violation of organization's rules, scheduling hearings over plaintiff's objections, refusing to allow plaintiff to present evidence, and prejudgment of plaintiff's claims, organization, acting through arbitrators, was immune from civil liability for acts of arbitrators arising out of contractually agreed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 12
Not Reported in F.Supp.2d, 2005 WL 3277966 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

upon arbitration proceedings).

> FN24. Arbitrators have been found to be immune from suit where only equitable relief is sought. *See Tamari,* 552 F.2d at 780-81.

In this case, in each of their claims against Florida SMACNA, Karr, Carver, Jeske and Sinclair, the Plaintiffs seek relief from the arbitration award on the grounds of alleged violations of the CBA and related procedural rules. (*See* discussion of specific allegations in section I(C), *supra* ). These are precisely the type of claims against which arbitrators (Carver, Jeske and Sinclair) and sponsoring organizations (Florida SMACNA and Karr) are protected by the doctrine of arbitral immunity. Accordingly, Counts I through V will be dismissed.[FN25]

> FN25. Arbitration awards may be vacated where the arbitrators exceeded their powers or acted in manifest disregard of the law, such as where the arbitrators knew of, and yet either refused to apply or ignored, well-defined law that was clearly applicable to the case. *Banco de Seguros del Estado v. Mutual Marine Office, Inc.,* 344 F.3d 255, 262-63 (2nd Cir.2003). Further, although arbitrators may be immune from suit based on a wrongful exercise of jurisdiction, *Int'l Med. Group, Inc. v. Am. Arbitration Ass'n, Inc.,* 312 F.3d 833, 844 (7th Cir.2002), they are not entitled to immunity when the pleadings, on their face, signal a "clear absence of jurisdiction." *New England Cleaning,* 199 F.3d at 545-46. As yet, the Plaintiffs have provided no factual allegations to even suggest that the above grounds exist. There do not appear to be any grounds upon which the Plaintiffs could base an amended claim(s) against these Defendants. Thus, if the Plaintiffs re-file claims against them, the Plaintiffs are advised to be mindful of the restrictions set forth in Federal Rule of Civil Procedure 11.

IV. Conclusion

For the reasons stated herein, it is

ORDERED THAT the Defendants' Motions to Dismiss (Docs. 16, 18 and 20) are GRANTED, and the Plaintiffs' Complaint is DISMISSED. The Plaintiffs may file an amended complaint consistent with this Order within twenty (20) days.

DONE and ORDERED.

M.D.Fla.,2005.
Precision Mechanical, Inc. v. Karr
Not Reported in F.Supp.2d, 2005 WL 3277966 (M.D.Fla.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1994 WL 132233 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

H Trans World Airlines, Inc. v. Sinicropi
S.D.N.Y.,1994.
Only the Westlaw citation is currently
available.
United States District Court, S.D. New York.
  TRANS WORLD AIRLINES, INC., and
  William D. Hart and Gary D. Dilley, as
  members of the Retirement Board of the
  Retirement Plan for Pilots of Trans World
  Airlines, Inc., Plaintiffs,
                     v.
  Anthony V. SINICROPI, H.O. Van Zandt,
  and W.A. Murphey, as members of the
  Retirement Board of the Retirement Plan for
  Pilots of Trans World Airlines, Inc., William
  L. Meusel, Jr., and the Air Line Pilots
  Association, International, Defendants.
          **No. 93 CIV. 3094 (CSH).**

              April 14, 1994.

MEMORANDUM OPINION AND ORDER
HAIGHT, District Judge:
**\*1** This case is before the Court on defendant
Anthony Sinicropi's motion to dismiss.
Cross-motions for summary judgment are
*sub judice,* and will be resolved at a later date.
For the reasons set forth below, defendant's
motion to dismiss is denied.

              BACKGROUND

This action was initiated by Trans World
Airlines, Inc. ("TWA") and two members of
the Retirement Board (the "Board") of the
Retirement Plan for Pilots of Trans World
Airlines (the "Plan") as fiduciaries, seeking
equitable relief under the Employee
Retirement Income Security Act of 1974, as
amended ("ERISA"), 29 U.S.C. § 1001, *et.
seq.,* from a decision made by the Board.

The Board's decision at issue concerned a
retired pilot's entitlement to benefits under
the Plan. The deliberations of the four Board
members, plaintiffs Hart and Dilley and
defendants Van Zandt and Murphey, resulted
in a deadlock. Pursuant to Article 2(F) of the
Plan, an impartial referee was appointed to
consider the matter with the full Board.
Sinicropi, the impartial referee selected by
the Board, sided with the defendants and
granted the retired pilot the benefits he
sought.

Plaintiffs then initiated this action alleging
that the Board's decision violates ERISA's
requirement that a pension plan's fiduciaries
discharge their duties prudently and in
accordance with the documents and
instruments governing the plan. Plaintiffs
contend the decision requires the Plan to pay
the retiring pilot a subsidized early retirement
benefit even though the Plan does not
authorize the subsidy. Plaintiffs ask this
Court to vacate the Board's decision and
award injunctive and declaratory relief under
ERISA.[FN1] Plaintiffs do not seek monetary
damages from any of the defendants.

Defendant Sinicropi moves to dismiss on the
basis that as an impartial arbitrator, he is
entitled to judicial immunity. Plaintiffs argue
that while judicial immunity shields certain
arbitrators from liability for damages, it does
not protect pension plan fiduciaries from
lawsuits seeking prospective equitable relief
from conduct that violates ERISA or the
terms of the plan.

