UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
:
GLOBAL GOLD MINING, LLC,                          :
:
                        Petitioner,      :
:    07 Civ. 10492 (GEL)
        -v-                              :
:    **OPINION AND ORDER**
PETER M. ROBINSON, et al.,                        :
:
                        Respondents.    :
:
------------------------------------------------------------------x

Edward G. Kehoe (Louisa B. Childs, of counsel), King & Spalding LLP, New York, NY, for petitioner.

Louis B. Kimmelman, Allen & Overy LLP, New York, NY, for respondents.

GERARD E. LYNCH, District Judge:

      This case presents an interesting question regarding the reviewability of a decision by the International Court of Arbitration ("ICC Court") of the International Chamber of Commerce ("ICC") finding a dispute prima facie not arbitrable. Petitioner Global Gold Mining, LLC ("GGM"), seeks an injunction requiring the ICC Court to refer the question of the arbitrability of a dispute between GGM and one Vardan Ayvazian to an arbitral panel. The ICC respondents[1] move to dismiss for failure of service, lack of in personam jurisdiction, and failure to state a claim on which relief can be granted. Because petitioner has failed to state a claim, respondents' motion pursuant to Rule 12(b)(6), Fed. R. Civ. P., will be granted, and the case dismissed.

---

[1] The named respondents are Peter M. Robinson, sued as President of the International Chamber of Commerce (which he may or may not be) and the ICC Court. For convenience, the Court will generally refer to these parties as "the ICC respondents."

**BACKGROUND**

The facts set forth below are drawn from the allegations in GGM's petition, which are to be taken as true for purposes of this motion, and the various documents that are cited and relied upon in that petition, including the underlying Share Purchase Agreement ("SPA") and the ICC Rules of Arbitration ("ICC Rules").

In December 2003, GGM entered into a contract (the SPA) to purchase the shares of an Armenian company from its three shareholders. The SPA contained an arbitration clause providing for arbitration of disputes in New York under the ICC Rules. The ICC Court, located in Paris, is the organ of the ICC that administers ICC arbitrations under those rules. In December 2006, GGM initiated an arbitration against the three shareholders who were signatories to the SPA and a fourth individual, Ayvazian, who was alleged to be an undisclosed shareholder, by filing a request for arbitration with the ICC Court.[2] None of the named parties responded to the demand for arbitration.

Under Article 6(2) of the ICC Rules, when a respondent objects to arbitrability, or fails to respond to an arbitration demand, the ICC Court makes an initial determination of the existence of an arbitration agreement governing the dispute. In this case, the ICC Court ruled that it was prima facie satisfied that an arbitration agreement existed between GGM and the three shareholders who were signatories to the SPA. It made a negative determination, however, with respect to Ayvazian, who was not a signatory to the contract containing the arbitration clause, and denied GGM's request to reconsider this determination. Accordingly, the ICC Court

---

[2] Ayvazian, the petition alleges, was at one point Armenia's Minister of the Environment.

referred GGM's dispute with the three signatory shareholders to an arbitral tribunal, but declined to refer the dispute with Ayvazian to the tribunal.

GGM thereupon petitioned the Supreme Court of the State of New York for New York County, seeking an order directing the ICC Court to refer the dispute with Ayvazian, including the question of its arbitrability, to the tribunal convened to arbitrate the dispute involving the other shareholders.  The ICC respondents timely removed the matter to this Court, and moved to dismiss, arguing that the petition had not been properly served, that New York lacks in personam jurisdiction over the ICC Court, and that the petition fails to state a claim on which relief may be granted.

## DISCUSSION

In its reply memorandum, the ICC respondents make no reference to their claim of improper service, thus effectively abandoning that argument, and concede that GGM has made at least a prima facie showing of in personam jurisdiction, such that the Court at a minimum has an adequate jurisdictional basis to address the substantive motion to dismiss for failure to state a claim.  (Reply Mem. 1-2 n.2.)  The Court thus proceeds directly to that motion.  The principal issue presented by the motion is whether this Court has authority to review the decision of the ICC Court and enjoin that body to refer the question of arbitrability of the dispute against Ayvazian to the same arbitral tribunal convened to resolve GGM's disputes against the three shareholders that actually signed the SPA.

The arbitration clause in the SPA binds all signatories, including GGM, to arbitrate "any dispute" related to the SPA under the ICC Rules. (Childs Dec. Ex 2, SPA § 11.5.)  "When the parties agree upon an arbitration clause referring to the ICC Rules of Arbitration, they thereby

entrust the ICC International Court of Arbitration with certain decision-making powers assigned to it under the Rules." Shäfer, Verbist and Imhoos, ICC Arbitration in Practice, at 15 (2005); see also ICC Rules, Arts. 6(1), 9. Among other commitments made, by agreeing to these rules the parties have demonstrated an "intent to arbitrate arbitrability" pursuant to the ICC Rules, including Article 6, Section 2. See Shaw Group Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 122 (2d Cir. 2003).