              DISCUSSION

Defendant argues that as an arbitrator, his
role was "functionally comparable" to that of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2
Not Reported in F.Supp., 1994 WL 132233 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

a judge, entitling him to judicial immunity. *See Butz v. Economou,* 438 U.S. 478, 513 (1978). He contends that even if his actions as arbitrator cast him as a fiduciary under ERISA, he is nonetheless shielded by immunity because ERISA does not abrogate common law immunities. Defendant's argument relies heavily on *International Union, United Automobile Workers v. Greyhound Lines,* 701 F.2d 1181 (6th Cir.1983), which held that an arbitrator who directed an employer to amend its employees' pension and benefit fund to increase benefit levels, was protected by arbitral immunity against claims for money damages caused by his actions. The Sixth Circuit held that whatever the arbitrator's status as a fiduciary, he was shielded by immunity because there was no evidence that Congress intended to abrogate common law immunities with ERISA. *Id.,* at 1187.

**\*2** I need not decide whether Sinicropi's status as a fiduciary of the Plan, as alleged by TWA, strips him of arbitral immunity, because I find as a matter of law, arbitral or judicial immunity does not shield an individual from claims for equitable relief. It is well settled that judges do not have absolute immunity from suits for prospective relief. *See Pulliam v. Allen,* 466 U.S. 522, 537 (1984) (judicial immunity not a bar to prospective injunctive relief against a judicial officer acting in his judicial capacity); *Heimbach v. Village of Lyons,* 597 F.2d 344, 347 (2d Cir.1979) (judge not immune from suit for injunctive relief); *Person v. Association of the Bar of the City of New York,* 554 F.2d 534 (2d Cir.1977) (judicial immunity does not extend to actions for injunctive relief). *International Union, United Automobile Workers* is not to the contrary. In concluding that the arbitrator was entitled to immunity from liability for damages, the court declined to address whether the doctrine of arbitral immunity would bar an action for equitable relief. *International Union of United Autoworkers,* 701 F.2d at 1187, n. 10.

Plaintiffs seek only equitable relief from the defendants. In those circumstances, judicial immunity does not bar their claims. Furthermore, judicial immunity does not shield Sinicropi from claims for attorney's fees if plaintiffs prevail in their quest for equitable relief. *See Pulliam,* 466 U.S. at 54-544 (judges cannot claim judicial immunity to a claim for attorneys' fees resulting from a successful suit for injunctive relief).

Sinicropi also moves to dismiss this action on the ground that the Court lacks personal jurisdiction over him. Defendant inexplicably fails to elaborate on this argument in his memorandum of law. Reading his papers to assert that he lacks the requisite minimum contacts with this jurisdiction, I find his argument to be without merit.

ERISA provides that process "may be served in any other district where a defendant resides or may be found." 29 U.S.C. § 1132(e)(2). Courts have interpreted this provision for nationwide service to confer jurisdiction over a defendant without regard to state long-arm statutes, so long as the defendant has sufficient minimum contacts with the United States. *See IUE AFL-CIO Pension Fund v. Hermann,* 9 F.3d 1049, 1056 (2d Cir.1993) (interpreting an identical ERISA provision § 1451(d)); *Mariash v. Morrill,* 496 F.2d 1138, 1142-43 (2d Cir.1974) (interpreting nationwide service provision of 15 U.S.C. § 78aa to mean that the court had jurisdiction over the defendants

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 3
Not Reported in F.Supp., 1994 WL 132233 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

where they had minimum contacts with the United States); *Cripps v. Life Insurance Co. of North America,* 980 F.2d 1261, 1267 (9th Cir.1992) (interpreting § 1132(e) to provide jurisdiction over defendant in California based on service of process in Massachusetts); *Hetchkop v. George Harms Excavating Corporation,* 1993 WL 88106 (S.D.N.Y.1993) (Keenan, J.) ("defendant residing in United States has sufficient 'minimum contacts' to be subject to suit under ERISA in any district court in the United States."); *Harrison Combs v. Pelbro Fuel, Inc.,* 4 Employee Benefits Cas. [BNA] 2611 (D.D.C.1993).

**\*3** Defendant admits he was served with a copy of the summons and complaint at his residence in Iowa City, Iowa. This is sufficient under 29 U.S.C. § 1132(e) to subject him to the jurisdiction of this Court.

Sinicropi's motion to dismiss is denied.

It is SO ORDERED.

> FN1. Section 502 of ERISA authorizes a plan beneficiary, participant or fiduciary to bring a civil action:
> (A) to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or
> (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan....
> 29 U.S.C. § 1132(a)(3).

S.D.N.Y.,1994.
Trans World Airlines, Inc. v. Sinicropi
Not Reported in F.Supp., 1994 WL 132233 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                           :

GLOBAL GOLD MINING, LLC,          :       07 CV 10492 (GEL)
                           :

                Petitioner,    :
      -against-             :
                           :       ECF Case

PETER M. ROBINSON, et al.,        :
               Respondents.   :
------------------------------------------------------------------x

## DECLARATION OF SERVICE

      **KURT R. VELLEK,** hereby declares under penalty of perjury that on January 11,

2008 the Reply Memorandum of Law in Further Support of the Motion to Dismiss the

Petition was served upon Petitioner's counsel via the Court's CM/ECF system.


Dated:  New York, New York
        January 11, 2008



                            /s/ Kurt R. Vellek_____