Under Article 6(2) of the ICC Rules, if the respondents fail to answer a demand for arbitration or object to arbitrability, the ICC Court "may decide, without prejudice [to any objection to arbitrability made before the tribunal], that the arbitration shall proceed if it is *prima facie* satisfied that an arbitration agreement under the Rules may exist." On the other hand, "[i]f the [ICC] Court is not so satisfied, the parties shall be notified that the arbitration cannot proceed. In such a case, any party retains the right to ask any court having jurisdiction whether or not there is a binding arbitration agreement." ICC Rules, Art. 6(2).[3] The ICC Rules are thus clear that if the ICC Court decides, upon initial screening, that a dispute may be prima facie

---

[3] Article 6(2) provides, in its entirety, that:

> If the Respondent does not file an Answer, as provided by Article 5, or if any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement, the Court may decide, without prejudice to the admissibility or merits of the plea or pleas, that the arbitration shall proceed if it is *prima facie* satisfied that an arbitration agreement under the Rules may exist. In such a case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself. If the Court is not so satisfied, the parties shall be notified that the arbitration cannot proceed. In such a case, any party retains the right to ask any court having jurisdiction whether or not there is a binding arbitration agreement.

arbitrable, the dispute will be referred to an arbitration panel, which then will make its own "decision as to [its] jurisdiction." Id. The Rules are somewhat less clear as to what happens next if the ICC Court determines that a dispute is *not* prima facie arbitrable, or that a dispute may be arbitrable against some parties but not others. The Rules clearly permit the disappointed party demanding arbitration to put the question of arbitrability to a court, but the manner in which that is to be done is less clear. GGM argues that the ICC Rules permit an action for "judicial review" of the ICC Court's decision, brought by the party seeking arbitration against the ICC Court itself. The ICC respondents argue that the proper vehicle is an action to compel arbitration against the party that failed to submit to arbitration. See, e.g., 9 U.S.C. §§ 4, 206.

Under both New York and federal law, whether a dispute is arbitrable is a question for the courts, unless the parties clearly indicated their intention to have such issues decided by an arbitrator. Smith Barney Shearson Inc. v. Sacharow, 91 N.Y.2d 39, 45-46 (1997); First Options of Chicago v. Kaplan, 514 U.S. 938, 944 (1995); AT & T Techs., Inc. v. Commc'ns Workers of America, 475 U.S. 643, 649 (1986). However, when parties agree to arbitrate "any and all controversies," such as is the case here, the question of arbitrability is itself arbitrable. Shaw, 322 F.3d at 121. GGM attempts to draw from this principle the conclusion that the ICC Court is in effect required by law to submit any disputed question of arbitrability to the arbitral tribunal, or face an action in which a court will review that decision.

But GGM's reasoning is incorrect. First, it ignores the ICC Rules, by which the parties to the SPA, including GGM, declared their intention to be bound. Those rules expressly provide for an initial decision by the ICC Court regarding whether a dispute is prima facie arbitrable. If GGM were correct that in every case the question of arbitrability is to be decided by the

arbitrators themselves, this screening process would be pointless and the rule providing for it a nullity. The purpose of the rule is clear. If the ICC Court, a permanent administrative body of the ICC, decides against arbitrability in its entirety, the trouble and expense of convening a panel is obviated. Likewise, if the ICC Court decides against arbitrability as to a particular party, the trouble and expense of involving that party in the construction and composition of a panel, and of addressing the arguments of that party, is obviated. The ICC Court's *negative* decision ends the matter, so far as the ICC is concerned, and returns the matter to the courts. The ICC Court's *positive* decision indicates that the convening of a tribunal (or the participation of an additional party in the process of convening the tribunal and litigating before it) is appropriate. In such a case, however, the decision regarding the ultimate arbitrability of the dispute is provisional: the matter is referred to an arbitral tribunal without prejudice to that tribunal's ultimate decision as to arbitrability. If a negative decision also resulted in the convening of a tribunal and referral of the case to the arbitrators themselves, or in the participation of an additional party against whom there is no prima facie arbitrable dispute, the ICC Court's function under Article 6(2) would be defeated.[4]

---

[4] Although the undesirability of GGM's interpretation is clearest where the ICC Court's decision avoids convening an arbitral panel at all, referring an additional party to an already convened panel likely would hardly be costless. First, of course, there would be costs to the additional party. The parties normally split the costs of arbitration, see ICC Rules, Art. 30, and asking the additional party to split those costs may prove to be a substantial burden on that party. Here, for example, the advance budget for the arbitration between GGM and the three shareholders is $280,000. (See Childs Decl. Ex. 5.) Adding Ayvazian would thus impose significant costs on him, including the legal fees associated with defending against a claim halfway across the world. Requiring the ICC Court to include in the referral an individual as to whom the ICC Court has already decided there is no prima facie arbitrable dispute would be neither efficient nor fair. Second, adding an extra party or parties whose amenability to the arbitration is doubtful would also increase the costs to the co-respondents. For example, the additional party would have a right to influence the composition of the arbitrable tribunal. See

Second, GGM's point somewhat mistakes the nature of the legal rule on which it relies. That the parties have referred the question of arbitrability to the arbitration process speaks to the division of functions between the court and the arbitrating organization, not to the division of functions within that organization. The parties have agreed to refer their dispute, including ultimately the question of arbitrability, to arbitration by the ICC under its particular rules. If those rules call for the ICC Court to make a determination, those rules are to be followed, and that determination respected. GGM cannot use the fact that it has agreed to refer the question of arbitrability to the ICC arbitration process as a device to trump the very rules of that process. No one forced GGM to agree to arbitrate pursuant to the ICC process, and if GGM had preferred another process it could have agreed to arbitrate under that process instead.

Third, GGM's proposed method of resolving the question involves the Court in determining the question of arbitrability no less than does the ICC respondents' proposed method. The ICC Court having initially decided, in the ordinary course of the arbitration process under the ICC Rules, that the dispute between GGM and Ayvazian is not apparently arbitrable, GGM and the ICC respondents *both* agree, and the ICC Rules make explicit, that GGM may next ask the Court to revisit that question. They disagree only about the procedural *mechanism* for

---

ICC Rules, Art. 10(1) ("Where there are multiple parties, whether as Claimant or as Respondent, and where the dispute is to be referred to three arbitrators, . . . the multiple Respondents, jointly, shall nominate an arbitrator for confirmation pursuant to Article 9."). Other co-respondents thus may face a heavy burden if they must compromise with the additional party to find an arbitrator with whom all respondents are mutually satisfied, a burden that appears especially unnecessary if the additional party is likely to be knocked out of the case immediately on a finding that the claim against him is not arbitrable. It therefore appears rational that contracting parties would find it in their interest to have a screening mechanism to protect the integrity of the process of convening a tribunal. Third, allowing a petitioner to defeat the ICC Court's gatekeeper function merely by joining an unarbitrable claim to a potentially viable claim against another party could undermine the integrity and perceived fairness of the arbitral process.

putting the matter before the Court. The ICC respondents seek to have the Court decide whether the dispute should be passed on to the arbitral tribunal via an action to compel arbitration, brought by GGM against Ayvazian. GGM seeks to put the question before the Court by an action for judicial review brought directly against the ICC Court. In either case, the Court will decide in the first instance whether the matter should go to the arbitrators.[5]

While the ICC Rules do not unambiguously resolve the question of how the Court's judgment is to be invoked, neither the text of the rules nor the general principles of arbitration favor GGM's interpretation. While GGM repeatedly asserts that the Rules expressly provide for "judicial review" of the ICC Court's determination (see Pet. Opp. 14, 16), that phrase does not appear in the rule. Article 6(2) provides that the disappointed party "retains the right to ask any court having jurisdiction whether or not there is a binding arbitration agreement." This language does not suggest that the ICC has submitted to "judicial review" in the sense of an appellate proceeding to revise the ICC Court's judgment, still less does it purport to authorize an action against that agency itself.

Under American law, a party that wishes to "ask a court . . . whether or not there is a binding arbitration agreement" (id.) typically sues to compel arbitration by asking a "court

---

[5] GGM suggests that unless an action will lie to enjoin the ICC Court, that body could simply disregard a court's conclusion, in an action against Ayvazian, that a binding arbitration agreement with Ayvazian exists. There is little to fear in this regard. The ICC Rules specifically authorize the party seeking arbitration to put the question to a court if the ICC Court does not find the dispute prima facie arbitrable. Moreover, by arguing to this Court that an action against Ayvazian is the proper method for seeking judicial intervention, the ICC respondents have implicitly represented to the Court that they would abide by the result of such an action and would honor an order compelling arbitration. Whether the ICC respondents could be sued in the event of such an unlikely decision to flout their own rules and a judicial decision they had invited would present a very different question from the issue now before this Court.

having jurisdiction" over the issue to "direct that arbitration be held in accordance with the agreement at any place therein provided for."  9 U.S.C. § 206; see also 9 U.S.C. § 4 (A party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" may petition a court which, "save for such agreement, would have jurisdiction" over the dispute "for an order directing that such arbitration proceed in the manner provided for in such agreement.").  GGM does not cite any precedent for bringing an action to compel arbitration against arbitrators or an arbitral organization.

Similarly, parties seeking "review" of an arbitrator's ultimate decision do not normally sue the arbitrator; instead, they bring an action against the counterparties to the arbitration seeking to confirm or vacate the arbitrators' decision.  See 9 U.S.C. §§ 9-12.  As the Second Circuit mentioned in passing in Shaw, where the ICC Court had determined, pursuant to Rule 6(2), that a petitioner had an arbitrable dispute against one party but not others, an action in federal court involving both that petitioner and those other parties – but not the ICC Court or the ICC – would satisfy Rule 6(2) by allowing the petitioning party "to seek review of the arbitrator's [i.e. the ICC Court's] decision" that the petitioner's dispute against the other parties was not prima facie arbitrable.  Shaw, 322 F.3d at 122 n.3.  Here, therefore, in order to put the question whether a binding arbitration agreement with Ayvazian exists before a court, GGM must bring a motion to compel arbitration against Ayvazian himself, not in injunctive action against the ICC respondents.

General principles undergirding the law of arbitration also counsel against GGM's approach.  The parties devote considerable attention to debating the precise scope of arbitral immunity, debating whether such immunity extends beyond suits for damages to encompass

suits for equitable relief, and whether the equitable relief sought here should be characterized as "retrospective" or "prospective."[6]  But in this case the precise contours of arbitral immunity are less important than the general principle involved.  The Court need not decide whether the ICC respondents are flatly immune from suit, because the principles underlying such immunity are helpful in interpreting the ICC Rules, and lead to the conclusion that the rule permitting a disappointed party seeking arbitration to put the issue to a court should not be read to contemplate an action against the ICC Court itself seeking review of its prima facie decision.

The rationale of arbitral immunity is that such immunity "'is essential to protect the decision-maker from undue influence and protect the decision-making process from reprisals by dissatisfied litigants.'"  Austern v. Chicago Bd. of Options Exch., Inc., 898 F.2d 882, 886 (2d Cir. 1990), quoting Corey v. New York Stock Exch., 691 F.2d 1205, 1211 (6th Cir. 1982); see also Pfannenstiel v. Merrill Lynch, Pierce, Fenner & Smith, 477 F.3d 1155, 1158 (10th Cir. 2007), quoting New England Cleaning Servs., Inc. v. American Arbitration Ass'n, 199 F.3d 542, 545 (1st Cir. 1999).  In order to protect the decision-making process, courts should be wary of "claim[s] [which], regardless of [their] nominal title, effectively seek to challenge [a] decisional act" made during the arbitration process.  Pfannenstiel, 477 F.3d at 1159.

That rationale extends equally to claims against arbitral administrative institutions, when they perform "functions that are integrally related to the arbitral process."  Austern, 898 F.2d at

---

[6] Petitioner claims that arbitral immunity does not necessarily shield an arbitrator from claims for "injunctive relief." (Pet. Opp. 18 & n. 9.)  Respondents argue that although arbitral immunity may not extend to claims for *prospective* injunctive relief, the doctrine nonetheless "applies to claims for retrospective equitable or injunctive relief." (Resp. Reply 5-6.)

886.[7] Nor does that rationale apply only to suits for damages. If administrative institutions such as the ICC or the ICC Court can be required to defend their decisions in the national courts of any country in the world, the expenses of defending such potentially far-flung suits could constrain their judgment, and increase the costs of arbitration procedures, every bit as much as potential liability for damages. The real parties in interest to litigate the question of arbitrability are the parties seeking and resisting arbitration, not the arbitrators or arbitral administrators, whose role is solely to render neutral judgment. Any action to ask this or another court "whether or not there is a binding arbitration agreement" must be brought as a motion to compel arbitration against the party resisting arbitration.

There is thus no basis in law for permitting GGM to maintain the present action.

## CONCLUSION

Accordingly, the ICC respondents' motion to dismiss for failure to state a claim is granted, and the petition is dismissed.

SO ORDERED.

Dated: New York, New York
       February 5, 2008

_____
GERARD E. LYNCH
United States District Judge

---

[7] Once again, GGM's reliance on the fact that, within the ICC arbitration process, the ICC Court functions not as the arbitral tribunal that resolves the dispute, but as an administrative body to facilitate and organize the arbitration (Pet. Opp. 20 n. 11), misses the point. Whether the ICC Court is, within the ICC process, the arbitrator, surely its function within the ICC arbitration process, as defined by the ICC Rules, is as part of the arbitration regime to which the parties have bound themselves. To permit a disappointed party to sue the ICC Court would have exactly the same ill effects as allowing a suit against the arbitrators themselves.